UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-108 (PAM/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|        ) | |
|      Plaintiff,   ) | |
|        ) | **GOVERNMENT'S TRIAL** |
|      v.     ) | **BRIEF** |
|        ) | |
| 2.     TOU THAO,   ) | |
| 3.     J. ALEXANDER KUENG, and   ) | |
| 4.     THOMAS KIERNAN LANE,   ) | |
|        ) | |
|      Defendants.   ) | |

COMES NOW the United States of America, by and through undersigned counsel, and respectfully files this trial brief for the convenience of the Court. This brief contains a summary discussion of the nature of this case, the elements of the offenses charged in the Indictment, and certain evidentiary and legal issues that may arise during trial.

## I.     The Indictment

In May 2021, a federal grand jury returned an Indictment charging Derek Chauvin, Tou Thao, J. Alexander Kueng, and Thomas Kiernan Lane, all former police officers at the Minneapolis Police Department ("MPD"), with violations of 18 U.S.C. § 242. Count One charged Defendant Chauvin with acting under color of law to willfully deprive George Floyd of the right, secured by the United States Constitution, to be free from the unreasonable force of a police officer.[1] Count Two charges Defendants Thao and Kueng with acting under color of law to willfully deprive George Floyd of the right, secured by

---

[1] Defendant Chauvin pleaded guilty to Count One on December 15, 2021.

GOVERNMENT
EXHIBIT

**2**

21-cr-108 (PAM/TNL)

the United States Constitution, to be free from the unreasonable force of a police officer, by failing to intervene to stop Chauvin's use of unreasonable force. Count Three charges all three defendants with acting under color of law to willfully deprive Mr. Floyd of the right, secured by the United States Constitution, to be free from a police officer's deliberate indifference to his serious medical needs, by seeing Mr. Floyd lying on the ground in clear need of medical care, and willfully failing to aid him. The Indictment further alleges that the offenses resulted in bodily injury to and the death of Mr. Floyd.

## II.    Summary of Expected Facts[2]

On May 25, 2020, on-duty Defendant-Officers Kueng and Lane handcuffed and searched Mr. Floyd, who was accused of using a counterfeit $20 bill at a convenience store. As on-duty Officer Chauvin and Defendant-Officer Thao arrived on scene, Kueng attempted to push and Lane attempted to pull Mr. Floyd into a squad car, as Mr. Floyd complained that he was claustrophobic and resisted their efforts. After their attempt to seat Mr. Floyd in the car, Chauvin and Defendants Kueng and Lane maneuvered Mr. Floyd, who was asking to be placed on the ground, out of the vehicle and face-down on the street.

Numerous videos depict the officers' restraint of Mr. Floyd on the ground, including the officers' body-worn camera footage, security camera footage from the convenience store and a neighboring business, recordings taken on several bystanders' cell phones, and video from a "Milestone" camera operated by the city of Minneapolis. The video evidence

---

[2] Any recitations of anticipated testimony and evidence in this trial brief are set forth in summary and in part, and do not purport to encompass all witnesses' statements or evidence that will be offered at trial.

will show that as soon as Mr. Floyd was face-down on the street, Chauvin placed his left knee on the back of Mr. Floyd's neck and his right knee on Mr. Floyd's left arm and upper back, and Kueng placed his right knee on Mr. Floyd's lower torso, holding Mr. Floyd, who remained handcuffed, in the prone position.  Kueng also held Mr. Floyd's left arm down across Mr. Floyd's lower back, and Lane intermittently held down Mr. Floyd's lower legs. Video evidence will show that, less than one minute into the restraint, Mr. Floyd stopped resisting.

Nevertheless, Chauvin did not remove his knees from Mr. Floyd's body for the next 9 minutes and 29 seconds and, at times, shifted the majority of his body weight to his knees. Video evidence will show that Thao stood directly alongside Chauvin and Mr. Floyd for more than 6 minutes of Chauvin's restraint, and then, for the final 3 minutes and 20 seconds of Chauvin's restraint, Thao periodically looked at Chauvin and Mr. Floyd.  Kueng held his knees on Mr. Floyd's body for more than 8 minutes and did not move from his position at Mr. Floyd's back throughout Chauvin's entire restraint.  Lane held Mr. Floyd's lower legs for about 1 and a half minutes, pushed Mr. Floyd's legs to the ground when they seized up approximately 5 minutes into the restraint, and did not move from his position at Mr. Floyd's lower legs throughout Chauvin's entire restraint.

Video evidence will show that although any need for the prone restraint ended shortly after Chauvin and the defendants placed Mr. Floyd on the ground, Chauvin continued to hold his knees on Mr. Floyd throughout the almost 5 minutes that Mr. Floyd pleaded for air 25 times, begged, "Please, somebody help me!" and told the officers, "I'm about to die!"; for almost 5 more minutes after Mr. Floyd spoke his last words, "Please,

3

man, I can't breathe"; for 4 minutes after Lane observed, "I think he's passing out"; for almost 3 minutes after Kueng reported that he could not find a pulse; and for more than 1 minute after paramedics arrived. The three defendants each were in a position to hear that Mr. Floyd had ceased speaking and to see his deteriorating condition. Yet they did nothing to remove Chauvin from Mr. Floyd's back and neck, to move Mr. Floyd onto his side so that he could breathe, or to provide any other basic medical aid.

