1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

3
              ------------------------------------------------------------
                                       )

United States of America,  )  File No. 21-cr-108

4
                                    )             (PAM/TNL)

        Plaintiff,         )

5
                                      )

v.                          )

6
                                      )

Tou Thao(2),             )  Courtroom 7D

7
J. Alexander Kueng(3), and  )  St. Paul, Minnesota

Thomas Kiernan Lane(4),    )  Wednesday, January 26, 2022

8
                                      )  9:28 a.m.

        Defendants.       )

9
                                         )
              ------------------------------------------------------------

10

11

12
BEFORE THE HONORABLE PAUL A. MAGNUSON
UNITED STATES DISTRICT COURT SENIOR JUDGE

13

**(JURY TRIAL PROCEEDINGS - VOLUME V)**

14

15

16

17

18

19

20

21

22

23

24

25
    Proceedings recorded by mechanical stenography;
transcript produced by computer.

RENEE A. ROGGE, RMR-CRR
(612)664-5107

```
 1     APPEARANCES:

 2       For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                 BY:  ALLEN A. SLAUGHTER, JR.
 3                                    LEEANN K. BELL
                                      MANDA M. SERTICH
 4                               300 South 4th Street, #600
                                 Minneapolis, MN 55415
 5
                                 DEPARTMENT OF JUSTICE
 6                               CIVIL RIGHTS DIVISION
                                 BY:  SAMANTHA TREPEL
 7                               150 M Street NE
                                 Washington, D.C. 20530
 8
         For Defendant           ROBERT M. PAULE, PA
 9       Tou Thao:               BY:  ROBERT M. PAULE
                                 920 2nd Avenue South, #975
10                               Minneapolis, MN 55402

11                               PAULE LAW PLLC
                                 BY:  NATALIE PAULE
12                               5100 West 36th Street
                                 P.O. Box 16589
13                               Minneapolis, MN 55416

14       For Defendant           LAW OFFICE OF THOMAS C. PLUNKETT
         J. Alexander Kueng:     BY:  THOMAS C. PLUNKETT
15                               101 East 5th Street, #1500
                                 St. Paul, MN 55101
16
         For Defendant           EARL GRAY DEFENSE
17       Thomas Kiernan Lane:    BY:  EARL P. GRAY
                                 332 Minnesota Street, #W1610
18                               St Paul, MN 55101

19       Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                 United States District Courthouse
20                               300 South 4th Street, Box 1005
                                 Minneapolis, MN 55415
21

22

23

24

25
```

1                                                 __I N D E X__

2                                                                                                 PAGE

3              **DEREK SMITH**
                    Direct Examination by Ms. Sertich                    588
4                   Cross-Examination by Mr. Gray                         607
                    Cross-Examination by Mr. Robert Paule                 616
5                   Cross-Examination by Mr. Plunkett                     646
                    Redirect Examination by Ms. Sertich                   649
6                   Recross-Examination by Mr. Gray                       659
                    Recross-Examination by Mr. Robert Paule               659
7                   Further Redirect Examination by Ms. Sertich           661

8              **JEREMY NORTON**
                    Direct Examination by Ms. Sertich                     662
9                   Cross-Examination by Mr. Gray                         700
                    Cross-Examination by Mr. Robert Paule                 701
10                  Cross-Examination by Mr. Plunkett                     712
                    Further Cross-Examination by Mr. Gray                 718
11
               **GENEVIEVE HANSEN**
12                  Direct Examination by Ms. Sertich                     722
                    Cross-Examination by Mr. Gray                         755
13                  Cross-Examination by Mr. Plunkett                     757
                    Cross-Examination by Mr. Robert Paule                 760
14                  Redirect Examination by Ms. Sertich                   770
                    Recross-Examination by Mr. Plunkett                   772
15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                       **IN OPEN COURT**

3                      **(JURY NOT PRESENT)**

4          (Defendants present)

5                    THE COURT:  Good morning, everyone.

6                    Mr. Paule, you've got something you wanted to

7      bring to our attention?

8                    MR. ROBERT PAULE:  Yes, Your Honor, two matters.

9                    One is first I would just like to note that I

10     would request an exception from the sequestration order with

11     regard to my client's wife.  She has watched some of the

12     testimony.  I have her listed on my witness list as a

13     potential character witness.  She would be doing nothing

14     that would be fact related, so I would ask for an exception

15     as to that.

16                   THE COURT:  Same exception is granted.

17                   MR. ROBERT PAULE:  Thank you.

18                   MS. BELL:  Your Honor, can we make a record on

19     that, please?

20                   THE COURT:  No.  You objected.

21                   MR. ROBERT PAULE:  Thank you.

22                   The second thing I would just like to put on the

23     record is that I would note yesterday during both the fact

24     witnesses who testified, both Chris Martin and Charles

25     McMillian were asked questions that elicited an emotional

1    response.

2          It's my perspective that that is in violation of

3    our motion in limine that was granted by the court and has

4    happened on two occasions.  Both times, if memory serves,

5    the court sustained the objection and struck the questions

6    from the record.  But at least from my perspective, I'm

7    starting to see a pattern develop.

8          Thank you.

9          THE COURT:  Well, I'm going to deny that, counsel.

10   I think that if there was any emotional response, it

11   diffused very, very quickly, and so I don't think that is

12   applicable.

13         Okay.  Anything else?

14         MS. BELL:  Judge, one additional item.

15         THE COURT:  Take your mask off because I just

16   can't understand you.

17         MS. BELL:  I'm sorry, judge.  I'll get closer to

18   the microphone also.

19         Government's Exhibit 5 is the body camera for

20   Officer Lane.  In the format that we admitted it, there is a

21   portion of that exhibit when Mr. Floyd is in the ambulance

22   being cared for by the paramedics.  During that time they

23   cut off his clothing.  And the government did not anticipate

24   playing the portion of that video in public here where the

25   clothing was not fully covering.

```
 1              And so Mr. Gray has indicated that he wants to

 2      play that portion in public and so we have substituted, with

 3      consent of defense counsel, Government's Exhibit 5 for a

 4      version that has blurred the pertinent area on the original

 5      exhibit.  And we would ask the court's permission to

 6      substitute the Exhibit 5 that was admitted for the copy that

 7      has the blurring.

 8              THE COURT:  Okay.  I'll grant that request.

 9              MS. BELL:  Thank you, Your Honor.

10              THE COURT:  I actually had viewed that exhibit and

11      I didn't really see what you are suggesting, but that's

12      fine.  Rather than take a chance on --

13              MS. BELL:  That's right.

14              THE COURT:  -- let's go with your version here

15      now, the blurred version.

16              Okay.  Anything else before we get our jury?  With

17      that, we will call for the jury.

18      (9:33 a.m.)

19                          IN OPEN COURT

20                          (JURY PRESENT)

21              THE COURT:  You may be seated.

22              Good morning, members of the jury, and welcome

23      back.

24              Do you want to call your next witness, please.

25              MS. SERTICH:  Thank you, Your Honor.  The
```

1   government calls Derek Smith.

2           THE COURT:  Mr. Smith, if you'd stop there and

3   raise your right hand, please.

4                           DEREK SMITH,

5   called on behalf of the government, was duly sworn, was

6   examined and testified as follows:

7           THE COURT:  If you'd take the stand, please.

8   Remove your mask and slide up close to the microphone so you

9   can be heard.

10          THE WITNESS:  All right.

11          THE COURT:  And, with that, if you'd state your

12  name and particularly how do you spell Derek.

13          THE WITNESS:  My name is Derek Smith, D-E-R-E-K,

14  Smith traditional spelling.

15          THE COURT:  Okay.  Proceed, counsel.

16          MS. SERTICH:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18  BY MS. SERTICH:

19  Q.  And good morning, Mr. Smith.  Where are you employed?

20  A.  Hennepin Healthcare, HCMC, whatever you want to call it.

21  Q.  What is your job at HCMC?

22  A.  Paramedic.

23  Q.  And in Minneapolis, is a paramedic someone who performs

24  emergency care and lifesaving aid in response to calls

25  throughout the city?

1    A.  Yes.

2    Q.  How long have you been a paramedic with Hennepin EMS?

3    A.  Going on five years.

4    Q.  Have you worked anywhere else as a paramedic?

5    A.  I did a training program in Georgia, [indiscernible]

6    County.

7              COURT REPORTER:  What county?

8              THE WITNESS:  Gwinnett County, Georgia.

9    BY MS. SERTICH:

10   Q.  Do you recall receiving a dispatch call to Cup Foods the

11   evening of May 25th, 2020?

12   A.  Yes.

13   Q.  Where were you when you got that call?

14   A.  HCMC.

15   Q.  Is that in downtown Minneapolis?

16   A.  Yes.

17   Q.  Do you know about how far that is from Cup Foods?

18   A.  Couple miles, two, three, maybe.

19   Q.  I'm showing you what's been previously admitted as

20   Government Exhibit 109.  Do you recognize that document?

21   A.  Yes.

22   Q.  Can you tell the jury what that is.

23   A.  It's a patient care report.

24   Q.  And is that a patient care report for the call to Cup

25   Foods on May 25th of 2020?

1    A.   It appears to be.

2    Q.   Did you enter the information into this form?

3    A.   Yes.

4    Q.   I'm going to go down to page 4 of this report.  And we

5    see a section here called Times.  Can you tell the jury what

6    time you were dispatched to this call.

7    A.   Dispatch time is 20:20:48.

8    Q.   And then by what time were you en route to Cup Foods?

9    A.   En route 20:21:07.

10   Q.   So less than 20 seconds later?

11   A.   Yeah.

12   Q.   And do you recall what you learned from dispatch about

13   the call?

14   A.   It was Code 2 for mouth injury, if I recall correctly.

15   Q.   And what does "Code 2" mean?

16   A.   Code 2 is a nonemergent request for our services.  That

17   means no lights and sirens.  Code 3 would be lights, sirens,

18   get there with due regard.

19   Q.   And was that call updated to a Code 3?

20   A.   Yes.

21   Q.   Do you remember about how long after you got the initial

22   call?

23   A.   A few minutes, I believe.

24   Q.   Was a reason provided for that upgrade to a Code 3?

25   A.   At that time, no.

1   Q.  And is that unusual, not knowing the reason for an

2   upgrade to Code 3?

3   A.  Yes.  In my opinion, I should be told why there's a

4   change in status.

5   Q.  So then when you get to the Code 3, you testified that

6   means you turn on the lights and sirens and get there as

7   quickly as you safely can?

8   A.  Yep.

9   Q.  Were you working with a partner that day?

10  A.  Yes.

11  Q.  Who is that?

12  A.  My partner was Seth Bravinder.

13  Q.  So I'm going to look at the same part of your report

14  here.  What time did you arrive on the scene?

15  A.  At scene 20:27:19.

16  Q.  So if we compare that back to your dispatch time, maybe

17  about six and a half minutes from dispatch?

18  A.  Approximately, yes.

19  Q.  Is part of your job responding to scenes where the MPD

20  has already responded?

21  A.  Repeat that, please.

22  Q.  Is part of your job responding to scenes where the

23  Minneapolis Police Department has already responded?

24  A.  Sometimes, yes.

25  Q.  And sometimes is the patient someone who is in the MPD

1    custody?

2    A.  Sometimes.

3    Q.  And usually how does that handoff work when you arrive

4    on scene?

5    A.  Generally speaking, an officer will greet you and kind

6    of give you the quick rundown of what's going on, maybe

7    provide you a license, name, date of birth, something, and

8    then the reason for the request for medical aid.

9    Q.  Can you explain for the jury what a Code 4 is.

10   A.  Code 4 is something we'll express meaning the scene is

11   safe.  It's generally done by a police department.  For

12   instance, if there's a shooting or something, we're not

13   going to go in until it's been Code 4'd, meaning it's safe

14   for us to enter and provide patient care.

15   Q.  And if you are waiting to get that Code 4 on a call,

16   what do you usually do?

17   A.  We'll stage in an area we feel safe a couple blocks

18   away, whatever it is.

19   Q.  Were you ever asked to stage a couple blocks away in

20   this case?

21   A.  I don't recall being told to stage.

22   Q.  When you arrived at 38th Street and Chicago in May of

23   2020, did you assess the patient's condition?

24   A.  Yes.

25   Q.  What did you do to assess the patient's condition?

1     A.  To assess the patient's condition, I walked up to the

2     individual.  I was looking for how well his skin was

3     perfusing, if he had any chest rise and fall, if the patient

4     was mentating, was able to look at me, was aware of what's

5     going on with me.  I would check his pupils and a pulse upon

6     arrival because I did not see any chest rise and fall and I

7     did not see him tracking or appear to be mentating.

8     Q.  So for purposes of identifying yourself, I'm going to

9     show you a brief clip from a video that's already been

10    admitted into evidence as Government Exhibit 20.  This is an

11    video, for the record, taken by Alyssa Funari.

12        (Video recording played)

13    Q.  Mr. Smith, with the understanding it's not the easiest

14    to see through people there, are you the paramedic who was

15    wearing the hat that bent down to take Mr. Floyd's pulse?

16    A.  Yes.

17    Q.  Okay.  And so you mentioned that taking his pulse was

18    one of the assessments you did.  Did you find a pulse?

19    A.  I did not.

20    Q.  You also mentioned that you would check the patient's

21    pupils.  Is that what you were doing when you shined the

22    flashlight in the eyes?

23    A.  Yes.

24    Q.  What did you observe about the patient's pupils?

25    A.  They were large.

1    Q.  What does that mean to you?

2    A.  They were large pupils.  They indicate the patient was

3    probably deceased.

4    Q.  You also indicated that one of the things you did to

5    assess the patient was to see if his chest was rising and

6    falling; is that right?

7    A.  That's correct.

8    Q.  What did you observe in that regard?

9    A.  His chest was not rising and falling.

10   Q.  And then I think the other thing you said you checked

11   was whether the patient is mentating.  Can you explain what

12   that means and what you observed with this patient.

13   A.  Generally, you walk into a room people are, you know,

14   going to look at you and make eye contact or at least have

15   some sort of mentation that your presence is there.  In this

16   instance the individual was just listless, staring off,

17   didn't appear to be mentating.

18   Q.  If someone is not breathing and doesn't have a pulse, to

19   you is that called cardiac arrest?

20   A.  Not breathing, no pulse, cardiac arrest, that's fair,

21   yes.

22   Q.  After that, did you talk to your partner about moving

23   Mr. Floyd away from the scene?

24   A.  Yes.

25   Q.  What did you say to him?

1    A.  I said, "I think he's dead and I'd like to provide

2    patient care away from the scene and load him and go."

3    Q.  And did you have a number of reasons for moving

4    Mr. Floyd from the scene for care?

5    A.  Yes.

6    Q.  Can you explain those for the jury.

7    A.  Reasons I moved?  There was a large crowd.  I wasn't

8    quite sure what was going on.  There seemed to be some

9    elevated tones, and I was just concerned it may further the

10   situation.

11          Working a cardiac arrest, I was trying to --

12   knowing I was going to have to work a cardiac arrest, I

13   wanted to respect the dignity of this patient.  Oftentimes

14   you get them declothed, naked, and some of the things we got

15   to do are pretty grotesque to laypeople.

16          All my equipment was in the rig.  It's a

17   controlled environment.  There's better lighting.  There's

18   no bugs, wind, outside distractions.  It's just faster to

19   bring the patient to all my stuff rather than trying to get

20   all the stuff out of the truck and work in the middle of the

21   street.

22   Q.  You mentioned some -- a crowd that had elevated tones,

23   that's the way you put it?

24   A.  Yeah.

25   Q.  Could you hear what those people were saying?

1    A.  At the time I don't recall what they were saying.  It

2    just -- yeah, at the time I don't recall specifically what

3    was said.

4    Q.  And I think you referred to this situation where you

5    relocate with a patient as a load and go.  Is that what you

6    said?

7    A.  Yes.

8    Q.  Now, after performing this initial assessment of

9    Mr. Floyd, did you believe you had adequate information

10   about this patient upon arrival at the scene?

11   A.  Repeat that, please?

12   Q.  Did you believe you had adequate information about this

13   patient upon arrival at the scene?

14   A.  Upon arrival at the scene, I had no information other

15   than it went from Code 2 mouth injury to Code 3.  To me,

16   that -- more information could have been provided.

17   Q.  Is there anything you could have done in the ambulance

18   on the way to the scene if you'd known you were responding

19   to a cardiac arrest?

20            MR. PLUNKETT:  Objection.  Speculation.

21            THE COURT:  Sustained.

22   BY MS. SERTICH:

23   Q.  Mr. Smith, you've been a paramedic for five years?

24   A.  Approximately, going on, yes.

25   Q.  Going on five years.  And in the course of your work, do

1    you get called to cardiac arrests where you know that that's

2    what you are responding to?

3    A.  Yes, sometimes.

4    Q.  And in that situation are there steps that you take in

5    the back of the ambulance to prepare to respond to that

6    scene?

7              MR. PLUNKETT:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    BY MS. SERTICH:

10   Q.  You mentioned that you were outside of the rig assessing

11   the patient, and so getting him back in the rig would be

12   useful because you didn't have any of your equipment with

13   you; is that right?

14   A.  Repeat that, please.

15   Q.  Of course.  You testified that one of the reasons you

16   wanted to get Mr. Floyd back in the ambulance was because

17   your equipment was in the ambulance, right?

18   A.  Correct.

19   Q.  Could you have had that equipment ready?

20             MR. PLUNKETT:  Objection.  Speculation and

21   relevance.  And I'm going to ask for a direction to move on.

22             THE COURT:  Again, it is speculation and I do

23   sustain.

24             MS. SERTICH:  Your Honor, could I have a quick

25   sidebar?

```
1                    THE COURT:  Okay.
2             (At sidebar)
3                    MS. SERTICH:  Your Honor, can you hear me?
4                    THE COURT:  Yes.
5                    MS. SERTICH:  Thank you, Your Honor.  Your Honor,
6      I think I've made an appropriate foundation for Mr. Smith to
7      testify about what he would do on a call to a cardiac
8      arrest.  I don't think it's speculative for him to say that,
9      having responded to calls like this for almost five years
10     now.
11                   MR. PLUNKETT:  Tom Plunkett speaking, Your Honor.
12                   It's -- first of all, it's not relevant to the
13     case.  You're asking to essentially say that if the officers
14     had done a better job of giving information to their
15     dispatcher, that it would have, you know, made all the
16     difference in the world.
17                   I think I had a pretrial motion that specifically
18     looked at not allowing witnesses to speculate about, you
19     know, what they could have done differently.  I think it
20     violates the pretrial order.
21                   And also it's just not relevant.  It's speculating
22     about other situations that are not here.
23                   THE COURT:  The testimony is that the information
24     was not conveyed.  I think that's the end of it.  The rest
25     of it becomes speculative and not relevant to this
```

```
 1    proceeding and does violate the pretrial order as well.
 2                 Thank you.
 3            (In open court)
 4    BY MS. SERTICH:
 5    Q.  Mr. Smith, did one of the officers get in the ambulance
 6    with you?
 7    A.  Yes.
 8    Q.  Sitting here today, do you know who that officer was?
 9    A.  I do today, yes.
10    Q.  Okay.  And is that Mr. Lane?
11    A.  That's my understanding.
12    Q.  Okay.  You didn't know him at the time?
13    A.  No.
14    Q.  And did you, along with your partner and the officers,
15    load Mr. Floyd into the ambulance?
16    A.  Yes.
17    Q.  Did Mr. Lane ask you if he should stay in the ambulance?
18    A.  Yes.
19    Q.  How did you respond?
20    A.  "You should stay in the ambulance," I believe.  "Yes,
21    stay."
22    Q.  And why did you say that?
23    A.  I was going to need help.
24    Q.  Okay.  Was your equipment ready to treat a cardiac
25    arrest?
```

1    A.  Ready to -- no.

2    Q.  And so what did you have to do to prepare for that?

3    A.  I had to get it out and prep the patient, and update

4    dispatch and fire of the change in events and where to meet

5    us and that I was going to need assistance.

6    Q.  Okay.  So let's walk through that a little bit.  In

7    order to prepare the patient, did you have to cut off his

8    clothing?

9    A.  Yes.

10   Q.  Did you have to remove handcuffs?

11   A.  Yes.

12   Q.  And this might seem obvious to you, but why did you take

13   these steps?

14   A.  To better serve the patient.

15   Q.  Would you be able to perform the actions you needed to

16   perform for a cardiac arrest with Mr. Floyd in handcuffs?

17   A.  Not as well.

18   Q.  Generally speaking, is it important for you to gather

19   information about what happened to a patient to lead to

20   their circumstances?

21   A.  Yeah.

22   Q.  And why is that?

23   A.  It may provide further information to better treat the

24   individual.

25   Q.  Did you ask Mr. Lane about what happened?

1    A.  Briefly, yes.

2    Q.  In his response did Mr. Lane tell you how long Mr. Floyd

3    had been in that prone restraint position before you arrived

4    on the scene?

5    A.  I don't recall being told the duration.

6    Q.  Did Mr. Lane tell you the officers had not been able to

7    find a pulse for minutes?

8    A.  I don't recall that.

9    Q.  Did Mr. Lane tell you Mr. Floyd had been nonresponsive

10   for even longer than that?

11   A.  I don't recall that.

12   Q.  I'm going to show you what's been admitted as

13   Government's Exhibit 5, which is from Officer Lane's

14   body-worn camera, and this is a clip that begins at

15   20:29:10.

16       (Video recording played)

17   Q.  Mr. Smith, is that clip consistent with your

18   recollection of the report that Mr. Lane provided to you

19   about what happened before your arrival on the scene?

20   A.  Yes.

21   Q.  And then we saw at the end you instructed Mr. Lane to

22   begin CPR?

23   A.  That's correct.

24   Q.  And he did so?

25   A.  Yep.  Yep.

602

```
1    Q.  Did he eventually do other things that you asked, like
2    pump an oxygen bag and things like that?
3    A.  I don't recall everything that he had to do.  I just
4    remember telling him to start CPR.
5    Q.  I think I also heard you say in that clip that you
6    wanted a request for backup from the Minneapolis Fire
7    Department; is that right?
8    A.  That's correct.
9    Q.  Did you begin to monitor Mr. Floyd's heart in the
10   ambulance with a cardiac monitor?
11   A.  Yes.
12   Q.  What, if anything, was detected at first?
13   A.  At first he was in asystole.
14   Q.  And just for the jurors here, is asystole like a
15   flatline heart rate?
16   A.  Yes.
17   Q.  And does that mean that there's no electrical pulse in
18   the heart?
19   A.  Correct.
20   Q.  After that, did the heart rate change to something
21   called pulseless electrical activity?
22   A.  At some point it did, yes.
23   Q.  Do you sometimes call that PEA?
24   A.  Correct.
25   Q.  And is that an electrical activity that still has no
```

 1    pulsing?

 2    A.  Yes.  There's electrical activity, but the heart isn't

 3    physically pumping.

 4    Q.  Are asystole and PEA heart rhythms that you as a

 5    paramedic can shock to attempt to revive a patient?

 6    A.  No.

 7    Q.  Did your partner, as you hoped, drive the ambulance a

 8    few blocks away to continue Mr. Floyd's treatment?

 9    A.  Sorry.  Repeat that.

10    Q.  Sure.  Did your partner drive the ambulance a few blocks

11    away to continue Mr. Floyd's treatment?

12    A.  Yes.

13    Q.  And when you stopped, did your partner get in the back

14    to assist with treatment?

15    A.  Yes.

16    Q.  Do you have protocols that you follow in treating

17    someone who is in cardiac arrest?

18    A.  Yes.

19    Q.  And if I show you an image, will you be able to describe

20    for the jury some of the treatment provided to Mr. Floyd as

21    seen in the image?

22    A.  Yes.

23    Q.  I'm going to show you an image from Government's

24    Exhibit 5, which is again Mr. Lane's body-worn camera.  And

25    does this image show some of the medical care, as part of

1   those protocols, provided to Mr. Floyd in the ambulance?

2   A.   Yes.

3   Q.   Can you tell the jury what you see being done here.

4   A.   We've provided an airway.  We've placed on some

5   monitoring equipment, a bag valve.  There's a filter on

6   there with all the COVID stuff going on.

7   Q.   And can you just touch on the screen and show the jury

8   what you are talking about.

9   A.   Actually touch it?

10  Q.   Right there, yep.

11  A.   So there's an airway (indicating).  There's a bag valve

12  mask (indicating); helps breathe.  This -- whoops.  This

13  thing here (indicating) is doing chest compressions.  This

14  here (indicating) can monitor, with this machine over here

15  (indicating) in the corner, the heart rhythm.  I'm trying to

16  do an IV here.  This here (indicating) is some cabling to go

17  to this machine back here (indicating) again.  It confirms

18  that this here airway (indicating) is placed and then I can

19  monitor his CO2 output.  And then there's an oxygen tube

20  placed.  Kind of the nitty-gritty of what's going on here.

21  Q.   Okay.  So is that airway device sometimes called an

22  i-gel?

23  A.   Yeah, that down there (indicating) is an i-gel tube.

24  Q.   And does that help get oxygen into a person's body?

25  A.   Yeah, it helps provide -- keep the airway open so you

605

1    can use this bag valve mask to push oxygen into the lungs.

2    Q.  Do you remember who placed the airway device in?

3    A.  My partner.

4    Q.  And then you referred to the device that is doing

5    compressions.  Is that sometimes called a LUCAS machine?

6    A.  Yes.

7    Q.  And then you said that you were administering some

8    medication there, right?

9    A.  I was attempting an IV.

10   Q.  Okay.

11   A.  Yep.

12   Q.  Okay.  And what sort of medications do you put in the IV

13   when someone is in cardiac arrest?

14   A.  Epinephrine is one you can provide.  Sodium bicarb is

15   another.  There's a few others.

16   Q.  What does epinephrine do?

17   A.  Essentially adrenaline and -- just hope to kickstart the

18   heart, is my understanding.  You'd have to take it up with a

19   cardiologist, obviously, to get more of a cellular level of

20   all that.

21   Q.  All right.  And how about sodium bicarbonate, what does

22   that do?

23   A.  It's an attempt to reverse any potential acidosis, get

24   your PH levels back to where they're supposed to be.

25   Q.  Did Minneapolis firefighters eventually join you in the

1    ambulance?

2    A.  Yes.

3    Q.  Did Mr. Lane leave the ambulance when the firefighters

4    arrived?

5    A.  Yes.

6    Q.  After having taken all of these steps that you just

7    described in your protocol to address cardiac arrest, did

8    you reach a point where you'd taken all the steps that you

9    could take in the ambulance?

10   A.  I reached a point where I thought it was manageable to

11   start transport.

12   Q.  Okay.  And did you transport to the hospital at that

13   point?

14   A.  Yes.

15   Q.  On the way to the hospital, did you continue to monitor

16   Mr. Floyd's heart?

17   A.  Yes.

18   Q.  And to do that, would you have to stop the LUCAS device

19   periodically to check if he had an independent heart rhythm?

20   A.  Yes.

21   Q.  At some point during the drive to the hospital, did you

22   detect a possible rhythm to Mr. Floyd's heart?

23   A.  Yes.

24   Q.  What did you do?

25   A.  It's a different algorithm.  It's a shockable rhythm, so

1    I elected to shock it, and I did.

2    Q.  Was there any improvement after you shocked Mr. Floyd's

3    heart?

4    A.  No.

5    Q.  What did you do when you arrived at the hospital?

6    A.  We brought the patient into the stabilization room, and

7    I provided a report to the nurse and the hospital staff that

8    was awaiting our arrival.

9    Q.  Mr. Smith, can you explain for the jury what shocking

10   the heart is.

11   A.  It's defibrillation.  Those pads I pointed at can

12   provide, through that little machine that was in the corner,

13   150 joules of electricity, and hopefully to reset the heart

14   rhythm and get all that electrical stuff going again so it

15   can pump and perfuse and work like it's supposed to.

