1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

3

------------------------------------------------------------
                                )
4        United States of America,  )  File No. 21-cr-108
                                )              (PAM/TNL)
5              Plaintiff,         )
                                )
6        v.                      )
                                )
7        Tou Thao(2),            )  Courtroom 7D
         J. Alexander Kueng(3), and  )  St. Paul, Minnesota
8        Thomas Kiernan Lane(4),   )  Monday, January 31, 2022
                                )  9:32 a.m.
9              Defendants.        )
                                )
------------------------------------------------------------

10

11

12              BEFORE THE HONORABLE PAUL A. MAGNUSON
           UNITED STATES DISTRICT COURT SENIOR JUDGE

13

14              **(JURY TRIAL PROCEEDINGS - VOLUME VIII)**

15

16

17

18

19

20

21

22

23

24

25       Proceedings recorded by mechanical stenography;
         transcript produced by computer.

```
 1    APPEARANCES:

 2      For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                BY:  ALLEN A. SLAUGHTER, JR.
 3                                   LEEANN K. BELL
                                     MANDA M. SERTICH
 4                              300 South 4th Street, #600
                                Minneapolis, MN 55415
 5
                                DEPARTMENT OF JUSTICE
 6                              CIVIL RIGHTS DIVISION
                                BY:  SAMANTHA TREPEL
 7                              150 M Street NE
                                Washington, D.C. 20530
 8
        For Defendant           ROBERT M. PAULE, PA
 9      Tou Thao:               BY:  ROBERT M. PAULE
                                920 2nd Avenue South, #975
10                              Minneapolis, MN 55402

11                              PAULE LAW PLLC
                                BY:  NATALIE PAULE
12                              5100 West 36th Street
                                P.O. Box 16589
13                              Minneapolis, MN 55416

14      For Defendant           LAW OFFICE OF THOMAS C. PLUNKETT
        J. Alexander Kueng:     BY:  THOMAS C. PLUNKETT
15                              101 East 5th Street, #1500
                                St. Paul, MN 55101
16
        For Defendant           EARL GRAY DEFENSE
17      Thomas Kiernan Lane:    BY:  EARL P. GRAY
                                332 Minnesota Street, #W1610
18                              St Paul, MN 55101

19      Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                United States District Courthouse
20                              300 South 4th Street, Box 1005
                                Minneapolis, MN 55415
21

22

23

24

25
```

1

## I N D E X

2
                                                        PAGE

3   **KATIE BLACKWELL**
        Cross-Examination by Mr. Robert Paule        1202
        Cross-Examination by Mr. Gray                1291
4       Redirect Examination by Ms. Bell             1319
        Recross-Examination by Mr. Plunkett          1368
5       Recross-Examination by Mr. Robert Paule      1371
        Recross-Examination by Mr. Gray              1374
6       Further Redirect Examination by Ms. Bell     1377
        Further Recross-Examination by Mr. Gray      1379

7

8   **ANDREW BAKER**
        Direct Examination by Ms. Trepel             1382

9

10

11

    DEFENDANT THAO EXHIBITS                          REC'D
12      13                                           1229
        14                                           1277

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (9:32 a.m.)

 2                        IN OPEN COURT

 3                       (JURY PRESENT)

 4             THE COURT:  You may be seated.

 5             Mr. Paule or Mr. Gray?  Mr. Paule.

 6                      KATIE BLACKWELL,

 7   called on behalf of the government, was duly sworn, was

 8   examined and testified as follows:

 9             MR. ROBERT PAULE:  May I inquire, Your Honor?

10             THE COURT:  Please proceed.

11             MR. ROBERT PAULE:  Thank you.

12                      CROSS-EXAMINATION

13   BY MR. ROBERT PAULE:

14   Q.  Inspector Blackwell, you and I have never met, have we?

15   A.  No, we haven't.

16   Q.  You are currently the inspector in command of the Fifth

17   Precinct; is that correct?

18   A.  Correct.

19   Q.  That's located in the southwest portion of Minneapolis?

20   A.  Yes.

21   Q.  And you were promoted to inspector by Chief Arradondo;

22   is that correct?

23   A.  Yes, I was.

24   Q.  And if my notes are correct, I have you being promoted

25   by Chief Arradondo on January 31st of 2021, correct?
```

1    A.  Yes.

2    Q.  So you've been an inspector for just about one year

3    exactly?

4    A.  Yes.

5    Q.  And you were promoted approximately two months before

6    you testified in the Chauvin state court trial, were you

7    not?

8    A.  I was.

9    Q.  And before that you were a lieutenant?

10   A.  Yes.

11   Q.  And you were in command of the training division,

12   correct?

13   A.  So before that I was commander of training.  Before that

14   I was a lieutenant in training.

15   Q.  Okay.  Just so the jury understands, you were promoted

16   to lieutenant in December of 2017, correct?

17   A.  Correct.

18   Q.  You were promoted by Chief Arradondo?

19   A.  Yes.

20   Q.  And you were placed, when you were promoted as a

21   lieutenant, as one of the, essentially, command of the

22   training division, correct?

23   A.  Yes.

24   Q.  I believe at that point you oversaw the field training

25   officer program?

```
 1    A.  I did.

 2    Q.  As well as the academy itself, correct?

 3    A.  Yes.

 4    Q.  And then later you were promoted, so you were in command

 5    of the entire training division; is that correct?

 6    A.  Correct.

 7    Q.  Okay.  Now, you testified about, when you were promoted

 8    to lieutenant, you were put in charge of the FTO program.

 9    You testified that you, quote, reset the program; is that

10    correct?

11    A.  Yes.

12    Q.  And you created a 40-hour mandatory training program for

13    anyone who wanted to become a field training officer; is

14    that correct?

15    A.  Correct.

16    Q.  And did you essentially let go of all the people who had

17    previously been operating as a field training officer unless

18    they entered that program?

19    A.  Yes.

20    Q.  Okay.  And so they had to volunteer, complete the

21    program, and then be approved by you; is that correct?

22    A.  Yes, they had to be -- volunteer.  Their supervisor,

23    their direct supervisor, had to approve, the precinct

24    commander had to approve.  And then ultimately I selected

25    them after their disciplinary file was sent up and the
```

1    deputy chief of patrol -- or, excuse me, deputy chief of

2    professional standards cleared them.

3    Q.  You indicated that in order to qualify as a field

4    training officer, they had to have at least three years on

5    the police force; is that correct?

6    A.  Correct.

7    Q.  They had to be in good standing with the department; is

8    that correct?

9    A.  Yes.

10   Q.  And then internal affairs had to do a background check

11   on them?

12   A.  Yes.

13   Q.  And I believe you testified that was done to see if a

14   particular applicant had a pattern of things; is that

15   correct?

16   A.  Yes.

17   Q.  What did you mean when you used the words "pattern of

18   things"?

19   A.  A pattern of excessive force or an open case was

20   generally when they were told they could not FTO.

21   Q.  And eventually you were not only in charge of the police

22   academy and the field training officer program, but you were

23   put in charge of the entire training division; is that

24   correct?

25   A.  Yes.

```
1    Q.  And then you selected all of the trainers in that

2    division; is that correct?

3    A.  Yes.  Well, the ones that were currently there were

4    there; I kept them.  And then trainers that came in, then I

5    would bring them in.

6    Q.  So are you testifying that you kept the trainers who

7    were already there, but simply would select their

8    replacements?

9    A.  Yes.  If they were already there, then it was up to me

10   to keep them or release them back to the street,

11   investigative.  And then if there was an opening, I would

12   bring in new ones.

13   Q.  Okay.  And how many of the trainers that were there when

14   you became the commander of the training division did you

15   release?

16   A.  I don't think any.

17   Q.  Now, when you became commander of the training

18   division -- and just so this jury knows, you were the person

19   in command of the training division on May 25th of 2020 when

20   the incident that brings us into court occurred, correct?

21   A.  Correct.

22   Q.  And you had a support staff person named Mary Lou Fiala;

23   is that correct?

24   A.  I did.

25   Q.  And then you had three divisions within the training
```

```
 1    division, correct?

 2    A.  Yes.

 3    Q.  There was the preservice that was headed by Lieutenant

 4    Molly Fischer; is that correct?

 5    A.  Yes.

 6    Q.  And that preservice contains both the police academy and

 7    the field training officer program, correct?

 8    A.  Correct.

 9    Q.  And then you had a division called leadership and

10    professional development; is that correct?

11    A.  Yes.

12    Q.  And that was headed by Lieutenant Brian Anderson,

13    correct?

14    A.  Yes.

15    Q.  And two of the programs within that particular division

16    were the medical program; is that correct?

17    A.  Yes.

18    Q.  And that was headed by a person named Officer Nicole

19    Mackenzie; is that correct?

20    A.  Correct.

21    Q.  Now, on a diagram I have heard -- she's also referred to

22    as Nicole Murray; is that correct?

23    A.  Yes.  That was her maiden name.

24    Q.  Okay.  Thank you for clarifying that.

25              And then there was also a person in charge of the
```

```
 1     CIT program; is that correct?

 2     A.  Yes.

 3     Q.  That's what you referred to previously as a crisis

 4     intervention training program, correct?

 5     A.  Yes.

 6     Q.  And that's by Sergeant Ker Yang; is that correct?

 7     A.  Correct.

 8     Q.  And then the third division is the POST service, which

 9     is really the in-service, the training for the officers who

10     have completed the academy that are on the police force,

11     correct?

12     A.  Yes.

13     Q.  And that was headed at that time under your direction by

14     Lieutenant Johnny Mercil; is that correct?

15     A.  Mercil, yes.

16     Q.  Did I say it wrong?

17     A.  It was close enough.

18     Q.  Mercil?

19     A.  Mercil.

20     Q.  Mercil.  Thank you.

21              And within that division there was a defensive

22     tactics program, correct?

23     A.  Yes.

24     Q.  And that was headed by Sergeant -- is it Schoonover?

25     A.  Yes.
```

1    Q.  Now, with regard to your investigation -- excuse me,

2    your involvement in this particular investigation, you

3    obviously became aware of this incident shortly after it

4    occurred, correct?

5    A.  Yes.

6    Q.  And Mr. Plunkett mentioned, when he was asking you

7    questions, that you are aware of the federal civil rights

8    investigation into the Minneapolis Police Department's

9    pattern and practices being done by the Department of

10   Justice; isn't that correct?

11   A.  Correct.

12   Q.  I would assume, as part of your duties as the head of

13   the training division, you had to comply with that

14   investigation as well, correct?

15   A.  Correct.

16   Q.  And you're also aware that there was a separate lawsuit

17   filed by the Minnesota Department of Human Rights days after

18   the incident in question, correct?

19   A.  Correct.

20   Q.  And that was alleging, to some degree, some illegal

21   racial bias in the Minneapolis Police Department, correct?

22   A.  I believe so.

23            MS. BELL:  Objection, Your Honor.  Relevance.

24            MR. ROBERT PAULE:  Goes to bias, Your Honor.

25            THE COURT:  I'm going to overrule.

```
1    BY MR. ROBERT PAULE:
2    Q.  And are you aware that that particular lawsuit, the one
3    brought by the state, was settled within one week by the
4    City of Minneapolis?
5    A.  I believe it was right around that time.
6    Q.  Now, over the course of your career, would you agree
7    that policies and practices in training have changed and
8    evolved?
9    A.  Yes.
10   Q.  Okay.  For instance, some of the things that are being
11   trained as defensive tactics are different than what was
12   taught when you first entered the police department,
13   correct?
14   A.  Yes.
15   Q.  And some of the things that you were taught have been
16   phased out, correct?
17   A.  Yes.
18   Q.  Could you tell the jury what a baton strike is, please.
19   A.  A baton strike is -- we generally had an ASP.  It was
20   about six inches in length and it would retract when you'd
21   push it and it would extend out.  And a baton strike was
22   just basically striking somebody in the arm, leg to gain
23   compliance.
24   Q.  Now, oftentimes on TV you will see police officers, or
25   at least some of the older ones, with things called billy
```

1    clubs; is that correct?

2    A.  Yes.

3    Q.  Is that a precursor of the ASP or the extendable baton?

4    A.  They're similar.

5    Q.  When I think of billy club, I think of sort of like a

6    miniature baseball bat.  Is that accurate?

7    A.  Yes.  We didn't have baseball bats.

8    Q.  No, of course not.

9         But what you are referring to is essentially an

10   extendable baton, something that you can flick and it will

11   extend out, correct?

12   A.  Correct.

13   Q.  This is a metal object?

14   A.  Yes.

15   Q.  And this was used when you were a younger police

16   officer, for lack of a better term, to use to strike people

17   to gain compliance, correct?

18   A.  Correct.

19   Q.  And that is really something that isn't really trained

20   anymore, is it?

21   A.  They train strikes and we don't -- they don't use the

22   ASP, but they train on some of those.

23   Q.  Okay.  Now, you also talked about neck restraints.

24   These have been something that were taught to you in the

25   police academy through your field training program and

1    through your regular in-service training, correct?

2    A.  Yes.

3    Q.  And there are two separate types of neck restraint that

4    you said are trained; is that correct?

5    A.  Correct.

6    Q.  And I might get those wrong, so I will have you instead

7    tell the jury what those two specific kinds of neck

8    restraints that are trained.

9    A.  So the conscious and the unconscious neck restraint.

10   Q.  And one of those is essentially putting your arm around

11   somebody from behind, protecting their trachea and airway

12   with the crook of your elbow to -- essentially it's like a

13   wrestling tactic to gain control of them, correct?

14   A.  Correct.

15   Q.  You are not trying to put them unconscious by any means?

16   A.  Correct.

17   Q.  And the other one, the unconscious restraint, you are

18   actually doing sort of a similar move, but applying pressure

19   to one of the carotid arteries, are you not?

20   A.  Correct.

21   Q.  And the idea is if you put pressure on the carotid

22   artery, it will shut down the blood flow to the brain and

23   cause someone to be unconscious?

24   A.  Correct.

25   Q.  It's why it's called an unconscious neck restraint,

1    isn't it?

2    A.  Yes.

3    Q.  But you also said that the use of legs is allowed by

4    policy; is that correct?

5    A.  Yes.

6    Q.  Now, there are many parts of a leg, but a knee is one of

7    those, isn't it?

8    A.  Yes.

9    Q.  And you indicate that although those are allowed by

10   policy, or were at least in 2020, that was something that

11   the department did not train on, correct?

12   A.  Correct.

13   Q.  You didn't train on the use of legs to use as a neck

14   restraint in the police academy?

15   A.  No.

16   Q.  You didn't do it in the field training officer program?

17   A.  No.

18   Q.  And you didn't do it during the in-service?

19   A.  No.

20   Q.  In other words, police officers received absolutely zero

21   training on how to use a leg as a mechanism of restraint?

22   A.  Correct, we didn't show them the exact way to do it.  I

23   think it was mentioned that it was part of policy, but we

24   trained on the arm.

25   Q.  So you didn't train them, but it was allowed as part of

1    policy, correct?

2    A.   Correct.

3    Q.   Okay.  Now, these neck restraints we're talking about,

4    would you agree that on some level those are a valuable,

5    useful technique to use on somebody to gain compliance?

6    A.   Correct.

7    Q.   Okay.  Those neck restraints were banned by Minneapolis

8    Police policy?

9              MS. BELL:  Objection, Your Honor.  Sidebar,

10   please.

11        **(At sidebar)**

12             MS. BELL:  Your Honor, we have had specific -- can

13   you hear me?

14             THE COURT:  I can now.

15             MS. BELL:  Okay.  Your Honor, I have had specific

16   conversations with counsel about not introducing into

17   evidence things that were changed after May 25th of 2020 in

18   policy because they have no relevance to what happened here

19   in this case.  We did agree that counsel could inquire about

20   the pattern and practice investigation only insofar as it

21   went to bias, but not substantively.

22             And now counsel is inquiring about changes to the

23   policy, which would not be relevant here because they

24   occurred after the events in this case, and so therefore

25   they are irrelevant and, frankly, likely to confuse the

```
 1    jury.
 2              MR. ROBERT PAULE:  I can withdraw the question,
 3    Your Honor.
 4              THE COURT:  Okay.
 5         (In open court)
 6              THE COURT:  The question is withdrawn.
 7    BY MR. ROBERT PAULE:
 8    Q.  Inspector Blackwell, following this incident you were
 9    contacted by an FBI agent and did an interview with that
10    agent on the phone on June 8th of 2020; is that correct?
11    A.  Correct.
12    Q.  And the topics of that discussion included the
13    Minneapolis Police officer hiring policies and practice,
14    correct?
15    A.  I believe so.
16    Q.  It included the Minneapolis Police Department Academy
17    training?
18    A.  Yes.
19    Q.  It concerned the Minneapolis Police Department field
20    training officer program?
21    A.  Yes.
22    Q.  And it also included what's referred to as the POST
23    Academy, which is the in-service training program?
24    A.  Correct.
25    Q.  And, again, just so the jury knows, what we're referring
```

1    to is the regular trainings that police officers who are

2    already members of the force and fully sworn receive,

3    correct?

4    A.  Correct.

5    Q.  I'm sorry?

6    A.  Correct.  Sorry.

7    Q.  Okay.  Thank you for clarifying.

8            And you would agree that this includes medical

9    training by Officer Mackenzie, correct?

10   A.  Yes.

11   Q.  And it also includes use of force and defensive tactics

12   training, correct?

13   A.  Yes.

14   Q.  And that included training on excited delirium; is that

15   correct?

16   A.  Yes.

17   Q.  And that was trained by a number of the instructors

18   within the police department training division, correct?

19   A.  Yes.

20   Q.  Okay.  It was trained by Sergeant Ker Yang, correct?

21   A.  The excited delirium part?

22   Q.  Yes.

23   A.  I probably did an overview on it, yes.

24   Q.  It was trained by Officer Mackenzie; is that correct?

25   A.  Yes.

1    Q.  And at least by Sergeant Schoonover, correct?

2    A.  Correct.

3    Q.  So this is something you regularly trained officers to

4    be aware of and to recognize and how to deal with it; isn't

5    that accurate?

6    A.  Yes.

7    Q.  And afterwards you sent the FBI agent a PowerPoint; is

8    that correct?

9    A.  I sent them several.

10   Q.  Okay.  Do you recall what PowerPoint you sent them?

11   A.  Not off the topic of my head, sir.

12   Q.  Okay.  And I'm not trying to confuse you.

13   A.  Okay.  Thanks.

14   Q.  All right.  And then on September 17, 2020, you received

15   a federal grand jury subpoena; is that correct?

16   A.  Yes.

17   Q.  Okay.  And that grand jury subpoena requested that you

18   provide a number of records concerning the training session

19   attended by Officer Chauvin and Officer Thao; isn't that

20   correct?

21   A.  Correct.

22   Q.  I'm sorry?

23   A.  Correct.

24   Q.  Okay.  And, specifically, there were a number of things

25   requested by them, correct?

1   A.  Yes.

2   Q.  I assume you were pretty busy after this incident

3   providing training records to a number of different people?

4   A.  Yes.

5   Q.  Is that something perhaps that Ms. Fiala would help you

6   out with from time to time?

7   A.  Yes.

8   Q.  It was a very busy time for the police department then,

9   correct?

10  A.  Very busy.

11  Q.  But, specifically, this federal grand jury subpoena

12  requested, one, curricula, presentations, handouts,

13  examinations, evaluations, lesson plans, and the outlines

14  used to teach it regarding Officer Chauvin and Thao; isn't

15  that correct?

16  A.  Yes.

17  Q.  The federal grand jury subpoena also requested the names

18  of the instructors who taught it to the listed officers,

19  correct?

20  A.  Yes.

21  Q.  It requested schedules, programs, and agendas for the

22  training involved in those two officers?

23  A.  Yes.

24  Q.  It also requested sign-in sheets, course registration

25  records, and attendance records for Officer Chauvin and

1    Thao; isn't that correct?

2    A.  Yes.

3    Q.  And you were instructed in that subpoena that if none of

4    these records exist, you were to respond there is nothing to

5    produce responsive to request number so-and-so for that

6    particular officer; is that correct?

7    A.  Correct.

8    Q.  And as part of that federal grand jury subpoena, they

9    requested specifically, quote, any and all documents,

10   records, and information regarding the use of the PowerPoint

11   presentation entitled, quote, MPD ExDS PowerPoint

12   Presentation; is that correct?

13   A.  Sounds right.

14   Q.  Do you recall exactly what they were asking you about,

15   that excited delirium PowerPoint specifically?

16   A.  Not specifically.

17   Q.  Would it refresh your recollection to look at a summary

18   of that?

19   A.  Sure.

20   Q.  Okay.

21             MR. ROBERT PAULE:  May I approach the witness,

22   Your Honor?

23             THE COURT:  You may.

24             MR. ROBERT PAULE:  And for reference, it's Bates

25   00029060.

```
1               MS. BELL:  Can I see it?

2               MR. ROBERT PAULE:  I'm sorry?

3               MS. BELL:  Can I see it?

4               MR. ROBERT PAULE:  Sure.

5          (Counsel confer)

6               MR. ROBERT PAULE:  May I approach, Your Honor?

7               THE COURT:  You may.

8               MR. ROBERT PAULE:  Thank you.

9      BY MR. ROBERT PAULE:

10     Q.  Now, Inspector Blackwell, just so everyone is clear and

11     maybe speed things up, I'm showing you what's called an FBI

12     302, which is --

13              MS. BELL:  Your Honor, the item is not in

14     evidence.  I would ask Mr. Paule just to show it to her to

15     refresh; and if it does, it does.

16              MR. ROBERT PAULE:  That's what I'm trying to do,

17     Your Honor.

18              THE COURT:  I think he's leading up to it.  He was

19     just introducing the document.

20              MR. ROBERT PAULE:  Yes.

21     BY MR. ROBERT PAULE:

22     Q.  And just so the record is clear -- I apologize -- what

23     I'm going to show you, Inspector Blackwell, is what's called

24     an FBI 302, which is a written summary of that request, to

25     refresh your recollection.  Do you have any questions?
```

```
 1    A.  No.

 2    Q.  Okay.

 3    A.  It looks familiar, yes, what they're requesting.

 4    Q.  Does that refresh your recollection?

 5    A.  Yes.

 6    Q.  Okay.  And they also wanted, as part of that federal

 7    grand jury subpoena, any and all documents regarding the

 8    author or creator of the particular PowerPoint; is that

 9    correct?

10    A.  Correct.

11    Q.  Okay.  And I presume you provided those documents to the

12    FBI?

13    A.  I'm certain I would have.

14    Q.  Okay.  Sorry about that.  I'm getting confused with my

15    mask.

16            And then on October 14th of 2020, you reached out

17    to an FBI agent named Brad Murkins that a flash drive

18    containing additional records was available for him to pick

19    up in response to the grand jury subpoena; is that correct?

20    A.  Correct.

21    Q.  And that included record requests on Officer Chauvin and

22    Officer Thao's in-service training for the years between

23    2014 through 2020; is that correct?

24    A.  Yes.

25    Q.  Now, going back to when you were in command of the
```

1   training division, you testified that you -- when you were

2   commander of the training division, you worked on the

3   development and the actual training that was going on,

4   correct?

5   A.  Correct.

6   Q.  Both preservice training, which would be the field

7   training officer program, and the police academy, correct?

8   A.  Yes.

9   Q.  And the in-service to existing officers; is that

10  correct?

11  A.  Yes.

12  Q.  And you were asked, whether or not you had written the

13  materials, that you reviewed and oversaw all the training;

14  is that correct?

15  A.  Correct.

16  Q.  And you testified that you did indeed take part in all

17  this training, correct?

18  A.  So all the in-service training and then I review -- what

19  I'm getting to is I guess I wouldn't have sat through the

20  whole police academy, but reviewed most of the material or

21  saw -- observed scenarios.

22  Q.  Certainly, but it seems to me like what you were

23  testifying is that when you were in charge of this division,

24  you reviewed all the training and actually went through the

25  training yourself, correct?

1    A.  Yes.

2    Q.  Okay.  And you were doing that in part to evaluate

3    whether the trainers were teaching what they were supposed

4    to be teaching; is that correct?

5    A.  Part of it, yes.

6    Q.  And you indicated, when you testified, that you did this

7    especially for in-service training for the whole department;

8    is that correct?

9    A.  Correct.

10   Q.  And you testified that you would bring the whole command

11   staff, all the way up to the chief's office, in to preview

12   this training; is that correct?

13   A.  Yes.

14   Q.  Before it was actually rolled out to the department,

15   correct?

16   A.  Yes.

17   Q.  And you testified that you did this because the chief

18   himself needed to approve this training; is that correct?

19   A.  He didn't need to, but I wanted his approval, that it

20   was within his vision and policy.

21   Q.  Yeah, you wanted to make sure that you were falling in

22   line with the chief's vision of what he was looking for at

23   that time, as well as policy, correct?

24   A.  Correct.

25   Q.  Okay.  Now, you testified previously about the excited

```
 1   delirium training; is that correct?

 2   A.  Yes.

 3   Q.  And is it your understanding that excited delirium

 4   training was provided to recruits when they were in the

 5   police academy?

 6   A.  Yes.

 7   Q.  Do you know if it was provided during part of the field

 8   training officer program?

 9   A.  I don't remember if it was or not.

10   Q.  Okay.  And it was also taught during the in-service

11   training to the officers who were already part of the force;

12   is that correct?

13   A.  Correct.

14   Q.  Do you know the content of all of that training?

15   A.  I have a general working knowledge of it.

16   Q.  Okay.  Do you know whether or not the training for the

17   in-service officers contained any scenario training?

18   A.  Not specifically.

19   Q.  Okay.  And you turned over what was entitled Minneapolis

20   Police Department -- and I want to make sure I have it

21   right -- the MPD ExDS PowerPoint; is that correct?

22   A.  Correct.

23   Q.  Do you know what that refers to?

24   A.  I don't know the exact acronym, no.  I'm guessing

25   excited delirium, I'm assuming that, PowerPoint for the
```

1    medical component.

2    Q.  And do you know whether the training given by the

3    Minneapolis Police Department on this excited delirium

4    syndrome consisted of just one PowerPoint or whether there

5    were more than one PowerPoints?

6    A.  For one in-service or from year to year?

7    Q.  For the in-service.

8    A.  Usually it's one PowerPoint, unless something changes

9    where we have to modify it.

10   Q.  Okay.  Now, going back to Officer Thao's training, if I

11   could ask to have Ms. Paule pull up Government Exhibit 59,

12   which has been accepted as part of evidence.

13            I'm very bad at this.  Showing you what has been

14   accepted as Government Exhibit 59, Inspector Blackwell, do

15   you recognize this document?

16   A.  I do.

17   Q.  Is this one of the documents you actually provided to

18   the FBI in response to their subpoena?

19   A.  Correct.

20   Q.  And does this contain the training history for Officer

21   Tou Thao?

22   A.  It does.

23   Q.  Okay.  Now, with regard to 2019, you indicated,

24   generally speaking, that there are three phases of the

25   in-service training; is that correct?

```
 1    A.  Yes.
 2    Q.  And there's a phase one in the spring, a phase two
 3    sometimes in the summer, and a phase three later in the
 4    year; is that correct?
 5    A.  Correct.
 6    Q.  Does Exhibit 59 demonstrate that Officer Thao attended
 7    those trainings?  And take whatever time you need.  And if
 8    you'd like me to zoom in, I can try to do that too.
 9    A.  No.  It's okay.
10    Q.  Okay.
11    A.  Correct.
12    Q.  And as well does this document indicate -- and I'll turn
13    it over.  Well, you let me know if you want me to turn over.
14    Does it indicate whether or not Officer Thao attended the
15    2018 in-service training?  And I would note at the bottom --
16    I believe you testified this goes from the most recent at
17    the top going down -- the bottom of this particular page
18    indicates that 2018 was the Taser recertification training?
19    A.  Yeah, if you could put it up a little bit, please.
20    Q.  I'll flip it over because I think that's --
21    A.  Oh, yes.  So 2018 Taser and then it rolled into 2018
22    annual in-service training.
23    Q.  So Officer Thao attended the 2018 in-service training,
24    all three phases; is that accurate, or isn't it?
25    A.  If you'd give me a moment?
```

1    Q.  Sure.

2    A.  So in 2018 it's not broken down by phases.

3    Q.  Okay.

4    A.  I see that he attended the 2018 procedural justice,

5    which is part of in-service, in August 2018 and then a

6    second -- excuse me.

7    Q.  If I may, it looks as if Officer Thao attended the 2018

8    annual in-service training both on November 8th and

9    November 7th; is that correct?

10   A.  Correct.

11   Q.  And then he attended the 2018 shotgun and CIT training

12   program on September 27th?

13   A.  Correct.

14   Q.  And the 2018 procedural justice and Narcan training on

15   August 16th?

16   A.  Correct.

17   Q.  And then the 2018 PIMS basic patrol training program on

18   April 21st of 2018?

19   A.  Correct.

20   Q.  Does that appear to be essentially the in-service

21   training for that year?

22   A.  It appears to be.

23   Q.  Okay.  All right.  Now, were you aware of the specific

24   excited delirium training that was taught during the

25   in-service training in 2018 or 2019?

1    A.  Yes.

2    Q.  Okay.  Did that contain that Minneapolis Police

3    Department ExDS PowerPoint presentation?

4    A.  I believe so.

5            MR. ROBERT PAULE:  Your Honor, with the court's

6    permission, I'd like to put on the screen Exhibit T I

7    believe it's 13.

8            THE COURT:  Is Exhibit 13 in evidence?

9            MR. ROBERT PAULE:  It is not yet, Your Honor.  I'm

10   going to seek to admit it.

11           THE COURT:  Well, then we don't put it on the

12   screen.  We keep it on the small screens.

13           MR. ROBERT PAULE:  Well, let me -- may I have a

14   moment, Your Honor?

15           THE COURT:  Sure.

16           MR. ROBERT PAULE:  Excuse me.

17       (Counsel confer)

18           MR. ROBERT PAULE:  May I approach the witness?

19           THE COURT:  You may.

20           MR. ROBERT PAULE:  Thank you.

21   BY MR. ROBERT PAULE:

22   Q.  And just for the record, I'm going to show you what has

23   been marked for identification only as Exhibit T-13.  Excuse

24   me.  Inspector Blackwell, do you recognize what Exhibit T-13

25   is?

```
1    A.  I do.

2    Q.  Could you tell the jury what that is, please.

3    A.  It's the PowerPoint on excited delirium syndrome that we

4    showed in our medical component showed in in-service

5    training.

6    Q.  Okay.  And do you recognize that as an accurate

7    portrayal of that particular PowerPoint?

8    A.  Yes.

9           MR. ROBERT PAULE:  Your Honor, I'd move for

10   admission of Exhibit T-13.

11          MS. BELL:  No objection.

12          THE COURT:  Received.

13          MR. ROBERT PAULE:  May I approach the witness?

14          THE COURT:  You may.

15          MR. ROBERT PAULE:  I'll give you that back.  And

16   if I could publish Exhibit T-13.

17      (Pause)

18          MR. ROBERT PAULE:  Your Honor, if I may, I think

19   what I'd like to do would be to take it back and put it on

20   the ELMO so that all of us can see it at the same time.

