1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

3       ------------------------------------------------------------
                                    )
United States of America,   )  File No. 21-cr-108

4                                   )              (PAM/TNL)
          Plaintiff,        )

5                                   )
v.                          )

6                                   )
Tou Thao(2),                )  Courtroom 7D

7   J. Alexander Kueng(3), and  )  St. Paul, Minnesota
Thomas Kiernan Lane(4),     )  Tuesday, February 1, 2022

8                                   )  9:29 a.m.
          Defendants.       )

9                                   )
        ------------------------------------------------------------

10

11

BEFORE THE HONORABLE PAUL A. MAGNUSON

12      UNITED STATES DISTRICT COURT SENIOR JUDGE

13

**(JURY TRIAL PROCEEDINGS - VOLUME IX)**

14

15

16

17

18

19

20

21

22

23

24

          Proceedings recorded by mechanical stenography;

25   transcript produced by computer.

```
 1    APPEARANCES:

 2      For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                BY:  ALLEN A. SLAUGHTER, JR.
 3                                   LEEANN K. BELL
                                     MANDA M. SERTICH
 4                              300 South 4th Street, #600
                                Minneapolis, MN 55415
 5
                                DEPARTMENT OF JUSTICE
 6                              CIVIL RIGHTS DIVISION
                                BY:  SAMANTHA TREPEL
 7                              150 M Street NE
                                Washington, D.C. 20530
 8
        For Defendant           ROBERT M. PAULE, PA
 9      Tou Thao:               BY:  ROBERT M. PAULE
                                920 2nd Avenue South, #975
10                              Minneapolis, MN 55402

11                              PAULE LAW PLLC
                                BY:  NATALIE PAULE
12                              5100 West 36th Street
                                P.O. Box 16589
13                              Minneapolis, MN 55416

14      For Defendant           LAW OFFICE OF THOMAS C. PLUNKETT
        J. Alexander Kueng:     BY:  THOMAS C. PLUNKETT
15                              101 East 5th Street, #1500
                                St. Paul, MN 55101
16
        For Defendant           EARL GRAY DEFENSE
17      Thomas Kiernan Lane:    BY:  EARL P. GRAY
                                332 Minnesota Street, #W1610
18                              St Paul, MN 55101

19      Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                United States District Courthouse
20                              300 South 4th Street, Box 1005
                                Minneapolis, MN 55415
21

22

23

24

25
```

1                     <u>I N D E X</u>

2                                                        <u>PAGE</u>

  **ANDREW BAKER**
3   Cross-Examination by Mr. Robert Paule        1446
    Cross-Examination by Mr. Plunkett            1540
4   Cross-Examination by Mr. Gray                1544
    Redirect Examination by Ms. Trepel           1545
5   Recross-Examination by Mr. Robert Paule      1552

6  **CHRISTOPHER DOUGLAS**
    Direct Examination by Ms. Trepel             1561
7   Cross-Examination by Mr. Gray                1586
    Redirect Examination by Ms. Trepel           1589

8

9

10

   <u>DEFENDANT THAO EXHIBITS:</u>
11    T-15                                       1461
      T-16                                       1465
12    T-17                                       1534

13 <u>GOVERNMENT EXHIBITS:</u>
      92                                         1560
14    93                                         1560
      94                                         1560
15    95                                         1560
      96                                         1560

16

17

18

19

20

21

22

23

24

25

 1    (9:29 a.m.)

 2                          **IN OPEN COURT**

 3                          **(JURY PRESENT)**

 4            THE COURT:  Good morning, everyone.

 5            Mr. Paule, proceed.

 6            MR. ROBERT PAULE:  May I inquire, Your Honor?

 7            THE COURT:  Proceed.

 8            MR. ROBERT PAULE:  Thank you.

 9                          ANDREW BAKER,

10    called on behalf of the government, was previously duly

11    sworn, was examined and testified as follows:

12                          CROSS-EXAMINATION

13    BY MR. ROBERT PAULE:

14    Q.  Good morning, Dr. Baker.

15    A.  Good morning.

16    Q.  Dr. Baker, you are the chief medical examiner for

17    Hennepin County; is that correct?

18    A.  That is correct.

19    Q.  And can you please tell the jury how long you've held

20    that position?

21    A.  Since 2004.

22    Q.  And how is it that one is chosen to become the chief

23    medical examiner?

24    A.  It is an appointed position.  Under Minnesota Statutes

25    Chapter 390 I am appointed by the Hennepin County Board of

1   Commissioners.  That has to be renewed every four years.

2   Q.  And so there's I believe it's a board of seven

3   particular county commissioners that would vote to reappoint

4   you; is that correct?

5   A.  That is correct.

6   Q.  Okay.  And how long are your appointments for?

7   A.  Four years.

8   Q.  And when was your most recent appointment?

9   A.  2020.

10  Q.  Do you remember the exact date?

11  A.  I don't remember the exact date, but it would have been

12  in the early to mid June time frame.

13  Q.  Does June 11th sound approximately right?

14  A.  Could be.

15  Q.  All right.  Now, Dr. Baker, just so the jury's aware,

16  the medical examiner is supposed to be a neutral and

17  independent office; is that correct?

18  A.  Not is supposed to be.  It is.

19  Q.  It is.  Pardon me.  It is.  Why is that so important?

20  A.  We investigate deaths from a medical point of view, and

21  you would never want that to be influenced by the interests

22  of law enforcement or any prosecutorial agency.  So when we

23  say we're independent, we mean they have no role in whether

24  I get appointed or whether I get to keep my job.

25  Q.  Okay.  And the idea is, you don't want anyone, really,

```
 1    influencing your decisions as a public health department

 2    correct?

 3    A.  Well, certainly not other agencies that we work with,

 4    they should not be able to influence my decisions, no.

 5    Q.  Okay.  Thank you.  And, Dr. Baker, can you just give an

 6    estimate of how many autopsies you have performed?

 7    A.  Probably in the neighborhood of thirty-two, thirty-three

 8    hundred.

 9    Q.  Okay.  And I may be using the term wrong.  I think when

10    you testified yesterday, you described autopsy as a sort of

11    a multi-step process, is that correct, or death

12    investigation?

13    A.  So death investigation is the umbrella term for the

14    multi-step process I described yesterday.  The autopsy is

15    the actual physical examination of the body by the

16    pathologist.

17    Q.  And that physical examination also includes certain

18    surgical techniques that have to be done to examine the

19    body; is that correct?

20    A.  Yeah.  We don't often think of them as surgical

21    techniques, but, yeah, they're the same skills that surgeons

22    would use, oftentimes the same tools.

23    Q.  And okay.  And going to the amount of autopsies that

24    you've performed over the course of your career, I would

25    assume you've testified in courtrooms just like this a
```

1   number of times; is that accurate?

2   A.  This might be my first time in federal court actually,

3   but I've testified in state court scores of times, maybe

4   more than a hundred.

5   Q.  Okay.  And just so that this is clear, you don't just

6   testify essentially for one side.  You are subpoenaed by one

7   side and called as a witness; is that correct?

8   A.  That's correct.  I'm not beholden to or retained by

9   either side.

10  Q.  For instance, you've testified when called by the

11  prosecution, but I would also assume at times called by a

12  defense attorney; is that correct?

13  A.  It's pretty uncommon that the defense has subpoenaed me,

14  but I'm sure it's happened.

15  Q.  Okay.  And are you somehow involved or have you been

16  involved with a group called The Innocence Project?

17  A.  Yes.

18  Q.  Could you tell the jury a little bit about that, please.

19  A.  Well, I certainly can't speak for The Innocence Project.

20  I'm just a consultant for them, but it's an agency in New

21  York City.  I think they have branches all across the

22  country, sometimes associated with law schools and

23  universities, but basically they look at cases where they

24  think somebody has been wrongfully convicted, convicted of

25  crime they didn't actually commit.

```
 1              For many years most of their exonerations were
 2    related to DNA evidence, evidence that just didn't exist at
 3    the time that a person was killed or raped, but later
 4    because of new science could be used to prove that someone
 5    was actually innocent.  So I do pro bono work for The
 6    Innocence Project from time to time.
 7    Q.  Would your role in that capacity essentially be
 8    reviewing medical evidence and offering your particular
 9    opinion or diagnosis?
10    A.  Yeah, it would be medical evidence.  It would be
11    autopsies.  It would be the whole death investigation,
12    sometimes including the scene investigation.
13    Q.  Okay.  And I might be using the term wrong.  When you
14    reach a conclusion, do you call that an opinion or a
15    diagnosis from your medical perspective?
16    A.  I think most physicians probably use the terms
17    interchangeably, an opinion or diagnosis.  When you go to
18    another doctor to get a, quote unquote, second opinion what
19    you are really wanting to see is, is their diagnosis the
20    same or different than the first doctor.
21    Q.  And that is sort of how you work in that capacity when
22    you are called on as a consultant for The Innocence Project;
23    is that correct?
24    A.  To reach opinions or diagnoses?
25    Q.  To review medical evidence.
```

```
 1    A.  Yeah.
 2    Q.  Okay.  And again, that's presumably called typically by
 3    a defense attorney, correct, with The Innocence Project, not
 4    a prosecution office?
 5    A.  Correct.  The Innocence Project, they are all defense
 6    attorneys.
 7    Q.  Okay.  And your particular office, the Hennepin County
 8    Medical Examiners Office, you perform death investigations,
 9    but you are also the head of that office, correct?
10    A.  Correct.
11    Q.  And I would assume you have administrative duties and
12    probably take a great deal of your time?
13    A.  Yes.
14    Q.  And would I be correct in stating that you have a staff
15    of approximately 50 people?
16    A.  Yeah.  I don't have the exact number with me, but it's a
17    little bit north of 50.  We've continued to grow each year.
18    Q.  Okay.  And it sounds like your office also performs
19    death investigations for not just Hennepin County, but at
20    least two other counties; is that correct?
21    A.  That's correct.
22    Q.  And it seems to me like you might do a significant
23    percentage of the death investigation or autopsies in the
24    State of Minnesota; would that be accurate?
25    A.  By -- yes, by population I believe my office covers a
```

 1     third of the state.

 2     Q.  Okay.  And physically speaking, your office is located

 3     in Minnetonka right now; is that correct?

 4     A.  Yes, we just moved there about four weeks ago.

 5     Q.  And before that where was your office physically

 6     located?

 7     A.  Downtown Minneapolis right across the street from the

 8     U.S. Bank Stadium.

 9     Q.  All right.  Now, I'd like to talk about your particular

10     timeline of involvement in this particular case.  You are

11     aware, obviously, through your review, that Mr. Floyd was

12     treated at Hennepin County Medical Center and pronounced

13     dead on the evening of May 25th, 2020; is that correct?

14     A.  Yes.

15     Q.  And you indicated that you became involved in this

16     because this was on some level looked at as an unnatural

17     death which involved your office; is that accurate?

18     A.  Correct.

19     Q.  Okay.  And you indicated on direct examination that you

20     received a call from I believe it was the Bureau of Criminal

21     Apprehension, what sometimes lawyers refer to as the BCA,

22     that first started this process; is that correct?

23     A.  Yes.

24     Q.  Okay.  And they provided you some background on the

25     incident in question; is that correct?

1    A.  Yeah, it was pretty brief and a pretty high level.

2    Q.  What do you mean by "high level"?

3    A.  I just mean there weren't a lot of details in terms of

4    the known timeline, how long the CPR took place, exactly who

5    did what during the entire time of the incident with law

6    enforcement.

7             By "high level" I mean it was, this man went

8    unresponsive in custody.  He was pronounced dead at the

9    hospital.  There may have been pressure applied to his neck.

10   Q.  Okay.  Sort of it didn't have a whole lot of details is

11   what you meant?

12   A.  Correct.

13   Q.  Okay.  And you indicated that you chose to perform this

14   autopsy; is that correct?

15   A.  Yes.

16   Q.  How did this case get assigned to you?

17   A.  I assigned it to me.

18   Q.  That's because you are in charge, correct?

19   A.  Correct.

20   Q.  It's good to be the king.

21   A.  Well, sometimes.

22   Q.  Sometimes.  But did you specifically choose this to

23   perform this death investigation and put yourself in charge

24   of the autopsy for a particular reason, Dr. Baker?

25   A.  It's clear from the nature of this case that the chief

1    medical examiner just has to step in and do it.

2    Q.  Okay.  In other words, you are not going to have

3    somebody do something you wouldn't do, correct?

4    A.  Correct.

5    Q.  Okay.  And when you chose to put yourself in that role,

6    were you aware of the fact that this case was gathering

7    publicity?

8    A.  I was peripherally aware of that because it was pretty

9    early in the morning when I got the call from the BCA.  I

10   started the autopsy shortly after nine o'clock in the

11   morning, so I don't know what the groundswell of public

12   interest was during the day.  You know, it was probably

13   middle to late afternoon before I was done with the autopsy

14   and really online, getting a feel for just how big this had

15   become.

16   Q.  Okay.  And before you began that process where you

17   performed what I would call the autopsy, physical

18   examination of Mr. Floyd's body, you were aware of a

19   Facebook video, correct?

20   A.  I was aware that there was one, yes.

21   Q.  Okay.  Were you aware that that was, I suppose, quote

22   unquote, going viral at that point in time?

23   A.  I don't know if I knew that before or after the autopsy,

24   but certainly that day I knew it had gone viral.

25   Q.  Okay.  And when you performed the physical examination

1    or autopsy of Mr. Floyd's body, you specifically chose not

2    to view any videos before you performed that; is that

3    correct?

4    A.  That is correct.

5    Q.  And that would be to avoid having that somehow bias or

6    influence your medical findings; is that correct?

7    A.  Correct.

8    Q.  Okay.  And following that particular autopsy, once you

9    were done performing that, you indicated you got done in

10   early to mid afternoon on Tuesday, May 20th, correct?

11   A.  Did you say May 20th?

12   Q.  I'm sorry.  I did.  It would be May 26th.  Pardon me,

13   doctor.

14   A.  Yes.

15   Q.  Okay.  And again just so we're all clear, the incident

16   with police and Mr. Floyd occurred on May 25th, 2020.  I'm

17   speaking about Tuesday, the next day, May 26, 2020.  Does

18   that clarify that?

19   A.  Yes.

20   Q.  Okay.  Thank you for pointing that out to me.

21           And once you got done with that autopsy or that

22   procedure, you spoke to a number of state court prosecutors;

23   is that correct?

24   A.  Yes.

25   Q.  You did that via Microsoft Teams?

1    A.  Yes.

2    Q.  Did that include the Hennepin County Attorney himself,

3    Michael Freeman?

4    A.  Not that initial call, no.

5    Q.  Was there more than one call on that day?

6    A.  To the Hennepin County Attorney's Office?

7    Q.  Yes.

8    A.  No.  I believe that was the only call that day.

9    Q.  Okay.  But you spoke to a number of people who you knew

10   through your previous, your previous interactions with them

11   were prosecutors from the state -- excuse me -- Hennepin

12   County, which is the state court prosecutor, correct?

13   A.  Yes.

14   Q.  And do you recall telling them during that phone call or

15   Microsoft Teams that there was no physical evidence of

16   asphyxia?

17   A.  Yes.

18   Q.  Did you discuss the particular heart conditions that you

19   observed during the autopsy with those particular

20   prosecutors?

21   A.  I don't recall all the details of that call, but it's

22   almost impossible for me to think that I wouldn't have

23   explained the heart condition because his, obviously his

24   heart weight and the condition of Mr. Floyd's coronary

25   arteries were known to me the moment I walked out of the

1    autopsy suite.

2              That was not a pending test that required

3    conformation.  That was something I would have known the

4    moment I finished the exam.

5    Q.  Okay.  And just to be fair, it's not really unusual for

6    you to have discussions with state court prosecutors; is

7    that correct?

8    A.  Correct.  It's not unusual at all.

9    Q.  Okay.  Particularly Hennepin County is the largest

10   county in Minnesota, so that probably generates most of your

11   business, correct?

12   A.  Yeah.  I mean on a per capita basis, Hennepin County is

13   most of the autopsies my office performs.

14   Q.  Okay.  So you speak frequently with the state court

15   prosecutors, correct?

16   A.  Yes.

17   Q.  And there's absolutely nothing untoward about that, is

18   there?

19   A.  I don't believe so, no.

20   Q.  Okay.  And what they're really trying to do is get

21   preliminary information from you to use in terms of

22   presumably them making a decision about whether someone

23   should be charged and what they should be charged with; is

24   that fair?

25   A.  As far as I know, yes.  I'm not an attorney.  I'm just a

1   doctor, but I assume that they need that information so that

2   they can make appropriate legal decisions.

3   Q.  Okay.  Now later that day, did your office issue a press

4   release about this particular death investigation?

5   A.  Yes.

6   Q.  And in their position as the Hennepin Medical Examiner,

7   chief medical examiner, how often does your office issue

8   press releases whether there's an ongoing death

9   investigation?

10  A.  We do it quite frequently.  Our standard practice is, we

11  do it on virtually all homicides because we know we're going

12  to get inquiries from the press anyway, and so it's just

13  easier to proactively put those out, which is easy to do in

14  the modern era.

15          There are certain other cases that if we just know

16  there's going to be a lot of press inquiries, we'll get

17  ahead of it and put the press release out.

18  Q.  Okay.  The idea is, you want to provide information to

19  the public that you are allowed to provide at that given

20  time, correct?

21  A.  Correct.  Everything we're putting out is public data

22  under Minnesota statutes, and so anybody could call us and

23  get the same data.

24  Q.  Okay.  And in this case your office issued a press

25  release at approximately 4:27 p.m.; is that correct?

1    A.  I couldn't tell you the exact time, but I'll take your

2    word for it.

3    Q.  Would it refresh your recollection to look at a copy of

4    that particular press release?

5    A.  Sure.

6           MR. ROBERT PAULE:  Okay.  Your Honor, I'd like to

7    show Dr. Baker a copy of what I've marked for identification

8    only as T, I believe it's 16.

9           May I have a moment, Your Honor?

10          THE COURT:  You may.

11          MR. ROBERT PAULE:  May I approach Dr. Baker, Your

12   Honor?

13          THE COURT:  You may.

14          MR. ROBERT PAULE:  Thank you.  And, Your Honor,

15   while Dr. Baker is reviewing that document, I would like to

16   apologize because I don't have the physical copies of

17   Exhibit T-16 handy right now.  I will deal with that at an

18   appropriate time if the court would allow me to do so.

19   BY MR. ROBERT PAULE:

20   Q.  Dr. Baker, going to that document that I just showed

21   you, does that refresh your recollection about what time the

22   press release was actually issued?

23   A.  It does.  It says 4:27 p.m. on the bottom.

24   Q.  Okay.  And does the other side of the bottom of that

25   document indicate the date that that particular press

1   release was issued?

2   A.  Yes.  It says May 26th, 2020.

3   Q.  Now on that particular press release, is there a phone

4   number of someone that if I was interested in following up

5   on that I could call to try to get information from?

6   A.  Yes.

7   Q.  And would that person, without stating her name, his or

8   her name, would that be essentially a public information

9   officer that works for either your office or Hennepin County

10  in general?

11  A.  This individual works for the entire county and not just

12  my office, but she is the person we would indicate for

13  matters like this.

14  Q.  Okay.

15          May I have just a moment, Your Honor.  Excuse me.

16  The exhibits should be ready, and I apologize.

17          THE COURT:  Okay.

18          MR. ROBERT PAULE:  Your Honor, may I approach?  I

19  now have two paper copies for the court, and I would move to

20  admit Exhibit T-15.  And if I misspoke and said T-16 I

21  apologize.  T-15 is the particular press release that

22  Dr. Baker was just testifying to.

23          May I approach, Your Honor?

24          THE COURT:  Yes, you may.

25          MR. ROBERT PAULE:  Your Honor, may I publish T-15?

1     THE COURT:  Well, I assume you've offered it.  Is

2     there an objection?

3          MS. TREPEL:  No objection.

4          THE COURT:  T-15 is received.  You may publish.

5          MR. ROBERT PAULE:  Thank you.

6     BY MR. ROBERT PAULE:

7     Q.  Dr. Baker, one of the things that I become aware of is

8     that this particular ELMO or device won't allow me to show

9     the entire page at once, but do you see where this is marked

10    T-15 on the bottom?

11    A.  I do.

12    Q.  Okay.  And if I slide this down, does that allow you to

13    orient yourself as to the Exhibit T-15?