Instead, each defendant individually ordered away an off-duty Minneapolis firefighter who identified herself as a firefighter and asked if Mr. Floyd had a pulse. Neither Thao nor Kueng said or did anything to try to get Chauvin off of Mr. Floyd. Lane twice asked if the officers should roll Mr. Floyd onto his side. The first time, Chauvin and Kueng individually responded, "No." The second time, no one answered; Lane did not press the point, and did not say or do anything else to try to get Chauvin and Kueng to get off of Mr. Floyd, even after Kueng twice reported that he could not find Mr. Floyd's pulse.

MPD trainers and other officers, and MPD training records, will show that all three defendants were trained that: (1) an officer's use of force is no longer permitted after a subject is under control and has stopped resisting; (2) once an arrestee is in an officer's custody, the arrestee is the officer's responsibility to protect, because the arrestee can no longer help or get help for themselves; (3) it is counter to MPD policy and training, and unnecessary, to apply bodyweight to a prone, handcuffed, and unresisting person's neck; (4) regardless of rank or seniority, an officer who sees a fellow officer using unlawful force has a duty to stop or attempt to stop that officer; (5) the prone position may make it more difficult for a person to breathe; (6) once a prone arrestee is handcuffed and compliant,

officers are to move the arrestee into a side recovery or a seated position to help the arrestee breathe; (7) officers are required to provide emergency medical aid, while awaiting EMS, to an arrestee who needs it; and (8) MPD officers, who are all CPR-trained, are to start CPR immediately if they cannot find a pulse because the more time that passes without CPR, the less likely a person who has lost a pulse is to survive.

None of the defendants said or did anything to render any kind of basic medical aid, despite Mr. Floyd's obvious and gradually deteriorating medical condition, and despite being trained and required to do so. Contrary to their training, they did not place Mr. Floyd in a side recovery position. After Mr. Floyd lost consciousness and then a pulse, the CPR-certified defendants did not render CPR or any kind of basic aid. Instead, Thao ignored bystanders' pleas for him to either check Mr. Floyd's pulse or to tell the other officers to do it. Chauvin, Kueng, and Lane remained silent and took no action to aid Mr. Floyd for the nearly 3 minutes after Kueng announced that he could not find a pulse.

After a paramedic arrived on scene and gestured for Chauvin to get off of Mr. Floyd, Mr. Floyd was loaded into an ambulance, and Lane performed CPR when a paramedic told him to do so—4 minutes and 49 seconds after Kueng had reported he could not find a pulse. Mr. Floyd never regained consciousness or a pulse. Autopsy records, Mr. Floyd's death certificate, and testimony from medical experts will establish that Mr. Floyd's death was a homicide due to "cardiopulmonary arrest complicating law enforcement subdual, restraint, and neck compression," in the setting of heart disease, fentanyl intoxication, and recent methamphetamine use, and that Mr. Floyd's death resulted from the defendants' charged offenses. In laymen's terms, the defendants' continued restraint of Mr. Floyd, their failure

to stop the unlawful restraint, and their failure to provide any basic medical aid to Mr. Floyd resulted in Mr. Floyd's death because their actions and inaction impaired Mr. Floyd's ability to obtain and maintain sufficient oxygen to sustain Mr. Floyd's life.

### III.   Summary of the Law

Counts Two and Three of the Indictment charge the defendants with violating 18 U.S.C. § 242.  The statute reads, in relevant part:

> Whoever, under color of any law . . . willfully subjects any person in any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the [United States] Constitution . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section . . .  shall be fined under this title or imprisoned not more than ten years or both; and if death results from the acts committed in violation of this section . . . shall be fined under this title, or imprisoned for any term of years or for life, or both. . . .

18 U.S.C. § 242.  To establish a violation of § 242, the government must prove beyond a reasonable doubt:

| First: | That the defendant was acting under color of law; |
| --- | --- |
| Second: | That the defendant deprived the victim of a right protected or secured by the United States Constitution; |
| Third: | That the defendant acted willfully; and |
| Fourth: | To establish a felony violation of § 242, that the offense resulted in bodily injury and/or death. |

Each element is discussed in greater detail below.

### 1.  Color of Law

The first element requires that the defendant act under "color of law."  A defendant acts under "color of law" when he exercises power possessed by virtue of state law and

6

made possible only because he is clothed with the authority of state law. *West v. Atkins*, 487 U.S. 42, 49 (1988); *Screws v. United States*, 325 U.S. 91, 107 (1945). The evidence at trial will establish that all three defendants—who were on duty, in uniform, and acting in their capacities as MPD police officers—were acting under color of law.