16   Q.  But that was not successful in this case, correct?

17   A.  Correct.

18          MS. SERTICH:  Nothing further on direct, Your

19   Honor.

20          THE COURT:  Okay.  Thank you very much.

21          MR. PLUNKETT:  Go ahead.

22          THE COURT:  Mr. Gray.

23                    CROSS-EXAMINATION

24   BY MR. GRAY:

25   Q.  Good morning, Mr. Smith.

 1    A.  Hello.

 2    Q.  My name is Earl Gray.  I'm the lawyer for Tom Lane, the

 3    officer that was in the ER.

 4         What do you call them?  Do you call them trucks or

 5    ambulances?  What do you call them?

 6    A.  The ambulance.

 7    Q.  Okay.  He was the one in the ambulance with you.

 8    A.  Okay.

 9    Q.  Do you recognize him at all in the courtroom?

10    A.  This -- hi.

11    Q.  The tall guy?

12    A.  All right.

13    Q.  When you received this call, you immediately went out to

14    the area, right, to where the incident was at?  In other

15    words, you get an emergency call, you get in your ER truck

16    or van or ambulance, and you drive there, correct?

17    A.  Yes.

18    Q.  And in this situation at one point in time a Code 2 went

19    up to Code 3, which means lights and siren, correct?

20    A.  At some point we were Code 2 and were upgraded to Code 3

21    to respond lights and sirens, yes.

22    Q.  Okay.  And when you arrived at the scene, you noticed a

23    crowd there, correct?

24    A.  There was a crowd upon arrival, yes.

25    Q.  And when you got out of the ambulance with your partner,

1    you told the police officers that you were going to take

2    over, correct, that's what you do?

3    A.   That is not correct.

4    Q.   What is correct?  What did you tell them?  Did you tell

5    them that you were going to handle it now?  Was there some

6    language -- I could pull it up on the recording, but it's

7    not that -- did you get involved by saying you were going to

8    take over?

9    A.   I did not verbally say, "I'm taking over."

10   Q.   What did you say?

11   A.   I'd have to watch the film.  I don't recall saying much

12   of anything at the arrival.

13   Q.   Okay.

14   A.   I was looking for --

15   Q.   You did -- go ahead.

16   A.   No, you go ahead.

17   Q.   Well, in any event, the first thing you did was check

18   his carotid artery, is that right, one of the first things?

19   A.   We've discussed that, yes, I checked the pulse and

20   assess the patient and --

21   Q.   In order to do that, did you have to get Derek Chauvin

22   off of his neck?

23   A.   There was enough room for me to check his carotid pulse

24   with Chauvin --

25   Q.   His -- I'm sorry.

1    A.  -- in his position.

2    Q.  His knee was still on his neck?

3    A.  Look at the film to specifics where his knee was.

4    Q.  Okay.  I think we will do that.

5             MR. GRAY:  Your Honor, could we play Exhibit 5,

6    the whole exhibit, starting when the ambulance gets there?

7    That would be 20:27:02.

8             MS. BELL:  May we have a minute?  What number is

9    that?

10            MR. GRAY:  Exhibit 5 is the body camera of Lane.

11   About 8:27:22.

12            MS. BELL:  Close to there?

13            MR. GRAY:  Yes, when they arrived, when you see

14   the lights and siren on.  And how do you stop it?  Like

15   this?

16      (Counsel confer)

17            MR. GRAY:  Could we go to 8:27:22, please, and

18   then start the camera?

19            MS. BELL:  That's the closest -- Mr. Gray, that's

20   the closest we can get.

21            MR. GRAY:  Well, then can you start the camera?

22      (Video recording played)

23            MR. GRAY:  Can you stop it there, please?

24   BY MR. GRAY:

25   Q.  Did you see yourself in that picture, sir, with the

```
1    brown uniform?

2    A.  Yes.

3    Q.  And what were you doing when you were at the scene at

4    that time?

5    A.  Again, I was assessing the patient, checking pupils,

6    looking for chest rise and fall.

7    Q.  Okay.

8              MR. GRAY:  Can you start it up again?

9        (Video recording played during questioning)

10   BY MR. GRAY:

11   Q.  Were you going back to your ambulance at this time to

12   get the gurney, as it's called?

13   A.  I was grabbing the stretcher and I was updating my

14   partner.

15   Q.  Okay.  Is that where Thomas Lane asked to ride with you

16   or to go with you?  Did you just hear that?

17   A.  Yes.

18   Q.  So Mr. Lane, by being in the ambulance with you,

19   allowed -- could give you help while the driver of the

20   ambulance could go down a couple blocks and get away from

21   the crowd, correct?

22   A.  Correct.

23   Q.  Is Mr. Lane now telling you what happened?

24   A.  Yeah.

25   Q.  And after he explained that to you, you were busy taking
```

```
 1    care of him, but you also didn't ask him any more questions;

 2    is that right, Mr. Smith?

 3    A.  Eventually we asked more questions, but at this time,

 4    no, I did not ask further questions.

 5    Q.  And right now we have Mr. Lane doing chest pumps on

 6    Mr. Floyd, correct?

 7    A.  He's doing chest compressions on Mr. Floyd.

 8    Q.  And while he was doing that, you were doing other

 9    things, one of them being getting the LUCAS ready; is that

10    correct?

11    A.  I was doing other things, and one of the other things I

12    was doing to get ready was getting the LUCAS ready.

13    Q.  Did Mr. Lane appear indifferent at all when he was doing

14    what he is doing right now?

15              MS. SERTICH:  Objection, Your Honor.  Calls for a

16    legal conclusion.

17              THE COURT:  I sustain.

18    BY MR. GRAY:

19    Q.  Well, did he --

20              MS. SERTICH:  Mr. Gray.

21        (Counsel confer)

22              MS. SERTICH:  Your Honor, can we have a sidebar?

23              THE COURT:  Okay.

24        (Video recording stopped)

25        (At sidebar)
```

1           MS. SERTICH:  Your Honor, we were not planning on

2    playing this version of Exhibit 5 this morning and so we do

3    not have the blurred version pulled up for the computer.  We

4    provided it to Mr. Lane this morning.

5           MR. GRAY:  Well --

6           THE COURT:  Counsel, how long will it take you to

7    get that thing up?

8           MR. PLUNKETT:  I don't mean to interrupt -- Tom

9    Plunkett -- but I've got my version right here if that would

10   be helpful.

11          MS. SERTICH:  Do you want to play it?

12          MR. PLUNKETT:  How?  It's on your disk.  This is

13   the one you gave me this morning.

14          MS. SERTICH:  Right.  Do you want to play it?

15          MR. PLUNKETT:  Go ahead.

16          MS. SERTICH:  Can Henry do that?

17          MR. PLUNKETT:  I will do whatever you want,

18   honestly.

19          THE COURT:  Okay.

20      **(In open court)**

21          THE COURT:  Members of the jury, this is going to

22   take a few minutes.  Let me excuse the jury and step out.

23   Please don't discuss the case or speculate about this during

24   this break.  And we will be in break for a few minutes.

25          (Recess taken at 10:17 a.m.)

```
 1                          *  *  *  *  *

 2      (10:29 a.m.)

 3                         IN OPEN COURT

 4                        (JURY PRESENT)

 5              THE COURT:  Okay.  Proceed, Mr. Gray.

 6              MR. GRAY:  Thank you, Your Honor.  We were in the

 7      process of playing Exhibit 5, a portion of it.  I'd ask that

 8      it start playing again.

 9          (Video recording played during questioning)

10      BY MR. GRAY:

11      Q.  While Mr. Lane is doing the chest compression, are you

12      the only one in the ambulance besides him and Mr. Floyd?

13      A.  Right now, no.

14      Q.  Okay.  Who else is in there?

15      A.  My partner.

16      Q.  All right.  And that would be the man that drove the

17      ambulance from the scene a couple blocks away?

18      A.  Yes.

19      Q.  And is that Tom Lane's hands helping you with -- the

20      LUCAS, is it called?  Is that Mr. Lane's hands?

21      A.  Yes.

22      Q.  What's Mr. Lane doing now with his hand, sir?  Did you

23      catch that?

24      A.  Appears to be checking a pulse, holding the gentleman's

25      head.
```

```
 1    Q.  What's Mr. Lane doing at this time, if you remember, at

 2    the scene?

 3    A.  He was assisting with ventilation.

 4    Q.  I'm sorry.  I didn't hear that.

 5    A.  He appears to be assisting in ventilations.

 6    Q.  Thank you.

 7              Is that now the fire department coming?

 8    A.  Yes, sir.

 9    Q.  Is that Lane asking if you still need him?

10    A.  It sounded like it, yes.

11    Q.  And you didn't because the fire department was there

12    now; is that --

13    A.  That's correct.

14    Q.  -- accurate?

15    A.  That's correct, sir.

16        (Video recording stopped)

17    Q.  So he explained to you a little bit what happened with

18    Mr. Floyd in the beginning, and then I notice at the end

19    there he also told either you or your partner what he

20    thought happened; is that right?  Did you hear him talking?

21    A.  Yes, sir.

22    Q.  And was he helpful to you when he was in there assisting

23    Mr. -- assisting you with Mr. Floyd?

24    A.  In my opinion, he was helpful, yes.

25              THE WITNESS:  Thank you.
```

```
 1     BY MR. GRAY:

 2     Q.  And by doing the chest pumps and what you were doing in

 3     there, what you're attempting to do was to revive Mr. Floyd,

 4     correct?

 5     A.  We were attempting to revive Mr. Floyd, yes.

 6     Q.  And sometimes you're successful in that; is that right?

 7     A.  Sometimes you can be successful in resuscitating, yes.

 8              MR. GRAY:  Thank you.  That's all I have.

 9              THE COURT:  Thank you.

10              Mr. Paule.

11              MR. ROBERT PAULE:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13     BY MR. ROBERT PAULE:

14     Q.  Good morning, Mr. Smith.

15     A.  Hi.

16     Q.  Hi.  My name is Bob Paule.  I, along with my daughter,

17     Natalie Paule, represent Officer Thao or former Officer

18     Thao.

19              You and I have never met, have we?

20     A.  No, sir.

21     Q.  Okay.  On the other hand, you've met, I think, a total

22     of five times, at least, previously to speak to other

23     people, correct?

24     A.  I've spoken with other people, yes.

25     Q.  Okay.  And I'd like to talk a little bit -- because
```

1    today when the government was asking you questions, they

2    asked you about the reasons that you moved upon arrival, and

3    I believe you stated five different reasons.

4            You stated, one, there was a large crowd; is that

5    correct?

6    A.  Yes.

7    Q.  Okay.  And just so the jury knows, could you please tell

8    us the approximate number of people that you thought were

9    there.

10   A.  Double digits, I thought.  And if you encompass the

11   other sides of the street --

12   Q.  So --

13   A.  -- 20, maybe even 20.

14   Q.  Pardon me.  I interrupted you.

15           And it seems obvious to me that when you arrive on

16   a scene, you are not really normally paying attention to the

17   people around, you are trying to focus on your patient, is

18   that accurate?

19   A.  When I arrive on scene, I generally am trying to take

20   care of my patient, but I am also trying to be aware of

21   things going on around me as best I can, but I am human

22   and --

23   Q.  Sure.  Some of that is related to your patient care, is

24   it not?

25   A.  Yes.

1   Q.  And some it's also related to your safety, correct?

2   A.  Yes.

3   Q.  Your own personal safety, that's what I meant.  Is that

4   accurate?

5   A.  Mine, my crew's, other bystanders, the officers, the

6   patient, and everybody's safety is to be considered.

7   Q.  Okay.  You also indicated, and I've got it sort of

8   separated as two reasons, but the fact that Mr. Floyd, you

9   believed, was in cardiac arrest was one of the reasons,

10  correct?

11  A.  Yes.

12  Q.  And I believe that you indicated, first, that that

13  requires a lot of work and focus from people like you, who

14  were trying to work on the patient, correct?

15  A.  Working a cardiac arrest takes focus and -- yeah.

16  Q.  And then you also indicated, the second reason that I

17  have related to the cardiac arrest, is that the type of care

18  you need to provide involves some aspects that might sort of

19  expose that person.  In other words, you are talking about

20  the dignity of the person you are trying to treat, correct?

21  A.  Yes, sir.

22  Q.  You also indicated, in response to the government,

23  that -- you talked about having your equipment in the rig.

24  And by the way, just as an aside, Mr. Smith, when you use

25  the term "rig," are you referring to the ambulance?

```
1    A.  When I use the term "rig," I'm referring to the
2    ambulance.
3    Q.  Is that sometimes called other things, like a squad or
4    something like that, as well by you?
5    A.  I've never heard it called a squad.  A squad, to me,
6    would be a police vehicle.
7    Q.  Okay.  And when you talked about the equipment in your
8    rig, could you please tell us what you meant and elaborate a
9    little bit on that.
10   A.  What I meant by the equipment being in the rig is that
11   there's airway equipment, there's cardiac equipment, there's
12   medications, there's other devices we may use throughout to
13   care for a patient.
14   Q.  Okay.  And then the last reason, that I at least wrote
15   down, was that moving away from the scene would be -- would
16   allow you to work on your patient without any distractions,
17   correct?
18   A.  It would limit the distractions, yes.
19   Q.  What did you mean by that, sir?
20   A.  What do I mean by limiting the distractions?
21   Q.  Yes.
22   A.  Environmental controls, getting away from the screaming,
23   shouting.  Like I said, all my equipment is there.  It's a
24   controlled environment.  As best we can replicate as an ER
25   bay on four wheels, essentially, but.
```

1    Q.  And can I ask you just a general sort of question?  It

2    seems to me like once you relocated your rig to 36th and

3    Park, you performed a number of medical interventions on

4    Mr. Floyd to get him what's called stable and then the

5    decision was made to drive to the hospital; is that correct?

6    A.  Yes.  Once I thought the cardiac arrest was manageable

7    by the individuals I had, we elected to transport the

8    patient.

9    Q.  And at some point when you were being questioned by I

10   believe it was the FBI, they asked you why you didn't just

11   load Mr. Floyd into the ambulance and drive straight to the

12   hospital.  Do you remember that?

13            MS. SERTICH:  Objection, Your Honor.  Improper

14   form of the question.

15            THE COURT:  Well, I will overrule.  He may answer

16   it "yes" or "no."

17            THE WITNESS:  Can you repeat the question?

18   BY MR. ROBERT PAULE:

19   Q.  I can just phrase it differently.

20   A.  Okay.

21   Q.  If someone were to ask you, instead of putting Mr. Floyd

22   in the ambulance and performing all kinds of care on the

23   scene or even at a different location, why you didn't just

24   drive that person straight to the hospital as fast as you

25   could, it seems like a silly question, but could you please

621

```
1    answer that?
2    A.  We don't drive straight to the hospital.  We have
3    equipment and care we can provide to stabilize a patient and
4    then transport in this situation.
5    Q.  In other words, it's actually better for the patient if
6    you provide care on the scene and get him to what's
7    considered a stable position before you transport; is that
8    correct?
9    A.  Yes.
10   Q.  Is that kind of a common misnomer or misplaced thought
11   about how people look at what you do?
12   A.  I think there needs to be an education to what EMS
13   provides society, yes.
14   Q.  Could I go back and ask some questions about your
15   qualifications?
16        You studied for how long to become an EMT -- or,
17   excuse me, a paramedic, correct?
18   A.  I'm a paramedic, yes.
19   Q.  Could you please explain to me the distinction between
20   what a paramedic is and an EMT, if I'm using the right
21   terms, sir.
22   A.  There's a paramedic, which is the highest level of
23   prehospital care.  There's an EMT.  EMT can do vitals,
24   oxygen, CPR, some very basic drugs.  You get into the
25   paramedic level, which I'm at, you get into cardiac stuff,
```

1   more advanced drugs, some advanced airways and maneuvers.

2   Q.  Okay.  And so to study to be a paramedic like you are,

3   you not only have to pass a test, but you have to study for

4   some period of time, correct?

5   A.  Yes, sir.

6   Q.  How long did you do that, sir?

7   A.  Approximately a year.

8   Q.  Okay.  And just as a comparison for the jury, do you

9   know how long a person needs to study or how long of

10  training it is to become an EMT?

11  A.  I believe it's a few months.

12  Q.  So much less than it is to be a paramedic, correct?

13  A.  There is a difference between becoming a paramedic and

14  an EMT.

15  Q.  Okay.  And if I'm correct, aren't you also, sir, a

16  volunteer firefighter somewhere in this area?

17  A.  I was, yes.

18  Q.  Now, just so the jury knows, could you give us on some

19  level just a basic idea of how the training that you

20  received or your certifications are different, say, than

21  your average Minneapolis firefighter.

22  A.  Can you repeat that, please?

23  Q.  Sure.  And it was a poorly phrased question.

24          How is your level of medical training and

25  certification different than, say, a firefighter who has an

```
 1    EMT certification?

 2    A.  You want to know as a paramedic or you want to know as a

 3    volunteer -- at my previous tenure as a volunteer

 4    firefighter, how it differs from Minneapolis Fire?

 5    Q.  I think I'm confusing you, and I don't mean to do that.

 6    A.  That's fine.  I just want to understand.

 7    Q.  Yes.  You work oftentimes with Minneapolis Fire; is that

 8    correct?

 9    A.  Yes.

10    Q.  And how are they helpful to you in that role?

11    A.  They provide an extra set of hands and skill sets.  That

12    way I can focus on more of the paramedic stuff.

13    Q.  So they perform sort of basic medical services to allow

14    you to perform more advanced ones; would that be accurate?

15    A.  More or less, yes, that's accurate.

16    Q.  And in your job as a paramedic with Hennepin Healthcare,

17    you work also with Minneapolis Police Department members?

18    A.  On some calls, yes.

19    Q.  What level of medical care are they generally able to

20    provide to assist you?

21    A.  I think to at least get POST, they've got to be first

22    responders.  I'm sure there's a few EMTs floating around.

23    Q.  Just so I'm clear, you are a paramedic, which is

24    essentially the highest level of emergency medical response,

25    correct?
```

1    A.  Yes.

2    Q.  And then there's something called emergency medical --

3    is it technician for EMT?

4    A.  Yes, sir.

5    Q.  And then you indicate there is a lower level.  What was

6    that?  And I don't you want to use the wrong terms.

7    A.  I believe it's first responders.  You'd have to look at

8    the registry for the current titles of all this, but yeah.

9    Q.  So if I'm following you correctly, police are sort of

10   the lowest level of medical care, correct, first --

11   A.  Yes.

12   Q.  -- responders?

13           And Minneapolis Fire would be a higher level, that

14   EMT level?

15   A.  Correct.

16   Q.  And then a paramedic, which is what you are, that took

17   about a year to be trained, correct?

18   A.  Yes, sir.

19   Q.  And just the jury knows, I would assume you do some

20   level of ongoing certification licensure process, correct?

21   A.  Yes, sir.

22   Q.  In other words, you are trying to train and learn new

23   things to become better at what you do, correct?

24   A.  Yes, sir, I'm trained.

25   Q.  Okay.  Now, going back to the scene -- again, I'm

```
 1    talking about the scene upon your arrival on May 25th --
 2    when Ms. Sertich was asking you questions, you described the
 3    crowd as using elevated tones, correct?
 4    A.  Yes.
 5    Q.  And you guys decided to do a load and go; is that
 6    correct?
 7    A.  Yes.
 8    Q.  Now, you spoke to FBI agents about four days after this
 9    occurred, on May 29th of 2020; is that correct?
10    A.  Sounds accurate.  I don't have specifics on it, but
11    yeah.
12    Q.  And just to put it in context, I'm assuming this is a
13    very chaotic time for you professionally given what was
14    happening in Minneapolis with all the unrest or however you
15    want to describe that, correct?
16    A.  Yeah, that's -- yes.
17    Q.  And, by the way, basically what you do professionally is
18    you try to help people medically and safe people's lives,
19    correct?
20    A.  I try to help people medically to safe their lives, yes.
21    Q.  And you put your patient's care first, correct?
22    A.  I put myself and my crew and responders first, and then
23    the patient is a very close second.
24    Q.  Okay.  And pardon me.  I didn't mean to imply anything.
25              So the idea is you want to make sure that you go
```

```
1    home safe at the end of every day, sort of overall

2    arching -- overarching principle, correct?

3    A.  If I'm hurt, I can't help.  So take care of me, so I can

4    take care of others.

5    Q.  Okay.

6    A.  That's my thought on it.

7    Q.  Now, do you remember describing or what you told the FBI

8    when you met with them approximately four days after this

9    incident with regard to your description of the crowd?

10               MS. SERTICH:  Objection, Your Honor.  He should

11   ask a question and then impeach.

12               THE COURT:  I'm going to overrule because this can

13   just be answered "yes" or "no."

14               THE WITNESS:  I don't recall specifically what I

15   said to the FBI during -- approximately four days after,

16   whenever they were interviewing me.

17   BY MR. ROBERT PAULE:

18   Q.  Okay.  Do you recall them asking you about why you

19   left -- you chose to leave the scene with Mr. Floyd in the

20   ambulance rather than providing care right away?

21   A.  It's -- yeah.  Similar to whatever we already discussed.

22   Q.  Well, it was in a little more detail, wasn't it?

23   A.  What do you have to suggest, sir?

24   Q.  Well, do you recall telling them that you arrived on

25   scene to, quote, a large crowd of people with cell phones
```

 1    out, they appeared very agitated, yelling and pleading with

 2    Minneapolis Police?

 3    A.  I believe that's been discussed, but okay.

 4    Q.  Do you recall telling them, quote, I wanted to get off

 5    the scene due to the environment we are in?

 6    A.  Yeah.  I told that to my partner, yeah.

 7    Q.  Do you recall telling the FBI that you told your

 8    partner, quote, I want you to get to at least 42nd and

 9    Chicago or somewhere else you deem safe?

10    A.  Yeah, I wanted to get a few blocks away.

11    Q.  Do you recall telling the FBI back on May 29th, "I'm

12    going to go home at the end of the night, the way they teach

13    it is scene safe, and that scene was not safe"?

14    A.  Yeah, that sounds appropriate.

15    Q.  And do you recall the FBI asking you questions about why

16    rendering aid at the scene when you first arrived at 38th

17    and Chicago would have been difficult?

18    A.  As we've already discussed, yes.

19    Q.  Okay.  Do you recall telling them "especially with that

20    hostile crowd that I depicted"?

21    A.  I felt it was a hostile crowd, yes.

22    Q.  "And we had recent events of individuals trying to get

23    into the back of our squad and ultimately losing his life."

24    Do you remember that?

25    A.  Yeah, it's -- with the Jamar Clark incident, he, you

1    know, unfortunately got shot trying to get in the back of

2    one of our rigs.  The community remembers that and then now

3    I've got this and obviously burned half the city to the

4    ground, so.

5    Q.  So obviously your own personal safety is something that

6    you, like everyone else, take very importantly, correct?

7    A.  Yes, sir.

8    Q.  And your description of that scene was you did not feel

9    it was safe, correct?

10   A.  I did not feel it was safe.

11   Q.  Now, do you recall meeting again on August 4th of 2020

12   with more FBI agents and several federal prosecutors?

13   A.  I've met with a bunch of people, yeah.

14   Q.  You were aware some of those people were FBI agents?

15   A.  FBI and CIA.  I don't know all the acronyms, but yeah.

16   Q.  Okay.  And there were some lawyers there as well, some

17   prosecutors, were there not?

18   A.  I believe so.

19   Q.  And one of them was actually a woman named Samantha

20   Trepel, at least virtually, correct, if you recall?

21   A.  Honestly, I've met so many people and lawyers and suits,

22   I don't remember everybody name.  I apologize.

23   Q.  And just as an aside, when you met with the FBI both on

24   May 29th of 2020 and on August 4th of 2020, there were a

25   number of people sort of on your behalf at those meetings as

```
 1    well too, correct?

 2    A.  Yes.

 3    Q.  Okay.  The lead lawyer for Hennepin Healthcare, that

 4    person was there?

 5    A.  Yep.

 6    Q.  The head of the emergency medical service for Hennepin

 7    Healthcare, first name Martin Scheerer?

 8    A.  My chief was present at a few meetings, yes.

 9    Q.  Am I using the right term when I call him the head of

10    it?

11    A.  Honestly, I don't know his title.

12    Q.  Okay.

13    A.  I call him chief.  I don't know.

14    Q.  He's in charge, correct?

15    A.  Yep.

16    Q.  Okay.  But when you met with the FBI on April 4th of

17    2020, do you recall telling them about the scene itself?

18    A.  When I met with them, did I tell them about the scene

19    itself?

20    Q.  Yeah.

21    A.  Yes.

22    Q.  Okay.  And do you remember them asking you about whether

23    or not you've ever been able to resuscitate someone?

24              MS. SERTICH:  Objection, Your Honor.  Mr. Paule

25    can ask these questions or he can refresh Mr. Smith's
```

1    recollection, but reading the questions and answers should

2    not be permitted.

3              THE COURT:  Yeah, counsel, I sustain.  If you want

4    to -- if you need to show it to him to refresh his

5    recollection, that's fine, but --

6              MR. ROBERT PAULE:  I can rephrase.

7              THE COURT:  -- is not going to work.

8    BY MR. ROBERT PAULE:

9    Q.  Do you recall being asked about whether or not you've

10   ever been able to resuscitate someone successfully?

11             MS. SERTICH:  Same objection, Your Honor.

12             THE COURT:  Well, he can answer this "yes" or "no"

13   and then we'll find out.

14             THE WITNESS:  I was asked if I've ever

15   successfully resuscitated during these meetings, yeah.

16   BY MR. ROBERT PAULE:

17   Q.  Do you recall what you said, sir?

18   A.  It's possible --

19             MS. SERTICH:  Objection, Your Honor.

20             THE COURT:  I'm going to overrule.  He's

21   answering, I think, what he said.  If he's not, then we can

22   show him what was said on that report, but his own

23   recollection can count, if that's what it is.

24             MS. SERTICH:  Your Honor, I believe he can be

25   asked his current feelings about these questions first

 1    before referring to an old -- or an older interview with him

 2    to see if the answers are consistent or inconsistent.

 3               THE COURT:  I don't think so.  I've lost the

 4    question now.  Let's start over again and we'll go from

 5    there.

 6    BY MR. ROBERT PAULE:

 7    Q.  Mr. Smith, let's just put it simply.  Did the -- do you

 8    recall what you told the FBI and the federal prosecutors

 9    about whether you'd ever been able to resuscitate someone

10    who had been in a cardiac arrest successfully?

11    A.  I don't recall specifically what I stated to them in

12    those meetings, but if you are trying to wonder if it's

13    possible to resuscitate somebody, it's possible to

14    resuscitate somebody.  It's also possible to not resuscitate

15    somebody.

16    Q.  Sure.  Have you ever done that yourself, sir?

17    A.  I have had a successful resuscitation, yes.

18    Q.  Okay.  And that's what you told the FBI on August 4th?

19    A.  Okay.

20    Q.  Do you recall that incident, the incident in question

21    where you resuscitated the person?