21          THE COURT:  That's fine.

22          MR. ROBERT PAULE:  Thank you.

23   BY MR. ROBERT PAULE:

24   Q.  Inspector Blackwell, I have printed this out, but I'm

25   showing what's labeled Excited Delirium Syndrome, which is a
```

1    picture of three officers appearing to pursue a person; is

2    that correct?

3    A.  Correct.

4    Q.  Is this the first page of the PowerPoint presentation

5    that is given on excited delirium syndrome?

6    A.  Yes.

7    Q.  And at the lower right of that, right here on this

8    document, what is that?

9    A.  It's a Minneapolis police badge.

10   Q.  Would that indicate that this particular PowerPoint was

11   created and trained by the Minneapolis Police Department?

12   A.  Yes.

13   Q.  And that is page 1, correct?

14   A.  Yes.

15   Q.  Page 2 is the second page on that PowerPoint; isn't that

16   correct?

17   A.  Correct.

18   Q.  Can you indicate what this says as far as an

19   introduction, could you read that, please.

20   A.  After this block of instruction, you should be able to

21   define excited delirium syndrome, also known as ExDS, and

22   risk factors, understand the pathophys -- sorry,

23   pathophysiology of excited delirium, understand the law

24   enforcement role in excited delirium syndrome.

25   Q.  And I'm going to page 3.  What is that titled?

1    A.  Cops Made This Up.

2    Q.  And in the actual PowerPoint is at this point a link

3    that someone would show a video at this point under the

4    heading Cops Made This Up?

5    A.  I believe so.

6    Q.  Could we play that particular video, please.

7        (Counsel confer)

8            MR. ROBERT PAULE:  And so what I think we're going

9    to see is when you click on the link, what video was shown,

10   if that's accurate, under the title Cops Made This Up.

11           And may I pause for a minute?  Your Honor, I would

12   note that there is some rather disturbing scenes in these

13   videos.  I just wanted to alert the court and the jury to

14   that.

15           Okay.  Could we play this particular video.

16       (Video recording played)

17   BY MR. ROBERT PAULE:

18   Q.  And the next page of this particular PowerPoint, a video

19   I'll put up.  This is another what appears to be a blank

20   black screen that says, "Reality"; isn't that correct?

21   A.  Correct.

22   Q.  And this contains a link to a different video; is that

23   correct?

24   A.  Yes.

25           MR. ROBERT PAULE:  Could we play that video.

1       (Video recording played)

2   BY MR. ROBERT PAULE:

3   Q.  And the next page of that PowerPoint presentation,

4   Inspector Blackwell, is entitled History of ExD; is that

5   correct?

6   A.  Correct.

7   Q.  And if you could note the first year you trained the

8   officers that excited delirium or something similar had been

9   noted by a particular author?

10  A.  It appears to be 1832.

11  Q.  And it was titled something different, was it not?

12  A.  Yes, delirious mania.

13  Q.  And what was the clinical description?

14  A.  A rare, life-threatening psychosis, extreme

15  hyperactivity, mounting fear, stuporous exhaustion.

16  Q.  And then again in 1849 there's a different historical

17  notation, correct?

18  A.  Yes.

19  Q.  And what is this syndrome entitled at that time?

20  A.  Bell's mania.

21  Q.  And what is the clinical description?

22  A.  Sudden onset of hyperactive arousal, confusion,

23  transient hallucinations, core body temperature

24  dysregulation, 75 percent mortality rate.

25  Q.  And then you train the officers there's another

```
 1   historical reference from a different year; is that correct?

 2   A.   Yes.

 3   Q.   What year is that, Inspector?

 4   A.   1867.

 5   Q.   And what do they term this particular syndrome at that

 6   point?

 7   A.   Acute maniacal delirium.

 8   Q.   I might call that maniacal.

 9   A.   Thank you.

10   Q.   We'll help each other.

11          Can you indicate what the clinical description is,

12   please.

13   A.   Violent mania, rapid pulse, constant motion, elevated

14   temperature of skin, complete exhaustion.

15   Q.   And it looks like the next one down is a little bit more

16   recent.  What year is that next author noted?

17   A.   1934.

18   Q.   And what do they term this particular syndrome at that

19   point?

20   A.   Forgive me if I mess this up, but lethal catatonia.

21   Q.   I think that's how I would pronounce it.

22          Could you read the clinic description, please.

23   A.   Intense motor excitement, violent, suicide attempts,

24   intermittent rigidity, incoherent speech, bizarre delusions,

25   fever 43.3 Celsius, cardiovascular collapse.
```

1    Q.  And then the most recent one noted on this particular

2    one, what year is that?

3    A.  It was 1985.

4    Q.  Okay.  And what is the term described as then?

5    A.  Excited delirium.

6    Q.  And what is the clinical description, please?

7    A.  Agitation, motor excitement, super-human strength,

8    paranoia, mounting fear, hyperthermia, cardiorespiratory

9    collapse, cocaine intoxication, no anatomic cause of death.

10   Q.  Going, then, to the next page of the PowerPoint

11   presentation, what is the title of that, Inspector

12   Blackwell?

13   A.  Excited Delirium.

14   Q.  And can you read how that is described.

15   A.  It's a condition that manifests as a combination of

16   delirium, psychomotor agitation, anxiety, hallucinations,

17   speech disturbances, disorientation, violent and bizarre

18   behavior, insensitivity to pain, elevated body temperature,

19   and super-human strength.

20   Q.  And the next slide on the PowerPoint is entitled what,

21   Inspector?

22   A.  ExD Reporting Problems.

23   Q.  And could you read what some of those problems that you

24   train the officers are.

25   A.  Lack of an accurate, uniform database to track this

1    phenomenon.

2    Q.  Do you know specifically what that refers to?

3    A.  Basically just there's no uniform database to track all

4    excited delirium cases.

5    Q.  Thank you.  Please go on.

6    A.  Usually many factors lead to death and not one specific

7    cause.  One important study found that only 18 of 214

8    individuals identified as having ExDS died while being

9    restrained or taken into custody.

10   Q.  And that referenced a particular study; is that correct?

11   A.  Yes.

12   Q.  And the next slide on the PowerPoint, could you say what

13   that's titled?

14   A.  Common Risk Factors.

15   Q.  And could you read those, please.

16   A.  Male under the age of 44, median age of 36; use or abuse

17   of illicit drugs; preexisting mental and/or cardiovascular

18   disease; exhibition of bizarre behavior, such as various

19   stages of nudity, incoherence, and delirium,

20   violence/attacking or breaking glass, running in traffic, or

21   paranoia.

22   Q.  And the title of the next slide?

23   A.  Median Age of Death.

24   Q.  And -- I'm sorry.  I should push this up just a little

25   bit.  There are some notes in this PowerPoint.  Can you

1    explain what those are, if you know.

2    A.  First graph shows the frequency of ARD with excited

3    delirium inclusion data cases broken down by age category.

4    It looks like just the median age is mid 30s.

5    Q.  Okay.  And I apologize because I didn't phrase that

6    question correctly.  Do you know how come on this particular

7    PowerPoint slide there appears to be notes written outside

8    of sort of the brown area?  Do you know why that is?

9    A.  Probably for instructors to refer back to.

10   Q.  And then on the next page of the PowerPoint

11   presentation?

12   A.  Age of illicit drug users.

13   Q.  And again there's some notations below that?

14   A.  This graph, without coincidence, shows the age breakdown

15   of illicit drug use to include cocaine and other

16   amphetamines related to excited delirium.

17   Q.  So essentially you train the officers sort of there is

18   an age of illicit drug use; is that correct?

19   A.  Correct.

20   Q.  And that includes both cocaine and amphetamine, correct?

21   A.  Yes.

22   Q.  Related to ExD, which I would assume stands for excited

23   delirium?

24   A.  Correct.

25   Q.  And then the next slide?

1    A.  Is illicit drug use.

2    Q.  And could you read what that slide says, please.

3    A.  Illicit drug use is an underlying factor in ExDS cases.

4    Common drugs found in the ExDS person were cocaine, lysergic

5    acid dieth -- LSD, and methamphetamines.

6    Q.  And the next -- whoops, excuse me.  There is also

7    going -- back to that same slide, there's also some more

8    comments.  Could you read what those are, please.

9    A.  Elevated levels of dopamine cause agitation, paranoia,

10   and violent behavior.  Heart rate, respiration, and

11   temperature control are also affected by dopamine levels

12   with elevation resulting in tachycardia, tachypnea, and

13   hyperthermia.  For this reasons hyperthermia is a hallmark

14   of excited delirium.

15   Q.  And the next slide is titled?

16   A.  Autopsy Findings.

17   Q.  And could you read what that slide says.

18   A.  One study out of Ventura County, California, found that

19   of the persons who died as a result of ExDS, three suffered

20   from psychosis, six were high on cocaine, one from meth, and

21   one from LSD.  I'm sorry, I was looking at that funny, but

22   it was basically a study out of California found that 11

23   persons who died as a result.

24   Q.  And then there's some comments; is that correct?

25   A.  Yes.

1    Q.  And that apparently references the study; is that

2    correct?

3    A.  Correct.

4    Q.  And would I be correct if I would assume that was the

5    *American Journal of Forensic Medical Pathology* from 1993?

6    A.  Yes.

7    Q.  And the next slide, could you read what the title is on

8    that.

9    A.  Preexisting Factors.

10   Q.  And could you read those, please.

11   A.  Autopsies often reveal severe atherosclerosis,

12   cardiomyopathy, and diabetes.  Cardiomyopathy results from

13   chronic cocaine and methamphetamine abuse.  The combination

14   of the metabolic arrest with severe cardiovascular disease

15   makes a successful resuscitation highly unlikely.

16   Q.  And again there's some comments underneath.  Could I

17   have you read those, please.

18   A.  These people typically have a whole bunch of issues

19   prior to the incident.  Due to the damage already done to

20   their bodies, it does not respond well to the increased

21   demand that is placed on the ExD subject.  The body has a

22   high amount of acids in its system from the ExD event and

23   the preexisting medical issue has a very poor outlook on

24   survivability.

25   Q.  And then the next slide, please, what is that entitled?

```
 1    A.  Mental Health.

 2    Q.  Could you read what it says.

 3    A.  Those suffering from psychological illness are routinely

 4    prescribed dopamine reuptake inhibitors, DRI.  They are used

 5    to treat depression, ADHD, and even obesity.  Much higher

 6    risk of ExDS in combination with illicit drug use due to

 7    prior use of DRIs.

 8    Q.  And again there are some comments.  If you could read

 9    those, please.

10    A.  Common DRIs you find on the street are sertraline,

11    mazindol, bupropion.  Street drugs used as amphetamines,

12    meth, cocaine, and MDMA all have the same effects as DRIs.

13    Q.  And then the next slide, what is the title of that,

14    Inspector Blackwell?

15    A.  Why Does Dopamine Matter.

16    Q.  Could you please read what the slide says.

17    A.  Dopamine, the reward chemical in your brain, is blocked

18    from being removed from your system.  The result is a

19    considerable buildup of this chemical.  Heart rate,

20    respiration, and temperature control are all affected by

21    dopamine levels with elevation resulting in tachycardia,

22    tachypnea, and hypothermia.

23    Q.  And in the picture here, could you tell the jury what's

24    illustrated on that.

25    A.  It's a scale and there appears to be a substance that's
```

1240

1    consistent with a narcotic that they're weighing on the

2    scale.

3    Q.  And that's a digital scale, it's commonly known as that,

4    correct?

5    A.  Correct.

6    Q.  And then there are some comments.  This one has a little

7    bit more, so I will have you read them as we go up.

8    A.  The point to stress here is that the drug abuser's

9    long-time use of the drug causes the body to inhibit the

10   uptake of dopamine properly.  With very high levels of

11   dopamine in the system unable to be utilized by the synaptic

12   nerve and narcotics, your body will exhibit the other

13   classic signs of ExD, such as.

14   Q.  Can you read what those classic signs of ExD that you

15   train the officers are.

16   A.  Motor activity, impulsive behavior, high agitation,

17   violent, anxiety, loss of contact with reality, inhibiting

18   pain response.

19   Q.  There's some more comments.  If you could read those,

20   please.

21   A.  The higher level of dopamine activity, the lower the

22   impetus required to evoke a given behavior.  As a

23   consequence, high levels of dopamine lead to high levels of

24   motor activity and impulsive behavior.  Low levels of

25   dopamine lead to torpor and slowed reaction.  Chronic

1    amphetamine use alters the body's ability to copy with

2    increased dopamine production and prevents dopamine

3    reuptake.

4    Q.  And then the next slide, could you tell the jury what

5    that's titled, please.

6    A.  Behaviors.

7    Q.  And then could you read what that slide says.

8    A.  NOTACRIME pneumonic -- I don't know how to say that

9    word; I apologize -- used to remember specific clues or

10   behaviors we can use to identify ExDS subjects.

11   Q.  And I'm not sure what "pneumonic" means either, but are

12   you familiar with what's capitalized as one word NOTACRIME,

13   spelled N-O-T-A-C-R-I-M-E?

14   A.  Correct.  It's an acronym that was used to put out the

15   symptoms of or the behaviors that someone with excited

16   delirium would display.

17   Q.  The idea is you make up a word that goes with it that

18   helps the officers remember their training, correct?

19   A.  Correct.

20   Q.  And then the next slide looks again like it's one of

21   these just black boxes with a link to a PowerPoint; is that

22   correct?

23   A.  Correct.

24       (Video recording played)

25   Q.  And the end of that video has what words at the end of

1    it?

2    A.   "Successfully restrained."

3    Q.   And then?

4    A.   "Suddenly gets calm, stops breathing, dead."

5    Q.   And I know this isn't fair because you weren't paying

6    attention, but there were a numbers of officers that were

7    required in that particular video to restrain this person;

8    is that correct?

9    A.   Correct.

10   Q.   Do you have any idea how many physically restrained him?

11   A.   I --

12   Q.   And maybe to be fair, we could turn it back towards the

13   end of that video.

14        (Video recording played)

15   Q.   And also, Inspector Blackwell, does it appear to you

16   that some of those officers restraining this person may

17   actually be using their legs, specifically their knees, to

18   restrain this person?

19   A.   It appears that way.

20   Q.   And that's what you train the officers, correct?

21   A.   We're training the behaviors of excited delirium and the

22   officers that responded and took him into custody.

23   Q.   And then going to the acronym -- whoops, excuse me.  The

24   next slide is titled what, Inspector Blackwell?

25   A.   N:  Patient is Naked and Sweating.

1  Q.  And, again, going to the acronym the NOTACRIME, does the

2  "N" stand for, essentially, naked?  Is that what you teach

3  the officers to help them remember the signs?

4  A.  The -- yes, that's what it looks like.

5  Q.  And then could you please read the text on this slide.

6  A.  Hyperthermia: partially clothed, naked subject, cold

7  environments are a huge clue, an indicator of impending

8  death.

9  Q.  And what do you mean when the slide says, "Cold

10  environments are a huge clue"?

11  A.  So when a person strips down and becomes naked, they're

12  generally overheating; and if it's a cold environment, it's

13  a huge clue that if someone is naked running around in cold

14  weather, that would be a big clue that something is not

15  right.

16  Q.  And again there is some comments below this for the

17  instructors.  Could you please read that.

18  A.  A 2009 case series of an unprecedented 90 fatal ExD

19  victims, Mash, et al., conducted a postmortem quantitative

20  analysis of dopamine transporters and heat shock protein 70.

21  Incident circumstances, force measures, autopsy and

22  toxicology results were determined and controlled in the

23  analysis.  Mean core body temperature among the 90 victims

24  was 40.7 degrees Celsius and, although the majority tested

25  positive for cocaine, four had no licit or illicit drugs or

1    alcohol found at autopsy.

2    Q.  And then showing you the next slide, Inspector

3    Blackwell, that appears to be again just a black box which

4    has a link to a video; is that correct?

5    A.  Yes.

6    Q.  Okay.

7        (Video recording played)

8    Q.  And the next slide within this PowerPoint, what is that

9    titled, Inspector Blackwell?

10   A.  O:  Patient Exhibits Violence Against Objects.

11   Q.  So would this be to train the officers that "O" stands

12   for something, meaning objects, correct?

13   A.  Correct.

14   Q.  Could you please read the text.

15   A.  Breaking objects within reach.  High likelihood that

16   glass is targeted, which creates a danger for blood borne

17   pathogens.

18   Q.  And again what are the comments given to the

19   instructors.

20   A.  This is where you have a subject fight off batons, Mace,

21   Tasers, and anything else that you throw at them.

22   Q.  And the next slide appears to be a link to a video.

23   We'll now play that.

24       (Video recording played)

25   Q.  Now, again, we can play this back, but at various points

```
1    in this particular video did you see the police officers

2    trying to restrain that person?

3    A.  I did.

4    Q.  Did you see them using their knees as part of that

5    restraint?

6    A.  I did.

7    Q.  This is, again, what you're teaching the officers in

8    training?

9    A.  No.  We're teaching the behaviors of those that are

10   showing excited delirium.  This is a -- it's a medical

11   PowerPoint.  And the videos -- this isn't our department.

12   We're using real videos of other agencies that are showing

13   somebody exhibiting signs of excited delirium.  Defensive

14   tactics on ours is completely separate from our medical.

15   Q.  You're aware that there was a separate training on

16   excited delirium as part of your defensive tactics training,

17   were you not?

18   A.  Yes.

19   Q.  And then the next slide, could you read the title of

20   that, Inspector Blackwell.

21   A.  T:  Patient is Tough and Unstoppable.

22   Q.  And, again, this appears to be the "T of "NOT,"

23   NOTACRIME, correct?

24   A.  Correct.

25   Q.  Could you read the content of that slide.
```

1    A.  Seems like super-human strength, failure of normal pain

2    responses in their system, increased metabolic activity.

3    Q.  And what does the "failure of normal pain responses in

4    their system" mean to you?

5    A.  It means that they are not displaying any signs that

6    they're feeling pain no matter what restraint or technique

7    is being used against them.

8    Q.  And there's some comments again.  If you could read

9    those, please.

10    A.  This is where you have a subject fight off batons, mace,

11    Tasers, and anything else that you throw at them.  Attempts

12    to subdue these patients often result in an escalation of

13    their violent behavior, which necessities the use of

14    stronger physical restraints.

15    Q.  And if I may interrupt you, basically what you are

16    training the officers is that any attempt to subdue the

17    patients will result in an escalation of their violent

18    behavior, correct?

19    A.  Correct.

20    Q.  And the response to that, you train them is the next

21    sentence.  What is that, please?

22    A.  Which necessities the use of stronger physical

23    restraints.

24    Q.  In other words, attempts to subdue these people can

25    cause them to become more resistant or violent, correct?

1    A.  Correct.

2    Q.  And you train them that what you should do is respond

3    with an even stronger physical restraint?

4    A.  If they're that violent in behavior, yes.

5    Q.  Could you continue reading, please.

6    A.  This increased metabolic activity worsens their

7    hyperthermia, which has been recorded in some cases to

8    exceed 105 degrees Fahrenheit.  The patient with excited

9    delirium continues to fight the restraints until cardiac

10   arrest occurs.

11   Q.  And the next -- excuse me.  Next slide, Inspector

12   Blackwell, could you please read the title?

13   A.  A:  Onset is Acute.

14   Q.  And this would be the "A" of NOTACRIME, correct?

15   A.  Correct.

16   Q.  Okay.  And could you point out -- could you read what

17   the content of the slide is.

18   A.  Bystanders could state that the subject just went crazy.

19   Damage to their cardiovasculature and buildup of dopamine in

20   their systems was not acute.

21   Q.  And, again, the next slide appears to be one of those

22   black boxes that apparently has a link to a video.  I'd like

23   to play that for you now.

24       (Video recording played)

25   Q.  And, again, Inspector Blackwell, during the course of

1    that particular video, did you see the police officers that

2    were involved using some restraint techniques?

3    A.  Yes.

4    Q.  Did that involve using their knees to try to restrain

5    that person?

6    A.  Yes.

7    Q.  And they also used Tasers, which apparently that person

8    was impervious to, correct?

9    A.  Yes.

10   Q.  And could you read the next slide's title, Inspector

11   Blackwell.

12   A.  C:  Patient is Confused.

13   Q.  And, again, this would be the "C" for NOTACRIME,

14   correct?

15   A.  Yes.

16   Q.  Okay.  Could you read the content of this slide.

17   A.  Subject confused to time, place, purpose, and

18   perception.  Typically will have no recollection of events.

19   Q.  Then the next slide, again, is one of those black boxes

20   that has a link to a video; is that correct?

21   A.  Yes

22       (Video recording played)

23   Q.  Now, Inspector Blackwell in these videos that we're

24   seeing, you're seeing the police officers using, among other

25   restraint techniques, the officers using their knees to

 1    restrain that person; is that correct?

 2    A.  Correct.

 3    Q.  On any of these videos have you seen any of these

 4    officers put the person in any sort of a side recovery

 5    position?

 6    A.  I did not.

 7    Q.  And this is the medical training you testified that

 8    you're giving the officers on excited delirium, correct?

 9    A.  This is the medical training that we're trying to show

10    the -- basically the symptoms that someone is displaying

11    excited delirium, yes.

12    Q.  And the next slide, Inspector, if you could read the

13    title to that.

14    A.  R:  Patient is resistant.

15    Q.  And could you please read the context.

16    A.  Verbal loop of "get on the ground."  Handcuffing and

17    hobbles will take multiple officers.  Understand some

18    subjects will not respond to pain compliance.

19    Q.  And going to this content, what is meant by the "verbal

20    loop of 'get on the ground'"?

21    A.  It's generally when the officers are telling someone get

22    on the ground and they're not listening or complying, and

23    you are constantly saying, "Get on the ground, get on the

24    ground, get on the ground."

25    Q.  And what does that second sentence mean?  What are you

1    training the officers there?

2    A.  Handcuffing and hobbles might take multiple officers to

3    get the person in custody.

4    Q.  We've actually seen that in these videos, have we not?

5    A.  Correct.

6    Q.  And there is a comment there for the instructors.  Could

7    you please read that.

8    A.  MPD blue hog pile.

9    Q.  Now, could you tell the jury what is meant by that

10   particular phrase.

11   A.  It means that you might see a pile of MPD officers, hog

12   piling someone that's displaying excited delirium to get

13   them into custody.

14   Q.  And, as we discussed, sort of the training has evolved

15   over the years, correct?

16   A.  Yes.

17   Q.  And you've taught different techniques to officers on

18   how to restrain a person?

19   A.  Yes.

20   Q.  So what's referred to there as a hog pile is just a

21   whole bunch of people pinning someone down, correct?

22   A.  Correct.

23   Q.  And are you familiar with what's called the swarm

24   technique that was taught at one point by Minneapolis?

25   A.  Yeah, sounds familiar.

1    Q.  Could you tell the jury what that is.

2    A.  Just where basically the MPD officers are swarming

3    somebody to try to get them in custody, a combative person,

4    and you are trying to get them into handcuffs as quick as

5    possible.

6    Q.  Same thing, essentially, as a hog pile, is it not --

7    A.  Similar.

8    Q.  -- just different terminology.

9         And the next slide, if you could read the title,

10   Inspector Blackwell.

11   A.  I:  Patient's speech is incoherent.

12   Q.  And, again, would this be the "I" in the middle of

13   "CRIME" for NOTACRIME?

14   A.  Yes.

15   Q.  And if you could read the content, please.

16   A.  Most, if any, conversation the person is having is

17   incoherent.  Do not rely on information they are giving you

18   to be accurate.

19   Q.  And that second sentence, could you elaborate on that a

20   little further?  What do you mean by that?

21   A.  It means someone's -- they might not be coherent enough

22   to know what they're talking about, so they might say a lot

23   of things that might not make sense.

24   Q.  Might not be accurate?

25   A.  Yes.

1    Q.  Might not be truthful?

2    A.  Correct.

3    Q.  And the comments below that?

4    A.  Delusions can sometimes mask these subjects as just a

5    mental health crisis.  Always be safe when these signs exist

6    to believe it could be ExD.

7    Q.  Now, essentially you've got two sentences that mean

8    different things, correct?

9    A.  Correct.

10   Q.  What does that first sentence mean?  What are you

11   training those officers by putting that first comment in

12   there?

13   A.  Delusions -- they might be delusional.  That might mask

14   that they might be going through a mental health crisis.

15   Q.  In other words, their delusions could sometimes mask as

16   just a mental health crisis, correct?

17   A.  Correct.

18   Q.  So you are trying to differentiate a mental health

19   crisis from excited delirium, are you not?

20   A.  Yes.

21   Q.  Okay.  And then what's that second sentence?

22   A.  Always be safe when these signs exist to believe it

23   could be excited delirium.  So we are just saying be safe.

24   If the signs are showing, it could be excited delirium.

25   Q.  Now, going back to these videos, you can see in these

1   videos that the people are noncompliant to pain techniques,

2   correct?

3   A.  Correct.

4   Q.  Things like Tasers and chemical irritants aren't having

5   an effect on them?

6   A.  Yes.

7   Q.  And they are attacking officers, correct?

8   A.  Correct.

9   Q.  Isn't that what you are really saying when you say

10  "always be safe when these signs exist"?

11  A.  Yes.  They are very dangerous situations to be in.

12  Q.  And then the next, could you read the title of that,

13  Inspector Blackwell, please?

14  A.  M:  Patient exhibits mental health.

15  Q.  And the content?

16  A.  Any behavior that seems out of the ordinary.  Can be

17  anything you observe from scene.  Bystanders can also be

18  helpful for subject's history.

19  Q.  And then there's some comments for the instructors,

20  correct?  Could you read those.

21  A.  Read your dispatch information.  Callers will typically

22  tell dispatch if the event is out of ordinary.

23  Q.  And would that assume that the caller knew this person?

24  A.  Sometimes generally it would or sometimes it might be a

25  witness that's calling in reporting unusual behavior.

1    Q.  And the next slide, could you read the title to that,

2    please.

3    A.  E:  EMS Should Be Requested Early.

4    Q.  And is that the "E" at the tail end of "CRIME"?

5    A.  Yes.

6    Q.  Okay.  And could you read the content to that slide,

7    please.

8    A.  Always advised to have EMS coming to stage Code 2 if

9    dispatched to a combative or likely combative emotionally

10   disturbed person, call comments state any injury, you feel

11   that this is true ExDS per the comments.

12   Q.  Now, I'd like to break that down a little bit to the

13   jury.  It says you are always advised to have EMS; is that

14   correct?

15   A.  Correct.

16   Q.  What does that stand for, Inspector Blackwell?

17   A.  Emergency medical services.

18   Q.  And is that basically the ambulance staff?

19   A.  Correct.

20   Q.  Okay.  And "coming to stage," what does that mean?

21   A.  Means stage the ambulance nearby until you are Code 4,

22   the scene is safe.

23   Q.  In other words, you train the officers to request

24   emergency medical services, but to stage away from the scene

25   until the scene is under control, correct?

1    A.  Correct.

2    Q.  Is that actually for the safety of the EMS personnel?

3    A.  Yes.

4    Q.  And then "Code 2," what does that mean?

5    A.  Routine.

6    Q.  So, in other words, request EMS, but ask them to come

7    Code 2, in other words, normal, obeying traffic lights,

8    things like that, correct?

9    A.  Correct.

10   Q.  And then could you talk about "dispatched to a combative

11   or likely combative emotionally disturbed person."  That's

12   if they're dispatched to that situation, correct?

13   A.  Correct.

14   Q.  It doesn't indicate anything to do if they come upon

15   that situation without being warned ahead of time on some

16   level, correct?

17   A.  Correct.

18   Q.  And then the second thing is "call comments state any

19   injury"; is that correct?

20   A.  Yes.

21   Q.  What is meant by that?

22   A.  Call an ambulance, basically, if you see any comments in

23   there, in your call, that there's any injuries involved.

24   Q.  And then there are some comments to that particular

25   slide, Inspector Blackwell.  Could you please read those.

1    A.  We do not need EMS on every single emotionally disturbed

2    person.  Some are just a basic welfare check.  EMS should be

3    staged if you believe this could be an excited delirium as

4    you showing up could escalate the situation.

5    Q.  So what you are training the officers is even them

6    simply responding to a call might escalate the reactions of

7    the person if they're in the syndrome?

8    A.  Correct.  Correct, yes.

9    Q.  And the next slide, if you could read the title to that.

10   A.  Could you push it down a little bit?

11   Q.  I'm sorry.

12   A.  Thank you.  Okay.  They Are in Handcuffs.  Now What?

13   Q.  And then could you read the content on this particular

14   slide.

15   A.  Sudden cardiac arrest typically occurs immediately

16   following a violent struggle.  Place the subject in the

17   recovery position to alleviate positional asphyxia.  Once in

18   handcuffs, get EMS on the scene quickly to monitor and

19   transport.  Sign a transport hold on these individuals.

20   Complete a CIC report.

21   Q.  And what does "a CIC report" refer to, Inspector

22   Blackwell?

23   A.  I forgot what the acronym is off the top of my head, but

24   it's a person in crisis.

25   Q.  And you indicate that -- the second thing talks about

1   putting the subject in the recovery position, correct?

2   A.  Correct.

3   Q.  Up until this point has any of this training, this

4   PowerPoint presentation, mentioned the recovery position?

5   A.  I don't believe so.

6   Q.  Have any of the videos shown a recovery position?

7   A.  No.

8   Q.  And going to this picture in question here, do you see

9   the instructor who is wearing the khaki pants?

10   A.  I do.

11   Q.  Could you please tell the jury where that person's knee

12   is on the person they're restraining.

13   A.  Appears to be in the neck/upper shoulder area.

14   Q.  Okay.  And the person in this video has his head turned

15   to the side?

16   A.  Yes.

17   Q.  Would you argue with me if I told you it appears as if

18   that instructor's knee is on that person's neck?

19   A.  I would not argue with you on that, no.

20   Q.  And then could you please read the comments to this

21   particular slide.

22   A.  Supporters of the positional asphyxia hypothesis

23   postulate that an anoxic death results from the combination

24   of increased oxygen demand with a failure to maintain a

25   patent airway and/or inhibition of chest wall and

1    diaphragmatic movement.  This explanation has been further

2    supported by coroners' reports of positional asphyxia as the

3    cause of death in multiple fatal ExD cases.

4    Q.  And talking about that particular comment that you want

5    the instructors to talk to the officers about, it refers to

6    something of supporters of the positional asphyxia

7    hypothesis; is that correct?

8    A.  Correct.

9    Q.  And it looks like what you are training them is that

10   people that believe in positional asphyxia think that a

11   death results from a combination of increased oxygen demand

12   with a failure to either maintain an airway or what's called

13   inhibition of the chest wall and diaphragmatic movement.  Do

14   you understand what all those terms mean?

15   A.  It's a lot.

16   Q.  "Inhibition of the chest wall and diaphragmatic

17   movement," what does that mean to you, Inspector Blackwell?

18   A.  It means probably the diaphragm is not getting enough

19   movement.

20   Q.  In other words, the chest and the diaphragm are

21   constricted, correct?

22   A.  Correct.

23   Q.  And that's what you are telling the officers that

24   supporters of positional asphyxia hypothesis believe,

25   correct?

1    A.  Yes.

2    Q.  And the second part of that sentence talks about this

3    explanation has been supported by coroners' reports of

4    positional asphyxia, correct?

5    A.  Correct.

6    Q.  In multiple fatal excited delirium cases, correct?

7    A.  Correct.

8    Q.  And then if I could have you read the next two

9    sentences, please.

10   A.  Policy is written -- sorry, I'll go back up one.

11          You may need to have one officer ride along with

12   the subject if there is a chance they could become violent.

13          And then policy is written in Manual Revision

14   7-809 Crisis Intervention.

15   Q.  And that refers to a separate crisis intervention

16   policy, correct?

17   A.  Correct.

18   Q.  But the sentence above that, "You may need an officer to

19   ride along with the subject if there's a chance they could

20   become violent," why are you putting that in your training?

21   A.  Generally to protect the paramedics if they're riding

22   along in an ambulance and a person can turn -- could become

23   violent, has the potential.

24   Q.  Okay.  Now, in the training on excited delirium, you

25   actually train that these people can be restrained, but then

1    can suddenly become violent again, correct?

2    A.  Correct.

3    Q.  With super-human strength?

4    A.  Correct.

5    Q.  So you are going to need to keep an eye on them, that's

6    really what you are telling the officers in that particular

7    sentence, correct?

8    A.  Yes.

9    Q.  The next slide, Inspector Blackwell, if you could please

10   read the title to that.

11   A.  EMS Role in Sedation.

12   Q.  And read the content, please.

13   A.  Assist in controlling suspect for you, your partner, and

14   EMS safety on scene.  If EMS decides to medicate suspect,

15   they could use benzodiazepine like versed, antipsychotics

16   like haldol, dissociative agent ketamine.

17   Q.  Now, are you familiar with ketamine, Inspector

18   Blackwell?

19   A.  Yes.

20   Q.  Can you tell the jury how you are familiar with

21   ketamine.

22   A.  It's generally the paramedics will have it on them and

23   if a person is displaying that super-human strength, they

24   will give them a dosage of ketamine to calm them down.

25   Q.  Have you actually been at scenes where that has

1    occurred?

2    A.  I have.

3    Q.  And essentially the police officers aren't equipped with

4    ketamine, correct?

5    A.  Correct.

6    Q.  So they have to restrain the person until the EMS shows

7    up with the ketamine, correct?

8    A.  Yes.

9    Q.  And it would be the paramedic or the EMS, not the police

10   officer, who decides what medical route to take, correct?

11   A.  Yes.

12   Q.  And the top phrase talks about assist in controlling the

13   suspect for yourself and your partner.  Presumably for

14   officer safety, correct?

15   A.  Yes.

16   Q.  As well as the safety of the first responders.  Those

17   paramedics, correct?

18   A.  Yes.

19   Q.  And again there is some comments?

20   A.  Listed medications are for information purposes taken

21   from the ALS protocols from HCMC EMS.

22   Q.  And just going back so the jury understands, what does

23   "ALS protocols" stand for?

24   A.  I can't remember.  I apologize.

25   Q.  Can you tell the jury what HCMC EMS stands for?

```
1    A.  It's Hennepin County Medical Center emergency medical

2    services, paramedics from Hennepin County.