14    A.  Yes.

15    Q.  And again, this is a copy of your press release report

16    that was issued on Tuesday, May 26th at 4:27 p.m.; is that

17    correct?

18    A.  Correct.

19    Q.  And again, on this document there is a -- there's a

20    notation that please direct any media inquiries to a

21    particular person at a particular phone number.  That is

22    essentially a public information officer that we spoke of;

23    is that correct?

24    A.  Correct.

25    Q.  Okay.  Thank you.  Now, Dr. Baker, I assume after this

1   press release was issued, there comes the end of a workday

2   and you go about the rest of your life; fair to say?

3   A.  Yes.

4   Q.  Okay.  And after that press release was issued, would I

5   also be correct in assuming that your office started to

6   receive a number of phone calls from all kinds of different

7   people?

8   A.  Yes.

9   Q.  And were some of these people simply inquiring about

10  information, perhaps members of the media?

11  A.  Yes.

12  Q.  Were you getting other calls from the public of probably

13  a broad range of reasons?

14  A.  On this particular day I will confess I do not have a

15  good handle on what our call volume was or the nature of the

16  calls.  Initially there they did seem skewed primarily to

17  media inquiries.

18  Q.  Okay.  And just by way of background, this is the day

19  after the incident at Cup Foods; is that correct?

20  A.  Yes.

21  Q.  Over the course of the next few days, would I be correct

22  in assuming that your office started to receive more and

23  more calls and requests for information about these cases?

24  A.  Yes.

25  Q.  Excuse me, this case.  Pardon me.

1    A.  Yes.

2    Q.  And, Dr. Baker, would I also be correct in assuming some

3    of these were media, some of these were general public.  But

4    also was your office receiving what could be termed as

5    harassing phone calls?

6    A.  Yes.

7    Q.  And as that week we want on, there were obviously a

8    number of protests going on, correct?

9    A.  To my knowledge, yes.  I did not watch a lot of the

10   media coverage, but, yes, I'm certainly aware there were

11   protests going on.

12   Q.  Okay.  And also you're the head of this office.  Some of

13   these protests were going on downtown; is that correct?

14   A.  Yes.

15   Q.  Were people approaching your office in any way to

16   protest physically speaking?

17   A.  I honestly don't know if those were directed at my

18   office or U. S. Bank Stadium was just a logical place to

19   organize a protest.  It was not always clear to me.

20   Q.  But were these protests, or whatever we want to call

21   them, occurring generally in the area of your offices at

22   least at times?

23   A.  Yes.

24   Q.  And this is over the course of several evenings,

25   correct?

```
 1    A.  Yes.

 2    Q.  And I think we all remember this time, but these

 3    protests were getting more and more large, more and more

 4    destructive, particularly in the evening; is that correct?

 5    A.  Yes.

 6    Q.  And would I also be correct in assuming that your office

 7    over the course of the next week or so started to receive

 8    calls of a more threatening nature?

 9    A.  Yes.

10    Q.  Were some of these phone calls specific to you, sir?

11    A.  Yes.

12    Q.  Now, going to May 28th, that would be Thursday, so three

13    days after the incident with the police at Cup Foods, on

14    that date did your office issue a second press release?

15    A.  I don't recall the specific date of the second press

16    release, but I would be happy to look at a copy if you have

17    one.

18    Q.  Certainly.

19            And, Your Honor, I would -- excuse me -- like to

20    show Dr. Baker what I've marked for identification only as

21    Exhibit T-16.  I do have two copies for the court and have

22    provided them to counsel.

23            May I approach, Your Honor?

24            THE COURT:  You may.

25            MS. TREPEL:  Mr. Paule, do you have one for me?
```

```
1              MR. ROBERT PAULE:  Yes.

2    BY MR. ROBERT PAULE:

3    BY MR. ROBERT PAULE:

4    Q.  Dr. Baker, excuse me.  Does looking at what I've offered

5    for identification only as Exhibit T, I believe it's 16,

6    does that refresh your recollection about the press release

7    and when it was issued?

8    A.  It does.

9    Q.  All right.  And is that a fair and accurate copy of that

10   actual press release?

11   A.  I believe it to be, yes.

12   Q.  And just so I'm aware, is this something you would have

13   any input in reviewing before it's released?

14   A.  This particular press release, I definitely had input on

15   this.  The language in the second full paragraph is probably

16   entirely me.

17   Q.  Okay.

18              Your Honor, I would offer, and I apologize, I

19   believe it's T-16.

20   A.  Correct.

21              MS. TREPEL:  No objection.

22              THE COURT:  T-16 is received.

23   BY MR. ROBERT PAULE:

24   Q.  And, Dr. Baker, may I take that back?

25              Permission to publish, Your Honor?
```

1              THE COURT:  You may.

2              MR. ROBERT PAULE:  Thank you.

3   BY MR. ROBERT PAULE:

4   Q.  Dr. Baker, again I'm showing you what's been marked and

5   admitted as Exhibit T-16, and then I'll pull it down so you

6   can see the entire thing.

7              Is this a copy of the press release your office

8   issued on May 28th, 2020?

9   A.  It is.

10  Q.  And just to orients everyone, this is Thursday, the 3rd

11  day after the incident at Cup Foods; is that correct?

12  A.  Correct.

13  Q.  Okay.  Can you tell the jury why you had this particular

14  press resist issued?

15  A.  Yeah.  So we're getting tremendous pressure from the

16  public and from the media to release information.  You know,

17  there's the public has a very skewed view of what medical

18  examiners do because of the way we're portrayed on

19  television and the movies.

20             You know, the afternoon person probably thinks

21  that most deaths are resolved within 59 minutes and you get

22  your DNA results back from the lab in seconds and you get

23  your toxicology results back in minutes, and none of those

24  things happen in real life.  I mean a good death

25  investigation takes time.

1    And so this was just a way of telling the public

2    we understand you're looking for information, but we have

3    these other things that we need to do.  There's still an

4    ongoing investigation.  There's still pending laboratory

5    studies.  We will be as transparent as we can under

6    Minnesota law, but this is the way these things play out.

7    Q.  Okay.  And was your office also getting any calls or

8    requests for actions by any elected officials during this

9    time?

10   A.  To my knowledge, no.

11   Q.  And going to the contents of this, could you read the

12   paragraph that I'm putting my finger on.  Is that the second

13   paragraph that you're referring to, Dr. Baker?

14   A.  Yes.

15   Q.  Could you please read that for the jury, and I think

16   it's on that screen in front of you.

17   A.  It's not.

18   Q.  I apologize.  I should have taken care of that.  Thank

19   you very much.  I apologize, Dr. Baker.  I thought you could

20   see it in front of you.  I didn't realize you were looking

21   over your shoulder.

22   Could you please read that second paragraph to the

23   jury?

24   A.  The medical examiner recognizes the public expectation

25   for timely, accurate and transparent information release

1   within the confines of Minnesota law.  However, the autopsy

2   alone cannot answer all questions germane to the cause and

3   manner of death and must be interpreted in the context of

4   the pertinent investigative information and informed by the

5   results of laboratory studies.

6   Q.  And, Dr. Baker, at the time this press release was

7   issued, you had not yet received the toxicology results from

8   Mr. Floyd; is that accurate?

9   A.  That's correct.

10  Q.  Would that be one of the more important components in

11  you waiting until you had all of the information to provide

12  your final diagnosis?

13  A.  Yes.

14  Q.  Or opinion.  Pardon me.  All right.  Now, Dr. Baker, I'd

15  like to point out a couple things.  On the first press

16  release your office issued, there was a phone number to

17  reach the public information official, correct?

18  A.  Yes.

19  Q.  And on this particular document it does not appear that

20  that information is contained on it; is that correct?

21  A.  Correct.  We provided her email address instead of her

22  phone number on this document.

23  Q.  Would that presumably be because a lot of people were

24  probably calling up that person seeking information?

25  A.  I can only assume that's the reason that this change was

1  made.

2  Q.  Okay.  Thank you very much.

3          Now, Dr. Baker, going back to the time that this

4  whole case is occurring, I know that you testified that you

5  weren't essentially watching a lot of the news coverage, but

6  I assume you had some aware, awareness of what was occurring

7  in our community during that time; is that correct?

8  A.  Yes.

9  Q.  Speaking specifically to the protests or the riots or

10 however we wish to describe these, correct?

11 A.  Correct.

12 Q.  Okay.  Are you aware that the Third Precinct burned down

13 the evening into the early morning hours of --

14          MS. TREPEL:  Objection, Your Honor.  403,

15 relevance.

16          THE COURT:  I will overrule.  You may answer.

17          MR. ROBERT PAULE:  Thank you.

18          And I'll finish the question, Dr. Baker.  Are you

19 aware that the Third Precinct was burned down during these

20 protests the evening of either Thursday, March 28th [sic],

21 or into the early morning hours of Friday, March 29th [sic]?

22          THE WITNESS:  I don't recall the date that it

23 happened or the date that I became aware of it, but I was

24 certainly aware that that had happened.

25

1    BY MR. ROBERT PAULE:

2    Q.   And I would assume on some level as the head of the

3    medical examiners office you were dealing with security

4    issues without going into any detail; is that accurate?

5    A.   Yes.

6    Q.   Okay.  Now obviously in this case you're aware that

7    Mr. Chauvin was charged in state court with various homicide

8    charges, correct?

9    A.   Yes.

10   Q.   And that occurred on Friday, May 29th; is that correct?

11   A.   I believe so, yes.

12   Q.   And are you also aware that the charging document

13   itself, the complaint, criminal complaint against Derek

14   Chauvin, was made public on that day?

15   A.   Yes.

16   Q.   Did that generate more phone calls and more requests for

17   information from your office?

18   A.   I believe it did.

19   Q.   Was that at least in part do you assume because there

20   was language in that charging document that referenced

21   preliminary findings by your office?

22   A.   Yes.

23   Q.   Specifically, the preliminary findings included the fact

24   that there were no physical findings that supported a

25   diagnosis of traumatic asphyxiation or strangulation; would

1    that be accurate?

2    A.  Yes.

3    Q.  Secondly, that there were underlying health conditions

4    including coronary artery disease and hypertensive heart

5    disease; is that correct?

6    A.  Yes.

7    Q.  And third, that the combined effects of the restraint by

8    the police, his underlying health conditions, and any

9    potential intoxicants likely contributed to his death,

10   referring to Mr. Floyd?

11   A.  Yes.

12   Q.  And that would have been information presumably that the

13   County Attorney's Office, the state court prosecutors, had

14   obtained from you in that May 26th, the Tuesday,

15   conversation, correct?

16   A.  That conversation and subsequent conversations, yes.

17   Q.  So you had other conversations with the prosecutors up

18   until that Friday; is that correct?

19   A.  One other that I can specifically recall, yes.

20   Q.  Do you recall what date that was?

21   A.  We had a, an in-person meeting on the 27th.

22   Q.  That would be the Wednesday; is that correct?

23   A.  Correct.

24   Q.  And is that kind of where you went over some of these

25   findings with them?

1    A.  Yes.

2    Q.  Okay.  And was Mike Freeman, the Hennepin County

3    Attorney, at that particular meeting?

4    A.  He was.

5    Q.  Okay.  And just so I'm clear, were you aware whether any

6    of those meetings, whether they were being recorded so that

7    everyone could have a record of what was said?

8    A.  If you mean literally recorded like with a recorder or a

9    cell phone or something, no, I don't believe any of that

10   took place.

11   Q.  No one made you aware of that in any event, did they,

12   Doctor?

13   A.  Are you implying that they were recorded?

14   Q.  I'm not implying anything at all.  I'm just asking you.

15   Do you have any -- do you have any idea whether they were

16   being recorded?  Let me rephrase it differently.

17   A.  Okay.

18   Q.  And I'm sorry.  I'm not trying to be contentious with

19   you.

20        Doctor, do you have any idea whether or not any of

21   these conversations were recorded?

22   A.  To my knowledge, none of them were recorded.

23   Q.  Thank you.  All right.  Now, that was Friday, correct?

24   And did your office continue to receive more requests for

25   information and more phone calls from members of the public?

1    A.  Yes.

2    Q.  Can you describe sort of the tenor of people calling up,

3    what were they saying essentially, if you know?

4    A.  I did not have to field those phone calls.  My staff

5    did, and I would say by a very large margin they were

6    threatening.  They were harassing.  They were calling people

7    out by name, threatening families, threatening to out people

8    by home addresses.

9    Q.  Have you ever in your entire career had a situation

10   where anyone in your office was threatened with violence by

11   anyone as a result of just simply doing your job?

12   A.  I have personally been threatened once in a previous

13   case.  That was very short-lived, but beyond that I'm

14   unaware that any of my other staff had ever had something

15   like this happen.

16   Q.  And was this going on relatively constantly throughout

17   that first week?

18   A.  We are open 24 hours a day, so it was around the clock.

19   Q.  Okay.  Now do you know a physician named Dr. Roger

20   Mitchell?

21   A.  I do.

22   Q.  Could you tell the jury who that person is, please?

23   A.  Roger is a forensic pathologist.  He is a friend of

24   mine.  He, up until recently, he was the chief medical

25   examiner in Washington, DC, for several years at least.  I

1  believe he has since left that position and assumed the

2  chair of the pathology department at Howard University.

3  Q.  Okay.  And you yourself at one point worked in

4  Washington, DC; is that correct?

5  A.  Well, yes and no.  I mean, I was in the military.  My

6  office was actually in Rockville, but my headquarters was in

7  Washington, DC.

8  Q.  It shows my ignorance one more time, but you know

9  Dr. Mitchell.  Had you known him for a number of years

10  before this, this weekend we're talking about?

11  A.  Yeah.  I've known, I've known Roger for many years.  We

12  didn't cross paths when I worked in DC because Roger is

13  younger than I am, and I had very little interaction with

14  the DC office as a military officer, but, yeah, I've known

15  Roger for years.

16  Q.  Okay.  And are you familiar with the acronym N as in

17  Nancy, A, M as in Michael, E as in Edward.

18  A.  Yes.

19  Q.  Could you tell the jury what that is, please?

20  A.  Yeah.  That's the National Association of Medical

21  Examiners.  It's the professional organization in the United

22  States to which nearly all forensic pathologists like me

23  belong.  We also have affiliate members, investigative

24  members, administrative members and coroner members.

25  Q.  So basically professionals and doctors that practice in

1   the area of pathology, correct?

2   A.  Forensic pathology specifically, yes.

3   Q.  Excuse me.  And could you explain to the jury what

4   forensic pathology means, the distinction?  I may be using

5   the terms incorrectly.  I apologize.

6   A.  Sure.  So the umbrella term "pathology" refers to what

7   99 percent of my colleagues do in hospitals, which is

8   they're the pathologist that look at every biopsy that's

9   removed from every patient.

10          Anytime tissue is removed from somebody for

11   diagnostic reasons, it could be something as simple as a PAP

12   smear or something as complex as an entire organ with a

13   tumor in it, that tissue is examined by one of my

14   colleagues.  That's what we call anatomical pathology.

15          Also hospital based is all the laboratory work

16   pathologists do.  So every time you get your blood sugar

17   measured, blood gas run, your white cells counted, anything

18   that's done in a laboratory in a hospital is almost

19   certainly overseen by one of my colleagues, and that hat is

20   known as clinical pathology.

21          Forensic pathology is a subspecialty under that

22   overarching field of anatomic and clinical pathology where

23   we have additional training in performing autopsies and

24   supervising death investigations and certifying cause and

25   manner of death.

1    Q.  Okay.  And you're board certified in forensic pathology,

2    are you not, Dr. Baker?

3    A.  Yes, and anatomic and clinical pathology.

4    Q.  Excuse me.  But, Dr. Baker, were you also a member of

5    that National Association of Medical Examiners?

6    A.  Still am.

7    Q.  Were you the past president?

8    A.  I am a pass president.

9    Q.  Okay.  And is Dr. Roger Mitchell a member of that

10   particular organization as well, too?

11   A.  I did not look up his membership status as of today.  I

12   assume he is still a member unless he had some reason

13   because of his transfer to academia to drop the membership.

14   Q.  I don't know any different.  I was just asking if you

15   knew.

16   A.  Yeah.  I don't know.

17   Q.  Okay.  And have the two of you, you and Dr. Roger

18   Mitchell, have you actually worked together on certain

19   cases?

20   A.  I don't know if you'd call it working together, but,

21   yes, we were jointly involved in a previous case.

22   Q.  Okay.  Would that be a case referred to as the Philando

23   Castile case based in Minnesota?

24   A.  Yes.

25   Q.  And you did not testify in that case, did you,

1    Dr. Baker?

2    A.  I'm pretty sure I did testify in that case.

3    Q.  Okay.  Excuse me.  But that's the case you worked with

4    Dr. Roger Mitchell on; is that correct?

5    A.  Well, again, I wouldn't use the phrase "worked with."

6    Roger was brought in either by Mr. Castile's family or their

7    attorney to do a review of my office's work, and so I hosted

8    Roger in our library.  I provided him with all of the

9    photographs, all of the documentation, all of the X-rays,

10   everything he would need to do a thorough review of the case

11   and then report back to the family or their attorney.

12   Q.  Okay.  And I'm sorry.  I wasn't trying to mislead you or

13   to do anything like that.

14         You essentially allowed him to review your

15   findings, correct?

16   A.  Correct.

17   Q.  But as a lawyer I oftentimes will talk to other lawyers

18   to get certain ideas.  Do you do the same thing as a medical

19   examiner?

20   A.  Yeah.  Physicians do that all the time.  It's called

21   curbsiding when you grab another physician who has

22   experience or particular expertise or maybe they're even a

23   different specialty and you say, hey, can I run something by

24   you.

25   Q.  Okay.  Have you done that with Dr. Mitchell in the past?

1    A.  I don't know that I would have done that with Roger in

2    the past.  It's entirely possible.  I mean, Roger is

3    talented enough and I respect him enough that I can imagine

4    myself calling him, but I don't know that I had ever done it

5    before this case.

6    Q.  Okay.  Now going back to the Friday afternoon, between

7    Friday afternoon and the next Monday, did you receive a

8    phone call from Dr. Mitchell?

9    A.  Yes.

10   Q.  Can you tell the jury just generally what that phone

11   call was about?

12   A.  It will have to be generally because of course this was

13   a year and a half ago.  I don't remember all the details.

14   Q.  Certainly.

15   A.  But Dr. Mitchell called me, and he was unhappy with the

16   language that had come out in the charging document, and

17   just as a little bit of a back story here, Roger chaired the

18   committee in name, the professional organization, that wrote

19   our position paper on the approach to in-custody deaths.

20          So I mean he has expertise in this area.  He had

21   led the group that wrote the paper, and one of the tenants

22   of the paper, if I'm recalling correctly is, you know,

23   preliminary results should not go out.  It should be the

24   final product that the public gets all at once.

25          And so Roger was unhappy that that had happened,

1    and so I explained to him it wasn't my call to do that.  The

2    County Attorney writes the charging document.  There is no

3    preliminary autopsy report.  We don't print anything out and

4    produce it and give it to anyone in the form of an actual

5    preliminary report, but obviously law enforcement and the

6    County Attorney gets verbal information as the case develops

7    as to what we do and don't yet know about the case.

8              So I explained that to Roger, that it was not a

9    preliminary report.  That was a document authored by another

10   department.

11   Q.  In other words, the state court prosecutors had drafted

12   that document that included probably information you had

13   provided to them that they deemed to be preliminary

14   findings, correct?

15   A.  Correct.

16   Q.  But as a medical examiner you don't issue preliminary

17   findings, correct?

18   A.  Correct.

19   Q.  Okay.  And so that's what Dr. Mitchell was upset with

20   you about, correct?

21   A.  To the best of my recollection, that's what prompted him

22   to call me, yes.

23   Q.  Okay.  Did you receive a different phone call from

24   Dr. Roger Mitchell later on that weekend or Monday morning,

25   perhaps?

1    A.  I think I did.  I don't remember if he called me once or

2    twice, to be honest with you.  That was a very hectic

3    weekend.

4    Q.  Okay.  Do you recall whether or not he was critical of

5    the information that was contained in that criminal

6    complaint?

7    A.  He was unhappy, yes.

8    Q.  Did he speak to you about the term "neck compression"?

9    A.  I'm sure we discussed it.

10   Q.  Did he in fact inform you that you had to include the

11   words "neck compression" in your final diagnoses?