## 2. Deprivation of Right Secured by Constitution

The second element that the government must prove is that the defendants deprived Mr. Floyd of a right secured and protected by the United States Constitution. The protected rights in Counts Two and Three are discussed separately here.[3]

### a. Count Two (Failure to Intervene)

The source of the right at issue in Count Two is the Fourth Amendment. Just as an officer violates the Fourth Amendment by intentionally using unreasonable force, an officer likewise violates the Fourth Amendment by intentionally failing to stop another officer from using unreasonable force, despite having the opportunity to do so. *See United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd in part on other grounds*, 518 U.S. 81 (1996) ("[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows."). This is because "when the State takes a person into its custody and holds him there against his

---

[3] Many of the cases cited are civil suits under 42 U.S.C. § 1983 because the constitutional rights underlying § 242 and § 1983 suits are identical; to prove a violation of § 242, the government must prove that same constitutional violation, plus willfulness. *See, e.g.*, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 n.13 (1982) (characterizing § 242 as the "criminal counterpart" of § 1983); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 613 (8th Cir. 1980) ("[W]illful deprivations of constitutional rights under color of state law are punishable under [§] 242, the criminal analog of [§] 1983.").

will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety"; in other words, an "affirmative duty to protect arises." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see also United States v. Serrata*, 425 F.3d 886, 896 (10th Cir. 2005) (affirming officer's conviction for failure to intervene to stop unreasonable force); *United States v. Reese*, 2 F.3d 870, 887-90 (9th Cir. 1993) (same).

To prove that Thao and Kueng violated Mr. Floyd's Fourth Amendment rights by failing to intervene, the government must prove (1) that Chauvin used objectively unreasonable force against Mr. Floyd; (2) that the defendant observed or had reason to know that unreasonable force was being used; (3) that the defendant had the opportunity and means to intervene to stop the unreasonable force; and (4) that the defendant failed to take reasonable steps to do so. *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). Each officer present has an independent duty to intervene. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) ("The number of officers present and able to intervene . . . in no way correlates with any one officer's duty to intercede. Each police officer present has an independent duty to act."). An officer has a constitutional duty to intervene regardless of rank or seniority. *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).

Body-worn camera and surveillance video, bystander cell-phone recordings, bystander testimony, and testimony from MPD trainers and other officers will establish that both Thao and Kueng observed and had reason to know that Chauvin was using unreasonable force. Thao stood alongside Chauvin and Mr. Floyd for the first more than 6 minutes of Chauvin's restraint. For the final 3 minutes and 20 seconds of Chauvin's

restraint, bystanders directed pleas— *e.g.*, "Check a pulse, Thao"; "Do they have a pulse? . . . Right now, tell them to check for one"; "Thao . . . you gonna let him kill that man in front of you?"—directly to Thao. For his part, Kueng was positioned directly next to Chauvin on Mr. Floyd, could see and feel that Mr. Floyd was no longer resisting, and could see (and hear from the bystanders) that Chauvin held his knees on Mr. Floyd after Mr. Floyd stopped talking, stopped moving, and lost consciousness, and for almost 3 minutes after Kueng himself reported that he could not find a pulse.

The above evidence will also establish that both officers had the opportunity and means to intervene and failed to take reasonable steps—indeed, any steps—to do so. Thao was standing within feet of Chauvin and Mr. Floyd and can be seen looking at them consistently for 6 minutes and intermittently thereafter; Kueng knelt next to Chauvin and had his knees and a hand on Mr. Floyd. "[A] few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification" for force. *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134-35 (8th Cir. 2020). Thao and Kueng were not forced to make a split-second decision; they had more than 8 minutes (480 seconds) after Mr. Floyd stopped resisting on the ground, during which time Mr. Floyd gradually stopped talking, stopped moving, lost consciousness, and lost a pulse. Throughout these more than 8 minutes, Thao and Kueng did not do or say *anything* to ask, direct, or attempt to get Chauvin off of Mr. Floyd. To the contrary, at the same time that Chauvin rebuffed Lane's question as to whether Mr. Floyd should be rolled on his side, Kueng rebuffed it as well, saying: "No, just leave him." Kueng himself held his knees on Mr. Floyd for more than 8 minutes, including after Kueng could not find a pulse.

b. <u>Count Three (Deliberate Indifference)</u>

The source of the right at issue in Count Three is the Fourteenth Amendment right not to be deprived of liberty without due process of law, which includes the right of an arrestee to be free from deliberately indifferent delays or denials of emergency medical care by officers.[4] *See Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016) ("[I]t [is] clearly established . . . that a pretrial detainee (or an arrestee) has a right to be free from deliberately indifferent denials of emergency medical care.") (citations omitted).[5] The same underlying principle animates failure to intervene and deliberate indifference charges: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200.