22    A.  Yeah, vaguely.

23    Q.  Okay.  Would that have been someone who was in cardiac

24    arrest and you were able to resuscitate them and drop them

25    off at the emergency room of a hospital?

```
1    A.  Yes.

2    Q.  And did that person ultimately survive?

3    A.  I don't know the outcome.

4    Q.  Okay.  And then do you recall, going to a different

5    meeting, on March 8th of 2021 did you have a meeting with

6    six state prosecutors to prepare for an entirely different

7    legal proceeding?

8    A.  I don't know specifically the dates and who I've met.

9    Like I said, I've met so many people and been jerked around,

10   I don't know.

11   Q.  Okay.  Do you remember what you said to them about what

12   your first thought was upon arrival at the scene of 38th and

13   Chicago?

14           MS. SERTICH:  Objection, Your Honor.  Hearsay.

15           THE COURT:  Sustained.  That is hearsay, counsel.

16           MR. ROBERT PAULE:  All right.

17   BY MR. ROBERT PAULE:

18   Q.  Did you have another meeting with a bunch of state

19   prosecutors on March 31st of 2021?

20   A.  I don't know specific dates and who I met, like I've

21   said.

22   Q.  Okay.

23   A.  I would have to look at my calendar or whatever you may

24   have to present to the court.

25   Q.  Would you take -- would you disagree with me if I said
```

1    that that's the date that's indicated in some records I've

2    received?

3    A.  I would assume it's correct.

4    Q.  And ultimately you testified at a different proceeding;

5    is that correct?

6    A.  I have testified before, yes.

7    Q.  Now, you testified previously that the original dispatch

8    was a Code 2, correct?

9    A.  Yeah.

10          MS. SERTICH:  Objection.  Hearsay.

11          THE COURT:  No, that's testimony today.  It's

12    overruled.

13   BY MR. ROBERT PAULE:

14   Q.  And you testified that that was upgraded to what's

15   called Code 3, which means lights and sirens, approximately

16   a minute and a half later; is that correct?

17   A.  I testified we were upgraded to Code 3.  I don't recall

18   the exact duration.

19   Q.  Okay.  And when you -- on the way to the call, based on

20   that information, what were your thoughts about what

21   potential situation you'd be looking at upon arrival?

22   A.  With -- just repeat the question, please.

23   Q.  Sure.  Given the information you had from dispatch, the

24   Code 2 dispatch and then the Code 3, what were your thoughts

25   about what type of situation you might be encountering when

```
1    you first arrived?

2    A.  A Code 3 upgrade, I would encounter some life-or-death

3    situation.

4    Q.  I'm sorry.  I couldn't hear you, sir.

5    A.  With a Code 3 upgrade, there would probably be maybe a

6    potential life-or-death situation or similar.

7    Q.  Were there any specific medical conditions you were

8    thinking about?

9    A.  With the PD custody, potentially excited delirium or

10   somebody just not going with the program.  I don't know.

11   Q.  Sure.  And when you used that term "excited delirium," I

12   don't know that everyone is familiar with it.  Could you

13   tell us what you are referring to, please.

14   A.  Some people in the medical community believe there is an

15   event that occurs called excited delirium, super-human

16   strength and your body is just redlining and you can't stop

17   it because -- due to drugs or a mental breakdown or

18   whatever, and eventually you will go into cardiac arrest and

19   die.  And when that happens, my understanding is there's no

20   way to resuscitate an individual once they've hit that

21   point.

22   Q.  Is that a particular medical condition that you've

23   received training on as a paramedic?

24   A.  Yes.

25   Q.  Okay.  And is that a particular medical condition that
```

1    you have encountered professionally over the course of your

2    career?

3    A.  I have seen what I suspect to be excited delirium.  I'm

4    not allowed to diagnose.  That's up to a doctor.

5    Q.  And when you say you've seen what you recognize, could

6    you please describe for the jury what you recognized as to

7    particular symptoms.

8    A.  On this case?

9    Q.  Well, let's just talk about in general.  Well, let me

10   back up a step, sir.  I don't mean to confuse you.

11        Have you seen in other situations, other than this

12   incident, what you believe to be a person involved with

13   excited delirium?

14   A.  Yes.

15        MS. SERTICH:  Objection.  Speculation and

16   relevance, Your Honor.

17        THE COURT:  That is relevant, and the fact that

18   he's seen it is overruled.  He may answer -- or the answer

19   stands.

20   BY MR. ROBERT PAULE:

21   Q.  I'm not sure you got to answer that question.  I at

22   least can't tell.

23        Have you actually encountered that yourself

24   professionally?

25   A.  I have seen what I suspected to be excited delirium.

1    Q.  And on how many occasions?

2    A.  That I don't know.

3    Q.  More than one?

4    A.  More than one, yes.

5    Q.  Okay.  And have you actually received some particular

6    medical training on how to respond to that through your

7    employment at Hennepin Healthcare?

8    A.  Yes.

9    Q.  And what is that particular medical training?

10   A.  There's a protocol we can provide a medication to

11   alleviate the situation if it calls for it.  This situation

12   that we are referring to, though, did not have that

13   opportunity.  This was a cardiac arrest when I arrived and

14   we worked a cardiac arrest.

15   Q.  Sure.  In the last part of your answer, you are

16   referring to this particular incident, correct?

17   A.  I'm talking about this Cup Foods, Derek Chauvin, George

18   Floyd, whatever, Memorial Day.

19   Q.  Sure.  I understand that.  And if I could ask you just

20   to step back.  Have you had other incidents where you've

21   experienced or encountered someone who you believed to be

22   suffering from excited delirium?

23   A.  Have I seen -- yes, I've seen what I suspected to be

24   excited delirium.

25   Q.  And what type of symptoms or things did you observe that

1    led you to believe that, sir?

2    A.  For instance, one was it's the middle of winter, they

3    are naked running around in the street, screaming, yelling,

4    sweaty, not de-escalatable, shouting "I'm high as," beep,

5    using vulgarities.  Once you get them, their heart rate is

6    through the roof and you provide interventions.

7    Q.  Okay.  And if I could go through some of those a little

8    more slowly because it sounds like there are a number of

9    things.

10              You mentioned one was the sweating.  What did you

11   mean by that?

12   A.  Well, in that instance, it's 40 below.  You shouldn't be

13   sweating.  It's freezing.  And just perfusing sweat on all

14   of his body.

15       (Simultaneous indiscernible crosstalk)

16              COURT REPORTER:  Would you say that again?

17              MR. ROBERT PAULE:  I'm sorry.

18   BY MR. ROBERT PAULE:

19   Q.  And, Mr. Smith, that's entirely my fault.  It's not

20   yours.  I'm the one that theoretically know what I'm doing

21   here.

22              But you talk about one of the symptoms of excited

23   delirium or one of the signs is excessive sweating, correct?

24   A.  Yeah.

25   Q.  Is there also oftentimes nudity or nakedness involved?

```
 1    A.  In my experience, there has been.
 2    Q.  Okay.  In your experience, has there also been people
 3    using loud and incoherent speech?
 4    A.  Yes.
 5    Q.  And unable to comprehend really what's going on?
 6    A.  Yep.
 7    Q.  Refusal to follow commands?
 8    A.  Yep.
 9    Q.  Is also foaming at the mouth one of the things that
10    theoretically is a symptom of that, in your training and
11    experience?
12    A.  It could be.
13    Q.  Now, you indicated there's certain protocols that you've
14    been trained on if you suspect a person is in that
15    particular condition; is that correct?
16    A.  Yep.
17    Q.  Could you please tell the jury what that is.
18    A.  When I see somebody in excited delirium, what do I do?
19    Q.  Yes.
20    A.  Assuming we can obtain access to the individual, we can
21    potentially provide ketamine if they are in that state.
22    Q.  And could you tell the jury what ketamine is.
23    A.  It's a drug we provide.  It essentially will sedate the
24    individual, and then we can breathe and monitor their heart
25    and provide medications and care for the patient, because
```

1    they were not de-escalatable.

2    Q.  Is that something that you've been specifically trained

3    to do by Hennepin Healthcare?

4    A.  Yes.

5    Q.  And at some point maybe prior to this incident, did you

6    carry ketamine as part of the equipment you need in your

7    ambulance?

8    A.  Yes.

9    Q.  For that specific purpose?

10   A.  That and others, yeah.

11   Q.  And just as an aside, is ketamine sort of a strong

12   tranquilizer that might be used on animals, as an example?

13            MS. SERTICH:  Objection, Your Honor.  Relevance.

14   I think this is pretty far afield of this case.

15            THE COURT:  No, I think it is relevant.  I'm going

16   to overrule and he may answer.

17            MS. SERTICH:  Can we have a sidebar, Your Honor?

18            THE COURT:  Sure.

19        **(At sidebar)**

20            MS. SERTICH:  Your Honor --

21            THE COURT:  Just a minute.  Before you get into

22   your objection, counsel, I have been advised that you were

23   getting feedback from my microphone.  Is that feedback still

24   there or has it disappeared?

25

1           MR. GRAY:  It disappeared.

2           MS. SERTICH:  Only right at the end there, Your

3    Honor.  While you were talking, it was fine, but then there

4    was some feedback.

5           THE COURT:  Okay.  I have a theory that I've been

6    too close to this light bulb here and that that may be the

7    reason that you were getting feedback.

8           Okay.  Let's go to your objection.

9           MS. SERTICH:  Thank you, Your Honor.  Mr. Smith

10   has now testified that he did not see symptoms of excited

11   delirium with Mr. Floyd and therefore his testimony is

12   irrelevant on this point.

13          MR. ROBERT PAULE:  Your Honor, Robert Paule.  In

14   response, I've been talking this last few series of

15   questions in terms about what experience he's had

16   professionally, as well as the training and the protocols.

17          He also indicated that upon arrival his suspicion

18   was, based on the information he had, that he may be dealing

19   with a situation involving excited delirium.

20          MS. SERTICH:  Your Honor, that was not the

21   situation he actually arrived to, however, and that's what

22   he said.

23          THE COURT:  Counsel, there's earlier testimony in

24   this case of the potentiality of excited delirium.

25   Admittedly, at the time that this witness arrived the person

1    was nonresponsive.  But this type of testimony, because of

2    the foundation that was previously laid, is admissible and I

3    overrule the objection.  He may answer.

4         **(In open court)**

5              THE COURT:  Proceed, Mr. Paule.

6              MR. ROBERT PAULE:  Thank you.

7    BY MR. ROBERT PAULE:

8    Q.  And to be perfectly honest, Mr. Smith, I forgot what I

9    asked you.

10             MR. ROBERT PAULE:  Would it be possible, please,

11   to have the court reporter please read back my last question

12   to reorient at least me?

13        (Requested portion read back)

14             THE WITNESS:  I don't know if they use it on

15   animals.  It is a sedative, that's why we use it.  Because

16   the person is incapable of making their won decisions, so we

17   make them for them to better serve them.

18   BY MR. ROBERT PAULE:

19   Q.  In other words, you sedate people using this

20   tranquilizer to protect them to allow you to help them

21   medically?

22   A.  Correct.

23   Q.  Have you ever in your own personal experience used

24   ketamine or a sedative to sedate somebody who you suspected

25   was under this condition?

```
1     A.  Yes.

2     Q.  How many times?

3     A.  I don't know.

4     Q.  More than once?

5     A.  More than once.

6     Q.  Now, reorienting you, do you remember back when you met

7     with the federal investigators and the prosecutors on

8     April 4th of 2020, did you discuss with them about your

9     experience with excited delirium?

10    A.  I recall having some sort of conversation.  I don't

11    remember the details of it.

12    Q.  Okay.  Do you recall being asked -- excuse me.  Do you

13    recall being asked whether excited delirium was a real

14    condition?

15              MS. SERTICH:  Objection.  Hearsay.

16              THE COURT:  That is hearsay, counsel.  Sustained.

17    BY MR. ROBERT PAULE:

18    Q.  Do you recall discussing this issue with them on

19    August 4th?

20    A.  Yes, I recall discussing excited delirium.

21    Q.  And do you recall discussing this with the state court

22    prosecutors when you met with them in preparation for the

23    previous hearing?

24    A.  Yes.

25    Q.  Do you recall -- well, let me ask you -- I'll rephrase
```

1    it differently -- Mr. Smith, do you have training and own

2    personal experience on whether -- if someone in excited

3    delirium results in cardiac arrest, what the likelihood of

4    resuscitation would be?

5    A.  From my understanding, it's -- you do not -- you are not

6    able to resuscitate them.  Once they have hit that cardiac

7    state, they're dead.

8    Q.  Now, just a couple more questions.

9           Going to when you first arrived, Mr. Lane --

10   excuse me, Mr. Gray asked you some questions about this, but

11   in the video did you notice that when you checked the pulse

12   of Mr. Floyd, that Officer Chauvin still had his knee on

13   Mr. Floyd's neck?

14   A.  I had enough room to check a pulse.  The exact

15   positioning, you'd have to look at the film.

16   Q.  Do you remember that you didn't recall that until you

17   actually saw a video of this incident?

18   A.  As we sit here today, I -- it's been a few years.  I'm

19   not recalling everything.  And, like I said, I've been

20   jerked around and answering so many questions.  I try to

21   block this out and seek my own treatment to move on from

22   this and get my life together.

23   Q.  Probably explains Shakespeare, doesn't it?

24          Just going back to this case, did you draft

25   something called a PCR or patient care report?

```
1    A.  Yes.

2    Q.  Can you just briefly tell the jurors what that is.

3    A.  The document we had up earlier.

4    Q.  Okay.  And I believe that was Exhibit 109; is that

5    correct?  And you wouldn't know that.

6    A.  I don't know that.

7             MR. ROBERT PAULE:  Could I please have Exhibit 109

8    pulled up on the screen?

9    BY MR. ROBERT PAULE:

10   Q.  Mr. Smith, do you see Exhibit 109?

11   A.  Yes.

12   Q.  Is that the patient care report that you drafted?

13   A.  Yep.

14   Q.  I'm not sure I know how to do this.

15            MR. ROBERT PAULE:  Could we go to page 2, please?

16   BY MR. ROBERT PAULE:

17   Q.  At the top of page 2 there's something called a

18   narrative; is that correct?

19   A.  Yes.

20   Q.  Could you tell the jury what that is, please.

21   A.  More or less what occurred, a summary of the events.

22   Q.  And, again, this is something that you drafted, sir?

23   A.  Yes.

24   Q.  Did you notice anything in that narrative about

25   potential sweating involved with Mr. Floyd in this incident?
```

1   A.  "Perfusion, sweaty, no responses," yeah, right there,

2   about third line down.

3   Q.  And I don't want to put words in your mouth, but are you

4   referring to sweating profusely?

5   A.  When I say "perfusion," I mean his skin color looked all

6   right, but it was sweaty.

7   Q.  Okay.

8           MR. ROBERT PAULE:  And then if we could move it to

9   page 4, please.  May I have just a moment, Your Honor?

10          THE COURT:  Yes, you may.

11      (Pause)

12          MR. ROBERT PAULE:  Excuse me.  If we could go back

13  to page 2.  I'm sorry.  I'm having a difficult time reading

14  this.  I'm sorry.  It's page 1.  Pardon me.

15  BY MR. ROBERT PAULE:

16  Q.  Going now to the bottom of page 1, Mr. Smith, when you

17  put down symptoms, do you see a notation in there about

18  sweating?

19  A.  Yep.

20  Q.  Could you tell the jury what you wrote.

21  A.  It's a preselected thing, but I selected sweating.

22  Q.  Okay.  It's actually excessive sweating, isn't it?

23  A.  Yeah.

24  Q.  Okay.  Now, Mr. Smith, to be fair --

25          MR. ROBERT PAULE:  And I'm done with the exhibit.

```
1    Thank you very much.

2    BY MR. ROBERT PAULE:

3    Q.  To be fair, when we talk about this incident involving

4    George Floyd, you did not observe excited delirium with

5    regard to Mr. Floyd; is that correct?

6    A.  I did not, no.

7    Q.  Can you tell the jury why that is, please.

8    A.  I don't know.  I showed up to a cardiac arrest.

9    Q.  Okay.  In other words, if he was in excited delirium,

10   that would have been something that would have occurred

11   before that point, correct?

12   A.  Yes.

13   Q.  But that's what you, as a paramedic with your level of

14   training, suspected upon arrival, correct?

15   A.  With the sudden upgrade, police custody, some of the

16   notes indicating drug use, I suspected that.

17   Q.  Okay.  Thank you very much, sir.  I don't have any

18   further questions.

19              THE COURT:  Thank you.

20              Mr. Plunkett.

21                       CROSS-EXAMINATION

22   BY MR. PLUNKETT:

23   Q.  Good morning, sir.

24   A.  Hello.

25   Q.  My name is Tom Plunkett.
```

```
1    A.  Hi.

2    Q.  Hi.  It's nice to meet you.  We've never had the

3    pleasure of meeting before; isn't that correct?

4    A.  I have never met you, sir, no.

5    Q.  I'm not going to re-ask the questions that you've

6    already endured, but I do have a few other questions.

7    A.  Yes, sir.  Thank you.

8    Q.  Thank you, sir.

9             When you arrived at the scene, you took a carotid

10   pulse; is that correct?

11   A.  Yes.

12   Q.  Not to state the obvious, but that's a pulse taken at

13   the neck, correct?

14   A.  Yes, sir.

15   Q.  And the reason you do that is because that's the best

16   place to take a pulse; isn't that correct?

17   A.  That's where I've been trained to do it, yep.

18   Q.  They wouldn't train you to take a pulse at the bad place

19   to take a pulse, would they?

20   A.  I don't know.

21   Q.  I suppose anything is possible.

22            In fact, it's my understanding of your training is

23   that if you can't get a -- radial or a posterior tibial

24   pulse, you would defer to the carotid pulse; isn't that

25   correct?
```

1    A.  If I can't get a radial or a what?

2    Q.  A pulse at the ankle, a posterior tibial pulse.

3    A.  If I can't get any of those, I do a carotid.  I suppose

4    you can check a pulse in multiple different locations, if

5    that's what you are asking.

6    Q.  But the radial pulse is where you'd go to, correct?

7    A.  I'm sorry.  I'm not understanding what you are trying to

8    get at.

9    Q.  I'm sorry.  Because you know why you are not

10   understanding is because I'm mixing up radial and carotid.

11   I owe you an apology, sir.

12   A.  Thank you.

13   Q.  I'm not trying to be tricky with you and I want to be

14   respectful, so I do apologize.  I think we've done enough

15   about pulses.  We agree that the neck is the one you want to

16   go for.

17            My -- you were asked some questions about talking

18   to the police officers at the scene, and now you've had a

19   chance to review your -- the movie or the video.  And it

20   would be correct to say that you didn't talk to the police

21   at the scene initially, correct?

22   A.  Other than I told them to get out of the way when we

23   were loading him, but I did not verbally tell them anything

24   upon arrival.

25   Q.  Okay.  You took over, you got to work trying to take

1   care of your patient; isn't that what you did?

2   A.  I wasn't sure what was going on.  I was trying to gather

3   information.  I didn't necessarily take over the scene.

4   Q.  I didn't say you took over the scene, and I didn't mean

5   to imply that.  You started doing your job is what I was

6   trying to say.

7   A.  Okay.  Yes, I was trying to gather information to better

8   serve Mr. Floyd.

9   Q.  And what's why you checked his eyes and you checked his

10  pulse, and then you -- at that point that was the

11  information you gathered, right?

12  A.  Yes.

13  Q.  And you didn't talk to the officers after that, you went

14  right back to grab your gurney out of the rig, correct?

15  A.  I talked to my partner, yep.  I did not talk to the

16  officers.

17  Q.  Okay.

18          MR. PLUNKETT:  Nothing further, Your Honor.  Thank

19  you.

20          THE COURT:  Thank you.

21          Counsel, redirect?

22          MS. SERTICH:  Thank you, Your Honor.

23                   REDIRECT EXAMINATION

24  BY MS. SERTICH:

25  Q.  Mr. Smith, both Mr. Gray and just now Mr. Plunkett asked

```
1    you some questions about what you told the officers to do

2    when you first arrived on the scene.

3              Having reviewed the video they played, did you say

4    anything to them when you first arrived on the scene?

5    A.  I believe the first thing I said to them was "Get out of

6    the way" when we were trying to load him.

7    Q.  And that's when you had the gurney?

8    A.  Yep.

9    Q.  You were asked a number of questions about moving the

10   ambulance to get away from the crowd.  Do you recall those

11   questions?

12   A.  Yep.

13   Q.  And you previously testified that you heard elevated

14   tones.  You didn't know what those folks were saying,

15   correct?

16   A.  Correct.

17   Q.  When did you learn that those bystanders had been

18   yelling for the officers to take Mr. Floyd's pulse and get

19   off of him?

20   A.  After the fact.

21   Q.  So not at any point on that night of May 25th, 2020?

22              MR. PLUNKETT:  Objection.  Asked and answered.

23              THE COURT:  No, he may answer.

24   BY MS. SERTICH:

25   Q.  So not at any point on that night of May 25th, 2020?
```

```
 1    A.  I don't recall being told, no.

 2    Q.  Was part of the confusion on scene the lack of

 3    information you had?

 4              MR. GRAY:  Object to that as leading, Your Honor.

 5              THE COURT:  That is leading, counsel.  Sustained.

 6    BY MS. SERTICH:

 7    Q.  Mr. Smith, you previously testified you felt like there

 8    was a lack of information when you first arrived on the

 9    scene, right?

10              MR. GRAY:  Object to that, Your Honor, as leading.

11    It's also repetitious.

12              THE COURT:  It is, counsel.

13              MS. SERTICH:  Your Honor, I'm trying to lay the

14    foundation for my next question by asking about his previous

15    testimony.

16              THE COURT:  Okay.  Then you may ask it.

17    BY MS. SERTICH:

18    Q.  You previously testified, Mr. Smith, that you didn't

19    feel like you had sufficient information when you arrived on

20    scene; is that right?

21    A.  In reference to the Code 2, Code 3 upgrade, I felt more

22    information could have been provided.

23    Q.  And did that lack of information add to the feeling on

24    the scene that you wanted to get into the ambulance?

25              MR. PLUNKETT:  Objection.  Relevance.
```

```
1              THE COURT:  Again I sustain the objection,

2     counsel.  We're leading.

3     BY MS. SERTICH:

4     Q.  Now, Mr. Gray played a video for you that showed

5     Mr. Lane giving his response about what happened on the

6     scene.  Do you remember that?

7     A.  Yes.

8     Q.  And having reviewed that video again with Mr. Gray, were

9     you told that Mr. Floyd was restrained on the ground for

10    more than nine minutes with a knee on his neck before you

11    had arrived on the scene?

12    A.  No.

13    Q.  When did you learn that information?

14    A.  After the fact.

15    Q.  Were you told that Mr. Floyd did not have a pulse for

16    minutes before you arrived?

17              MR. PLUNKETT:  Objection, Your Honor.  Improper.

18              THE COURT:  Again, I sustain.

19              MR. PLUNKETT:  I'm marking the record for a future

20    motion, too.

21    BY MS. SERTICH:

22    Q.  When did you learn that Mr. Floyd had been unconscious

23    for a couple minutes before you arrived on the scene?

24              MR. GRAY:  Your Honor, object to that as leading

25    and it's also not accurate.
```

```
1              THE COURT:  I sustain.

2    BY MS. SERTICH:

3    Q.  And then I believe in the longer version of the video

4    played that Mr. Gray showed you, when the firefighters came

5    in, Mr. Lane started to talk again about what happened; is

6    that right?  Did you hear that?

7    A.  Yeah.

8    Q.  And, again, did you hear anything about a loss of pulse

9    or consciousness?

10   A.  I don't recall that.

11   Q.  When did you first hear about that?

12              MR. PLUNKETT:  Objection.  Improper.

13              THE COURT:  Yeah, counsel, I sustain.  That video

14   speaks for itself, and I sustain the objections to it.

15   BY MS. SERTICH:

16   Q.  You were asked some questions by Mr. Paule about the

17   fact that you didn't drive straight to the hospital.  Do you

18   remember that?

19   A.  Yes.

20   Q.  And you said that in this situation, this specific

21   situation, that was the right thing to do.  Do you remember

22   that?

23   A.  Yes.

24   Q.  And is that because Mr. Floyd was in cardiac arrest?

25   A.  Why I stayed, yeah, I wanted to -- that was -- I stayed
```

 1   because it was best for Mr. Floyd's outcome.

 2   Q.  Is getting treatment started right away important with

 3   cardiac arrest?

 4   A.  Yes.

 5   Q.  Is that true even if you don't have your equipment with

 6   you?

 7   A.  Yes.

 8   Q.  What can you do if you don't have your equipment with

 9   you?

10            MR. PLUNKETT:  Objection.  Speculation.  A

11   violation of pretrial order.

12            THE COURT:  I sustain, counsel.  I think we've

13   gone over he arrived and the ambulance came; he arrived in

14   the ambulance.

15   BY MS. SERTICH:

16   Q.  Can someone who is in cardiac arrest be provided with

17   CPR?

18            MR. PLUNKETT:  Objection.  Speculation.

19   Relevance.

20            THE COURT:  No.  He may answer that.

21            THE WITNESS:  If somebody is in cardiac arrest,

22   they can be provided CPR.

23   BY MS. SERTICH:

24   Q.  And is it best to start that right away?

25   A.  In theory, it would be ideal to start CPR right away.

1    Q.  And Mr. Paule asked you a lot of questions about the

2    different levels of medical responders, paramedic, EMT, and

3    emergency responder.  Is someone who is CPR certified be

4    able to start CPR?

5    A.  Yes.

6    Q.  Mr. Paule asked you a number of questions about what you

7    expected to see when you arrived on the scene.  Do you

8    recall getting asked those questions?

9    A.  Yes.

10   Q.  And so was it surprising to you when you found someone

11   in cardiac arrest?

12              MR. GRAY:  Object to that as leading and

13   repetitious.

14              THE COURT:  Sustained.  It's leading.

15   BY MS. SERTICH:

16   Q.  Based on what you responded to, were you surprised that

17   there were officers on top of Mr. Floyd?

18              MR. GRAY:  Same objection, Your Honor.  Besides

19   that, whether he was surprised is not relevant.

20              THE COURT:  Surprised is not relevant.  What he

21   saw is relevant.

22   BY MS. SERTICH:

23   Q.  Mr. Smith, did you see the officers on top of Mr. Floyd

24   when you arrived?

25              MR. GRAY:  Object to that too as vague, Your

```
 1    Honor.

 2                 THE COURT:  It's overruled.

 3                 MR. GRAY:  We don't know what officers she's

 4    even --

 5                 THE COURT:  It's overruled.

 6                 THE WITNESS:  I saw officers on Mr. Floyd.

 7    BY MS. SERTICH:

 8    Q.  Do you remember how many?

 9    A.  Three.

10    Q.  You also talked with Mr. Paule about the symptoms of

11    something called excited delirium.  Do you remember that?

12    A.  Yes.

13    Q.  And the example you gave, right, is someone naked and

14    running around in the cold and sweating; is that right?

15    A.  Yep.

16    Q.  And so I think you were saying -- you can correct me if

17    I am wrong -- that one of the symptoms is being

18    inappropriately clothed?

19    A.  What I mean by that was generally there's like an

20    overheating and so it would be inappropriate -- so yeah.

21    Q.  Was Mr. Floyd appropriately clothed when you responded

22    to the scene?

23    A.  Yeah.  He had jeans and a shirt on, yeah.

24    Q.  And one of the things you also mentioned when Mr. Paule

25    asked you the question was that you would expect the person
```

1    to be using vulgarities; is that right?

2    A.   Yeah.

3    Q.   And I think you said not being compliant with police

4    officers; is that correct?

5    A.   Just not being compliant in general or un -- you can't

6    de-escalate them or talk any sense into them.

7    Q.   And in the cases you've seen, has it been hard to even

8    get that person to interact with you and answer questions

9    normally?

10   A.   Yeah.  They're in their own world.

11   Q.   And I think you also said a person like that can't be

12   restrained; is that what you said?

13   A.   I believe I said resuscitated once they've hit cardiac

14   arrest because of excited delirium.

15   Q.   And that's the thing I wanted to talk about next.  It's

16   your understanding that someone who is suffering from

17   excited delirium is more susceptible to cardiac arrest?

18   A.   If untreated, they go into cardiac arrest and there's --

19   my understanding there's no way of resuscitating them.