3    Q.  Referred to as Hennepin Healthcare now, correct?

4    A.  Sounds right.

5    Q.  A long time ago was referred to as General Hospital, was

6    it not?

7    A.  Yes, it was.

8    Q.  All right.  And then could you continue reading, please.

9    A.  Benzodiazepines are a class of drugs primarily used for

10   treating anxiety.  Antipsychotic medications are used as a

11   short-term treatment for bipolar disorder to control

12   psychotic symptoms, such as hallucinations, delusions, or

13   mania symptoms.  Dissociatives are a class of hallucinogen,

14   which distort perceptions of sight and sound and produce

15   feelings of detachment, disassociation, from the environment

16   and self.

17   Q.  And the next slide on the power presentation, Inspector

18   Blackwell, if you could read the title of that.

19   A.  Ketamine.

20   Q.  And what is the content of this particular slide?

21   A.  Appears to be a bunch of articles in the media.

22   Q.  Talking about the use --

23   A.  Talking about ketamine.

24   Q.  Excuse me.  I spoke over you.

25           Those articles are basically referencing ketamine
```

1   used by emergency medical responders from Hennepin

2   Healthcare and presumably other places, correct?

3   A.  Correct.

4   Q.  And to the right this slide says, MPD Involvement in

5   Prehospital Sedation.  What does that mean, Inspector

6   Blackwell?

7   A.  It just means that Minneapolis -- when we're involved in

8   the prehospital sedation, it means more or less that we're

9   going to be there to protect the paramedic if they have to

10  administer ketamine.

11  Q.  So when they're sedating people out on the street, the

12  police are there to protect the emergency medical responders

13  from the person they're going to sedate, correct?

14  A.  Correct.

15  Q.  That would ensue -- that would assume, would it not,

16  that the police officers are in some ways restraining this

17  person to allow that person to be sedated by EMS, correct?

18  A.  Correct.

19  Q.  This is what you're training the officers about excited

20  delirium, isn't it?

21  A.  That there's dangers involved in it, yes.

22  Q.  And there are some comments to this particular slide.

23  Could you please read those.

24  A.  Though well-intentioned, the ketamine draft report from

25  the City of Minneapolis is a reckless use of anecdotes,

1    partial snapshots of interactions with police, and

2    incomplete information and statistics to draw uninformed and

3    incorrect conclusions.  This draft report prevents progress

4    we are making to understand and improve the use of sedation

5    to manage patient agitation, and in some cases this draft

6    report will prevent the saving of lives by promoting the

7    concept of allowing people to exhaust themselves to death.

8    Q.  And they're referring to a draft report from the City of

9    Minneapolis.  Do you know what that is that you're training

10   these officers about?

11   A.  I'm not sure what the draft report was at the time.

12   Q.  So you don't know what that means in the training,

13   correct?

14   A.  Correct.

15   Q.  Okay.  And the last sentence appears to be a critique of

16   this draft report; is that correct?

17   A.  Appears to be.

18   Q.  Could you please read that last sentence.

19   A.  This draft report prevents progress we are making to

20   understand and improve the use of sedation to manage patient

21   agitation, and in some cases this draft report will prevent

22   the saving of lives by promoting the concept of allowing

23   people to exhaust themselves to death.

24   Q.  What is meant by that, this exhausting themselves to

25   death, Inspector Blackwell?

1    A.  Basically wearing themselves out until they overheat and

2    die.

3    Q.  So, in other words, the police restraint is actually a

4    means of protecting these people from exhausting themselves

5    and dying, correct?

6    A.  Correct.

7    Q.  That's what you are training these officers again,

8    correct?

9    A.  I don't think that was the point of the training, but

10   appears that way.

11   Q.  In the next slide, Inspector Blackwell, if you could

12   read the title of that.

13   A.  The White Paper.

14   Q.  And could you read the content of that slide.

15   A.  Twenty medical doctors across the United States

16   contributed to white paper report on excited delirium

17   syndrome in 2010.  Beneficial use of aggressive chemical

18   sedation as first line intervention.  Law enforcement

19   control measures should be combined with immediate sedative

20   medical intervention to attempt to reduce the risk of death.

21   Q.  And could you explain what that last paragraph or bullet

22   point really means.

23   A.  So law enforcement control measures should be combined

24   with the sedatives to help the medical to attempt to reduce

25   the risk of death of the person that you are trying to take

1    in custody.

2    Q.  So, in other words, what you are training officers is to

3    restrain these people until they can be sedated by EMS,

4    correct?

5    A.  Well, it's law enforcements control measures, so within

6    our policy, right.

7    Q.  It's restraint, isn't it?

8    A.  Could be.

9    Q.  Okay.  And if they're doing that, you are training them

10   they will actually reduce the risk of death to the person,

11   correct?

12   A.  Correct.

13   Q.  And there's some comments.  If I could have you read

14   those too, please.

15   A.  The report studied inability to report ExDS cases

16   constantly due to the wide ranging clinical manifestations

17   of ExDS patients.  One main theme that is consistently

18   stated throughout the paper is that the patient has almost a

19   10 percent chance of death due to metabolic acidosis if they

20   are not properly sedated following the typical violent

21   combative behavior.

22   Q.  And that's a reference to the study in question,

23   correct?

24   A.  Correct.

25   Q.  And the first sentence refers to "wide ranging clinical

1    manifestations of excited delirium syndrome patients,"

2    correct?

3    A.  Correct.

4    Q.  What do you mean by that?

5    A.  Because there's a wide range of different symptoms and

6    behaviors that a person can display in excited delirium

7    patients.

8    Q.  Some people display certain symptoms and not other ones,

9    others different symptoms and not other ones, correct?

10   A.  Correct.

11   Q.  Every case is different, is it not?

12   A.  Yes.

13   Q.  And then could you read the title to this particular

14   slide, please.

15   A.  MPD Policy.

16   Q.  And could you read the content.

17   A.  MPD employees shall not make any suggestions or requests

18   regarding medical courses of action to be taken by any

19   medical personnel.  Determinations made by medical personnel

20   regarding medical courses of action must be clearly made by

21   medical personnel.

22          MPD -- do you want me to continue reading 1 and 2?

23   Q.  Yes, go ahead.

24   A.  MPD employees shall provide medical personnel with any

25   necessary information related to the subject's observed or

1   known conditions and behaviors so the medical personnel can

2   conduct a quick and accurate assessment and determine the

3   best medical courses of action.

4          MPD employees shall provide medical personnel the

5   names of any MPD employees who provided first aid or

6   assisted with a person's care so that notifications can be

7   made to involved officers of possible exposure to any

8   pathogens discovered through further medical examination.

9   Q.  And then if I push it up to the instructors comment,

10  could you read that, please.

11  A.  MPD policy 7-350, emergency medical response.

12  Q.  That refers to a different policy within the Minneapolis

13  Police Department, correct?

14  A.  Correct.

15  Q.  And what is the title of this next slide, Inspector

16  Blackwell?

17  A.  HCMC Policy for Ketamine.

18  Q.  Could you please read the content.

19  A.  Profound agitation.  If the patient is profoundly

20  agitated with active physical violence to himself/herself or

21  others evident and usual chemical or physical restraints

22  (Section C), may not be appropriate or safely used,

23  consider, A, ketamine 5 milligrams.  If IV already

24  established, may give 2 milligrams IV.

25          If ketamine is administered, rapidly move the

1    patient to the ambulance and be prepared to provide

2    respiratory support, including suctioning, oxygen, and

3    intubation; monitoring of the airway for laryngospasm

4    (presents as stridor, abrupt cyanosis/hypoxia early in

5    sedation period).  If laryngospasm occurs, perform the

6    following in sequence until the patient is ventilating, then

7    support as needed.

8    Q.  Now, again, to be clear, this isn't a Minneapolis Police

9    Department policy, you are training the Minneapolis police

10   officers on what the Hennepin County Medical Center policy

11   is for ketamine, correct?

12   A.  Correct.

13   Q.  And the Hennepin County Medical Center policy for

14   ketamine talks about using physical restraints, correct?

15   A.  Correct.

16   Q.  And then the comments to the instructor?

17   A.  Though well-intentioned, the ketamine draft report from

18   the City of Minneapolis is a reckless use of anecdotes,

19   partial snapshots of interactions with police, and

20   incomplete information and statistics to draw uninformed and

21   incorrect conclusions.  This draft report prevents progress

22   we are making to understand and improve the use of sedation

23   to manage patient agitation, and in some cases this draft

24   report will prevent the saving of lives by promoting the

25   concept of allowing people to exhaust themselves to death.

1    Q.  Okay.  And this time I'd like to go back to the first

2    sentence, Inspector Blackwell.  Does this first sentence

3    appear to be a critique of the ketamine draft report from

4    the City of Minneapolis?

5    A.  It does.

6    Q.  And it talks about the people behind that being

7    well-intentioned, does it not?

8    A.  It does.

9    Q.  But it's a reckless use of anecdotes, partial snapshots

10   of interactions with police, and incomplete information and

11   statistics to draw uninformed and incorrect conclusions,

12   correct?

13   A.  Correct.

14   Q.  What you are training the officers is that this draft

15   report is wrong and uninformed, correct?

16   A.  Appears that way.

17   Q.  And the next slide, Inspector Blackwell, could you read

18   the title.

19   A.  Final Thoughts.

20   Q.  And the content, please.

21   A.  Never go to an EDP call alone.  Always have an escape

22   route.  Have a backup plan when Taser or pain compliance

23   fails.  If Taser is used, gets hands on instantly.

24   Q.  And the next slide appears to be one of those black

25   boxes leading to a video, which we will now play.

1     (Video recording played)

2  Q.  Now, Inspector Blackwell, did you see the way the police

3  officers in this particular video showed in training were

4  restraining the person?

5  A.  I did.

6  Q.  Did you see a knee being placed on that person by one of

7  the officers?

8  A.  I did, and he removed it.

9  Q.  Excuse me.  I --

10  A.  I said, "I did."  Put the knee on to restrain and then

11  removed it.

12  Q.  And did he put his knee in the area of the person's

13  upper back or neck area, if you could tell?

14  A.  It appeared that way.

15  Q.  And then the next PowerPoint -- whoops, excuse me.  The

16  next PowerPoint is another black box, which is a link to a

17  video, which we will now play.

18     (Video recording played)

19  Q.  Now, Inspector Blackwell, that appears to be the second

20  responding officer's on-the-scene body cam footage; is that

21  correct?

22  A.  Yes.

23  Q.  And in that particular video, can you actually see the

24  first officer using his knee to restrain that person?

25  A.  It appeared that way.

1    Q.  And then the next slide.  Can you tell the jury -- read

2    the jury the title of that slide.

3    A.  Safety First.

4    Q.  And then the next sentence?

5    A.  You never know when a cat is packed with explosives.

6    Q.  And what is depicted in that image, the picture on this

7    slide?

8    A.  Appears to be two SWAT officers from another agency

9    stopping a cat.

10   Q.  Now, if we may describe those, those two officers are

11   carrying basically assault rifles, are they not?

12   A.  Correct.

13   Q.  They have tactical helmets?

14   A.  Yes.

15   Q.  Tactical vests?

16   A.  Yes.

17   Q.  Almost looks military-like, doesn't it?

18   A.  Yes.

19   Q.  And then the final slide to this PowerPoint is a series

20   of references, correct?

21   A.  Correct.

22   Q.  Now, Inspector Blackwell, this is the training you gave

23   the Minneapolis police officers in-service about excited

24   delirium, correct?

25   A.  One of our medical professionals did, yes.

1    Q.  You are the head of training.  You approved this,

2    correct?

3    A.  Correct.

4    Q.  Would I be correct in assuming, from your previous

5    testimony, this is something you previewed?

6    A.  Yes.

7    Q.  You previewed with the command staff?

8    A.  Yes.

9    Q.  Including Chief Arradondo, correct?

10   A.  Correct.

11   Q.  To make sure that his vision was included in this

12   training, correct?

13   A.  Correct.

14   Q.  And in that entire presentation, that PowerPoint, there

15   is one sentence about putting someone in a side recovery

16   position, correct?

17   A.  Correct.

18   Q.  And multiple instances of police officers physically

19   restraining people, correct?

20   A.  Correct.

21   Q.  And using their knees to do so, correct?

22   A.  Correct.

23   Q.  Including a photograph of an instructor putting his knee

24   on the back of someone's neck, correct?

25   A.  It wasn't our agency, but there was a photo of, yes.

```
 1    Q.  That was a photo you used in training, your department?

 2    A.  For medical, not DT, yes.

 3    Q.  You can see a knee being placed on someone's upper back

 4    or neck in at least one of these videos, correct?

 5    A.  Correct.

 6         MR. ROBERT PAULE:  And may I have just a moment,

 7    Your Honor?

 8         THE COURT:  Yes, you may.

 9      (Pause)

10         MR. ROBERT PAULE:  Your Honor, with the court's

11    permission, I'm going to attempt to introduce Exhibit T-14.

12    And I do have two paper copies for the court and I have

13    given counsel one.  May I approach your staff?

14         THE COURT:  You may.

15         Counsel, I think it's time we take a morning

16    break.

17         MR. ROBERT PAULE:  Fine.

18         THE COURT:  Let's take a morning break.

19         Members of the jury, I caution you, once again,

20    not to discuss the case during the course of the recess.

21    And we are in recess.  You may be excused.

22      (Jury excused)

23                        IN OPEN COURT

24                     (JURY NOT PRESENT)

25         THE COURT:  Okay.  Do you want to tell me about
```

```
 1    T-14?

 2                   MR. ROBERT PAULE:  T-14 is a course lesson --

 3    excuse me, Your Honor.  T-14 is a lesson plan from the 2019

 4    Phase III Defensive Tactics - Instructor Development

 5    training that includes a description of how to train a

 6    scenario for police officers who believe someone is dealing

 7    with excited delirium.  And the specific reference I believe

 8    is on the fifth page of the document, which is Bates

 9    00052605, into the next page.

10                   THE COURT:  And it is offered?

11                   MR. ROBERT PAULE:  It is offered, Your Honor.

12                   THE COURT:  Is there objection?

13                   MS. BELL:  No, Your Honor, but we would need to do

14    that in front of the jury.

15                   THE COURT:  We will do it in front of the jury.

16                   MS. BELL:  Oh, okay.

17                   THE COURT:  I just wanted to find out if we had

18    something to argue about now.

19                   MS. BELL:  I thought maybe we were just jumping

20    ahead.  No objection, Your Honor.

21                   THE COURT:  All right.  We will receive it when we

22    come back in.  In fact, you will have to lay the -- you have

23    permission to lay the foundation of it.

24                   Okay.  Let's take a break.

25    (Recess taken at 11:14 a.m.)
```

```
1                          *  *  *  *  *

2       (11:30 a.m.)

3                        IN OPEN COURT

4                       (JURY PRESENT)

5              THE COURT:  Proceed, Mr. Paule.

6              MR. ROBERT PAULE:  Thank you, Your Honor.

7       BY MR. ROBERT PAULE:

8       Q.  I think just to reorient everyone, Inspector Blackwell,

9       I believe my last serious of questions were about the 2009

10      Phase III defensive tactics training, the instructor

11      development, correct?

12      A.  Correct.

13      Q.  And can you please explain to the jury what that means.

14      They may not know.

15      A.  Defensive tactics instructor development is we have

16      full-time trainers at our training facility, a small core

17      group.  And then we have -- we rely heavily on many

18      part-time trainers that are permanent assignments throughout

19      the department who come and help teach throughout in-service

20      because there are so many sessions.

21      Q.  So this is essentially training the instructors on how

22      to train people during the in-service training, correct?

23      A.  Correct.

24      Q.  And are you familiar with the defensive tactics

25      instructor development lesson plan from the 2019 Phase III
```

1    defensive tactics?

2    A.  Generally, yes.

3              MR. ROBERT PAULE:  May I approach the witness,

4    Your Honor?

5              THE COURT:  You may.

6    BY MR. ROBERT PAULE:

7    Q.  Showing you a document that is not marked for

8    identification, but if I was to show you, I'd like to see if

9    you recognize this particular document.

10   A.  Okay.

11             THE COURT:  Counsel, is this T-14?

12             MR. ROBERT PAULE:  It is T-14, Your Honor.

13             THE COURT:  Okay.  Members of the jury, you should

14   be aware that during the recess Exhibit T-14 was received as

15   evidence.

16   BY MR. ROBERT PAULE:

17   Q.  Do you recognize that document?

18   A.  I do.

19   Q.  Okay.

20             And I would offer T-14 if it has not been

21   received.

22             THE COURT:  It is received.

23             MR. ROBERT PAULE:  I would like to publish.  And

24   may I approach the witness to get my copy back?

25             THE WITNESS:  Yes.

```
 1                 THE COURT:  Counsel, I have an extra copy if you
 2       need two copies.
 3                 MR. ROBERT PAULE:  That would actually be helpful.
 4       May I approach?  Thank you very much.
 5       BY MR. ROBERT PAULE:
 6       Q.  Inspector Blackwell, I'm showing you Exhibit T-14.  It
 7       looks like it's difficult for me to get this all on one page
 8       with my lack of skill, but the top of this has the title.
 9       Could you please read the title.
10       A.  2019 Phase Three Defensive Tactics - Instructor
11       Development.
12       Q.  And what is this document?
13       A.  It is a training syllabus that basically is going to
14       show what the training covered, which was critical
15       decision-making, deescalation, use of force, Taser, annual
16       training requirements, use of force policies, weapon
17       retention, the new Taser 7 introduction, and then
18       introducing the BolaWrap, which is a demonstration on a new
19       nonlethal device.
20       Q.  And it indicates that the unit's ultimate goal is to
21       teach respect, professionalism, and the sanctity of life; is
22       that correct?
23       A.  Correct.
24       Q.  And do you know who created this lesson plan?
25       A.  Sergeant Kurtis Schoonover.
```

1    Q.  And this was part of the instruction to the people that

2    were going to be instructing in Phase III of 2019; is that

3    correct?

4    A.  Correct.

5    Q.  Now, do you know if there was any scenario-based

6    training as part of this Phase III defensive tactics, if you

7    know?

8    A.  Not off the top of my head.  Sorry.

9    Q.  Okay.  I'd like to direct your attention, then, to I

10   believe it's page 5 of the lesson plan, and I'll try to

11   queue it up so you can read it, Inspector Blackwell.  Do you

12   see on page 5 --

13   A.  Yes.

14   Q.  -- do you see where it says, "HALT Scenario 1"?

15   A.  Yes.

16   Q.  What does that mean?

17   A.  I'm not sure, the HALT close quarter.  Stop?

18   Q.  Well, just so I'm clear, do you know what the word

19   "HALT" means in that it's in all capitals?  I assume that

20   refers to something.

21   A.  Not off the top of my head, I don't.

22   Q.  Okay.  But HALT Scenario 1 appears to be teaching

23   instructors how to instruct police officers about certain

24   scenarios; is that correct?

25   A.  Sounds right, yes.

1   Q.  And Scenario 1 would be a suicidal object with a knife?

2   A.  Yes.

3   Q.  And does the rest of the lesson plan essentially give

4   the instructor advice on how to enact or to complete the

5   scenario with the students?

6   A.  Yes.

7   Q.  And then I direct your attention to HALT Scenario 2.

8   Could you read what HALT Scenario 2, the first two

9   sentences, instructs them to do.

10  A.  Officers have HALT close quarter in CEW.  Radio call:

11  Subject on 10th floor in small room, sweating profusely,

12  removing clothing, and breaking out windows.

13  Q.  Does this appear to be a scenario to teach the

14  instructors how to instruct the officers in in-service

15  training about recognizing and dealing with a person who is

16  in a situation where they're in excited delirium?

17  A.  It appears that way, yes.

18  Q.  And then going over to page 6 of Exhibit T-14, could you

19  read through the rest of that scenario, please.  And I will

20  try to zoom up just so I can see it better.

21  A.  Thank you.

22          O1 will engage the subject with O2 giving lethal

23  cover.  O1 should recognize excited delirium danger signs

24  and call EMS to the scene.  O1 may give warning and arc

25  display.

1   Q.  Could I interrupt you.  O1 and O2, I assume, refer to

2   Officer 1 and the second officer in training, correct?

3   A.  Correct.

4   Q.  And what is lethal cover?

5   A.  Lethal is your firearm.

6   Q.  So, in other words, your training them in this

7   particular scenario that they should draw their firearm to

8   provide cover for the other officer?

9   A.  Correct.

10  Q.  And lethal cover means to use a gun, correct?

11  A.  Correct.

12  Q.  Okay.  And then what does -- the second sentence, "O1

13  should recognize excited delirium danger signs and call EMS

14  to the scene," that might seem self-explanatory, but could

15  you please explain what you are trying to train the

16  officers.

17  A.  Sure.  So Officer 1 should recognize the symptoms or the

18  behavior and the danger signs of excited delirium and make

19  sure that they are calling paramedics to the scene.

20  Q.  And what's the second sentence of that particular line?

21  A.  Officer 1 may give warning and arc display.

22  Q.  What does "arc display" mean?

23  A.  So when you have a Taser, it has to two mechanisms to

24  it.  One is the stun portion, and then the second one is

25  there's a cartridge that shoots out of the Taser probes.  So

 1    when you remove that cartridge, you can take your Taser and

 2    it arcs when you press the trigger, just arcs like electric.

 3    It's like a loud noise, static.

 4    Q.  Kind of like one of those balls in science class that

 5    has the lightning in it?

 6    A.  Correct.

 7    Q.  And then could you read the rest of the scenario,

 8    please.

 9    A.  Instructor advises:  Subject approaches Officer 1 and

10    Officer 2.  Officer 1 deploys 1 HALT close quarter

11    cartridge.  Instructor advises:  Ineffective.  O1 fires the

12    second cartridge.  And then the instructor advises:  Subject

13    fell to ground.  Officers handcuff subject.  End scenario.

14    Once --

15    Q.  And -- I'm sorry.  Go ahead.

16    A.  Once scenario is complete, have the officers reset and

17    switch roles.

18    Q.  And if we could go through that, so it looks like it at

19    the start you want the officer -- the first officer should

20    recognize the person is in excited delirium and then should

21    respond to that by requesting emergency medical response to

22    the scene, correct?

23    A.  Correct.

24    Q.  And then warn them about a Taser and essentially

25    demonstrate it?

1   A.  Correct.

2   Q.  And then the instructor would advise the person with

3   excited delirium, the person who is pretending that, the

4   subject, to go and approach both officers; is that correct?

5   A.  Yes.

6   Q.  And at that point the first officer is supposed to

7   deploy the Taser?

8   A.  Yes.

9   Q.  The instructor will then advise, as part of the

10  scenario, that the Taser wasn't working.  They are

11  pretending, but that's what he tells them.  So they are

12  reacting to that scenario, correct?

13  A.  Correct.

14  Q.  So what is the officer supposed to do at that point?

15  A.  Fire a second cartridge.

16  Q.  And then the instructor advised them that the subject

17  fell to the ground, correct?

18  A.  Yes.

19  Q.  And that the officers should handcuff the subject,

20  correct?

21  A.  Yes.

22  Q.  And that's the end of the scenario?

23  A.  Correct.

24  Q.  Doesn't seem to mention the recovery position in the

25  training, does it?

```
1    A.  Does not.

2    Q.  Does it have any continuing medical training for the

3    officers as part of this scenario?

4    A.  Not part of this scenario, no.

5    Q.  Now, Inspector Blackwell, you met on March 9th of 2021

6    for preparation for your testimony in the state court trial,

7    correct?

8    A.  Sounds right.

9    Q.  Sounds right.

10            Do you remember meeting with three separate state

11   prosecutors on that particular date?

12   A.  Yes.

13   Q.  Including the lead prosecutor, Matt Frank?

14   A.  Sounds correct.

15   Q.  Okay.  He's actually in the courtroom, isn't he?

16            MS. BELL:  Objection, Your Honor.

17            THE COURT:  Yeah, I don't see the relevance of

18   that.  If he wants to be in the audience, that's his

19   privilege.

20            MR. ROBERT PAULE:  Absolutely, Your Honor.

21   BY MR. ROBERT PAULE:

22   Q.  But when you were preparing for your testimony in that

23   trial, do you recall talking about a New York Police

24   Department video on excited delirium?

25   A.  I remember discussing excited delirium.
```

1    Q.  Okay.  Do you remember discussing a specific video from

2    the New York Police Department?

3    A.  Not off the top of my head.

4    Q.  Okay.  Do you recall re -- excuse me.  Do you recall

5    discussing, during that meeting with the state court

6    prosecutors, a positional asphyxia training video from the

7    New York Police Department?

8    A.  I believe so.

9    Q.  Now, the jury has seen a New York Police Department

10   video on positional asphyxia; is that correct?

11   A.  Yes.

12   Q.  I believe, if I'm correct, that was the approximate

13   six-minute video that was Exhibit 76; is that correct?

14   A.  Sounds correct.

15   Q.  Let me put it to you differently.  Do you recall seeing

16   a video with some guy sitting on a desk talking about

17   positional asphyxia who appeared to be a doctor?

18   A.  Yes.

19   Q.  If I was to tell you that was Exhibit 76, does that make

20   sense to you?

21   A.  Yes.

22   Q.  Okay.  Now, is that the video that you were discussing

23   with the state court prosecutors?

24   A.  I believe so.

25   Q.  Okay.  And you told them during that meeting that part

1   of your training --

2              MS. BELL:  Objection.  Hearsay, Your Honor.

3              MR. ROBERT PAULE:  Excuse me.  I can rephrase

4   that.

5              THE COURT:  I'm sorry, counsel.  I didn't --

6              MR. ROBERT PAULE:  I will rephrase the question,

7   Your Honor.

8              THE COURT:  Okay.

9   BY MR. ROBERT PAULE:

10  Q.  Do you recall discussing the move away from the military

11  mindset that you were trying to move the department?

12  A.  Yes.

13  Q.  And do you recall also telling them -- well, did you

14  discuss whether or not you had personally selected Derek

15  Chauvin as a field training officer?

16  A.  I believe we discussed that.

17  Q.  Do you recall what you told them with regard to that?

18  A.  That I selected many field training officers.

19  Q.  Okay.  Do you remember saying that you did not select

20  him personally, if you remember?

21  A.  Well, not personally.  I select all FTOs, I guess.  So

22  not reaching out and selecting him as in calling him up and

23  saying, hey, will you be a field training officer.  He had

24  to go through a process, like all 80 of them that I

25  selected.  The 80-plus that I selected had to go through

1    this process.

2    Q.  Okay.  That makes sense to me.

3            Now, again, then, on December 17, 2021, did you

4    have a meeting with the federal prosecutors?

5    A.  Sounds right.

6    Q.  And during that meeting did they show you a video on

7    positional asphyxia that was created by the New York Police

8    Department?

9    A.  Yes.

10   Q.  Is that the same one that we showed in court?

11   A.  Yes.

12   Q.  Okay.  Now, I wasn't clear when you testified, but you

13   spent a great deal of time trying to locate the video that

14   was shown in 2012, correct?

15   A.  I did, yeah.

16   Q.  You personally, as head of the training department, went

17   through all the records to see if you could find the actual

18   video, correct?

19   A.  Correct, my staff and I.

20   Q.  Were you ever able to find the actual video you showed

21   the officers?

22   A.  I was not.

23   Q.  So the video that was shown in court --

24           MS. BELL:  Objection, Your Honor.  May we have a

25   moment?  No, with Mr. Paule.  May I have a moment with

1    Mr. Paule?

2              THE COURT:  Oh, okay.

3              MS. BELL:  Thank you.

4         (Counsel confer)

5    BY MR. ROBERT PAULE:

6    Q.  Inspector Blackwell, it appears I was a little confused.

7    Without going to how that video was obtained, is your

8    testimony that that was the actual video that was

9    distributed during this 2012 roll call where you asked -- or

10   someone asked the officers to show this video to everyone?

11   A.  I don't know if that was the same exact video.  I

12   remembered that in 2012 we did see a positional asphyxia

13   video.  I just couldn't remember if it was that specific

14   one.

15   Q.  Yes.  And I'm not trying to --

16             THE COURT:  Counsel, I need to interrupt.  We've

17   heard about that video, this video, and I don't know

18   specifically what we're talking about.

19             MR. ROBERT PAULE:  That's my mistake, Your Honor.

20   May I clarify?

21             THE COURT:  Please.

22             MR. ROBERT PAULE:  Thank you.

23   BY MR. ROBERT PAULE:

24   Q.  Inspector Blackwell, just so we're both clear,

25   Exhibit 76 was the video that was shown, correct?

```
 1    A.  Correct.

 2    Q.  Okay.  And that video was obtained somehow and that is

 3    the video that was shown to officers at roll call in 2012;

 4    is that correct?

 5    A.  I believe so.

 6    Q.  Okay.  Didn't want to confuse anyone.

 7    A.  Thank you.

 8    Q.  And this was referred to as an administrative

 9    announcement, correct?

10    A.  Correct.

11    Q.  And is this something that is sent out to basically all

12    of the sergeants to give this instruction on this video, to

13    show this video at roll call?

14    A.  Administrative announcements are generally sent out to

15    the whole department, and then supervisors will take those

16    administrative announcements and show them at roll calls.

17    Q.  And my understanding of roll call is sort of right

18    before the shift starts, a supervisor assigning partners and

19    explaining sort of what's going on if there's anything in

20    particular to pay attention to, something like that.  Is

21    that accurate?

22    A.  Yes.

23    Q.  Okay.  Was there any instruction on what the supervisor

24    should tell the officers to look for in that video?

25    A.  No.  Generally the administrative announcements will
```

1    have some brief description of what it is and then to play

2    the video.

3    Q.   Okay.  Now, going back to the start of your testimony,

4    one of the themes of your testimony was that when a person

5    is in your custody, they are in your care; is that correct?

6    A.   Correct.

7    Q.   And I believe what your testimony was is that that means

8    that you are responsible for them and their well-being; is

9    that correct?

10   A.   Correct.

11   Q.   Are there scenarios where you have a person in custody

12   where you have to protect them from themselves?

13   A.   We have a lot of scenarios, so I'd have to look through

14   all of our scenarios.

15   Q.   Okay.  How about if a person is in the throes of excited

16   delirium and you are worried about them exciting themself

17   essentially to death, would that be a situation where you

18   might have to protect them from themselves?

19   A.   Yes.

20   Q.   Are there other scenarios where you might have to

21   protect someone who is in your custody from, let's say,

22   someone else who intends them ill will?

23   A.   Yes.

24   Q.   Sort of as an example, let's say you break up a fight

25   and you've got one person and the other person comes over

```
1    and tries for a second round with them.  You would still

2    have to protect the person in your custody from that person;

3    is that correct?

4    A.  Correct.

5    Q.  Would this also involve other situations where someone

6    was trying to intervene but didn't really understand what

7    was going on?  Would you still have to protect that person

8    in your custody?

9    A.  Yes.

10            MR. ROBERT PAULE:  Thank you.  I don't have any

11   further questions.

12            THE COURT:  Thank you.

13            Mr. Gray.

14            MR. GRAY:  Thank you.

15            MR. ROBERT PAULE:  Your Honor, may I bring the

16   court back Exhibit T-14?

17            THE COURT:  Certainly.

18                      CROSS-EXAMINATION

19   BY MR. GRAY:

20   Q.  Good morning.

21   A.  Good morning.

22   Q.  Inspector Blackwell, I'm Earl Gray.  I don't know if

23   we've ever met.  We may have in years past.

24            But I'm going to ask you some questions a little

25   bit unrelated to what you've gone through this morning, and
```

1    that is in regards to Officer Lane, Thomas Lane.

2            And you watched the video of Thomas Lane; is that

3    a fair statement?

4    A.  Yes.

5    Q.  The video of him approaching George Floyd, arresting

6    him, and all of what happened after that; is that correct?

7    A.  Correct.

8    Q.  And you also testified about the use of force booklet or

9    program or document that the officers are trained on; is

10   that right?

11   A.  Correct.

12   Q.  And the use of force starts at 5-303-1, duty to

13   intervene or duty for intervention; is that correct?

14   A.  Sounds right, yes.

15   Q.  Do you have a copy of the -- do you remember -- do you

16   have that exhibit?  I think it's 134 -- or 130.  Do you have

17   a copy of that?

18            MR. GRAY:  Can we have a copy of that for her?

19            MS. BELL:  Which one?

20            MR. GRAY:  Exhibit 130.

21       (Counsel confer)

22            THE COURT:  Counsel, I think I have it, if you

23   don't.

24            MR. GRAY:  Well --

25            THE COURT:  I guess I don't have it.