12   A.  I don't know if the phrase "had to include it."  Again,

13   Roger is a valued colleague, and I'm going to take his

14   input, just as I would the other doctors in my office or

15   other doctors that I routinely turn to.

16   Q.  Sure, or the doctors you curbside with, correct?

17   A.  Correct.

18   Q.  Okay.  But did Dr. Mitchell also tell you at the time he

19   had drafted an opinion education op ed I think would be the

20   term to be published in the Washington Post?

21   A.  He did mention an op ed.  I don't remember if it was the

22   Post or the Baltimore Sun, but he did mention he was either

23   writing one or had drafted one.

24   Q.  Did he indicate that he was going to be critical of what

25   these preliminary findings would be?

1  A.  He may have.  Again, I don't recall the specifics of the

2  call.

3  Q.  Okay.  And again, you don't recall any specifics about

4  the words "neck compression" as you sit here; is that

5  correct?

6  A.  Again, I don't recall specifically, but it wouldn't

7  surprise me if Roger and I did talk about the autopsy.

8  Again, he's a valued colleague.  He chaired the committee

9  that wrote the paper on how these deaths get investigated.

10  Q.  Sure.  And doctors are opinionated people, are they not?

11  A.  Some more than others.

12  Q.  Well, and just in a general setting, Dr. Baker, you're

13  essentially tasked with coming to your opinion or diagnosis

14  about a particular situation in front of you, are you not?

15  A.  Correct.

16  Q.  And as a doctor you are trained to do as much research,

17  put as much time as you need to do everything you need to,

18  but to be firm in your opinion if you feel it's justified,

19  correct?

20  A.  Yes.

21  Q.  That's the general training for a doctor, is it not?

22  A.  I guess that's one way to character it, yes.

23  Q.  Okay.  But in any event these conversations or

24  conversation with Dr. Roger Mitchell occurred before you

25  signed the death certificate; is that correct?

1   A.  Correct.  I don't believe I signed the death certificate

2   until June 1st, if I have my dates right.

3   Q.  Okay.  I have down as perhaps June 5th, but it was after

4   this conversation in any event, correct?

5   A.  Yes.

6   Q.  Okay.  And then do you recall when you ultimately

7   received the toxicology results on Mr. Floyd's blood sample?

8   A.  Yes.

9   Q.  Can you tell the jury what date that was, please.

10  A.  Could I take out the autopsy report to refresh my

11  memory?

12  Q.  Absolutely.

13  A.  So I've got the actual toxicology report in front of me.

14  It was actually issued the evening of May 31st at 6:44 p.m.

15  Q.  That would have been Sunday evening, would it not,

16  Doctor?

17  A.  Yes.

18  Q.  Okay.  And so is that -- and just for my edification, is

19  a report like that sent to perhaps your email, or is it sent

20  to your office more specifically?  How would you become

21  aware of that?

22  A.  Of these tox reports?

23  Q.  Yes.

24  A.  Normally they come to an inbox that's managed by my

25  technicians, and then they put the autopsy report in the

1     right case in our electronic database and alert the

2     physician that the results have come in.

3     Q.  Okay.  So the idea being, you know, you get a

4     notification there's some new information about this

5     particular case, correct?

6     A.  Correct.  And just to clarify, given the complexity of

7     this case and how high profile it was, it is entirely

8     possible that this could have been emailed to me directly

9     from the lab at the same time it was emailed to my office.

10    I don't recall, but it would not surprise me if that had

11    happened.

12    Q.  Okay.  And then on Wednesday, June 3rd, is that the date

13    that your final autopsy report was completed?

14    A.  No.  I believe I signed it on June 1st.

15    Q.  Okay.  Would that be the date that it was released

16    publicly?

17    A.  Yes.

18    Q.  And that was done with the input from Mr. Floyd's

19    family, correct?

20    A.  Mr. Floyd's family was given a chance to review the

21    autopsy report before it was going to go public, and if I

22    could expand upon my answer because it's important the jury

23    understands this.

24         Minnesota has a very tightly written medical

25    examiner data privacy law.  It's Minnesota Statutes Chapter

1    13.83, and it dictates what the medical examiner can and

2    cannot make public.  And there's very few things in

3    Minnesota that actually can be automatically made public

4    following a death investigation.  It's basically what's on

5    the death certificate.

6            So for us to release an autopsy report to the

7    public actually requires a written court order, and so

8    that's why there's a lag time between the day I signed the

9    autopsy, which was June 1, and the release of the autopsy to

10   the world, which was June 3.  So part of that was making

11   sure that Mr. Floyd's family got a chance to see this.

12           And part of this, of course, was attorneys going

13   in front of the judge to get the order to make this public.

14   Q.  Okay.  And just to back up a step, let's assume that I

15   were to pass away and you were to do my autopsy, you would

16   sign my death certificate.  Under that state law, only the

17   death certificate would normally be made public, correct?

18   A.  Correct.  Your family members could get a copy of your

19   autopsy report.  They could get the entire medical examiner

20   file, but to the rest of the public that would be off limits

21   for 30 years under Minnesota statute.

22           If the case is classified as a homicide, no one

23   can access the medical examiner's file except law

24   enforcement and the legal system.

25   Q.  That's to sort of protect an ongoing investigation in

1    most instances, correct?

2    A.  I assume that's the rationale for the statute is to

3    protect the integrity of upcoming judicial proceedings.

4    Q.  But the idea is that the death certificate is a public

5    document, so that's to be released, but the rest of it is

6    intended to be protecting the privacy of, say, my particular

7    family if I was the person in that stead, correct?

8    A.  Yes.

9    Q.  And is that body of law that you talked to, is that

10   referred to as the Minnesota Government Data Practices Act?

11   A.  I don't know the name of the overarching act.  I just

12   know the one little section that pertains to the medical

13   examiner and it's 13.83.

14   Q.  Okay.  In your final autopsy report, am I using the

15   right term, Doctor, when I use that term?

16   A.  Yes.

17   Q.  Okay.  That includes the term "neck compression"; is

18   that correct?

19   A.  Correct.

20   Q.  Okay.  Now just so I'm clear, you indicated that this

21   was a cardiopulmonary arrest complicating law enforcement

22   subdual restraint and neck compression; is that accurate?

23   A.  Correct.

24   Q.  And yesterday when you were testifying, you used the

25   word "top-lined" it.  What did you mean by that, Dr. Baker?

1    A.  So if you, if you look at an actual physical death

2    certificate work sheet that we fill out on every case, the

3    top line is literally the top line where you put the

4    immediate cause of death.  I think we may have looked at

5    this yesterday.

6              And then the other significant conditions are

7    lower on the death certificate.  Those are the things that

8    contributed to the death but are not immediately responsible

9    for what took place on the top line.

10   Q.  Okay.  And I assume as a doctor you choose your words

11   very carefully and accurately; is that correct?

12   A.  I certainly try to.

13   Q.  And I think you had to explain this to me, but

14   cardiopulmonary arrest means essentially the heart and the

15   lungs stop functioning; is that correct?

16   A.  Correct.

17   Q.  And then you used, the next word is "complicating"; is

18   that correct?

19   A.  Correct.

20   Q.  What did you intend when you used that word, Dr. Baker?

21   A.  When a physician uses the word "complicating" he or she

22   means an untoward or unexpected outcome on the heels of some

23   kind of medical intervention.  So typical examples in

24   medicine, you do a hip replacement on a patient, and they

25   develop a blood clot in that leg.  That would be a

1    complication ensuing on the heels of an intervention.

2              If your doctor starts you on a new medication and

3    you have an allergic reaction to it, that would be a

4    complication ensuing on the heels of an intervention.

5    Q.  Would another example be putting a patient under

6    anesthesia to perform surgery and them having end up with a

7    cardiopulmonary arrest, if I'm using that term correctly?

8    A.  Yes, that's a potential complication.

9    Q.  So complicating, in your words, really means it's

10   something that occurred but was not a foreseen consequence

11   of an act, correct?

12   A.  It depends on the nature of the complication.  I mean

13   some complications in medicine are known.  There's a known

14   risk with some procedures, and some complications are just

15   completely unexpected.

16   Q.  Okay.  But whether you chose to use the word

17   "complicating," you meant unforeseen, correct?

18   A.  I mean on the heels of.

19   Q.  Okay.  Thank you for that clarification.

20              And it was complicating the law enforcement

21   subdual.  What does that term mean when you use it,

22   Dr. Baker?

23   A.  So I'm not a use of force expert.  I only understand

24   these terms in the broadest sense that a medical examiner

25   would understand them.  So when I mean subdual, I mean when

1    somebody goes from being free and mobile to being in your

2    control.

3    Q.  Okay.  And then you use the word "restraint."  What did

4    you mean by that term?

5    A.  That's the mechanism by which you are maintaining your

6    control over that individual.  It might be that you are

7    doing it physically.  It might be, you might be doing it

8    chemically.  You might be doing it with restraints.  You

9    might be doing it with all of the above, but to me

10   "restraint" means you are maintaining your control over that

11   individual.

12   Q.  So to me it seems like subdual means to subdue someone

13   somehow, and restraining means to keep them essentially

14   subdued; is that fair?

15   A.  I think that's a fair synopsis of what I just said, yes.

16   Q.  And you also chose to include the word "neck

17   compression."  Can you explain why you did that, Dr. Baker?

18   A.  Yes.  Because as I mentioned yesterday, in my experience

19   neck compression was a unique form of restraint.  I had not

20   seen that done before.  I've certainly seen handcuffs.  I've

21   seen people restrained in different positions.  I've seen

22   people restrained in chairs, but I had not seen that

23   particular form of restraint used to maintain control of

24   someone.

25   Q.  Okay.  So your use of the term "neck compression" was a

1    type of restraint, correct?

2    A.  Correct.

3    Q.  It was not separate from the restraint that you had

4    listed earlier; is that also fair?

5    A.  Well, again, it's separate in the sense that at least in

6    my experience it was a unique form of restraint.

7    Q.  But that was part of the restraint that was being used

8    on Mr. Floyd that you observed, correct, Dr. Baker?

9    A.  Yes.

10   Q.  Okay.  And then, Dr. Baker, do you remember meeting with

11   agents from the Federal Bureau of Investigation, the

12   Minnesota Bureau of Criminal Apprehension and some federal

13   prosecutors back on July 8th of 2020?

14   A.  I mean, I remember that that meeting happened.  I'm not

15   going to be able to quote you chapter and verse of what was

16   discussed.

17   Q.  Certainly, but you remember a meeting occurred.  Do you

18   disagree with that particular time frame?

19   A.  No, I don't disagree with that, and I believe that was a

20   virtual meeting if I'm recalling correctly.

21   Q.  Okay.  And we're in 2022, but "virtual" means

22   essentially because of the pandemic people were separated

23   physically but meeting over a computer, correct?

24   A.  Correct.

25   Q.  Like a Microsoft Teams or a Zoom?

1    A.  Correct.

2    Q.  Okay.  Thank you.  And, Dr. Baker, just so the jury

3    knows, as the Hennepin County Medical Examiner, I assume you

4    have all kinds of legal issues that are part of your

5    day-to-day effects of your job; is that correct?

6    A.  I'm not sure what you mean by --

7    Q.  Poor question.  Do you have lawyers that will represent

8    you or other members of your office or your office in

9    general if need be?

10   A.  Yes.  We have a civil attorney from the county

11   attorney's office available to us as needed.

12   Q.  Okay.  And was a representative like that, a legal

13   representative from the Hennepin County Attorneys, separate

14   from the prosecution but representing your office or you

15   present on this meeting as well?

16   A.  Yes.

17   Q.  Okay.  And do you remember discussing the restraint that

18   was going on at the foot of Mr. Floyd during this meeting?

19   A.  I don't have any specific recollection of that.

20   Q.  Okay.  Do you remember indicating that there was no

21   relation to the position or restraint to Mr. Floyd by the

22   officers at his feet and the actual cause of death?

23   A.  I don't remember that particular part of the discussion,

24   but to answer your question, I wouldn't consider what was

25   happening to Mr. Floyd's feet to go beyond the bounds of the

1    term "restraint" as I used them in the, on the death

2    certificate.

3    Q.  Okay.  Do you remember indicating that the level of

4    fentanyl that was found in Mr. Floyd's blood was "relatively

5    high" at that meeting?

6    A.  Again, I don't recall the specifics, but that sounds

7    like exactly what I would say to describe his fentanyl

8    level.

9    Q.  And going then to the amount of methamphetamine that was

10   discovered in Mr. Floyd's body, do you recall at that

11   meeting referring to it as relatively small?

12   A.  Again, I can't recall the specifics of that meeting, but

13   it sounds exactly like how I would describe his

14   methamphetamine concentration.

15   Q.  All right.  You're aware that that particular meeting

16   was not recorded; is that correct?

17   A.  Correct.

18   Q.  Because that became the subject of some contention

19   between the people who were doing the interview and perhaps

20   your legal representatives, correct?

21   A.  Yes.

22   Q.  Can you tell the jury what occurred then, please,

23   Dr. Baker?

24   A.  Again, I only recall the highest level details.  It was

25   originally represented to me that that meeting would be

1    recorded, and then a decision was made kind of at the last

2    minute to not record it.

3    Q.  Do you know who made that particular decision,

4    Dr. Baker?

5    A.  I just know that it wasn't me or my attorney.  I don't

6    know who in, on the other end of the call made that

7    decision.

8    Q.  Okay.  And going to these series of emails that

9    apparently took place following this meeting seeking

10   clarification, was one of the points of clarification what

11   you meant by the use ever either "restraint" or "stress," if

12   you know?

13   A.  It could have been.  Again, I don't recall.

14   Q.  Okay.

15               Just a moment, Your Honor.

16               THE COURT:  Sure.

17   BY MR. ROBERT PAULE:

18   Q.  Dr. Baker, do you recall, going to that last point we

19   were talking about, an email drafted by a person from your

20   office and sent to members of the federal prosecutors

21   office?

22   A.  Are you actually referring to something written by a

23   county attorney?

24   Q.  I am.

25   A.  Okay.  So that wouldn't have come from my office.  That

1    would have come from the county attorney's office, if we're

2    talking about the same document.

3    Q.  Excuse me.  And just so we're clear, the county

4    attorney's office does many things, if you know, correct?

5    A.  I'm sorry.  Could you repeat that?

6    Q.  Sure.  The Hennepin County Attorney's Office, that's the

7    office that provides you a lawyer when you need one,

8    correct?

9    A.  Correct.

10   Q.  They also do other things, including prosecuting people

11   for criminal offenses that occur within Hennepin County,

12   correct?

13   A.  Yes.

14   Q.  But the person that is your lawyer is entirely separate

15   only representing you and presumably your office, correct?

16   A.  She does have other duties, but, yes, she's the only

17   lawyer that represents my office, and she is a civil

18   attorney, not a criminal attorney.

19   Q.  Okay.  And again, your office is neutral and independent

20   from any law enforcement, correct?

21   A.  Correct.

22   Q.  Okay.  But did you perhaps have a conversation with your

23   legal representative to provide points of clarification that

24   arose out of that meeting on July 8th?

25   A.  Yes.

1   Q.  Did one of those points of contention involve whether or

2   not the restraint occurring included in your cause of death

3   include the time that was spent on the ground?

4   A.  I do recall that coming up, yes.

5   Q.  Okay.  And just so the jury's clear, what do you mean

6   "separate and apart from any emails," because this is your

7   opinion?

8            What did you mean when you used the words

9   "restraint" during that time period?  Excuse me.

10  A.  So if -- so broadly speaking, as you look at videos of

11  the event, I would use the term "restraint," and again I am

12  not a use of force expert.  It might have different meanings

13  to different people, but I would use restraint to more or

14  less define the time when Mr. Floyd was out of the back of

15  the vehicle, because he'd gone all the way across the

16  backseat, after he was out of the vehicle and on the ground.

17           Starting with the time he was on the ground and

18  being held in roughly the same or similar position for about

19  nine or nine and a half minutes, I would consider that the

20  restraint.

21  Q.  And that was one of the things that you spoke to your

22  counsel about clarifying coming out of that meeting, would

23  that be correct?

24  A.  To the best of my recollection, yes.  I don't have that

25  document in front of me.

```
1    Q.  Would it, had you ever seen the email that was sent by

2    your lawyer to the federal prosecutors?

3    A.  Yes.

4    Q.  Would it refresh your recollection to look at that?

5    A.  Sure.

6    Q.  Okay.  And it is --

7              May I approach the witness, Your Honor?

8              THE COURT:  You may.

9    BY MR. ROBERT PAULE:

10   Q.  Dr. Baker, I'm going to show you a copy of that email.

11             For counsel's benefit, it is 000 --

12             MS. TREPEL:  I have it, Mr. Paule.  Thank you.

13   I'm good.

14             MR. ROBERT PAULE:  00040651.

15             THE WITNESS:  Okay.

16   BY MR. ROBERT PAULE:

17   Q.  Dr. Baker, does that refresh your recollection about the

18   restraint that we were just talking about?

19   A.  Yes.

20   Q.  That was a point that your representative spoke to you

21   about to provide clarity about what your position was; is

22   that accurate?

23   A.  Yes.

24   Q.  And would I be correct in assuming that what you wanted

25   to convey when you used the word "restraint" you were
```

1    including the activities when Mr. Floyd was on the ground?

2    A.  Yes.

3    Q.  Could I back up a step and ask what you meant by

4    "subdual" at this point, what particular actions?

5                MS. TREPEL:  Asked and answered.

6                THE COURT:  I'm going to overrule.  I -- you may

7    answer.

8                THE WITNESS:  So as I mentioned earlier in the

9    broadest sense as I am not a use of force expert, I would

10   regard the term "subdual" to reflect the time from when the

11   person went from being completely independent to the time

12   when you had gained essentially full control over that

13   individual.

14               In the context of the events of the night of

15   May 25th, I would say that would start with the moment that

16   Mr. Floyd was handcuffed and being the struggle that ensued

17   in the back of the vehicle when he went in one door and out

18   the other until the time he was on the ground and being

19   restrained.  To me that I would broadly define that as the

20   time he was being subdued.

21   BY MR. ROBERT PAULE:

22   Q.  Okay.  And to that point, before you completed your

23   autopsy report, you had viewed a number of videos, correct?

24   A.  Correct.

25   Q.  And that would be the, what we're calling the Facebook

1    video, the video that kind of went viral; is that correct,

2    Dr. Baker?

3    A.  Yes.

4    Q.  Also the video from the inside of Cup Foods?

5    A.  Yes.

6    Q.  And also the body-cam footage from the officers

7    involved; is that correct?

8    A.  Yes.

9    Q.  So you were able to see what was occurring as Mr. Floyd

10   was being extracted from the car, being handcuffed, walked

11   over to the Dragon Wok, walked over to the squad car, the

12   struggle inside the squad car and then what occurred on the

13   ground, correct?

14   A.  Yes.

15   Q.  Okay.  Did it occur, or excuse me.  Did it appear to you

16   as if there was a struggle when Mr. Floyd was being

17   handcuffed?

18   A.  I, I don't recall that part of the video.

19   Q.  Okay.  Going back to the overall point, I think

20   yesterday you testified that sort of in laymen's terms what

21   occurred to Mr. Floyd was, the stress of what was happening

22   was more than his heart could handle given his particular

23   medical conditions and the toxicology results, the drugs

24   that were in his body?

25   A.  Yes.

1   Q.  And when you talk about the word "stress," are you

2   referring to the stress beginning at the time the police

3   started interacting with him?

4   A.  Essentially, yes.

5   Q.  Is there any way you can quantify that?

6   A.  No.  I mean, I can't put a number on it.

7   Q.  So in other words, you can't tell anyone just how much

8   stress Mr. Floyd was feeling when the police officers

9   approached and pounded on the window, correct?

10  A.  Correct.

11  Q.  Or when they asked him to step out of the vehicle and

12  pointed the gun at him, correct?

13  A.  Correct.  I can't quantify that.

14  Q.  Okay.  Because stress is something you talk about where

15  adrenaline is rushed into the body?

16  A.  Yes.

17  Q.  So you can't exactly tell when that process began with

18  Mr. Floyd, other than as a doctor and probably very rational

19  person, you would assume that started the minute he started

20  interacting with police; is that accurate?