To prove that Thao, Kueng, and Lane violated Mr. Floyd's Fourteenth Amendment rights, the government must prove (1) that Mr. Floyd had an objectively serious medical need, which, when unaddressed, exposed him to a substantial risk of serious harm; (2) that

---

[4] Although the source of this right is the Fourteenth Amendment, the Eighth Circuit applies the Eighth Amendment deliberate indifference standard to analyze it. *See, e.g.*, *Barton v. Taber*, 820 F.3d 958, 966-67 & n.3 (8th Cir. 2016); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).

[5] *See also, e.g.*, *United States v. Hickman*, 766 F. App'x 240, 251 (6th Cir. 2019) (affirming officers' sentences for their deliberate-indifference convictions under 18 U.S.C. § 242); *United States v. Pendergrass*, No. 15-1965, 648 F. App'x 29 (2d Cir. 2016) (affirming officer's conviction under § 242 for deliberate indifference); *United States v. Gray*, 692 F.3d 514, 523 (6th Cir. 2012) (same); *United States v. Gonzales*, 436 F.3d 560, 573-75 (5th Cir. 2006) (same).

the defendant actually knew that Mr. Floyd had a serious medical need; and (3) that the defendant disregarded that medical need by failing to take reasonable measures to address it. *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016). "An objectively serious medical need" includes one that "is so obvious that even a layperson would easily recognize" it. *Jones v. Minn. Dep't. of Corr*., 512 F.3d 478, 481 (8th Cir. 2008) (internal quotation marks omitted). "We determine whether an objectively serious medical need exists based on the attendant circumstances, irrespective of what the officer believes the cause to be." *Barton*, 820 F.3d at 965. "[A] factfinder may conclude that a[n officer] knew of a substantial risk [of serious harm] from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Body-worn camera footage, bystander cell-phone recordings, and bystander testimony will establish that Mr. Floyd had an objectively serious medical need that was so obvious that a layperson would recognize it. The video evidence and testimony will show that a chorus of laypeople—ranging in age from 9 years old to 61 years old— did recognize it and that they pleaded for Chauvin to get off of Mr. Floyd and for officers to check Mr. Floyd's pulse because it appeared that Mr. Floyd was struggling to breathe and then was not moving, not breathing, and not responsive.

The above evidence, as well as testimony from MPD trainers and other officers, will also establish that all three defendants actually knew that Mr. Floyd had a serious medical need. The evidence includes the defendants' medical training, detailed above, pp. 4-5; what they observed and heard from Mr. Floyd, who, before he lost consciousness, told Thao in particular (in response to Thao's question, "What are you on?"), "I can't breathe –

11

please, the knee on my neck!"; what they heard from bystanders, who alerted the defendants that Mr. Floyd had stopped talking, that he lost consciousness, and that he appeared unresponsive, and who pleaded for Thao to check for a pulse; and what Kueng and Lane heard from each other, including Lane's observation that Mr. Floyd was "passing out" and Kueng's repeated statements that he could not find a pulse.

The same evidence will also establish that all three defendants disregarded Mr. Floyd's objectively serious medical need by willfully failing to take reasonable measures to address it. The defendants kept Mr. Floyd in a position—face-down on pavement, handcuffed behind his back, with body weight on top of him—that they knew from their training compromised his breathing.[6] Each of the defendants ordered away the off-duty firefighter who asked to assist and begged them to check for a pulse. None of the defendants rolled Mr. Floyd into a side recovery or a seated position as they were trained to do immediately after a prone arrestee is handcuffed and compliant, let alone passed out and unresponsive. When Lane asked a second time, "Should we roll him on his side?"[7] none of the officers responded; Lane said nothing more and took no action. None of the defendants started or directed CPR at any time when Mr. Floyd was on the ground,

---

[6] *Cf. Estate of Booker v. Gomez*, 745 F.3d 405, 432 (10th Cir. 2014) ("A brief delay in care is particularly problematic when, as here, the Defendants were responsible for placing [a person] in his vulnerable state and engaged in activity that could produce foreseeable, rapid, and deadly consequences.").

[7] *Cf. Jones v. City of Cincinnati*, 507 F. App'x 463, 469 (6th Cir. 2012) ("We also assume that all six officers (1) were aware or could infer that Jones was at risk for positional asphyxia and (2) inferred that Jones was at risk by 6:02:32 a.m. when Officer Slade first asked, 'How 'bout we roll him?'").

although all were CPR certified and required to provide CPR immediately if they could not find a pulse.  Instead, Thao ignored bystanders' pleas that Mr. Floyd was unresponsive, and Kueng and Lane sat in silence for almost 3 minutes after Kueng twice checked for a pulse and twice said that he could not find one.  They remained that way until paramedics arrived.[8]

### 3. Willfulness

Section 242 requires proof that the defendant committed his acts or omissions with a bad purpose or improper motive to disobey or disregard the law, specifically intending to do what the law forbids or to fail to do what the law requires.  *See Screws v. United States*, 325 U.S. 91, 106 (1945).  The government need not prove that the defendant was "thinking in constitutional terms."  *Id.*  The requisite purpose to deprive someone of a plainly established constitutional right may be inferred from blatantly wrongful conduct that in fact causes such a deprivation.  *Id*.  In determining whether an act is willful, a jury may consider "all the attendant circumstances."  *Id*. at 107.