20   Q.   So if you were responding, as you talked about with

21   defense counsel, to a situation with someone with excited

22   delirium, given that susceptibility, would you have concerns

23   about them being held in the prone position for a long

24   period of time?

25   A.   Would I -- knowing what I know, I don't know -- let's

1    see here.  It would depend.  If you've got three officers

2    doing their job, there might be a reason to keep him in the

3    prone position.

4            MR. PLUNKETT:  I object at this point, Your Honor.

5    No disrespect.  It's become nonresponsive.  Also, the

6    question is not seeking relevant evidence.

7            THE COURT:  I think the answer is given and it's

8    going to stand.

9    BY MS. SERTICH:

10   Q.  I believe you were shown a report by Mr. Paule, the same

11   report that you and I looked at earlier about the call; is

12   that correct?

13   A.  Yep.

14   Q.  I just wanted to give you a chance to clarify.  When you

15   were filling out that form and you indicated sweatiness,

16   were you trying to say that it automatically populates with

17   excessive sweatiness?

18   A.  On that particular -- where the three were with the

19   apnea, excessive sweating one or whatever, that one is a

20   prepopulate.  In the narrative, when I said perfusion but

21   sweaty or something along those lines, that I physically

22   actually wrote.

23   Q.  And what were you trying to communicate by saying that

24   Mr. Floyd was sweaty in your narrative?

25   A.  I was just documenting whatever information I could get.

```
1    I mean, it was middle of May, too, so he could have been

2    just been sweating.  I don't know.

3            MS. SERTICH:  Can I have just one moment, Your

4    Honor?

5            THE COURT:  Certainly.

6        (Counsel confer)

7            MS. SERTICH:  Nothing further at this time, Your

8    Honor.

9            THE COURT:  Okay.  Thank you.

10            Mr. Gray.

11                    RECROSS-EXAMINATION

12   BY MR. GRAY:

13   Q.  Mr. Smith, I'll be very brief.  If the video in this

14   case showed that when you arrived and came over to check on

15   Mr. Floyd, that Mr. Lane was not even contacting Mr. Floyd

16   at that time, would you disagree with that, that he wasn't

17   on top of him?

18   A.  The judge has said the video speaks for itself.

19   Q.  Okay.  Thank you.

20            THE COURT:  Mr. Paule.

21                    RECROSS-EXAMINATION

22   BY MR. ROBERT PAULE:

23   Q.  Mr. Smith, just two points I want to make.  One is when

24   you arrived at 38th and Chicago, let's say there wasn't a

25   crowd around there, would you have just done the medical
```

1    care at that particular location?

2                 MS. SERTICH:  Objection.  Calls for speculation.

3                 THE COURT:  No, I'm going to overrule.  You may

4    answer.

5                 THE WITNESS:  No crowd?  I'd show up and there's

6    three officers, whatever is going on, just with a guy in

7    custody, I would put him in the back of my rig and work

8    there, yes.

9    BY MR. ROBERT PAULE:

10   Q.  So the idea is you don't have to drive to another place

11   to start care because you've got everything you need right

12   there?

13   A.  Yep.  I've just got to get him loaded up and we can

14   start care.

15   Q.  So the real reason you left that scene, the delay of

16   medical care, was caused by your concern for the crowd,

17   correct?

18   A.  Yes, sir.

19   Q.  Thank you.

20                 Now, with regard to the second thing, with regard

21   to excited delirium, is this something I'm making up or is

22   this something you've been trained in and seen and

23   experienced yourself?

24   A.  I've been trained in it.  I've seen it on more than one

25   occasion, and some people in the medical community believe

```
 1    its true.

 2    Q.  You've actually sedated people who you believed to be in

 3    that condition?

 4    A.  Yes.

 5    Q.  All right.  Now, as a paramedic, you're authorized to

 6    give sedatives like ketamine, correct?

 7    A.  Yes.

 8    Q.  Do you know if the police are authorized to carry and

 9    administer ketamine or sedatives in that instance?

10    A.  I don't believe they are.

11            MR. ROBERT PAULE:  Thank you.  No further

12    questions.

13            THE COURT:  Anything else, Mr. Plunkett?

14            MR. PLUNKETT:  Nothing further, Your Honor.  Thank

15    you.

16            THE COURT:  Okay.  Thank you.

17            Counsel.

18                    FURTHER REDIRECT EXAMINATION

19    BY MS. SERTICH:

20    Q.  Just one question for you, Mr. Smith.  You just

21    testified with Mr. Paule that if there hadn't been a crowd

22    there, you would have put Mr. Floyd in the back of your rig

23    and started working on him; is that right?

24    A.  Yes.

25    Q.  And is that what you did on May 20th -- 25th, 2020?
```

```
 1    A.  Yeah, more or less.  We just had -- my partner drove and

 2    I was already trying to do patient care with Mr. Lane

 3    assisting us.

 4              MS. SERTICH:  Thank you.  Nothing further.

 5              THE COURT:  Okay.  Thank you.

 6              With that, you may step down.  Thank you.

 7              MS. SERTICH:  Are you ready for the next witness,

 8    Your Honor?

 9              THE COURT:  Please.

10              MS. SERTICH:  The government calls Jeremy Norton.

11              THE COURT:  I think as the witness comes in,

12    counsel, my thought is that we did have a short break

13    earlier.  We'll go until about 12 o'clock and then we'll

14    take a noon break at that point.

15              Sir, if you'd step up and raise your right hand to

16    be sworn.

17                           JEREMY NORTON,

18    called on behalf of the government, was duly sworn, was

19    examined and testified as follows:

20              THE COURT:  Take the stand, please.  Slide up

21    close to the mic.

22              THE WITNESS:  Yep.

23                         DIRECT EXAMINATION

24    BY MS. SERTICH:

25    Q.  Good morning, Captain Norton.
```

1    A.  Good morning.

2    Q.  Where are you employed?

3    A.  I'm employed in Minneapolis for the Minneapolis Fire

4    Department.

5    Q.  What is your position with the Minneapolis Fire

6    Department?

7    A.  I am a captain.

8    Q.  How long have you been a Minneapolis Fire Department

9    captain?

10   A.  I promoted to captain in 2007, I promoted to battalion

11   chief in 2014, and I voluntarily returned to the captain

12   rank in 2017.

13   Q.  So you said that you voluntarily went back to being a

14   captain from battalion chief?

15   A.  Yes, ma'am.

16   Q.  Why did you want to return to being a captain?

17   A.  For me, the engagement with the public and the working

18   with the crew trumped kind of the managerial aspect of it.

19   Q.  And what are your primary duties as a chief with the

20   Minneapolis Fire Department -- or captain, I'm sorry?

21   A.  As a captain, ma'am?

22   Q.  As captain.

23   A.  I am in charge of our crew and our rigs day-to-day

24   operations.  I'm in charge of safety, of delivering services

25   to the public, to ensuring that all rules and regulations

1    are followed, working well with other agencies.  And then on

2    emergency calls and nonemergency calls, I am the primary

3    supervisor making sure that I assess and direct our actions.

4    Q.  And, in total, how long have you been a firefighter with

5    Minneapolis?

6    A.  I joined in 2000.  So just about 22 years at the end of

7    this month.

8    Q.  Can you describe your education and training background

9    as it relates to your work with the fire department.

10   A.  Yes, ma'am.  When I started in -- I applied in '98 and

11   in -- is that all right.

12   Q.  Yeah.

13   A.  Okay.  In 2000 we were trained to EMT basic level

14   through the fire department and through Hennepin County

15   Medical Center.  We did Firefighter I and II, entry level,

16   kind of whatever is considered standard level, and then

17   along with hazmat training as well.

18   Q.  And as a part of that, then, do you have emergency

19   medical response training or certification?

20   A.  Yes, ma'am, the EMTB.

21   Q.  What does it mean to be an EMTB?

22   A.  Really I believe there are two, if not three levels.

23   EMTB is kind of the entry level.  It's about 150 hours of

24   coursework prior to getting a certification, passing the

25   national registry test, and then from there it's actually

1    applying it in real-life situations and then every year

2    ongoing continuing education.

3    Q.  And can you compare being an EMTB and how that relates

4    to being either a paramedic or an emergency responder.

5    A.  I can't speak to emergency responder.  Paramedics, I

6    believe, are two years of coursework and practicals.  So

7    they are -- they are advance life -- ALS, advance life

8    service, and we are basic life service.

9              So we have proficiency with an AED or heart start

10   with providing oxygen, ventilations, a lot of stuff that can

11   keep somebody alive or bring them back.  And then the

12   paramedics have a far higher level of training and skill.

13   Q.  You mentioned an AED.  Is that one of those devices that

14   you see around in public buildings that can be used to shock

15   a person?

16   A.  Yes, ma'am.  I don't see one in here now, but, yes, it's

17   an automatic external defibrillator.

18   Q.  And is one of the distinctions between EMTBs and

19   paramedics that paramedics can administer medications?

20   A.  Yes, ma'am, that's one of the primary.  They can do --

21   in Minneapolis at least they can do IVs, they can provide

22   medicines and medications, and they use an EKG monitor.  And

23   then they have a manual defibrillator, which is different

24   from our automatic one.

25   Q.  And then are you aware that there's another level of

1     emergency medical responder that's below EMTB?

2     A.  Yes, ma'am, if you say so.

3     Q.  Can you --

4     A.  I'm sorry.  Meaning there might be one or two below.

5     There's a community responder also, but yes.

6     Q.  Understood.  Can you describe a typical day for you with

7     the Minneapolis Fire Department.

8     A.  Yes, ma'am.  The joy and the challenge of this job is we

9     show up every day and we have no idea what's coming.  So I

10    can give you a general sense.

11            We check the rig, check our equipment.  We do

12    house duties.  We do some form of training.  And then any

13    time in our 24- or 48-hour shift that an emergency call

14    comes in, we respond.  So we interrupt whatever we are

15    doing, whether it's cleaning, whether it's training, whether

16    it's having lunch or whether it's sleeping, and we respond.

17            About 80 percent of the response calls that

18    Minneapolis Fire Department does are medical in nature.  And

19    then on top of that there are fire alarms, hazmat calls, CO

20    detecters, and then fires.  But the majority of our work is

21    medical in nature.

22    Q.  And you respond to all variety of medical calls?

23    A.  Yes, ma'am.  We respond essentially from before birth,

24    so any sort of OB/GYN issue, through after death,

25    essentially.

1         And, as I said, we provide BLS and in Minneapolis

2    we work in concert with the primarily Hennepin County

3    medical ambulances, south side, and then North Memorial,

4    north side, and so we work as kind of as a support with

5    them.

6    Q.  You mentioned something called BLS.  Can you explain for

7    the jury what that is.

8    A.  Ma'am, BLS is basic life support.

9         So I can -- if someone here were to have a heart

10   attack, I can assess them and I can provide ministrations

11   myself, and then I can organize to -- without equipment try

12   to do CPR and then with equipment I can use.  I'm proficient

13   with the equipment to try to bring them back.

14        Same thing with ventilations.  If someone is in

15   respiratory failure, I can use a simple airway, an

16   intermediate airway, and we can use any of our oxygen

17   delivery devices to try to improve someone's respirations.

18   Q.  Now, just in case the jury isn't familiar with this

19   concept, can you explain why the fire department and

20   firefighters respond to so many calls for medical

21   emergencies.

22   A.  Yes, ma'am.  I believe in the 1980s it was realized that

23   as the number of fires was going down, you had fire stations

24   positioned around a city to respond swiftly to every -- to

25   areas in their block.

1          So while there might be seven to twelve ambulances

2     covering Minneapolis and the outer county, for Minneapolis

3     we have 19 fire stations currently and 26 rigs spread out.

4     So we can get most places in our box within three to

5     four minutes.  And then with GPS, now it's even easier;

6     whatever the closest rig is.  So we respond quickly.

7          So we are able to, on emergency calls, provide the

8     buffer to keep someone alive until a higher trained, in this

9     case, ALS or the ambulance arrives.  In cases that are not

10    necessarily emergent, if someone has fallen and broken their

11    leg, while that is painful, it is not necessarily life

12    threatening, so we can stabilize the injury and then we end

13    up providing assistance to the paramedics to help get

14    somebody out of this situation they are in, if that answers

15    your question.

16    Q.  It does.

17         And you said, then, that in any given area there

18    are likely fewer ambulances than firefighters to respond to

19    a call; is that what you were saying?

20    A.  Yes, ma'am.  I can't speak to the specifics of how the

21    ambulances are deployed, but my understanding is on a daily

22    level they shift between about seven or eight to eleven or

23    twelve covering Minneapolis and then parts of the suburbs;

24    whereas, we are always -- Minneapolis Fire only responds to

25    emergency medical emergencies within the city boundaries,

1    unless there is something extraordinary.

2    Q.  And so then that results in a significantly faster

3    response time under normal circumstances for fire as opposed

4    to paramedics?

5    A.  Ma'am, it depends on where the ambulance happens to be,

6    but, yes, generally we can get places faster.  So on most

7    calls we arrive just ahead of the paramedics, sometimes in

8    concert.  And then if they are coming from, say, Wayzata or

9    somewhere outside, we might be there three, five,

10   ten minutes before they arrive.

11         And so the idea of BLS is my crew and I can keep

12   someone alive, stop whatever -- that we can -- whatever kind

13   of negative effect is affecting them and then provide care

14   until the medics arrive.

15   Q.  So fair to say that you have been on calls involving

16   cardiac arrests before?

17   A.  Yes, ma'am.

18   Q.  And you have provided medical aid to someone who does

19   not have a pulse?

20   A.  Yes, ma'am.

21   Q.  Do you frequently respond to calls where the Minneapolis

22   Police Department officers are on a scene?

23   A.  I do.  I'm not sure how we would define frequently, but

24   there are many calls where police are called in because the

25   nature of the call is unclear and there are calls where we

1   come in because there is both a civil or a criminal issue as

2   well as a medical issue.

3   Q.  So you anticipated my next question, which is:  Do those

4   calls ever include a situation where someone who is being

5   arrested by the Minneapolis Police Department requires

6   medical treatment?

7   A.  Yes, ma'am, I've been on several of those.

8   Q.  Were you on duty with the fire department on May 25th of

9   2020?

10  A.  Yes, ma'am.

11  Q.  And where were you when you were on duty that night?

12  A.  I'm stationed at Fire Station 17, 330 East 38th Street,

13  South Minneapolis.

14  Q.  Okay.  And when you are at Station 17 is your rig called

15  Engine 17?

16  A.  Yes, ma'am, it is.

17  Q.  Did you receive a call for Engine 17 to respond to the

18  area near Cup Foods that evening?

19  A.  Yes, ma'am.

20  Q.  And you were at the station when you received that call?

21  A.  Yes, ma'am.

22  Q.  Do you recall about what time you received that call?

23  A.  I believe it came in at 2030 or 8:30 p.m.

24  Q.  What did you learn from dispatch about the nature of the

25  call?

671

1    A.  The call came in.  Our station opened up.  Dispatch

2    tells us -- kind of gives us basic information.  We proceed

3    to the rig, and on our mobile data terminal rig computer it

4    will often populate with whatever information.  And all this

5    said was Code 2, which is a nonemergent response, and I

6    believe it said assist, one with a mouth injury.

7    Q.  And just to give the jurors a sense of how this works,

8    how is it when you are in the station that you are notified

9    of a call?

10   A.  The lights click on, there's an audible clicking sound

11   of the station audio opening up, and then there are either

12   an up/down, up/down, up/down tone for medical call or five

13   or six staccato bursts for a fire call.  So that kind of

14   gives us the direction.

15   Q.  And you got the signals for a medical call here; is

16   that --

17   A.  Actually, no, ma'am.  It came in as just two solid

18   beeps, which is a Code 2 response.  That was the third

19   option.  I apologize.

20   Q.  And the jury has had some testimony on this.  Is a

21   Code 2 a nonemergent response?

22   A.  Yes, ma'am.

23   Q.  Was that call updated?

24   A.  Yes, ma'am.  We proceeded to the rig, left the station,

25   took a left onto 38th Street, and within a block it was

 1   updated to Code 3.  Our dispatcher gave us no further

 2   information and nothing further populated the -- our data

 3   terminal before we arrived.

 4   Q.  Okay.  So you didn't receive any additional information

 5   when that update happened?

 6   A.  No, ma'am.

 7   Q.  Okay.  I'm going to show you a document that's been

 8   admitted as Government's Exhibit 128.  Do you recognize this

 9   document?

10   A.  Yes, ma'am.  It looks like it's -- sorry.  It looks like

11   it's one of our -- kind of the generated reports of our data

12   information.

13   Q.  Okay.  So what kind of information does this document

14   show?

15   A.  In the center there under Time Stamps, it will show

16   phone pickup, first key stroke, in waiting, call -- first

17   unit assigned, which is 20:30:31, which would be us.  20 --

18   first unit en route, which is 20:31:26, and first unit

19   arrived 20:32:49.  Because from when -- sorry.  There's

20   often a delay from radio communication to when dispatch

21   fields it and to when they distribute it back to us.

22   Q.  Okay.

23   A.  But that's what it says.

24   Q.  So let's walk through that with it blown up for the jury

25   so that they can see it.

1        Do you see the time here at which fire was

2    dispatched to the scene at Cup Foods?

3    A.  I believe it is at 20:30:31.

4    Q.  And then by what time were you en route to the Cup Foods

5    area?

6    A.  At 20:31 and 26 seconds, I believe.

7    Q.  So that's less than a minute later?

8    A.  Yes, ma'am.

9    Q.  Okay.  And then you mentioned that you'd already left

10   and were about a block out when you got the upgrade; is that

11   right?

12   A.  Yes, ma'am.

13   Q.  So what time, then, did you arrive on the scene?

14   A.  20:32:49 seconds.

15   Q.  And is that about a minute and 20 seconds after you

16   left?

17   A.  Yes, ma'am.

18   Q.  Okay.  Going down to page 2 of Government's Exhibit 128,

19   and I want to direct your attention to the entry there at

20   20:28:36.  Do you see where it says, "E412 Req Fire Code 3"?

21   A.  Yes, ma'am.

22   Q.  Okay.  Does that tell you who requested fire and rescue

23   presence on the scene?

24   A.  The right hand where it says, "E412," that is the

25   ambulance.

1    Q.  Who was in the rig with you that day, Captain?

2    A.  My Fire Motor Operator Or Driver Tracy Terbell,

3    Firefighter Steven Mudek, and Firefighter Jennifer Hall.

4    Q.  And I think by your description we understand what Fire

5    Motor Operator/Driver Terbell does.  Can you explain the

6    roles of Ms. Hall and Mr. Mudek.

7    A.  Yes, ma'am.  They're rank firefighters and so they -- we

8    work as a team.  So even though I'm a supervisor, we all

9    work together.  They work under my direction.  They do most

10   of the task level activities and -- yeah.  So they're kind

11   of the worker bees, essentially.

12   Q.  Was Ms. Hall fairly new at the time?

13   A.  Yes, ma'am.

14   Q.  I'm going to show you a map previously admitted as

15   Government Exhibit 43, and I think we see up towards the

16   center top of the screen an indicator of Cup Foods.  Do you

17   see that?

18   A.  Yes, ma'am.

19   Q.  Okay.  And traveling off of the map, can you explain for

20   the jury where Station 17 is located.

21   A.  Yes, ma'am.  What's clipped off at the very bottom after

22   Oakland would be Portland and then 5th and then 4th.  So we

23   are two blocks off the map right there, which is west.

24   Q.  And about how many blocks is that, then, to Cup Foods?

25   A.  It's about six.

1    Q.  What did you -- actually, I'm going to show you another

2    map admitted as Government's Exhibit 1.  Are you familiar

3    with this intersection?

4    A.  Yes, ma'am.

5    Q.  And do you see the indicator there of where Cup Foods is

6    on the upper left part of the screen?

7    A.  Yes, ma'am.  That's the northeast corner.

8    Q.  And just touching the screen, can you indicate where the

9    fire truck pulled up when you responded to that call on the

10   evening of May 25th, 2020.

11   A.  Yes, ma'am.  We pulled through the intersection, pulled

12   past the store, and parked right about there (indicating).

13   Q.  And you are indicating on the screen just to the right

14   of the Cup Foods entrance; is that correct?

15   A.  Yes, ma'am, just east of it.

16   Q.  What did you see when you first arrived on the scene at

17   38th Street and Chicago?

18   A.  When we -- as we approached, because part of my job is

19   to always be looking at what we're going into and then

20   assessing for safety and assessing and then starting my plan

21   of what we're going to do, as we approached from the west

22   entering the intersection, there were several squad cars.

23        I did not -- at that point there was no indication

24   there was an ambulance.  I did not see an ambulance.  I did

25   not see anyone on the ground.  We pulled through the

```
 1      intersection, parked about where I designated.

 2             There were -- there was at least one squad car to

 3      my right on the southeast side of the intersection.  I got

 4      out of the rig and initially spoke to one of two police

 5      officers who was standing there.

 6             MS. SERTICH:  Your Honor, I'm going to be digging

 7      into some further video evidence here.  Would this be a good

 8      place to stop?

 9             THE COURT:  Okay.  Let's do that.

10             Members of the jury, we're going to take a noon

11      recess at this time.  We'll be in recess until 1:30 this

12      afternoon.  I would caution the members of the jury, once

13      again, not to discuss the case amongst yourselves or other

14      persons.  And we will stand in recess until 1:30.

15             The jury may be excused.

16      (Lunch recess taken at 11:59 a.m.)

17                             *  *  *  *  *

18         (1:27 p.m.)

19                          IN OPEN COURT

20                        (JURY NOT PRESENT)

21             THE COURT:  Mr. Gray, you have something?

22             MR. GRAY:  Yes, Your Honor.  I got an email during

23      lunchtime.  I don't know if it was sent during lunchtime,

24      but I went back to my office and looked at some of my emails

25      and it was from the government advising me that they're not
```

 1        going to pull up any more exhibits for me.

 2                And I assume that when they have all the exhibits

 3        on their computer, that you'd ask for one because they are

 4        all -- I mean, I don't have paper exhibits, judge, so I'm

 5        relying on their computer.

 6                And we're trying to figure something out, but

 7        it's -- I'm not going to be using that many exhibits in my

 8        cross-examination, but if I ask for one, I would like to be

 9        able to have access to it.

10                MS. BELL:  So, judge, let me explain.  I sent the

11        email this morning, and the reason I sent the email, as you

12        noticed, we have been disconnecting our computer so that

13        when defense counsel go up for cross-examination, like

14        Mr. Plunkett did yesterday, he went to plug in his computer

15        and so that he could use his computer and use the exhibits

16        as he sees fit.

17                The court will have noticed that when Mr. Gray was

18        asking us to pull up videos, there was a delay because we

19        don't know what they're asking to pull up.  The computer is

20        not -- let's put it this way.  It doesn't work that fast

21        sometimes.

22                And so I noticed that it was frustrating because

23        we were waiting and so I asked counsel -- I said I think

24        maybe we should go back to what is the practice I have

25        experienced here, where each side pulls up their exhibits

1    how they want, because with video in particular it is really

2    hard to get it to a particular spot if you don't know well

3    in advance where you want it.  It always takes a few minutes

4    to get it moved around, as the court has seen.  And so that

5    was my suggestion.  That is an experience I have had.

6    Mr. Paule explained to me he has not had that experience.

7            I'm assuming defense counsel will use -- I know

8    they all have exhibits.  I'm assuming they plan to pull them

9    up either in paper or however, on the computer.  I'm not

10   sure how they plan to use the exhibits they've provided, but

11   I assumed they had a system because they've provided us with

12   exhibits.

13           They told me now today, since we've come in here,

14   that they are not sure if they can hook up from the table or

15   if they have to be up at the podium, and I'm not sure about

16   that either from a technological standpoint.

17           And so I'm just trying to facilitate everyone

18   getting the exhibits they want when they want them, because

19   we are going to be slow because we don't know what exhibits

20   they want to cross-examine witnesses with because they don't

21   provide us with outlines in advance, obviously.

22           So that's what I was trying to facilitate, was to

23   not have these delays starting the program back up and doing

24   all of that.

25           THE COURT:  Okay.  Ms. Bell, your experience in

```
1    this district is different than mine.  My experience has

2    always been that lawyers have cooperated with one another,

3    bringing up various electronic exhibits.

4         And it is not an uncommon thing, quite frankly,

5    because the government so often has the vast majority of the

6    exhibits, which is understandable and appropriate, and

7    defense often needs them just for very limited

8    cross-examination, which I've always seen provided to the

9    defense when that is called for.  And I'm going to continue

10   to say that should happen.

11        I think we get into the difficulty that we are in,

12   quite frankly, with what happened this morning.  We had

13   delayed a start in order for a particular exhibit to be -- I

14   have to be careful.  I use the word "modified," but that

15   isn't true.  It was a particular exhibit that may have been

16   inappropriate.  That's what I guess I'll say.

17        MS. BELL:  Yeah.

18        THE COURT:  And the plan was that that

19   inappropriate exhibit would not be used, but this other one

20   would be used.  And then when Mr. Gray went to use it, he

21   didn't get the -- he got the inappropriate one.

22        MS. BELL:  So what happened is I actually did give

23   him the redacted version on a thumb drive, and I didn't know

24   he was going to play it with that particular witness.  We

25   hadn't loaded it on -- into the Trial Director program the
```

```
1     court has been seeing, and so that was the challenge

2     there --

3                 THE COURT:  Okay.  Well, that was --

4                 MS. BELL:  -- for that particular exhibit.

5                 THE COURT:  That was and it is a challenge,

6     because I, frankly, was disappointed in what we had there

7     because it did just delay -- you know, it delayed with the

8     jury.

9                 Now, with that, I'm going to suggest that Mr. Gray

10    be permitted to use your exhibits, but I also will suggest

11    to you, Mr. Gray, that when you are going to go into

12    cross-examination, then you need to have particular exhibits

13    that the government has, that you advise them at the

14    beginning so that they're not suddenly getting surprised by

15    what you pull up.  In other words, I'm saying the lawyers

16    have got to cooperate.

17                MS. BELL:  And we are happy to do --

18                THE COURT:  Trying a lawsuit -- just a minute.

19                MS. BELL:  Sure.

20                THE COURT:  Counsel, trying a lawsuit is hard work

21    for everybody.  And, yes, you have to be advocates for and

22    on behalf of your clients, but at the same token you have to

23    cooperate with each other.  Otherwise, it just

24    disintegrates.

25                MS. BELL:  I understand.  I think we --
```

1          THE COURT:  And that's why I'm encouraging what I

2     am.

3          I think with that, Mr. Plunkett, you had something

4     that you wanted to bring up too.

5          MR. PLUNKETT:  Thank you, Your Honor.  Tom

6     Plunkett.

7          During the examination of Mr. Smith, I believe,

8     I'd said -- noted an objection, several, and then at one

9     point I said I want to mark the record for a future motion.

10         And so at this point, that line of questioning,

11    Your Honor, and I want to be very respectful because I've

12    got to be honest, these are all people I have a lot of

13    respect for and I don't want to see this case deteriorate

14    any more in the way the court has pointed out, but the

15    government kept going back into the same line of questions,

16    asking the person to speculate about had this happened, had

17    that happened.  That was the subject of a pretrial order.

18    Regrettably, we are seeing this as a pattern of practice of

19    tiptoeing up to the edge and often stepping over the

20    pretrial orders.  I've got to say at this point I still

21    don't -- I can't articulate the prejudice right now other

22    than the fact that the jury is being tainted by this because

23    they're hearing the question, essentially it's a leading

24    question, and they're getting the testimony in.

25         Of course, the objections were all sustained and,

1     of course, there's going to be an instruction to the jury

2     that they need to disregard anything that was -- objections

3     that were sustained, but I think that it's -- I'm having a

4     hard time believing this is just a "by chance" thing when it

5     was so persistent.  And then even on redirect we went back

6     to the same problem and had the same series of objections.