```
 1    BY MR. GRAY:
 2    Q.  I'm going to give you this Document 130 and direct your
 3    attention to the authorized use of force section.  I think
 4    it's 303 -- 5-303.  You might be able to find it easier.
 5    A.  Thank you.
 6    Q.  I'm going to talk about 5-303.01, that chapter, if
 7    that's helpful to you.
 8    A.  Almost there.  5 -- what was it?
 9    Q.  5-303.01 and after that, the use of force.  You got that
10    there?
11    A.  I do.
12    Q.  Now, the use of force -- and what is this document, the
13    exhibit that you have there?
14    A.  It's the MPD Academy's manual.
15    Q.  Okay.  So that's the manual that all of the trainees,
16    the officers get when they are going through the academy?
17    A.  Correct.
18    Q.  And in that manual, is the document referring to the use
19    of force, correct?
20    A.  Correct.
21    Q.  And the first thing 5-303.01, duty to intervene -- you
22    see that?
23    A.  Yes.
24    Q.  And that says that it shall be the duty of every sworn
25    employee present at any scene where physical force is being
```

1    applied to either stop or attempt to stop another sworn

2    employee when force is being inappropriately applied or is

3    no longer required.  Is that what it says?

4    A.  Correct.

5    Q.  And it doesn't say to stop and go on, it says to stop or

6    attempt to stop another sworn employee, correct?

7    A.  Correct.

8    Q.  So it's either/or, correct?

9    A.  Correct.

10   Q.  So then we go to my client's -- on May 25th he goes to

11   Cup Foods.  You saw that video part, right?

12   A.  Correct.

13   Q.  And he got the information from the person that did the

14   911 call, correct?

15   A.  Correct.

16   Q.  And then he went over across the street to George

17   Floyd's Mercedes, correct?

18   A.  Correct.

19   Q.  And do you remember on the way over there him saying

20   that they're moving around a lot in the car?

21   A.  Yes.

22   Q.  And once he got there, do you remember him knocking on

23   the window with his flashlight?

24   A.  Yes.

25   Q.  And that was because he couldn't see in the car; is that

1    a fair statement?

2    A.  Yes.

3    Q.  Did he say that?

4         And once he -- the window was rolled down, he told

5    George Floyd who he was and George Floyd would not show his

6    hands, correct?

7    A.  Correct.

8    Q.  And Officer Lane, after he was moving around, wouldn't

9    show his hands, and had his right hand down below the seat,

10   he pulled his gun out, correct?

11   A.  Yes, Officer --

12        MS. BELL:  Objection.  Mischaracterizes the video,

13   Your Honor.

14        MR. GRAY:  Well, we can play the video or I can do

15   it this way.  I don't think I have inaccurately --

16        THE COURT:  I'm going to overrule this objection.

17   I think there is a snippet in there with respect to a weapon

18   being exposed.

19   BY MR. GRAY:

20   Q.  So he said, "Show me your hands," correct?

21   A.  Yes.

22   Q.  And he swore a couple times and he pulled his gun out,

23   correct?

24   A.  Yes.

25   Q.  And finally George Floyd put his hands on the steering

```
 1    wheel, correct?

 2    A.  Yes.

 3    Q.  And once he put his hands on the steering wheel, Thomas

 4    Lane put his gun back in his holster, correct?

 5    A.  Correct.

 6    Q.  And I'm going to direct your attention to threatening

 7    the use of force, 5-304, in Exhibit 130.  And that -- and

 8    what it says is, A, threatening the use of force, correct?

 9    A.  Yes.

10    Q.  And as an alternative or the precursor to the actual

11    force of -- use of force, MPD officers shall consider

12    verbally announcing their intent to use force.  Is that what

13    Thomas Lane did?

14    A.  Yes.

15    Q.  Including displaying an authorized weapon as threat of

16    force.  Is that what he did?

17    A.  Yes.

18    Q.  And when reasonable under the circumstances.  Was it

19    reasonable for him under those circumstances to do that?

20    A.  Yes.

21    Q.  And he did use some harsh language, but that's

22    authorized too, correct, to get the attention of the

23    arrestee; fair statement?

24    A.  Well, we have a policy against it, but it seemed to be

25    reasonable in this situation.
```

1    Q.  Okay.  You have heard, in your experience as a law

2    enforcement officer, officers swearing when they're in these

3    kinds of situations?

4    A.  I have.

5    Q.  So after George Floyd put his hands on the steering

6    wheel, Thomas Lane put his gun in his holster, correct?

7    A.  Correct.

8    Q.  And that's, B, use of force -- B is called deescalation;

9    is that correct?

10   A.  Correct.

11   Q.  And by -- it says, Whenever reasonable, according to MPD

12   policies and training, officers shall use deescalation

13   tactics to gain voluntary compliance and seek to avoid or

14   minimize use of physical force.  Is that what it says?

15   A.  Yes.

16   Q.  And by Thomas Lane putting his gun back in his holster,

17   he was deescalating this incident, correct?

18   A.  Correct.

19   Q.  And when he tried to get him out of the car and had to

20   pull him out, he was deescalating the situation, was he not?

21   A.  When he's pulling him out?

22   Q.  Yes, when he's trying to get him out without --

23   A.  Yes.

24   Q.  -- using his gun, without beating him, without using a

25   billy club --

1    A.  Correct.

2    Q.  -- correct?

3            Okay.  And once the officers got George Floyd out

4    of the vehicle, they handcuffed him, correct?

5    A.  Yes.

6    Q.  And you remember that was a struggle, but they got it

7    done?

8    A.  Yes.

9    Q.  And then, at that point in time, Officer Lane left

10   George Floyd and went and talked to the other two

11   individuals in the vehicle.  Do you remember that?

12   A.  I do.

13   Q.  And do you remember him asking the female what's

14   Mr. Floyd's deal, what's he on, a situation like that?

15   A.  Yes.

16   Q.  And do you remember the female saying that he just

17   doesn't like cops, something to that effect?

18   A.  Something to that effect, yes.

19   Q.  Okay.  And then Thomas Lane went back to transport

20   George Floyd, who would be the arrestee; fair statement?

21   A.  Yes.

22   Q.  Transport him to the vehicle that Thomas Lane and his

23   partner were in, correct?

24   A.  Correct.

25   Q.  And during that walking over there, Thomas Lane asked

1    George Floyd if he was on something, correct?

2    A.  Yes.

3    Q.  And George Floyd denied being on drugs, correct?

4    A.  Correct.

5    Q.  Now, going to the deescalation, B -- 1B, look at 1B.

6    Consider -- first of all, this is the directions when you

7    are deescalating, correct?

8    A.  Correct.

9    Q.  And B says, Consider whether a subject's lack of

10   compliance is a deliberate attempt to resist or an inability

11   to comply based on factors including, but not limited to.

12   And then we have a list of eight, I think -- seven factors

13   that the officer might look into to see what's the deal with

14   George Floyd, correct?

15   A.  Correct.

16   Q.  And down there at the bottom, one up, it says, Influence

17   of drug or alcohol use.  Do you see that?

18   A.  I do.

19   Q.  And what Thomas Lane did that day, when he asked him are

20   you on something, was an attempt to determine this; is that

21   right?

22   A.  Correct.

23   Q.  And that would be part of your deescalation of the

24   program or the policy of the police department, correct?

25   A.  Yes.

1   Q.  So up until now he was pretty much following what you

2   trained him to do, correct?

3   A.  Correct.

4   Q.  And then after that on number 2 on deescalation, it

5   says, Deescalation tactics include, but are not limited to.

6   And the first one -- and I think there's about ten of those.

7   But the first one says, Placing barriers between an

8   uncooperative subject and an officer.  Do you see that?

9   A.  I do.

10  Q.  And when Thomas Lane and his partner took George

11  Floyd -- you saw the video where he wasn't going -- he was

12  going to the squad car, but he fell down a couple times.  Do

13  you remember that?

14  A.  Yes, I do.

15  Q.  And you could tell that the plan of Thomas Lane was to

16  put a barrier up to put him in the squad car so that they

17  could conduct their investigation, correct?

18          MS. BELL:  Objection.  Calls for speculation as

19  what was in Tom Lane's mind.

20          THE COURT:  It's overruled.  It's the observation.

21  Proceed.

22  BY MR. GRAY:

23  Q.  Well, is Thomas Lane attempting with his partner to put

24  George Floyd in his vehicle?

25  A.  Yes.

1    Q.  And that would be a barrier, because he couldn't get out

2    of it, correct?

3    A.  Technically, yes.

4    Q.  Okay.  And so when they were doing that, they were

5    following the protocol of the police department, correct?

6    A.  Correct.

7    Q.  And then you go down to the second one up, where it

8    says, Deescalation tactics include, not limited to, using

9    verbal techniques to calm an agitated subject or promote

10   rational decision-making.  Do you see that?

11   A.  I do.

12   Q.  While they were wrestling Mr. Lane and his partner,

13   while they were wrestling with him to get into the squad

14   car, do you remember hearing Thomas Lane at least five times

15   that he would roll the window down?  Do you remember that?

16   A.  I do.

17   Q.  And do you remember him telling George Floyd, "I'll sit

18   in here with you.  I'll be with you"?  Do you remember that?

19   A.  Correct.

20   Q.  And were these -- would you consider those verbal

21   techniques to try and get George Floyd in the squad without

22   further physical confrontation?

23   A.  I would.

24   Q.  And then when -- do you remember also in the video that

25   George Floyd was the one that said he wanted to go down on

1    the ground?  Do you remember that?

2    A.  Yes, when -- yes.

3    Q.  And do you remember Thomas Lane saying, "Let's put him

4    on the ground"?

5    A.  Yes.

6    Q.  And that would be further deescalation of the situation

7    up until that point, correct?

8    A.  Yes.

9    Q.  So then once he was on the ground, do you remember that

10   Thomas Lane was down by his feet, correct?

11   A.  Correct.

12   Q.  He was holding his feet, basically, his legs, correct?

13   A.  Correct.

14   Q.  And up in the front was Derek Chauvin, correct?

15   A.  Correct.

16   Q.  And now we go to 5-311, go to that.  And 5-311 -- did

17   you get there?

18   A.  I did.

19   Q.  Okay.  5-311 is use of neck restraints and chokeholds,

20   correct?

21   A.  Yes.

22   Q.  And at this time, when Thomas Lane was going through the

23   academy, chokeholds were allowed, correct?

24   A.  Correct.

25   Q.  And a neck restraint was also allowed, correct?

1    A.  Yes.

2    Q.  And could you explain to me the conscious -- I'm going

3    to get you down to A, procedural regulations.  The conscious

4    neck restraint may be used against a subject who is actively

5    resisting.  Do you see that?

6    A.  Correct.

7    Q.  And that's what Thomas Lane was taught at this academy,

8    right?

9    A.  Yes.

10   Q.  And when George Floyd was on the ground and he could see

11   that Derek Chauvin was up there by his head and neck and

12   shoulders and he was restraining him perhaps by the neck,

13   was there anything that Thomas Lane would have objected to

14   in that situation?

15   A.  He still had a duty to intervene.

16   Q.  Well, I'm talking about in the beginning when he was

17   resisting, when --

18   A.  Okay.

19   Q.  -- when George Floyd was resisting.  And it says here

20   the conscious neck restraint may be used against a subject

21   who is actively resisting.  Is that what it says?

22   A.  It says that, yes.

23   Q.  Okay.  So when Thomas Lane is down at the bottom, down

24   by the feet, and he sees Derek Chauvin up front, and it

25   looks to him like he's restraining him by the neck, maybe,

1    or by the shoulders, there was a person in between those

2    two, and that was the other officer, Thomas Lane's partner.

3          But at that point in time, while he was resisting,

4    while Derek Chauvin was holding onto his head or his neck or

5    his shoulders and Thomas Lane was down by his feet, there

6    was no need at that time to interfere at all, is there,

7    because that's when he was actively resisting, correct?

8    A.  Not at that moment, correct.

9    Q.  Okay.  That's what I -- now I got to get my --

10          MR. GRAY:  Excuse me a minute, Your Honor.

11   BY MR. GRAY:

12   Q.  Now, after George Floyd was on the ground and -- and I'd

13   say approximately around 3 minutes, Thomas Lane said,

14   "Should we roll him on his side?"  Do you remember that?

15   A.  I do remember that.

16   Q.  And what did Chauvin say?  "No, staying put where we got

17   him."  Lane, "Okay.  I just worry about excited delirium or

18   whatever."  Do you remember him saying that?

19   A.  I remember him saying that, yes.

20   Q.  And you agree, do you not, that Thomas Lane saw all of

21   those videos that Mr. Paule played because he was in that

22   2019 class, correct?

23   A.  Correct.

24   Q.  And after Lane said, "I just worry about the excited

25   delirium or whatever," Chauvin said, "Well, that's why we

1    got the ambulance coming."  Correct?

2    A.  Yes.

3    Q.  And, by the way, one of the rules in this volume, this

4    Government Exhibit 130, is to get medical attention as quick

5    as possible, right?  It's B(1)(b), little (b), medical

6    conditions on deescalation.  Do you see that?

7    A.  Under deescalation, you said?

8    Q.  Well, in that manual -- and I'm not quite sure where,

9    but it says that if somebody -- once you get somebody under

10   control who has an injury, you call an ambulance, EMS,

11   correct?

12   A.  Correct.

13   Q.  And as you saw from the video, Thomas Lane was the one

14   that called the ambulance for Code 2 because he had a cut

15   lip.  Do you remember that?

16   A.  Correct.

17   Q.  And two minutes after that, approximately, Thomas Lane

18   asked or told Tou Thao to up it to a 3.  Do you remember

19   that in the video?

20   A.  Yes.

21   Q.  And that was proper police procedure, was it not?

22   A.  Yes.

23   Q.  And then you also -- excuse me.  And did you also notice

24   that after George Floyd was not actively resisting anymore,

25   that Thomas Lane was not restraining him, he was just there

1    with his hand on his leg?  Do you remember that?

2    A.  Yes.

3    Q.  And do you remember Thomas Lane saying about George

4    Floyd, "I think he's passing out"?  Do you remember that?

5    A.  Yes.

6    Q.  And do you remember him answering his own question,

7    seconds after that, by saying, "He's breathing"?  Do you

8    remember that?

9    A.  Yes.

10   Q.  And then again after a couple minutes, Thomas Lane again

11   said to Derek Chauvin, "Shall we roll him on his side?"  Do

12   you remember that?

13   A.  I do.

14   Q.  And, by the way, let's back up.  There was a hobble

15   mentioned in the beginning.  And do you remember who

16   mentioned that?  It was Thomas Lane, right?

17   A.  Yes.

18   Q.  And when Thomas Lane mentioned that hobble, the

19   experienced officers went looking for it, correct?

20   A.  Correct.

21   Q.  And basically what was said to Thomas Lane was, "Well,

22   if we used the hobble, we'd have to call the sergeant."  And

23   so Thomas Lane backed off, correct?

24   A.  Correct.

25   Q.  And then after the "Should we roll him on his side" for

1   the second time, Thomas Lane asked Kueng, who was checking

2   to see if there was a pulse on his wrist -- and you will see

3   that, that he's checking it, correct, on the video?

4   A.  Yes.

5   Q.  And Lane asked, "Do you got one?"  And Kueng said he

6   can't find the Floyd pulse and we -- right?

7   A.  Correct.

8   Q.  And we learned through this case so far that finding a

9   pulse on the wrist is not anything like finding a pulse on a

10  carotid artery; fair statement?

11  A.  Correct.

12  Q.  And actually finding a pulse on the ankle would be even

13  less of a chance, correct?

14  A.  Yes.

15  Q.  And you know right after Kueng checked the pulse, Lane

16  checked the pulse on the ankle, correct?

17  A.  Yes.

18  Q.  And within nine seconds, approximately, after he checked

19  the pulse there was, by Lane, "There we go."  And the

20  ambulance is arriving, correct?

21  A.  Yes.

22  Q.  And after the ambulance --

23          MS. BELL:  Objection Your Honor.  Misstates the

24  video.

25          MR. GRAY:  Excuse me?

```
 1                 MS. BELL:  Misstates the evidence.

 2                 MR. GRAY:  I will rephrase the question, judge.

 3                 THE COURT:  Okay.

 4     BY MR. GRAY:

 5     Q.  Within seconds after Lane checked the ankle, the

 6     ambulance -- you can hear the sirens and the lights and the

 7     ambulance was arriving, right?

 8     A.  Yes.

 9     Q.  Okay.  And after the ambulance arrived, Derek Smith got

10     out of the ambulance and told the guys to move away,

11     correct?

12     A.  Is that the paramedic?

13     Q.  Yes.

14     A.  I don't know the names.

15     Q.  Okay.  I'm sorry.

16     A.  So paramedic, yes, got out of the ambulance.

17     Q.  Because he was taking over.

18     A.  Yes.

19     Q.  And what the paramedic did first off is check his

20     carotid artery, correct?

21     A.  Yes.

22     Q.  Now, when he did this -- first of all, when you back up,

23     he walked over to George Floyd to do that, correct?

24     A.  Yes.

25     Q.  And then after doing that -- he said nothing to anybody,
```

```
 1    nothing to the police officers at that time, correct?
 2    A.  Correct.
 3    Q.  And then he went back into his ambulance and brought out
 4    the stretcher, whatever it is called, the gurney, a
 5    stretcher, correct?
 6    A.  Yes.
 7    Q.  Now, did you notice on the video what Thomas Lane did
 8    while he went in there?  Did you notice that he grabbed
 9    George Floyd's leg and tried to flip him over?  Did you
10    notice that?
11    A.  I don't remember that part.
12    Q.  In any event, the paramedic, Derek Smith, came out with
13    the stretcher, correct?
14    A.  Yes.
15    Q.  He walked out, right?
16    A.  Yes.
17    Q.  Didn't look like he was in a hurry, correct?
18    A.  No.
19    Q.  And he -- he put the stretcher down, and the officers
20    helped him put Mr. Floyd on the stretcher, correct?
21    A.  Yes.
22    Q.  And that was the first time that George Floyd was put on
23    his back where you can see his face, correct?
24    A.  Yes.
25    Q.  And once he was on the stretcher, the officers -- or the
```

1   officers helped to put him in the ambulance, correct?

2   A.   Correct.

3   Q.   But before Derek Smith went in the ambulance, Thomas

4   Lane asked, "Should I go along, should I roll with you,"

5   correct?

6   A.   Yes.

7   Q.   And that would have been important, right, because there

8   were only two paramedics, correct?

9   A.   Yes.

10   Q.   And one of the paramedics has to drive the ambulance;

11   fair statement?

12   A.   Yes.

13   Q.   And the reason the paramedic had to drive the ambulance

14   was because the paramedics had made a decision to load and

15   go, correct?

16   A.   Yes.

17   Q.   And that was because of the disturbance around that area

18   with the people watching?

19           MS. BELL:   Objection.   Lack of foundation as to

20   what's in the mind of the paramedics.

21           THE COURT:   Overruled.   It's cross-examination of

22   a subject previously covered.   Proceed.

23   BY MR. GRAY:

24   Q.   Is that right?

25   A.   I'm not sure why the paramedics pulled out so quickly.

1    I thought it was because he didn't have a pulse.

2    Q.  All right.  So what was that?  Because he didn't have a

3    pulse?

4    A.  At some point in the back of the ambulance, George Floyd

5    did not have a pulse when he asked him to do CPR.

6    Q.  Okay.  And did you watch the Thomas Lane video when he

7    went into the ambulance himself?

8    A.  Yes.

9    Q.  And did you see the first thing Thomas Lane did was

10   check the carotid artery, correct?

11   A.  Yes, yes.

12   Q.  And then he talked with Derek Smith, the paramedic, and

13   he started doing chest compressions, correct?

14   A.  Yes.

15   Q.  Thomas Lane did --

16   A.  Yes.

17   Q.  -- is that right?

18   A.  Correct.

19   Q.  And he stayed in that ambulance and helped out and did

20   the chest compressions and after this assisted Derek Smith,

21   the paramedic, with putting on a LUCAS.  You remember that,

22   don't you?

23   A.  Yes.

24   Q.  And then after the fire people came and they were parked

25   and there were two paramedics, he asked if he could stay and

1   go down to the hospital with them; isn't that right?

2   A.  Yes.

3   Q.  And they said, no, we don't need you anymore.  So he got

4   out of the ambulance and got a ride back to where his

5   partner was, correct?

6   A.  Correct.

7   Q.  By him going in that ambulance, that was -- that George

8   Floyd -- after the paramedic took over, George Floyd was no

9   longer in the custody and care of Thomas Lane or any other

10  officer, correct?

11  A.  Correct.

12  Q.  And he, Thomas Lane, went above that and decided to help

13  the paramedics out by trying to revive George Floyd,

14  correct?

15  A.  Correct.

16  Q.  Let's go back to one other subject.  With respect to

17  Derek Chauvin, you testified -- if I can find my -- you

18  testified that you were involved in selecting the field

19  training officers, correct?

20  A.  Yes.

21  Q.  And you testified also that you checked the internal

22  affairs complaints against these officers, correct?

23  A.  I send the names off to internal affairs.

24  Q.  Excuse me?

25  A.  I send the names of the FTO applicants to internal

1    affairs, and then a brief synopsis generally comes back to

2    me, the training division commander.  At the time I was a

3    lieutenant.

4    Q.  Okay.

5    A.  And then to the deputy chief of professional standards.

6    Q.  But you did testify you checked with internal affairs

7    about these field training officers, correct?

8    A.  Correct.

9    Q.  And did you check Derek Chauvin's internal affairs

10   record?

11   A.  I submitted the names and then the --

12   Q.  Well, what happened?  Did it come back?  Did it show all

13   of his complaints?

14             MS. BELL:  Objection, Your Honor.

15             MR. GRAY:  You don't disagree with me, do you,

16   that he had numerous complaints?

17             MS. BELL:  Objection, Your Honor.

18             THE COURT:  Now we're arguing, counsel.

19             MR. GRAY:  All right.  I'll withdraw it.

20             THE COURT:  The first question I'll overrule.  I

21   sustain the objection on the second part.

22             MR. GRAY:  Okay.

23             THE COURT:  Because I believe the testimony is

24   that, yes, she did get some kind of a report back.

25             MR. GRAY:  Yes.  Okay.  I'll do that.

1    BY MR. GRAY:

2    Q.  Did you get a report back from -- about Derek Chauvin?

3    A.  At the time it would have went to the -- I was a

4    lieutenant when those -- so the commander of the training

5    division at that time got those back.

6    Q.  You testified under oath that you reviewed the internal

7    affairs files of the field training officers when you took

8    over, correct?

9    A.  We get a brief synopsis of what -- I don't get the whole

10   internal affairs file, but, yes, I think I answered the

11   question.

12   Q.  I assume you checked the brief synopsis.  What did that

13   tell you?  Do you remember?

14   A.  I don't remember specifically, but it didn't -- I didn't

15   see any red flags.

16   Q.  You didn't?

17   A.  No.

18   Q.  Was he the -- was he in your -- after reviewing this,

19   was he one of the highest caliber to serve as a field

20   training officer?

21   A.  I wouldn't know.

22   Q.  Well, we have the Minneapolis Police field training

23   officer handbook, right?

24   A.  Yes.

25   Q.  And you're involved in that, correct?

```
1    A.  Yes.

2    Q.  Yeah.  And it says here -- and, of course, this is for

3    the officers in training to read, correct?

4    A.  Correct.

5    Q.  About this.  And it says here the FTO program is to

6    select and retain experienced officers of the highest

7    caliber to serve as field training officers and field

8    training sergeants.  That's what it says, right?

9    A.  Yes.

10   Q.  And so that would tell the officers in training, like

11   Mr. Lane, that these guys are gold, correct?  These are the

12   guys we follow.  They're role models, correct?

13   A.  They should be.

14   Q.  In fact, it says it in here that the field training

15   officers are role models, does it not?

16   A.  Yes.

17   Q.  And back at this time when -- when the training was

18   going on in 2019, when Thomas Lane received this training,

19   they were told pretty much that the commanders, the

20   sergeants, to lieutenants, field training officers, you

21   don't question them.  They tell you to do something, you do

22   it, within reason, of course.  Is that right?

23   A.  Generally.

24   Q.  Generally?

25   A.  Yes.
```

1   Q.  It's "Yes, sir; no, sir," right?

2   A.  Not to everything.

3   Q.  Or "Yes, ma'am."  Excuse me.

4   A.  Thank you.

5   Q.  All right.  And that's what they're taught, right?  They

6   have to stand at attention.  When a couple of officers walk

7   down the academy, they stand back and at attention, correct?

8   A.  At that time we had changed it, but it clearly -- it was

9   happening at some point.

10  Q.  Well, I'm talking about 2019.  If they changed it now,

11  great.  But back then --

12  A.  No.  I changed it back then.  It just clearly -- it took

13  a little bit to get changed to stop.

14  Q.  It took a little while to adjust?

15  A.  Yes.

16  Q.  You also, in the field training book, describe field

17  training officers as professionals with communication

18  skills, establish them as role models.  That says that in

19  there too, doesn't it?

20  A.  It does.

21  Q.  And we've learned since then that Derek Chauvin was not

22  really a role model?

23          MS. BELL:  Objection.  Objection.

24          MR. GRAY:  I'll withdraw it, Your Honor.  I'm

25  done.

1      THE COURT:  Okay.

2      MS. BELL:  Your Honor, can we have a sidebar,

3  please?

4      THE COURT:  Sure.

5      MS. BELL:  Thank you.

6      **(At sidebar)**

7      MS. BELL:  Your Honor, I would request that

8  counsel be advised they have actually on multiple occasions

9  now implied that there was something in Derek Chauvin's file

10  that made him inappropriate to be a field training officer.

11  There is no such evidence in this case and implying that is

12  not appropriate.  And then withdrawing the question when I

13  make the objection after they've already asked the question,

14  I would ask the court to remind them not to do that.

15      MR. GRAY:  Well, may I respond, Your Honor?

16      THE COURT:  Sure.

17      MR. GRAY:  We learned after this incident that

18  Derek Chauvin did the same thing back in 2017.  In fact,

19  that was a 15-minute knee on the neck.

20      MS. BELL:  However, that was not in his file and

21  that is not information that this person would have.  And

22  you cannot ask this person a question for which she has no

23  foundation.

24      MR. GRAY:  How do we know it wasn't in his file?

25  We can't see his file.  That's I --

 1                 MS. BELL:  Because there was no internal affairs,

 2        and you've been provided the final --

 3                 THE COURT:  Okay.  Counsel, let's stop the

 4        argument.  We're at the point that we are, and I will advise

 5        counsel that you need to be able to support the questions

 6        that are presented, but aside from that, it also is

 7        cross-examination and they have the right to do that.

 8                 MS. BELL:  Correct, Your Honor.  My concern is

 9        they just implied something that is not accurate.

10                 THE COURT:  With that, counsel, do you have

11        redirect?

12                 MS. BELL:  I do, Your Honor.  And I think maybe it

13        might make sense to take lunch versus me start for five

14        minutes.

15                 MR. PLUNKETT:  Your Honor, Tom Plunkett speaking

16        just to fill out the record.  In his file there is a

17        psychological evaluation that says, "His ability to work

18        closely with team members should be monitored during

19        training and that others may not see him as particularly

20        friendly or warm.  His ability to be supportive to citizens

21        in times of stress should be monitored."  She's already

22        testified that this wasn't considered.

23                 I want to be clear when I asked about it, that is

24        a good-faith basis.  And I feel like the implication was

25        that both -- or all three of us have done that.  So I just

```
 1    want to make sure the record is clear.
 2              MS. BELL:  My concern is that we don't -- haven't
 3    laid foundation that she would have ever seen that before
 4    the question was asked.
 5              THE COURT:  Counsel.  Counsel.  Counsel.
 6    Arguments going back and forth aren't doing any of us any
 7    good.  Let's take our noon break at this time.
 8         (In open court)
 9              THE COURT:  Members of the jury, we're going to
10    take a noon recess at this time.  We will stand in recess
11    until 2:00 this afternoon.  Again, please don't discuss the
12    case among yourselves and others.  And we are in recess for
13    the noon break.
14         (Lunch recess taken at 12:25 p.m.)
15                         *  *  *  *  *
16         (2:00 p.m.)
17                        IN OPEN COURT
18                       (JURY PRESENT)
19              THE COURT:  You may be seated.
20              Ms. Bell.
21              MS. BELL:  Thank you, Your Honor.
22                      REDIRECT EXAMINATION
23    BY MS. BELL:
24    Q.  Good afternoon.
25    A.  Good afternoon.
```

1    Q.  All right.  I want to start out by talking to you about

2    Defense Exhibit T-14, which was the -- here, I'll just put

3    it up on the screen so we're all on the same page.

4             Do you see that there, the 2019 Phase III

5    Defensive Tactics - Instructor Development; do you see that?

6    A.  I do.

7    Q.  And this is for 2019 Phase III class; is that right?

8    A.  Correct.

9    Q.  And Mr. Paule pointed to you -- pointed to some drills

10   that start on page 5.  Let me get there for you.  Do you see

11   that?

12   A.  I do.

13   Q.  And specifically I wanted to ask you what these are.

14   Are these Taser 7 firing drills?

15   A.  Taser 7 is just the name of the Taser that was used at

16   the time.

17   Q.  And are these drills drilling when to use a Taser, I

18   guess is my question?

19   A.  Correct.

20   Q.  Okay.  And so these -- I think we saw two -- maybe four

21   scenarios.  Does that sound right?

22   A.  Sounds right.

23   Q.  Okay.  Now, when officers -- let me ask you this.  Are

24   they required to practice their Taser firing in order to be

25   qualified to use a Taser?

1    A.  Yes.

2    Q.  And so that was part of the 2019 Phase III defensive

3    tactics; is that right?

4    A.  Yes.

5    Q.  Now, do you recall Mr. Paule, if we turn -- looking at

6    the bottom of page 5, asking you some questions about

7    Scenario number 2, which involved a person on the 10th floor

8    in a small room, sweating profusely, removing clothing, and

9    breaking out windows; do you remember that?

10   A.  I do.

11   Q.  And do you remember that Mr. Paule turned it, then, to

12   page 6 and looked at the top of page 6 and asked you

13   questions about the fact that there was no medical training

14   included in this train the trainer document; is that right?

15   A.  Yes.

16   Q.  Are the people attending the 2019 Phase III in-service,

17   like Officer Thao, are they actually working off this train

18   the trainer document?

19   A.  No.

20   Q.  And so if we actually look at the training from the 2019

21   Phase III defensive tactics that Mr. Thao attended, and that

22   would be Government's Exhibit 63 -- excuse me.  I'm going to

23   pull up starting at page 35.  And do you see where it says

24   at the top of page 35, Use of conducted energy weapons?

25   A.  Yes.

1    Q.  What is a conducted energy weapon?

2    A.  It's a Taser.

3    Q.  So this is the PowerPoint about Tasers; is that right?

4    A.  Yes.

5    Q.  And so is this the training that Officer Thao actually

6    would have seen about Tasers?

7    A.  Yes.

8    Q.  In the classroom, that is.

9    A.  Yes.

10   Q.  Okay.  And then he would have done those scenarios on

11   the mat or for practice; is that right?

12   A.  Yes.

13   Q.  Okay.  And you were asked about if there was medical on

14   the trainer -- train the trainer document, Defense

15   Exhibit T-14, and you said there wasn't, right?

16   A.  Not that I'm aware of.

17   Q.  But let's take a look at this use of conducted energy

18   devices, and I'm just going to scroll through.  There are

19   several pages in here.  In fact, on page 46 was there

20   training provided to Officer Thao with respect to medical

21   aid related to the deployment of a Taser?

22   A.  Yes.

23   Q.  And what was taught to Officer Thao?

24   A.  It's post-exposure treatment.  This is a list of things

25   that you must do when you are doing -- after you use your

1   Taser, you deploy it on someone, you have to determine if

2   the subject is injured, requires paramedics, render medical

3   aid consistent with training, request an EMS response or

4   paramedic response for evaluation, request EMS response for

5   probe removal.  When you shoot a Taser, there's two darts.

6   So problem removal, especially if they are in sensitive

7   areas: face, groin, neck, breast areas.  And then wear

8   protective gloves and remove probes from the person's

9   nonsensitive body parts.

10  Q.  And going down to page 47, you don't have to read all

11  these, but is this further information on post-exposure

12  treatment and medical aid after Taser use?

13  A.  Correct.

14  Q.  Now, I wanted to go back up to page 45 and ask you

15  specifically about the training with respect to whether or

16  not you can use a Taser on someone who is already

17  handcuffed.

18  A.  So in the following situations, a Taser should not be

19  used unless the use of deadly force would otherwise be

20  permitted.

21  Q.  So unless it's a deadly force situation?

22  A.  Yes.  And then there's some other requirements.  If

23  they're in an elevated position, you wouldn't want them to

24  fall on some other operating vehicles, things like that.

25  Q.  But generally what is the training, assuming we're not

```
 1    in a deadly force position, about whether or not an officer

 2    can use a Taser on a handcuffed person?