21  A.  I mean, I would view stress as gradations depending on

22  what the activity is.  Just being approached by a police

23  officer is probably more stress for some people than for

24  others.  I've never personally had a gun pointed at me, but

25  I'm going to assume that that would be very stressful.

```
1              And then I think one can reasonably infer that
2     when the struggle is taking place in the back of the
3     vehicle, clearly there has to be some physical stress
4     because there's exertion going on.
5     Q.  Okay.  And on some level the exertion levels --
6     A.  Go ahead.
7     Q.  Thank you.  The exertion level that you are referring to
8     is essentially similar to when a person exercises, correct,
9     in some broad sense.
10    A.  Well, I mean, in one sense it is, but exercise is
11    generally voluntary.
12    Q.  Sure.  But if a person's exercising, let's say I get up
13    and I do Peloton in the morning, I'm trying to work out my
14    body and get my muscles moving, correct?
15    A.  Yes.
16    Q.  And does that produce lactic acid?
17    A.  It does.
18    Q.  Okay.  Is that on some level similar to what's referred
19    to as acidosis?
20    A.  Lactic acid is one of the chemicals that results in the
21    blood being more acidotic, yes.
22    Q.  Okay.  Now I'd like to shift gears.  Do you remember
23    during that discussion with the FBI and the other people
24    involved on July 8th, do you recall the topic of excited
25    delirium coming up?
```

1    A.  I do not specifically recall that coming up.

2    Q.  Are you familiar with that term?

3    A.  I am.

4    Q.  Could you tell the jury just in general terms what that

5    term means to you and what you know about it, please?

6    A.  Sure.  And this will have to be in general terms,

7    because I'm not a clinician who treats people who are in the

8    excited delirium or assesses it or manages it.

9    Q.  By the way can I interrupt you, Doctor?

10   A.  Please.

11   Q.  You say you are not a person that normally treats it.

12   What type of medical professional would be the person that

13   typically treats that?

14   A.  It would, well, outside of a hospital, it would be

15   paramedics and allied health care professionals in the

16   hospital.  Would also certainly be emergency room

17   physicians.

18   Q.  Okay.  Excuse me.  Please go ahead.

19   A.  So to answer the previous question with regard to my

20   understanding of excited delirium, it's a condition that

21   people can go into, typically but not always precipitated by

22   stimulant use, the classic case being cocaine, although

23   there are potentially others, and it produces a variety of

24   behavioral and physical effects.

25            Those include things like violent behavior,

1    destruction of property, incoherent ability to speak,

2    ripping off your clothing and running down the street,

3    sweating profusely, being quite hypertensive meaning you

4    were very, very warm as a result of this condition.

5            It is a potentially life threatening condition.

6    The mortality rate, my understanding from the literature, is

7    quite high.  There is one other thing.  I believe the, quote

8    unquote, super-human strength is often reported as one of

9    the effects of excited delirium.

10   Q.  Certainly.  And to be fair, is it correct that this is

11   an area of some controversy medically?

12   A.  Yes and no.

13   Q.  Could you expand on what you meant by that, please?

14   A.  Well, you know, there's some people that claim that the

15   term is overused and that that may be true.  There's some

16   people that are concerned that we're not recognizing it

17   enough, and that may be true.  It's a difficult.  It's a

18   difficult condition to define because it's a syndrome.

19           It's not one unique feature that's diagnostic of

20   something.  I have used the term on rare occasions in the

21   past on deaths that I've investigated, so I'm certainly

22   familiar with it.

23   Q.  Now, historically the medical examiners office in

24   Hennepin County, how long has that office been around, if

25   you know?

1    A.  Well, it started as a coroners office in 1897.  It

2    converted to a medical examiners office in 1963.

3    Q.  Could you explain the distinction between a coroner and

4    a medical examiner, please?

5    A.  In the State of Minnesota, a coroner is an elected

6    official who runs that county's death investigation system.

7    A medical examiner is an appointed forensic pathologist who

8    runs the death investigation system.  Minnesota and I

9    believe Ohio are the only two states that require their

10   elected coroners to be licensed physicians.

11          In many parts of this country, an elected coroner

12   has a minimal age requirement, they have to live in the

13   county in which they hope to be the coroner, and they have

14   to have a high school diploma.

15   Q.  But not necessarily a medical degree?

16   A.  Correct.

17   Q.  Whereas medical examiners need to be certified and have

18   to have a medical degree, correct?

19   A.  Yes.  With very rare exceptions, by definition the term

20   "medical examiner" is equivalent to forensic pathologist.

21   Q.  And just going into the general idea of pathologist or

22   forensic pathologist, but say a coroners office is now a

23   medical examiners office, is it fair to say that sort of the

24   abilities or diagnoses or the training has evolved?

25   A.  From?

```
1    Q.  From, say, the early 1900s until now?

2    A.  Oh, yes.  I mean technology has radically changed in the

3    things we are able to do as forensic pathologists.

4    Q.  Has terminology changed as well?

5    A.  I guess you'd have to be more specific.

6    Q.  Sure.  The Hennepin County medical examiners keep

7    records over the years; is that correct?

8    A.  Yes.

9    Q.  How far back do those records go?

10   A.  We have records back to the early 1900s in the form of

11   the investigations that were done by the coroner back at

12   that time.  I don't know how many autopsies were necessarily

13   done at that time, but all of the death investigations are

14   still in our record books.

15   Q.  And I was using pathology, like all medicine, is an

16   evolving field, is it not?

17   A.  Correct.

18   Q.  And going back to some of those early days, they would

19   use terms as causes of death that clearly we don't use any

20   more; is that correct?

21   A.  I haven't looked through those books in a long time, and

22   I don't know how to answer that question.

23   Q.  Are you familiar with the cause of death as criminally

24   insane being used at some point by your office?

25   A.  I've never heard that used as a cause of death before.
```

1    It sounds a little archaic.

2    Q.  You wouldn't, you wouldn't define anyone as being

3    criminally insane at this point, correct?

4    A.  No.

5    Q.  We don't even use the term "insanity," do we, Doctor?

6    A.  I don't know.  I'm not a psychiatrist or a lawyer.

7    Q.  Okay.  Now, when you were meeting with the federal

8    agents and the BCA back in July, do you remember discussing

9    the prone position?

10   A.  I'm sure we covered it.  Again, I don't recall the

11   specifics of the meeting.

12   Q.  Okay.  Let me just step back then.  In your experience

13   and training, you're aware what the prone position is,

14   correct?

15   A.  Correct.

16   Q.  Is the prone position in your training and experience

17   any more inherently dangerous than any other position in

18   terms of inhibiting a person's ability to breathe?

19   A.  So the answer to that is no, but that's not based on my

20   training and experience because I don't, I don't treat

21   living people and I don't restrain people.  It's my

22   understanding from the literature that the prone position in

23   and of itself is not inherently dangerous.

24   Q.  And you've reviewed a number of studies in that regard,

25   correct?

1    A.  Yes.

2    Q.  And these studies are various ways where we try to

3    quantify that position and other things that affect a

4    person's ability to breathe, correct?

5    A.  Yes.

6    Q.  And you talked yesterday about a bellows effect.  Do you

7    remember that?

8    A.  Yes.

9    Q.  Could you explain that to me just so it's clear for me,

10   please?

11   A.  Bellows is kind of a common analogy we use to describe

12   the motion of the chest.  I think most people can picture

13   what bellows do, and what I'm saying is, the chest cage

14   expands like bellows, and that allows us to take oxygen in.

15           And when the bellows contract, when the chest cage

16   contracts, it is pushing the air, the carbon dioxide, out of

17   the lungs.

18   Q.  And do you have an opinion based on literature review

19   you've done if the bellows effect is inhibited by a person

20   being in the prone position?

21   A.  Again, this is my understanding as a pathologist.  I'm

22   certainly not a pulmonologist, but just being in the prone

23   position my understanding it would not cause a clinically

24   significant difference in one's ability to move the bellows.

25   Q.  Okay.  And again directing you back, pardon me,

1    directing you, but you had this email exchange which

2    apparently occurred sometime in August with your lawyer and

3    the federal prosecutor at that time, correct?

4    A.  Correct.

5    Q.  Okay.  And afterwards did you have a meeting again with

6    the Federal Bureau of Investigation and some federal

7    prosecutors on August 18th, 2020?

8    A.  Again, I don't recall specifically, but that sounds

9    right.

10   Q.  Okay.  And I'm probably going to use this term

11   incorrectly, but are you aware of the term tachyia?

12   A.  Petechiae.

13   Q.  I knew I was doing it wrong.  Could you explain what

14   that term is if you are aware?

15   A.  Yes.  In forensic pathology, pulmonary petechiae means

16   tiny little blood spots that form on the whites of the eyes,

17   on the inside of the eyelids and sometimes you can even see

18   them showering a person's face and on the mucosa, the lining

19   of the inside of their mouth.

20           In my world petechiae occur in a limited number of

21   ways.  One of those situations is when there's marked

22   pressure put on the neck.  What happens is, blood can get

23   into the brain through the carotid arteries, but it can't

24   get back out through the jugular veins, and so the pressure

25   in the head builds up, and those little tiny blood vessels

 1    burst, and that's why you see those petechiae.

 2              There are other circumstances in which you can get

 3    them, but in the context of an asphyxial death, that's the

 4    general mechanism for petechiae.

 5    Q.  And would I be correct in assuming that because the

 6    blood can come into the head but can't get out, that's

 7    because of the compression that's being used?

 8    A.  The compression of the neck.

 9    Q.  Okay.  And is this something we're commonly looking at

10    or talking about in terms of a manual, or excuse me, a

11    strangulation?

12    A.  Correct, or a hanging as we discussed yesterday.

13    Q.  Okay.  And those are ways in which the neck is sort of

14    encircled at the carotid arteries, and blood can't get out?

15    A.  With the hanging, the carotid arteries are functionally

16    encircled.  As you mentioned with a manual strangulation, it

17    is really more additional pressure right over the arteries.

18    It doesn't have to be around the neck.

19    Q.  And did you observe any petechiae in this case on

20    Mr. Floyd?

21    A.  No, I did not.

22    Q.  Is that something you were looking for?

23    A.  Yes.

24    Q.  And I know I'm going to use this term wrong.  A negative

25    inference, is that a term you used yesterday or previously?

1    A.  I think the term I used is pertinent negative.

2    Q.  That's it.  Can you explain again what that means,

3    please, Dr. Baker?

4    A.  Yeah.  So as a physician, you have a differential

5    diagnosis as to what may have happened to your patient or

6    what the potential diagnosis might be, and so you do certain

7    things on a physical exam to either prove or disprove one of

8    your concerns.

9         So a pertinent negative is something that you

10   would have expected to see if a particular diagnosis was

11   correct, and because it's not, because that finding is not

12   there, that becomes pertinent because now that goes against

13   that diagnosis that makes that diagnosis less likely because

14   of what you expected to find was not there.

15   Q.  Okay.  And relevant to this case, did you observe any

16   petechiae in Mr. Floyd?

17   A.  I did not.

18   Q.  And what, if any, significance did you attach to that

19   particular negative inference?

20   A.  It, the lack of petechiae, is just a strike against the

21   hypothesis that his airway or more specifically the blood

22   vessels in his neck were actually being compressed.  Now

23   petechiae are not 100 percent diagnostic.  The presence or

24   absence of petechiae is never actually diagnostic, but it

25   does go against the pressure on his neck compressing

1    critical vessels.

2    Q.  And then, Dr. Baker, you were called to testify in front

3    of what's called a grand jury on August 20th of 2020; is

4    that correct?

5    A.  Yes.

6    Q.  And this is a, excuse me, a room somewhere in a federal

7    courthouse, correct?

8    A.  Yes.

9    Q.  And was your legal representation there when you

10   testified on August 20th of 2020?

11   A.  She was in the building, but she was not in the

12   courtroom.

13   Q.  Okay.  And do you remember testifying that anatomically

14   you didn't have any evidence of trauma to the front of

15   Mr. Floyd's neck?

16   A.  Correct.

17   Q.  And do you remember testifying that anatomically

18   pressure on the back, and I want to make sure this is clear,

19   back or back side of Mr. Floyd's neck would not cut off an

20   airway or compress the arteries?

21   A.  Correct.

22   Q.  What did you mean when you testified to that, just so

23   it's clear to everyone?

24   A.  So when we talk about the anatomy of the neck, we're

25   talking about the trachea, which is right here in the

1    middle.  It's right behind your Adam's apple.  For any of

2    you who only check your carotid pulse, you know your carotid

3    artery is right next to the trachea on either side.

4            So when I talk about the pressure on Mr. Floyd's

5    neck not affecting those, I'm talking about this area right

6    here (indicating).

7            In my opinion the pressure applied to the back of

8    Mr. Floyd's neck, as evidenced on the videos, would not

9    explain how these structures would be compressed.  When we

10   do an autopsy, we meticulously lift the skin off the neck,

11   and we dissect every one of the individual muscles that

12   lives under the skin on either side of the trachea because

13   we're looking for bruises on those muscles because that

14   would be indicative of pressure to the front of the neck.

15           We very carefully look at the thyroid cartilage,

16   which is your Adams apple, the pie shaped thing here, and

17   the hyoid bone, the little U shaped bone.  We look very

18   carefully at those for fractures because if those are

19   fractured, that would be indicative of pressure to the front

20   of the neck, and that would support a concern that someone's

21   blood supply to their brain had been cut off or their

22   trachea had been compressed shut.

23   Q.  And there was no such evidence that you found in your

24   examination of Mr. Floyd; is that correct?

25   A.  That's correct.

1   Q.  And you also performed, I don't want to use the word

2   unusual, but a particular medical procedure where you looked

3   under the skin of Mr. Floyd from his neck all the way down

4   his back; is that accurate?

5   A.  That is correct.

6   Q.  Could you explain what you did and why you did that,

7   Dr. Baker?

8   A.  Yes, this is going to sound a little bit graphic, but on

9   many deaths in custody we want to make sure we don't miss

10  any occult trauma and occult trauma means stuff you can't

11  see on the outside of the body with the naked eye.  You've

12  got to look under the skin.

13          And so to do that I make an incision all the way

14  from the back of the head down the entire length of the back

15  and down both buttocks.  And then with that incision, I take

16  a blade and cut underneath the skin all the way out to the

17  sides of the neck, all the way out to the shoulders, all the

18  way out to the flanks.

19          And so basically you've seen every square inch of

20  that individual's skin from underneath, because you already

21  did it from the front with the traditional autopsy.  Now

22  you're doing it from the back, and the whole point of that

23  is, you don't want to miss bruises that you couldn't see

24  with the naked eye from the outside.

25          And those bruises are not just in the skin.  You

1   are also looking for those bruises in the fat in the muscles

2   that live right underneath the skin because it is often much

3   easier to see underneath than from the outside.

4   Q.  You talked about various factors that can affect

5   bruising, but in essence you were trying to get as much

6   medical evidence of what either was there or wasn't there in

7   terms of any bruising, correct?

8   A.  Correct.

9   Q.  Was there any bruises found in that examination?

10  A.  With regard to Mr. Floyd's back, no.

11  Q.  Okay.  Now, when you testified in front of the grand

12  jury, you talked about the phrase "I can't breathe," not

13  specific as to Mr. Floyd but about this particular

14  sensation.

15          Do you recall that?

16  A.  I don't recall the specifics of that.

17  Q.  Okay.  When someone is saying they can't breathe, is

18  that a sensation that could be caused by perhaps more than

19  one thing?

20  A.  Again, with the caveat that I'm not a pulmonologist,

21  yes, I can picture several scenarios where a person would

22  feel they couldn't breathe.

23  Q.  Would one of those be the toxicological status of a

24  person?

25  A.  I would probably defer that question to a toxicologist.

1   I'm not sure what the side effects would be in an awake,

2   conscious person where a drug could cause that sensation.  I

3   would punt that to a toxicologist.

4   Q.  Okay.  And then would another thing that could cause

5   that sensation be what's referred to as a cardiac event?

6   A.  Yes.

7   Q.  And again I don't want to use an inappropriate term.

8   When the term "cardiac event" is used, what does that mean

9   to you as a doctor?

10  A.  That's kind of a catchall term for a variety of cardiac

11  questions.  To answer your question specifically, if you

12  have bad coronary arteries and your heart is being ischemic,

13  meaning your heart muscle is not getting enough oxygen, you

14  may start to exhibit the classical signs of a heart attack,

15  and one of those signs could be the inability to breathe or

16  the perception that you can't catch your breath.

17  Q.  Okay.  And in this case you've reviewed the officers'

18  body-cam videos, correct?

19  A.  Yes.

20  Q.  That depicts the struggle that was going on inside of

21  Squad 320, correct?

22  A.  Yes.

23  Q.  Do you recall hearing Mr. Floyd say that he couldn't

24  breathe during that point in time?

25  A.  Yes.

1    Q.  And that is prior to any of the restraint occurring

2    while he's on the ground?

3    A.  Yes.

4    Q.  Prior to any of the officers being on top of him?

5    A.  Yes.

6    Q.  Is it possible that at that point Mr. Floyd was

7    experiencing sensation because of a cardiac event?

8    A.  I can't say one way or the other, but it is possible.

9    Q.  And when you say you can't say one way or the other, can

10   you explain why, Dr. Baker?

11   A.  The only way you'd be able to know that in a person in

12   real time would be if it occurred in a controlled setting

13   where you had an echocardiogram and you can see the

14   electrical impulses in the heart, you can see the ischemic

15   changes.  That does happen in a medical setting, and that's

16   how we know it's occurring.

17           There's obviously no way I can know that in

18   Mr. Floyd's case.  All I can say is exhibits at least an

19   anatomic substrate for that possibility and that being his

20   coronary arteries.

21   Q.  I would like to reference back to what you just said.

22   Are you familiar with what's referred to as a stress test?

23   A.  Yes.

24   Q.  Can you explain that, please?

25   A.  Again, I'm a pathologist, not a cardiologist, but if a

```
 1      cardiologist suspects a person might have serious coronary

 2      artery disease and they would like to unmask that to prove

 3      the person has it, one of the easiest ways they can do it is

 4      to put the person on a treadmill wearing an EKG while

 5      they're doing it.

 6              And I only know the basics of this, because I've

 7      never had one, but you're essentially trying to stress that

 8      person's heart just enough to trigger those EKG changes so

 9      you know they have coronary artery disease.  And then your

10      next step is to have that person get an angiogram and some

11      kind of intervention if the stress test turns out to be

12      positive again.

13              That's a pathologist's understanding how the

14      stress test works.

15      Q.  Sure.  But going to Mr. Floyd, again, the reason we

16      don't know what was going on essentially in his heart is

17      because he wasn't set up with an EKG test.  Is that the

18      term?

19      A.  They're just little patches you actually stick on a

20      person's skin.

21      Q.  Okay.  To monitor the activity in his heart, correct?

22      A.  Correct.  There's no way that could be happening in the

23      real world.

24      Q.  Okay.  In other words, perhaps Mr. Floyd could have been

25      dealing with the cardiac event at that point, but there's no
```

1    way to know?

2    A.  It's possible, but there's no way to know.

3    Q.  Now, by the way, Dr. Baker, you made a couple references

4    during that last line of questioning referring me to a

5    different outside specialist; is that correct?

6    A.  Correct.

7    Q.  Okay.  I think you referred to a cardiologist and a

8    toxicologist, correct?

9    A.  Correct.

10   Q.  Now, I've looked at a transcript of your testimony in

11   front of the federal grand jury on August 20th, 2020.  In

12   your first grand jury testimony, I only noted one instance

13   when you made a reference to an outside specialist.  Would

14   that be accurate?

15   A.  That sounds about right, yes.

16   Q.  And I believe that was when you reached out to someone

17   to consult about this sickle cell trait.  And again I don't

18   want to use the wrong terms, but is that what you referred

19   to?

20   A.  I don't recall the specifics of how I came to mention an

21   outside expert in my first grand jury testimony, but I

22   definitely did when assessing Mr. Floyd's sickle status.

23            THE COURT:  Excuse me.  Excuse me.  We have to

24   take a recess.

25            We're in recess.  The jury can be excused.

1       (Recess taken at 10:54 a.m.)