As to Count Two, the government intends to present testimony of MPD trainers, who will describe the training the officers received, along with some of the actual training materials and textbooks.  This evidence, along with the video evidence, will establish that Thao and Kueng acted willfully by intentionally failing to intervene to protect Mr. Floyd

---

[8] *Cf. McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (noting that "[a]n officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference," and denying qualified immunity where defendant-officer "made no attempt to resuscitate" prisoner who was not breathing and instead stood "over [him] and sh[ook] him for seven minutes before paramedics arrive[d]").

from unreasonable force. *Cf. United States v. Reese*, 2 F.3d 870, 890 (9th Cir. 1993). The same evidence that supports their knowledge that Chauvin was using unreasonable force for more than 8 minutes as Mr. Floyd's condition gradually deteriorated also supports that their failure to intervene was willful. The government anticipates that law enforcement witnesses will testify that the duty to intervene is a foundational principle of policing that permeates many aspects of training and practice. Additionally, the defendants knew that they were required to intervene because they were trained on MPD's duty-to-intervene policy that required them to do so.

As to Count Three, the video and training evidence will establish that Thao, Kueng, and Lane acted willfully by intentionally failing to aid Mr. Floyd, knowing that Mr. Floyd had an objectively serious medical need. *Cf. United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006). The same evidence that supports their knowledge that Mr. Floyd had a serious medical need also supports that their failure to aid Mr. Floyd was willful. "[T]he obvious inadequacy of a response to a risk may support an inference that the officer recognized the inappropriateness of his conduct." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009). The evidence will show that all three defendants were aware that Mr. Floyd pleaded for air, stopped talking, stopped moving, and lost consciousness, and Kueng and Lane were aware that Mr. Floyd lost a pulse. None of the defendants provided any kind of basic medical aid, such as simply moving Mr. Floyd onto his side or, later, providing CPR to Mr. Floyd, despite the fact that they were trained and required to do so.

14

### 4. Bodily Injury and/or Death Resulting

Finally, for a felony violation of Section 242, the government must prove that bodily injury and/or death "result[ed] from" the offense. 18 U.S.C. § 242. Bodily injury[9] or death "results from" a defendant's conduct where, but for the defendant's conduct, it would not have happened. *See Burrage v. United States*, 571 U.S. 204, 211, 216 (2014). The government does not need to prove that a defendant *intended* for Mr. Floyd to suffer injury or to die. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Nor does the government need to prove that a defendant's conduct was the *only* cause. Rather, conduct is a but-for cause of bodily injury or death if it played an indispensable, even if "incremental," role in causing the injury or death — "if, so to speak, it was the straw that broke the camel's back." *Burrage*, 571 U.S. at 211; *see also Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (explaining that "[o]ften, events have multiple but-for causes," and thus "a defendant cannot avoid liability just by citing some *other* factor").

The autopsy records, death certificate, and testimony from medical experts and providers will establish that Chauvin's unreasonable force resulted in Mr. Floyd's bodily injury and death, as is required for Count Two.[10] The same evidence will also establish

---

[9] Bodily injury is defined as "any. . . injury to the body, no matter how temporary," including "a cut, abrasion, bruise," or just "physical pain." *See, e.g.*, *United States v. DiSantis*, 565 F.3d 354, 362 (7th Cir. 2009); *United States v. Perkins*, 470 F.3d 150, 161 (4th Cir. 2006); *Gonzalez*, 436 F.3d 560, 575 (5th Cir 2006); *United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir. 1992) (quoting 18 U.S.C. §§ 831(f)(4), 1365(g)(4), 1515(a)(5), 1864(d)(2)).

[10] For Count Two, the government must prove that Chauvin's unreasonable force—not a defendant's failure to intervene to stop that unreasonable force—resulted in Mr. Floyd's

that the defendants' deliberate indifference to Mr. Floyd's serious medical needs resulted in his bodily injury and death, as is required for Count Three. Medical experts will opine, based on the video evidence, autopsy report, and other medical records, that the primary cause of Mr. Floyd's death was that the officers' unlawful restraint prevented Mr. Floyd from maintaining a sufficient level of oxygen to live.

## IV.    Summary of Anticipated Witnesses

The government plans to call witnesses that, generally, fall into three categories: bystander witnesses; law enforcement and training witnesses; and medical expert and provider witnesses.