7               So I'm moving for a mistrial once again.

8               THE COURT:  Denied.

9               MS. SERTICH:  May I respond?

10              THE COURT:  No, we don't need to talk about it.

11    It's denied.

12              I do caution counsel, all counsel, that on direct

13    examination leading questions are not appropriate and on

14    cross-examination they are, but that's the way it is.

15              MS. BELL:  Your Honor, I would like to clarify

16    something for the record and if you would like I can --

17              THE COURT:  I don't need to clarify anything,

18    counsel.

19              MS. BELL:  Okay.

20              THE COURT:  We got a jury ready to come in.  Let's

21    get to work.

22              MS. BELL:  Sure.

23              THE COURT:  Can we get the jury, please.

24    (1:36 p.m.)

25

1       **IN OPEN COURT**

2       **(JURY PRESENT)**

3               THE COURT:  You may be seated.

4               Counsel, proceed.

5               MS. SERTICH:  Thank you, Your Honor.

6       BY MS. SERTICH:

7       Q.  Captain Norton, before we took a break, I believe you

8       had just started testifying about your initial response to

9       the Cup Foods area at 38th Street and Chicago.  Do you

10      recall that?

11      A.  Yes, ma'am.

12      Q.  Okay.  And I'll just pull up the Government's Exhibit 1

13      one more time so you can remind the jury where you pulled up

14      in the fire truck.

15      A.  Yes, ma'am.  We came from the west, pulled through and

16      positioned ourselves right about there (indicating), just

17      past the entry of the store.

18      Q.  Thank you, Captain.

19              Okay.  And you had also told the jury about what

20      you had observed in items of squad cars when you first

21      arrived; is that right?

22      A.  Yes, ma'am.

23      Q.  So then what did you do after the fire truck pulled over

24      and parked in front of the Cup Foods?

25      A.  Ma'am, we had no information from our dispatch at that

1    point, even with the Code 3 update.

2              Is this okay?

3              And as we entered I saw no ambulance, I saw no

4    patient on the ground.  And so we stopped and I got off on

5    my side, which is -- the captain side is the front

6    passenger, and my partner got off from the back left and I

7    descended to the street.

8    Q.  After that, did you encounter an officer?

9    A.  Yes, ma'am.  I believe there were two to my right, which

10   would be the southeast corner of the street, and I spoke

11   with one of them.

12   Q.  At the time did you know that officer?

13   A.  No, ma'am.

14   Q.  Sitting here today, do you know who it was?

15   A.  I've been told that it was Officer Thao.

16   Q.  And you've talked --

17             MR. ROBERT PAULE:  I object as hearsay.  Ask the

18   answer to be stricken.

19             THE COURT:  No, I'm going to overrule.  I think

20   we're getting into identification.  It's appropriate.

21   BY MS. SERTICH:

22   Q.  And you've touched on this a little bit, but as you are

23   getting out of the fire truck, what are you looking for?

24   A.  On most calls when we pull up, if there's -- I'm

25   basically looking to see if there's an incident before the

1    address.  So the call came in at 38th and Chicago, Cup

2    Foods, which is actually, I believe, 3759, but I'm looking

3    to see if there's -- first of all, is the scene safe and

4    then what is going on in the vicinity that we're entering,

5    and then I'm looking to see what's actually going on.

6            So on a fire call I'm looking for smoke and fire,

7    I'm looking for victims.  On an EMS call or car crash I'm

8    looking to see is the house damaged, are there multiple

9    patients and all that so I can update the paramedics and

10   continue -- or whatever agencies we need.

11   Q.  So as you got off of the rig and encountered this

12   officer, what did the officer say to you?

13   A.  I believe -- he was the Minneapolis officer.  There was

14   one Park officer and one Minneapolis officer.  He was the

15   Minneapolis officer.  I asked, "Inside?"  I kind of wiggled

16   my radio a little and said, "Inside?"  Meaning there's

17   nothing out here.  I believe he said, Why are you here?" or

18   "We don't need fire.  We just need EMS."

19   Q.  And so did he tell you where the patient was?

20   A.  No, ma'am.  I clarified to him that we are EMS.  I

21   believe he said, "Oh."  And then at this point I was moving

22   past him clockwise around our rig and making my way to grab

23   my partner to go into the -- or go towards the store.

24   Q.  Okay.  So for purposes of identifying yourself and the

25   officer for the jury, I'm going to show you what's been

1    admitted as Government Exhibit No. 9, and this is from

2    Mr. Thao's body-worn camera footage and it is a clip that

3    begins at 20:32:46.

4         (Video recording played)

5              MS. SERTICH:  Your Honor, I'm going to pause this

6    here.  I think our volume might need some adjusting in the

7    courtroom.

8              THE COURT:  Yes, it is pretty quiet.  I don't know

9    how to do that.

10             MS. SERTICH:  Ms. Bell will help me, I'm certain

11   of it.

12        (Counsel confer)

13        (Video recording played)

14   BY MS. SERTICH:

15   Q.  And this clip ends at 20:33:19.  Now, it's a little bit

16   hard to tell from the masks, but was that you who got out of

17   the passenger door of the fire truck?

18   A.  Yes, ma'am.

19   Q.  And I think we see there on the right-hand side of the

20   screen another firefighter who appears to have a long braid?

21   A.  Yes, ma'am.

22   Q.  Who is that?

23   A.  That is Firefighter Jennifer Hall.

24   Q.  And the body-worn camera there was on Mr. Thao, so is

25   that the person you were interacting with?

1    A.  Yes, ma'am.

2    Q.  At any point here did Mr. Thao tell you that there

3    wasn't a patient in Cup Foods in response to that call for a

4    Code 3?

5              MR. ROBERT PAULE:  I object as leading, Your

6    Honor.

7              THE COURT:  You are leading, counsel.

8              MS. SERTICH:  Okay.

9    BY MS. SERTICH:

10   Q.  You previously testified that Officer Thao told you he

11   had called for EMS; is that right?

12   A.  No, ma'am.  He said they were looking for EMS.

13   Q.  And you responded?

14   A.  "We are EMS."

15   Q.  And did he say anything else to you?

16   A.  I believe he added something about they called for

17   someone taking -- transport one who was high, I believe.

18   Q.  Anything else other than that?

19   A.  At that interaction, no.

20   Q.  Okay.  So after that did you head into Cup Foods?

21   A.  Yes, ma'am.

22   Q.  And what were you doing?

23   A.  I was looking for a patient.

24   Q.  And so looking at that final frame from the clip on

25   Government Exhibit 9, as you walked into Cup Foods were

1    there people standing nearby who were not law enforcement

2    officers?

3    A.  Yes, ma'am.  There were three or four people outside the

4    store and several in the vestibule right to my right.

5    Q.  Can you describe those people in terms of age and

6    gender?

7    A.  There was, I believe, three men and one woman.

8    Q.  Older or younger?

9    A.  Over 20.

10   Q.  Do you recall the demeanor of those individuals?

11   A.  Almost everyone was on a cell phone.  They were talking

12   and speaking loudly.  As we walked to the right, the

13   gentleman on my left in shorts and I believe striped socks

14   said, "Yo, you all killed that man," not to me, to the

15   officer behind me.

16   Q.  As you walked by them, did you feel unsafe at all?

17   A.  Negative.

18   Q.  Did the officers on scene seem worried about those

19   people?

20   A.  I can't --

21              MR. GRAY:  Object to that, Your Honor.  It's a

22   conclusion of the witness.

23              THE COURT:  No, that's his observation.  He may

24   answer.

25              THE WITNESS:  Could you repeat that I?  I

1    apologize.  I spoke on you.

2    BY MS. SERTICH:

3    Q.  That's okay.

4         MR. GRAY:  It's also vague unless she points out

5    what officer she's talking about.

6         THE COURT:  We will let the question stand.

7    BY MS. SERTICH:

8    Q.  Did the officers on scene seem worried about those

9    people?

10   A.  No, ma'am.  At that point I had only interacted with one

11   and he was not at all -- he did not seem at all concerned.

12   Q.  When you entered Cup Foods, did you encounter anyone?

13   A.  Ma'am, yes.  I passed through in the vestibule several

14   younger people, I would say one teenager and several

15   adolescents right in the vestibule.  They were also --

16   essentially a chorus of "The police killed that man, they

17   killed him," and maybe a couple cuss words.

18        And then I passed through them.  We literally

19   squeezed past each other in the vestibule.  There was no --

20   no one stopped me.  There was no aggression towards me.  I

21   entered the store to my right, which is where -- along their

22   counter space.  I believe there was one employee, but I was

23   looking for a patient down on the ground.

24   Q.  Did you speak to anyone in Cup Foods?

25   A.  Yes, ma'am.

```
1     Q.  Who did you speak to?

2     A.  I might have spoken briefly with one of the countermen

3     right at the -- towards the front.  And then while I was

4     looking around, off-duty Firefighter Genevieve Hansen came

5     up.  She was out on the street, and she followed and came up

6     on my left and started speaking with us.

7     Q.  Do you recall how long she had been working as a

8     firefighter at that time?

9     A.  Under two years, I believe just about, or just over a

10    year.

11    Q.  And at that time did you know what her name was?

12    A.  Could you clarify?

13    Q.  When you first encountered her in the store, did you

14    know what her name was?

15    A.  Once I recognized her, yes, ma'am, I did.

16    Q.  Okay.  What was Ms. Hansen's demeanor?

17    A.  She came up and pretty rapid-fire started asking us

18    questions and emotionally vomiting, frankly.  She was -- she

19    said, "Is he okay?  Is he okay?  He was down.  They wouldn't

20    let him up.  I identified myself as a firefighter.  They

21    wouldn't let me help and I think they killed him.  Tell me

22    he's okay."

23              And, you know, for clarity, I had no context of

24    what she was talking about.  So at this point, I mean, she

25    was red-faced, you know, she was kind of spluttering with
```

1    her mask, her eyes were red, very, very agitated.  But I had

2    no context.

3    Q.  Did you speak with anyone else inside of Cup Foods?

4    A.  Yes, ma'am.  I -- there were more employees towards the

5    rear of the store, which is the southeast corner of the

6    store, and there was a police officer talking with the

7    employees.  So I made my way back looking for a patient or a

8    victim, and the officer turned around and we spoke -- or he

9    spoke to me briefly.

10   Q.  Okay.  And what did he tell you?

11   A.  Right as he opened his mouth, his radio and I believe my

12   radio all sounded at the same time from our separate

13   dispatches the EMS or the medics need Fire Code 3 to 36th

14   and Park.  And he essentially told me -- he said that they

15   taken a patient and left the scene.

16   Q.  Do you recall if he told you why they left the scene?

17   A.  No, ma'am, I don't -- umm, I don't recall.  Correction.

18   I'm sorry, I misspoke.  He said we moved -- they moved

19   either to get away or to move away from the crowd.

20   Q.  Okay.  And I will bring up for you Government's

21   Exhibit 7, which is a clip from Officer Kueng's body-worn

22   camera.  This clip begins at 20:33:46.

23        (Video recording played)

24   Q.  Okay.  And that clip ended at 20:34.  Is that an

25   accurate depiction of your exchange with that officer?

1    A.  Yes, ma'am.

2    Q.  Did you leave Cup Foods after that?

3    A.  Yes, ma'am.

4    Q.  Did you encounter Officer Thao again?

5    A.  I encountered an officer.  I did not recognize or I did

6    not know who he was.

7    Q.  Was it the same person who you encountered on the way

8    in?

9    A.  Frankly, I wasn't paying attention.  At that point we

10   were moving, but we did -- he did speak to us.

11   Q.  I'm going to show you a clip from Government's

12   Exhibit 9, and this is from Mr. Thao's body-worn camera,

13   beginning at 20:34:08.

14       (Video recording played)

15   Q.  And that clip ends at 20:34:56.  Captain Norton, do you

16   recall when you learned that the patient was in cardiac

17   arrest?

18   A.  I believe when I was exiting the store.

19   Q.  And then did you, in fact, relocate to Park and 36th?

20   A.  Yes, ma'am.

21   Q.  And I'm going to go back to that map, Government's

22   Exhibit 43.  On the left side of the screen, do you see the

23   indicator of an ambulance there?

24   A.  Yes, ma'am.

25   Q.  Is that an accurate depiction of where the ambulance was

```
1    stopped?

2    A.  On the street level, yes.

3    Q.  Do you recall about how long it took you to get there?

4    A.  I believe we pulled out at right around 20:35 and we

5    were at the ambulance by 20:37, I believe.

6    Q.  What did you do when you arrived at the ambulance?

7    A.  My partner and I got off of the fire truck.  We had

8    parked behind.  We entered the side door of the ambulance

9    and then we -- well, I saw what was happening and then we

10   jumped in to help.

11   Q.  And which partner jumped in with you?

12   A.  Firefighter Hall.

13   Q.  Who was in the ambulance when you got in?

14   A.  There were two paramedics working.  There was a police

15   officer to my left on the bench seat and then there was a

16   victim on the cot.

17   Q.  And sitting here today, do you know who that officer

18   was?

19   A.  The police officer?

20   Q.  Yes.

21   A.  I believe it was Officer Lane.

22   Q.  At the time did you know who it was?

23   A.  No, ma'am.

24   Q.  After you got in the ambulance, did Officer Lane leave?

25   A.  I walked in.  I looked at what we had, and I essentially
```

1    kind of replaced him and took over ventilations and hooked

2    up the oxygen.  And within a minute I believe he was gone --

3    or less than a minute I believe he was gone.

4    Q.  And so entering the ambulance is the first time you saw

5    this patient?

6    A.  Yes, ma'am.

7    Q.  And sitting here today, do you know the patient's name?

8    A.  Yes, ma'am.

9    Q.  And what is the patient's name?

10   A.  It was Mr. George Floyd.

11   Q.  And did you know it at the time?

12   A.  No, ma'am.

13   Q.  Can you please explain for the jury Mr. Floyd's

14   condition when you got into the ambulance.

15   A.  I can describe what I witnessed.  Is that what you are

16   asking?

17   Q.  What his condition was when you got in.

18   A.  We walked in and there was an unresponsive male face up

19   on the cot.

20          There was an airway, an advanced airway of some

21   sort, inserted into his throat, which meant he was

22   unresponsive and had no gag reflect.

23          There was a bag valve mask, ventilation -- an

24   oxygen delivery device that was affixed to that.  The oxygen

25   was not yet at that point hooked up.

1          And then there was the LUCAS compression device,

2     which is a pneumatic automated CPR device or compression

3     device and that -- you can't use that on someone who is not

4     unresponsive or, frankly, dead.

5     Q.  So you said that you took over providing respiration for

6     Mr. Floyd?

7     A.  Yes, ma'am.

8     Q.  Okay.  I'm going to show you an image from Government

9     Exhibit 5, which is from Mr. Lane's body-worn camera at

10    20:37:26.  And can you just explain for the jury who you see

11    in this image and what -- the treatment that's being

12    provided to Mr. Floyd.

13    A.  Yes, ma'am.  I believe it's Paramedic Derek Smith,

14    center standing up.  At Mr. Floyd's head, that's Paramedic

15    Seth Bravinder.  I am to the right.  That's my hand on the

16    BVM.  And the knee of the fire turnout pants belongs to

17    Firefighter Hall.

18    Q.  Now, aside from -- you said that the LUCAS device was

19    going and that there had been an airway put in place.  While

20    you were parked there at Park and 36th, what other treatment

21    of Mr. Floyd did you either observe or participate in?

22    A.  Well, at that point it's the paramedics' show.  They --

23    so I -- again, once I cleared Officer Lane, I took over the

24    breathing and I attached the tube for the oxygen delivery to

25    go for the BVM.

1          Once Officer Lane left, my partner, Firefighter

2     Hall, sat down and she started assisting the paramedics with

3     getting IV setups.  We basically just were there in support

4     of them.  They got a second IV going.

5          They delivered medications for cardiac to kind of

6     offset a cardiac arrest.  At one point they got the -- they

7     already had their defibrillation pads in place.  I believe

8     they got a 12 lead going at one point, so they checked for

9     electrical activity.  At one point there was -- it was

10    indicated for a shock.  We did shock him once.

11         We did several pulse checks between 36th and Park

12    when we departed and when we arrived at the stab. room at

13    Hennepin County Medical and there was never -- never

14    regained a pulse.

15         So my partner and I were just there in support of

16    the paramedics.

17    Q.  At any time that you were with Mr. Floyd, was he

18    breathing on his own?

19    A.  No, ma'am.

20    Q.  And you mentioned Mr. Floyd's pulse being checked on the

21    way to the hospital.  Given that the jury has seen that he

22    was hooked up to this LUCAS device, how did you go about

23    doing those pulse checks?

24    A.  We were able to check his left wrist and then also his

25    carotid at the neck.

```
 1   Q.  Okay.  At times did you turn off the LUCAS to check his
 2   pulse and see if it was -- if he had any independent rhythm?
 3   A.  No.  We paused it.  We don't turn it off.  We paused it.
 4   Q.  You paused it.  Thank you.
 5            And I know you mentioned that at one point they
 6   thought they may have seen some sort of rhythm.  Other than
 7   that, at any time that you were with Mr. Floyd did he have a
 8   pulse?
 9   A.  Not to my knowledge.
10   Q.  And did that shock improve Mr. Floyd's condition?
11   A.  It did not.
12   Q.  Were you able to learn from the paramedics what had
13   happened to Mr. Floyd?
14   A.  No, ma'am.
15   Q.  What happened upon arrival at HCMC?
16   A.  We prepared to transfer the cot and the patient from the
17   ambulance into the ER, so we got a mobile oxygen device, et
18   cetera, and we rode into the stab. room and I was continuing
19   to provide ventilations for him until relieved by hospital
20   staff.
21   Q.  Where did you go after you left the hospital?
22   A.  I had sent our fire rig back to the scene while we were
23   working on Mr. Floyd at 36th and Park, and so there was a
24   little bit of a delay from when they returned to Cup Foods
25   or 38th and Chicago to check on Firefighter Hansen before
```

 1    they got down to pick us up at 8th and Chicago -- or 8th and

 2    Park, actually, and then from there we went to our duty

 3    deputy, Fire Station 1 downtown.

 4    Q.  Did you provide a report about what you had observed to

 5    anyone that night?

 6    A.  Yes, ma'am.

 7    Q.  To whom did you make a report?

 8    A.  I went directly to our duty deputy and reported that we

 9    been on a call, there was a death in police custody, and

10    that I was concerned there was -- that I wanted her to

11    notify supervisors.  And then also that there was an

12    off-duty firefighter who was a witness and I was concerned

13    for her.

14          And then I returned to our station and I wrote up

15    essentially that in formal reports and sent them through

16    channels to my battalion chief and then to the fire chief.

17    Q.  And is it routine for a fire captain to make an

18    in-person report to the deputy chief of the Minneapolis Fire

19    Department?

20    A.  Not routine, but not unheard of.

21    Q.  About how many times do you think you have done that in

22    your career?

23    A.  I'm a bit of an anomaly.  I've -- I was working within

24    the notion of immediate information in terms of our chain of

25    command.  So I was not breaking any rules while doing that.

```
 1    Q.  Okay.
 2    A.  I'm sorry.  And it felt that it was timely, and so I
 3    felt that was more -- it was more important to notify her
 4    right away and then I followed up with proper communication.
 5    Q.  And based on what you observed that evening and your
 6    20-plus years of experience, was it a medically sound
 7    decision by the paramedics to stop and provide care to
 8    Mr. Floyd nearby rather than going directly to the hospital?
 9    A.  Yes, ma'am.  Had my crew arrived first, we would have
10    started CPR and resuscitation attempts right there on the
11    street and so -- because the more -- we didn't know what the
12    cause of his death was, the more we can do to provide oxygen
13    and ventilation and compression to get the blood flowing and
14    then for the medics to provide medications to counteract the
15    fatal effects of a body not breathing, that's the best
16    chance someone has to recover from an incident like that.
17    Q.  And now I'm asking you specifically about the
18    paramedics' decision to relocate to 36th and Park rather
19    than driving straight from Cup Foods to the hospital.  In
20    your 20-plus years of experience, was that a medically sound
21    decision for Mr. Floyd's well-being?
22    A.  I believe that's -- I think that's a two-part question.
23    Q.  Okay.
24    A.  I think if they felt the need to relocate, that is the
25    decision they made.  I believe they conferred with one of
```

```
 1       the police officers.
 2              Ideally, we would have been there already and they
 3       would have had at least two and then the rest of my crew
 4       could have joined, so four people with skills and experience
 5       to provide BLS and ALS care for Mr. Floyd right away.  And
 6       providing for him immediately, given how long he had been
 7       down, was the best bet to get him -- give him a shot at
 8       coming back.
 9  Q.  Did you contact a supervisor to express your approval of
10       the paramedics' work with respect to Mr. Floyd?
11  A.  Ma'am, I did.
12              MS. SERTICH:  Your Honor, may I have one moment,
13       please?
14              THE COURT:  Certainly.
15         (Pause)
16              MS. SERTICH:  Nothing further on direct, Your
17       Honor.
18              THE COURT:  Thank you.
19              Mr. Gray, cross-examination.
20              MR. GRAY:  Exhibit 5, the one you just used.
21         (Counsel confer)
22              MR. GRAY:  I don't need it.
23                        CROSS-EXAMINATION
24  BY MR. GRAY:
25  Q.  Do you remember when there was a photo up there of you
```

```
1    and your partner and the two paramedics in the ambulance; do
2    you remember that?
3    A.  Yes, sir.
4    Q.  And that photo was taken by Tom Lane, by his body
5    camera; is that right?
6    A.  I believe so.
7    Q.  Well, Tom Lane is right over there (indicating).  Take a
8    look at him.  Was that the guy that was in the ambulance?
9    A.  I believe so.
10   Q.  Okay.
11             MR. GRAY:  That's all I have.  Thank you.
12             THE COURT:  Thank you.
13             Mr. Paule.
14                       CROSS-EXAMINATION
15   BY MR. ROBERT PAULE:
16   Q.  Good afternoon, Captain Norton.
17   A.  Good afternoon, sir.
18   Q.  You and I have never met before, have we?
19   A.  I don't believe so.
20   Q.  Now, Captain Norton, just a few questions.
21             You indicated that you had spoke to a police
22   officer at the scene initially when you got out, who you
23   somehow identified as my client.  You indicated that he
24   seemed confused while you were there; is that correct?
25   A.  No, sir.  He expressed confusion.
```

1    Q.  When you talked to him, he explained that they wanted

2    EMS to do a transport, correct?

3    A.  Yes.

4    Q.  What did he say about the person that he wanted to have

5    transported?

6    A.  I believe he said he was high.

7    Q.  Okay.  And what does that mean to you, Captain?

8    A.  It can mean any number of things, sir.

9    Q.  What are some of those?

10   A.  It can mean someone is -- with the opioid epidemic, we

11   have lots of people who are high and they have respiratory

12   failure.  With meth or cocaine or crack, it's someone who is

13   agitated.

14   Q.  All those things are drug related, aren't they?

15   A.  Yes, sir.

16   Q.  And when you returned out of the store -- well, let me

17   back up.

18            When you went into Cup Foods you ran into a police

19   officer, who you identified as Officer Kueng; is that

20   correct?

21   A.  Yes, sir.

22   Q.  You could see that on the video that was played to you,

23   could you not?

24   A.  I could see -- I had his perspective on me, but I was

25   told that that was Officer Kueng, yes, sir.

```
1    Q.  Yes, that's what I'm referring to.

2    A.  Yes.

3    Q.  And did he tell you where to go, to where the ambulance

4    was?

5    A.  I believe he said to 40th initially or that they pulled

6    several blocks away.

7    Q.  Okay.  And he used the word "40th," though, didn't he?

8    A.  I believe he did.

9    Q.  And do you know where HCMC is located vis-à-vis Cup

10   Foods, which direction?

11   A.  Yes, I do.

12   Q.  Tell the jury, please.

13   A.  It would be north.

14   Q.  And which way would 40th Street be from Cup Foods?

15   A.  Two blocks south.

16   Q.  So that would be the opposite way from HCMC, correct?

17   A.  It would.

18   Q.  And when you came out and you spoke to Officer Thao the

19   second time, he actually directed you to 36th and Park,

20   correct?

21   A.  Yes, sir, as did the radios, yes.

22   Q.  That's where the ambulance was located, was it not?

23   A.  Yes, sir.

24   Q.  Okay.  Now, you've talked about some of the training

25   you've received as a firefighter and throughout your career.
```

704

```
 1              You've received training on something called
 2    excited delirium, have you not?
 3    A.  Could you clarify?
 4    Q.  Sure.  Do you recall meeting with three state court
 5    prosecutors on March 8th of 2021?
 6    A.  Like a virtual meeting?
 7    Q.  I'm not sure, but these were state court prosecutors and
 8    there was a BCA agent present as well, correct?
 9    A.  Yes, sir.
10    Q.  Okay.  I wasn't there, was I?
11    A.  I don't believe so, since I'm having trouble remembering
12    which one it was.  I apologize.
13    Q.  I'm imminently forgettable.
14              But you spoke to them about some things about
15    excited delirium, did you not?
16              MS. SERTICH:  Objection, Your Honor.  Relevance.
17              THE COURT:  Overruled.
18              THE WITNESS:  I -- yes, I -- I'm sorry.  If
19    there's a transcript that says we spoke about excited
20    delirium, then I'm not challenging you, sir.
21    BY MR. ROBERT PAULE:
22    Q.  I don't have a transcript, but I do have --
23              MR. PAULE:  And for reference, counsel, it is
24    Bates 00058054.  Specific page reference would be 00058049.
25    BY MR. PAULE:
```

```
1    Q.  Have you ever seen a copy of the report the Bureau of

2    Criminal Apprehension wrote about their discussion with you?

3    It's not up on the screen.

4    A.  Oh, sorry.  From this March incident?

5    Q.  Your meeting in March with the state court prosecutors.

6    A.  No, sir, I don't believe I have.

7    Q.  Would it in some manner refresh your recollection about

8    what you discussed if you were to see a portion of it?

9    A.  Well, clearly because I'm having trouble remembering,

10   but I'm not sure what the -- or what you are asking, sir.

11   Q.  Fair enough.

12            MR. PAULE:  Your Honor, for my edification, would

13   the court like me to approach him to give him --

14            THE COURT:  Please do.

15            MR. ROBERT PAULE:  Thank you.  And again it's

16   00058059.  May I approach the witness?

17            THE COURT:  You may.

18   BY MR. ROBERT PAULE:

19   Q.  And, Captain, please take all the time you need to look

20   at that report.  I take it you haven't seen it before and I

21   don't want to surprise you.

22   A.  Thank you.

23            MS. SERTICH:  Your Honor, while Captain Norton

24   reviews, I'm going to object on the grounds that this

25   exceeds the scope of the direct examination.
```

```
 1                    THE COURT:  It's overruled.
 2                    MS. SERTICH:  Your Honor, can we have a sidebar,
 3        please?
 4                    THE COURT:  No thank you.  I think we need to deal
 5        with what we have here first.
 6                    THE WITNESS:  Yes, sir.  I've read what you've got
 7        here.
 8        BY MR. ROBERT PAULE:
 9        Q.  And, Captain, just so that I'm clear, does reading what
10        I handed you, does that help refresh your recollection about
11        that meeting with the state court prosecutors?
12        A.  Yes.  It's -- yes.
13        Q.  And I don't mean to step --
14                    THE COURT:  Captain, would you remove your mask.
15        It's hard to understand people when you have them on.
16                    THE WITNESS:  Oh.  I apologize, sir.
17        BY MR. ROBERT PAULE:
18        Q.  I appreciate you putting it on for me, though, I do.
19                    But does reading that document refresh your
20        recollection about that meeting with the state court
21        prosecutors?
22        A.  It does, sir.
23        Q.  You did discuss excited delirium with them, did you not?
24        A.  Yes.
25        Q.  And you indicated that you had received training as a
```

```
 1    firefighter on this condition excited delirium, correct?

 2              MS. SERTICH:  Objection.  Hearsay.

 3              THE COURT:  It's overruled.

 4              THE WITNESS:  This is a summary, not quite a

 5    presees [phonetic].  But I said that as part of our medical

 6    ongoing education we have -- we'd had a unit on excited

 7    delirium, yes.

 8    BY MR. ROBERT PAULE:

 9    Q.  Are you familiar as you sit here today with that term,

10    what that means?

11    A.  I'm familiar with both the term and then how it has

12    been -- how it gets applied sometimes, yes, sir.

13    Q.  Have you ever been in a situation where you've seen

14    someone who you believe is in that condition?

15    A.  I have.

16    Q.  Okay.  Have you ever been present when paramedics have

17    been dealing with a person who is in that particular

18    condition?

19    A.  Well, sir, it is a reactive -- my experience is it is

20    someone goes into or it is a condition where someone is

21    being restrained.  It is -- someone doesn't walk down the

22    street in excited delirium.  That's never what I've seen,

23    no, sir.  So it is always a byproduct of someone being

24    restrained.

25    Q.  So you're understanding of this is it's not a
```

1    combination of other factors, it actually results from being

2    restrained?