 3    A.  You should not.

 4    Q.  So the remainder of the training, the medical, assumed

 5    you used a Taser on a non-handcuffed person; is that right?

 6    A.  Correct.

 7    Q.  All right.  Now, what does it mean to render medical aid

 8    consistent with training?

 9    A.  It means looking at someone's airway, breathing,

10    circulatory, meaning pulse.  Just evaluating them, their

11    medical condition at the time, if they're conscious or not.

12    Q.  And what is the training on what officers should do if

13    they Tase someone and then get them handcuffed while they

14    are in the prone position?

15              THE COURT:  Counsel, what are we doing spending

16    all this time on a Taser?

17              MS. BELL:  Well, Your Honor, defense counsel

18    raised the Taser training.

19              THE COURT:  Okay.  They had cross-examination.

20    That's one thing.  We're on redirect.

21              MS. BELL:  Correct, Your Honor, and I'm clearing

22    up whether there was medical training associated with the

23    Phase III defensive tactics.

24              THE COURT:  Okay.  Then why aren't we doing that?

25              MS. BELL:  That's what I am doing --
```

1    THE COURT:  Okay.  Then let's do that now.

2    MS. BELL:  -- I think.  I hope.

3    BY MS. BELL:

4    Q.  All right.  And so what is the medical training with

5    respect to what you do with someone who has been Tased and

6    then now they're handcuffed if they are in the prone

7    position?

8    A.  Roll them on their side, assess them, make sure that --

9    if they're injured or not.

10   Q.  Why do you have to roll them on their side after they've

11   been Tased and handcuffed?

12   A.  If they're in the prone position, you need to be rolled

13   onto your side.

14   Q.  Why is that?

15   A.  Because of the dangers of positional asphyxia.

16   Q.  And what is the training on what officers should do if

17   they Tase someone who they suspect as excited delirium, as

18   in the scenario that Mr. Paule talked to you about, after

19   they get them handcuffed?  What's the training?

20   A.  Roll them on their side in the side recovery position,

21   get them off their chest because of the dangers of

22   positional asphyxia, sit them upright when necessary, and

23   call EMS if needed.

24   Q.  All right.  Now, we spent a bunch of time looking at an

25   excited delirium PowerPoint.  Do you remember all that?

```
1    A.  I do.

2    Q.  Okay.  Who in your division teaches that PowerPoint

3    about excited delirium?

4    A.  Nicole Mackenzie.

5    Q.  And what's the purpose of that PowerPoint?

6    A.  The purpose of the PowerPoint on excited delirium is to

7    show the dangers of and the behaviors of a person that is

8    going -- if they have excited delirium, so it's all the

9    symptoms they might display and then what we should be

10   doing, watching out for, observing, and then follow-up care

11   where needed.

12   Q.  Okay.  And I think you mentioned this, but was that

13   PowerPoint -- was any purpose of that PowerPoint to teach

14   defensive tactics?

15   A.  No.

16   Q.  Now, as I understood your testimony about the

17   PowerPoint, there seems to be some, I guess, disagreement

18   about excited delirium and its applicability?

19   A.  Yes.

20   Q.  But even despite that disagreement, does MPD, in fact,

21   train officers on the signs?

22   A.  Yes.

23   Q.  Why do you want officers to know the signs?

24   A.  Because if you're dealing with somebody that is

25   displaying signs of excited delirium, it can be very
```

1    dangerous.  There's been in-custody deaths noted from

2    overheating.  So just identifying those signs and how you

3    respond and how quick you should get medical, EMS,

4    afterwards.

5    Q.  Okay.  And so we saw several videos as part of that

6    PowerPoint.  Do you recall those?

7    A.  Yes.

8    Q.  About how many videos do you think we saw?

9    A.  Probably five or six.

10   Q.  In any of the videos that we watched, what, if anything,

11   did the videos show about what happened after the officers

12   were able to get the person handcuffed and under control?

13   A.  Some videos showed that the officers put them on their

14   side and got them upright or they stopped the force.

15   Q.  And would that be consistent or inconsistent with MPD

16   policy and training?

17   A.  That would be consistent.

18   Q.  What was the purpose of the videos being played in the

19   first place?  What was it to show?

20   A.  The behaviors that somebody exhibits when they are in an

21   agitated state as excited delirium.

22   Q.  And were those videos from things that happened at

23   Minneapolis Police Department?

24   A.  No.

25   Q.  Was it one of the purposes of the videos -- well, so

1   there were a number of videos showed during that NOTACRIME

2   acronym.  Do you remember that?

3   A.  Yes.

4   Q.  Okay.  And so was it one of the purposes of the videos

5   shown during that NOTACRIME acronym to actually show what to

6   do after the person is handcuffed and under control?

7   A.  Yes.

8   Q.  And what was shown -- oh, I think you said on some of

9   those videos they showed them stopping?

10  A.  Correct.

11  Q.  Now, can you explain the difference between tactics that

12  can be used when someone is engaged in an active struggle

13  with a suspect versus after that suspect is controlled and

14  the struggle is over?

15  A.  They have to use the appropriate level of force

16  necessary to effectively put somebody in handcuffs and then

17  stop that force when the person is not resisting.

18  Q.  And so might it be a circumstance where you, under MPD

19  policy and training, you might use your knees to gain

20  control of a suspect to handcuff them?

21  A.  Yes.

22  Q.  What kind of circumstances would that be?

23  A.  If you're -- if the person is still showing active

24  resistance, even parts of active aggression where they're

25  combative or they're not complying with the officer -- the

1   officer's commands to effectively get them into custody.

2   Q.  And what do you mean by "get them into custody"?

3   A.  Handcuffing them.

4   Q.  Okay.  So this training about using the knees to gain

5   control is to gain control to handcuff?

6   A.  Correct.

7   Q.  I see.  And then what are officers trained to do if they

8   had to use a knee to control someone to get them handcuffed

9   once things have settled down?

10   A.  Well, once they have handcuffs on and things settle

11   down, then it's the side recovery position, and then

12   generally followed by upright, EMS if required.

13   Q.  And the training, I know the excited delirium

14   training -- like the first large number of slides were about

15   that acronym; is that right?

16   A.  Yes.

17   Q.  Okay.  And so that was to show the behaviors that you

18   might see?

19   A.  Yes.

20   Q.  And then we got to slide number 31.  And what was the

21   purpose -- I put it up on the screen -- of slide number 31?

22   A.  So the purpose of this slide was to show the medical

23   component to it.  So once they're in handcuffs, it's to put

24   them in the side recovery position because of the dangers of

25   positional asphyxia, get, you know, paramedics on scene

1   quickly, monitor, and sign a transport hold if need be.

2   Q.  Is this slide actually entitled, Okay.  They Are in

3   Handcuffs.  Now What?

4   A.  Yes.

5   Q.  Is the "Now what?" ever to leave them handcuffed

6   facedown on the ground?

7   A.  No.

8   Q.  Why not?

9   A.  Because then the dangers of them not -- or going

10  unconscious or not breathing would be higher.

11  Q.  You were asked some questions about the need to continue

12  to restrain someone if you expected excited delirium.  Do

13  you remember those questions?

14  A.  Yes.

15  Q.  And what are officers trained to do if they suspect

16  someone has excited delirium and that person continues to

17  either hurt themselves or others?

18  A.  It is to get them in handcuffs.  If you have to, go

19  through other resources that you have, to include using the

20  MRT, the maximal restraint technique, which is the hobble.

21  Q.  What are officers trained to do with someone who they

22  suspect might have excited delirium if that person becomes

23  compliant?

24  A.  To stop using any type of force.

25  Q.  Why?

1    A.  There's no need to at that point.  It would be an

2    inappropriate use of force to continue to do so.

3    Q.  So even if you suspect that somebody has excited

4    delirium, if that person becomes compliant, you should stop

5    using force?

6    A.  Correct.

7    Q.  What if you're thinking, well, maybe they'll at some

8    point get combative again?

9    A.  Well, then that would -- they would start -- that would

10   be another force that they're displaying and then we would

11   use our use of force continuum as well.  So then you could

12   use force.

13   Q.  So am I understanding that you have to stop the force

14   until they display something again that triggers it?

15   A.  Correct.

16   Q.  Okay.  You were also asked about EMS sometimes having to

17   stage elsewhere if there's certain circumstances; is that

18   right?

19   A.  Yes.

20   Q.  And what would the circumstances be where EMS would need

21   to stage somewhere else?

22   A.  So sometimes if the scene is not safe yet, we will have

23   an ambulance staged nearby until we render that scene safe.

24          Sometimes we are proactive about calling EMS to

25   stage nearby because we don't know what the situation is

1    going to -- if we're going to need medical or not, so we

2    proactively call them and stage nearby.

3    Q.  And if someone is not -- well, let me ask you this.  I

4    think we've heard that you render a scene safe -- or when a

5    scene is safe, you call out Code 4?

6    A.  Correct.

7    Q.  And so if a scene is Code 4, then is the ambulance able

8    to come right to the scene?

9    A.  Yes.

10   Q.  You were also asked some questions specifically about

11   restraining someone while waiting for EMS.  What is the MPD

12   policy and training on restraining someone while waiting for

13   EMS?

14   A.  Just restrain them.  You know, if they're in handcuffs,

15   it's still our policy that you have to put them in the side

16   recovery and just monitor them until the ambulance gets

17   there.

18   Q.  Because handcuffs themselves are a form of restraint

19   already; is that right?

20   A.  Correct.

21   Q.  And so you said that you need to put them in side

22   recovery and monitor them.  Does that apply even if you are

23   waiting for EMS?

24   A.  Yes.

25   Q.  Even if they are on the way?

```
 1    A.  Yes.

 2    Q.  Now, in this -- you were asked some questions about the

 3    video of this particular incident on May 25th, 2020.  In

 4    reviewing that video, did you observe whether Mr. Floyd was

 5    wearing clothes?

 6    A.  I did.

 7              THE COURT:  Counsel, would you repeat?  Your voice

 8    dropped off and I didn't get the last word.

 9              MS. BELL:  I'm sorry.

10              MS. BELL:  Did you observe whether Mr. Floyd was

11    wearing clothes?

12              THE COURT:  Okay.

13              THE WITNESS:  Yes.

14    BY MS. BELL:

15    Q.  And was he wearing clothes?

16    A.  He was.

17    Q.  And in your review of the video, did you observe

18    Mr. Floyd breaking any objects?

19    A.  No.

20    Q.  Did you observe -- I know we saw in the videos on

21    excited delirium somebody like punching through a fence.

22    Did you see Mr. Floyd do anything like punching through a

23    fence?

24    A.  No.

25    Q.  Did you see him hit anyone?
```

1    A.  No.

2    Q.  During your review of the video, did you observe

3    Mr. Floyd target any glass?

4    A.  No.

5    Q.  On your review of the video, was Mr. Floyd covered in

6    blood, like we saw in the videos, from any sort of injuries

7    that happened before the officers arrived?

8    A.  No.

9    Q.  Did you observe officers in the video needing to use

10   Mace or a baton with Mr. Floyd?

11   A.  No.

12   Q.  And I want to talk to you about one of the videos that

13   we saw.  I don't know if you remember this one, but there

14   was -- and I don't want to replay it -- there was a guy who

15   would end up on the ground and then he was able to get his

16   hands underneath him and his knees and push up, and there

17   were a couple of officers that he kind of pushed off

18   himself.  Do you remember that video?

19   A.  I do.

20   Q.  Okay.  Was that person handcuffed when he was able to do

21   that?

22   A.  No.

23   Q.  And did you observe whether or not Mr. Floyd was able to

24   push the officers off of himself, like the man in that

25   video?

1   A.  It appeared he could not.

2   Q.  During your review of the video, did you observe

3   Mr. Floyd make any expressions of pain?

4   A.  Yes.

5   Q.  What kinds of expressions?

6   A.  His facial expressions, wincing, kind of fidgeting

7   around.

8   Q.  What about verbal expressions of pain?

9   A.  Grunting.

10  Q.  During your review of the video, did you observe whether

11  or not Mr. Floyd was able to provide his name and date of

12  birth to the officers when asked?

13  A.  Yes.

14  Q.  And was he able to do so?

15  A.  Yes.

16  Q.  Now, Mr. Gray asked you a number of questions about what

17  you observed on the video up to the point that Mr. Floyd was

18  on the ground and no longer resisting, and then he also

19  asked you some questions about what happened after the

20  ambulance arrived.  Do you remember that?

21  A.  Yes.

22  Q.  I'm going to ask you some questions about what happened

23  after Mr. Floyd was on the ground and handcuffed and not

24  resisting but before the ambulance arrived.  Okay?

25  A.  Okay.

1   Q.  Did there come a time in your review of the video that

2   you observed that Mr. Floyd was on the ground and handcuffed

3   and not resisting?

4   A.  Yes.

5   Q.  And what would be the training requirements of the

6   officers on scene if Mr. Floyd is handcuffed and no longer

7   resisting?

8   A.  To stop using any force, roll him on his side for side

9   recovery, and sit him upright if you can.

10  Q.  And what did you observe on the video during those

11  minutes after Mr. Floyd had stopped -- was handcuffed and

12  not resisting but before the ambulance arrived?

13  A.  He was unconscious.

14  Q.  During that time period was there a period of time when

15  Mr. Floyd was still talking, that you observed?

16  A.  Yes.

17  Q.  And so while he was still talking and had stopped

18  resisting, what did you see Mr. Chauvin doing?

19  A.  He was putting his knee on his neck.

20  Q.  And was that consistent or inconsistent with MPD

21  training?

22  A.  It's inconsistent.

23  Q.  Why is that?

24  A.  Because we don't train the knee on the neck.

25  Q.  Separate from not training the knee on the neck, if

1    Mr. Floyd has stopped resisting, what is the training with

2    respect to use of force?

3    A.  To stop using any force.

4    Q.  Now, you also testified, I think earlier, that Mr. Floyd

5    at some point stopped talking; is that right?

6    A.  Yes.

7    Q.  When Mr. Floyd stopped talking, where was Mr. Chauvin at

8    that point?

9    A.  He was still on his neck.

10   Q.  And what, if any, significance did the fact that

11   Mr. Floyd stopped talking have to you?

12   A.  It means that probably he was having trouble breathing.

13   Q.  Why is that?

14   A.  Because he was talking a lot and then he would just stop

15   talking, so his airway appeared to be obstructed.

16   Q.  What did you observe Mr. Lane do, if anything, when

17   Mr. Floyd stopped talking?

18   A.  Nothing.

19   Q.  Now, you also mentioned that at some point Mr. Floyd

20   went unconscious; is that right?

21   A.  Yes.

22   Q.  Where was Mr. Chauvin at this point?

23   A.  Still on his neck.

24   Q.  And what did you observe Mr. Lane do when Mr. Floyd went

25   unconscious?

```
 1    A.  Nothing.  I think he suggested at some point to roll him
 2    over, but he didn't do any, like, actions to do anything.
 3    Q.  Well, let me ask you about that.  What was Mr. Lane
 4    trained to do if someone went unconscious in his custody?
 5    A.  To check their pulse, to medically assess them, do CPR
 6    if the person stopped breathing, roll them on their side
 7    before that, you know, medically assess them.
 8    Q.  And you said roll them on their side before they stopped
 9    breathing; is that right?
10    A.  Correct.
11               MR. GRAY:  Object to that as leading, Your Honor.
12               THE COURT:  That is leading.  I sustain.  Strike
13    the question.
14               MR. GRAY:  Ask that the answer be disregarded.
15               THE COURT:  Disregard it.
16               MS. BELL:  Just following up.
17    BY MS. BELL:
18    Q.  And so when you -- so you mentioned that Mr. Lane said
19    something; is that right?
20    A.  Yes.
21    Q.  But then you said -- what did you mean when you said but
22    he didn't do anything?
23    A.  He didn't take any action to stop -- physically stop the
24    inappropriate force that was being used or when no force was
25    necessary.
```

```
1    Q.  And so does he have an obligation to do more than just

2    say something under the training and policy?

3              MR. GRAY:  Object as leading, Your Honor, and --

4              THE COURT:  That is leading.

5         (Simultaneous indiscernible crosstalk)

6              MR. GRAY:  -- opinion of the witness.

7              THE COURT:  Well, that's an opinion.  I'm sorry.

8    It's an improper opinion at this point.

9    BY MS. BELL:

10   Q.  Based on training and policy, what does the duty to

11   intervene require?

12   A.  It requires the officer must stop or attempt to stop an

13   inappropriate force being used or when force is no longer

14   required.

15   Q.  And so in what circumstances would you attempt to stop?

16   A.  When you see the inappropriate amount of force is being

17   applied by another officer or when there's absolutely no

18   need to use force anymore, when the person is not resisting,

19   they're -- they're not resisting.

20   Q.  And so what circumstances -- or what does the policy and

21   training teach about the attempt to stop?

22   A.  The policy just says make an attempt to stop the other

23   officer.

24   Q.  And what does that mean?

25   A.  Either that you have to do something physically or
```

```
1    verbally to jump in there and stop the person, whether --

2              MR. GRAY:  Object to that, Your Honor, and move it

3    be stricken as a conclusion of the witness.

4              THE COURT:  I'm going to sustain.  I think that's

5    the province of the jury.

6    BY MS. BELL:

7    Q.  Under MPD policy and training, what are officers trained

8    to do or required to do if the force doesn't stop --

9              MR. PLUNKETT:  Objection.  Asked and answered.

10             THE COURT:  I sustain.  We're going over the same

11   territory, counsel.

12   BY MS. BELL:

13   Q.  In your review of the video, did you notice a time when

14   the officers were discussing that Mr. Floyd had no pulse?

15   A.  Yes.

16   Q.  And where was Mr. Chauvin at that point?

17   A.  Still on George Floyd's neck.

18   Q.  And what did you observe Officer Lane do when Mr. Floyd

19   had no pulse?

20   A.  Nothing.

21   Q.  Now, Mr. Gray asked you some questions about the time

22   period after custody had been transferred to the paramedics

23   and Mr. Floyd was in the ambulance.  Do you remember those

24   questions?

25   A.  I do.
```

1    Q.  At that time did you observe Mr. Lane performing CPR at

2    the request of the paramedic?

3    A.  I did.

4    Q.  What, if anything, did you see Mr. Lane do to render

5    medical aid to Mr. Floyd while he was in police custody?

6    A.  Nothing.

7    Q.  What, if anything, did you see Mr. Kueng do to render

8    medical aid to Mr. Floyd while he was in police custody?

9    A.  Nothing.

10   Q.  And what, if anything, did you see Mr. Thao do to render

11   medical aid to Mr. Floyd while in police custody?

12   A.  Nothing.

13   Q.  Now, I wanted to follow up on -- you were asked some

14   questions about neck restraints in particular.  And let me

15   see if I can get the defense exhibit up on the screen.

16   Okay.  I've pulled up page 43 of Defense Exhibit K-A, I

17   think is what it is.  Let me double-check.  K-A.  Do you

18   recall being asked some questions about neck restraints?

19   A.  Yes.

20   Q.  And also some questions, I guess, about chokeholds as

21   well; is that right?

22   A.  Yes.

23   Q.  Okay.  When can you use a chokehold?

24   A.  During a deadly force situation.

25   Q.  And what odes "a deadly force situation" mean?

```
 1    A.  Meaning when the officers faced with death or great

 2    bodily harm.

 3    Q.  Are there any limits placed on when you can use neck

 4    restraints?

 5    A.  Yes.

 6    Q.  All right.  And so let's take a look at the conscious

 7    neck restraint.  Do you see that part there?

 8    A.  I do.

 9    Q.  What is meant by applying light to moderate pressure?

10          MR. ROBERT PAULE:  Your Honor, this has been asked

11    and answered.  I object.

12          THE COURT:  It has, counsel, and I sustain.

13          MS. BELL:  Your Honor, may we have a sidebar?

14          THE COURT:  No.

15    BY MS. BELL:

16    Q.  I'm inquiring about questions Mr. Gray asked you about

17    conscious neck restraints.

18          THE COURT:  Counsel?

19          MS. BELL:  Yes.

20          THE COURT:  We have looked at this document and

21    looked at this document.  I think it speaks for itself, and

22    I don't know why we're going back over that same territory.

23          MS. BELL:  All right, Your Honor.  Thank you.

24    BY MS. BELL:

25    Q.  During your questioning of -- or Mr. Gray's questioning,
```

1    you made a comment at one point that -- you said you still

2    have a duty to intervene.  What did you mean?

3              MR. GRAY:  Object to that, Your Honor.  It speaks

4    for itself.  She's already gone over it once.

5              THE COURT:  I sustain, counsel.

6              MS. BELL:  Your Honor, I'm asking --

7              THE COURT:  Just a few minutes ago we went over

8    this, from you.

9              MS. BELL:  I understand, Your Honor.  I was trying

10   to clarify what she meant in response to Mr. Gray's

11   question.

12             THE COURT:  I think that's what was asked before.

13   I have to admit I haven't memorized the transcript, but I

14   think that's what was asked before.

15             MS. BELL:  Okay.

16   BY MS. BELL:

17   Q.  As a general matter, what is -- understanding you have

18   medical trainers who have that extra training, but generally

19   what is the training provided to officers about the speed or

20   the timing necessities as it relates to CPR?

21   A.  The timing would be as soon as possible if someone is

22   not breathing, no pulse.

23   Q.  And why is that?

24   A.  So that they don't die.

25   Q.  Well, what if EMS is on the way?

```
1    A.  You still have an obligation to render first aid.
2    Q.  All right.  I think -- maybe I'm the only one, but there
3    might have been a little confusion about some various
4    positions you've held in the training department.  So I want
5    to understand:  When you first came into the training
6    division, what was your role?
7    A.  My role was the lieutenant in charge of leadership and
8    professional development programs.  So I created leadership
9    and professional development programs for supervisors, and
10   then a short while later I took over the field training
11   officer program and was basically overseeing that program.
12   Q.  Okay.  And this goes back to last Friday, so bear with
13   me, some questions that you were asked.  I think you -- I
14   think I heard you say that the entire MPD policy manual is
15   several hundred pages; is that right?
16   A.  Yes.
17   Q.  Okay.  This isn't a memory test.
18           And I wanted to ask you about the academy manual,
19   so Government's Exhibit 130 or Defense Exhibit K-A.  Does
20   the academy manual that was given to Mr. Kueng and Mr. Lane
21   contain a selection of those policies?
22   A.  Yes.
23   Q.  It doesn't contain all hundreds of pages, right?
24   A.  No.
25   Q.  And what types of policies are selected to be included
```

1    in the academy manual?

2    A.  Some of the big ones, like use of force.  There's

3    medical stuff and a few other ones that are bigger policies.

4    Q.  And why put those in their manual?

5    A.  Because those ones are critical for them to know the

6    most.  There's some policies that you have time to look up

7    and then there's some policies you need to know.

8    Q.  All right.  You were asked some questions last week

9    about the rule that recruits at the academy follow orders of

10    the academy staff.  Do you remember that?

11    A.  Yes.

12    Q.  Are recruits at the academy, does MPD consider them

13    fully sworn officers?

14    A.  No.

15    Q.  Why is it important that they follow the orders of the

16    academy staff while they're still in the academy?

17    A.  Because they're in a training environment and there's

18    rules to that academy, that they must follow the cadre's

19    instructions so that they know where to be, when to be so

20    maybe they don't get injured on the range or during

21    defensive tactics or any other training component.

22    Q.  And you also testified on cross-examination that the

23    requirement to follow orders does not supersede policy.

24    What did you mean by that?

25    A.  Meaning following -- you need to follow your cadre's

1    orders, but it doesn't supersede the policy on our code of

2    ethics or any violations or unlawful orders that a cadre

3    officer might give them.  So they still have to follow

4    Minneapolis Police policy.

5    Q.  I wanted to also follow up with you, you were asked some

6    questions about the training in the academy and we looked --

7    I can pull it up just to remind us.  We looked at

8    Government's Exhibit 73, which was a PowerPoint from the

9    academy on defensive tactics.  Do you remember questions

10   about that?

11   A.  Yes.

12   Q.  Can you explain the differences, if any, as to how

13   PowerPoints are used in the academy versus how they're used

14   at in-service refreshers.

15   A.  Yes.  So generally they're pretty similar.  We cover a

16   lot of the same content in the academy that we would all

17   training for the department, but we want the recruits in the

18   academy to have discussions with the trainers and so there's

19   less words on the screen.  So they might ask them questions

20   and they're looking for answers from the recruits.  Whereas,

21   the department we cover, you know, verbatim on the

22   PowerPoint.

23   Q.  I see.  And so what kind of discussions are you hoping

24   to engender with these PowerPoints in the academy?

25   A.  Generally it's just making sure that they understand the

1    policy, that we're not just giving them the answer right

2    away on the screen, that they have to start articulating

3    that use of force, different levels, with the defensive

4    tactics instructors.

5    Q.  Okay.  And so we saw that, I think, in some of these

6    PowerPoints slides where it will say a topic and then say,

7    "What is this?"  Do you remember those slides?

8    A.  Yes.

9    Q.  Is that what you are talking about?

10   A.  Yes.

11   Q.  And then sometimes there would be information following?

12   A.  Correct.

13   Q.  Okay.  Now, is there more or less time spent on that

14   in-class training at the academy as compared to in-service?

15   A.  I'm sorry.  I want to make sure I understand your

16   question.  More or less time?

17   Q.  So where -- if there is a difference, where is there, if

18   there is, more time spent going through the PowerPoints?  Is

19   it in in-service or in the academy?

20        MR. ROBERT PAULE:  I object as vague.

21        THE COURT:  No, that's overruled.  It's just which

22   one do you spend more time, on the video or whatever you

23   call the thing.

24        MS. BELL:  PowerPoints.

25        THE COURT:  PowerPoint.

```
1            THE WITNESS:  Generally hands-on defensive
2     tactics.
3     BY MS. BELL:
4     Q.  Okay.  I'll move one.  I think my question is confusing.
5            And, in fact, just -- you're talking about
6     discussions.  I'm pulling up the academy manual,
7     Exhibit 130.  And what does the academy manual provide about
8     the methodology for which the academy will be run?
9     A.  Will supply the students with any materials or
10    information, PowerPoints, handouts, overheads or verbal that
11    cover the information needed to successfully meet the course
12    objectives and ensure that the students have the information
13    needed to complete, pass the written exam.  Class
14    participation, questions, and discussion should be
15    encouraged.  Cover all safety, practice and injury rules
16    before any physical exercises or practice.
17    Q.  And why is class participation, discussions, and
18    questions encouraged?
19    A.  So that they can show their knowledge of the subject,
20    especially use of force, to the instructors, that they have
21    a good working knowledge of that policy.
22    Q.  And so, for example, looking at page 73 -- excuse me
23    page 13 of Exhibit 73, this would be the slide on duty to
24    intervene from the academy defensive tactics training.  It
25    says, "What does this mean?"  So what would happen, then, at
```

```
 1    the academy with this slide?

 2                MR. PLUNKETT:  Objection.  Calls for speculation.

 3                THE COURT:  I'm going to overrule.  She can answer

 4    the question that is on the screen.

 5                THE WITNESS:  So generally, then, the instructors

 6    would ask the class what is duty to intervene and we would

 7    expect one of the recruits to start explaining what this

 8    policy is and then have any questions regarding it, if they

 9    did.

10    BY MS. BELL:

11    Q.  Now, Mr. Plunkett asked you some questions that -- one

12    of the things that was brought up when talking about the

13    duty to intervene was an example of another officer hitting

14    someone in handcuffs.  Do you remember that question?

15    A.  I believe -- around that question, yeah.

16    Q.  Something like that?

17    A.  Yeah.

18    Q.  Okay.  Sorry.  It was last week.

19                Would that be an example, then, of an

20    inappropriate force?

21    A.  Yes.

22    Q.  All right.  All right.  You were asked some questions

23    about the policy on duty to intervene and the fact that that

24    was enacted in 2016.  Do you recall those questions?

25    A.  Yes.
```

1    Q.  Can you explain to the jury for how long the duty to

2    intervene, separate from the written policy, has existed at

3    MPD based on your training and experience.

4            MR. ROBERT PAULE:  Objection.  Speculation and

5    foundation.

6            THE COURT:  Yeah, I'm going to have to ask for

7    some foundation here, counsel.  I'm not sure that I

8    understand what you are getting at.

9            MS. BELL:  Sure.

10   BY MS. BELL:

11   Q.  How long have you been a Minneapolis police officer?

12   A.  Since 2002.

13   Q.  And have you attended in-service training every year

14   since 2002?

15   A.  I have.

16   Q.  And did you attend the Minneapolis Police Academy back

17   in 2002?

18   A.  I did.

19   Q.  And are you familiar, then, with the training at MPD as

20   provided to officers since you started there?

21   A.  Yes.

22   Q.  And so my question is:  For how long of your tenure at

23   the Minneapolis Police Department, based on your training

24   and experience, has the duty to intervene been part of the

25   training?

1    A.  It wasn't called duty do intervene, but it was always

2    part of that concept.

3    Q.  Well, explain what you mean.

4    A.  So it was always part of the concept that you

5    communicate with one another so that we wouldn't use

6    excessive force, and that if we saw somebody that --

7    sometimes your adrenaline goes up and they weren't stopping

8    the force that was being used, that it was our

9    responsibility to pull them off through physical means or

10   just take charge of the scenario.

11   Q.  And so do you have specific training about this idea

12   that your adrenaline might get up a little bit?

13               MR. GRAY:  Object to that, Your Honor, as leading

14   and there was no specific training in that area.

15               THE COURT:  I sustain on both grounds.

16   BY MS. BELL:

17   Q.  All right.  You had mentioned that there were tests

18   administered at the academy; is that right?

19   A.  Yes.

20   Q.  Those are written tests; is that right?

21   A.  Yes.

22               MS. BELL:  Your Honor, may I approach?

23               THE COURT:  You may.

24               MR. PLUNKETT:  Your Honor, I'd like to request a

25   sidebar

```
 1         (At sidebar)

 2              THE COURT:  Proceed, counsel.

 3              MR. PLUNKETT:  Thank you, Your Honor.  Tom

 4    Plunkett speaking.

 5              If I'm not mistaken, Ms. Bell right now is

 6    approaching this witness with Exhibits 131 and 132.  Those

 7    exhibits were just handed to all of us this morning when we

 8    got to court.  I don't believe that they've previously

 9    appeared on the exhibit list.  What these two exhibits are

10    is a complete copy of Mr. Kueng and Mr. Lane's quiz or tests

11    while at the academy.  It must be a final exam, I guess.

12              I wasn't provided this until after my

13    cross-examination was completed.  It wasn't included in my

14    trial preparation.  And, frankly, with everything I've got

15    going on right now, I have not properly reviewed this

16    document.  If I would have had this at the time of my

17    cross-examination and when I was preparing for this trial, I

18    would have incorporated it into my examination.

19              So I'm objecting to -- well, I'm going to object

20    to Mr. Kueng's exhibit, Exhibit 131, and I don't know what

21    Mr. Gray is going to do about Exhibit 132.  That's his

22    business.

23              MR. ROBERT PAULE:  And, Your Honor, Robert Paule.

24    I would just point out one thing.  I can tell that due to

25    the proximity of Ms. Bell to the jury, that they are able to
```

1   overhear her comments or at least some of them because of

2   visual reactions.  I know this has been an issue.  I just

3   want to make a note of it to try to avoid these things

4   coming before the jury.  Thank you.

5           THE COURT:  It is noted and it is a problem, but I

6   don't know how we avoid the problem because you and I have

7   to hear what Ms. Bell says too.  So it's just what it is.

8           MS. BELL:  Your Honor --

9           THE COURT:  Just a minute.  I need to hear from

10  Mr. Gray.

11      **(At sidebar)**

12          THE COURT:  I can't hear you, Mr. Gray.

13          MR. GRAY:  Can you hear me now?

14          THE COURT:  Okay.

15          MR. GRAY:  I never touched this in my direct

16  examination, so it's improper cross -- or redirect for her

17  to introduce an exhibit that I never went into and was never

18  in the case until today.

19          MS. BELL:  Your Honor, Mr. Plunkett on

20  cross-examination -- and I'm facing the back, I'm not

21  meaning any disrespect, Your Honor, in an attempt to not let

22  anyone hear me -- Mr. Plunkett raised on cross-examination

23  the concept with the head of training that one of the best

24  things to do is to use testing as a metrics to understand if

25  people understood their information.

```
1            A piece of this testing is already in evidence.

2     It is one of the -- there are two government's exhibits that

3     are the quiz.  That is the first part of this exhibit.  This

4     is the remaining of the testing.  They have had this in

5     discovery for literally months and would have seen it when

6     they reviewed the exhibit that was a portion of this

7     testing.