2                                * * * * *

```
1        (11:10 a.m.)

2                        IN OPEN COURT

3                        (JURY PRESENT)

4             THE COURT:  Proceed.  Counsel, proceed.

5             MR. ROBERT PAULE:  Thank you, Your Honor.

6    BY MR. ROBERT PAULE:

7    Q.  To reorient ourselves, Dr. Baker, I think I was talking

8    about your inquiry or your statement when you were

9    testifying in front of the grand jury in August of 2020

10   about seeking information from a different specialist.

11            I think if memory serves, that was about a sickle

12   trait, if I'm using the right word.

13   A.  Again I don't recall what specialist I referenced in

14   that particular testimony, but I will take your word for it.

15   And I did in fact consult a hematopathologist briefly to

16   look at one slide from Mr. Floyd's blood taken when he was

17   alive.

18   Q.  And again, you testified yesterday about that particular

19   finding.  You don't find any medical significance with

20   regard to Mr. Floyd's cause of death, correct?

21   A.  Correct.  I would not imply that sickle cell trait

22   played any role in his death.

23   Q.  And likewise the same thing with Mr. Floyd's COVID

24   diagnosis, correct?

25   A.  Correct.
```

1    Q.  Okay.  Thank you.  And then, Dr. Baker, did you later

2    have a meeting in December of 2020 with a number of state

3    court prosecutors?

4    A.  Again, I don't recall the date specifically, but yes.

5    Q.  I believe Keith Ellison was there.  Does that ring a

6    bell?

7    A.  Yes.

8    Q.  Okay.  Do you remember on that one discussing an injury

9    to the inside of Mr. Floyd's lips that you found during your

10   examination of him?

11   A.  I don't specifically recall that discussion, but

12   Mr. Floyd did in fact have injuries to the inside of his

13   lips.

14   Q.  Okay.  And do you know, can you tell us about that

15   injury first, Dr. Baker?

16   A.  Well, I don't have the photos with me, so I'll just have

17   to describe it, but one of the things we do during an

18   examination like Mr. Floyd's is, we actually lift the lips

19   up and look at the inside of them because there is injuries

20   that could be in the inside that you can't see just by

21   looking at someone's face.

22        My recollection is, Mr. Floyd had some patterned

23   injuries on the inside of his lips that more or less

24   resembled the teeth that would be right underneath at that

25   part of the lip.

1   Q.  Okay.  And you also testified that when you first

2   examined Mr. Floyd, any medical intervention was essentially

3   left in place, correct?

4   A.  Correct.

5   Q.  And you talked about Mr. Floyd being intubated; is that

6   correct?

7   A.  Correct.

8   Q.  And again so the jury knows, this is where there's a

9   device put down a person's throat to try to assist them in

10   breathing, correct?

11   A.  Yes.

12   Q.  Do you know the source of the injury on the inside of

13   Mr. Floyd's lips?

14   A.  No.  I would deem them nonspecific.  They could be from

15   blunt trauma.  They could be as a result of medical

16   intervention.

17   Q.  And do you remember also during that meeting talking

18   about a scar on Mr. Floyd's left clavicle?

19   A.  I don't specifically recall that, no.

20   Q.  Let me back up, Dr. Baker.  When you are doing this

21   meticulous physical examination of the patient you are

22   dealing with, you are looking for any signs of any scars,

23   correct?

24   A.  Within reason.  I mean there are some scars that are so

25   small they might not have any relevance, but generally we

1    are going to document any scars.

2    Q.  And I assume as a forensic pathologist you deal a lot

3    with gunshot wounds?

4    A.  Yes.

5    Q.  And are you also familiar in your practice and your

6    training and experience in diagnosing scars that appear to

7    be from bullet wounds?

8    A.  I would say that by the time an injury has reached the

9    point where it's a scar, I would not be able to tell that it

10   occurred from a firearm injury or not.

11   Q.  In your examination of Mr. Floyd's body, did you find

12   any scar consistent with a bullet hole?

13              MS. TREPEL:  Objection.  Relevance.

14              THE COURT:  It's overruled.  You may answer.

15              THE WITNESS:  Again, I'll fall back on the same

16   answer, which is by the time it's a scar, I really couldn't

17   say what it's from.

18   BY MR. ROBERT PAULE:

19   Q.  And you don't recall what your statements were when you

20   met with the state prosecutors back on January 9th of 2020?

21   A.  I don't.

22              MR. ROBERT PAULE:  May I have just a moment, Your

23   Honor?

24              THE COURT:  You may.

25

1    BY MR. ROBERT PAULE:

2    Q.  Dr. Baker, would it refresh your recollection of the

3    meeting you had with the state court prosecutors on

4    December 9, 2020, to look at a summary that was created by

5    their investigators, the BCA agents?

6    A.  It might.

7         MR. ROBERT PAULE:  And for counsel's reference,

8    it's Bates 040655.

9         Your Honor, may I approach the witness?

10        MS. TREPEL:  Your Honor, I'm going to object at

11   this point to form.  I'm not sure that there's any question

12   pending to refresh Dr. Baker's recollection of.

13        THE COURT:  Because there's been an answer of

14   something that wasn't recalled, so you can show it to him.

15   BY MR. ROBERT PAULE:

16   Q.  Does that refresh your recollection to some degree?

17   A.  Not really.  I mean, I'm not the author of this

18   document.  This is somebody paraphrasing what they thought

19   they heard me say.  I'm speaking medical.  This is not a

20   medical person transcribing this, so I don't know that this

21   accurately reflects exactly what I said.

22   Q.  Okay.  You don't recall exactly what you said, and that

23   document does not refresh your recollection?

24   A.  No.  I mean, in the overall scheme of things as I'm

25   trying to understand how Mr. Floyd passed away, a scar over

1   his left clavicle is not going to get a lot of attention

2   from me.

3   Q.  Dr. Baker, do you also recall during that meeting

4   discussing the what's called I think edema?  Am I using that

5   term correctly?

6   A.  Yes.

7   Q.  And again just to orient the jurors, what does that term

8   mean?

9   A.  Well, edema generally is fluid that builds up in any

10  body tissue or organ.  I think you are probably specifically

11  referencing Mr. Floyd's pulmonary edema, which is fluid that

12  has built up in the lungs.

13  Q.  Okay.  And I believe you testified that you saw that

14  present in Mr. Floyd, correct?

15  A.  Correct.

16  Q.  And that there are multiple potential causes for that;

17  is that correct?

18  A.  Yes.

19  Q.  One of them is resuscitative efforts, including CPR; is

20  that correct?

21  A.  Correct.

22  Q.  Does fentanyl also sometimes play a role in edema?

23  A.  Yes.  All opioids, including fentanyl, can cause

24  significant pulmonary edema as one of their side effects

25  leading to death.

1   Q.  Okay.  And does that in turn act the rigidity of the

2   chest wall?

3   A.  The pulmonary edema.

4   Q.  Yes, or edema.  Yes.

5   A.  I'm not aware that pulmonary edema would have any effect

6   on the rigidity of chest wall.  Again, a pulmonologist may

7   know better.

8   Q.  All right.  And then following that interview in

9   December of 2020, were you given some more video evidence by

10  agents from the Bureau of Criminal Apprehension in

11  January 28th of 2021?

12  A.  I don't recall.

13  Q.  And, Dr. Baker, you've talked about viewing the body-cam

14  footage, the Cup Foods video and some of the social media;

15  is that correct?

16  A.  Correct.

17  Q.  Were you also provided video from Hennepin County

18  Medical Center?

19  A.  Yes.

20  Q.  Can you tell the jurors what you remember being provided

21  by them or of that particular -- of Hennepin County Medical

22  Center?  I'm phrasing it very poorly.

23  A.  Yeah.  So again, this is me not as a Hennepin County

24  Medical Center employee and certainly not as an ER

25  physician, I believe they have cameras running in the

1    emergency room for all of their codes.  I think it's for

2    teaching and quality assurance purposes.

3            And that happened to be available on Mr. Floyd's

4    case and was made available for me to be able to watch.  I

5    watched it once at most.  My only concern was, I just wanted

6    to make sure that nobody actually gave Mr. Floyd fentanyl in

7    the emergency room because it is sometimes used as an

8    emergency drug.

9            Now there's nothing in his medical records to

10   suggest that ever took place, and there was nothing in that

11   video to suggest that anybody verbally authorized it.

12   Beyond that, I really wouldn't know much of what I'm seeing

13   in that video because I'm not an emergency room doctor.

14   Q.  Were you also provided video from inside of the

15   ambulance from Hennepin County Health Care?

16   A.  I don't specifically recall.  And if I watched it, I

17   certainly don't recall it ever changing any of my opinions

18   on the case.

19   Q.  And then, Dr. Baker, do you remember testifying a second

20   time in front of the federal grand jury on February 18th of

21   2021?

22   A.  Yes.

23   Q.  And again this was in a federal courthouse, correct?

24   A.  Correct.

25   Q.  And your attorney was somewhere in that building; is

1    that correct?

2    A.  Yes.

3    Q.  And you were actually questioned by Ms. Trepel, who did

4    the direct examination of you here in this courtroom; is

5    that correct?

6    A.  Yes.

7    Q.  Okay.  And you indicated that at that point you created

8    a what's called hierarchy from most immediate to underlying,

9    and those may be my terms, but I'm talking about the cause

10   of death?

11   A.  Yes.

12   Q.  Okay.  And again, could you go through and is hierarchy

13   your term, or did I just kind of make that up?

14   A.  We use the phrase "cause of death hierarchy" as a term

15   of art all the time in pathology.  It refers to those four

16   lines I drew yesterday on a death certificate, where you

17   point out the immediate cause of death due to this, due to

18   this, due to this.

19            There is actually four lines depending on how

20   verbose you need to be in painting an accurate picture of

21   how that person died.

22   Q.  And again the first line on that hierarchy is the

23   cardiopulmonary arrest complicating law enforcement subdual

24   restraint and neck compression; is that correct?

25   A.  Correct.

1    Q.  And then the second was the heart disease?

2    A.  No.  So on Mr. Floyd's death certificate, the cause

3    death hierarchy, I only used the first line.  It's the

4    cardiopulmonary arrest due to.

5            All of the other conditions that I described were

6    placed on what's called the other significant conditions or

7    contributing conditions section of the death certificate.

8    Q.  Okay.  And there's actually two different types of heart

9    disease that you observed in Mr. Floyd; is that correct?

10   A.  Yes.  Different, different but typically interrelated

11   heart diseases.

12   Q.  Okay.  And again, could you please describe those for

13   the jury?

14   A.  Yes.  So Mr. Floyd had what we call arterial sclerotic

15   heart disease.  That is hardening and narrowing of the

16   coronary arteries.  Mr. Floyd also had hypertensive heart

17   disease, which means due to some long-standing history of

18   high blood pressure, his heart was somewhat enlarged and a

19   little bit dilated.

20           There's also features you can see under the

21   microscope that correlate with that, so those were his two

22   heart conditions, hypertensive heart disease and

23   arteriosclerotic heart disease.

24   Q.  And if I understand correctly, those act in combination

25   to put him in a more vulnerable or fragile condition,

1    correct?

2    A.  Yes.  All other things being equal, that would put your

3    heart at risk for deleterious things to happen if you are

4    stressed.

5    Q.  And just so I'm clear, the hypertensive heart disease

6    means that because he has essentially high blood pressure,

7    his heart has had to work harder over a period of time, and

8    since it is a muscle it has gotten bigger, correct?

9    A.  Correct.

10   Q.  And that creates the need for this particular heart to

11   get more oxygen at certain times than a normal sized heart

12   would be, correct?

13   A.  Correct.

14   Q.  And then the other part of the heart disease is the

15   narrowing of those three arteries insides Mr. Floyd's heart,

16   correct?

17   A.  Correct, although he only had narrowing in two of the

18   arteries.

19   Q.  Excuse me.  Is one of them called a branch?

20   A.  Yes.

21   Q.  So there were three measurements made of the coronaries

22   inside Mr. Floyd's heart, correct?

23   A.  I believe there might have been more than three, but the

24   arteries that were affected were the left anterior

25   descending.  The branch that you just mentioned, which is

1    the first diagonal and, then his right coronary artery.

2            My recollection is his circumflex, which we

3    typically regard as the third of the three coronary

4    arteries, did not have significant disease.

5    Q.  And is the idea that because these arteries are

6    narrowed, it makes it harder for blood to get through to a

7    heart that already needs more oxygen because it is bigger?

8    A.  Correct.

9    Q.  And in this case when you testified in front of the

10   grand jury, you made references to a number of other

11   subspecialties of medicine, correct?

12   A.  I recall two specifically.  There could be more in

13   there.

14   Q.  A pulmonologist?

15   A.  Yes.

16   Q.  And an emergency room physician?

17   A.  Yes.

18   Q.  And I if told you I went through your transcript and

19   found references to a pulmonologist eleven times, does that

20   sound accurate?

21   A.  That could be, yes.

22   Q.  And an emergency room physician 16 times.  Excuse me.

23   Five times.  Pardon me.

24   A.  Again, I'll take your word for it, Counselor.

25   Q.  Let's go through the math again just so I'm not screwing

1    anything up.

2         I told you I found eleven references to a

3    pulmonologist.  Does that sound accurate?

4    A.  Again, I have not been able to do a word search on the

5    transcript, but I will take you at your word.

6    Q.  And then five other times where you made a reference to

7    an area that might be better suited by an emergency room

8    physician.

9    A.  Again I don't recall specifically, but I'll take you at

10   your word.

11   Q.  Okay.  And then during that grand jury testimony, is one

12   of the things you made a reference to an emergency

13   department physician be about the topic of excited delirium?

14   A.  I don't, I don't honestly recall that coming up during

15   the grand jury, but if it had I can easily picture myself

16   saying that an emergency room specialist would have more

17   expertise in recognizing that and treating it than I would.

18   Q.  Would it refresh your recollection to look at a copy of

19   your grand jury testimony from I believe it's February,

20   February 18th of 2021?

21   A.  Yes.

22   Q.  And a page reference to be 00037505.  And I think what

23   that means for your purposes, Dr. Baker, would be page 54.

24         May I approach the witness, Your Honor?

25         THE COURT:  You may.

1               MR. ROBERT PAULE:  Thank you.

2    BY MR. ROBERT PAULE:

3    Q.  Does that refresh your recollection?

4    A.  It does.

5    Q.  Did you make a specific reference to an emergency

6    department physician being better placed than you would be

7    to opine on the topic of excited delirium?

8    A.  I did.

9    Q.  Did you also refer to something in your grand jury

10   testimony as a white paper on excited delirium?

11   A.  Yes.

12   Q.  Can you explain what that is, please?

13   A.  I don't know specifically what the term "white paper"

14   means in the context of a medical publication.  I just know

15   that the American College of Emergency Physicians put one

16   out on this specific topic in 2009.

17         I have, I have read it in the past in relation to

18   other cases, and so I happened to have a copy on my computer

19   and was aware of it.

20   Q.  Okay.  Now, Dr. Baker, with the court's permission, I'd

21   like to approach and show you something marked for

22   identification only as Exhibit T-17.

23         And I have a copy for the court as well,

24   counsel -- or excuse me, Your Honor.

25         May I approach the witness?

```
1              THE COURT:  You may.

2              MR. ROBERT PAULE:  Thank you.  Dr. Baker, is that

3    the white paper that you were referring to?  Is that a copy

4    of it.

5              THE WITNESS:  It is.

6    BY MR. ROBERT PAULE:

7    Q.  Okay.  And does that fairly and accurately represent the

8    document you referenced having on your computer?

9    A.  Yes.

10   Q.  And specifically that was something you reviewed to

11   essentially educate yourself or to review literature, at

12   least, on the topic of excited delirium?

13   A.  That and to confirm that emergency room physicians are

14   really the people that would be on the front lines seeing

15   this and treating it, yes.

16             MR. ROBERT PAULE:  Okay.  Your Honor, I would

17   offer I believe it's T-17.

18             MS. TREPEL:  Your Honor, I'd object to admitting

19   the whole 20-page white paper into evidence.  I think

20   certainly Dr. Baker has said he --

21             THE COURT:  Counsel, we're going to have to go on

22   sidebar.  I'm not able to hear you.

23        (At sidebar)

24             MS. TREPEL:  Your Honor, this is an -- is everyone

25   on?
```

1    I'll just turn away from the jury slightly.  Can

2    everyone hear me now?

3    Okay.  This is Sam Trepel for the government.

4    Your Honor, we're objecting to the entry of this exhibit

5    into evidence.  Dr. Baker has said it's a 20-page medical

6    treatise from a different medical specialty that Dr. Baker

7    has said he's not an expert on this topic, and the actual

8    document is hearsay.

9    So I think he can be certainly questioned about

10   it, but I would object to it coming into evidence.

11   MR. ROBERT PAULE:  Your Honor, Robert Paule.  This

12   is a document that Dr. Baker has testified that he has

13   reviewed and used for part of his training and review of the

14   literature on this syndrome, which he has testified to.

15   It's also part of the basis of why he indicated

16   that it would be better referred to an emergency room

17   physician.  It forms the basis for that opinion.

18   MS. TREPEL:  And because of that, Your Honor, I

19   believe that it is entirely appropriate to question

20   Dr. Baker about it, but because he has -- it's just hearsay

21   from another medical specialty.  I don't think it's

22   appropriate to admit all this hearsay into evidence.

23   THE COURT:  Well, counsel, it seems to me that the

24   witness has indicated that he has reviewed this document and

25   referred to this document.  It does in fact refer to

1    emergency room physicians, that's correct, but at the same

2    token, it's within the quantum knowledge of the witness who

3    has given a number of opinions on a number of subjects.

4           So I'm going to overrule the objection and receive

5    T-17.

6       **(In open court)**

7           THE COURT:  The exhibit is received.

8    BY MR. ROBERT PAULE:

9    Q.  Now, Dr. Baker, that T-17, the exhibit in question,

10   that's a white paper that you just described about the

11   syndrome excited delirium syndrome, correct?

12   A.  It is.

13   Q.  Do you have a working familiarity with that particular

14   syndrome?

15   A.  I believe I answered that earlier this morning, and I

16   probably even used the phrase "working familiarity."

17   Q.  Okay.  And is that something that you in your capacity

18   as a medical examiner, or broadly a forensic pathologist,

19   feel like you should be aware of because that could come

20   into play in your practice?

21   A.  Yes.

22   Q.  Okay.  But again you feel like questions about that

23   particular syndrome are best referred to an emergency room

24   physician, correct?

25   A.  Yes.

1    Q.  Okay.  Now, Dr. Baker, towards the end of your testimony

2    in front of the grand jury on February 18th of 2021, you

3    were asked a question specifically about whether anyone has

4    tried to pressure you or influence you to say anything other

5    than the truth; is that correct?

6    A.  Yes.

7    Q.  Specifically, the question said:  Dr. Baker, has anyone

8    involved in this case, including anyone from the Minneapolis

9    Police Department --

10              MS. TREPEL:  Objection.  Hearsay.  He's reading

11   the statement into the record at this point without the

12   question.

13              THE COURT:  Yeah, I sustain.  I think reading that

14   question at this point would be inappropriate.

15              MR. ROBERT PAULE:  Okay.

16   BY MR. ROBERT PAULE:

17   Q.  Dr. Baker, you recall that question being posed to you,

18   correct?

19   A.  You didn't -- what question are you referencing,

20   counselor?

21   Q.  I didn't finish.  I apologize.  I believe you have the

22   document in front of you.

23   A.  Oh, I'm sorry.

24   Q.  And I apologize, Dr. Baker.

25              Would it refresh your recollection about what

1    specific question you were asked?

2              MS. TREPEL:  Your Honor, again, this pattern of

3    reading a question and asking about a hearsay statement that

4    was made earlier without there being a question, I object

5    to.

6              THE COURT:  Counsel, it may be hearsay, but it may

7    not be hearsay.  It depends on what we're talking about, and

8    I think we're got to get to the witness and refresh that

9    recollection, and then we'll make that hearsay

10   determination.

11             MS. TREPEL:  Yes, Your Honor.  I was just asking

12   for Mr. Paule to first propound a question before there's

13   something to refresh about.  That's all I was trying to

14   clarify.

15             THE COURT:  Okay.  Go ahead and do that.

16   BY MR. ROBERT PAULE:

17   Q.  Do you recall the exact question posed to you by

18   Ms. Trepel when you testified in front of the grand jury on

19   February 18, 2021, about whether anyone had tried to

20   pressure you or influence your testimony?

21   A.  I do not recall the question.  I recall the question

22   being asked, definitely.  I don't recall the exact wording

23   of the question.

24   Q.  Would it refresh your recollection to look at a copy of

25   your grand jury testimony from that date?