First, the government will call some, but not all, of the bystanders present during the event. Their testimony regarding what they observed is relevant to establish that Mr. Floyd had "an objectively serious medical need [that was] so obvious that even a layperson would easily recognize" it. *Jones*, 512 F.3d at 481. The testimony is also relevant to establish the defendants' knowledge both that Mr. Floyd had an objectively serious medical need and that continued force was no longer reasonable or lawful, because the bystanders called out to the defendants that Mr. Floyd had stopped talking, stopped moving, appeared unconscious, appeared unresponsive, and needed his pulse checked. The government anticipates that the defense will argue that video evidence fails to show the full picture of

---

bodily injury and/or death. *See Koon*, 34 F.3d at 1447 n.25 ("In these cases, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows.").

what happened at the scene. Testimony from bystander witnesses will provide context not provided by the videos alone.

Second, the government will call law enforcement witnesses and trainers to establish the defendants' willfulness: the defendants knew that failing to intervene, or failing to provide medical aid, was wrong, but they failed to do it anyway. The defense has indicated that a main defense will be that Kueng and Lane were "rookies" and thus did not have sufficient training to commit their acts and omissions willfully. To establish willfulness, the government must put on multiple law enforcement witnesses; such evidence is not a "needless" presentation of "cumulative evidence," Fed. R. Evid. 403, because it is material to willfulness and the witnesses will be speaking to different training phases and sources. *Cf.* 1 Fed. Evid. § 4:15 (3d ed.) ("When proof offered on a point is different in character or persuasive impact from other proof, the former is not merely cumulative of the latter.").

Both Kueng and Lane underwent extensive "Skills" training in order to receive their Peace Officer Standards and Training (POST) license; then they were trained at the 4- to 5-month long MPD Academy in order to be sworn in as police officers in December 2019; and then they underwent approximately 5 months of the MPD Field Training program, all of which they successfully completed. Lane had also received robust training in his prior employment at the Hennepin County Juvenile Detention Center. For his part, Thao—who had gone through all of the above training phases—also received annual MPD in-service refresher training on the topics that were more recently taught to Kueng and Lane in the Academy and Field Service training programs.

Law enforcement witnesses who plan or participate in training at the Minnesota POST Board, the MPD Academy, and MPD in-service program, will establish that all three defendants were taught that a prone and compliant arrestee should be placed on their side, as a matter of course, to help them breathe; that they were required to intervene to try to stop another officer who was using unreasonable force, even if that officer was a more senior officer of the same rank; and that they were required to provide basic medical aid, including placing an arrestee on their side and providing CPR, while awaiting EMS. Law enforcement witnesses will also opine that all three defendants' conduct was inconsistent with this training. These basic topics were drilled into the defendants at every phase of their extensive training. Conveying this point to the jury is essential to demonstrating willfulness.

Third, the government will call medical witnesses—both those who played a role in attempts to save Mr. Floyd's life or in his autopsy, as well as expert witnesses—to establish but-for causation. Medical experts will testify that Mr. Floyd died due to low oxygen from the restraint, and that coronary artery disease and drug intoxication, which were noted as contributing causes on his death certificate, were not the primary causes of his death. In particular, to establish but-for causation, the government anticipates calling a paramedic, an EMT, and an ER physician who treated Mr. Floyd on May 25, 2020, and will testify regarding Mr. Floyd's medical condition that night. The government will also call medical experts who will testify as to how and why Mr. Floyd's coronary artery disease was not the primary cause of his death; how and why Mr. Floyd's substance use was not the primary cause of his death; how and why, had Mr. Floyd been placed in the side recovery position

before he was rendered unconscious, Mr. Floyd's body would have regained a sufficient level of oxygen and would not have died; and how and why, once it was determined Mr. Floyd did not have a pulse, Mr. Floyd's chances at resuscitation would have significantly improved had the officers performed CPR when Mr. Floyd lay on the ground.

## V.   Anticipated Evidentiary and Legal Issues

### A. Defendants Kueng and Lane's Out-of-Court Statements

During its case-in-chief, the government may offer into evidence, pursuant to Rule 801(d)(2) (which provides that a defendant's statement is not hearsay if offered by the prosecution), relevant portions of video-recorded statements by Kueng and Lane to supervisory officers, and statements by Lane to a paramedic, who responded to the May 25, 2020, scene. *See United States v. Lomas*, 826 F.3d 1097, 1105 (8th Cir. 2016). A defendant's out-of-court statement is inadmissible hearsay when offered by the defense. *United States v. Kerley*, 784 F.3d 327, 342 (6th Cir. 2015). The rule of completeness comes into play only if a party offers an excerpt that gives a misleading impression; it does not automatically require the admission of a statement in its entirety. *United States v. Aungie*, 4 F.4th 638, 646-47 (8th Cir. 2021).

Similarly, Rule 801(d)(2) does not permit the defense to admit, through an expert witness, a defendant's own statement. Defendants Kueng and Lane's expert witnesses have written reports that refer to the defendants' statements. Allowing defense counsel to offer into evidence a defendant's own statements through another witness would allow the defendant to "effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand

19

scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) ("Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses.").