3    A.  Among other things, yes, sir.

4    Q.  What other things would there be, sir?

5    A.  It depends.  And I'm not a medical expert.  However, I

6    do know that I believe either AMA or JMA just had a lengthy

7    discussion and they are no longer using excited delirium as

8    a viable term for these sort of situations.

9    Q.  But you've seen those situations yourself, haven't you?

10   A.  Yes, sir.

11   Q.  And you've received training on them?

12              MS. SERTICH:  Your Honor, objection.

13              THE WITNESS:  I would like you to --

14              THE COURT:  Excuse me.  There's an objection.

15              MS. SERTICH:  May we have a sidebar, Your Honor?

16              THE COURT:  Yes.

17       **(At sidebar)**

18              THE COURT:  Proceed.

19              MS. SERTICH:  Thank you, Your Honor.

20              The witness has just indicated that he does not

21   have medical training on this and that he does not believe,

22   based on what he does know, that this is a condition that's

23   recognized by some medical authorities that he referenced.

24   So I don't believe it's proper to question this witness on

25   this topic any longer.

1        MR. ROBERT PAULE:  Your Honor, Robert Paule in

2    response.  He's testified that he has received training on

3    this, that it is a condition, and in his experience he's

4    actually dealt with people who are in this condition.

5        THE COURT:  The objection is overruled.  Let's

6    continue.

7        **(In open court)**

8    BY MR. ROBERT PAULE:

9    Q.  Again, I apologize.  I can't recall where I was.  In

10   fairness to you, sir, could I ask our court reporter to

11   please read back my last question?

12       (Requested portion read back)

13       MR. ROBERT PAULE:  Thank you.  That at least

14   orients me.

15       THE WITNESS:  I apologize.  I'm all over the

16   place.  But go ahead.

17   BY MR. ROBERT PAULE:

18   Q.  I'm right there with you.  But just so this jury knows,

19   you, as a medical firefighter, you've received training with

20   about this condition excited delirium, correct?

21   A.  Sir, respectfully, what I'm trying to clarify is the

22   topic has been used in one of our continuing education

23   modules as something to be aware of.

24       There has never been any clear agreement or never

25   any hard-fast rule about what it is and really that whether

1   or not it's actually solid science.  So that is the root of

2   my -- just struggling with what you are asking.

3   Q.  I guess you answered my question, though.  You have

4   received training on it, correct?

5   A.  We've received train -- yes, we've had -- yes we've had

6   informational training.

7   Q.  And I believe what you told the state court prosecutors

8   on March 8th was that there was no protocols in your

9   department about how to deal with this, correct?

10              MS. SERTICH:  Objection.  Hearsay.

11              THE COURT:  It's overruled.

12              THE WITNESS:  Right.  Because it is not a medical

13   condition, so I can't look and say that person has excited

14   delirium, I know how to treat this, that, or the other, yes,

15   sir.

16   BY MR. ROBERT PAULE:

17   Q.  So what you are telling me is you've received training

18   on something that you believe -- even though the department

19   is giving this training, they don't believe it exists?

20   A.  No, sir.  It's that it's a -- it has been described as a

21   condition that is basically a byproduct of other things, and

22   so it's a situation to be aware of and so we were given

23   awareness-level training.

24   Q.  Okay.  And when you say a product of other things, what

25   things were you trained on?

```
1    A.  Well, that's -- and that's one of the issues with the

2    phrase "excited delirium," is that it gets used as

3    essentially as a catchall for anyone who is agitated for any

4    of several reasons or anyone who is struggling against

5    restraints and becomes excited and then irrational.  I know

6    from the textbook definitions, you know, they do say that it

7    can be a mental issue, it can be a chemical issue, but

8    that's -- we're not -- I don't know.

9    Q.  Right, but the things you are referring to are either a

10   mental health of some sort or chemicals, which means

11   presumably illegal drugs, correct?

12   A.  I don't presume that and it is not either/or.

13   Q.  Okay.  Could be a combination, could it not?

14   A.  Well, that's one option, yes, sir.

15   Q.  Okay.  And you, yourself, have seen paramedics sedate

16   people who are suspected to be in this condition, correct?

17            MS. SERTICH:  Objection, Your Honor.  Can we have

18   a sidebar, please?

19            THE COURT:  No.  I'm going to overrule those.  If

20   the witness has seen it or not is the question.  It's either

21   "yes" or "no."

22            THE WITNESS:  I've seen people be sedated, yes,

23   sir.

24   BY MR. ROBERT PAULE:

25   Q.  By paramedics?
```

1    A.  Yes, sir.

2    Q.  Who are suspected to be in a condition like this?

3    A.  What is "like this"?  You need to define -- that's what

4    my point is.  There is no -- you need to give me a

5    definition of what I would be witnessing if I were seeing

6    someone in excited delirium, because they don't say I'm

7    going to treat excited delirium with a sedative, sir.

8    Q.  And I understand that totally.

9            But you've seen people be sedated by paramedics,

10   correct?

11   A.  Yes, sir, I have.

12   Q.  What were the circumstances predating that sedation that

13   you saw, sir?

14   A.  Everything from a badly broken leg, to a psychotic

15   episode, to overstimulation by drugs, by prescribed meds

16   that went wrong, mental breaks, diabetic.

17   Q.  All right.  Thank you very much, Captain.  I have no

18   further questions.

19   A.  Thank you, sir.  Do you want your --

20   Q.  Yes, I would.  Thank you.

21   A.  Yes.  Take care.

22           THE COURT:  Mr. Plunkett.

23                       CROSS-EXAMINATION

24   BY MR. PLUNKETT:

25   Q.  Good afternoon, sir.

1    A.  I've got both good morning and good afternoon.  Yes,

2    sir.  How are you?

3    Q.  I'm sorry about that.

4    A.  No, it's not you.

5    Q.  I'm good.  And how are you?

6    A.  Good.  Thank you.

7    Q.  Good.  I have very few questions for you, which must be

8    a relief.

9    A.  Depends what the questions are.

10   Q.  Well, they will be easy, I think you will find.

11          So I just want to revisit something you testified

12   about, and I think at the time you were testifying about it

13   they were showing you that sheet that has all the times

14   about when dispatches occur.  So I would just like to set

15   things up so you know what I'm talking about.  Do you know

16   what I'm talking about?

17   A.  The one we looked at this morning?  Yes, sir.

18   Q.  Okay.  So it sounds to me like, in your professional

19   parlance, when somebody says, "I need EMS," that's you?

20   A.  It depends, sir, what the context is.

21   Q.  When on the radio they say, "EMS Code 2."

22   A.  Yes.  I -- yes.

23   Q.  That's -- I shouldn't say "you," but you are the fire

24   department as you sit here today, you can appreciate.  Fair?

25   A.  Yes, sir.  It depends who is asking for it.

1    Q.  Police.

2    A.  It can be -- well, sir, that depends.  It depends on if

3    they specify what they need us for, because EMS as a

4    catchall is paramedics --

5    Q.  Yeah.

6    A.  -- and fire together, yes, sir.

7    Q.  Correct.  EMS -- "I need EMS" is I need you?

8    A.  Not solely the fire department, yes.

9    Q.  Okay.  "I need the fire department" -- and I apologize.

10   When I say "you" --

11   A.  No, no, no.

12   Q.  -- I do mean the fire department.

13   A.  Yes, sir.

14   Q.  And it's just generally understood that when I say "I

15   need EMS," they're anticipating a fire response because your

16   department is better located for quicker responses?

17   A.  Sir, it depends what they need us for and if it's -- it

18   depends, because one should specify what the need is.

19   Q.  If you say "I need EMS," you are asking for emergency

20   medical services?

21   A.  Yes, sir, and that's paramedics and fire.

22   Q.  Both of you?

23   A.  Yes.

24   Q.  Okay.  It's not just you?

25   A.  No, sir.

1     Q.  It's not just paramedics?

2     A.  This is why they -- one needs to follow up with

3     information.  Because if they need firefighters to lift

4     somebody, they need firefighters to open a door, they need

5     paramedics to transfer, those are all things that -- so your

6     question is broad, sir.

7     Q.  It is broad, but when somebody says, "I need EMS," it's

8     not your job to figure out what they need, you just go, you

9     are dispatched?

10    A.  Thank you.  Yes.

11    Q.  Okay.  And then you go; fair?

12    A.  Yes, sir.

13    Q.  Okay.  You talked about checking a wrist pulse.  Is that

14    called a radial pulse?

15    A.  It would be, yes.

16    Q.  Okay.

17    A.  Or it could be, yes, sir.

18    Q.  I think that's all it can be, isn't it?

19    A.  Yes.

20    Q.  Okay.

21    A.  I'm sorry.  I thought you were asking where I can check

22    the pulse.  I misunderstood the question.

23    Q.  No.  I'm sorry.  Radial pulse --

24    A.  A pulse at --

25    Q.  You said wrist -- I'm going to have to apologize to the

1    court reporter because we're stepping over each other.  I'm

2    going to try to work on that and do a better job.

3            And then you said then I checked a carotid pulse,

4    correct?

5    A.  I did say that, yes.

6    Q.  And the reason you -- carotid is on the neck?

7    A.  Yes, sir.

8    Q.  And the reason you do that is because that's the best

9    pulse?

10   A.  It's the one arguably closest to the heart, yes, sir.

11   Q.  And so if you can't find it on the ankle or the wrist,

12   you'd want to -- I better check the carotid because it's

13   closest to the heart, correct?

14   A.  Yeah, I seldom check an ankle pulse, but essentially

15   yes.

16   Q.  Okay.  In this case, and I'm not trying to be cute with

17   you or mix you up, didn't find one on the wrist, so you

18   check the carotid or the neck, correct?

19   A.  I might have actually checked them both at the same

20   time, but yes.

21   Q.  Okay.  But if you can't find it on the wrist, you go for

22   the carotid, isn't that correct, because that's your

23   training?

24   A.  Right.

25   Q.  Okay.  And so if you're down farther from the neck and

```
1    you are not able to reach the neck, but your partner is up

2    there by the neck, you'd say check a carotid pulse, correct?

3              MS. SERTICH:  Objection.  Speculation.

4              THE COURT:  Sustained.

5              MR. PLUNKETT:  Fair enough.  That means you can't

6    answer it.

7              No further questions, Your Honor.

8              THE COURT:  Thank you.

9              Ms. Sertich.

10             She may have some more.  I don't know.

11             THE WITNESS:  My day is free.

12             MS. SERTICH:  I have nothing further for this

13   witness, Your Honor.

14             THE COURT:  Okay.

15             MR. GRAY:  Your Honor, may I reopen my cross for

16   one question?

17             THE COURT:  One question.

18             MR. GRAY:  All right.  That was unfair to the

19   witness.

20             MS. SERTICH:  The government objects, Your Honor.

21             THE COURT:  We'll permit one question.

22             MR. GRAY:  I'm not used to these masks.  He said,

23   I believe -- I would like to have my client stand up and

24   take his mask off and see if he can recognize him then from

25   being in the ambulance.
```

1          Can you stand up, Tom?

2                    FURTHER CROSS-EXAMINATION

3    BY MR. GRAY:

4    Q.  Take a look at him.

5    A.  I have no recollection between this man and the man in

6    the ambulance.  I barely looked at him.  I especially did

7    not look at his face when I walked into the ambulance, sir.

8    Q.  Okay.  Was he a tall fellow?

9    A.  We were all sitting down -- or he was sitting down and I

10   was --

11   Q.  He was sitting down with the body-worn camera on him?

12   A.  Well, when I walked in, he was sitting down and then I

13   took over and I was focusing on the patient.

14             THE COURT:  You've overdone your one question.

15             MR. GRAY:  Yes.  All right.  Thanks.

16             THE COURT:  Everybody sit down.

17             Okay.  We are all done.  You may step down.

18             THE WITNESS:  Thank you, sir.

19             Thank you, all.

20             MS. SERTICH:  Your Honor, can I have a moment to

21   confer with defense counsel?

22             THE COURT:  Certainly.

23        (Counsel confer)

24             MS. SERTICH:  Your Honor, we'll have to have a

25   sidebar to address a couple of issues with the government's

```
1   next witness.

2            THE COURT:  Okay.

3        (At sidebar)

4            MS. SERTICH:  Your Honor, the government's next

5   witness is Genevieve Hansen, the firefighter who was a

6   bystander witness on the scene.

7            Ms. Hansen has indicated on a number of occasions

8   that she is unable to view the on-the-street video of this

9   incident or listen to her 911 call without becoming

10  extremely emotional.  This was before Your Honor entered any

11  motions -- any orders about witnesses becoming emotional or

12  before the defense made a motion on that issue.

13           And so the government's proposal is to play her

14  video for the jury either before she enters the courtroom,

15  because she took a video on her cell phone, or to play that

16  video at another time with an agent or something along those

17  lines.

18           Same thing for her 911 call, although Mr. Gray has

19  also objected to the 911 call as hearsay.  The government

20  believes it is not hearsay based on both the present sense

21  impression exception and the excited utterance exception.

22           MR. GRAY:  May I respond on the 911 call?

23           THE COURT:  Go ahead.

24           MR. GRAY:  Well, it wasn't a true 911 call.  It

25  was after the law enforcement left.  The incident had
```

1     already happened.  She's calling up 911, but it's not

2     because of the 911 -- because of the incident.  She's

3     calling after the fact.  So it's just pure hearsay.

4            In addition to that, there's an opinion -- as I

5     remember it, there's an opinion of hers in there that's

6     unfair.  So that's why I objected, Your Honor.

7            MR. ROBERT PAULE:  Your Honor, Robert Paule.  I'd

8     like to also object to that.  I would note that in her

9     statement she indicated that she made this call not to get

10    911 to the scene, but to document what she had seen.  So

11    it's not an excited utterance.  It's not a typical 911 call.

12    She's trying to make a record of something.

13           Secondly, with regard to the issue about some of

14    the videos, I would note that there are enough other

15    witnesses who were present and there are other witnesses who

16    they could get this particular evidence in through, that

17    they don't need to call her for that purpose.  And so if

18    they don't want us to impeach her, they shouldn't call her.

19    They can simply get the evidence of the video in through

20    other mechanisms.

21           MS. SERTICH:  Your Honor, on the 911 call, the

22    call was made within two minutes of the ambulance departing.

23    She is very clearly distressed in the recording, and she is

24    reporting what happened, as anyone does, during a 911 call.

25    The government has cited that case law in its trial brief.

 1              As to Ms. Hansen, she can be impeached, to the

 2     extent defense counsel wants to do that.  What I am

 3     informing the court of is if they try to show her a video,

 4     it is going to make her emotional, which I know is what this

 5     court is trying to avoid with witnesses in this case.

 6              THE COURT:  Okay.  Counsel, we'll try to keep this

 7     as short as we can.

 8              First of all, I have not reviewed in any detail --

 9     I've been aware that there was a 911 call, but I just have

10     not been aware of what's in it.  At an appropriate time I

11     can become aware of that.  And I don't think that call is

12     necessary with this witness other than just to advise the

13     world that she did make a call, period.

14              Then as it relates to the video itself, whether

15     it's duplicative, cumulative, and all the rest of that

16     stuff, I don't want to necessarily make a ruling on that at

17     this moment, but I would suggest very strongly that you just

18     put her on the stand and have her testify like a witness

19     does testify rather than using the prop of a video.

20              MS. SERTICH:  Yes.  Thank you, Your Honor.  To be

21     clear, I may show her a couple of clips from that Milestone

22     view just to orient her in terms of placement that are very

23     short.

24              And in addition to that, my understanding of your

25     ruling right now is that while you may not think its

```
 1    necessary, the government isn't precluded from any -- the

 2    exhibit is already in evidence and the defense has

 3    stipulated to it, but between that and the 911 call, those

 4    are issues we can have for another day?

 5              THE COURT:  That's right.

 6              MS. SERTICH:  Understood, Your Honor.

 7         (In open court)

 8              MS. SERTICH:  The government calls Genevieve

 9    Hansen.

10              THE COURT:  Ms. Hansen, if you would stop there

11    and raise your right hand to be sworn.

12                        GENEVIEVE HANSEN,

13    called on behalf of the government, was duly sworn, was

14    examined and testified as follows:

15              THE COURT:  If you'd take the witness stand,

16    please.  And remove your mask, speak directly into the

17    microphone.  And I assume Hansen is spelled H-A-N-S-O-N?

18              THE WITNESS:  E-N.

19              THE COURT:  Okay.  Proceed, counsel.

20              MS. SERTICH:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22    BY MS. SERTICH:

23    Q.  Good afternoon, Ms. Hansen.

24    A.  Hi there.

25    Q.  In what city do you live?
```

```
1    A.  Minneapolis, Minnesota.

2    Q.  And how old are you?

3    A.  27.

4    Q.  Where are you employed?

5    A.  I'm a firefighter for the City of Minneapolis.

6    Q.  How long have been a Minneapolis firefighter?

7    A.  Three years.

8    Q.  So back in May of 2020, how long had you been a

9    firefighter?

10   A.  I was -- I had been on the streets for like about two,

11   give or take.

12   Q.  Okay.  In May of 2020 were you still considered a rookie

13   firefighter?

14   A.  Yes.

15   Q.  Can you explain that for the jury.

16   A.  I -- you're still in your probationary period, so they

17   keep a close eye on how you perform your job and you're

18   still learning on the job.

19   Q.  And is there a test that you take after a period of time

20   that allows you to move on from being a rookie?

21   A.  Yes.

22   Q.  Had you taken it by that time?

23   A.  It got pushed off because of COVID, but yes.

24   Q.  And is there -- are rookies treated differently than

25   folks who are no longer rookies at the Minneapolis Fire
```

1    Department?

2    A.  Yes, definitely.

3    Q.  In what way?

4    A.  You know, you don't want to say too much, just kind of

5    put your head down and do a lot of cleaning and be right

6    there with anything your captain needs.

7    Q.  Can you describe your duties as a firefighter for

8    Minneapolis.

9    A.  My shifts are 24 hours.  We stay at the station and when

10   we get a call, we respond to structure fires, medical calls,

11   car accidents, a lot of things we respond to.

12   Q.  Can you describe the training you received to become a

13   firefighter, starting at the beginning of that process and

14   working your way forward.

15   A.  I did a Pathways Program where I got my EMT.  And then

16   in the academy I went through EMT again, just with everybody

17   else that hadn't done it.  And then we do Firefighter I,

18   Firefighter II, and hazmat ops.

19   Q.  So how long was that initial EMT training that you did?

20   A.  The course that we did for Minneapolis Fire Department

21   was about a month.

22   Q.  How about the one you did before that?

23   A.  That one was more thorough, so I would say -- I think we

24   did that one in two or three months.

25   Q.  And when you say "the academy," what academy are you

```
 1    referring to?

 2    A.  So we have the Pathways Academy that was before, and

 3    then the Minneapolis Fire Department Academy.

 4    Q.  How long was the Minneapolis Fire Academy in total?

 5    A.  Four months.

 6    Q.  And then did you say you had to have some sort of

 7    national certification or test?

 8    A.  Mm-hmm.  I have -- yeah, we have national tests for all

 9    of those certifications separately.

10    Q.  And then you mentioned, like, Firefighter I and

11    Firefighter II.  Is that more about the firefighter side of

12    your job than the medical side of your job?

13    A.  Yeah, completely, mm-hmm.

14    Q.  And before you were an EMT, had you been CPR certified?

15    A.  Mm-hmm.  I have been a lifeguard and I did Red Cross

16    babysitting certification a few times when I was a kid too.

17    Q.  Now, you talked about some of the different kinds of

18    calls that you go on as a firefighter.  What are the most

19    common types of calls that you respond to?

20    A.  I would say overdoses or mental health crisis -- based

21    on mental health crises.

22    Q.  So those are on the medical side of things as opposed to

23    the firefighter?

24    A.  Mm-hmm.

25    Q.  I'm just going to ask you, for the court reporter, if
```

1     you can say "yes" instead of --

2     A.  Oh.  Yes.  Sorry.

3     Q.  And can you explain why the fire department responds to

4     so many calls for medical emergencies.

5     A.  Sorry.  Say it one more time.

6     Q.  Can you explain why the fire department responds to so

7     many calls for medical emergencies.

8     A.  Oh.  Well, we have our box that we respond in and

9     depending on what the medical emergency is, we show up to

10    assist the paramedics and that's what we're there for.

11              Sometimes the -- sometimes we get there quite a

12    bit more ahead of time than the paramedics, so there are

13    things that we can do too, because there are less medics in

14    the city.

15    Q.  So why do you oftentimes get there more quickly than

16    EMS?

17    A.  Well, we stay in the box that we respond to and then,

18    like I said, there's just -- there are more fire stations

19    than there are medic rigs around the city.

20    Q.  So what type of support do you provide for EMS or for

21    paramedics when you go on runs?

22    A.  We're just a lot -- we're extra hands.  They can kind of

23    direct us to get any equipment or bags or things that they

24    need, carrying patients, doing CPR while they administer

25    drugs, whatever they need.

1    Q.  And can you also start those types of things if they

2    aren't there yet?

3    A.  Oh, yeah.  We do on a regular basis.

4    Q.  Have you been on calls involving cardiac arrests before?

5    A.  Yes.

6    Q.  So have you provided medical aid to someone without a

7    pulse on calls with the Minneapolis Fire Department?

8    A.  Yes.

9    Q.  And do you respond to calls on occasion where the

10   Minneapolis Police Department officers are already on the

11   scene?

12   A.  Unless we are waiting for them to clear a scene for our

13   safety, I would say most of the time -- it's rare that I've

14   been to calls where they're there first.

15   Q.  And, Ms. Hansen, with your training and experience, how

16   is it that you determine whether a person needs CPR?

17   A.  They'd be [indiscernible].

18              COURT REPORTER:  Could you say that again?

19              THE WITNESS:  They'd be pulseless.

20   BY MS. SERTICH:

21   Q.  Are you familiar with something called the ABCs for

22   assessing someone who is nonresponsive?

23   A.  Yeah.  That's just like a quick assessment: airway,

24   breathing, and circulation.

25   Q.  How do you check on each of those things?

1    A.  An airway is we're just making sure that it's, like,

2    open and clear.  And are they breathing?  Are they breathing

3    normally?  And then on circulation, we are checking for a

4    pulse or excessive traumatic bleeding.

5    Q.  And according to your training, what are some of the

6    signs that a person might be having trouble breathing?

7    A.  You can see in their body language that it seems

8    labored.  They may have, like, a little -- a discoloration

9    to their skin, maybe more blue or pale, or just kind of --

10   they may be hunched over.  Their natural instinct would be

11   to be in a tripod position.

12   Q.  Is there anything that you can tell by hearing as to

13   whether someone's having trouble breathing?

14   A.  Yeah.  It depends on why they're having trouble

15   breathing, but you may hear just like a restricted airway,

16   kind of more of a wheezing sound or something like that.

17   Q.  And what is it that you are trained to do if someone is

18   not breathing?

19   A.  Is not breathing at all?  We would -- they would be in

20   cardiac arrest eventually.  So we -- if -- we would monitor

21   for pulses.  I mean, if it's an overdose, we could

22   administer Narcan right away, but we would be going in with

23   CPR compressions right away.

24   Q.  Ms. Hansen, what made you want to become a firefighter?

25   A.  I grew up in Minneapolis and so I -- you know, fell in

1   love with the city, obviously.  And my parents have both,

2   you know, been in healthcare work, so they care for

3   vulnerable people and I think it rubbed off.

4   Q.  What do you like about being a firefighter?

5   A.  I like moving fast.  I like working as a team.  I like

6   feeling helpful and productive.

7   Q.  And did you have to swear an oath when you became a

8   firefighter?

9   A.  Mm-hmm.  Yes.

10  Q.  So I'd like to talk about the evening of May 25th, 2020.

11  A.  Okay.

12  Q.  What were you doing that night?

13  A.  I was on a walk.

14  Q.  Do you recall if you had worked that day?

15  A.  I think -- I believe I got off that morning.

16  Q.  And at that time did you live in the neighborhood near

17  Cup Foods?

18  A.  Yes.

19  Q.  About how far away from Cup Foods?

20  A.  I think maybe a couple miles.

21  Q.  And so were you going on a walk generally in your

22  neighborhood?

23  A.  Mm-hmm, yeah.

24  Q.  Let me ask you this.  Is that neighborhood known to be

25  particularly high crime for Minneapolis?

1          MR. ROBERT PAULE:  Objection.  Foundation.

2          THE COURT:  Oh, I'll overrule it.  She's really

3     laying foundation.  Continue.

4          THE WITNESS:  I think that -- I don't know exactly

5     how to answer that except for that, like, there are places

6     in Minneapolis that I would be nervous to walk around at

7     dusk, but I think the community in that neighborhood

8     particularly, like, really like looks out for each other, so

9     I almost feel safer in that community than most others in

10    Minneapolis.

11    BY MS. SERTICH:

12    Q.  And at least on that night you were going for a walk --

13    A.  Yeah.

14    Q.  -- by yourself at dusk?

15    A.  Yeah.

16    Q.  At some point did you get closer to Cup Foods?

17    A.  Mm-hmm, yes.

18    Q.  And I'm going to show you a map that's been admitted as

19    Government's Exhibit 1.  Does this area look familiar to

20    you?

21    A.  Yeah.

22    Q.  Okay.  On what street did you approach Cup Foods?

23    A.  I was on 38th and I kind of made, like, sort of a bigger

24    loop and came behind the officers.

25    Q.  Well, let me ask you this.  Can you just draw a line

1    where you entered on this screen and where you were walking

2    when you first came into this area.

3    A.  Yeah.  I think something like that (indicating).

4    Q.  All right.  You went the whole way around.  So it looks

5    like you came west on 38th Street, crossed over 38th Street

6    to the other side, crossed Chicago, and then crossed 38th

7    again over to that area around the Speedway; is that right?

8    A.  That's right.

9    Q.  Okay.  And as you got closer to Cup Foods, did you

10   notice anything?

11   A.  I saw the lights, which can mean anything, and then I

12   got a little closer and a woman was yelling that they are

13   killing him.  And so I kind of made my way around just to

14   kind of, like, get an eye of what was going on and assess

15   and -- yeah.

16   Q.  I'm going to back you up just a little bit.  When you

17   say you saw the lights, do you mean from squad cars?

18   A.  Oh.  Yes, but at that point I didn't know that they were

19   police or -- I was expecting it to be my coworkers.