8            And so this testing is relevant directly to

9     Mr. Plunkett's assertion that testing metrics are -- testing

10    is a metric to make sure that people are learning the

11    training that they are receiving.  And that's all I'm

12    offering it for, Your Honor.

13           THE COURT:  I think, counsel, for that limited

14    purpose it's just unfair to, after a direct exam -- I mean

15    cross-examination has been completed, to give an extensive

16    document such as this that counsel hasn't had an opportunity

17    to review.  I have not had an opportunity to even look at

18    them.  And therefore I'm going to sustain the objection at

19    this time.  It doesn't mean that another witness at another

20    time might not be permitted to look at it.

21           MS. BELL:  Yes, Your Honor.  I would put counsel

22    on notice that I do plan to introduce these exhibits later;

23    and so if they said they need to review them, I want to let

24    them know that.

25           THE COURT:  Okay.
```

1        MR. PLUNKETT:  And I'll have other objections

2    later.  Thank you.

3        THE COURT:  We'll leave it that way.  Thank you.

4    **(In open court)**

5        THE COURT:  Continue, please.

6        MS. BELL:  Thank you, Your Honor.

7    BY MS. BELL:

8    Q.  I did want to follow up with lesson plans.  You were

9    asked some questions last week about lesson plans.  I'm just

10   pulling up Government's Exhibit 74 so we can see just a

11   reminder of what a lesson plan looks like.  Is that right?

12   A.  Yes.

13   Q.  Okay.  You were asked on cross-examination about the

14   fact that these lesson plans are for the instructors and the

15   recruits don't see the lesson plans.  Do you recall that?

16   A.  Correct.

17   Q.  Why do you have lesson plans?  What's the purpose?

18   A.  Generally a lesson plan is a guide for instructors.  An

19   instructor might make a lesson plan, just a brief synopsis

20   of the training at hand, some bullet points in case -- maybe

21   the next instructor, he or she couldn't make that next

22   class.  Some other instructor could pick it up and teach

23   that lesson plan.

24   Q.  And so what is the -- in terms of -- what, if any,

25   benefits to consistency of training do these lesson plans

```
 1    have?

 2    A.  Because we can reflect back on them and then also use

 3    them in the academy or in in-service, and it's also another

 4    record for us in the training department.

 5    Q.  All right.  You were also asked some questions about

 6    scenarios at the academy.  Do you recall those questions --

 7    A.  Yes.

 8    Q.  -- generally about scenarios?

 9    A.  Yes.

10    Q.  How, if at all, does working a scenario about one issue,

11    let's say domestic violence, apply to other situations that

12    a police officer might encounter?

13    A.  How does the training?

14    Q.  So I guess -- this is my question.  You can't do

15    unlimited number of scenarios, right?

16    A.  Correct.

17    Q.  So you have to pick some scenarios; is that right?

18    A.  Yes.

19    Q.  And so does working a scenario in one issue -- let's say

20    domestic violence.  What, if any, applicability would that

21    have to other situations if you can't do every scenario?

22    A.  Well, you generally pick scenarios that recruit officers

23    will see the most out in the field, and domestics being one

24    of them and just being able to respond to them appropriately

25    and working through that whole scenario.
```

```
 1    Q.  Are there things about domestic scenarios that might

 2    apply to other circumstances that aren't a domestic service

 3    call?

 4    A.  I think if you're going to -- generally when you respond

 5    to a domestic, you're going to handcuff somebody.  You might

 6    fight with somebody.  There's a high likelihood that an

 7    officer could get injured.  They are more dangerous

 8    situations to respond to.

 9    Q.  And so are you saying, then, that there's some

10    applicability to other situations where you might find

11    yourself fighting or whatever but it's not a domestic

12    necessarily?

13    A.  Correct.

14    Q.  I see.

15         Okay.  You were also asked some questions about --

16    that one of your goals was to sort of move the training away

17    from being as paramilitary.  Do you remember those

18    questions?

19    A.  Yes.

20    Q.  And do you recall Mr. Plunkett challenging that

21    assertion by raising three things in a -- that Survey

22    Monkey?

23    A.  Yes.

24    Q.  Okay.  And the three things -- do you recall him raising

25    the drill and ceremony, the calling people "sir" and
```

1    "ma'am," and the not entering the office without permission?

2    A.  Yes.

3    Q.  Mr. Plunkett asked you a number of questions about the

4    drill and ceremony; is that right?

5    A.  Yes.

6    Q.  And I want to make sure I understood you correctly.

7    That is two hours out of the 700 and something hours of the

8    academy?

9    A.  Correct.

10   Q.  Why -- I don't recall Mr. Plunkett asking you this.  Why

11   do you do that very small amount of drill and ceremony?

12   A.  It's not as important as the other subjects, but they

13   have to have a baseline knowledge in case they are out in

14   the field responding to a protest, where we have to move in

15   mass formations or civil unrest.

16   Q.  So that might be a circumstance where they might

17   actually have to use these formations?

18   A.  Yes.

19   Q.  And then there was the questions about calling people

20   "sir," "ma'am," and waiting to enter at the office.  Do you

21   remember those questions?

22   A.  Yes.

23   Q.  And you, I think, talked about the continued use of

24   "sir," "ma'am," out in the field, but once officers graduate

25   from the academy, are they formally announcing themselves at

1    office doors once they're sworn police officers?

2    A.  No.  They have to show respect and still knock and

3    ask -- you know, they don't just walk into a sergeant's

4    office.  We all would generally ask our boss if we could

5    come in --

6    Q.  Okay.

7    A.  -- but they are not required to pound on the door and

8    request that.

9    Q.  Okay.  And so in what ways -- and this is when you were

10   working on this back in, I guess, 2018 and going forward; is

11   that right?

12   A.  Yes.

13   Q.  In what ways did you try to make the academy sort of

14   less paramilitary, less rigid?

15   A.  Sure.  So with the academy I fully recognized we were

16   sending recruit officers to the community, and a big part of

17   that is verbal skills, communicating skills.  So we wanted

18   to make sure that we with the officer of the day, that

19   they're -- that was creating the leader -- creating more

20   confidence in leadership abilities for the officers, the

21   recruit officers.  And then incorporating a lot more

22   community into the academies.  And then just a lot more --

23   we wanted more collaboration out of the recruits.  We didn't

24   want such a rigid style, because they're going to use those

25   communication skills out in the field.

1   Q.  So what do you mean by incorporating community into the

2   academy?

3   A.  So we had a couple different -- each academy we bring in

4   community groups.  So for their class we brought in a couple

5   different community groups into the police academy to give a

6   historical context.  One was the black men's group and then

7   the other, like, Jewish Community Council that would come in

8   and talk about historical context, why our job is important

9   and why some people were nervous of police, and then -- so

10  they had a better idea and a better understanding of what

11  some community members would go through and to have those

12  considerations when they're out in the field dealing with

13  community members, but also starting those relationships

14  early on.

15  Q.  Okay.  You also talked about -- I think you said you

16  told people to stop doing whatever they were doing in the

17  hallway?

18  A.  Yes.  There was just no purpose for it.  We wanted -- we

19  were trying to get the recruit officers to be able to engage

20  the public, not be afraid of them or think we're higher than

21  them.

22  Q.  All right.  And I'm sorry, I think I talked about -- I

23  think I mentioned the Survey Monkey with respect to the

24  academy and that drill and ceremony, and I didn't mean that.

25  I meant that Mr. Plunkett asked you questions about the

 1    paramilitary.  If I referenced the Survey Monkey, I

 2    apologize.  That was my screwup.

 3    A.  Okay.

 4    Q.  Now I want to talk about the Survey Monkey.

 5    A.  Okay.

 6    Q.  Mr. Plunkett -- the Survey Monkey was related to the

 7    field training program, correct?

 8    A.  Correct.

 9    Q.  So Mr. Plunkett raised on his cross-examination four

10    things that were complaints of the survey: not consistent

11    training for the field training officers, inconsistent

12    grading, stricter --

13             MR. ROBERT PAULE:  Your Honor, I'm having

14    difficulty hearing.  She's speaking very quitely.  We have

15    no microphones.  It's soft.

16             THE COURT:  Yeah, you have a tendency, counsel, at

17    the end of a sentence to drop off and I think that's what is

18    being discussed.  And it may be a little bit -- pulling the

19    microphone down directionally may improve it too.

20             MS. BELL:  I apologize.  I have never had anyone

21    actually tell me I was too quiet.  So I will endeavor to

22    improve.

23    BY MS. BELL:

24    Q.  All right.  Mr. Plunkett raised with you four complaints

25    that came out of the survey, that field training officers

1    were not getting consistently trained, there was

2    inconsistency in the grading among officers in training,

3    there should be a stricter process for selecting the FTOs,

4    and there needed to be an understanding by the FTOs of each

5    of the phases of the program.  Do you remember those four

6    items?

7    A.   Yes.

8    Q.   Okay.  What Mr. Plunkett didn't ask you and I am asking

9    you now is:  What, if anything, did you do to address those

10   four areas back in 2018?

11   A.   So when I hit the reset button on the field training

12   program, part of that was to bring that consistency to the

13   program.  So first day of the field training course that I

14   offered, I put on my itinerary -- I'll even back up a little

15   bit.

16            During in-service I taught all the police officers

17   this is the overview of the field training program and it

18   was a brief just touchpoint on it and what direction we were

19   heading, the phases.  And then if you would even fill in as

20   a field training officer, what the grading metric was and

21   what we expected from the field training office, as well as

22   then in the field training course we gave an overview of

23   what the field training -- the phases looked like, what we

24   were expecting of the field training officers.  We did

25   scenarios through role playing, as well as body-worn camera

```
1    scenarios as a group so that we could get the scoring back
2    to a consistent level.  So that was some of the things that
3    we did in the field training.
4    Q.  Okay.  So I want to break that down a little bit.  As
5    part of your resetting -- and maybe this was part of a
6    different situation; I want to make sure I'm
7    understanding -- was that when you made all the FTOs
8    reapply?
9    A.  Correct.  I think we had right around 160.  And I put
10   out another job announcement and said if you want to be an
11   FTO, that's where you had to have a direct supervisor --
12   your direct supervisor approve, your precinct commander
13   approve, and then apply and basically write a memo of
14   interest why you wanted to be a field training officer.
15   Q.  And then I think you were asked some questions by
16   Mr. Gray that then that person if -- assuming they got those
17   approvals, then that would also go to the internal affairs
18   division; is that right?
19   A.  Correct.
20   Q.  Okay.  And then at that point, if people cleared or
21   passed all of those things, then you had this 40-hour
22   training?
23   A.  Correct.
24   Q.  And we looked at what appeared to be like an
25   introductory PowerPoint that you put together for that
```

```
1     training.  Did you see that?

2     A.  Yes.

3     Q.  Okay.  Tell me what happened during the 40 hours.  What

4     were you training on?  Because that PowerPoint is not very

5     long.

6     A.  So it was a lot on leadership.  It was on the critical

7     decision-making model.  It was a lot on -- what was being

8     taught in the academy was the same in the field training

9     course, because there was a -- some people were saying, I

10    believe the Survey Monkey -- or I heard from field training

11    officers that -- or even recruits that came back saying that

12    field trainers, some would say forget what you learned in

13    the academy, we're going to teach you this way.

14          And we were trying to get them to learn this is

15    what is taught in the academy, which is now taught in

16    in-service, which is now taught as a field trainer for

17    consistency of how the department operates according to

18    policy and procedure and what you are supposed to be doing.

19    Q.  It sounds like it was kind of to get everybody on the

20    same page?

21    A.  It was.  And it was also giving tips and techniques on

22    training the adult learner.

23    Q.  What do you mean by "training the adult learner"?

24    A.  So getting away from what we were talking about a little

25    bit earlier, that paramilitary.  We wanted to create mentors
```

1   for the recruits.  And that training the adult learner was

2   basically a point of empowerment, how do we empower the

3   recruits or the officers in training that are on field

4   training to successfully pass their FTO.

5   Q.  Now, you mentioned this just now.  So folks who are

6   selected as field training officers, I think you had said

7   last week they had to have at least three years on?

8   A.  Yes.

9             MR. ROBERT PAULE:  I object.  This is asked and

10   answered and it is repetitive testimony.

11             THE COURT:  I think we're getting completely

12   repetitive, counsel.  We've been over and over and over

13   this.

14             MS. BELL:  Thank you, Your Honor.

15

16   BY MS. BELL:

17   Q.  And so my question is -- I understand we talked about

18   this.  This is my question:  So would anybody who was

19   serving as an FTO have had to attend the in-service training

20   that were required for every officer every year?

21   A.  Yes.

22   Q.  Okay.  That was my question.  How did you address

23   inconsistent grading?

24             MR. ROBERT PAULE:  Your Honor, same objection.

25             THE COURT:  Yeah, counsel, I think we've just gone

1    over and over it.  She just answered that very question.

2    BY MS. BELL:

3    Q.  Were these changes that you've been talking about, were

4    they made by the time that Officers Kueng and Lane went

5    through the field training program?

6    A.  Yes.

7    Q.  You were also asked some questions about how someone

8    could be terminated from the FTO program.  Do you recall

9    those?

10   A.  Correct.

11   Q.  And I think what you said was it takes a lot.  Can you

12   explain what you meant by that.

13   A.  So when we have an officer in training that's in field

14   training, they have to -- each phase when they're going

15   through -- the critical month is that last portion of their

16   field training, when they're coming up to their ten-day.  So

17   they would have to do something that really shows that no

18   matter what training we provided them, that they're not

19   responding to that training and they're not achieving the

20   grades that they need to get to pass the program.

21          So we average about one a class that does not pass

22   field training.  And generally then we will, myself and the

23   lieutenant and sergeant, will go through all the -- well,

24   let me explain it.

25          The FTO sergeant and lieutenant will go through

1    all the ROPE forms, and then they will write up a synopsis

2    of their field training that says what the deficiencies

3    were, what we tried as trainers to fix.  And then I take

4    that.  I review it.

5            I end up sending that to the deputy chief of

6    professional standards, who reviews it.  Basically I'm

7    asking to release this officer from probationary release and

8    that -- for the chief's approval and also goes through a

9    component of HR to make sure that we are doing everything

10   correct and unbiased.

11   Q.  And so would an individual field training officer's

12   opinion control the decision about whether a field training

13   officer passed or failed?

14   A.  No.

15           MS. BELL:  Could I have a moment, Your Honor?

16           THE COURT:  Yes.

17      (Pause)

18           MS. BELL:  I have nothing further.

19           THE COURT:  Thank you.

20           Any further recross?

21           MR. PLUNKETT:  Yes, Your Honor.

22           THE COURT:  Mr. Plunkett.

23           MR. PLUNKETT:  Thank you, Your Honor.

24

25

1              <u>RECROSS-EXAMINATION</u>

2     BY MR. PLUNKETT:

3     Q.  We meet again.

4     A.  Hi, Mr. Plunkett.

5     Q.  Hi.  How are you?

6     A.  I'm okay.

7     Q.  Good.  Grab your drink before we begin.

8              You were asked some questions by Ms. Bell just

9     recently about 5-300, which is the policy on use of force?

10    A.  Yes.

11    Q.  Okay.  And I'm going to show you -- you were asked

12    specifically about some leg restraint stuff; isn't that

13    correct?

14    A.  Yes.

15    Q.  Okay.  So -- and those are preparatory so you know

16    what's coming.

17             MS. BELL:  I'm sorry.  I couldn't hear,

18    Mr. Plunkett.

19    BY MR. PLUNKETT:

20    Q.  When you look at that policy, though, what we find out

21    is only sworn employees who have received training from the

22    MPD training unit are authorized to use neck restraints.

23    Isn't that what the policy says?

24    A.  Yes.

25    Q.  And so that would mean that that's what the recruits are

1   told, correct?

2   A.  Correct.

3   Q.  And the recruits wouldn't know who does or does not have

4   that training; isn't that correct?

5   A.  Correct.

6   Q.  I mean, with all due respect, there's six to eight

7   hundred officers.  You don't know that either?

8          MS. BELL:  Your Honor, I'm going to object this is

9   repetitive of the earlier --

10         THE COURT:  It is repetitive, counsel.

11  BY MR. PLUNKETT:

12  Q.  You were also asked some questions about what to do --

13  in the academy when there's conflict between orders,

14  policies.  Do you remember those questions?

15  A.  Yes.

16  Q.  When we look at the training manual, which this is

17  Exhibit K-A, it says that if you receive an order that

18  conflicts with a previous order, you will respectfully

19  advise the person giving the second order of the conflict

20  and then comply with the second order.  Isn't that what the

21  recruits are told?

22  A.  Correct.

23  Q.  And you were asked a few questions about scenarios and

24  then I think you said, well, you try to pick the scenarios

25  that people are most likely to see in the field.  Isn't that

1    what you told us?

2    A.  Correct.

3    Q.  But, still, there is no scenario on intervention; isn't

4    that correct?

5    A.  Not titled intervention, correct.

6    Q.  One of the things you just told us is that on the

7    paramilitary issue, that drill and ceremony, marching in

8    lines, things like that is important because they might use

9    that at civil unrest?

10   A.  Part of it, yes.

11   Q.  But the reality is there's specific classes on how to

12   address civil unrest, correct?

13   A.  Yes, there is.

14   Q.  And there is nothing about the position of attention,

15   the position of parade rest, column left march, column right

16   march, platoon halt that has anything to do with civil

17   unrest; isn't that correct?

18   A.  During -- you would have to still move in a mass

19   formation somewhere.  So drill and ceremony is the basic

20   foundation of marching.

21   Q.  Parade rest, that's how you address a civil disorder?

22   A.  Well, not that command, no.

23   Q.  You talked about the 40-hour class that you created

24   after you did the Survey Monkey.  Do you remember that?

25   A.  Yes.

1    Q.  That's a one-time class; isn't that correct?

2    A.  Correct.

3    Q.  There's no testing that is part of that class except for

4    the lawyer one, correct?

5    A.  Correct.

6    Q.  And there's no follow-ups in that class as it's a

7    one-time class; isn't that correct?

8    A.  Correct.

9             MR. PLUNKETT:  Thank you, Your Honor.

10            THE COURT:  Thank you.

11            Mr. Paule.

12                          RECROSS-EXAMINATION

13   BY MR. ROBERT PAULE:

14   Q.  Inspector Blackwell, I'll try to be brief.

15   A.  Thanks.

16   Q.  I believe you testified in response to Ms. Bell's most

17   recent set of questions that the only person that trains on

18   excited delirium is Nicole Mackenzie; is that correct?

19   A.  She's one of the trainers.

20   Q.  Isn't there a Sergeant Ker Yang who trains on excited

21   delirium?

22   A.  Yes.

23   Q.  And when you spoke to the FBI on June 8th of 2020,

24   didn't you tell them that he is the excited delirium

25   training expert?

1    A.  Yes.

2    Q.  Now, going to the PowerPoint, this Exhibit 14, there are

3    30-some slides and some videos in there, are there not?

4    A.  Yes.

5    Q.  And showing --

6          MR. ROBERT PAULE:  Excuse me, Your Honor.  I'm

7    going to put on the screen to publish page 31 of T-14.

8    BY MR. ROBERT PAULE:

9    Q.  I'll try to zoom in.  The second sentence on that

10   particular image says, Place the subject in the recovery

11   position to alleviate positional asphyxia.  Is that correct,

12   Inspector Blackwell?

13   A.  Yes.

14   Q.  Isn't that the only place in this entire PowerPoint

15   where side recovery is mentioned?

16   A.  Yes.

17   Q.  Now, Ms. Blackwell [sic] talked about some of the

18   typical signs that are exhibited by people who are in

19   excited delirium syndrome.  Do you recall her mentioning

20   that there are damaged objects?

21   A.  Yes.

22   Q.  The person punching the fence?

23   A.  Yes.

24   Q.  And targeting glass?

25   A.  Yes.

1   Q.  Was Mr. Floyd able to do those?

2   A.  No.

3   Q.  Is that because he was already handcuffed?

4   A.  Yes.

5   Q.  So he wasn't able to take off his clothes either, was

6   he?

7   A.  No.

8   Q.  And then I'm showing you page 6 of T-14.  This talks

9   about the definition of excited delirium that you train

10  people on; isn't that correct?

11  A.  Yes.

12  Q.  And you train this in the in-service, do you not?

13  A.  Yes.

14  Q.  What is the last sentence in the comment section?

15  A.  How many calls do we go on every year with someone

16  exhibiting at least on one of these signs and symptoms.

17  Q.  I think it says "on," but I think what it's supposed to

18  say is "one."  Isn't that correct, Inspector Blackwell?

19  A.  Correct.

20  Q.  So what you are really training them is to look for

21  people with excited delirium, they could only be exhibiting

22  one of these symptoms; isn't that right?

23  A.  Possibly, yes.

24          MR. ROBERT PAULE:  Thank you.  I don't have any

25  further questions.

```
 1              THE WITNESS:  Thanks.
 2                      RECROSS-EXAMINATION
 3      BY MR. GRAY:
 4      Q.  Good afternoon.
 5              I don't -- I don't know if I heard you right, but
 6      did you testify, when the prosecutor was questioning you,
 7      that Thomas Lane did nothing on that video to care for
 8      George Floyd?
 9      A.  To render aid, I think, was the --
10      Q.  Excuse me?
11      A.  To render aid, I think, was the --
12      Q.  To render aid?
13      A.  Yes.
14      Q.  Okay.
15      A.  Or to stop --
16      Q.  Excuse me?
17      A.  Or to stop anything.
18      Q.  Or what?
19      A.  Or to stop anything.
20      Q.  Told to stop anything, did you say, or --
21      A.  It was in the context of either rendering aid or trying
22      to stop anything from happening, the appropriate amount of
23      force.
24      Q.  You do agree, however, that he did, as soon as Floyd
25      stopped resisting, suggested to Chauvin, "Shall we roll him
```

1   on his side?"  Right?

2   A.  He subjected that, yes.

3   Q.  Yeah.  And what did Chauvin say?  "No, stay, we're

4   staying where we're at."  Is that right?

5   A.  He did.

6   Q.  "No, staying, put where we got him."  And then Lane

7   said, "I just worry about excited delirium."  You heard

8   that, didn't you?

9   A.  I did hear that.

10  Q.  He was concerned about the arrestee, correct?

11  A.  Correct.

12  Q.  And then later he said, "I think he's passing out,"

13  talking about Floyd.  Do you remember that?

14  A.  Yes.

15  Q.  And do you remember Lane then saying, after checking his

16  back and watching his chest go up and down, "He's

17  breathing"?  Do you remember Lane saying that?

18  A.  Yes.

19  Q.  And, again, two minutes after the first time, he asked

20  Chauvin, "Should we roll him on his side?"  Do you remember

21  that?

22  A.  Yes.

23  Q.  That's twice in two minutes, correct?

24  A.  Yes.

25  Q.  And then shortly after that, within minutes -- seconds,

1    Thomas Lane checked Floyd's ankle for a pulse; is that

2    right?

3    A.  Yes.

4    Q.  Okay.  And I have a photo of that if you want to see it.

5    But you remember that, right?

6    A.  I do.

7    Q.  And right after he checked the ankle for a pulse, the

8    ambulance -- he says, "There we go."  He can see the

9    ambulance coming, correct?

10   A.  Correct.

11   Q.  And then after the ambulance, he sees it's coming and it

12   gets there, Thomas Lane went over and tried to pick up

13   George Floyd by his pants to turn him over.  Do you remember

14   that?

15   A.  Yes.

16   Q.  And then, of course, we -- you said that he did go in

17   the ambulance and check his carotid pulse on his neck right

18   away, correct?

19   A.  Correct.

20   Q.  And he did chest pumps, correct?

21   A.  Correct.

22   Q.  You're aware that there was a crowd of people there.

23   They might not have been the largest crowd in the world, but

24   they were very vocal, correct?

25   A.  Yes.

```
 1    Q.  They were vocal enough where the EMS guy, he wanted to

 2    go down a couple blocks, correct?

 3    A.  I didn't know if --

 4    Q.  You don't know that?

 5    A.  Yes.

 6    Q.  Sure, you knew that.

 7    A.  Yep.

 8    Q.  So --

 9              MR. GRAY:  That's all I have.

10              THE COURT:  Thank you.

11              Ms. Bell.

12              MS. BELL:  Very briefly.

13                    FURTHER REDIRECT EXAMINATION

14    BY MS. BELL:

15    Q.  When you said you don't have a scenario titled

16    intervention, what did you mean?

17    A.  I didn't believe we had a scenario that was actually

18    labeled duty to intervene.

19    Q.  Did you have a scenario that addressed that in some way?

20    A.  Yes.

21    Q.  What was that?

22    A.  It was just basically a defensive tactics scenario where

23    the -- it's kind of a fight call, where it's a multiple

24    officer takedown and the officers have to work together to

25    communicate with one another to effectively take the person
```

1    into custody, meaning handcuffing them and then working

2    together to get them in the side recovery and upright

3    position.

4    Q.  Okay.  You were also asked some questions about

5    Mr. Floyd being handcuffed, which prevented him from taking

6    off his clothes or banging on glass.  Before Mr. Floyd was

7    handcuffed, did he have his clothes off when the police

8    arrived?

9    A.  No.

10   Q.  Did he have an attraction to glass before he was

11   handcuffed?

12   A.  No.

13          MR. ROBERT PAULE:  Objection.  Foundation and

14   speculation.

15          THE COURT:  Sustained and sustained.

16   BY MS. BELL:

17   Q.  Before Mr. -- you've watched the video, correct?

18   A.  Yes.

19   Q.  And you've seen the portion of the video before

20   Mr. Floyd was handcuffed when the police officers arrived?

21   A.  Yes.

22   Q.  And so before he was handcuffed but after the police

23   officers arrived, did Mr. Floyd have his clothes on?

24   A.  Yes.

25   Q.  Did Mr. Floyd break anything, punch a fence, anything

1    like that during that time period?

2              MR. ROBERT PAULE:  Your Honor, I'd object.  This

3    is improper.

4              THE COURT:  I sustain, counsel.  This is, I think,

5    pretending.  Let's get to the real case.

6    BY MS. BELL:

7    Q.  You also said -- Mr. Gray just asked you about

8    statements that Mr. Lane made while Mr. Floyd was on the

9    ground.  Do you remember those questions?

10   A.  Yes.

11   Q.  Why do you not consider those statements to be rendering

12   medical aid?

13   A.  Because he didn't physically do -- he didn't render aid.

14             MS. BELL:  I have no further questions.

15             THE COURT:  Thank you.

16             MR. GRAY:  May I?

17             THE COURT:  Mr. Gray.

18             MR. GRAY:  Thank you.

19                   FURTHER RECROSS-EXAMINATION

20   BY MR. GRAY:

21   Q.  You know, one of these codes of conduct that we have

22   here, it's 5-101 --

23             MS. BELL:  Your Honor, this is beyond the scope

24   of --

25             MR. GRAY:  No, it's not.  I'm not done with my

```
1    question.

2              MS. BELL:  Oh, I'm sorry.

3    BY MR. GRAY:

4    Q.  One of these codes of conduct is truthfulness.  Do you

5    know what that is?

6    A.  Yes.

7    Q.  Okay.  And when you say that Mr. Lane did nothing, he

8    was the one that got in the ambulance, correct?

9    A.  I apologize.  So in the end he did, Mr. Gray.

10   Q.  In the end.  In the beginning he called the ambulance,

11   didn't he?

12   A.  Yes.

13   Q.  Didn't he suggest a hobble?  Didn't he?

14   A.  Yes.

15   Q.  Didn't he say, "Roll him over on his side" twice?

16   Didn't he?

17   A.  Yes.

18              MR. GRAY:  I have nothing further.

19              THE COURT:  Thank you.

20              MS. BELL:  I have nothing further, Your Honor.

21              THE COURT:  I'm sure you're not going to object to

22   stepping down.

23              THE WITNESS:  I am not, Your Honor.

24              THE COURT:  Thank you very much.

25              THE WITNESS:  Thank you very much.
```

1    THE COURT:  Members of the jury, let's take our

2    afternoon break at this time.  Again, I caution you not to

3    discuss the case during the recess.

4    We are in recess for an afternoon break.

5    (Recess taken at 3:14 p.m.)

6    * * * * *

7    (3:31 p.m.)

8    **IN OPEN COURT**

9    **(JURY PRESENT)**

10    THE COURT:  You may be seated.

11    Counsel.

12    MS. TREPEL:  United States calls Dr. Andrew Baker.

13    THE COURT:  Doctor, if you'd stop there and raise

14    your right hand.

15    ANDREW BAKER,

16    called on behalf of the government, was duly sworn, was

17    examined and testified as follows:

18    THE COURT:  Take the stand, please.  Remove your

19    mask and give us your name and spell your last name.

20    THE WITNESS:  My full name is Andrew Michael

21    Baker.  Last name is B-A-K-E-R.

22    THE COURT:  Okay.  Thank you.

23    Proceed.

24

25

```
 1                       DIRECT EXAMINATION

 2    BY MS. TREPEL:

 3    Q.  Good afternoon, Dr. Baker.

 4    A.  Good afternoon.

 5    Q.  Can you tell us where you work.

 6    A.  I am the chief medical examiner for Hennepin, Dakota,

 7    and Scott Counties.  I work in Minnetonka.

 8    Q.  And how long have you been the chief medical examiner

 9    for those counties?

10    A.  I was appointed in 2004, so I think I'm coming up on my

11    18-year anniversary.

12    Q.  All right.  Congratulations.

13              Can you explain to us generally what a medical

14    examiner does.

15    A.  Yes.  Medical examiners perform autopsies.

16              THE COURT:  Excuse me.  Is the light on on your --

17              THE WITNESS:  It is, Your Honor.  Do I need to get

18    closer?

19              THE COURT:  Yes, or else maybe just kind of tip

20    the mic a little bit so it's directly to you.  It's a -- I

21    think it's not multidirectional or something like that.