1    A.  Yes.

2    Q.  Okay.  And I would direct your attention, Dr. Baker, to

3    page 58 of exhibit, excuse me, of that document at Bates

4    00037509.

5    A.  Okay.

6    Q.  Does that refresh your recollection?

7    A.  It does.

8    Q.  Can you tell the jury exactly what question was posed to

9    you?

10   A.  I can read it verbatim.

11   Q.  Please.

12          MS. TREPEL:  Objection to reading it verbatim.

13   Hearsay.

14          THE COURT:  Overruled.

15          THE WITNESS:  This is by Ms. Trepel:  "Dr. Baker,

16   has anyone involved in this case, including anyone from MPD

17   or the government, pressured you or influenced you to say

18   anything other than the truth here today?"

19   BY MR. ROBERT PAULE:

20   Q.  And what was your response to that question being posed

21   to you?

22   A.  I answered, "Can I take a break and speak with counsel?"

23   Q.  And what was the time that you asked to take a break and

24   speak with counsel?

25   A.  It says, "Witness leaves the room from 10:12 a.m. to

1   12:18 a.m.," which is obviously a typo.

2   Q.  So it's a period of just over six hours -- excuse me --

3   just over two hours and six minutes, approximately, when you

4   returned to that room to answer that question?

5   A.  No, counselor, that's incorrect.  If you look at the end

6   of the transcript, you can see that the deposition or,

7   sorry, the grand jury ended at 10:21 a.m.

8   Q.  Okay.  Let me ask you a question.  Did you go out and

9   speak with your counsel with respond to that particular

10  question?

11  A.  Yes, apparently for no more than nine minutes.

12  Q.  Okay.  And what was your answer when you returned back

13  and read that same exact question?

14  A.  My answer was, in response to the question have you been

15  pressured by any of these various agencies, my response was,

16  "No."

17  Q.  Now to be accurate, a number of people have through

18  various means tried to, I assume, show their feelings

19  towards your work in this case, correct?

20  A.  I think you're going to have to be a little bit more

21  specific, counselor.

22  Q.  Certainly you received, your office has received, lots

23  of harassment about your work in this case, correct?

24  A.  Correct.

25  Q.  And you testified to threats being made to your staff?

1    A.  Yes.

2    Q.  And threats being made to you?

3    A.  Yes.

4    Q.  What would you assume those people are doing that for?

5    A.  I don't know.  I didn't listen to most of the incoming

6    phone calls.  I don't know the answer to that.

7    Q.  Okay.  But, again, being threatened, I think you

8    indicated that happened at one point previously in your

9    career, correct?

10   A.  Correct.

11   Q.  If you have any idea, how many threats do you think you

12   received with regard to your work in this case?

13   A.  Me personally or my office?

14   Q.  Both.

15   A.  I'm sure it was in the hundreds, if not more.  I mean,

16   there were days when the phone was ringing off the hook

17   around the clock.

18   Q.  And some of these threats were very specific, without

19   going into any more detail; is that accurate?

20   A.  I believe so, yes.  My very stoic and very intrepid

21   staff did an excellent job of insulating me from a lot of

22   that.

23   Q.  Good.  And as well, Dr. Mitchell spoke with you and

24   indicated he was going to write an op ed piece critical of

25   your findings, correct?

1    A.  Again, I don't recall specifically what Roger's wording

2    was.  That was a phone call 18 months ago, but that might be

3    the gist of it.

4    Q.  Okay.  And your reappointment, you had some of the

5    county commissioners specifically vote against you as a

6    result of your work on this case correct?

7    A.  I don't recall the rationale for both of them, but at

8    least one of them I think articulated it being directly

9    related to this case, yes.

10   Q.  And I'm just going to put it to you, sir, because you

11   know best.  Has anyone influenced you or pressured you to

12   say anything other than the truth here today about your work

13   with Mr. Floyd?

14   A.  No.

15            MR. ROBERT PAULE:  Okay.  Thank you very much,

16   Dr. Baker.  I don't have any further questions.

17            THE COURT:  Thank you.

18            Mr. Plunkett, anything?

19            MR. PLUNKETT:  Yes, Your Honor.

20            THE WITNESS:  Counselor, do you need your

21   documents back?

22                      CROSS-EXAMINATION

23   BY MR. PLUNKETT:

24   Q.  Good morning, Dr. Baker.

25   A.  Good morning.

1  Q.  My name is Tom Plunkett.  I think we've met before.

2  A.  Yes.

3  Q.  And very few questions for you, if I may.

4  A.  Okay.

5  Q.  Thank you.  Dr. Baker, you have seen the body-worn

6  camera videos, correct?

7  A.  Yes.

8  Q.  And you watched the body-worn camera videos and the

9  by-standard videos, correct?

10  A.  Correct.

11  Q.  And I believe when you watched the various videos, your

12  purpose was to figure out what happened to George Floyd?

13  A.  Part of it, yeah.

14  Q.  Okay.  I'm going to display a screenshot from what's

15  called Exhibit No. 5, which is a body-worn camera video of

16  Mr. Lane, and it's a demonstrative exhibit, so it won't go

17  into evidence, but I just want to for your benefit it is

18  demonstrative 6-W.

19          Just for the purposes of orientation we see a

20  handcuff, and that's Mr. Floyd's right hand.  And after that

21  we see a knee, and in front of that we see a black glove,

22  and we see Officer Chauvin is wearing that black glove.  And

23  the right knee is Mr. Kueng's right knee.  Fair enough?

24  A.  Yeah.  I mean I don't know who Mr. Kueng is.  I know who

25  Mr. Chauvin is, so I'll take your word for it.

1    Q.  Okay.  Mr. Kueng is my client.

2    A.  Right.  No.  I get that, but I can't tell that by

3    looking at the picture.

4    Q.  Okay.  Well, he just -- you've seen other portions of

5    the video, and there were three people, and there's one in

6    the middle?

7    A.  Yes.

8    Q.  This screenshot is from the third person looking

9    forward, so the knee belongs to the person in the middle.

10   Fair?

11   A.  Okay.

12   Q.  All right.  It's your opinion having watched the videos

13   is that Mr. Kueng's right knee above the waist or the

14   buttocks did not have any significant impact on Mr. Floyd's

15   death?

16   A.  I'm sorry.  Could you repeat the question?

17   Q.  It was my understanding that your opinion having watched

18   the videos is that Mr. Kueng's knee above the waist or the

19   buttocks did not have a significant impact in this case?

20   A.  Just for clarification, are we talking about Mr. Kueng's

21   right knee?

22   Q.  Yes.

23   A.  And that's this right here (indicating)?

24   Q.  Yes, it is.

25   A.  Okay.  I'm not sure that's entirely -- you said above

1  his buttocks or his waist.  I'm not sure it's actually even

2  that high on Mr. Floyd's body.

3  Q.  It's lower, isn't it?

4  A.  As best as I can tell from this photograph and knowing

5  what Mr. Floyd was wearing at the time, it appears to me

6  that it may be below the crest of his buttocks, maybe even

7  on the back of his thigh.

8  Q.  And I wouldn't dispute you on that.  I think that's

9  accurate, but the point of the question is that Mr. Kueng's

10  position didn't have a significant impact on Mr. Floyd's

11  death?

12  A.  I think the original question posed, not by you,

13  counselor, but in the context it was first asked was, would

14  this be impairing Mr. Floyd's ability to breathe, and my

15  answer would have been no.

16         As a pathologist, I wouldn't be able to come up

17  with a mechanism where pressure on your buttock or your

18  thigh would impair your ability to breathe.

19  Q.  Okay.  Would that be the same as saying no significant

20  impact?

21  A.  Correct.

22  Q.  Okay.  You met with the defense counsel, three of the

23  defense attorneys, on January 22nd.  Do you recall that?

24  A.  Yes.

25  Q.  And thank you for your time, by the way.

```
 1    A.  Of course.

 2    Q.  During that meeting you shared that the hands cuffed

 3    behind Mr. Floyd's back would not impair his ability to

 4    breathe unless they were held above his lungs; is that

 5    correct?

 6    A.  That would be my understanding as a pathologist, yes.  I

 7    wouldn't be able to come up with a mechanism for where they

 8    are located in this picture impairing someone's ability to

 9    breathe.

10    Q.  Okay.  Again, no significant impact, correct?

11    A.  In my opinion as a pathologist, yes.

12    Q.  Thank you.  You told us that you have no particular

13    skill interpreting videos, but that common sense would

14    support the fact that the weight on Mr. Floyd fluctuated as

15    Mr. Chauvin and Mr. Floyd moved around.  Agreed?

16    A.  Yes.

17              MR. PLUNKETT:  Thank you, Your Honor.

18              THE COURT:  Thank you.

19              Mr. Gray.

20              MR. GRAY:  Thank you.

21                        CROSS-EXAMINATION

22    BY MR. GRAY:

23    Q.  Good morning, Doctor.

24    A.  Good morning.

25    Q.  Earl Gray.  I think we may have met before.  I don't
```

1    remember.

2    A.  I believe we have a few times over the years.

3    Q.  I just have one question.  From looking at the video and

4    listening to the audio of the video, is it your opinion that

5    my client Thomas Lane's position on George Floyd had no

6    relation to the cause of death of George Floyd?

7    A.  Could you remind me of your client's position?

8    Q.  Yes.  He was down by the feet.

9    A.  Okay.  So with regard to Mr. Floyd's ability to breathe,

10   as a pathologist I would find that position completely

11   unrelated to impairing Mr. Floyd's ability to breathe.

12   Q.  Okay.  Thanks, doctor.

13           MR. GRAY:  That's all I have, Your Honor.

14           THE COURT:  Thank you.

15           Ms. Trepel.

16           MS. TREPEL:  Thank you, Your Honor.

17                   REDIRECT EXAMINATION

18   BY MS. TREPEL:

19   Q.  All right.  Dr. Baker, you were asked a series of

20   questions by Mr. Paule about potential effects that various

21   threatening and harassing calls that you received or other

22   means of public pressure had on you.  Do you remember those

23   questions?

24   A.  I do.

25   Q.  All right.  First of all, I want to focus on the role of

Exhibit A-00108

1   doctors that you may have consulted with or spoken with.

2   All right?  So, first, how typical is it for you to consult

3   with another doctor or medical examiner when you are

4   conducting a death investigation?

5   A.  Well, I'm very fortunate because I have a staff of eight

6   pathologists that -- seven at the time Mr. Floyd passed

7   away, but we've expanded to eight, and so we commonly

8   frequently consult with each other all the time on cases.

9   I'm lucky to have that collective experience in my office.

10  Q.  And so did you consult with anyone in this case?

11          MR. ROBERT PAULE:  Objection.  Calls for hearsay,

12  Your Honor.

13          THE COURT:  I'll overrule.  You may answer.

14          THE WITNESS:  So, yes, because as a matter of

15  policy all homicides in our office are thoroughly reviewed

16  by a second pathologist before that report can be signed and

17  released.  So that's an automatic keyway mechanism.  I would

18  say virtually every death in custody in the recent past, the

19  pathologist responsible for that actually presents it to the

20  entire team for discussion, for input, is there anything

21  here I missed, is there anything here I should have done

22  differently.  That is routine in our office, and that took

23  place in Mr. Floyd's case.

24  BY MS. TREPEL:

25  Q.  And how large is that entire team?

1    A.  Again, at the time it was seven staff pathologists,

2    including me.

3    Q.  And what was the result of that consultation?

4              MR. ROBERT PAULE:  Objection.  Calls for hearsay.

5              THE COURT:  No.  It's overruled.

6              THE WITNESS:  Well, the ultimate answer to your

7    question is it's what you saw on the death certificate and

8    it's the final signed autopsy report, which also indicates

9    it was QA'd under my signature block.

10   BY MS. TREPEL:

11   Q.  And when you say "QA'd," what do you mean by "QA?

12   A.  Quality assurance.

13   Q.  Did any other consultations with other medical

14   professionals cause you to alter your opinion about the

15   cause of Mr. Floyd's death?

16   A.  No.

17   Q.  Now, what about receiving of various threatening and

18   harassing phone calls?  Did any of that type of pressure

19   change or alter your opinion about the cause of Mr. Floyd's

20   death?

21   A.  It did not.

22   Q.  Now, I think you were also asked some questions about

23   releasing partial information about an autopsy before you

24   get all of the lab results and that type of information

25   back?  Do you remember those questions?

1    A.  I do.

2    Q.  Can you explain why is it you don't release partial

3    information?

4    A.  Well, we don't release partial information for several

5    reasons.  One is it may paint the wrong picture for what the

6    ultimate conclusions turn out to be.  The second is most of

7    that information would be protected data under Minnesota

8    statutes, and so I wouldn't be able to release it even if I

9    thought it was a good idea.

10   Q.  So what involvement, if any, did you have in any

11   language about the autopsy before there was a conclusion

12   being included in a criminal complaint?

13   A.  Again, I had multiple meetings with the Hennepin County

14   Attorney's Office, so they knew what the preliminary

15   findings were as they were coming in in realtime.  I don't

16   write the charging documents, and I don't know how the

17   decisions get made as to what does or does go in those.

18   Q.  And did you have any input in the decision about whether

19   to release that information in a criminal complaint?

20   A.  No.  That's completely a function of the legal system.

21   I honestly don't know how that works.

22   Q.  I think you were asked some questions about petechiae?

23   A.  Yes.

24   Q.  All right.  So can you clarify, does the fact that you

25   didn't see evidence of petechiae rule out the idea that

1    Officer Chauvin placed pressure on Mr. Floyd's neck?

2    A.  No.  As I testified earlier, petechiae can be suggestive

3    of certain kinds of asphyxia.  They can mitigate against

4    certain kinds of asphyxia, but they are not a hundred

5    percent accurate.

6    Q.  All right.  Now, you were asked a serious of questions

7    about deferring to other medical specialties?

8    A.  Yes.

9    Q.  Can you explain why it is you defer to other medical

10   specialties at times?

11   A.  Sure.  I often get asked questions that clearly pertain

12   to phenomena that only occur in living people, whether it's

13   measurements of pulmonary function, what you would be

14   looking for on an EKG if a living person had a stress test,

15   what forms of resuscitation would you use in different

16   circumstances.  Obviously, I'm going to defer to, A, the

17   appropriate clinician for a better answer to questions like

18   that.

19   Q.  All right.  And in this case did you refer the

20   government to various medical specialties?

21   A.  Yes.  I specifically recall being asked multiple

22   questions about various effects, different things would

23   happen on a person's ability to breathe and gradations along

24   that difficulty in breathing.  And I said, to the effect,

25   you know, a pulmonologist would be in a much better position

1    to answer a question like that.

2    Q.  All right.  I'm trying to reduce the number of questions

3    as much as I can here.  Pardon my moment to organize my

4    thoughts.  But now I think Mr. Plunkett asked you some

5    questions based on that image he put up on the screen?

6    A.  Yes.

7    Q.  Do you remember that?  So based on your review of the

8    video, generally, could you determine whether or not

9    officers were exerting enough pressure to keep Mr. Floyd

10   pinned to the ground?

11           MR. GRAY:  Object to that, Your Honor, as vague

12   when she mentions officers.

13           THE COURT:  No.  I'm going to overrule.  I think

14   the witness has previously identified three people.

15           THE WITNESS:  Would you mind repeating the

16   question, counselor?

17   BY MS. TREPEL:

18   Q.  If I can remember it, I will try.  So based on your

19   review of the video, the question was whether you could

20   determine whether the officers were or were not exerting

21   enough pressure to keep Mr. Floyd pinned to the ground.

22   A.  So qualitatively the answer to that is yes.  I mean,

23   Mr. Floyd was not able to get up.  I have no way of knowing

24   as a forensic pathologist how much force that's requiring in

25   that situation.  There is nothing about being a medical

1  examiner that makes me any more gifted at reviewing videos

2  than the average person.  So I have no way to quantify the

3  amount of force being used.

4  Q.  Now, based on your -- well, let me ask you this.  You

5  testified a bit about, in response to defense counsels'

6  questions, about stress, the stress that the police

7  interaction was placing on Mr. Floyd.  Do you remember those

8  questions?

9  A.  Yes.

10  Q.  Is the duration of time that a person is under stress

11  relevant to the effects that the stress has on a person?

12  A.  I would assume so, yes, because as long as the stress

13  continues and as long as the person is conscious, the stress

14  hormones would continue unabated.

15  Q.  Okay.  And based on your review of the videos, in your

16  opinion, was Mr. Floyd's decline sudden or did it occur over

17  a period of minutes?

18  A.  It certainly appeared to me that it went on over the

19  course of minutes.

20  Q.  And where was Mr. Floyd when you observed his decline

21  occurring over a period of minutes?

22  A.  He was on the ground.

23       MS. TREPEL:  One moment, please.  This is why one

24  has colleagues.  I forgot something.

25

```
 1    BY MS. TREPEL:

 2    Q.  All right.  Mr. Paule asked you some questions about

 3    excited delirium.  Do you recall those questions?

 4    A.  I do.

 5    Q.  Now, I think in your testimony earlier you said

 6    something like you had previously used excited delirium on a

 7    death certificate before?

 8    A.  Over the course of 24 years I've been doing this, I've

 9    probably done it a handful of times.  It's pretty uncommon,

10    but I have used the term before.

11    Q.  Did you place excited delirium on Mr. Floyd's death

12    certificate as a cause of his death?

13    A.  I did not.

14              MS. TREPEL:  I have no further questions.

15              THE COURT:  Thank you.

16              Mr. Paule.

17                    RECROSS-EXAMINATION

18    BY MR. ROBERT PAULE:

19    Q.  Dr. Baker, I think as I get older my hearing gets worse.

20    Did I just hear that you have actually listed as cause of

21    death on a death certificate excited delirium?

22    A.  Either on the first line of the cause of death hierarchy

23    or as a contributing condition, yes.

24    Q.  All right.  Thank you very much.  No further questions.

25              THE COURT:  Thank you.
```

1    Anything, Mr. Plunkett?

2    MR. PLUNKETT:  Nothing further, Your Honor.

3    THE COURT:  Mr. Gray?

4    MR. GRAY:  No, Your Honor.

5    THE COURT:  Anything further?

6    MS. TREPEL:  No, Your Honor.

7    THE COURT:  Okay.  Thank you very much, Doctor.

8    You may step down.

9    THE WITNESS:  Thank you, Your Honor.

10    MS. BELL:  Your Honor, can we have a sidebar?

11    THE COURT:  Yeah, we can.  I think we can probably

12    have it out loud.  Are you going to suggest we take our

13    lunch break now?

14    MS. BELL:  I am, Your Honor.  You are a mind

15    reader.

16    THE COURT:  Okay.  Well, I was going to suggest it

17    if you didn't, so.

18    Okay.  Members of the jury, when we came in

19    earlier, I said we're going to be late for lunch.  Now we're

20    going to be early for lunch, but we will take it anyway.

21    We're going to stand in recess at this time.  We'll be in

22    recess until 1:30 this afternoon.

23    The jury may be excused.

24    (11:54 a.m.)

25

1    **IN OPEN COURT**

2    **(JURY NOT PRESENT)**

3         THE COURT:  Counsel, I understand that one of

4    the jurors -- not jurors, one of the witnesses that you had

5    lined up for this afternoon is ill.  Have we made any

6    contact there?  Is that person going to be here or not?

7         MS. BELL:  Your Honor, I'm not sure yet.  I can

8    let -- I can shoot out an email to the court and counsel as

9    soon as I find out --

10         THE COURT:  Okay.

11         MS. BELL:  -- the circumstances and let the court

12    know what I think the afternoon will look like.

13         THE COURT:  Okay.  That's fine.  If we can fill it

14    up, why, that's good; if we can't, that's the way it goes.

15         MS. BELL:  Thank you, judge.

16         THE COURT:  Okay.  Let's break for lunch.  See you

17    at 1:30.

18    (Recess taken at 11:55 a.m.)

19                   * * * * *(1:32 p.m.)

20                   **IN OPEN COURT**

21                   **(JURY NOT PRESENT)**

22         THE COURT:  Counsel, I came in knowing that we

23    have witness problems, but I don't know what the status is.

24         MS. BELL:  Sure, Your Honor.  So the witness who

25    was going to be our first witness this afternoon is sick and

1     so will not be here today.

2              And so we are calling one witness who is in the

3     building but is making his way up here.  I think he's --

4     he's in the building, I know that, and making through

5     security and et cetera and will be up here to start probably

6     in the next five minutes, ten minutes.