### B. Opinions Regarding Ultimate Legal Issues

No witness may opine on the reasonableness of a use of force or whether an officer acted willfully because these are impermissible legal conclusions that invade the province of the jury. *See, e.g.*, *Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). Likewise, no witness may opine as to whether a defendant committed acts or omissions willfully. Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged. . . . Those matters are for the trier of fact alone.").

However, witnesses may offer opinions regarding specific "factual building blocks" that support ultimate legal conclusions. *United States v. Keys*, 747 F. App'x 198, 209 (5th Cir. 2018) (noting that Rules 701 and 704 permit a witness to offer "opinion[s] regarding specific factual building blocks" supporting an ultimate legal conclusion, as well as "analysis of facts which would tend to support a jury finding on the ultimate issue"). In particular, experts may offer opinions as to whether a defendant's conduct was consistent or inconsistent with MPD policy and training. *See, e.g.*, *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) (explaining that an expert "can testify to his opinion about whether a certain action by [a defendant-officer] in a certain circumstance, assuming that those are the facts, would be consistent with police practices"). And officers may offer lay

20

testimony about their training under Rule 701 based on their particularized knowledge by virtue of their experience within the field. *See, e.g.*, *Abdullahi v. Ungurian*, No. 04-cv-4524, 2006 WL 145076, at *1 (D. Minn. Jan. 18, 2006) (Magnuson, J.) (denying plaintiff's motion in limine seeking to preclude a sergeant from testifying as a lay witness "about K-9 training and proper use procedure"; rejecting plaintiff's argument that, because the sergeant was not present for the incident, his testimony would be that of an expert witness; and concluding that the sergeant's "personal knowledge or perceptions based on his experience as a K-9 trainer provide sufficient foundation for lay opinion testimony").

### C. Evidence of the Defendants' Training

Evidence of a defendant's training is relevant and admissible to establish whether the defendant acted "willfully." *United States v. Proano*, 912 F.3d 431, 442 (7th Cir. 2019) (collecting cases and reasoning that, "[i]f, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully"). Training evidence may only be used for the limited purpose of proving willfulness; it may never be used as evidence that a defendant violated the victim's constitutional rights. *See, e.g.*, *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1994) (noting that "[c]onduct by a government official that violates some state statutory or administrative provision is not necessarily constitutionally unreasonable," and "police department guidelines do not create a constitutional right"). Thus, courts recommend issuing a cautionary limiting instruction. *See Proano*, 912 F.3d at 440-41; *Rodella*, 804 F.3d at 1338; *United States v. Palkowitsch*, No. 19-cr-13, Dkt. No. 104 (D. Minn. Nov. 26, 2019)

21

(instructing jury that it may consider training evidence "only on the question of whether the Defendant acted willfully [and not] for any other purpose").

### D. Evidence of Victim's Alleged Bad Character, Criminal History, or Bad Acts

Should the defense seek to introduce evidence of the victim's alleged bad character, criminal history, or bad acts, the government will object on the grounds that such evidence should not be admitted because:

(1) The victim will not be a witness at trial, and therefore his credibility may not be attacked, *see* Fed. R. Evid. 404(a)(2), 608(a); *see also Old Chief v. United States*, 519 U.S. 172, 176 n.2 (1997) (explaining that prior convictions may not be admitted for impeachment if subject does not testify); *United States v. Beeks*, 224 F.3d 741, 746 n.3 (8th Cir. 2000) (same);

(2) Such evidence would not go to relevant proof of the victim's motive, intent, plan, knowledge and/or absence of mistake or accident, *see* Fed. R. Evid. 404(b), because the victim's motive, opportunity, intent, etc., are irrelevant; and

(3) The prejudicial nature of the evidence outweighs the probative value because there is no evidence the defendants knew of any alleged prior bad acts or criminal history, and such irrelevant evidence would unnecessarily prolong the trial and encourage the jury to decide the case on an improper basis (*e.g.*, based on their personal feelings about the victim's alleged prior history or bad acts, which are irrelevant here), *see* Fed. R. Evid. 403.

### E. Present Sense Impressions and Excited Utterances

The government may offer, as substantive evidence under the present-sense-impression exception to the hearsay rule, Fed. R. Evid. 803(1), a recording of a call made from a dispatcher to an MPD sergeant during the incident in which she relates to the sergeant what she sees the defendants doing as she watches city surveillance cameras.

The government may also offer, as substantive evidence under the present sense-impression and excited-utterance exceptions to the hearsay rule, Fed. R. Evid. 803(1) and

803(2), recordings of two bystander 911 calls made moments after Mr. Floyd was loaded into the ambulance: one in which off-duty firefighter G.H. reported in a shaky voice that she had just watched "police officers not take a pulse and not do anything to save a man;" and one in which bystander D.W. reported in a distressed voice that Chauvin "had his knee on the dude's neck the whole time."

The government respectfully submits that the three calls containing nontestimonial statements are admissible under Rule 803(1), which provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(1); *see also United States v. Dean*, 823 F.3d 422, 427-28 (8th Cir. 2016) (noting that 911 calls that are placed with "sufficient contemporaneity" are admissible under the present-sense-impression hearsay exception). The dispatcher's call was made during the incident; the bystander 911 calls, mere moments after.