20   Q.  Firefighters?

21   A.  Mm-hmm.

22   Q.  Okay.  And can you just put a mark on the screen there

23   where the woman was that you said you encountered who was

24   yelling.

25   A.  She maybe was around here (indicating).

1    Q.  Okay.  So sort of at the corner there.  Is that by the

2    Dragon Wok?

3    A.  Yes.

4    Q.  Okay.  And then you said you continued around until you

5    were standing over by the Speedway; is that right?

6    A.  That's right.

7    Q.  Can you describe for me and for the jurors here what you

8    saw in the direction of Cup Foods.

9    A.  I saw a squad car and three officers with a man

10   underneath them and an officer facing Cup Foods, and there

11   was a small group of people there.

12   Q.  Okay.  And I should have asked you this.  Could you see

13   that before you got over by the Speedway or was it when

14   you --

15   A.  No, I couldn't.

16   Q.  Okay.  So at some point you said you approached the

17   officers from behind?

18   A.  Mm-hmm, yes.

19   Q.  And what made you decide to approach the officers?

20   A.  I -- it was just alarming, the amount of people that

21   were on top of one person not moving and handcuffed, so I --

22   and I also noticed that there was no medics or fire there,

23   so there was no medical attention available.  And judging by

24   him not -- George not seeming to be moving or anything, I

25   was concerned that he may have needed help.

```
 1    Q.  And you said, "George."  At the time did you know who
 2    was the person underneath the officers?
 3    A.  No.
 4    Q.  Okay.  And just to orient the jury to your position, I'm
 5    going to show you a clip from what's been admitted as
 6    Government's Exhibit 14, which is a video from up across the
 7    street that jurors know as the Milestone video.  Okay.  And
 8    this is a clip that is going to begin at 8:25:19.
 9         (Video recording played)
10    Q.  Okay.  Ms. Hansen, do you see yourself on the screen
11    right now?
12    A.  Yes.
13    Q.  Okay.  Can you make a little circle or a mark where you
14    see yourself.
15    A.  (Indicating.)
16    Q.  And, for the record, the video was stopped at 8:25:37.
17             THE COURT:  And then, counsel, I think that
18    completes what's been previously discussed.
19    BY MS. SERTICH:
20    Q.  Once you got to that position, did you speak to an
21    officer who you were standing near there?
22    A.  Yes.
23    Q.  In your training have you learned that as a firefighter
24    who is an EMT that you are required to stop and provide
25    medical assistance if you see someone who needs it?
```

```
1    A.  Yes.

2              MR. GRAY:  Excuse me.  Objection.  Counsel is

3    leading.  May I --

4              THE COURT:  You are leading, counsel.

5              MR. GRAY:  May I be on the speaker here for just a

6    minute?

7              THE COURT:  You mean on the sidebar?

8              MR. GRAY:  Sidebar.

9              THE COURT:  Okay.

10       (At sidebar)

11             MR. GRAY:  Judge, can you hear me?

12             THE COURT:  I can hear you.

13             MR. GRAY:  Every question she asks, she shakes her

14   head yes when she wants a yes.  I'm sure it's maybe not

15   intentional, but I don't want to object to that in front of

16   the jury.  But she's going like this (indicating) for a yes,

17   and that's totally improper and that's my other part of the

18   objection.  Thank you.

19             THE COURT:  Okay.  I think it's heard and we'll do

20   the best we can.

21             Proceed.

22       (In open court)

23             THE COURT:  Continue.

24   BY MS. SERTICH:

25   Q.  Ms. Hansen, what are you -- as a firefighter who is an
```

1    EMT, what are you trained to see if you see -- do if you see

2    someone in medical distress?

3    A.  I would identify myself as a first responder and let

4    them know that I can offer them medical attention if they

5    need it or want it.  And then if they do, I would do an

6    assessment of what's going on and what they may need and

7    probably call 911.

8    Q.  And you said that once you got to that position you saw

9    in the clip, that you spoke to Officer Thao?

10   A.  Yes.

11   Q.  At the time did you know his name?

12   A.  No.

13   Q.  Okay.  And sitting here today you know that?

14   A.  Yes.

15   Q.  And what did you do when you went up to him?  What did

16   you say to him?

17   A.  I said that I'm a Minneapolis firefighter.  I don't

18   know -- I haven't watched the video, so I can't remember

19   exactly.

20   Q.  Did you have any work ID on you at that time?

21   A.  No.  I didn't have my wallet at all.

22   Q.  As you were standing out in the street talking to

23   Mr. Thao, did you look down at what was happening with

24   Mr. Floyd?

25   A.  Yes.

```
1    Q.  And what did you observe?

2    A.  I observed -- from that point that I was on the

3    sidewalk?  I could see --

4    Q.  I'm sorry.  I'm still talking about when you are in the

5    street.  Could you see --

6    A.  Well, either way, once I come around to facing

7    Officer Thao, I could only see George Floyd's head being

8    pressed down and I could see Chauvin on top of him, and

9    that's kind of the vantage I had.

10   Q.  Did Officer Thao say anything to you when you came up to

11   him?

12   A.  Yeah.  He said something like, "If you're really a

13   Minneapolis firefighter, then you'd know better than to get

14   involved."

15   Q.  Did he tell you to do anything?

16   A.  Get on the sidewalk.

17   Q.  And did you get on the sidewalk?

18   A.  Mm-hmm, yes.

19   Q.  Now, that's where you said you could observe Mr. Floyd;

20   is that right?

21   A.  Mm-hmm, yes.

22   Q.  Did you notice that there were other people standing

23   there on the curb?

24   A.  Yes.

25   Q.  And were they saying anything?
```

1    A.  Yeah, everyone was saying something, but I don't really

2    remember because I -- I was addressing Thao and saying what

3    I thought I needed to say to get him help.

4    Q.  So you were -- you heard people saying things you don't

5    know what sitting here today?

6    A.  Correct.  Yeah.

7    Q.  So once you were standing on the sidewalk, you said that

8    you could see Mr. Thao and Mr. Chauvin with his knee on

9    Mr. Floyd.  Did you recognize either of these officers?

10   A.  Yeah.  I actually -- I was on a call with Chauvin and

11   Kueng I think the day before or a couple days before.

12   Q.  Did you know them by name?

13   A.  No.

14   Q.  And outside of that one call, did you know them at all?

15   A.  No.

16   Q.  Could you see any part of the -- once you were on the

17   sidewalk, could you see any part of the other two officers

18   who you'd seen when you were coming up from behind?

19   A.  Not as I recall.

20   Q.  Based on your training, what did you observe about the

21   condition of Mr. Floyd?

22   A.  He -- his face -- in my memory, his face looked really

23   swollen and smashed to the ground.  He wasn't moving.  He

24   was definitely unconscious.

25              And I was -- at the time I was immediately alarmed

1    and concerned because I saw fluid kind of coming from the

2    general body, which I thought may be a sign that he had lost

3    his -- you know, emptied his bladder, which is a sign of

4    death or near death.

5    Q.  And was there a time at which your recollection was that

6    you could see Mr. Floyd's face when you were on the opposite

7    side of the street at Speedway?

8    A.  Yeah.  I don't -- I think it's one of those mind tricks,

9    because I would have sworn that's what I saw when I was on

10   the other side of the street, but it's not.

11   Q.  Okay.  And, similarly, did you previously think that you

12   saw four officers on Mr. Floyd on the ground?

13   A.  Yes.

14   Q.  Okay.  And sitting here today, do you know that

15   that's --

16   A.  I know that that's not true, mm-hmm.

17   Q.  And I think you've already mentioned you haven't --

18   other than these far away videos, you haven't watched the

19   videos to refresh your memory on that?

20   A.  Correct.

21   Q.  And what's the reason you haven't done that?

22                MR. ROBERT PAULE:  Objection.  Relevance.

23                THE COURT:  Sustained.

24   BY MS. SERTICH:

25   Q.  Do you recall whether you heard Mr. Floyd vocalizing at

1    all after you arrived?

2    A.  No, I don't recall.

3    Q.  And based on your training, what were your concerns

4    about his medical needs at that point?

5    A.  Well, when we start to become concerned about breathing

6    and airway and that the situation doesn't improve, then

7    we'll be worried about whether that person has a pulse or

8    they also probably should be receiving CPR.

9    Q.  And you said that Mr. Chauvin's position was that he had

10   his neck [sic] on Mr. Floyd.  Did you see him moving at all

11   while he, Mr. Chauvin, while he was in that position?

12   A.  I mean, it really seemed like he was just kind of

13   leaning in.

14   Q.  So based -- you just testified that your concern would

15   be you want to do CPR?

16   A.  I would want to assess him, but more than likely I was

17   assuming that's what needed to be done.

18   Q.  And what would be the steps that you would take in that

19   situation, based on your training?

20   A.  So -- well, we know that his airway was, you know, being

21   crushed, so I --

22              MR. ROBERT PAULE:  Objection.  That's a

23   misstatement.  May we sidebar?

24              MR. GRAY:  It's also speculation.

25              THE COURT:  Yeah, I'm going to sustain.  I don't

1    know that the evidence supports it.  I'm going to sustain

2    the objection to that answer and instruct the jury to

3    disregard.

4              MR. GRAY:  [Inaudible].

5              COURT REPORTER:  Could you say that again?

6              MR. GRAY:  Oh, I'm sorry.  Move that what she did

7    say stricken so the jury doesn't --

8              THE COURT:  That's what I said.  The jury should

9    disregard it.

10   BY MS. SERTICH:

11   Q.  So, Ms. Hansen, I'll just ask you another question.

12   A.  Okay.

13   Q.  Based on your training, what would be the steps that you

14   would take?

15   A.  So I would check to see if he was breathing and I

16   would -- if I found that he -- if he wasn't breathing, I

17   would check for a pulse.  And if he didn't have a pulse, I

18   would --

19             MR. PLUNKETT:  Objection, Your Honor.  Relevance.

20             THE COURT:  It's overruled.

21             THE WITNESS:  I would have directed somebody to

22   call 911, someone to go look for an AED at the gas station.

23   I would have flipped him over and I would have checked his

24   airway, considered any spinal cord injuries, and then

25   checked for a pulse and started CPR, waiting for backup.

```
 1   BY MS. SERTICH:
 2   Q.  And when you say check for an AED over at Speedway, what
 3   are you talking about?
 4   A.  Automatic external defibrillator.  It would just be pads
 5   to check for a rhythm and potentially give a shock if it was
 6   advised.
 7   Q.  And based on your training, what is the purpose of
 8   performing chest compressions?
 9   A.  We're just trying to circulate the blood, help with the
10   heart rhythm to get a heart rhythm back.
11   Q.  Are you familiar with Fire Department Station 17?
12   A.  Yes.
13   Q.  About how far is that from Cup Foods?
14   A.  Just a couple blocks, a few blocks down.
15   Q.  When you were standing there on the curb, did you make
16   requests of the officers?
17   A.  Yeah.  I wanted them to check for a pulse.
18   Q.  What response did you receive?
19              MR. GRAY:  Object to that as vague, Your Honor.
20   What response [inaudible].
21              THE COURT:  That's what she asked, is what
22   response did she receive.
23              THE WITNESS:  I don't recall, but what I -- I
24   don't recall what anybody was saying, but I do know that
25   they never checked one or if they did, they didn't let me
```

```
1     know.

2     BY MS. SERTICH:

3     Q.  Did you see or hear anything to make you understand that

4     Mr. Thao heard what you were requesting?

5     A.  I don't remember what he said exactly, but I do know

6     that he was responding to me directly, so I know for sure he

7     could hear me.

8     Q.  Okay.  So what did you see or hear that made you think

9     that he was responding to you?

10    A.  Eye contact, directly responding to something I was

11    saying.  I mean, I knew that he was communicating with me.

12    I just can't exactly recall what he was -- what exactly was

13    said.

14    Q.  And did he respond to you directly when you were asking

15    for a pulse check?

16    A.  Yes.

17    Q.  At some point did Mr. Thao tell you he was busy dealing

18    with you?

19    A.  Mm-hmm.

20    Q.  Is that a "yes"?

21    A.  Yes.

22    Q.  Based on your observation there on the sidewalk, was

23    Mr. Thao busy doing anything with you or the other folks on

24    the curb?

25              MR. ROBERT PAULE:  Objection.  Vague.  Calls for
```

```
 1    speculation.

 2              THE COURT:  Sustained.

 3    BY MS. SERTICH:

 4    Q.  Based on your observation, did Mr. Thao seem scared or

 5    threatened by anyone on the curb?

 6              MR. ROBERT PAULE:  Objection.  Vague.  Calls for

 7    speculation.  May we have a sidebar.

 8              THE COURT.  Sustained.

 9              MR. ROBERT PAULE:  Your Honor, excuse me.  May we

10    sidebar?

11              THE COURT:  No thank you.

12    BY MS. SERTICH:

13    Q.  Did you hear Mr. Thao say anything about drug use?

14    A.  Yeah.  I heard -- I do remember him saying something

15    about, "This is why you shouldn't use drugs" or something

16    like that.

17    Q.  And did you notice whether any of the other officers

18    besides Mr. Thao, had a response to what you were saying?

19    A.  I don't.

20    Q.  Did you ever see any of the officers taking a pulse?

21    A.  I didn't.

22    Q.  In your training and experience, someone who is CPR

23    certified, if you cannot find a person's pulse, what do you

24    do next?

25    A.  I would start compressions.
```

744

1    Q.  And in your training and experience, is time of the
2    essence in that situation?
3    A.  Absolutely.
4    Q.  During the time that you were on the curb, did you
5    become more assertive?
6    A.  Yes.
7    Q.  Did that include raising your voice?
8    A.  Yes.
9    Q.  Did that include swearing?
10   A.  Yes.
11   Q.  And why were you getting louder or swearing?
12   A.  Because I was recognizing that this was a time-sensitive
13   thing.  He needed help and he wasn't getting it, and I felt
14   like I was just trying everything.
15   Q.  Did you ever step off of the curb?
16   A.  Yes.
17   Q.  And to make clear your position to the jury, I'm going
18   to show you a brief clip from Government Exhibit 14, which,
19   again, is that faraway Milestone video.  And this is
20   beginning at 8:26:08.
21       (Video recording played)
22   Q.  And is that you in the bottom left-hand corner?
23   A.  Yes.
24   Q.  Did you go off screen there?
25   A.  Yes.

1          THE COURT:  Thank you, counsel.

2          MS. SERTICH:  The clip ends at 8:26:32.

3     BY MS. SERTICH:

4     Q.  Did you see there that as you stepped off the curb, you

5     were going off to the side?

6     A.  Yes.

7     Q.  Do you recall why you were stepping off to the side?

8     A.  No.

9     Q.  Why did you step off of the curb at that point?

10    A.  I just felt like I was just -- I just wanted to get in

11    there.

12    Q.  Did Mr. Thao tell you to get back on the sidewalk?

13    A.  Yep.

14    Q.  Now, you've just testified that you raised your voice.

15    Did you ever threaten the officers?

16    A.  About reporting them?  Probably.

17    Q.  Did you ever physically threaten the officers?

18    A.  No.

19    Q.  Did you see anyone else physically threaten the

20    officers?

21    A.  No.

22    Q.  Do you recall telling the officers that they were on

23    another level?

24    A.  Mm-hmm.  Yes.

25    Q.  What did you mean by that?

```
1    A.  They -- I mean, I've been to calls where people have

2    been restrained, where they're -- a lot like -- so many

3    different situations, but I've never seen such, like,

4    determination or -- I don't know.  It didn't seem like a

5    normal scene whatsoever.

6    Q.  Were you present when EMS arrived?

7    A.  Yes.

8    Q.  What did you observe when EMS arrived?

9    A.  I was really relieved because we work so closely with

10   HCMC medics, so I kind of didn't really watch what they were

11   doing so much.  I knew that they were going to do a load and

12   go, and so I could see that out of kind of the corner of my

13   eye.

14   Q.  So you said you knew they were going to do a load and

15   go?

16   A.  Yeah.

17   Q.  What does that mean?

18   A.  Load and go is something that we do all the time, just

19   getting the patient up and into the ambulance quickly, more

20   often than not just kind of driving down the block or

21   something.  It's like -- it's respectful to the community to

22   not have to see whatever medical interventions we need to

23   perform.

24   Q.  At any point while you were on the scene, did you see

25   Mr. Floyd gain consciousness?
```

```
1    A.   No.

2    Q.   Were you prevented from treating Mr. Floyd?

3    A.   Yes.

4    Q.   And given your training and experience, could you have

5    made a difference in that moment?

6    A.   I believe so.

7              MR. ROBERT PAULE:  Objection.

8              THE COURT:  Sustained.

9              MR. ROBERT PAULE:  Ask to disregard --

10             THE COURT:  Sustained.

11   BY MS. SERTICH:

12   Q.   Based on your training, did you believe Mr. Floyd had a

13   right to receive medical care?

14   A.   Absolutely.

15             MR. GRAY:  Object to that, Your Honor.  Lack of

16   foundation.  Legal question.

17             THE COURT:  It is a legal question.  I sustain.

18             MR. GRAY:  Move the answer be stricken.

19             THE COURT:  There isn't any answer.

20   BY MS. SERTICH:

21   Q.   So we talked about this a little bit.  You were on scene

22   before EMS arrived.  And then did fire rescue arrive later?

23   A.   Yeah, and the paramedics were off scene already.

24   Q.   And in your experience, is that unusual?

25   A.   Yes.
```

```
1      Q.  Why?

2             MR. GRAY:  Object to that as not relevant, why

3      it's unusual.

4             THE COURT:  No, I'll overrule.  You may answer.

5             THE WITNESS:  Because when there's proper

6      communication through dispatch, we -- first of all,

7      especially because Station 17 is where it is, we would have

8      absolutely gotten there first.  But it was -- I've never

9      been to a call that was in that order.  And the fire got

10     there and had no idea where the paramedics were is another

11     sign of not communicating through dispatch.

12     BY MS. SERTICH:

13     Q.  And in your experience, is there a situation where you

14     would be with someone in cardiac arrest where you would just

15     wait for paramedics to arrive?

16     A.  Without helping?

17     Q.  Yeah.

18     A.  No.  No, I would -- no, we would intervene.

19     Q.  So we talked a little bit about those other people

20     standing on the curb near you.  Were you afraid of any of

21     those people standing around you?

22     A.  No.

23             MR. ROBERT PAULE:  Objection.  Relevance, Your

24     Honor.

25             THE COURT:  Oh, I'll overrule.  It will stand.
```

```
1     BY MS. SERTICH:

2     Q.  Were you carrying your cell phone with you that evening?

3     A.  Yes.

4     Q.  At some point did you start recording what was happening

5     to Mr. Floyd on your cell phone?

6     A.  Yes.

7     Q.  Why did you do that?

8     A.  Because there's proof, then, of what happened.

9     Q.  And did you mostly focus on recording Mr. Thao?

10    A.  Yeah.

11    Q.  Why is that?

12    A.  Because he was in the way of George Floyd's medical

13    attention because he was interacting with the group.

14    Q.  And so for identification purposes, I'm just going to

15    show you an image from Government's Exhibit 19.

16    A.  Mm-hmm.

17    Q.  Do you recognize this as an image from your recording?

18    A.  Yes.

19    Q.  At some point did you make a 911 call regarding this

20    incident?

21    A.  Yes.

22    Q.  Do you recall when that happened in terms of when EMS

23    left the scene?

24    A.  I think it was before fire got there or maybe during

25    fire being there.  I'm not quite sure.
```

```
 1    Q.  Why did you call 911?

 2    A.  Because, I mean, if that was the police, then someone

 3    needed to know what happened and the scene was -- at that

 4    point I was -- you know, if the police had done what they

 5    did there, I didn't feel comfortable with the safety of that

 6    corner anymore.

 7    Q.  What do you mean by that?

 8    A.  I didn't trust those officers.

 9              MR. GRAY:  Judge, I move that be stricken from the

10    record.

11              THE COURT:  Sustained.

12              MR. GRAY:  Ask the jury to disregard it.

13              THE COURT:  Disregard it.

14    BY MS. SERTICH:

15    Q.  Did you feel like it was unsafe because of the

16    bystanders who were with you?

17    A.  No.  The --

18    Q.  Okay.  That's enough.

19              And during your call to 911, did you ask to speak

20    to a supervisor?

21    A.  Yes.

22    Q.  Did you ever actually speak to a supervisor?

23    A.  No.

24    Q.  Okay.  Did something happen to end the call?

25    A.  I believe that's when the -- when fire got there, but I
```

1    don't -- I'm not sure why the call -- exactly why the call

2    was ended.

3    Q.  Fair enough.

4            So did some of your colleagues from fire arrive?

5    A.  Yes.

6    Q.  Who did you see?

7    A.  Jeremy Norton was the captain and Jennifer Hall was his

8    firefighter.

9    Q.  What happened when they arrived?

10   A.  They were looking for a patient and they went into Cup

11   Foods, and I followed them in there and explained to them

12   what happened.  And I think that at that point maybe they

13   were getting radio from dispatch about where the ambulance

14   was.

15   Q.  After Mr. Floyd was taken away by EMS, did any of the

16   officers come to speak to you?

17   A.  Yes.

18   Q.  Do you remember which officer or officers?

19   A.  I know Lane is the officer that, like, spoke to me

20   directly and there was one other.

21   Q.  What did he say to you?

22   A.  "Are you really a Minneapolis firefighter?" or something

23   like that and asked if I wanted to make a statement.

24   Q.  Was there another man on the scene, an African-American

25   man wearing a hoodie that day?

```
 1    A.  Yes.

 2    Q.  At the time did you know that man's name?

 3    A.  No.

 4    Q.  Sitting here today, do you know it?

 5    A.  Yes.

 6    Q.  Okay.  Is that Mr. Williams?

 7    A.  Yes.

 8    Q.  Did Mr. Lane offer for Mr. Williams to make a statement?

 9    A.  Yes.

10    Q.  I'm just going to show you an exhibit from what's

11    been -- or I'm sorry, an image of what's been admitted as

12    Government's Exhibit 8 from Mr. Kueng's body-worn camera.

13          Is this an image of Mr. Lane speaking to you and

14    Mr. Williams, as you've described?

15    A.  Yes.

16    Q.  And this is at 20:51:29?

17    A.  Yes.

18    Q.  Can you just touch on the screen there where

19    Mr. Williams is.

20    A.  (Indicating.)

21    Q.  Did Officer Lane seem at all afraid of the people

22    standing on the sidewalk?

23    A.  No.

24          MR. PLUNKETT:  Objection.  Speculation.

25          THE COURT:  Sustained.
```

```
1    BY MS. SERTICH:

2    Q.  Did Mr. Lane say or do anything to indicate fear of you

3    or Mr. Williams?

4              MR. PLUNKETT:  Same objection, Your Honor.

5              THE COURT:  Sustained.

6    BY MS. SERTICH:

7    Q.  So you previously testified you were a rookie back in

8    May of 2020?

9    A.  Yeah.

10   Q.  And have you testified in other public hearings related

11   to this case?

12   A.  Yes.

13   Q.  As a firefighter, do you still respond to calls for

14   service where members of the Minneapolis Police Department

15   are on the scene?

16             MR. PLUNKETT:  Object to this line of questions as

17   irrelevant.

18             THE COURT:  I don't see the relevance of that,

19   counsel.

20             MS. SERTICH:  Can we have a sidebar, Your Honor?

21             THE COURT:  Sure.  We're going to do better than

22   that.  We're going to take an afternoon break.

23             Members of the jury, we're going to be in recess

24   for an afternoon break at this time.  Again, please don't

25   discuss the case during the recess.  We are in recess.
```

1          (Jury excused)

2                        **IN OPEN COURT**

3                     **(JURY NOT PRESENT)**

4          THE COURT:  Counsel, what is the relevance of

5    whether or not she responds to calls with Minneapolis Police

6    Department?

7          MS. SERTICH:  Your Honor, Ms. Hansen was a rookie

8    firefighter at this time, and the government anticipates

9    that she will talk about some of the ways she has been

10   treated since she's provided public testimony on this case.

11         THE COURT:  Okay.  I sustain.  I then sustain the

12   objection.  That's just not relevant to this case, how she's

13   been treated.  It has nothing to do with this lawsuit.  I

14   sustain the objection.

15         MS. SERTICH:  Your Honor, the government believes

16   this is --

17         THE COURT:  No.  I sustained the objection.

18   (Recess taken at 3:22 p.m.)

19                       *  *  *  *  *

20   (3:38 p.m.)

21                        **IN OPEN COURT**

22                       **(JURY PRESENT)**

23         THE COURT:  You may be seated.

24         Ms. Hansen, if you'd return, please.

25         You may proceed, Ms. Sertich.

 1              MS. SERTICH:  Thank you, Your Honor.  I have no

 2      further questions for Ms. Hansen at this time.

 3              THE COURT:  Okay.  Who is up?  Okay.  Mr. Gray.

 4              MR. GRAY:  Yes, Your Honor.  I thought somebody

 5      else was.

 6                          CROSS-EXAMINATION

 7      BY MR. GRAY:

 8      Q.  You remember testifying at a previous hearing, ma'am,

 9      and telling under oath that you did not see --

10              MS. SERTICH:  Objection.  Hearsay.

11              MR. GRAY:  It's under oath, Your Honor.  It's

12      cross-examination.

13              THE COURT:  I'm going to have to hear the

14      question.  Go ahead.

15      BY MR. GRAY:

16      Q.  All right.  Do you remember telling under oath at

17      another hearing that all you could see when you were

18      standing up on the sidewalk filming were the top of the

19      heads of the junior officers, I believe you referred to

20      them?

21      A.  I don't remember saying that.

22      Q.  Okay.  Would it -- do you agree that you said it?

23      A.  I could believe that.  They just weren't on my radar,

24      really.