22              Okay.  Let's try again.  Proceed.

23    BY MS. TREPEL:

24    Q.  You were telling us what generally a medical examiner

25    does.
```

1    A.  Yes.  So in Minnesota medical examiners perform

2    autopsies.  We identify deceased individuals and we certify

3    their causes and manners of death.  We're the arm of local

4    government that investigates any sudden, unexplained, or

5    unnatural appearing death.

6    Q.  And are those generally, then, your duties as chief

7    medical examiner or do you have additional duties in that

8    role?

9    A.  I have additional duties that are largely administrative

10   because I do oversee a staff of more than 50 people that

11   includes seven other physicians.

12   Q.  What position did you hold before you became the chief

13   medical examiner?

14   A.  I was an assistant chief medical examiner for Hennepin

15   County from 2002 through 2004.

16   Q.  All right.  Now, you've said that you are the chief

17   medical examiner.  Are you also a doctor?

18   A.  Yes.

19   Q.  And what is the area of medicine, then, that you

20   practice in?

21   A.  My specialty is forensic pathology.

22   Q.  Can you walk us through your training to become a

23   forensic pathologist.

24   A.  Sure.  I received my bachelor's degree from the

25   University of Iowa in 1988.  I received my medical degree,

1    my MD, from the University of Iowa College of Medicine in

2    1992.

3             From 1992 through 1997 I was a resident at the

4    University of Iowa Hospitals and Clinics, where I completed

5    my training, in what's known as anatomic and clinical

6    pathology.  In 1997 I then moved to Minneapolis and did a

7    year of specialty training in the field of forensic

8    pathology; completed that in 1998.

9    Q.  And where did you work after that?

10   A.  In the summer of 1998 I went on active duty as a medical

11   officer in the United States Air Force, and I had that

12   position until 2002.

13   Q.  And as a medical officer in the United States Air Force,

14   what was it that you were doing?

15   A.  I practiced exclusively forensic pathology for the

16   Department of Defense.

17   Q.  Are you board certified in any areas?

18   A.  Yes.

19   Q.  What areas?

20   A.  I am certified by the American Board of Pathology in

21   anatomic and clinical pathology, and I hold a subspecialty

22   certification in forensic pathology.

23   Q.  And can you explain what it means to be board certified

24   in those areas.

25   A.  Yes.  Like all medical specialities in America, we have

1    an independent board that assesses people's competency to

2    practice.  I don't know what all the hoops are for every

3    medical speciality, but for pathology it would be, for

4    example, graduating from an accredited U.S. medical school,

5    completing an accredited training program, performing a

6    certain number of procedures in a variety of fields in

7    pathology.  There's letters of recommendation that are

8    required.  And I think most people would probably regard the

9    biggest hurdle as the examination test that we take.

10          When I was originally certified, the examination

11   for general pathology alone was three days long and then the

12   forensic pathology exam was an additional day.

13   Q.  And as a forensic pathologist, do you treat living

14   patients?

15   A.  I do not.

16   Q.  Can you tell the jury what a death investigation is.

17   A.  When I use the term "death investigation," I'm basically

18   describing all the functions of a medical examiner's office,

19   because there's quite a bit more we do than just autopsies

20   and certifying deaths.

21          A typical death investigation will start when my

22   office is notified by law enforcement, by EMS, by an

23   emergency room that there has been a death that they believe

24   falls under our jurisdiction.  That call is answered by one

25   of my death investigators, who are investigators that work

1    just for my office.  They assess whether that case falls

2    under our jurisdiction.

3              And then if that death took place outside of a

4    hospital, they would actually respond to that scene of

5    death, make an assessment of the body, take photographs,

6    talk to family members if they're present, get some history

7    from law enforcement if they're present, and then arrange

8    for the transport of the body back to the medical examiner's

9    office.  So that's just the first step of the death

10   investigation.

11             Following that, my investigators will work to make

12   sure that we properly identified the decedent, that we've

13   notified the decedent's next of kin.  We help the next of

14   kin understand if there will be an autopsy and why one needs

15   to be performed.  In many cases they are also helping the

16   next of kin make decisions about things like donations,

17   corneas, heart valves, bone, that sort of thing.

18             Yet another facet to the death investigation --

19   and again this is largely my investigators -- is gathering

20   the decedent's medical history.  It could be a phone call to

21   their primary care provider.  It could be a review of that

22   person's medical records.  If their identity is in question,

23   it could be us contacting their dentist as well in case we

24   need to get x-rays or dental charts to try to make an

25   identification.

1          So those are all the initial phases of the death

2     investigation.  Typically once my office is notified of a

3     death, if there's going to be an autopsy, it's generally

4     done the next day at the latest unless there's extenuating

5     circumstances.

6          Oftentimes when the autopsy is complete, the next

7     phase of the death investigation is the family calling back

8     to get some results from one of my investigators because

9     they'd like to know why their loved one died, they'd like to

10    know about how long it's going to take to get various tests

11    back.

12         Once the death investigation is complete, once I

13    have all the autopsy results back, then in most cases the

14    final stage of our role in the death investigation would be

15    me completing that person's death certificate.

16    Q.  And so then big picture, what is the objective of a

17    death investigation?

18    A.  Ultimately it's to certify that individual's cause and

19    manner of death.

20    Q.  And could you give us an estimation of how many deaths

21    you've certified a cause and manner of death for?

22    A.  Oh, gosh.  Me personally?  I mean, my office

23    investigates about 9,000 deaths per year.  Many of those we

24    waive jurisdiction on.  We probably end up certifying 2,500

25    to 3,000 of those deaths.  And so in any given year, I'm

1    properly certifying at least one-eighth of those.  I can't

2    do the math, but the number has got to be in the thousands

3    of death certification I've signed in my career.

4    Q.  Okay.  And then you mentioned an autopsy being part of a

5    death investigation --

6    A.  Yes.

7    Q.  -- if I understand.

8         So what role does the autopsy then play in the

9    death investigation?

10   A.  Well, the autopsy goes a long way in helping understand

11   the cause of an individual's death, and it also informs our

12   decision as to how to classify the manner of that person's

13   death.

14   Q.  You've used now the term "the cause of death."  Can you

15   explain what that term means specifically as a medical

16   examiner.

17   A.  Yes.  So every death certificate in America has a cause

18   of death placed on it.  For natural deaths, that cause of

19   death is almost always filled out by the decedent's primary

20   care physician or whatever doctor took care of them during

21   life.

22        The cause of death is literally whatever disease

23   or injury caused the person to die, and there's essentially

24   an infinite number of potential causes of death.  It could

25   be metastatic cancer.  It could be a gunshot wound to the

1    head.  It could be blunt force injuries from a car crash.

2    The list goes on and on.  And, again, it's up to a physician

3    to put that cause of death or those causes of death on a

4    death certificate.

5    Q.  And then in other situations where there's not a

6    physician doing that, is that what you do?

7    A.  Well, I am a physician, but yes.

8    Q.  Sorry.

9    A.  We take the place of the treating physician, because in

10   Minnesota treating physicians shouldn't be signing death

11   certificates if the manner of death is other than natural.

12   Q.  And to be clear, I didn't mean to imply otherwise.

13   A.  That's quite all right.

14   Q.  All right.  Now, were you the medical examiner who

15   examined Mr. Floyd?

16   A.  Yes.

17   Q.  Did you ultimately determine a cause of death for

18   Mr. Floyd?

19   A.  I did.

20   Q.  What was that cause of death?

21   A.  If it's all right with the court, I'm just going to take

22   out my copy of the autopsy report.

23             THE COURT:  Please do.

24             MR. ROBERT PAULE:  Your Honor, while Dr. Baker is

25   doing that, I would just like to ask counsel could you

1    please use the microphone and keep your voice up.  I am

2    having difficulty hearing you.

3              MS. TREPEL:  I apologize, counsel.

4              THE WITNESS:  So I believe the question is how I

5    worded Mr. Floyd's cause of death?

6    BY MS. TREPEL:

7    Q.  What was the cause of death?

8    A.  Yes, I listed his cause of death as cardiopulmonary

9    arrest, complicating law enforcement subdual restraint and

10   neck compression.

11   Q.  And I want to take that piece by piece.

12             So, first, what does the term "cardiopulmonary

13   arrest" mean?

14   A.  That is just fancy medical lingo for the person's heart

15   and lungs have stopped.

16   Q.  So that's the actual final moment that they stop,

17   essentially?

18   A.  Yes.  I mean, barring resuscitation that gets the heart

19   going again, it would be the final moment.

20   Q.  So not the same thing as a heart attack, then?

21   A.  Correct.  Heart attack is kind of a catchall term for a

22   variety of underlying conditions that to a lay observer

23   would look like a sudden death.

24   Q.  And then I believe you said complicating law enforcement

25   subdual restraint and neck compression?

1    A.  Correct.

2    Q.  Can you explain what you mean by that.

3    A.  Yes.  I top lined the law enforcement subdual restraint

4    and neck compression because in my opinion those played a

5    key role in precipitating Mr. Floyd's cardiopulmonary

6    arrest.

7    Q.  Did you find that Mr. Floyd had any other conditions

8    that contributed to his death, even if they weren't the

9    primary cause?

10   A.  Yes, I did.

11   Q.  And just briefly, what were those contributing

12   conditions?

13   A.  And, again, I may refer to my report as I answer the

14   question.

15        The other conditions Mr. Floyd had included

16   atherosclerotic heart disease, which is fancy medical lingo

17   for narrowing of the coronary arteries.  He had hypertensive

18   heart disease, which means his heart was enlarged due to his

19   history of hypertension.  And he also had some drugs in his

20   system that I considered other significant conditions for

21   the purpose of certifying his death.

22   Q.  All right.  And I want to get into each of those

23   specifically in a moment, but big picture, can you tell us

24   why you determined that those were contributing causes

25   rather than, I think you said, top line or immediate causes.

1   A.  Correct.  I would consider those contributing causes

2   because obviously his heart disease did not trigger the

3   interaction with law enforcement officers.  His drug use

4   didn't trigger the interaction with the law enforcement

5   officers.  They played a role in his death, but they were

6   not the -- in my opinion the top line cause of his death.

7   Q.  Okay.  So now I want to drill down a bit.  So, first,

8   when was it that you began the death investigation into

9   Mr. Floyd's death?

10  A.  I can't give you the exact time without referring to my

11  office notes, but his death would have been reported to us

12  shortly after he was pronounced dead in the emergency room,

13  and he was pronounced dead in the emergency room at 9:25 on

14  the evening of May 25th, 2020.

15  Q.  All right.  And what did you know about the

16  circumstances of Mr. Floyd's death at the time?

17  A.  So I was not aware of his death until the following

18  morning when I was notified by the BCA.  My recollection is

19  that I knew that he had become unresponsive while he was

20  being restrained by Minneapolis Police, that there may have

21  been pressure applied to his neck, and that he had been

22  pronounced dead in the emergency room.

23  Q.  All right.  Had you watched any videos at the time --

24  and now I mean the next day -- when you received a report of

25  this from the BCA?

1    A.   No.   I intentionally avoided watching any of the videos

2    until after I had completed my autopsy of Mr. Floyd.

3    Q.   Why was that?

4    A.   I did not want to go into the autopsy with any

5    preconceived notions about what I should or should not find.

6    I would rather do a -- the most thorough autopsy that I'm

7    capable of doing and then going and seeing how that compares

8    to the video.

9    Q.   Okay.   And earlier you mentioned the term "BCA."   Could

10   you just explain what BCA is, in case people don't know.

11   A.   Oh.   Yeah, that's the Bureau of Criminal Apprehension.

12   Q.   All right.   Could you tell us generally what steps are

13   involved in an autopsy.

14   A.   Yes.   In an autopsy that's considered to be a homicide

15   or a potential homicide, as a matter of policy we leave that

16   body intact until the physician who is performing the exam

17   can start that.   In other cases we will have an investigator

18   process the body, which means they will remove the clothing,

19   the jewelry, the personal effects.   But in a potential

20   homicide only the physician is allowed to do that.

21           And so our initial examination of the body often

22   includes the decedent with their clothing still on, with all

23   their medical interventions still in place, with any foreign

24   material that might be on their body, which could be in the

25   form of, you know, plants, leaves, dirt, whatever.   We

1    document all that meticulously as we start the exam.

2         And then the physician very carefully removes the

3    decedent's clothing.  In Mr. Floyd's case, I believe his

4    clothing had already been removed in the emergency room, but

5    it was still with him.  But I did very carefully document

6    all of his medical interventions before I removed that, and

7    then another set of meticulous photographs is taken.

8         And then the next step in the autopsy is we

9    collect any potential trace evidence on the body.  That

10   might be in the form of pulled head hairs.  That might be in

11   the form of fingernail clippings.

12        Then we meticulously clean the body off because we

13   want to make sure that there's no injury that's obscured by

14   blood or any other foreign material.  And then we take yet

15   another set of meticulous external photographs so we can

16   really drill down on what are we seeing that's an injury,

17   what are we seeing that's a natural disease, et cetera.

18        After all of that has taken place, then we go to

19   the step that I think most people think of when they hear

20   the word "autopsy," and that is a very carefully placed set

21   of incisions on the body that allows us to document injuries

22   under the skin that you might not see from the outside and

23   that allows us to remove all of the organs one by one, so we

24   can meticulously examine each of those organs for any

25   internal evidence of injury or any natural diseases that

1    this person may be harboring.

2            As we're doing that, we also collect specimens for

3    toxicology.  Typically those specimens are blood and urine.

4    Those were collected in Mr. Floyd's case, although we had

5    blood from the hospital, so we did not use autopsy blood for

6    our testing, but we did collect it and retain it.

7            We also take a small biopsy of each organ and

8    anything abnormal we see, and we put those biopsies under a

9    microscope so that we can look for natural diseases that

10   maybe you couldn't see with a naked eye.

11           And then really the final step in the autopsy is

12   waiting for those slides to come back from the lab so that

13   we can look at them and waiting for our toxicology results

14   to come back from the reference lab.  Once we have all those

15   things back, all of that is tied into a very lengthy and in

16   this case a very detailed final autopsy report.

17   Q.  All right.  Now, I want to follow up on one thing you

18   said.  You mentioned medical interventions.  Can you just

19   explain in the context of the autopsy what that means or

20   looks like.

21   A.  Yeah.  So any time someone makes it to the emergency

22   room, there's a pretty good chance they're going to have

23   lines and tubes in their body.  And "by lines and tubes" I

24   mean anything from a catheter, to a breathing tube, to IVs,

25   to central lines in the neck or in the groin.  Some of the

1   medical devices that are used to perform CPR can actually

2   cause injuries to the outside and even the inside of the

3   body.

4            So we have to meticulously document all those

5   things because what you don't want your medical examiner to

6   do is to mistake medical intervention for an actual injury.

7   And so that's why we ask the emergency room to leave all

8   those things in place so that we know exactly what took

9   place.

10  Q.  And because I think I jumped right in.  Who was it

11  actually that conducted the autopsy in the case of

12  Mr. Floyd?

13  A.  That was me.

14  Q.  Okay.  Now, you also, I believe, referred to

15  documentation that you do of an autopsy?

16  A.  Yes.

17  Q.  How is it that you typically document an autopsy?

18  A.  Two primary ways.  One is the dictated narrative autopsy

19  report, and most physicians in my office dictate their

20  autopsy reports as they go.  So I'm dictating what I'm

21  seeing in real time during the exam, and then that gets

22  transcribed for me.

23           So ultimately that signed report is one way we

24  document our work, but equally importantly is the

25  photography that we do.  And we do copious photography on

1    cases that are potentially homicides.

2    Q.  All right.  And so did you, in fact, document

3    Mr. Floyd's autopsy in the manner you've just described?

4    A.  Yes.

5    Q.  Who took the photographs?

6    A.  I did.

7    Q.  All right.  Now, in addition to the autopsy, what else

8    did you do to conduct the death investigation in the case of

9    Mr. Floyd?

10   A.  So most of the other components of the death

11   investigation I mentioned are done by my investigators.  So

12   they are the folks that reached out to Mr. Floyd's family to

13   make contact with them.  They are the folks that got the

14   records we needed to confirm his identification.  They're

15   the folks that got me the hospital records that I asked for

16   so I could review.

17            My primary other role in the death investigation,

18   besides performing the autopsy, was eventually I did get to

19   see what I believe were all of the videos of what had

20   transpired the evening of May 25th.

21   Q.  All right.  Well, as the jury knows, there are a number

22   of videos in this case.  Can you just tell us generally

23   which videos you viewed.

24   A.  I guess I would categorize them as the Cup Foods video,

25   the body-worn camera videos, and what I believe were mostly

1    bystander cell phone videos.

2    Q.  And when was it that you did see those videos?

3    A.  I saw one video not long after I completed the autopsy

4    the morning of the 26th, because that was the one that had

5    already gone viral on the internet.

6            I believe it wasn't until the Friday after

7    Mr. Floyd passed away when I physically received a thumb

8    drive with all the other videos on it, the body-worn camera

9    and the Cup video and that stuff.

10   Q.  Okay.  And why was viewing the videos part of your

11   investigation?

12   A.  There's some cases where you have a relative paucity of

13   autopsy findings.  You just don't have a lot to go on in

14   terms of injury despite doing the best exam you are capable

15   of doing.

16           And so the video really helps put that death in

17   some context for you so you, as a medical examiner, can try

18   to figure out what happened, because the answers are not

19   always obvious at the autopsy table alone.

20   Q.  Can you give us an example to illustrate that.

21   A.  Of?

22   Q.  Of a case where the video or the context gives you

23   information that's important to your investigation.

24   A.  A simple example would be we occasionally find people in

25   one of our rivers who have drowned and maybe they have blunt

1    trauma from hitting something on the way into the water, and

2    we have no idea how they came to end up in the river.

3           And you discover later that there happens to be

4    security camera that covers the particular bridge over that

5    river.  And if you can see that the person clearly

6    intentionally climbed over the rail, stood there for a

7    minute and thought about it and then leaped in, that's very

8    helpful contextual evidence that you are dealing with a

9    suicide.

10          And you wouldn't have known that without the

11   video, because the autopsy in an vacuum is just going to

12   tell you this person is injured and they apparently drowned.

13   Q.  And so what does it mean for an autopsy to be largely

14   negative?

15   A.  It just means that you don't have a lot of dispositive

16   findings that would stand on their own to tell you what the

17   cause and manner of death is.

18          Most of our autopsies are pretty straightforward

19   in the sense of if I do an autopsy of somebody who is

20   riddled with gunshot wounds, you don't need a lot of context

21   to figure out what that person's cause of death is.  There

22   may even be video of that person's death, but that's not

23   going to be of great use to me.

24          But there are subcategories of autopsies where

25   there's a relative lack of anatomical findings and you just

1    need to know the context in which the death occurred.

2    Q.  Okay.  And how, if at all, important was reviewing the

3    video in Mr. Floyd's case?

4    A.  I think it was extremely important.

5    Q.  Can you explain why.

6    A.  Because I was able to see his interactions with other

7    people before he passed away.  I mean, to the extent that

8    one can assess it, sort of a qualitative look at how much he

9    was exerting himself, how much other people were exerting on

10   him, how long that interaction went on, over what time

11   course did he go from appearing relatively normal to being

12   in extremis.  I mean, all of those things at some level are

13   helpful in my understanding of what happened.

14            MS. TREPEL:  At this time I'd like to show the

15   witness for demonstrative purposes only a still image from

16   what has previously been admitted as Government Exhibit 17.

17   BY MS. TREPEL:

18   Q.  All right.  Do you recognize this?

19   A.  I do.

20   Q.  All right.  And just generally, what is it that you are

21   looking at?

22   A.  That is a still shot of former Officer Chauvin kneeling

23   on Mr. Floyd's neck with his left knee.

24   Q.  Okay.  And earlier you referred to neck compression in

25   your cause of death?

1    A.  I did.

2    Q.  Okay.  And does this demonstrative help you discuss what

3    you are referring to as neck compression in your cause of

4    death?

5    A.  Yes.

6    Q.  Can you describe that, please.

7    A.  So I listed neck compression as the cause of death --

8    excuse me, on the cause of death line because that was one

9    of the ways in which Mr. Floyd was being restrained.  In my

10   experience, that was -- to me, that was unique.  I have seen

11   a lot of deaths in which people have been restrained in

12   different ways.  I had never seen this done before, and so

13   that's why I chose to list it along with the subdual and

14   restraint.

15   Q.  All right.  Thank you.

16          And when you viewed the video, about how long,

17   just general, did the neck compression you saw appear to

18   last?

19   A.  It appeared to last about nine to nine and a half

20   minutes, if I'm recalling correctly.

21   Q.  What does the term "asphyxia" mean?

22   A.  Asphyxia when a pathologist uses it is a very broad term

23   that essentially means the cells in the body are not getting

24   enough oxygen.  There's a variety of ways that can happen

25   that span the gamut from hangings to carbon dioxide

1    poisoning and everything in between.

2           We tend to look at the brain as a special case

3    when we talk about asphyxia because it's really the organ

4    that is most vulnerable to asphyxia.  If you have the oxygen

5    supply or the blood flow to your brain cut off, you are

6    going to go unconscious very, very quickly.  And if that

7    oxygen supply is not restored, chances are whatever brain

8    damage has occurred is likely to become permanent after

9    seven, eight, nine minutes, give or take.

10   Q.  What are some types of physical evidence of asphyxia you

11   might find in an autopsy?

12   A.  So that totally depends on what the mechanism of

13   asphyxia is, so I'll give you some examples.

14          Hanging is a very common form of asphyxia that

15   medical examiners see.  Not surprisingly, most hangings are

16   suicides.  Typically what we will see is a ligature mark on

17   that decedent's neck.  Depending on how long they were

18   hanged and what force was below the level of the ligature,

19   we might see blood spots in that person's eyes.  We might

20   see plethora or blood spots in that person's face.

21          A different form of asphyxia that also involved

22   compression of the neck would be people who are strangled,

23   either manually or by someone else using the ligature.

24   Typically in those sorts of cases we will see a ligature

25   mark on the neck or we will fingernail marks or bruises on

1       the neck from a manual strangulation.  Commonly we will also

2       see internal injuries on the neck, and those internal

3       injuries would be bruises to all the little muscles that

4       live right underneath your skin.  We'll see fractures of the

5       thyroid cartilage, which is the cartilage that makes up your

6       Adam's apple.  Sometimes we even see fractures of the hyoid

7       bone, which is little U-shaped bone that lives in your neck

8       at the base of your tongue.

9               Those are the reasons we do such meticulous neck

10      examinations in all of our cases, but particularly potential

11      asphyxias.  So when we're talking about compression of

12      someone's neck, those are the typical findings we're looking

13      for.

14              There are other forms of asphyxia.  For example,

15      carbon dioxide poisoning is a form of asphyxia.  Easy to

16      rule out with a laboratory test.  Cyanide poisoning, a form

17      of asphyxia; pretty rare.  That would be ruled out with a

18      laboratory test.

19      Q.  Okay.  What about "positional asphyxia," what does that

20      term mean?

21      A.  So "positional asphyxia," when I use that term as a

22      forensic pathologist, what I mean is a person got into a

23      position that they can't get out of and in that position

24      their airway is compromised and they cannot protect their

25      airway themselves.  I'll give you some specific examples.

1           Not uncommonly in the medical examiner world

2    somebody is intoxicated with opioids or alcohol and they

3    collapse facedown into their bedding or the cushion of their

4    couch and their nose and their mouth are completely blocked,

5    but they're so intoxicated they no longer have the reflex to

6    even turn their head to the side so that they can breathe

7    again.  That would be a positional asphyxia.

8           Much less commonly, but in some people with

9    epilepsy, if they have a seizure and they collapse in a

10   facedown position where their airway is no longer protected,

11   they have a condition known as postictal paralysis, where

12   they can't move for a period after that seizure; and if

13   somebody doesn't come and help them turn their head to the

14   side, they may asphyxiate.

15          That's generally what we mean by "positional

16   asphyxia."  It's literally the position of the body and they

17   can't get out of it.

18   Q.  What about the term "mechanical asphyxia," what does

19   that mean?

20   A.  So when I use that term as a forensic pathologist,

21   "mechanical asphyxia," what I mean is there was so much

22   weight on a person's chest or back that they literally

23   cannot move the bellows of their lungs and so they can't get

24   air in and out, and they will asphyxiate pretty quickly with

25   enough weight.

1   Q.  And can you explain what you mean by "the bellows of

2   their lungs."

3   A.  Sure.  Yeah.  So what I mean by that is if you think of

4   your rib cage as kind of a bellows, you have a number of

5   muscles between your ribs known as the intercostal muscles

6   and you also have your diaphragm, which runs -- it's

7   basically the divider between your chest and your abdomen.

8   Those muscles work together to make your chest expand like

9   bellows and pull air, and then they make your chest contract

10  to push the air out.  So the oxygen comes in, carbon dioxide

11  goes out.

12  Q.  And just to illustrate, what are some examples of

13  mechanical asphyxia that you see?

14  A.  So the typical examples in my line of work, the classic

15  one is somebody who is working underneath a car and the car

16  is on a jack and the jack slips and the car settles on that

17  person's chest, and there's so much weight on their chest

18  they literally suffocate because obviously you couldn't

19  possibly move your chest in and out if you have that kind of

20  weight on it.

21          In the pediatric world I've seen several cases

22  where kids have had something really heavy tip over on them,

23  like a refrigerator or a stove that was left outside on an

24  incline and they really shouldn't have been playing with it,

25  but they were and that fell on their chest.  I've seen

1    examples like that too.

2    Q.  And so in those examples the victim entirely loses the

3    ability to expand their chest; am I understanding?

4    A.  Correct.

5    Q.  Is it possible for a person to die from mechanical

6    asphyxia and there be no evidence at autopsy?

7    A.  It's possible.

8    Q.  Now, when you conducted the autopsy of Mr. Floyd, did

9    you look for physical evidence of asphyxia?

10   A.  I did.

11   Q.  Did you find any?

12   A.  I did not.

13   Q.  So going back to mechanical asphyxia, what about a

14   situation where the chest is not fully compressed, in other

15   words, the chest can compress to take in some amount of

16   fair, but can't freely expand and contract?

17   A.  So I can't say that I've ever personally had a case that

18   would fit what you just describe.  Most of my -- all the

19   cases I can recall are pretty much as extreme as the

20   examples I just gave the jury.

21          You know, if there's gradations where having the

22   lungs only partially expand and collapse would come into

23   play, that would be a little outside my area of expertise,

24   so I would defer to a lung specialist, a pulmonologist for

25   things like that.

1    Q.  Okay.  Fair enough.  And if I had, then, other questions

2    about lung volume or how much oxygen a person is actually

3    getting in a situation like you've described, would those

4    questions be within your field of expertise?

5    A.  No.  Those would definitely be in the wheelhouse of a

6    pulmonologist.

7    Q.  And just to be clear, do the patients you treat or

8    examine breathe?

9    A.  They do not.

10   Q.  Fair enough, then.

11          Okay.  I want to first, then, ask you about

12   injuries you did observe on Mr. Floyd.  So, first, can you

13   tell us what, if any, injuries you observed to Mr. Floyd's

14   back.

15   A.  I did not find any injuries on Mr. Floyd's back.

16   Q.  What about on Mr. Floyd's face?

17   A.  Yes, Mr. Floyd did have a handful of what I would call

18   blunt force injuries to his face.  "Blunt force injury" is a

19   catchall term for bruises and scrapes and scratches and

20   lacerations.

21   Q.  All right.  And let's -- if we can take a look at what

22   is in evidence as Government Exhibit 106, the first page of

23   that exhibit.  First of all, what is this?

24   A.  This is a photograph of Mr. Floyd's face taken after

25   most of the steps I described earlier, meaning cleaning

1    everything off, removing nearly all of the medical devices.

2    It's hard to read the number on this placard because of the

3    glare in the autopsy suite, but that has his unique case

4    number on it, which is ME-20-3700.

5         There's a scale on that placard -- it's the same

6    scale you'll see in every photograph -- so you can gauge the

7    size of injuries.  That placard is exactly two inches long

8    on one side or, if you prefer metric, it's five centimeters

9    long on the other side.

10        The one medical device you will see that is still

11   in this picture is the cut-off breathing tube in Mr. Floyd's

12   mouth.  We always leave those tubes in until we can confirm

13   from the inside that it's in the right place.  That's just a

14   quality assurance mechanism we provide to the hospital so

15   that they know that things ended up where they intended.

16        You can see a number of Mr. Floyd's facial

17   injuries in this photograph.  I think probably all of them

18   are better represented in the subsequent exhibits.

19   Q.  All right.  If we can move to pages 2 and 3 of this

20   exhibit, could you tell us what we're looking at here and

21   what injuries you observed.

22   A.  Sure.  You are looking at a split screen photograph of

23   the profile photographs of Mr. Floyd.  On your left is the

24   right side of his face, and that is essentially injury-free.

25   There are no discernable bruises or scrapes or scratches or

1    lacerations there.

2          The large indentation you see running just

3    underneath his right ear along the angle of his jaw, that I

4    think is just the indentation from the strap that was

5    holding the breathing tube in place before I removed it.

6    That's not an actual injury.

7          On your right, you can see the left side of

8    Mr. Floyd's face.  Just above the corner of his left eyeball

9    there is an abraded contusion -- fancy medical lingo for a

10   bruise -- that's also got a component of scraping to it.  On

11   his left cheek just outside of his left eye, you can see

12   another large abrasion.

13         I would just mention that these probably don't

14   look like abrasions you are familiar seeing on yourselves,

15   and the reason for that is after people pass away, the

16   normal moisture in your skin that keeps injuries like this,

17   quote, unquote, fresh appearing isn't there and so they dry

18   out very quickly after death.  And that's why some of these

19   look much darker than you might picture them on a living

20   person.

21         Also in this photograph just below the left corner

22   of Mr. Floyd's mouth you can also see a small abrasion there

23   below his lower lip.

24   Q.  We will zoom in on that in a moment.

25         But based on your investigation, do you have an

1   opinion about how Mr. Floyd received these injuries to his

2   face?

3   A.  There's no way to date injuries like this with any

4   specificity, but given what I saw in the videos, knowing

5   that he was held to the ground with the left side of his

6   head down against what I would assume was asphalt or

7   something similar to it, that would be a perfectly logical

8   explanation for these injuries, because that's the kind of

9   surface that would create the abrasions that you are seeing

10  here.

11  Q.  All right.  And if we can go to page 4 of this exhibit,

12  what are we looking at here?

13  A.  This is a close-up photograph of Mr. Floyd's upper lip

14  and his nose.  Just for orientation, his right nostril is

15  basically right in the middle of the picture.

16          And just below his right nostril, that is a

17  laceration of his skin, a little tearing of the skin of his

18  upper lip.  You can see on the outside of his right nostril

19  a collection of very small abrasions.  And I think it's

20  projecting reasonably well in here.  There's even some

21  bruising to his nose as well.  You can see the kind of

22  purple discoloration.  So I did record those as bruises.

23  Q.  All right.  Did you find any injuries to Mr. Floyd's

24  shoulders?

25  A.  Yes.

```
 1    Q.  All right.  And if we could bring up page 5 of the same

 2    exhibit, please, could you tell us what we're looking at

 3    here.

 4    A.  Yeah.  So this is kind of an overall photograph of

 5    Mr. Floyd after all of those medical devices, except the

 6    breathing tube, have been removed.

 7              I think we'll get to close-up photographs of the

 8    injuries of his shoulders in a moment, but even at this

 9    relatively high altitude you can see injuries to each

10    shoulder.

11              You probably can also see a circular injury

12    centered right in the middle of his chest.  That's from the

13    compression device that is used by EMS in the emergency room

14    to do CPR.  So that's not an actual injury in the sense of

15    being injured by another person.  That's just an artifact of

16    medical intervention.

17              You can just barely make out on either side of

18    Mr. Floyd's chest -- and I'll just use myself as a reference

19    point -- a little incision on either side.  That's a

20    thoracostomy incision that's made in the emergency room.

21    Sometimes one of the things they do as sort of a last-ditch

22    effort is just to make a quick incision on either side of

23    the chest and make sure that there's not what's called a

24    pneumothorax in there that they can immediately relieve that

25    might revive the patient.  Now, Mr. Floyd didn't have a
```

1    pneumothorax, but that's pretty typical in an emergency room

2    situation.

3    Q.  And you should be able to actually tap on the screen if

4    you want to indicate where you see those.

5    A.  (Indicating.)

6    Q.  All right.  And if we can move to pages 6 and 7 of the

7    same exhibit, then.  Okay.  What do you see here?

8    A.  So on your left you're looking at the top of Mr. Floyd's

9    right shoulder, so basically this part of his body right

10   here (indicating), and you can see a purple contusion, a

11   bruise, with those lines in it.  That's the abrasion or the

12   scrapes there.  So that's an abraded contusion on his right

13   shoulder.

14          There is also an abraded contusion on his left

15   shoulder.  It's on the right side of your screen.  If I were

16   to indicate on my own body, it would be this area right here

17   (indicating).

18   Q.  All right.  And what are these -- what, if anything, are

19   these injuries consistent with, based on your investigation?

20   A.  Again, there's no way to date injuries like this in a

21   vacuum, but given the interaction Mr. Floyd had with law

22   enforcement and given that he was taken to the ground,

23   either of these or both of these would be consistent with

24   rubbing against that asphalt or impacting something while

25   that's going on.

1    Q.  What, if any, injuries did you observe on Mr. Floyd's

2    wrists?

3    A.  Mr. Floyd had patterned injuries on each of his wrists,

4    which would be entirely consistent with the use of

5    handcuffs.

6    Q.  And if we can take a look at pages 8 and 9 of this

7    exhibit, then, what do we see on the screen here?

8    A.  So on your left you see the back of Mr. Floyd's left

9    hand and wrist.  And I'll just circle this kind of train

10   track injury right there in the middle of that oval.  That's

11   pretty classic for the sort of patterned injury you would

12   get from a handcuff use.

13           On your right you are looking at the back of

14   Mr. Floyd's right hand and wrist, and again I will just

15   circle it.  In the middle of that oval, there's that

16   patterned train track injury entirely consistent with

17   handcuffs.

18           You will also notice that there are some areas of

19   some thickened gray/white discoloration of the skin of

20   Mr. Floyd's hand, and I honestly don't know what that is.

21   It's clearly not an injury.  It's either some dermatological

22   condition or reaction to something.  But I'm talking about

23   this change right here (indicating) has nothing to do with

24   his death.

25   Q.  And if we can move on to page 10 of this exhibit, what

```
 1    are we looking at here?

 2    A.  This is a close-up of the back of Mr. Floyd's right

 3    hand.  The first circle I'm putting up is the back of his

 4    index finger, his second finger.  This is his middle finger

 5    right here (indicating).  You can see that there are

 6    lacerations over the knuckles of both of those fingers.

 7    Q.  What injuries, if any, did you observe on Mr. Floyd's

 8    legs?

 9    A.  He had a couple of pretty minor injuries on his legs.

10    My recollection is there was a contusion on his right shin

11    and a couple of abrasions farther downstream on his right

12    shin, and that was about it.

13    Q.  And let's turn to pages 11 and 12 of this exhibit.  All

14    right.  What are we looking at here?

15    A.  So this is sort of a high altitude photograph of

16    Mr. Floyd's right shin and then a closer-up photograph.  So

17    just for orientation, that arrow is pointing to the region

18    on his right knee.  And just above the scale there is a

19    bruise right there (indicating).  And on your right, this is

20    just a closer-up photograph of that same bruise.

21    Q.  What, if any, injuries did you observe to Mr. Floyd's

22    arm?

23    A.  Oh.  There was a contusion just on the inside of his

24    left elbow.