7              THE COURT:  Okay.  He might be in the hallway now.

8              MS. TREPEL:  He's in the hallway now.

9              MS. BELL:  He's in the hallway now.  So we are

10    ready to start when the court is, but that will be our only

11    witness for this afternoon.  Our next witness is a doctor

12    who is flying in and will be testifying tomorrow morning.

13             THE COURT:  Counsel, you've got 40 some witnesses

14    on your list, and many, many of those people are in the Twin

15    Cities.

16             MS. BELL:  Yes.

17             THE COURT:  And somehow or other you've got to get

18    these people on notice that you can bring them in out of

19    order.  When we've got this long a trial, we just can't

20    afford to be down any more time than we have to, and I'll

21    tell you flat out, the occupant of this chair before me, you

22    would have rested today when you didn't have the witness.

23             MS. BELL:  I understand, Your Honor.  I apologize.

24    I did not predict that we were going to have an illness this

25    afternoon.

```
 1              THE COURT:  Of course you didn't, but you also
 2      knew it this morning, and there are other people that are in
 3      the metropolitan area.  That's what I'm concerned about.
 4              Anyway, we got the person.  We're going to do what
 5      we have to.
 6              MS. BELL:  Judge, I will in the future make sure
 7      that I have a lineup.
 8              THE COURT:  Please do.
 9              MS. BELL:  Deeper, yes.
10              THE COURT:  Please do.
11              If the witness is here, let's get the jury in and
12      get started.
13              MR. ROBERT PAULE:  Excuse me, Your Honor.
14              THE COURT:  Mr. Paule.
15              MR. ROBERT PAULE:  I would like to request that
16      the jury be given a limiting instruction prior to this
17      particular witness.
18              THE COURT:  For what?
19              MR. ROBERT PAULE:  It's my understanding that this
20      witness is related only to Mr. Lane and not to either
21      Mr. Kueng or Mr. Thao.
22              THE COURT:  Ms. Trepel, is that true?
23              MS. TREPEL:  Yes, Your Honor.  Yes, Your Honor.
24              THE COURT:  Okay.
25              MS. TREPEL:  That's true.  And related to that,
```

1    and I discussed this with counsel at various points, there

2    were four exhibits on our exhibit list that were not part of

3    the stipulation because I believe counsel wanted to make,

4    wanted to include the exhibits in that limiting instruction.

5              And I would offer into evidence those exhibits as

6    to Mr. Lane now.

7              THE COURT:  Okay.  And those exhibit numbers are?

8              MS. TREPEL:  Yes.  Those are Exhibits 92

9    through 96.

10             THE COURT:  Do I hear objections to 92 through 96?

11             MR. GRAY:  I'm just going to take a look at them,

12   Your Honor.

13             THE COURT:  Okay.

14             MR. GRAY:  I apologize.  It will just be a minute.

15             MR. ROBERT PAULE:  Your Honor, and on behalf of

16   Mr. Thao, I would just simply make a relevance objection for

17   the record and ask for a limiting instruction.

18             MR. GRAY:  Your Honor, the exhibits, the only

19   objection I have actually to this witness, too, his name is

20   Christopher Douglas.  He was the trainer in 2017 when Thomas

21   Lane was a correctional officer.

22             And I don't know the materiality or the relevance

23   of him coming in here and saying that he trained Tom Lane.

24   In fact, I would stipulate that he went through training

25   when he was a corrections officer.  It's not that big of a

1    deal to me.

2           If they want to prove he was a correctional

3    officer in 2017 and went through training, what does that

4    prove about knowing that George Floyd was seriously in

5    medical needs?  None.

6           MS. TREPEL:  Your Honor --

7           THE COURT:  What's the relevance of this witness?

8           MS. TREPEL:  The relevance is, the trainer is

9    going to explain the content, very briefly, that Mr. Lane

10   received in terms of his training on positional asphyxia and

11   the duty to intervene.  It goes to his willfulness, which is

12   an element that we have to prove.

13          THE COURT:  Counsel, how can that possibly be

14   relevant when it's a completely different position involving

15   a different organization?

16          MS. TREPEL:  Because what matters is in Mr. Lane's

17   head, and so when he -- if he knew that he had a duty to do

18   something to provide medical care, to turn a person onto his

19   side, no matter where he learned that, that is relevant to

20   his willfulness.

21          THE COURT:  Counsel, that's what he tried to do.

22          MS. TREPEL:  But we need to prove the fact that he

23   didn't take the actions to provide the medical care.  This

24   is the training where he got some of that -- exactly what he

25   should have been doing at the time.

1          THE COURT:  Counsel, your previous witness
2     conveniently dropped out a word "attempt" on direct
3     examination.  That was brought out on cross-examination that
4     the word "attempt" was included in the request to turn the
5     patient on its side.
6          MS. TREPEL:  Your Honor, the full slide, I
7     believe, was put up with all the words, but that was in the
8     duty to intervene, which is not the count that Mr. Lane is
9     charged with, the attempt.
10          THE COURT:  Okay.  I'm going to overrule the
11     objection.  I'm going to receive Exhibits 92 through 96 as
12     it applies to Officer Lane only, and it has no application
13     to Officers Thao or Kueng.
14          MR. GRAY:  Excuse me, Your Honor.  There's one
15     thing here that should be noted.  It's not "should have
16     known."  It's know, that he knew that this guy was in
17     serious medical needs, and they're going to prove this by
18     2017 --
19          THE COURT:  That's what she said, "should have
20     known."
21          MR. GRAY:  It's not "should have known."  It's
22     "know."
23          THE COURT:  But that's what she said.  That's not
24     what you said.
25          Let's get the jury.

Douglas - Direct

1560

1       (1:39 p.m.)

2                        **IN OPEN COURT**

3                        **(JURY PRESENT)**

4               THE COURT:  You may be seated.

5               Members of the jury, first of all, we're a little

6       bit late coming in, and you are going to get out early

7       today, I think and hope.  The reason for that is one of the

8       witnesses that was scheduled to be here at 1:30 today is ill

9       and not COVID, by the way, but is just not feeling well, and

10      as a result, that witness couldn't get here today.

11              So instead of having two witnesses this afternoon,

12      there will only be one.  And that witness will be coming

13      forward, and with that witness, you need to be aware that

14      this witness's testimony will be only applicable to Officer

15      Lane.  It is not applicable in any way, shape or form to

16      Officers Thao or Kueng.

17              In addition to that, Exhibits 92, 93, 94, 95 and

18      96 are received in evidence as applicable to Officer Lane,

19      but again those exhibits are not applicable to either

20      Officer Thao or Officer Kueng.

21              With that, if you'd call your witness, please.

22              MS. TREPEL:  United States calls Christopher

23      Douglas.

24              THE COURT:  Mr. Douglas, if you'd stop there and

25      raise your right hand.

Douglas - Direct

1    CHRISTOPHER DOUGLAS,

2    called on behalf of the government, was duly sworn, was

3    examined and testified as follows:

4         THE COURT:  Take the witness stand.  Remove your

5    mask.  Slide up close to the microphone and give us your

6    name, including spelling of your last name.

7         THE WITNESS:  My name is Chris Douglas,

8    D-o-u-g-l-a-s.

9         MR. GRAY:  Your Honor, could he speak into the

10   mic?  I can't hear him.

11        THE WITNESS:  Sorry.

12        THE COURT:  Yeah.  That microphone is kind of

13   directional, so you need to pull it down so it looks right

14   straight at your mouth.  There we are.

15        THE WITNESS:  My name is Christopher Douglas

16   D-o-u-g-l-a-s.

17                  DIRECT EXAMINATION

18   BY MS. TREPEL:

19   Q.  Mr. Douglas, where do you work?

20   A.  Currently I work for the Department of Community

21   Corrections and Rehabilitation in Hennepin County.

22   Q.  And what is that department responsible for in terms of

23   the facilities it oversees?

24   A.  We have two facilities.  One is preadjudication and one

25   is adjudicated facility for adults.

```
 1    Q.  Okay.  When you say preadjudicative, are they --

 2    A.  Pretrial.  Pretrial, the juvenile institution is a

 3    pretrial facility.

 4    Q.  So detention centers or jails?

 5    A.  Correct.

 6    Q.  All right.  What is it that you do there?

 7    A.  I'm the lead safety trainer for both facilities.

 8    Q.  And just to preview why you are here, did you train any

 9    of the defendants in this case?

10    A.  I believe I did.

11    Q.  Who was that?

12    A.  Officer Thomas Lane.

13    Q.  Okay.  And at the time where was Defendant Lane working?

14    A.  The juvenile detention center.

15    Q.  Can you tell us what you do as the lead safety trainer

16    for the department?

17    A.  Sure.  I train all of the new employees that come on

18    board to work at the facilities and then once they are

19    there, I provide refresher training throughout the year,

20    throughout their employment, in restrictive procedures.

21    Q.  Can you tell us what restrictive procedures means?

22    A.  It might also be known as use of force techniques, but

23    restrictive procedures are just a series of soft hand or

24    open hand techniques that we train the officers that work in

25    the facilities to gain control physically of residents when
```

1    it's needed.

2    Q.  How long have you held the position of lead safety

3    trainer?

4    A.  I've been with the DOCCR for five years now.

5    Q.  And before that very briefly what did you do?

6    A.  Prior to coming to the DOCCR, I worked at the Hennepin

7    County Sheriff's Office as a detention deputy and a

8    detention sergeant.

9    Q.  And is that like a corrections officer?

10   A.  Correct.

11   Q.  And what type of detainees or inmates did you work with?

12   A.  So there, both pretrial detainees and some were, would

13   return from prisons and other facilities to go to court, so

14   both.

15   Q.  Okay.  And those are adults?

16   A.  Yes.

17   Q.  All right.  And how long did you work as a detention

18   deputy and sergeant for Hennepin County?

19   A.  16 years.

20   Q.  Now, what types of trainings do you teach as a lead

21   safety trainer?

22   A.  For the most part, it is, again, the restrictive

23   procedures techniques, how to use your hands to, you know,

24   bring physically under control residents in the facilities

25   who are not under control.

1    Q.  Who is it that you are giving these trainings to?

2    A.  The officers and the supervisors that work there.

3    Q.  And when you say, "The officers and supervisors that

4    work there," do you mean in both facilities, the adult jail

5    facility and the juvenile detention center?

6    A.  That's correct.

7    Q.  And in 2017 and 2018, were both the adult and juvenile

8    detention officers given the same use of force training, or

9    was that different?

10   A.  It's the same.

11   Q.  How long is the use of force training you teach to new

12   juvenile detention officers when they start?

13   A.  Part of their on-boarding really encompasses about 20-

14   to 24-hour training.

15   Q.  And what topics do you cover in that training?

16   A.  We go over things like deescalation techniques.  We go

17   over physical restraint techniques.  That's pretty much it.

18   Q.  All right.  Now, is that restrictive procedures training

19   or use of force training that you provide to new officers or

20   new hires part of a longer training program for new

21   employees?

22   A.  Yes, the on-boarding process I believe is two weeks.

23   Q.  And what type of use of force training do officers get

24   after they are already on-boarded and completed that new

25   employee training?

Douglas - Direct

```
 1              MR. GRAY:  Judge, I object to this.  Lack of

 2     foundation unless he did the training.

 3              THE COURT:  Sustained.

 4     BY MS. TREPEL:

 5     Q.  Mr. Douglas, is it Officer Douglas or Mr. Douglas?

 6     A.  Mr. Douglas is fine.

 7     Q.  Okay.  Sorry.  Did you actually train Mr. Lane?

 8     A.  Yes.

 9     Q.  What course did you actually train Mr. Lane in?

10     A.  I've trained -- I know specifically I've trained a

11     refresher class that he would take, four hours in length,

12     that basically covers all of the things that they trained

13     when they came on board.

14              MR. GRAY:  Judge, I object to that.  Move the last

15     part be stricken because he didn't do the training when he

16     came on board.

17              THE COURT:  I sustain the latter part of the

18     sentence.

19     BY MS. TREPEL:

20     Q.  So when you said the four-hour restrictive procedures

21     training, when was that offered in terms of a person's

22     employment?  In other words, was that in-service training or

23     training that folks get once they're already on-boarded?

24     A.  They are already on-boarded, and it is in-service

25     training.  It's a part of a quarterly refresher training on
```

 1    those skills.

 2    Q.  What was Mr. Lane's position at the time that you

 3    trained him?

 4    A.  A juvenile corrections officer.

 5    Q.  When, if you know, did Defendant Lane begin working as a

 6    juvenile correction officer?

 7    A.  I don't have the exact date.  The -- 2017, I believe?

 8    Q.  If I showed you a document, would it refresh your

 9    recollection?

10    A.  Sure.

11    Q.  Actually, can we bring up what's been admitted into

12    evidence as Government Exhibit 92, please, page 1?

13            Is that large enough for you to see?

14    A.  It is.

15    Q.  Okay.  What is that document?

16    A.  This appears to be an acceptance letter.

17    Q.  From where?

18    A.  From the DOCCR, from the Department of Community

19    Corrections.

20    Q.  And who is it for?

21    A.  It is for Thomas Lane.

22    Q.  And what's the date on that letter?

23    A.  October 2017.

24    Q.  Does that refresh your recollection at all about when

25    Mr. Lane started?

1    A.  Yes.

2    Q.  All right.  And -- all right.  I'd like to move now to

3    show you what's been admitted into evidence as Government

4    Exhibit 94.

5            Do you recognize this document?

6    A.  I mean, it appears to be a training document of, kind of

7    laying out a schedule.

8    Q.  Okay.  Do you recognize any courses on there that you

9    typically teach?

10           MR. GRAY:  Judge, object to that.  Unless he

11   taught some of these courses to Tom Lane, this is not

12   admissible.

13           THE COURT:  Sustained.

14           THE WITNESS:  There are courses here that I

15   trained, yes.

16           MS. TREPEL:  May I build a foundation, Your Honor?

17           THE COURT:  Sure.

18   BY MS. TREPEL:

19   Q.  And which course on here do you regularly train?

20   A.  I train the Tria boundaries training.  Let me just go

21   through all of these.  The restrictive procedures training.

22   Q.  And is that the restrictive procedures training you

23   referred to earlier, like use of force?

24   A.  That's right.

25   Q.  And this is the eight-hour one for new hires?

 1    A.  Yes.

 2    Q.  Okay.  That's a course you regularly teach, correct?

 3    A.  Yes.

 4    Q.  And then you referred earlier you also would teach a

 5    refresher course on that same topic?

 6    A.  Yes.

 7    Q.  Are you familiar with who taught Mr. Lane on the two

 8    days referred to in Government Exhibit 94?

 9    A.  I am familiar with the trainers that were handling that

10    day, yes.

11    Q.  And who did provide the training on, on this date on the

12    restrictive procedures training for new employees?

13    A.  It would be my assistant or my direct report, Brandon

14    Halleran, and a facility trainer, Michael Schwartz.

15    Q.  And Mr. Halleran, is he still with your department?

16    A.  He is not.

17    Q.  As someone you supervised, did you observe him training?

18    A.  I have several times, yes.

19            MR. GRAY:  Judge, I object as leading.  Move the

20    answer be stricken.

21            MS. TREPEL:  Laying foundation, Your Honor.

22            THE COURT:  Counsel, it is a leading question, and

23    it seems to me that the witness has disqualified himself as

24    it relates to that particular training because it was done

25    by another person.

1       MS. TREPEL:  Yes, Your Honor.  I had another

2   question to finish my foundational --

3           THE COURT:  Okay.  Then ask the question.  I'm

4   sorry.

5   BY MS. TREPEL:

6   Q.  Just whether you, after observing him teaching, do you

7   cover the same information in that eight-hour restrictive

8   procedures class as your direct report when he teaches it?

9   A.  Absolutely.  It's the same across the board.

10          MR. GRAY:  Object.  That's lack of foundation.  He

11  doesn't know what was covered.

12          THE COURT:  That's right.  I sustain.

13          MS. TREPEL:  Okay.

14          MR. GRAY:  Move the answer be stricken.

15          THE COURT:  The answer is stricken.

16  BY MS. TREPEL:

17  Q.  All right.  If we could move to Government Exhibit 95,

18  please.  Can you take a look, and if we can enlarge the top

19  there.

20          Can you tell us generally what this document is

21  and what it shows?

22  A.  Yeah, this appears to be a training record.

23  Q.  Have you seen this before?

24  A.  I have.

25  Q.  And who is it for?

```
1    A.  For Officer Lane.

2    Q.  Now, if we can move down and find the refresher

3    restrictive training course here, and can we enlarge that?

4            Okay.  Do you see the refresher restrictive

5    training procedures class that you taught?

6            MR. GRAY:  Object to that, Your Honor, unless he

7    taught it.  I didn't quite catch if he taught that course.

8            THE COURT:  Well, let's lay that foundation.  Did

9    he or didn't he?

10           THE WITNESS:  I did.  I did teach this class, yes.

11   BY MS. TREPEL:

12   Q.  Okay.  The four-hour refresher that you've just

13   testified about?

14   A.  That's correct.

15   Q.  Okay.  Can you mark on your screen, if you can see it

16   there, where it is.

17           And we can make that one bigger, perhaps.

18   A.  (Indicating).

19   Q.  It looks like you are moving a cursor around that.

20   A.  That's right.

21   Q.  Okay.  That's the one you were moving the cursor around?

22   A.  Yes.

23   Q.  Okay.  And can you tell us the topics you covered in

24   this particular class?

25   A.  Sure.  In this class we go over physical restraint
```

Douglas Hocevar

1   techniques to aid the officers in the application of

2   mechanical restraints like handcuffs.  We teach takedowns,

3   how to control someone on the ground.  We go over various

4   techniques in controlling the legs at one point, if needed

5   the arms, and then getting the person up and --

6   Q.  Can you --

7   A.  -- getting them where they need to go.

8   Q.  Can you tell us how you teach these classes?  In other

9   words, practical, classroom component, lecture?  What does

10  that look like?

11  A.  Yeah.  So we strongly encourage everyone that is in this

12  role to use their words to diffuse situations whenever

13  possible.  That's first and foremost.  And as they move

14  closer to a situation where physical techniques are needed,

15  those decisions are really driven by, by the resident's

16  behavior.

17          And so as they, the situation escalates, then they

18  would be required to recognize the behavior and apply the

19  correct level of force needed to bring the situation under

20  control.  Our main goal, whenever possible, is to keep

21  somebody in a vertical position on their feet.

22          We train this because being on your feet, everyone

23  being on their feet, we have a less likelihood of sustaining

24  any injuries and, and it just makes it easier for transport

25  once they are under control or in restraints.

Douglas-Direct

1    Q.  And how are you conveying that information?  In other

2    words, are you -- is this a discussion or lecture class?

3    Are you actually doing the techniques that you are talking

4    about on mats?  How does that work?

5    A.  Yeah.  So we'll have, we'll have mats.  And typically

6    how the training goes is, we have this discussion.  We

7    explain what we expect as a department, and then myself or a

8    co-trainer will demonstrate and then provide time and space

9    for those attending to show us the skill and move forward.

10   Q.  Okay.  Are you familiar with the term "positional

11   asphyxia"?

12   A.  I am.

13   Q.  Is that a concept that you cover in your restrictive

14   procedures training?

15   A.  Yes.  This is a concept that -- it's not specifically a

16   block of training that we spend moments on separate to

17   restrictive procedures training.  It's a concept that is

18   introduced early on and revisited throughout every single

19   training that we teach when we do physical training.

20   Q.  Can you explain how it's conveyed in this restrictive

21   training class?

22   A.  Sure.  So the moment that an officer would then put

23   their hands on someone, that person's physical ability to

24   move freely is restricted, and depending on the level of

25   force needed or restraint needed, this can, we can find

1    ourselves in situations where a resident could have a

2    difficult time breathing.

3            And so what we're doing is constantly reiterating

4    a person's position with relation to how they are

5    restrained, where the officers are.  And the goal is to, in

6    these moments, restrain as quickly as possible, to get the

7    resident into a recovery position so that they can

8    successfully breathe.

9    Q.  And so when does that come up in terms of the tactics

10   that you are practicing in this class?

11   A.  The moment we are --

12           MR. GRAY:  Judge, I object to him saying "we."

13   He's testifying as to what he did, and if somebody else has

14   done it and he doesn't know about it, it's not fair to my

15   client.