Likewise, the two bystander 911 calls are also admissible under Rule 803(2), which provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(2); *see also United States v. Robertson*, 948 F.3d 912, 916 (8th Cir. 2020) ("We have held that 911 calls are admissible as nontestimonial statements when they are 'excited utterances.'"); *United States v. Brun*, 416 F.3d 703, 707 (8th Cir. 2005) (quoting "persuasive[] conclusion" that "statements made during [a] 911 call, moments after the criminal offense and under the stress of that event, are not 'testimonial.'"). The audible distress in the bystanders' voices, and their visible distress

23

captured on body-worn camera at around the same time as the calls, demonstrate that their condition was such that their statements were "emotional and spontaneous rather than deliberate and calculated." *Brun*, 416 F.3d at 707.

## F. References to Possible Punishment or Adverse Outcomes

It is well-settled law that it is improper for either the defense or the prosecution to comment on or argue a defendant's possible punishment in the presence of the jury. *See, e.g.*, *Feguer v. United States*, 302 F.2d 214, 252-253 (8th Cir. 1962) ("The argument of counsel, generally speaking, should be confined to the evidence that has been produced and to such inferences as may reasonably be drawn therefrom."); *United States v. Mayer*, No. 19-cr-96, 2021 WL 2434121, at *7 (D. Minn. June 15, 2021) (granting government's unopposed motion to preclude defense references to potential punishment). Defendants should not be permitted to comment on or elicit testimony regarding sentencing or potential penalties, including any reference to any advisory sentencing guidelines ranges. The jury should be instructed that punishment, if any, is solely the province of the Court.

## G. References to Prior Commendations or Good Acts

Character evidence must relate to a pertinent trait and must be in the form of opinion or reputation testimony. *See* Fed. R. Evid. 404(a) (character evidence must relate to a defendant's pertinent trait); Fed. R. Evid. 405(a) (character evidence, where admissible, "may be proved by testimony about the person's reputation or by testimony in the form of an opinion"). The defendants should not be permitted to offer testimony or evidence of instances of conduct offered to establish a defendant's character as a good person or a good police officer, such as awards, commendations, positive performance evaluations, or good

deeds, *see, e.g.*, Dkt. No. 146 (Defendant Lane's motion[11] to admit evidence that in January 2020 he assisted "a homeless Black individual in a wheelchair"), because such evidence is not relevant to a defendant's pertinent trait and, even if it were, it does not take the form of opinion or reputation testimony. *See United States v. Navedo-Ramirez*, 781 F.3d 563, 569 (1st Cir. 2015) (collecting cases).

### H. Exception to Exclusion of Witness

Consistent with district practice, FBI case agent Blake Hostetter will be at counsel table during trial. *See* Fed. R. Evid. 615, Advisory Comm. Notes. The government requests permission also to have expert witnesses present in the courtroom during trial, or to be permitted to summarize for the expert witnesses the testimony of other witnesses. *See id.* ("The category [of exclusion exceptions] contemplates such persons as . . . an expert needed to advise counsel in the management of the litigation."). The government has conferred with defense counsel for Thao, Kueng, and Lane, who agreed with this request. The government asks that all other witnesses be sequestered.

### I. Stipulations

The government has conferred with defense counsel for Thao, Kueng, and Lane, and the parties' stipulations are as follows:

(1) The parties agreed not to introduce evidence of events post-May 25, 2020, such as the ongoing civil pattern or practice investigation, civil settlement, training or policy changes, and Chauvin's federal guilty plea or state conviction, without first raising it with all parties and giving the parties an opportunity to address it with the Court.

---

[11] The government will address Defendant Lane's motion to admit evidence more specifically in a separate response.

(2) The parties agreed to refer to testimony from Derek Chauvin's state trial as testimony from a prior "hearing," "matter," "proceeding," etc.

(3) The parties have met and conferred (either by phone or in person) on multiple occasions in an effort to streamline trial presentment by way of joint stipulation to multiple exhibits. For example, on December 27, 2021 the parties addressed the pre-admission of several original recordings and came to a general agreement regarding various materials. The parties are also presently addressing various documentary materials, all with the hope of achieving a signed stipulation in advance of trial.

## VI.  **Conclusion**

The government submits this Trial Brief for the assistance of the Court in the above-captioned case.

Dated: January 6, 2022                                Respectfully submitted,


CHARLES J. KOVATS, JR.                        KRISTEN CLARKE
Acting United States Attorney                  Assistant Attorney General
                                                              Civil Rights Division

*/s/ Manda M. Sertich*
BY:  MANDA M. SERTICH                        */s/ Samantha Trepel*
Assistant U.S. Attorney                          BY:  SAMANTHA TREPEL
Attorney ID No. 4289039 NY                    Special Litigation Counsel
                                                              Attorney ID No. 992377 DC