25      Q.  They weren't on your radar?

```
1    A.  I may have been able to see small bits of their bodies,

2    but.

3    Q.  Okay.

4    A.  I believe it.

5    Q.  So when you testified that nobody took the pulse of

6    George Floyd, you weren't able to see if the pulse was taken

7    on his wrist or his ankle, correct?

8    A.  Yeah, I don't know if there was a pulse taken.

9    Q.  And one other thing.  You testified that you did meet

10   with ex-Officer Lane later after the fire truck left; is

11   that right?

12   A.  I don't know if -- I mean, I think it was after the fire

13   truck left.  Before or after.

14   Q.  Okay.  And you had a conversation with him?

15   A.  Not really.

16   Q.  What did you say that he -- he asked you something?

17   A.  He asked me whether or not -- if I was really a

18   firefighter or "Is that you?" or something like that and "Do

19   you want to make a statement?"

20   Q.  And what?

21   A.  And "Do you want to make a statement?"

22   Q.  Okay.  Did he say, "Are you really a firefighter?" or

23   was he a gentleman about it?

24   A.  I thought it was kind of condescending, but that's a

25   personal --
```

```
 1    Q.  Condescending?  Well, let's play it.

 2              MR. GRAY:  Can we play that?

 3              THE WITNESS:  No.

 4              THE COURT:  No, let's not.

 5              MR. GRAY:  We can't play that?

 6              THE WITNESS:  No.

 7              THE COURT:  No, we don't need to.

 8              MR. GRAY:  All right.  That's all I have.

 9              THE COURT:  Mr. Plunkett.

10                      CROSS-EXAMINATION

11    BY MR. PLUNKETT:

12    Q.  Hi there.

13    A.  Hi.

14    Q.  My name is Tom Plunkett.

15    A.  Nice to meet you.

16    Q.  It's nice to meet you too.

17              We haven't spoken before, have we?

18    A.  I don't think so.

19    Q.  I don't think we have.  Actually, I know we haven't.

20    A.  Okay.

21    Q.  So I'm just going to ask you a few questions.

22    A.  Okay.

23    Q.  Show you complete respect.  Show me the same.  Fair?

24    A.  Absolutely, mm-hmm.

25    Q.  All right.  You indicated that you had some kind of
```

```
 1   visual, kind of spinning around, but what you reacted to is
 2   what you saw on the other side of the vehicle?
 3   A.  Right.
 4   Q.  Okay.  And you said something about you were concerned
 5   about the fluid, and I get that.
 6   A.  Yeah.
 7   Q.  But we later found out that fluid was actually
 8   air-conditioning fluid from the car?
 9   A.  Yes.
10   Q.  Okay.  Do you know -- you talked about some medical
11   stuff.  Do you know what perfusion is?
12   A.  I think that's when your blood moves through your body,
13   oxygenates and -- yeah.
14   Q.  Right.  So your heart is beating and the blood is moving
15   around?
16   A.  Yeah.
17   Q.  We agree.
18            And you check that by kind of giving a little
19   pinch to see if --
20   A.  Yeah.  There's blood flow, yeah.
21   Q.  Capillary refill, is that what it's called?
22   A.  Yeah.  You're good.
23   Q.  And so if a firefighter got there and he said, "I sense
24   perfusion," he would have sensed blood flow?  Not the
25   firefighter.  The paramedic.  I'm sorry.
```

```
 1    A.  Well, we don't really check --

 2              MS. SERTICH:  Objection.  Speculation.

 3              MR. PLUNKETT:  I'm going to withdraw the question,

 4    Your Honor.

 5              THE COURT:  Okay.  Thank you, because I was lost

 6    on it.

 7              Continue.

 8              MR. PLUNKETT:  Yeah.  And that was my fault, Your

 9    Honor.  I said "firefighter" when I should have said

10    "paramedic."  I got everyone confused.

11              THE WITNESS:  Yeah.

12    BY MR. PLUNKETT:

13    Q.  So when you take a pulse, you always want to go for the

14    carotid pulse; isn't that the one you want?

15    A.  We -- I mean, we -- I go -- that's what I go for, but

16    you can check it on the wrist or groin or ankle.

17    Q.  Yeah.  Tibial posterior pulse on the ankle, brachial,

18    radial --

19    A.  Yeah.

20    Q.  -- carotid?

21    A.  Yeah.

22    Q.  Okay.  But this is the best one and that's why you are

23    trained to go there?

24    A.  Mm-hmm.

25    Q.  And if somebody can't get a -- I'm not going to go
```

1   through them again.  If you can't get a pulse at the ankle,

2   you check the carotid, correct?

3   A.  Correct.

4   Q.  You said something -- you talked about bad

5   communication.  Do you remember those questions with

6   dispatch?

7   A.  Yeah.

8   Q.  And so if it's bad communication, we don't know who was

9   doing the bad communicating, do we?

10  A.  No.  I don't know.

11  Q.  So we agree?

12  A.  Yeah.

13  Q.  So it could be the dispatch did it wrong too; isn't that

14  right?

15  A.  I didn't have a radio.

16  Q.  Okay.  Fair enough.  Short and simple.

17  A.  Thank you.

18          MR. PLUNKETT:  No further questions.

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you.

21          Mr. Paule.

22                    CROSS-EXAMINATION

23  BY MR. ROBERT PAULE:

24  Q.  Good afternoon, Ms. Hansen.  My name is Bob Paule.  I've

25  never met you before, have I?

 1    A.  I don't believe so.

 2    Q.  All right.  Good afternoon.

 3    A.  Hi there.

 4    Q.  Yes.  Ms. Hansen, you indicated that you approached the

 5    scene coming westbound down 38th Street; is that correct?

 6    A.  Correct.

 7    Q.  And what sort of drew your attention was you saw some

 8    lights ahead of you sort of in the area where the squad car

 9    was, correct?

10    A.  Correct.

11    Q.  And at that point you didn't know if it was a police or

12    a firefighter, some of your fellow coworkers, correct?

13    A.  Correct.

14    Q.  But you sort of walked up and once you heard the

15    yelling, you then crossed the street and I believe you said

16    you kind of circled the area to assess the situation?

17    A.  Correct.

18    Q.  Okay.  And you indicated that once you were on sort of

19    the Speedway or the west side of Chicago, that's when you

20    came up and approached the scene, correct?

21    A.  Correct.

22    Q.  Okay.  And I believe when you approached, can you tell

23    the jury how you came up vis-à-vis my client, Mr. Thao.

24    A.  Mm-hmm.

25    Q.  In other words, not to confuse you, did you come up the

1  way he was facing from behind?  How did you do that?

2  A.  I came -- I was on his left side.  I obviously came from

3  behind him because he was facing the group of people.  Not

4  too close.  I didn't seem to startle him.

5  Q.  Okay.  And when you came up there, you came up because

6  you were concerned what you were seeing in front of you,

7  correct?

8  A.  Correct.

9  Q.  Now, did you see any of what led up to Mr. Floyd being

10  in the position he was?

11  A.  No.

12  Q.  Did you have any information about why the police were

13  acting in the manner that they were?

14  A.  No.

15  Q.  Okay.  And when you got up to the scene, my client, you

16  talked to him.  He basically commanded you to get on the

17  curb, correct?

18  A.  Correct.

19  Q.  He indicated something like "If you were really a

20  firefighter, you would know not to interfere with this,"

21  something to that effect?

22  A.  "You would know better than to get involved."

23  Q.  Okay.  That's sort of the same thing, is it not?

24  A.  I disagree, but there it is.

25  Q.  Okay.  Well, it's a free country.

1    A.  Yep.

2    Q.  But then you got up in a stance and you started asking

3    to check his pulse and became more insistent; is that

4    correct?

5    A.  Correct.

6    Q.  When you were saying that, did you have any idea what

7    the other two officers were doing that were out of your view

8    at that point?

9    A.  No.

10   Q.  And, again, you are just reacting to what you are

11   seeing, correct?

12   A.  Correct.

13   Q.  And, as Mr. Plunkett said, you thought that perhaps the

14   fluid in the street indicated his bladder had voided, a sign

15   that the person is not doing well, correct?

16   A.  Correct.

17   Q.  Okay.  That's what you were responding to, was it not?

18   A.  That was -- just the general scene.  There was a lot

19   going on.

20   Q.  Okay.  And you testified that you were there when the

21   emergency medical people, I think I'll refer to as the

22   ambulance people showed up?

23   A.  They're paramedics.

24   Q.  Yes.

25   A.  Yep.

1    Q.  You were there when they showed up, correct?

2    A.  Correct.

3    Q.  And you discussed a load and go.  You've seen that

4    before, correct?

5    A.  Yep, we do it often.

6    Q.  Okay.  And did you just say you see it often?

7    A.  Yeah.  We do it all -- very frequently.

8    Q.  Okay.  And why do you do that?

9    A.  To spare the public, especially if there's minors there,

10   from just seeing any medical interventions that they don't

11   need to see.

12   Q.  Okay.  And just by -- in terms of so the jury knows, you

13   actually met and spoke with agents from the FBI on May 28,

14   2020, did you not?

15   A.  Right.

16   Q.  And they had you give a recorded statement about what

17   you were observing on that day; is that correct?

18   A.  Yeah.

19   Q.  I didn't mean to confuse you.  Poorly phrased question.

20   But the idea is you gave a recorded statement on May 28th

21   about the events of May 25th?

22   A.  Yeah, that they recorded.  Yes.

23   Q.  Do you understand me now?

24   A.  Yes.

25   Q.  Okay.  And did they ask you about the load and go?

```
 1    A.  I think so, yeah.

 2    Q.  Okay.  Do you recall what you said?

 3    A.  I don't.

 4    Q.  Okay.  In the transcript of the recording, I have down

 5    that you stated, "That's what they're trained" --

 6              MS. SERTICH:  Objection, Your Honor.  It should --

 7              THE COURT:  Sustained.

 8              MS. SERTICH:  -- be refreshed.

 9              THE COURT:  Sustained.  You can refresh her

10    recollection by showing it to her.

11              MR. ROBERT PAULE:  All right.  May I approach the

12    witness?

13              THE COURT:  You may.

14              MR. ROBERT PAULE:  Thank you.  And for counsel's

15    benefit, it's Bates 00002469.

16              May I approach the witness, Your Honor?

17              THE COURT:  You may.

18              MR. ROBERT PAULE:  Thank you.

19    BY MR. ROBERT PAULE:

20    Q.  Just so you understand what's going on, Ms. Hansen, I'm

21    going to approach and hand you a document loaded to a

22    particular page.  You will see probably some yellow

23    highlighting.

24    A.  Yeah.

25    Q.  That's the part, but take as much time as you would like
```

1    need to review so you can recall what you said.

2    A.  No problem.  Thank you.

3    Q.  Does that refresh your recollection?

4    A.  I don't remember saying that, but I see that I said

5    that, so.

6    Q.  What did you tell the FBI on that tape?

7    A.  I just said I don't remember, but I --

8              MS. SERTICH:  Objection.  Hearsay.

9              THE COURT:  It's overruled.

10             THE WITNESS:  I just said I don't remember, but I

11   can see that I said that.

12   BY MR. ROBERT PAULE:

13   Q.  And what did you tell the FBI?

14   A.  I told the FBI that a load and go is something that we

15   do on a regular basis.

16             MR. ROBERT PAULE:  May I approach the witness,

17   Your Honor?

18             THE COURT:  You may.

19             MR. ROBERT PAULE:  And I think what I'm going to

20   do, with the court's permission, would be to publish on the

21   ELMO what the recording said, just to make sure that

22   Ms. Hansen understands.

23             THE WITNESS:  I don't want to hear it.

24             MS. SERTICH:  Objection, Your Honor.  That's

25   hearsay and that's not the proper method of impeachment, to

1    publish it to the jury.

2              THE COURT:  I'm not sure that I understand.  What

3    do you -- are you going to put it on the ELMO?

4              MR. ROBERT PAULE:  I would like to, with the

5    court's permission -- a transcript of what she actually said

6    because she's saying she doesn't remember what's recorded on

7    the transcript, Your Honor.

8              THE COURT:  I'm not sure that's what she said.  I

9    think she said she didn't remember today what she had said

10   back then.  I don't know that she's denying --

11             THE WITNESS:  I'm not denying --

12             MR. ROBERT PAULE:  Excuse me.  I'm trying not to

13   speak over anyone.  I understand the court.

14             May I inquire?

15             THE COURT:  You may.

16   BY MR. PAULE:

17   Q.  What you said was is "A load and go is what they're

18   trained to do in a situation where it is not a safe scene";

19   isn't that correct?

20   A.  Yeah.  It was not safe for George Floyd.

21   Q.  And now when you -- you testified earlier -- you

22   testified, in response to Ms. Sertich's question, that you

23   never made any threats to any of the officers; isn't that

24   correct?

25   A.  I'm pretty sure I threatened to report them.

```
1    Q.  Do you remember stating to my client, "You can find me
2    in the streets"?
3    A.  Yeah, on the -- when you go on calls, we call that in
4    the streets, like I've been in the streets, working in the
5    streets for this amount of time.  It's --
6    Q.  Did you --
7    A.  -- common lingo.
8    Q.  Excuse me.
9    A.  It's common lingo.
10   Q.  Did you explain that to him?
11   A.  No.
12   Q.  And then, finally, do you remember when you spoke to the
13   FBI stating anything about whether you thought that Officer
14   Thao was aware of what was going on behind him?
15   A.  I don't remember.
16   Q.  Would it perhaps refresh your recollection to look at a
17   transcript of --
18   A.  That would be nice, yeah.  Thank you.
19          MR. ROBERT PAULE:  And, counsel, Bates stamp
20   00002478 -- excuse me, 70 into the top of 00002471.
21          May I approach the witness, Your Honor?
22          THE COURT:  You may.
23   BY MR. ROBERT PAULE:
24   Q.  And, Ms. Hansen, just so you understand what's going on,
25   I'm going to show you a different part of your transcript
```

1    that was taken off the recording of the statement you gave

2    to the FBI on May 29th, 2020.  All right?  And, again, I've

3    got some nice yellow highlighter there.

4    A.  Thank you.  Thank you.

5         (Pause)

6              Okay.

7    Q.  Does that refresh your recollection?

8    A.  I don't remember saying it, but I see that I said it.

9    Q.  Okay.  And what did you say to the FBI on that date?

10   A.  I didn't -- I had no idea what Thao understood, what he

11   knew about what was going on.  I wasn't there where -- if

12   there was -- he was assigned to be in front of the group.  I

13   don't know.

14   Q.  Okay.  Maybe I'll ask the question differently.  Did you

15   tell the FBI on that date that you had no idea if Mr. Thao

16   had any idea what was going on behind his back?

17   A.  I just don't -- I don't remember saying it, but if -- I

18   believe that this is true.

19   Q.  Okay.

20   A.  Okay?

21   Q.  That's my question.

22   A.  Great.

23   Q.  All right.  Thank you very much.  I don't have any

24   further questions.

25   A.  Thank you.

```
1              MR. ROBERT PAULE:  May I approach just to retrieve
2      my transcript, Your Honor?
3              THE COURT:  Sure.
4              MR. ROBERT PAULE:  And I will put on my mask.
5      Thank you.
6              THE WITNESS:  Thank you.
7                        REDIRECT EXAMINATION
8      BY MS. SERTICH:
9      Q.  Ms. Hansen, Mr. Gray asked you some questions about
10     whether you could see whether there were any pulse checks
11     being performed of Mr. Floyd, and you responded you didn't
12     know; is that right?
13     A.  Right.
14             MR. GRAY:  She said she couldn't see, Your Honor.
15             THE COURT:  This is close enough.
16     BY MS. SERTICH:
17     Q.  Okay.  And you said that you respond to calls with the
18     MPD?
19     A.  Yes.
20     Q.  Okay.  In your experience, if a pulse of someone was
21     taken and not found, what would happen?
22             MR. PLUNKETT:  Objection.  Speculation.
23     Relevance.
24             THE COURT:  That is sustained.
25
```

1    BY MS. SERTICH:

2    Q.  You also got a question from Mr. Paule where he asked

3    you if you heard Mr. Thao say that you should know better

4    than to get involved.

5    A.  Yes.

6    Q.  And you said you disagreed with that statement, that you

7    should have known better than --

8    A.  Oh, I -- yeah, I disagree with that statement.

9    Q.  Why do you disagree with that statement?

10   A.  Because I have a duty to identify myself and offer

11   medical assistance when I see it's fit.  And, also, it was

12   an unsafe scene for George Floyd, so I --

13          MR. ROBERT PAULE:  I object to that.  The last

14   part is not responsive.

15          THE COURT:  The last part is not responsive.  I

16   will sustain only as to the last part of the sentence.

17   BY MS. SERTICH:

18   Q.  Mr. Paule also asked you some questions about what you

19   thought was concerning, and he questioned you about the fact

20   that you thought you saw urine coming from Mr. Floyd's body?

21   A.  Yeah.

22   Q.  And you testified that you now know that it wasn't

23   urine?

24   A.  Oh, yeah, I do.

25   Q.  Were there other things that concerned you besides what

```
1    you thought was urine on the pavement?

2    A.  Besides being --

3             MR. PLUNKETT:  Objection.  Scope.

4             MS. SERTICH:  Your Honor, Mr. Paule asked her if

5    that's what was concerning her, and I'm clarifying what was

6    concerning her.

7             THE COURT:  Yeah, I'm going to overrule.  I'll let

8    you -- let the witness answer.

9             THE WITNESS:  Well, from before I approached the

10   sidewalk, I could see that there were three officers on one

11   cuffed man not moving.  When I got onto the sidewalk, I then

12   realized he seemed unconscious.  All those things are red

13   flags for me.  And I could see how much pressure Chauvin was

14   putting on his neck.  That's about it.

15            MS. SERTICH:  I have nothing further at this time,

16   Your Honor.

17            THE COURT:  Okay.  Thank you very much.

18            Anything further?

19            MR. PLUNKETT:  One question.

20            THE COURT:  Mr. Plunkett.

21                    RECROSS-EXAMINATION

22   BY MR. PLUNKETT:

23   Q.  Hello again.

24   A.  Hi.

25   Q.  I'm going to very briefly ask you a couple questions --
```

```
 1   A.  Okay.
 2   Q.  -- if that's okay, and it's only going to be questions.
 3   A.  Okay.
 4   Q.  I'm not showing you anything.  Fair?
 5   A.  All right.
 6   Q.  You talked about that as a firefighter, as a medical
 7   professional, that you have a duty to offer your care when
 8   you see somebody in need?
 9   A.  Offer it, yes.
10   Q.  Okay.  And we're not going to look at anything, but your
11   offer of care is what's -- is captured on the video; isn't
12   that right?
13   A.  I didn't really get the chance to --
14   Q.  I'm going to just interrupt you.  The video shows what
15   you said and did regarding --
16   A.  Right.
17   Q.  -- wanting to give care?
18   A.  Correct.
19   Q.  Okay.  The other thing you said is that you had
20   concerns, and then when you got around to the other side of
21   the car and could see Mr. Floyd's face --
22   A.  Yeah.
23   Q.  -- that's when you realized this was truly a medical
24   issue, correct?
25   A.  I don't think it was, like, the moment I saw his face,
```

```
1    but it --

2    Q.  It took --

3    A.  I don't know how specific you want me to be.

4    Q.  And I shouldn't say "the moment," but once you got

5    around to the other side, you could see --

6    A.  See everything going on.

7    Q.  -- from that perspective that was the --

8    A.  Lead -- everything leading up to that point --

9    Q.  It all came --

10   A.  -- is all part of the way I came to the conclusion that

11   help was needed.

12   Q.  And you drew the conclusion on the other side of that

13   car?

14   A.  By that time.

15   Q.  Yeah.  Thanks.

16   A.  You bet.

17           THE COURT:  Anything further?

18           MS. SERTICH:  Nothing further, Your Honor.  Thank

19   you.

20           THE COURT:  Okay.  Thank you very much.  You may

21   step down.

22           MS. BELL:  Your Honor, could we have a sidebar

23   briefly?

24           THE COURT:  Sure.

25           MS. BELL:  Thank you.
```

```
 1        (At sidebar)
 2             MS. BELL:  I didn't want to say anything --
 3             THE COURT:  Excuse me.  I've got to this so I can
 4        hear.  Okay.  Go ahead.
 5             MS. BELL:  I didn't want to say anything in front
 6        of the jury in case this was not your inclination, but I
 7        don't have another short witness right now.  So I'm
 8        wondering if perhaps we should just end for the day since
 9        it's a little after 4:00 or if you'd like to keep going.
10             THE COURT:  That would be fine with me.  We an
11        over time yesterday, so we'll cut it a little bit short
12        today.
13             MR. PLUNKETT:  The only thing I'm going to ask,
14        Your Honor, is -- and I'm directing the question to Ms. Bell
15        through the court.  Do we need to take a moment to put --
16        watch her video or are we not going to do that now that
17        she's gone?
18             THE COURT:  I think we can pick that up at a later
19        time.
20             MR. PLUNKETT:  Okay.
21             MS. BELL:  Sure.
22             MR. PLUNKETT:  This would be a good time -- well,
23        once the jury is out of the room, I just have another record
24        to make.
25             THE COURT:  Sure.  We will do it then.
```

1          MR. PLUNKETT:  Thanks.

2      **(In open court)**

3          THE COURT:  Members of the jury, there are a

4  couple of things going on here.

5          I've just been advised that the government does

6  not have a short witness to take -- that could come in and

7  be completed this afternoon.  And we're running a little bit

8  after 4:00 and, quite frankly, we kept you kind of late

9  yesterday, so we're going to quit a little bit early today

10  for that reason.

11          There's also another unrelated matter that you

12  don't have to worry about, but there is an unrelated matter

13  that I need to deal with with the lawyers in the matter.

14  And so we're going to take that up and let you go home.

15          Come back at 9:30 tomorrow morning and with the

16  usual instructions of don't talk amongst yourselves about

17  it, don't talk with other people about it, don't read or

18  listen to or carry out personal investigations, and continue

19  to have a good night.

20  (Jury excused)

21                    **IN OPEN COURT**

22              **(JURY NOT PRESENT)**

23          THE COURT:  Counsel, I'm going to ask that we have

24  the white noise on for just a minute before we get into

25  other motions.

1           **(At sidebar)**

2                   THE COURT:  I don't know the reason that you asked

3       for this early recess or not, but we have been advised that

4       there may be a demonstration later this afternoon, and

5       getting the jury out of the building, frankly, is an

6       advisable thing to do.  So whether you knew about it or not,

7       I thank you for it.

8                   And I think with that, I don't see any reason to

9       leave the white noise on.  We can hear your motion,

10      Mr. Plunkett.

11          **(In open court)**

12                  THE COURT:  Okay.  Mr. Plunkett.

13                  MR. PLUNKETT:  Thank you, Your Honor.

14                  I'm renewing my motion for a mistrial.  And at

15      this point, Your Honor, I have to frankly say I believe that

16      we have gotten to the point where I can demonstrate

17      prejudice.  I think I've been very candid that I've been

18      following up on records, conceding that I hadn't got to the

19      point where I could honestly tell the court that there's

20      prejudice, but I think we've crossed the Rubicon, if you

21      will.

22                  And it's this pattern of questions that are

23      leading and in violation of the pretrial order.  There was

24      some testimony, and Mr. Gray, I believe, objected to it, so

25      I didn't jump up and say I'm marking the record because it

1    had already been objected to.  And the government had asked

2    a question that was -- I think it was what is the reason for

3    not watching the videos, and I thought that was a very

4    inappropriate question.  I believe it was objected to and

5    sustained.

6          And then a legal question was later asked by the

7    government.  And just for clarification, everything I'm

8    talking about is during the testimony of Ms. Hansen right

9    now.  And the way that question was asked, the jury clearly

10   was given information that they shouldn't have.

11         And I'm not going to pound the table and say this

12   is intentional.  I think we've all tried a lot of cases and

13   tensions run high and pressure gets, you know, on, but this

14   had been a real pattern.

15         And now with the specific information that was

16   solicited or provided, really, during Ms. Hansen's

17   testimony, it is my assertion that there is a real

18   prejudice, not just because of the pervasive nature of this

19   misconduct, but because the information that's now been put

20   out there for the jury.  It's out there.  There's a point

21   where we can't just tell the jury to disregard it.

22         There's a point where it makes us look like -- the

23   defense lawyers look like we're just a bunch of Johnny

24   Jump-Ups and objecting like mad.  And I know that juries

25   don't like to see that sort of thing.  It casts a dim light

1    on the defense, as though we're the ones that are covering

2    up or doing something wrong.

3              And I think that at this point there is prejudice

4    to all of the defendants.  I think that it's also -- I hate

5    to call it intentional, but it's certainly -- because of the

6    pervasive nature of it, it doesn't appear to be isolated

7    incidents.  It's people questioning off of prepared

8    examinations and then going back to the same questions later

9    that were objected to and sustained and taking another bite

10   at it, and not even doing it in a way that it's a different

11   question.

12             So I'm moving for a mistrial on those grounds.

13             MS. BELL:  Your Honor, I honestly don't know what

14   Mr. Plunkett's second issue is.  Can you -- you just said an

15   issue and I didn't understand what it was.

16             MR. PLUNKETT:  There was a question that was

17   objected to by Mr. Gray as -- did I cut you off, LeeAnn?

18             MR. GRAY:  Your Honor, can I be heard on that?

19             MS. BELL:  No, I just -- can he clarify what he's

20   referring to first?

21             MR. GRAY:  Yes.

22             MS. BELL:  Thank you.

23             MR. GRAY:  Just to back up a little bit, when I

24   was --

25             THE COURT:  Just a minute.

1              MR. GRAY:  I'm sorry.

2              THE COURT:  I thought Mr. Plunkett was going to

3      respond and I'll hear -- when he gets done, I'll hear you

4      Mr. Gray.

5              MR. GRAY:  Okay.

6              MR. PLUNKETT:  Thank you, Your Honor.  I think at

7      that point the government had asked a question that called

8      for a legal conclusion.

9              MS. BELL:  What was the question is my question.

10             MR. PLUNKETT:  Well, you know --

11             MR. GRAY:  I've got the question.  Should I give

12     the question, Your Honor?

13             THE COURT:  Okay.  Please do, Mr. Gray.

14             MR. GRAY:  The prosecutor asked a learned health

15     provider did any of the officers that she saw provide

16     medical services.  And I objected to the legal conclusion of

17     the witness and it's also part of the issue in the case, is

18     whether or not my client was deliberately indifferent about

19     medical services.

20             And we know that it was intentional because when I

21     on cross-examination asked the witness before this, well,

22     did you think that Mr. Lane was deliberately indifferent,

23     there was a jump-up over there, objection, legal, and you

24     sustained me.  You sustained them.

25             So they can't say we didn't know medical services

1    was an issue because they knew that because they knew about

2    deliberate indifference.  So I believe it was intentional.

3    I had to object.  The judge told the jury not to regard it.

4           And it's getting a little annoying to have all

5    these objections.  I don't know -- they're obviously all

6    experienced lawyers.

7           And that's all I have to say.

8           MS. BELL:  Your Honor, it is an entirely different

9    thing to ask a jury if someone was deliberately indifferent,

10   which is an actual legal charge, than to ask someone a

11   factual question about whether or not they saw any officers

12   give any aid.  That is a factual question --

13          MR. GRAY:  Medical --

14          MR. PLUNKETT:  If I may interject?

15          MS. BELL:  Medical services --

16      (Simultaneous indiscernible crosstalk)

17          THE COURT:  Counsel, counsel, counsel, counsel.

18          First of all, before anybody gets any farther in

19   this, we're going to let you -- you are getting a

20   transcript.  We're going to let you look at an actual

21   transcript so we know what people are actually saying to

22   whom, when, where, and how.

23          If it then is appropriate to bring it to my

24   attention, bring it to my attention.  If it's not, that's

25   fine, it won't be.  But people just sitting and arguing back

1       and forth across here is just -- that's not going to work.

2               There are a couple of things that I will say, but

3       I -- gosh, all of you folks know me and you know me very

4       well.  I really believe in trying to let lawyers try their

5       lawsuit; and to the degree that I can, I want to let that

6       happen.

7               I want to do a cautionary instruction on the

8       prosecution side now because you're going into your direct

9       now, but it's going to carry over if defense is involved in

10      direct, and that's to be very, very careful of continuing

11      leading questions.  I think that's leading -- it's leading

12      us into some of the difficulties that we're dealing with.

13              Sometimes you have to lead the question, yes,

14      because you change the subject, you know, that kind of

15      thing.  I understand all of that.  Sometimes you have to ask

16      a leading question to bring a witness on track.  I

17      understand all of that.  But I am concerned about leading

18      questions being on an ongoing basis.

19              In the meantime, for the technical reason of it,

20      I'm going to deny the motion at this point on a mistrial and

21      caution to tell you, counsel, that you know and I know that

22      before we get into the mistrials, we're going to be into

23      very egregious territory, and I seriously doubt that we're

24      there.  At this point I think that we just need to, frankly,

25      just be a little bit careful on both sides.

1       With all of that cautionary stuff, have a good

2    night everybody.  You need it.  People try lawsuits; they

3    get tired.

4          MS. BELL:  Judge, are we back at 9:30?  Is that

5    what you said to the jury?

6          THE COURT:  9:30, yeah.

7          MS. BELL:  Thank you.

8          THE COURT:  At 9:30, but if it turns out you need

9    me earlier, let me know.

10          (Court adjourned at 4:12 p.m., 01-26-2022.)

11                         *   *   *

12          I, Renee A. Rogge, certify that the foregoing is a

13    correct transcript from the record of proceedings in the

14    above-entitled matter.

15                    Certified by:  /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR
16

17

18

19

20

21

22

23

24

25