25    Q.  All right.  And if we can take a look at page 13 of the
```

1    exhibit, what are we looking at here?

2    A.  So this is a photograph of Mr. Floyd's left elbow taken

3    from behind.  So you can pretty much see the bone of the

4    left elbow right there.  So this would be the lateral or the

5    outside part of his elbow.  So on the inside part of his

6    left elbow, there is a bruise right here (indicating).

7    Q.  At this time I'd like to show you -- let's see.  Well,

8    let me ask you this first.  Did you see anything during your

9    investigation that could be consistent with that bruising in

10   that location?

11   A.  That specific bruise on the left arm?

12   Q.  Yes.

13   A.  Yes.

14   Q.  What was that?

15   A.  When Mr. Floyd was being held to the ground, that bruise

16   is in the approximate location of where former Officer

17   Chauvin's right knee would have been.

18   Q.  Okay.  And I'd like to show you now for demonstrative

19   purposes only a still image from what's been admitted as

20   Government Exhibit 5.  All right.  Can you tell us what we

21   are looking at first.

22   A.  Yes.  I believe this is Mr. Floyd on the ground next to

23   the police vehicle.  His head would be up here (indicating).

24   And that is his left arm right there (indicating).  And

25   there is a knee right there (indicating) up against his left

1  arm.

2  Q.  And is that what you were describing as the position of

3  Mr. Chauvin's right knee?

4  A.  Correct.  And, of course, this is just a still image.

5  This was a very dynamic situation.  I don't know that this

6  exact image is necessarily the best one, but I think his

7  knee was definitely near that left elbow.

8  Q.  Okay.  We can take this down, and I will attempt my best

9  to clear it.

10          All right.  I'd like to turn now to Mr. Floyd's

11  heart, after you have a drink.  Did you find that Mr. Floyd

12  had conditions related to his heart?

13  A.  I did.

14  Q.  And what, briefly, were they?

15  A.  I'm going to refer to the autopsy report as I provide

16  the answer to that.  So, as I mentioned earlier, Mr. Floyd

17  had two heart conditions.  One was atherosclerotic heart

18  disease, which means hardening and narrowing of the coronary

19  arteries.  And the other one was hypertensive heart disease,

20  which mean enlargement of the heart in response to

21  long-standing high blood pressure.  It's very common for

22  both of those diseases to be present in the same person.

23  Q.  And what did you find with regard to the weight of

24  Mr. Floyd's heart?

25  A.  Mr. Floyd's heart weighted 540 grams.

1    Q.  And why, if at all, was that significant to you?

2    A.  Based on the data that I rely upon to normalize a heart

3    weight as a function of someone's height or body weight,

4    Mr. Floyd was above the normal range at 540 grams.

5            Just, again, referring to the autopsy report,

6    540 grams for a man of his body length, the upper limit

7    would be 510 grams.  For a man of his weight, the upper

8    limit would be 521 grams.

9            So he is somewhat above the upper limit for a man

10   of his size, and that fits with his known history of

11   hypertension that was in his medical records and it also

12   fits with some of the microscopic changes I could see in his

13   heart at autopsy.

14   Q.  Can you Just explain how that fits, how having a

15   slightly heavier heart fits with the heart conditions you

16   saw.

17   A.  So when your heart gets heavier, it's because your heart

18   has more muscle mass than a lighter heart.  When you go to

19   the gym and you lift weights and your arms get bigger,

20   that's a good thing.  When you have high blood pressure and

21   your heart gets bigger, that's a bad thing, because all

22   other things being equal, the larger the heart, the more

23   oxygen it's going to need to do its job.

24   Q.  And does having a heavier heart pose an immediate risk

25   to a person?

 1    A.  I mean, I have certainly certified deaths as due to

 2    purely hypertensive heart disease that were generally

 3    considerably bigger than Mr. Floyd's was.  I mean, he's

 4    above normal, but not -- I mean, he's not wildly above

 5    normal.

 6    Q.  Okay.  Did you see any previous damage to Mr. Floyd's

 7    heart muscle when you examined his heart?

 8    A.  So by "previous damage" you are asking about what we

 9    would call scarring and fibrosis or evidence of, quote,

10    unquote, heart attacks in the past.  And, no, I did not find

11    any microscopic evidence of that sort of damage in his

12    heart.

13    Q.  Can you tell us what the coronary arteries are.

14    A.  So the aorta is the largest blood vessel in your body,

15    and it comes off the top of your heart right here

16    (indicating) in your chest.

17              And as soon as your aorta comes off the top of

18    your heart, it gives rise to two coronary arteries, your

19    left coronary artery and your right coronary artery.  Those

20    are the arteries that supply all the blood to the four

21    pumping chambers of your hearty.  The left coronary artery

22    divides very quickly into what we call the left anterior

23    descending and circumflex arteries.

24              So normally when we talk about human coronary

25    anatomy, we talk about three coronary arteries, the left

1   anterior descending, the circumflex, and the right.  If

2   you've ever heard of somebody, say, having triple bypass

3   surgery, in all likelihood it's because a surgeon bypassed a

4   vessel to each one of those coronary arteries.

5            So that's basic coronary artery anatomy.

6   Q.  And what did you note, if anything, with regard to

7   Mr. Floyd's coronary arteries?

8   A.  I'm going to refer to my report, counselor, just so I

9   get this right.

10           Just so the jury understands how we do this, when

11  you are dissecting coronary arteries, it's one of the most

12  meticulous things we do in an autopsy.  You literally take a

13  scalpel blade and these tiny little coronary arteries, you

14  cut them at 2, 3, 4 millimeter wide intervals the entire

15  length of that artery.

16           And the reason is you don't want to miss a very

17  focal lesion in there that might explain someone's death,

18  and that's important to us because in our role in public

19  health, we're diagnosing a lot of undiagnosed heart disease.

20  I'm not talking about Mr. Floyd's case at this point, but

21  just in general we don't ever want to miss heart disease.

22  So that's how we're evaluating these coronary arteries.

23           In Mr. Floyd's case, I found 75 percent narrowing

24  of his left anterior descending coronary artery and

25  90 percent narrowing of his right coronary artery.

1          Now, there is a branch that comes off the left

2     anterior descending that's called the first diagonal branch.

3     In most people it's pretty small, but Mr. Floyd had a pretty

4     good sized one.  That branch was also 75 percent narrowed in

5     his heart.

6     Q.  You earlier just used the word or the term "focal

7     lesion."  Can you explain what that means.

8     A.  Yeah.  If you don't cut the coronary arteries as

9     meticulously as I just described, say that you just

10    willy-nilly make a couple of random cuts in them a couple

11    centimeters apart, you could miss a focal lesion, something

12    that's in a 2 or 3 millimeter area that you just completely

13    blew past and you've completely missed it and that could be

14    a person's cause of death, not in this case, but that's an

15    example of how seriously we take these heart exams.

16    Q.  But for us non-medical folk, what is it?

17    A.  What is?

18    Q.  A focal lesion.

19    A.  Oh.  It's a lesion that's just in one place.  Like if

20    you think this disease process is going to be everywhere and

21    you don't look everywhere, you are going to miss a focal

22    lesion.

23    Q.  And so -- all right.  But you did a meticulous exam,

24    then?

25    A.  I did the best heart exam I know how to do, yes.

1    Q.  Can you explain to the jury what it would mean to have

2    an acute change or fracture in sort of the stuff that causes

3    the arteries to narrow.

4    A.  Yes.  So the things that cause your coronary arteries to

5    narrow are basically plaque and cholesterol.  These plaques

6    in your coronary arteries are usually [indiscernible],

7    meaning the artery isn't --

8              COURT REPORTER:  Go back and just repeat that.

9              THE WITNESS:  I'm sorry.  What are you asking?

10             COURT REPORTER:  These plaques in your coronary

11   arteries are usually?

12             THE WITNESS:  They are usually eccentric.  So

13   unlike a pipe in your house that gets narrowed when stuff

14   builds up on the inside, in a coronary artery they are often

15   crescentic or moon shaped.  And.

16             These plaques can actually be quite hard.  It's

17   why we call it hardening of the coronary arteries.  And they

18   can occasionally crack or fracture.  And if a plaque has a

19   crack or a fracture in it, it can grow very, very quickly as

20   that fracture fills up with a blood clot and platelets and

21   fibrin.  It's one of the reasons that somebody might have

22   the sudden onset of crushing chest pain and need to go to

23   the hospital for emergency be geography.

24             So we're looking for acute changes in these

25   plaques that we're seeing as we're doing these heart exams.

1    Q.  Okay.  And is that something you can generally see at

2    autopsy?

3    A.  Yes, you can see it with the naked eye.  You can also

4    confirm it under the microscope if you need to.

5    Q.  And what did you see when you examined Mr. Floyd's

6    arteries, then, at autopsy?

7    A.   I did not see anything that looked like an acute change

8    in any of his plaques.  They all looked I would use the term

9    stable.

10   Q.  So then based on your investigation, do you have an

11   opinion about whether Mr. Floyd's narrowed coronary arteries

12   and high blood pressure were an immediate cause of

13   Mr. Floyd's death?

14   A.  Yes, I did not consider them the immediate cause of his

15   death.

16   Q.  Okay.  Did you make any observations about Mr. Floyd's

17   lungs?

18   A.  Yes.

19   Q.  All right.  Oh, I'm sorry.  Let me go back for one

20   moment and just ask:  How, if at all, was the context of

21   Mr. Floyd's death relevant to your opinion that Mr. Floyd's

22   coronary artery disease was not the immediate cause?

23   A.  Well, the context helped me understand that there was

24   quite a bit of exertion taking place before Mr. Floyd became

25   unconscious and was transported to the hospital.  To me,

1    that exertion is not something you would want to have happen

2    in somebody with this degree of coronary artery disease.

3    Q.  Earlier you were describing the signs of the ruptured

4    plaque, though?

5    A.  Yes.

6    Q.  Did you see any of those type of signs in terms of the

7    context of Mr. Floyd's death?

8    A.  Well, those signs would really be more of a clinical

9    thing, like somebody -- you know, somebody sweating

10   profusely, somebody having EKG changes, things like.  That

11   would not be something I would be privy to.

12   Q.  Understood.

13        Did you make any observations Mr. Floyd's lungs?

14   A.  I did.

15   Q.  All right.  And what were they?

16   A.  Again, I'm going to refer to my report.  The primary

17   thing I noted about Mr. Floyd's lungs is that they were

18   quite heavy, and that is because they were very edematous,

19   which is fancy medical lingo for there was a lot of extra

20   fluid in Mr. Floyd's lungs.

21   Q.  And what, if anything, is that consistent with?

22   A.  It's consistent with a couple of things, which you can't

23   really sort out in this case.

24        So in many of our opioid fatalities where somebody

25   overdoses, we see very wet, heavy lungs like this.  That's

1    quite common.  In Mr. Floyd's case, he also got very

2    extensive CPR both in the field and in the hospital, and so

3    we often see these wet, heavy lungs in that context as well.

4         So in his case it's a pretty nonspecific finding.

5    I don't really have a good way of assigning any particular

6    meaning to why his lungs are so heavy.

7    Q.  And can you tell us what a pulmonary embolism is.

8    A.  A pulmonary embolism is a clot that formed somewhere

9    else in your body.  Usually it's one of the deep veins in

10   your legs or your pelvis, although they can form almost

11   anywhere.  If that clot breaks off, it is going to be picked

12   up by your bloodstream and immediately swept into the right

13   side of your heart and pump into your pulmonary artery.  If

14   that clot is big enough to block most, if not all, of your

15   pulmonary artery, you will die almost instantly.

16   Q.  And is that something you look for evidence of at

17   autopsy?

18   A.  Yes, in every autopsy we look for pulmonary emboli.

19   Q.  Did you find any here?

20   A.  Did not.

21   Q.  Did Mr. Floyd test positive for COVID?

22   A.  He did.

23   Q.  Do you know when Mr. Floyd originally tested positive

24   for COVID?

25   A.  My recollection, it was on the order of about seven

1    weeks before he passed away he had a known positive

2    diagnosis.

3    Q.  Did you see any evidence of COVID infection during his

4    autopsy?

5    A.  I did not.  And I did look at his lungs under the

6    microscope, and I did not see any microscopic changes to

7    suggest he actually had an active COVID infection at the

8    time.

9    Q.  Okay.  So was that information significant to you in

10   figuring out what Mr. Floyd's cause of death was?

11   A.  I did not consider that COVID played any role in his

12   death.

13   Q.  Did you at some point obtain test results related to the

14   levels of carbon monoxide in Mr. Floyd's blood?

15   A.  I did.

16   Q.  Okay.  Can you briefly tell us what the significance of

17   carbon monoxide being in a person's blood is.

18   A.  So I think everybody knows what carbon monoxide is.

19   It's the byproduct of combustion when you burn things.

20   Carbon monoxide will bind to human hemoglobin with an

21   affinity many times higher than oxygen.  So if you're in an

22   environment where there's a lot of carbon monoxide around

23   you, you will absorb that carbon monoxide and it will take

24   up all your hemoglobin and you won't have any oxygen on your

25   hemoglobin and you will asphyxiate from carbon monoxide.

1    That's how it exerts its lethality.

2    Q.  And what are common sources of carbon monoxide in

3    people's blood?

4    A.  People who are in an enclosed space with an older motor

5    vehicle that's left running, you know, that doesn't have

6    like a catalytic converter or something else that catches

7    the carbon monoxide, that can do it.  People who have faulty

8    furnaces, that can do it.  I can't remember the last time I

9    saw one of these, but if you had a fireplace going and you

10   had like a bird's nest in your flue and all that smoke came

11   into your home while you were sleeping, I've seen that

12   happen.  I've seen people with grills indoors asphyxiate

13   from carbon monoxide.

14   Q.  And what levels were found to be in Mr. Floyd's blood?

15   A.  So Mr. Floyd's blood was actually evaluated at the

16   hospital while he was still alive.  He had several blood

17   gases run.

18          So when your blood gas is measured, there's an

19   actual machine that measures your oxygen saturation.  So by

20   definition your carbon monoxide level can't be any higher

21   than 100 percent minus whatever your oxygen saturation

22   percent is.  Not everybody knows this, but most blood gas

23   machines run an actual carbon monoxide level, whether the

24   treating clinical team asked for it or not.

25          So in Mr. Floyd's case, I had access to his blood

1    gas data because I had his entire medical and laboratory

2    chart and his arterial oxygen saturation I believe was 97 or

3    98 percent, which means at most his carbon monoxide level

4    could only have been 2 or 3 percent, which is a normal

5    carbon monoxide level.  I mean, that's what you get just

6    from walking on the street living in a city.

7    Q.  So, based on that information, do you have an opinion

8    about whether carbon monoxide played a role in Mr. Floyd's

9    death?

10   A.  Yes.

11   Q.  What was that opinion?

12   A.  It played no role in his death.

13   Q.  What, if anything, did you note about sickle cell trait

14   during Mr. Floyd's death investigation?

15   A.  So when I looked at Mr. Floyd's tissues under the

16   microscope, many of his organs had sickle cells in them.

17           Now, we pathologists know that people who have

18   sickle cell trait, when their red blood cells are put into

19   formaldehyde, which is where we put all our biopsies, the

20   formaldehyde will cause the red blood cells to sickle.  It

21   doesn't mean the person has sickle cell disease.  It just

22   means they have the trait.  And there's a huge difference.

23           Sickle cell trait means that you just have the

24   genetic mutation on one of your two hemoglobin beta chains,

25   and you will probably go your whole life and never know you

1    had that.  You will have a normal hemoglobin level.  You

2    will play sports.  You will not be anemic.  You will go

3    through your whole life and never know you had that trait.

4         It only becomes a problem when somebody inherits

5    the mutation on both of their beta hemoglobin genes.  Then

6    you have full-blown sickle cell anemia, which can be a very,

7    very serious disease.

8         So when I saw those sickle cells in Mr. Floyd's

9    case, I immediately called the laboratory and I said, hey,

10   will you do what's called a hemoglobin electrophoresis,

11   where they basically just run the hemoglobin -- I don't

12   actually know how they do it anymore, but they can tell you

13   exactly what percentage that person's hemoglobin is normal

14   and what percentage is hemoglobin S or sickle hemoglobin.

15        Mr. Floyd came back at I believe it was 38 percent

16   sickle, which means he just had sickle cell trait.  Just to

17   be absolutely sure, I contacted the hospital again and

18   confirmed that Mr. Floyd had a peripheral smear made before

19   he was pronounced dead.

20        Peripheral smear means the lab takes a drop of

21   blood and actually smear it out on a microscope slide so

22   that you can look at the individual blood cells from the

23   blood vessels with a microscope.

24        And so I had an expert in blood pathology look at

25   that slide and confirm there was no evidence of sickling in

1    Mr. Floyd's blood while he was still alive.

2    Q.  So to be clear, then, in your opinion did Mr. Floyd's

3    sickle cell trait have anything to do with why he died?

4    A.  No.

5    Q.  What is paraganglioma?

6    A.  A paraganglioma is a rare tumor of the nervous system.

7    It's kind of related to the adrenal glands in similar

8    organs.  They're pretty rare.  They can occur on any part of

9    the body.  On extremely rare occasions I believe there's

10   literature that says they can secrete hormones and actually

11   become clinically symptomatic.

12           The only reason we're discussing this is because

13   Mr. Floyd had what I would consider an incidental

14   paraganglioma.  In his autopsy I just happened to discover

15   this small mass in his pelvis.  I put it under the

16   microscope, and it fit best the way it looked for a

17   paraganglioma.

18   Q.  And what do you mean by an "incidental paraganglioma"?

19   A.  When a pathologist uses the term "incidental," they mean

20   it doesn't have anything to do with the larger issue at

21   hand, which in this case is his death.

22   Q.  And is that your opinion, then, about the paraganglioma?

23   A.  Correct.

24   Q.  I want to turn now to toxicology.  Did you do anything

25   to determine --

1             THE COURT:  Excuse me, counsel.  What?  You want

2     to turn to what?

3             MS. TREPEL:  Toxicology.

4             THE COURT:  Okay.  Thank you.

5             MS. TREPEL:  Sure.

6             THE COURT:  I just didn't hear you.

7             MS. TREPEL:  I apologize.  My throat is getting

8     quite dry in here, and I think it's causing my voice to

9     drop.  I think maybe I'll just actually -- last time I tried

10    this I spilled the water all over my papers, so I just want

11    to be a little careful.

12    BY MS. TREPEL:

13    Q.  All right.  Did you do anything to determine whether

14    there were medications or drugs in Mr. Floyd's body when he

15    died?

16    A.  Yes.

17    Q.  What was that?

18    A.  So our standard practice would be to always contact the

19    hospital and see if there's what we call antemortem blood

20    available, meaning was blood drawn from this person before

21    they were pronounced dead.  All other things being equal,

22    antemortem blood is generally better than autopsy blood for

23    interpreting some of the results you get.  So that's our

24    ideal specimen.

25             And, in fact, a specimen like that did exist in

1    Mr. Floyd's case.  It was drawn at 9 o'clock p.m. on the

2    night of the 25th, so 25 minutes before he was pronounced

3    dead.  We take custody of that specimen, and then we send it

4    to our reference laboratory that does all of our toxicology

5    for us.

6            I will add we do full toxicology on nearly all of

7    our autopsies.  I did not single Mr. Floyd out for

8    performing the exams that we did here.  There's a variety of

9    circumstances in which we would do this level of toxicology.

10   Q.  All right.  And so what was it that you actually sent

11   off to be screened in this case?

12   A.  It would have been one or more tubes of blood given to

13   us by the hospital drawn from Mr. Floyd.  We have a process

14   in place where we send it directly to the lab via FedEx and

15   so that we can also document the chain of custody.

16   Q.  And what was it that you learned, if anything, as a

17   result of that toxicology screen?

18   A.  So I'll just refer to my report because I've recapped

19   the results here.  So Mr. Floyd had fentanyl in his blood.

20   He also had a metabolite of fentanyl and another substance

21   that's both a precursor and a metabolite of fentanyl.  He

22   had methamphetamine in his blood.  He had several

23   cannabinoids, which is THC and related compounds, in his

24   blood.  And he was positive for cotinine, which is a

25   breakdown product of nicotine, so we see that all the time

1    in people who use tobacco or smoke.  And he was positive for

2    caffeine, which, not surprisingly, we see all the time.

3    Q.  Indeed.  So I want to turn first to the fentanyl, then.

4    What level of fentanyl was found in Mr. Floyd's blood?

5    A.  Mr. Floyd had a blood concentration of 11 nanograms per

6    milliliter.

7    Q.  And how easy or difficult is it to determine what

8    effects on a person a certain level of fentanyl is going to

9    have?

10   A.  It's difficult because at autopsy you have no way of

11   knowing what that person's tolerance to the drug is.  You

12   have no way of knowing how long they've used it or how

13   frequently they've used it or how much they typically use.

14            You know, most of the time we have to get those

15   datapoints from other people as a proxy, so we can maybe

16   learn it from the decedent's family or their treating

17   physician or their prescribing history, but a lot of times

18   you just really can't tell how tolerant a person was to an

19   opioid.

20   Q.  Can you explain how, if at all, you rely on context then

21   in interpreting toxicology results?

22   A.  Toxicology almost always has to be interpreted in

23   context.  So the example that I will use in this case is

24   that level of fentanyl, if Mr. Floyd had been found dead in

25   his locked residence in bed with no evidence of trauma and

1    no other natural diseases found at autopsy, that level of

2    fentanyl would explain his death.  Again, a vastly different

3    context than what we are talking about today, but that's

4    what I mean by you have to interpret autopsy and toxicology

5    findings in context.

6    Q.  Okay.  So how, then, did the context here play a role in

7    your understanding of what happened?

8    A.  Well, again, you know, when I finally got access to the

9    videos, I was able to see the level of exertion that was

10   involved and the duration of that exertion.

11   Q.  So did the toxicology screen then find another drug that

12   was of significance to your findings?

13   A.  Yes.

14   Q.  Which one was that?

15   A.  I would consider the methamphetamine to be significant

16   as well.

17   Q.  Can you tell us what level of methamphetamine Mr. Floyd

18   had.

19   A.  Mr. Floyd's methamphetamine blood concentration was

20   19 nanograms per milliliter.

21   Q.  And can you tell us, generally speaking, whether that's

22   a high or low amount.

23   A.  In my experience, that's a pretty low amount.  If you

24   were to look at the bell-shaped curves of all the deaths I

25   have certified due to methamphetamine toxicity, I'm not sure

1   19 nanograms per mL would even get on the curve.  It might

2   be lower than anything I've ever seen capable of causing

3   death all by itself.

4   Q.  Now, did you examine Mr. Floyd's stomach contents?

5   A.  I did.

6   Q.  What did you observe?

7   A.  If I could refer to my report, I will just read you.  So

8   what I dictated in Mr. Floyd's case was, quote, "The stomach

9   contains approximately 450ML of dark-brown fluid with

10  innumerable small fragments of gray, white food particulate

11  matter resembling bread," unquote.

12  Q.  Did you see anything resembling a pill or a piece of a

13  pill?

14  A.  I did not.

15  Q.  Had you seen that, is that something you would document?

16  A.  Yes.  What we'll do is we'll typically strain that out

17  and take a picture of it and save it.

18  Q.  Based on your investigation, then, do you have an

19  opinion about whether the drugs found in the toxicology

20  screen were an immediate cause of Mr. Floyd's death?

21  A.  Yes.  I did not consider those the immediate cause of

22  his death.

23  Q.  Why was that?

24  A.  Again, I think the precipitating event was the subdual

25  restraint and the neck compression, and that's why I

1    relegated the toxicological findings to a contributing

2    rather than the primary cause.

3    Q.  Can you tell us what it means to "certify a death."

4    A.  In the United States every person who passes away gets a

5    death certificate.  To certify a person's death from the

6    medical examiner's point of view means that I complete the

7    cause of death lines and I complete the manner of death for

8    that person's death certificate.

9         The majority of things that go on a death

10   certificate are actually done by funeral directors based on

11   information the family provides them, so date of birth,

12   proper spelling of the decedent's name, were they ever

13   married, were they ever in the armed forces.  There's a

14   variety of demographic data that are captured.  All of that

15   is done by funeral directors and families.

16        We're usually the last step in the certification

17   process, as we get the last datapoints we need to get that

18   cause of death and get that manner of death on there.

19   Q.  Okay.  And can you tell us, then, what the manners of

20   death are.

21   A.  Yes.  So "manner of death" means the medical examiner's

22   opinion as to the circumstances under which the death

23   occurred.  Unlike cause of death, which are free text boxes

24   and I can put as much as I want in there to explain the

25   case, manner of death is a check box.  I have to indicate

1     the death as either natural, it's an accident, it's a

2     suicide, it's a homicide or, despite everybody's best

3     efforts, we couldn't figure it out and I have to leave it

4     undermined.  So we have those five categories: natural,

5     accident, suicide, homicide, or undetermined.

6              It's a public health function of medical

7     examiners.  We do it in all 50 states.  And it is a medical

8     classification system.  It is not a legal classification

9     system.  It's so we can indicate to our state health

10    department the circumstances in which people are dying,

11    because that turns out to be really valuable public health

12    data.  You want to know how many people in Minnesota

13    committed suicide last year.  We're the people classifying

14    those deaths.

15    Q.  All right.  And I think we probably get it, but what

16    does a "natural death" mean?

17    A.  "Natural" means the person died exclusively of natural

18    causes.

19    Q.  What does it mean for a death, then, to be classified as

20    "accidental" in your line of work?

21    A.  "Accidental" basically means completely unforeseeable,

22    you know, the child who runs out in front of a car and gets

23    hit, the person who slips on the ice and falls and gets a

24    subdural hematoma, the person who is a chronic drug user and

25    one day takes too much --

1    COURT REPORTER:  Excuse me, Doctor.  Would you

2    please repeat that?

3    THE WITNESS:  Yes.

4    The person who overdoses on drugs and they have a

5    long history of drug use and is clearly not intentional.

6    You know, there's a variety of different ways that a death

7    gets classified as an accident.

8    BY MS. TREPEL:

9    Q.  And I think you've said "undetermined" is you were

10   unable to figure it out, despite best efforts?

11   A.  Correct.

12   Q.  Okay.  And what does the term "homicide" mean to you as

13   medical examiner?

14   A.  From a medical point of view, it just means that actions

15   of another person or persons were involved in causing that

16   person's death.

17   Q.  All right.  I'd like to show you now what has been

18   admitted as Government Exhibit 107.  Can you tell us what

19   this is.

20   A.  Yes.  This is Mr. Floyd's death certificate.  This is

21   actually issued by the State of Minnesota, not by the

22   medical examiner's office, which is why you can see the

23   seals at the top and it says, "State of Minnesota."

24   Q.  All right.  Now, is there a part on this form that

25   contains the cause and manner of death?

```
1    A.  Yes.

2    Q.  Where, roughly, is that?

3    A.  Right in the middle.

4    Q.  All right.  We can zoom in on that for you.  All right.

5    And is that your name, then, at the bottom of that section?

6    A.  It is.

7    Q.  Okay.  And so what does medical certifier mean on this

8    form?

9    A.  That means the person who took responsibility for what's

10   in the cause of death line and the manner of death line.

11   Q.  Okay.  And can you indicate here where the cause of

12   death goes, then.

13   A.  Yeah.  The cause of death is right here (indicating).

14   You will notice this.  It says "immediate and underlying."

15   You can actually have an immediate cause of death and an

16   underlying and a second underlying and a third underlying,

17   if you wish, if the nature of the case would make it more

18   clear.  Usually we use those for complicated accidents and

19   natural deaths.

20          So, for example, why might I use all four of these

21   lines?  It might be pneumonia due to multiple blunt force

22   injuries due to motor vehicle crash.  So you'd use three

23   lines to clearly spell out that person's cause of death

24   hierarchy.  But those were unnecessary in this case, but

25   they still put that line on the death certificate.
```

1   Q.  So you've explained "underlying."  What does "immediate"

2   mean in this context?

3   A.  It just means the thing that happened closest to the

4   person at the time -- closest to the time the person died.

5   Q.  Okay.  And then can you explain, then, the term "other

6   contributing conditions" down there.

7   A.  Yes.  So other contributing conditions or we sometime

8   use the phrase "other significant conditions" are conditions

9   that played a role in the person's death, but they weren't

10  the direct, they weren't the immediate cause of that

11  person's death.

12  Q.  All right.  And so can you just remind us what we have

13  here and what some of those terms mean as the contributing

14  conditions.

15  A.  Oh, okay.  So we covered the atherosclerotic and

16  hypertensive heart disease, and what those mean.  Fentanyl

17  intoxication was my reflecting Mr. Floyd's fentanyl

18  concentration in his blood.  The recent methamphetamine use

19  was my reflecting that he did -- that he had detectable

20  methamphetamine in his blood.

21  Q.  And can you explain for us the difference -- you used

22  fentanyl intoxication, but methamphetamine use.  Why the

23  difference in those terms?

24  A.  I chose intoxication simply because that level of

25  fentanyl, that concentration is pretty high in my

1    experience, as opposed to the methamphetamine, which was

2    pretty low.  To me, at most that proves he recently used it,

3    but it doesn't prove he's intoxicated with methamphetamine.

4    Q.  And can you explain to the jury, then, how in your

5    opinion the law enforcement subdual restraint and neck

6    compression caused Mr. Floyd's death.

7    A.  I view his death as being multifactorial, which is a

8    fancy way for saying that the stress of that interaction

9    with those law enforcement officers, the stress of being

10   pinned to the ground for nine, nine and a half minutes --

11   and when I use the term "stress" here, I don't mean like the

12   stress you have because you have an exam tomorrow or you --

13   or something like that.  I mean the kind of fight or flight

14   stress, where your heart rate goes up, you start to sweat,

15   you can feel your pulse quicken, that kind of stress.

16         When you have that level of stress, hormones come

17   out into your blood, particularly adrenaline, that are

18   telling your heart we need to beat faster, it's telling your

19   muscles we need more oxygen.  And you are doing that in a

20   setting where the person has a compromised heart because of

21   their atherosclerotic heart disease, because that heart is

22   demanding more oxygen.  That's what I mean when I say that

23   this is multifactorial.  Those things are coming into play

24   together.

25   Q.  And if I understand you, coming into play together is

```
1    the heart and the muscles are requiring more oxygen than the

2    body is able to supply?

3    A.  Correct.

4    Q.  Okay.  So, in your opinion, was the duration of the

5    restraint significant?

6    A.  Yes.  I mean, my opinion would be as long as the stress

7    continues and as long as you're conscious and knowing that

8    this is going on, I would assume that those hormones

9    continue unabated and that stress on the heart is going to

10   continue unabated until that stress is relieved.

11   Q.  And what did you determine the manner of death to be?

12   A.  I classified Mr. Floyd's death as a homicide.

13            MS. TREPEL:  One moment, Your Honor.

14        (Pause)

15            MS. TREPEL:  No further questions for this witness

16   on direct.

17            THE COURT:  Okay.  Thank you.

18            MR. ROBERT PAULE:  Your Honor, I would guess that

19   my cross-examination is going to be quite lengthy.  I don't

20   know if the court would prefer me to start tomorrow morning.

21            THE COURT:  Yeah, I guess it is quitting time,

22   isn't it?  Doctor, I hate to bring you back, but we're going

23   to have to.

24            THE WITNESS:  Understood, Your Honor.

25            THE COURT:  Members of the jury, we are going to
```

1    stand in recess at this time for the evening to reconvene

2    again tomorrow morning at 9:30.  Again, I would caution you

3    over the recess not to have any -- I have to turn my

4    microphone on -- not to have any communications amongst

5    yourselves or with other persons with respect to the case.

6    Don't read or listen to any media accounts with respect to

7    the case.  Don't do any personal investigations and don't do

8    any internet investigations.

9            I keep trying to think of a good example of why

10   you shouldn't listen to media accounts.  Well, as you know,

11   I kind of know a little bit and think a little bit about

12   football.  Last Saturday I was absolutely -- and this

13   happened to be the only time I looked at any media

14   account -- I was absolutely convinced that Tom Brady had, in

15   fact, retired.  I got up yesterday morning.  No, it was a

16   rumor.  Now, if I only saw one of those two announcements,

17   you can see what I'm talking about.  That's why it's so

18   very, very important not to read or listen to the media

19   accounts.  By the way, I still put my money on he's going to

20   retire.  He's 44 years old.

21           You may be excused.

22       (Court adjourned at 4:48 p.m., 01-31-2022.)

23

24           I, Renee A. Rogge, certify that the foregoing is a
     correct transcript from the record of proceedings in the
     above-entitled matter.

25                      Certified by:   /s/Renee A. Rogge
                                        Renee A. Rogge, RMR-CRR