16           THE COURT:  I sustain that.

17           Try to confine it to your own personal experience.

18           THE WITNESS:  Yes, Your Honor.

19           What I train is, the moment that a person or an

20   officer would be applying restraints or using these types of

21   restrictive procedures, this is when you should be thinking

22   about that very thing.

23           We know, I know, history tells us that if a

24   situation goes on too long, the likelihood increases for the

25   officers and the resident or the subject to be on the

1    ground, the level of restraint to be higher.  So the goal is

2    to restrain quickly, assess and move forward based on the

3    resident's behavior.

4    BY MS. TREPEL:

5    Q.  And what does that mean?  To move forward after you've

6    restrained quickly, what does that look like?

7    A.  Well, there's always a point B place.  Someone is

8    restrained, and we don't just walk away.  They're restrained

9    and escorted to another place.  That could be their cell.

10   It could be another housing location.  There is more to it

11   once the restraints are applied.

12   Q.  And do you train officers about prone handcuffing during

13   this class?

14   A.  Yes.  I've trained officers how to apply handcuffs in a

15   standing position, a kneeling position and if necessary a

16   prone position.

17   Q.  What do you train officers to do once they secure a

18   person in the prone position to handcuff them?

19   A.  It's always the practice for every person that gets

20   trained in --

21          MR. GRAY:  Object to this as not responsive.  He's

22   asked what he does, not always a practice, Your Honor.

23          THE COURT:  Go ahead and tell them what you do.

24          THE WITNESS:  I train every person once handcuffs

25   are applied in the prone position, our goal, the goal should

Douglas Frank Redirect

1   be to roll a person onto their side or into a seated

2   position so that they may breathe, expand their lungs and

3   breathe.

4   BY MS. TREPEL:

5   Q.  And what is the recovery position?

6   A.  Typically is on the side, on their side with their knees

7   brought up close to their chest.

8   Q.  And why do you train officers to place a person in the

9   prone -- sorry -- in the recovery position after they've

10   been handcuffed in the prone position?

11   A.  Because I understand that this allows for a person in

12   that position to breathe better, more effectively.

13   Q.  How long do you train officers to keep people in the

14   prone position before moving them?

15   A.  As soon as it's safe for everyone involved to get the

16   person rolled into that position, that's when they should be

17   doing it.

18   Q.  Why is that?

19   A.  Well, there are factors, environmental factors.  There

20   could be, just having handcuffs on in a prone position

21   doesn't necessarily mean that the struggle is over.  So we

22   don't want to have to lose any ground and then struggle to

23   gain it back.

24          So as soon as it's safe for everyone involved to

25   get that person rolled onto their side, that's when we

1    suggest that they do it.

2    Q.  So when the struggle is over, is that what you train?

3    A.  Whether it is --

4              MR. GRAY:  Object to that as leading, Your Honor.

5              THE COURT:  We are, but I'll let it stand.

6    BY MS. TREPEL:

7    Q.  What, if any, techniques do you train officers involving

8    holding a knee across somebody's neck?

9              MR. GRAY:  Object to that, Your Honor.  It's not

10   relevant to my client.  He's not accused of doing that.

11             MS. TREPEL:  It goes to his familiarity with

12   techniques.

13             THE COURT:  Yeah.  I sustain that objection.

14   BY MS. TREPEL:

15   Q.  Are you familiar with the idea of in your custody is in

16   your care?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  One of the things that I teach, words that I use

20   specifically are, the moment that you put or apply

21   restraints to a resident, you are responsible for their

22   safety.

23   Q.  Why is that important to teach?

24   A.  It's important to make it very clear that if someone's

25   hands are restrained behind their back, they're unable to

1    protect themselves should they fall or should something, you

2    know, fall towards them.  A natural reaction would be to

3    bring your hands up and protect vital parts of your body.

4           And the inability to do that because of mechanical

5    restraints being applied, whoever applies them, you are now

6    in charge of their safety until they come off.

7    Q.  And what, if anything, do you train officers in this

8    class about who decides when and how much force to use

9    during an encounter with a person?

10   A.  I'm always purposeful when I explain to those who attend

11   my class, they, the officer, are not the people who decide

12   when and how much force is used.  That decision is solely

13   arrived at by the behavior of the resident that they're

14   managing.

15   Q.  Can you explain what that looks like in practice?

16   A.  The officers are in positions where they have to enforce

17   rules and regulations inside a facility.  They are there to

18   manage those that are under our care, custody and control.

19   And at times words are not enough.  A physical action may be

20   needed.

21          I teach that we always use the least amount of

22   force necessary to achieve that goal.  Ultimately the

23   question is followed up or presented to me, well, when do I

24   know to do more, how do I know when.

25          MR. GRAY:  Judge, I object to this as narrative

1    and totally not relevant to this case.

2              THE COURT:  It is narrative, and so I suggest that

3    we ask another question.

4    BY MS. TREPEL:

5    Q.  So how is it that you -- well, strike that.

6              What, if anything, do you teach officers to do

7    when -- to inmates or detainees are fighting with one

8    another, in this class?

9    A.  Again, the ultimate goal --

10             MR. GRAY:  Excuse me, Your Honor.  I object to

11   this.  There is no evidence in this case that detainees were

12   fighting with each other, and I believe that's what she

13   asked.

14             THE COURT:  I don't think that's relevant.  I

15   sustain the objection.

16   BY MS. TREPEL:

17   Q.  In a custodial setting --

18             All right.  I'd like to turn back to this

19   Exhibit 94 here.  There's some positional asphyxia trainings

20   that officers in the Department of Community Corrections are

21   required to take annually?

22   A.  That's right.

23   Q.  Have you taken those classes?

24   A.  I have.

25   Q.  Do you see those classes here?

1    A.   I do.

2    Q.   Are those online or in-person classes?

3    A.   They are online or E learnings.

4    Q.   Are you familiar with the content of those classes?

5    A.   I am.

6    Q.   Did Officer Lane take those classes, as reflected on

7    this transcript?

8    A.   Yes.

9    Q.   How many times?

10   A.   Looks like twice.

11   Q.   Okay.  And what years were those?

12   A.   In 2017 and 2018.

13   Q.   All right.  And how long is that class?

14   A.   I believe it's an hour long training.

15   Q.   I'd like to go to Government Exhibit 96, please, which

16   is in evidence.

17        All right.  Now taking a look at this document,

18   and we'll zoom in when necessary, but just pig picture, what

19   is this document?

20   A.   This appears to be a Word document, a printout of the E

21   learning that the officers take.

22   Q.   And that's the positional asphyxia training you've just

23   referred to?

24   A.   Yes.

25   Q.   All right.  I'd like to go to page 5 of this exhibit,

1    slide 1.10, and blow that up.

2              All right.  What does this slide say about how to

3    avoid positional asphyxia?

4    A.  I'll read it.  Get control of the subject quickly.  If

5    restraint is necessary, have a plan and get control of the

6    subject quickly.  Try to use arm bars as opposed to

7    resorting to body weight to hold the subject down.  Avoid

8    putting pressure on the subject's torso or neck, if

9    possible.

10   Q.  And go to page 6, please, and slide 1.11.

11             What does this slide teach about how to avoid

12   positional asphyxia?

13   A.  It says, This should be done right away.  The best

14   position will be either lying on their side in a recovery

15   position or up in a seated position.  And then there's

16   artwork that depicts that.

17   Q.  And what does it say above the blue box there?

18   A.  I'm sorry?

19   Q.  Would you read the sentence above the blue box for me?

20   A.  Once restraints are applied, position the subject in a

21   position that doesn't restrict breathing.

22   Q.  All right.  And if we can go to 1.12 on the same page 6.

23             What does this slide teach about how to avoid

24   positional asphyxia?

25   A.  Monitor for any medical issues.  Ask the subject if they

Douglas Stewart
1581

1  have used drugs recently or if they have any cardiac or

2  respiratory issues.  This should be happening during the

3  restraint also.  Once the person is controlled and in the

4  position that allows them to breathe, they should still be

5  monitored for medical issues.

6  Q.  And if we can go to page 7, slide 1.13.

7          What does this slide teach are the signs of

8  positional asphyxia?

9  A.  This appears to be like a check on learning throughout

10  the E learning.  So here we are.  The slide says to click on

11  examples to review signs.  Then review all to continue.

12          And do you want me to read right down the list if

13  you would like?  The person states he or she can't breathe.

14  Gurgling or gasping sound indicating a --

15          MR. GRAY:  I object to the rest of this.  There's

16  no evidence in this case there was gurgling sounds.

17          THE COURT:  Yeah, I sustain.

18          MR. GRAY:  Ask that be taken off, the exhibit.

19          THE COURT:  The exhibit is in evidence.

20  BY MS. TREPEL:

21  Q.  You can go to the next slide.

22  A.  Lips --

23  Q.  No.

24  A.  I'm sorry.

25  Q.  Let's move to the next slide.  Go to page 9 and 10, go

1    side-by-side there for the quiz at the bottom.

2            If you could highlight -- can you actually

3    highlight, Mr. Fronk, put up 9 and 10 next to each other for

4    me?  Thank you.  And if you can highlight just that black

5    and white box at the bottom of nine and the top of ten.

6    Okay.

7            So what is this we're looking at here?

8    A.  It appears to be an answer, a choice, and it reads:  A

9    person's body weight has no bearing on whether it is hard

10   for them to breathe.

11   Q.  Okay.  And is that continued on the next page?

12   A.  Would you like me to read all of them?

13   Q.  Well, why don't you read the correct answer to this quiz

14   question?

15   A.  Sure.  Once a subject is restrained, he should quickly

16   be switched from the prone position to a position that

17   allows him or her to breathe more freely.

18   Q.  So that's the correct answer to this quiz?

19   A.  Correct.

20   Q.  And it's marked there with an X?

21   A.  I'm sorry.  I didn't --

22   Q.  I was just asking if that's what the X meant.

23   A.  Yes.

24   Q.  Okay.  And why is this quiz included in the training?

25   A.  Again, it's a check on learning.  At the end of the

1   training, the goal here is that someone who is taking it has

2   received and understands the information that's been

3   presented to them throughout.

4   Q.  Okay.  Now on the slide we were looking at earlier with

5   the various signs of positional asphyxia, was the training

6   teaching that a person has to be experiencing all of those

7   signs and symptoms or just one or more of them to be

8   experiencing positional asphyxia or at risk?

9              MR. GRAY:  Judge, I object.  This is an opinion of

10   the witness, his lack of foundation.  It's just --

11              THE COURT:  Yeah.  I sustain the objection.

12   BY MS. TREPEL:

13   Q.  I'd like to go to page 18 of this exhibit and 3.5.

14              What does this slide say about the sudden lack of

15   resistance?

16              MR. GRAY:  Judge, it's repetitious.  We've gone

17   over this.  It's an online training.  He wasn't even there,

18   Your Honor.  How can we get into this?  There's just no

19   foundation for this.

20              MS. TREPEL:  There's no --

21              THE COURT:  I'll let this be answered.

22              THE WITNESS:  Would you like me to read?

23              MS. TREPEL:  Yes.

24              THE WITNESS:  The sudden lack of resistance may

25   come as a relief to staff who assume the subject has

1    succumbed to the restraint.  However, that relief will turn

2    into dismay if staff find out that the person has stopped

3    responding.

4          It is critical that when a subject all of a sudden

5    becomes quiet and still that staff check for responsiveness

6    and vital signs.

7          The transition from restraint to medical

8    assistance must be quickly -- or must be quick.  Staff

9    should provide first aid and request medical assistance

10   right away.

11   BY MS. TREPEL:

12   Q.  In your restrictive procedures course that you teach,

13   what do you train officers about if a person says they can't

14   breathe?

15         MR. GRAY:  Judge, I object to this as repetitious

16   and also he didn't train on that.

17         THE COURT:  I'm going to overrule.

18         Answer.

19         THE WITNESS:  What is it that I teach if someone

20   says that they can't breathe?

21   BY MS. TREPEL:

22   Q.  Right.

23   A.  Immediately then what we should, what an officer should

24   do is to assess their physical position in relation to the

25   resident or the subject and then after that assessment make

1    proper adjustments.

2    Q.  In your course do you train officers that if a person is

3    talking they must be breathing?

4    A.  Negative.  I never train that.  That's not true.

5            MR. GRAY:  Move the last part of that be stricken,

6    "that's not true."  That's a judgment of his.  It's

7    certainly not evidence in this case.

8            THE COURT:  I sustain that.

9    BY MS. TREPEL:

10   Q.  Why do you train officers that?

11   A.  We know --

12           MR. GRAY:  Object to that.  Lack of foundation.

13   He doesn't know that, Your Honor.

14           THE COURT:  That's overruled.

15           You may answer.

16           THE WITNESS:  I understand that simply speaking

17   does not mean that you are taking a full cleansing breath.

18   You don't need that much to speak.

19           MS. TREPEL:  One moment, please.

20           I have no further questions on direct.

21           THE COURT:  Thank you.

22           Mr. Gray.

23           MR. GRAY:  Thank you, Your Honor.

24

25

Douglas - Cross

1                    CROSS-EXAMINATION

2    BY MR. GRAY:

3    Q.  Mr. Douglas, is it?

4    A.  Yes, sir.

5    Q.  Mr. Douglas, are you still with the juvenile center?

6    A.  I'm with the Department of Community Corrections, so --

7    Q.  What does that mean?

8    A.  I work for the Department of Community Corrections

9    Rehabilitation.  The Juvenile Justice Center is part of that

10   organization.

11   Q.  Okay.  And are you with the Juvenile Justice Center?

12   A.  No, I do not work there.

13   Q.  And what you are testifying to, basically, is when

14   somebody's in the prone position, you should roll them over

15   to the recovery position after they've calmed down, let's

16   put it that way; is that right?

17   A.  As quickly as possible.

18   Q.  Right.  And if the person is still resisting, fighting,

19   you can't put them in the recovery position until then,

20   correct?

21   A.  That's correct.

22   Q.  And if somebody is fighting and you handcuff them and

23   you have them in the prone position and once he calms down,

24   you say shall we roll him over on his side, right?

25   A.  Absolutely.

```
1    Q.  That's what you should do, right?

2    A.  Absolutely.

3    Q.  And in addition to that, if you are wondering if the

4    person is acting bizarre, unreasonable, you want to find out

5    if he's on drugs, correct?

6    A.  Yes.

7    Q.  And if the officer asks the arrestee or in your case a

8    detainee, a juvenile, you ask them are you on drugs, did you

9    take any drugs, correct?

10   A.  Yes.  Yes.  That would be assessing the situation as

11   it's unfolding, yes.

12   Q.  And if somebody is in need of medical services, you call

13   an ambulance, correct?

14   A.  That's correct.

15   Q.  And have you checked Mr. Lane's record at the juvenile

16   corrections division?

17   A.  His record?

18   Q.  Yeah.  Did he have any unreasonable use of force

19   allegations while he was there for a year and a half?

20   A.  I can't speak to that.  I don't know.

21   Q.  You don't know?  Didn't you check that when you were

22   asked to come here to testify?

23   A.  No.

24   Q.  No?  And what he did as a correction officer, if you

25   know, and if you don't know, I mean, you seem to know what's
```

1    on that chart.  If you know, did Mr. Lane have any -- strike

2    that.

3              Who was he a correction officer for?  Do you know

4    that?

5    A.  I believe he was a correctional officer for the juvenile

6    detention center.

7    Q.  And that would be for the juvenile delinquents that are

8    in that detention center, correct?

9    A.  Correct.

10   Q.  And at times that's quite a difficult job.  Fair

11   statement?

12   A.  Absolutely.

13   Q.  Because these juveniles are in there, and juveniles in

14   our system of justice now get many chances before they're

15   locked up, correct?

16   A.  Yes.

17   Q.  And, by the way, with respect to this correctional,

18   juvenile correctional institution, this isn't the military

19   thing where people are called lieutenants, sergeants, things

20   of that nature; is that right?

21   A.  It's not a paramilitary organization.

22   Q.  Not paramilitary at all.  And you also apparently in an

23   online lecture or some kind of lecture dealt with delirium,

24   right?

25   A.  I'm familiar with the term.

Douglas Anderson

1    Q.  What is it?  Excited delirium, what is that?

2    A.  It's, so it's -- my understanding is really quite

3    limited.  I understand that it is an effect of high levels

4    of dopamine in a person's brain.

5    Q.  Have you ever seen any of that in the juvenile center?

6    A.  I have not seen it in the juvenile center, no.

7    Q.  Are you a -- were you at some point in time a

8    corrections officer in the juvenile center?

9    A.  Not at the juvenile center, no.  At the public safety

10   facility for adults.

11   Q.  And that would be for adults?

12   A.  Yes.

13              MR. GRAY:  That's all I have, Your Honor.  Thank

14   you.

15              THE COURT:  Thank you.

16              Ms. Trepel, anything further?

17              MS. TREPEL:  Very briefly, Your Honor.

18                      REDIRECT EXAMINATION

19   BY MS. TREPEL:

20   Q.  Mr. Gray was just asking you if someone is in need of

21   medical services, you said you call an ambulance?

22   A.  Yes.

23   Q.  What if anything else do you do depending on the

24   situation?

25   A.  Depending on the severity of the situation, in the

1    moment, apply or aid in any way that I can or at the level

2    that one can.

3    Q.  And why is that?

4    A.  Well, we're all about the preservation of life.

5    Q.  And so why isn't it enough to just wait for the

6    ambulance?

7    A.  Well, if I'm -- if I understand the situation for what

8    it is and I can respond, then that's part of my duty as an

9    officer, to provide that safety and security, right.

10   Q.  Why is that part of your duty as an officer?

11            MR. GRAY:  Object to that, Your Honor.  Lack of --

12   it's not relevant.

13            THE COURT:  It's overruled.

14            MS. TREPEL:  You can answer.

15            THE WITNESS:  If you are a public safety officer,

16   that's your goal, that's your job, is to provide safety and

17   security, public safety.  And that should include any

18   medical aid if you are able to render it.

19            MS. TREPEL:  Thank you.  No further questions.

20            MR. GRAY:  I have no further questions, Your

21   Honor.

22            THE COURT:  Okay.  Thank you very much.  You may

23   step down.

24            And I take it, counsel, we have no other witnesses

25   this afternoon?

1          MS. BELL:  That is correct, Your Honor.

2          THE COURT:  Okay.  Members of the jury, I'm sorry

3    about this, but it happens.  We are going to have to be in

4    recess for the day.  I don't know.  Maybe you can go

5    shopping.  I don't know.

6          Anyway, the long and short is don't read and

7    listen to any media accounts.  Don't carry out any personal

8    investigations.  Don't pay any attention to the internet or

9    any of those things, and have a good, early evening through

10   the evening.  And we'll be back at 9:30 tomorrow morning,

11   and we'll have witnesses for you.

12         We are in recess.

13                      **IN OPEN COURT**

14                    **(JURY NOT PRESENT)**

15         THE COURT:  Counsel, I stayed on.  A couple of

16   things I want to talk to you about.  One is, it has just

17   come to my attention, and I had no idea of this, and that is

18   that when third parties are ordering transcripts of our

19   proceedings, they not only getting transcripts of what's

20   said publicly, but they're also getting in that, the

21   transcript, the sidebar conferences that occur.

22         I guess I don't care, but if you do, you're going

23   to have to make a specific point of it for me to deal with

24   that because that is -- that really is not part of the

25   proceeding that the jury is deciding.  Anyway, that's that.

1    Second thing is, I understand the defendants have

2    turned in -- the government has not turned in the copies of

3    the questionnaires of these many, many questionnaires that

4    were sent out.  I understand you're keeping the copies of

5    those people that are actually seated as jurors here, but

6    the others, please turn those in so that we can get them

7    properly sealed and accounted for in retention.

8         MS. BELL:  Sure.  I didn't know if the court

9    wanted us to shred them ourselves or bring them back.

10        THE COURT:  No.  I think we should be in charge of

11   shredding.

12        MS. BELL:  Very good.

13        THE COURT:  That's the first time you ever heard

14   me volunteer to do something.

15        Okay.  We'll stand in recess until tomorrow at

16   9:30.

17        (Court adjourned at 2:25 p.m., 02-01-2022.)

18                    *   *   *

19        I, Renee A. Rogge, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22        Certified by:  /s/Renee A. Rogge
                          Renee A. Rogge, RMR-CRR
23

24

25