1

            UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA

2

3     ------------------------------------------------------------
                                )
      United States of America,  )  File No. 21-cr-108

4                               )              (PAM/TNL)
                                )
            Plaintiff,          )

5                               )
                                )
      v.                        )

6                               )
      Tou Thao(2),              )  Courtroom 7D

7     J. Alexander Kueng(3), and )  St. Paul, Minnesota
      Thomas Kiernan Lane(4),   )  Monday, February 21, 2022

8                               )  9:32 a.m.
            Defendants.         )

9                               )
      ------------------------------------------------------------

10

11

            BEFORE THE HONORABLE PAUL A. MAGNUSON

12        UNITED STATES DISTRICT COURT SENIOR JUDGE

13

          (JURY TRIAL PROCEEDINGS - VOLUME XIX)

14

15

16

17

18

19

20

21

22

23

24

          Proceedings recorded by mechanical stenography;

25     transcript produced by computer.

3736

```
 1    APPEARANCES:

 2      For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                BY:  ALLEN A. SLAUGHTER, JR.
 3                                   LEEANN K. BELL
                                     MANDA M. SERTICH
 4                              300 South 4th Street, #600
                                Minneapolis, MN 55415
 5
                                DEPARTMENT OF JUSTICE
 6                              CIVIL RIGHTS DIVISION
                                BY:  SAMANTHA TREPEL
 7                              150 M Street NE
                                Washington, D.C. 20530
 8
        For Defendant          ROBERT M. PAULE, PA
 9      Tou Thao:              BY:  ROBERT M. PAULE
                                920 2nd Avenue South, #975
10                              Minneapolis, MN 55402

11                              PAULE LAW PLLC
                                BY:  NATALIE PAULE
12                              5100 West 36th Street
                                P.O. Box 16589
13                              Minneapolis, MN 55416

14      For Defendant          LAW OFFICE OF THOMAS C. PLUNKETT
        J. Alexander Kueng:    BY:  THOMAS C. PLUNKETT
15                              101 East 5th Street, #1500
                                St. Paul, MN 55101
16
        For Defendant          EARL GRAY DEFENSE
17      Thomas Kiernan Lane:   BY:  EARL P. GRAY
                                332 Minnesota Street, #W1610
18                              St Paul, MN 55101

19      Court Reporter:        RENEE A. ROGGE, RMR-CRR
                                United States District Courthouse
20                              300 South 4th Street, Box 1005
                                Minneapolis, MN 55415
21

22

23

24

25
```

1

<u>**I N D E X**</u>

PAGE

2

**MARC PENTLAND**

3        Direct Examination by Mr. Gray                    3738

4     **ADAM LEPINSKI**
         Direct Examination by Mr. Gray                    3741

5

      **JAMES LANE**

6        Direct Examination by Mr. Gray                    3745

7     **THOMAS LANE**
         Direct Examination by Mr. Gray                    3748

8        Cross-Examination by Ms. Trepel                   3831
         Redirect Examination by Mr. Gray                  3907

9

10

11

      <u>DEFENDANT LANE EXHIBITS:</u>                      <u>REC'D</u>

12       L3                                                3765
         L4                                                3826

13

14

15

16

17

18

19

20

21

22

23

24

25

PENTLAND - DIRECT

```
 1    (9:32 a.m.)

 2                          IN OPEN COURT

 3                         (JURY PRESENT)

 4           THE COURT:  Good morning, everyone.  Welcome back

 5    and in our day of respect to all of our presidents, here we

 6    are.

 7           Mr. Gray, do you want to proceed.

 8           MR. GRAY:  Sure.  Thank you, Your Honor.  Your

 9    Honor, the defense for Tom Lane first calls Marc Pentland.

10           Marc, would you take the stand, please.

11                         MARC PENTLAND,

12    called on behalf of the Defendant Lane, was duly sworn, was

13    examined and testified as follows:

14           THE COURT:  If you would take the stand, remove

15    your mask and state your full name, spelling your last name.

16           THE WITNESS:  Marc Joseph Pentland.

17    P-E-N-T-L-A-N-D.

18           THE COURT:  Okay.  Proceed, Mr. Gray.

19           MR. GRAY:  Thank you, Your Honor.

20                       DIRECT EXAMINATION

21    BY MR. GRAY:

22    Q.  Mr. Pentland, do you know Thomas Lane?

23    A.  Yes, sir.

24    Q.  And how do you know him?

25    A.  I worked with him at the juvenile center for Ramsey
```

HENDERSON - DIRECT

1     County Boys Totem Town.

2     Q. And could you tell the jury what is the Hennepin County

3     juvenile center Boys Totem Town?

4     A. Ramsey County.

5     Q. Excuse me. Ramsey County.

6     A. It was a facility for adjudicated youth.

7     Q. For what? I am sorry.

8     A. Youth that were committed by the courts for crimes.

9     Q. For juvenile delinquents?

10     A. Yes.

11     Q. And were you able when he was -- how long ago was he

12     working there, do you remember?

13     A. Tom left there in '17, I believe.

14     Q. Okay. And while he was there, were you able to observe

15     his interaction with the juvenile delinquents or the --

16     A. Yes, sir.

17     Q. -- locked up? And after observing that, do you have an

18     opinion as to his peacefulness?

19     A. Yes, sir.

20     Q. And what is that?

21     A. In my 20 plus years of experience in corrections I've

22     rarely known anybody who was comfortable enough walking into

23     that job with a very, various cultures that we worked with

24     that was able to do it quite like Tom did.

25     Q. Okay. And does Totem Town still exist?

1    A.  No, sir.

2    Q.  And you're retired?

3    A.  Yes, sir.

4             MR. GRAY:  Thank you.  That's all I have.

5             MS. TREPEL:  No questions, Your Honor.

6             THE COURT:  Okay.  Thank you very much.

7             I have a question.  I drove by Totem Town the

8    other day, and it dawned on me.  What kind of facility are

9    they using now?

10            THE WITNESS:  It's just not any.

11            THE COURT:  There just isn't any.

12            THE WITNESS:  No.

13            THE COURT:  Okay.  That's fine.  It doesn't have

14   anything to do with this case, but I was just curious about

15   it, so I thought I would ask somebody that knew.

16            MR. GRAY:  Your Honor, the defense Tom Lane calls

17   Adam Lepinski.

18            Mr. Lepinski, step forward over there and be

19   sworn.

20            THE COURT:  If you would raise your right hand to

21   be sworn.

22                      ADAM LEPINSKI,

23   called on behalf of the Defendant Lane, was duly sworn, was

24   examined and testified as follows:

25            THE COURT:  If you would take the stand, remove

Lepinski - Direct

1     your mask, state your full name and spell your last name.

2           THE WITNESS:  My name is Adam Lepinski.  My last

3     name is spelled L-E-P-I-N-S-K-I.

4                      DIRECT EXAMINATION

5     BY MR. GRAY:

6     Q.  And are you presently employed?

7     A.  Yes, sir, I am.

8     Q.  And what do you do for a living?

9     A.  I'm a police sergeant with the Minneapolis Police

10    Department.

11    Q.  Going back a few years, did you meet a man named Thomas

12    Lane?

13    A.  Yes, I did.

14    Q.  And where did you meet him at?

15    A.  I met Tom Lane at the Exchange Bar, which is in downtown

16    Minneapolis.  Mr. Lane was an employee of that bar.  He

17    worked security, and I worked off duty at that location as a

18    Minneapolis police officer.

19    Q.  And what do you mean by "security"?

20    A.  The bar would have security guards that would, if

21    there's someone out of control or someone that needed to

22    leave or, you know, they would check IDs when people came in

23    to ensure they were proper drinking age, that that sort of

24    thing.

25    Q.  And you said the Exchange Bar.  For the jurors that

Redirect - Grund

1    don't know about that, could you describe it a little bit?

2    A.  Yes.  It's in downtown Minneapolis.  It's located at

3    Fifth Street and Hennepin Avenue, right on the corner in the

4    Grain Exchange Building I believe it is.

5    Q.  Was that a rather busy bar back then?

6    A.  Yes, it was.

7    Q.  And did you observe Thomas Lane?  Were you able to

8    observe Thomas Lane working that bar as a security officer?

9    A.  Yes.

10   Q.  And were you able to form an opinion as to his character

11   for peacefulness?

12   A.  Yes, absolutely.

13   Q.  And what was that?

14   A.  He was very calm.  He always maintained his composure.

15   He dealt with individuals with respect and dignity.  Even if

16   they were, even if they were intoxicated or possibly high on

17   narcotics or some sort, he was always treating people very

18   well.

19   Q.  So in your opinion he was a peaceful person?

20   A.  Absolutely.

21   Q.  What about his empathy towards others?  What did, did he

22   care about others when they were drunk?  Did he try to take

23   care of them at all?

24   A.  Yes.

25           MS. TREPEL:  Objection.  Relevance as to that

REDIRECT - OLSON

1   character trait.

2           THE COURT:  Yeah, I think that is.  I'm going to

3   sustain, Counsel.

4           MR. GRAY:  Okay.  That's all I have.  Thank you,

5   sir.

6           THE WITNESS:  Thank you.

7           THE COURT:  Any examination?

8           MS. TREPEL:  No, Your Honor.

9           THE COURT:  Okay.  Thank you.  You may step down.

10          MR. GRAY:  Your Honor, excuse me.  I neglected a

11  couple questions.

12          THE COURT:  Sure.  Welcome back.

13          MR. GRAY:  I haven't done this for a while.

14          THE COURT:  Not for a couple days.

15          MR. GRAY:  No.  I sat over there for a long time.

16  BY MR. GRAY:

17  Q.  With respect to Thomas Lane and being a police officer,

18  did you have anything to do with that?

19  A.  Yes, I did.

20  Q.  And what was that?

21  A.  When I had initially met Mr. Lane at the Exchange Bar,

22  he expressed interest to me in wanting to become a police

23  officer.  I have done some recruiting for the police

24  department, and I'm kind of, I like to fill that role and

25  try to find applicants to come work as police officers.

 1              Mr. Lane had told me he wanted to be an officer,

 2     and I kind of helped him into the police department.  I kind

 3     of acted as like a mentor, if you will.

 4     Q.  All right.  Thank you.  That's all.

 5              Well, one more question:  What do you do for the

 6     police department?  What's -- you're a sergeant, correct?

 7     A.  Yes.  I've been with the Minneapolis Police Department

 8     for 18 years, 2 years as a civilian employee, and the last

 9     16 years I've been a sworn law enforcement officer.  I'm

10     currently, I hold the rank of sergeant, and I supervise our

11     gun investigations unit for the police department.

12     Q.  And what is a sergeant?  Is that -- in the police

13     department?

14     A.  A sergeant is one rank above police officer.  Like the

15     average patrol officer will be the rank of officer.  A

16     sergeant would be one rank higher than that, and then of

17     course there are other ranks on top of that, but it's the

18     first line supervisor.

19              MR. GRAY:  Okay.  Thank you, sir.  That's all I

20     have.

21              THE WITNESS:  Thank you.

22              THE COURT:  Thank you.  You can step down.

23              THE WITNESS:  Thank you, Your Honor.

24              MR. GRAY:  Your Honor, we call James Lane to the

25     stand.

```
 1                THE COURT:  Will you raise your right hand to be
 2      sworn.
 3                          JAMES LANE,
 4      called on behalf of the Defendant Lane, was duly sworn, was
 5      examined and testified as follows:
 6                THE COURT:  If you would take the stand, please,
 7      remove your mask and give us your full name.
 8                THE WITNESS:  James or Jim Lane, L-A-N-E.
 9                       DIRECT EXAMINATION
10      BY MR. GRAY:
11      Q.  Mr. Lane, are you Tom Lane's older brother?
12      A.  I am.
13      Q.  By how many years?
14      A.  Just about three years.
15      Q.  And where did you and Mr. Lane grow up?
16      A.  We grew up in Arden Hills, Minnesota.
17      Q.  And did you take care of your brother as a younger
18      brother?
19      A.  Yes.  We were definitely good friends growing up, and we
20      got into a lot of tomfoolery playing around in the woods and
21      doing just the normal things brothers do.
22      Q.  Did you also belong to the Boy Scouts?
23      A.  Absolutely.
24      Q.  And did Tom also?
25      A.  Yep.  We went on many trips to the Boundary Waters,
```

1   camping trips, weekend trips, all kinds of things the Scouts

2   do.

3   Q.  And at a period of time, certain period of time, did you

4   leave home?

5   A.  After I graduated high school in 1998, I enlisted in the

6   United States Navy for six years.

7   Q.  And you were in the Navy for six years?

8   A.  Correct.

9   Q.  And were you honorably discharged?

10  A.  Yes, sir.

11  Q.  And what do you do now?

12  A.  I'm currently a high school biology teacher at a local

13  high school.

14  Q.  And are you married?

15  A.  Yes, sir.

16  Q.  And children?

17  A.  Yep.  I have a daughter who is 11 and a son who is 7.

18  Q.  And where do you live, not the address but what area?

19  A.  We live in the northeast metro.

20  Q.  Have you been close to your brother all these years

21  after you got out of the Navy?

22  A.  Yeah.  After I got out of the Navy we -- I mean I was

23  gone for six years so I didn't get to see him very much, but

24  since we've been back, we have had a very good relationship.

25  And now with my children, he's been a fantastic uncle, just

1    being there for my kids and being a part of their lives.

2    Q.  Do you have an opinion as to Mr. Lane's character for

3    peacefulness?

4    A.  I do.

5    Q.  And what is that?

6    A.  Tom has always been the peacemaker, the compassionate

7    one who is able to stay calm and bring people together.

8    That's really what defines him is, he is that person who can

9    connect with other people very quickly.  He's more

10   personable than I am, and I am a teacher.

11   Q.  Are you saying that because you love your brother or

12   because it's true?

13   A.  Because it's absolutely true.

14              MR. GRAY:  Thank you.  That's all I have.

15              MS. TREPEL:  No questions, Your Honor.

16              THE COURT:  Okay.  Thank you very much.

17              MR. GRAY:  I call Thomas Lane, Your Honor.

18                       THOMAS LANE,

19   called on behalf of the Defendant Lane, was duly sworn, was

20   examined and testified as follows:

21              THE COURT:  If you would take the stand, please,

22   and remove your mask.

23              THE WITNESS:  I think so, yeah.

24

25

```
 1                   DIRECT EXAMINATION

 2    BY MR. GRAY:

 3    Q.  State your full name, sir.

 4    A.  Full name is Thomas Kiernan Lane.  Last name L-A-N-E.

 5    Q.  And how old are you?

 6    A.  I am 38.

 7    Q.  And do you have a birthday coming up?

 8    A.  Couple weeks, two weeks.

 9    Q.  Okay.

10    A.  Yeah.

11    Q.  And are you married?

12    A.  I am.

13    Q.  And what's the name of your wife?

14    A.  Courtney.

15    Q.  And is she in the courtroom?

16    A.  She is.

17    Q.  And are you expecting?

18              MS. TREPEL:  Objection.  Relevance.

19              THE COURT:  Overruled.

20    BY MR. GRAY:

21    Q.  Do you have any children?

22    A.  Not yet.

23    Q.  And are you expecting one soon?

24    A.  I am.

25    Q.  We heard from your brother that you grew up in Arden
```

E:0:21-cr-00108-PAM-T

3749

```
 1    Hills; is that right?
 2    A.  Correct.
 3    Q.  And where did you go to high school?
 4    A.  I attended Mounds View High School.
 5    Q.  And your parents, what are their names?
 6    A.  Kathy and Steve.
 7    Q.  Are they still alive?
 8    A.  They are, yes.
 9    Q.  Is your mother in the courtroom?
10    A.  She is.
11    Q.  Is your father?
12    A.  He's at home.  He's having some medical issues.
13    Q.  We've heard from your brother.  Do you have any other
14    siblings?
15    A.  I do.  I have a sister.  She lives out of state.  She's
16    an artist.
17    Q.  And how old is she?
18    A.  She is 34, 35.
19    Q.  So she's three or four years younger than you are?
20    A.  Yeah.
21    Q.  All right.
22    A.  Just over --
23    Q.  And while you were in high school did you work?
24    A.  I had a few just kind of random jobs, yeah.  I think my
25    first was dishwasher at a steak house.  Worked at a couple
```

1    gas stations, that kind of thing.

2    Q.  You heard from your brother.  You were also a Boy Scout?

3    A.  I was.  I did that for, did the Cub Scouts and Boy

4    Scouts.  I got the rank of Star.

5    Q.  What is the rank of Star?

6    A.  Star is the rank you need to go on high adventure trips,

7    so --

8    Q.  Did you go on those with your brother?

9    A.  Yep or correct.

10   Q.  After -- yes.  After high school what did you do first?

11   A.  After high school, I got my first full-time job was

12   Interconnect.  It was working in rural areas, plowing high

13   speed fiber optic cable.  We connected towns that had dialup

14   with high speed internet.

15   Q.  And what do you mean by that?  What did you do?

16   A.  My job was, the job description was underground

17   installation and maintenance technician.  It was kind of

18   false advertising.  It was, you would basically anytime we

19   would plow through an area and there was a utility, we would

20   have to spot the cable by, with our eyes.

21        We'd have to dig down by hand with a shovel and

22   visually check the depth of the cable to either go over or

23   under it.  So I was basically digging holes.

24   Q.  You were a hole digger?

25   A.  Hole digger, yeah, that first year.

1    Q.  And where did you work when you were digging holes such

2    as that?

3    A.  That was mostly outside of LaCrosse.  It was rural

4    Wisconsin, Iowa, southern Minnesota.

5    Q.  Did you work with a team, or were you working alone?

6    A.  Our crew was like six or seven, a couple operators and

7    then laborers, like that was my job.

8    Q.  And did you go home at night, or did you stay on the

9    road?

10    A.  No.  We lived out of hotels, so during the weekend we

11    would come home and get up early on Monday and drive out to

12    the job site.

13    Q.  How long did you do that job?

14    A.  I did that for three years, three or four years.  We'd

15    work, only have maybe three months off.  Once the ground

16    froze we couldn't plow anymore.

17    Q.  At some point in time did you decide that maybe you

18    should go back and get an education?

19    A.  I did.  It was a hard job, but it taught me good, you

20    know, just the hard work and how much that pays off, but it

21    was definitely something that I didn't want to do forever

22    and thought that an education would probably suit me better.

23    Q.  So where did you start getting an education?

24    A.  I enrolled in just general stuff at Century Community

25    College and kind of was just doing generals, figuring out

1      what I wanted to do.

2      Q.  How old were you when you enrolled there, approximately?

3      A.  22 or '3, maybe.

4      Q.  Okay.  And were you full time there?

5      A.  I went full time and then part time and then full time.

6      It was just, I was working full time while I went there to

7      help pay my way, and then it kind of, I fluctuated back and

8      forth between those.

9      Q.  Well, did you continue digging holes, or did you find

10     another job?

11     A.  No, I couldn't do that job anymore.

12     Q.  Okay.  So what was your next job after that?

13     A.  I think landscaping was the first one I did right after

14     that, and then I had, I started working in restaurants.  I

15     had a friend that owned a restaurant or managed a

16     restaurant, so I started getting into the service industry.

17     Q.  So what did you do in these restaurants?

18     A.  The first job I had I started doing prep in the kitchen,

19     and then I worked the line, doing, you know, just kind of

20     learning the whole function of a restaurant, but ultimately

21     I was trying to get up to bartending, but I ended up

22     sticking with serving just because it was kind of more my

23     speed and --

24     Q.  So you were a server?

25     A.  I was a server, yeah.

1   Q.  And did you continue to be a server while you were going

2   to Century?

3   A.  Yep.  It was kind of conducive with going to school

4   because you could, you know, work during the evenings and

5   pay was pretty decent so --

6   Q.  Where did you live at the time?

7   A.  I was living in New Brighton at the time.

8   Q.  Okay.  Live with anybody or alone or what?

9   A.  I lived with my brother.  He lived --

10  Q.  James?

11  A.  James, yep.  We lived together for three or four years

12  maybe and I think my sister.  It was kind of a family home.

13  It was my grandmother's home, so we lived there, and my

14  sister lived with us for a little bit, too, and we had lots

15  of roommates kind of in and out.

16  Q.  Did you graduate from Century at some point in time?

17  A.  I did.  I got my Associate's of Arts and Science, a

18  two-year degree that took a lot longer than two years to get

19  so --

20  Q.  And what was, what did you major in again?

21  A.  That was just a two-year degree.  It was just the

22  Associate's Degree, like an AA Degree.

23  Q.  Okay.

24  A.  More commonly.

25  Q.  And what, do you remember what year that was?

1    A.  2016, maybe, '17 or '15.

2    Q.  Don't look at me.  I don't know.

3    A.  Yeah.  I'm not good with years.

4    Q.  Okay.  In any event --

5    A.  It was after a while.

6    Q.  After Century did you go to another school?

7    A.  Yeah, the goal was to get my two-year degree at Century

8    and then transfer to the U of M just because community

9    college is a lot cheaper than the University.  So I

10   transferred to the U of M and got into a bachelor program,

11   Bachelor's Degree program there.

12   Q.  Okay.  And what was that program you got into?

13   A.  After I enrolled, I applied for a, it was the College of

14   Early Childhood Development.  I was looking to get into

15   teaching, and I was accepted into a program there but ended

16   up changing later.

17   Q.  And what did you change into?

18   A.  I had, I had looked at, after meeting with my counselor

19   just and kind of looking at what I really wanted to do, had

20   changed to the LCD, the sociology of law criminology and

21   deviance degree, and had an emphasis in policy analysis.

22   Q.  What's policy analysis?

23   A.  You take a statistics class and go over some stuff like

24   that.

25   Q.  So did you graduate from the University of Minnesota?

1    A.   I did.

2    Q.   And what year was that, if you know?

3    A.   2018.

4    Q.   Okay.  And did you get a job after you -- well, strike

5    that.

6              While you're going to school at University of

7    Minnesota, did you also work?

8    A.   I did.  I worked at the restaurants that I, one of the

9    restaurants that I worked at, and then I got a job.  Since I

10   was trying to get into law enforcement, I changed my degree,

11   I wanted to get more experience.

12             So I started, got a job working security at a

13   nightclub working the front door.

14   Q.   What nightclub was that?

15   A.   That Was the Exchange.

16   Q.   That's the one that Mr. Lepinski or Sergeant Lepinski --

17   A.   Yep.  That's where I met him.

18   Q.   Is he the one that got you interested in the Minneapolis

19   Police Department?

20   A.   I was interested before then, but he was just someone

21   that I had kind of met through there, and I didn't

22   necessarily want to tell him at if first that I was trying

23   to get into that, but I kind of, as we became friends, ended

24   up saying, hey, I am trying to do this, and he kind of

25   helped guide me and --

1    Q.  Okay.  So did you have another job besides The Exchange

2    at Totem Town?

3    A.  That was after I graduated, yeah.  The first job, one of

4    my first jobs right outside of, after I graduated from the U

5    of M with my Bachelor's Degree, I got a job at Boys Totem

6    Town.  I was assistant probation officer was the job title,

7    but I basically worked in housing, community, like there's

8    two different communities in the treatment facility.

9            So you would do everything with the kids.  You'd

10   serve meals, eat meals with them.  You do wakeup, you know,

11   get them up in the morning.  You go, actually go to school

12   with them.  There was a school, Ramsey County Public School,

13   in the facility.

14           So you would, you know, walk with them and sit in

15   their classrooms with them and help them with anything they

16   needed.

17   Q.  Did you enjoy that work?

18   A.  It was a good job, yeah.  It was in Ramsey County, and

19   I'm from Hennepin County in Minneapolis, so it was kind of

20   hard connecting on that level with the kids because they

21   would talk about areas and stuff that I didn't know about.

22   Q.  Did you leave that job?

23   A.  I did.  I, from there I went to, I got hired at the

24   Juvenile Detention Center in Hennepin County.

25   Q.  And how long were you at the Juvenile Detention Center

1    in Hennepin County?

2    A.  I was there probably a year and a half.

3    Q.  Did you know this Douglas fellow that testified from

4    there?

5    A.  I think I saw him once for a four-hour refresher.

6    Q.  Okay.

7    A.  He didn't work in the building that I worked in and I --

8    Q.  Do you remember him ever running any training classes or

9    doing anything?

10   A.  I think there was one refresher course that he ran.

11   Q.  So, excuse me.  Again, you worked at the Juvenile

12   Detention Center for a year and a half?

13   A.  Yep, or yes.  I started working on 2A, which is the

14   youngest kids.  They're 13 to 15.  I did that for three

15   months, three or four months, and then from there I switched

16   to 3C, which is the older kids, the 17- to 21-year old

17   highest felony offenders so -- and then I just stayed there

18   the rest of my time.

19   Q.  I asked Mr. Douglas this, but he hadn't apparently

20   reviewed it.  Were you ever written up there for

21   unreasonable use of force?

22   A.  No, sir.

23   Q.  And that sounds like a pretty good career job.  Why did

24   you apply to the Minneapolis Police Department?

25   A.  I had still been kind of in the process or trying to get

1    in with Minneapolis, and the JDC was good, and there was

2    lots of opportunities to work with the kids there and, you

3    know, try and work with them and show them there's other

4    opportunities and stuff for them to do once they're done

5    with their, the court system.

6            But I wanted to get out with people and start, you

7    know, and try and work with them before they got to the

8    point where they were in jail, and, you know, you have a lot

9    more opportunity I think in law enforcement to do that.

10   Q.  And is that why you applied at the Minneapolis Police

11   Department?

12   A.  That and family history and, yeah.

13   Q.  Was your grandfather, was he a detective in the

14   Minneapolis Police Department?

15   A.  Yes, my grandfather was a homicide detective.  He worked

16   the Washington Avenue beat in 1942, and his father and then

17   my great-grandfather, there was from like 1890 to 1950,

18   there was something, 60 years of continuous service from the

19   family.  So that was my connection with Minneapolis.

20   Q.  After applying to the Minneapolis Police Department,

21   when did you learn that they were willing to hire you?

22   A.  I think I got the conditional job offer in February of

23   2019.

24   Q.  All right.

25   A.  Early February.

1    Q.  Were you married at the time?

2    A.  Yes.

3    Q.  How long had you been married?

4    A.  We got married in 2018.  I remember that year.

5    Q.  Okay.  You won't give the day, huh?

6    A.  No, I'd rather not.

7    Q.  All right.  So you're married.  You got the job with the

8    Minneapolis Police Department.  What, how does that start?

9    Explain to the jury what a recruit, I suppose you call them,

10   right?

11   A.  We were cadets.

12   Q.  Cadets.

13   A.  Yes.

14   Q.  Tell the jury how you work your way through becoming a

15   police officer.

16   A.  Sure.  You get, you get your conditional job offer, and

17   then that's conditioned on passing the physical and psych

18   evaluation.  You have to go into a heart rate stress test

19   and some other screening, and once you get that and you're

20   accepted, then you start the Minneapolis Police Academy

21   cadet program.

22          Cadet program is a little bit longer and different

23   than the recruit program.

24   Q.  Back up a minute.  What was the first program you went

25   in?  After you passed the physical and all that, where did

```
1      you go from there?

2      A.  Oh, from there I went to the --

3      Q.  Back to Century?

4      A.  Back to Century Community College, and we did the theory

5      courses for six weeks.  Those are part of, part of the

6      skills portion of the training, and we just have to, there's

7      some other stuff you have to get done before you go to the

8      skills portion.

9      Q.  And was that at Century?

10     A.  That was at Century Community College.

11     Q.  And how long was the Century College training,

12     approximately?

13     A.  Six weeks, six or seven weeks.

14     Q.  And after the Century College training, what would

15     happen next?

16     A.  From there we went to the skills program, where we would

17     get -- it was an accelerated skills program.  I think skills

18     typically is nine months to a year, and this was a

19     five-month course.  So once we had our theory done, we went

20     to skills at --

21     Q.  Theory at Century?

22     A.  Yes.

23     Q.  And now you're in skills?

24     A.  Then we went to skills at Hennepin Technical College.

25     Q.  And what is skills for the jury?
```

1    A.  Skills is the POST requirements.  It -- to take the POST

2    test, you have to have all the requirements and stuff that

3    you get to be able to, to be eligible to take the POST test,

4    and that's what the skill portions does.  It says that you

5    are signed off and you are eligible to --

6    Q.  Is that where you shoot guns and things of that nature?

7    A.  Yeah, there was a weapons portion.  There was, you know,

8    criminal codes, legal theory.  There was some DT stuff.  We

9    did a little bit of PT.  There wasn't much.

10   Q.  What's PT?

11   A.  Physical training.

12   Q.  Okay.

13   A.  But it was more just passing stuff to be able to be

14   eligible to take POST.

15   Q.  Okay.  And what is POST?

16   A.  POST is the Police Officers Standards and Training test.

17   That's, once you pass that, you are eligible to be hired as

18   a police officer in the State of Minnesota.

19   Q.  And did you pass it?

20   A.  I did.

21   Q.  And after you passed it, where did you go next with

22   respect to the Minneapolis Police Department?

23   A.  I think we actually took that the first, we took our

24   POST test the first week of the Minneapolis academy, so we

25   passed the --

```
1    Q.  When was that?

2    A.  August, August of 2019.

3    Q.  Okay.  Go ahead.

4    A.  So once we, once we were POST eligible, then we went to

5    the Minneapolis Police Academy, which started in August, and

6    I think it was the first or second week of the academy, we

7    took our POST licensing test.

8    Q.  And you passed that?

9    A.  I did, yeah.

10   Q.  And is this what -- we heard a lot about the academy.

11   Is this where you wear uniforms and you say, sir, and yes,

12   sir?

13   A.  Yeah.  We wore the blue with the, with the cadet rocker

14   at Century and at Hennepin Technical College, the skills

15   portion.  But and then, you know, our boots were polished

16   and stuff, but once we started the MPD academy, that's when

17   we were expected, you know, to make sure our sleeves were

18   crisp and out boots polished and everything, you know, lint

19   rolling every day to make sure you didn't have a single hair

20   on you or anything.

21   Q.  Okay.  And were you able to do that?

22   A.  I was.

23   Q.  Okay.  And how did you address the officers, the police

24   officer at the academy?

25   A.  Yes, sir, ma'am, sir, ma'am.
```

1    Q.  Were you told to do that, or was that just something

2    that --

3    A.  That was, yeah.  We were absolutely told to do that.  We

4    had to address them by their names.  That was, our first day

5    at the Minneapolis Academy was the snap-in day, and that's

6    where they told us all the rules and everything that was

7    going to be expected throughout the academy and what we had

8    to go by.

9    Q.  And with respect to sergeants and commanders and

10   lieutenants and all those folks, if they're at the academy,

11   what are you expected to do?

12   A.  It depends on the situation.  You know, if they're

13   coming in the room, you have to stand on your feet.  If you

14   pass them in the hallways, you would have to stand against

15   the wall and, you know, eyes straight ahead and greet them

16   with the --

17   Q.  How did you greet them?

18   A.  Good morning, sir.  Good morning, ma'am.  You know, if

19   you were in a group of three, you would all have to say it

20   at the same time.

21   Q.  Did you have any problem with doing that?

22   A.  No.

23   Q.  Okay.  And the academy, how many months was that?

24   A.  That was four months, four and a half.

25   Q.  You ended up in December?

1    A.  Yeah, December 5.

2    Q.  And do you remember the date that you graduated from the

3    academy?

4    A.  December 10th.

5    Q.  And what did that mean, graduating on December 10th, as

6    far as actually being a police officer?

7    A.  That means we had completed everything for the

8    Minneapolis Police Academy portion.  We were sworn in.  We

9    got bullets.  They didn't have our badges at the time, so we

10   had loaner badges that they gave us.

11   Q.  Is this where you got an award?

12   A.  I did.  I was, there was -- they asked about a community

13   service award from the academy.  They said, you know, it's

14   just kind of a symbolic thing that we give to every class,

15   and someone just has to come up and accept it.

16          But they said we want you to choose someone in

17   your class to receive the award, and we want you to write up

18   why you think they should.  And it was kind of a bait and

19   switch situation where when we were in the graduation, it

20   was an individual award, and it was given to me for the

21   volunteering that I organized during the academy, so --

22   Q.  And who voted for that award?

23   A.  All my classmates.

24          MS. TREPEL:  Objection.  Relevance.

25          THE COURT:  Overruled.

```
 1    BY MR. GRAY:

 2    Q.  Your classmates?

 3    A.  Yes.

 4    Q.  And I want to show you Exhibit L3.  Can you identify

 5    that?

 6    A.  That's me receiving the community service award from the

 7    Mayor and the Chief.

 8    Q.  Is that Mayor Frey and Chief Arradondo in this photo?

 9    A.  Yes, sir.

10              MR. GRAY:  We'd offer Exhibit L3 Your Honor.

11              MS. TREPEL:  Objection to the exhibit as to

12    relevance.

13              THE COURT:  That's overruled.  Received.

14              MR. GRAY:  I'm not quite sure how to do this,

15    Judge.

16              Thanks, Tom.  So what do you do?  Put it on here?

17              MR. PLUNKETT:  Yes.

18              MR. GRAY:  Thanks.

19    BY MR. GRAY:

20    Q.  And was this the date you graduated and received the

21    award?

22    A.  It was.

23    Q.  And is that a true and accurate copy of you shaking

24    hands with Mayor Frey and Chief Arradondo?

25    A.  Yes, sir.
```

1    Q.  Was your family at that graduation?

2    A.  Yep, family, wife.

3    Q.  Okay.  We can --

4            Tom, can you take it down?  Yeah, I got some more.

5            Now during the four years before you became,

6    before you went to become a police officer in 2020, I

7    believe it was, were you involved in the Police Athletic

8    League?

9    A.  Yes, the first year that I started at the U of M and

10   switched from away from the teaching and started to pursue a

11   job with the Minneapolis Police Department, I was looking

12   for any way to get involved with the department and the

13   community and just try and get involved there.

14           So I started volunteering with the Police

15   Activities League Pal Program.  It's typically done by cops

16   who coach kids and stuff like that, but the program that I

17   was able to start volunteering with was summer camp.  The

18   brain and body summer camp, it's out of North Minneapolis,

19   and it's just a free summer camp for kids in the community.

20   Q.  And how many summers did you do that?

21   A.  I did that for four, four years.  I'd go once a week for

22   the whole day.

23   Q.  And what would you do once a week?

24   A.  They had all sorts of stuff that the kids would, would

25   go to.  They'd do field trips.  They'd do, they had like a

```
 1    little PT regiment that one of the guys would have them do

 2    where they would sing and do stuff like that.  But we would

 3    go to basketball camp, golf, aerospace museum, swimming, and

 4    then at the end of the year, we would always go to Camp

 5    Snoopy or whatever it's called now.

 6    Q.  I'm going to show you Exhibit L1.  Can you identify

 7    that?

 8    A.  That was, yes, that's the --

 9              MS. TREPEL:  Objection, Your Honor.  Can we have a

10    side-bar?

11              THE WITNESS:  Activities league, golf.

12              THE COURT:  I don't think, I don't think we're

13    going to need to.

14              Is that going to be offered.

15              MR. GRAY:  Not yet, but it will be.  It's one

16    photo.

17              THE COURT:  Okay.  Lay your foundation that you're

18    going to lay.

19    BY MR. GRAY:

20    Q.  Showing you L1, what is that a picture of?

21    A.  That was just one of the days I think we went to mini

22    golf with the kids, and so we started -- the camp is run out

23    of the SOC, the Special Operations Center in North

24    Minneapolis, but we would use the Pal vans to go on field

25    trips.  So that was one of the field trips we went on.
```

1    Q.  In this photo you are pictured; is that right?

2    A.  Yes.

3    Q.  With various children with Pal shirts on, correct?

4    A.  Yep, and then Officer Adams and Officer Edwards.

5    Q.  I was going to ask you that.  There were other adults

6    that were police officers, correct?

7    A.  Correct.  There's three in that picture.

8              MS. TREPEL:  Your Honor --

9              MR. GRAY:  We'd offer L1 Your Honor.

10             MS. TREPEL:  Objection, Your Honor.  Relevance.

11             THE COURT:  Yeah.  I'm going to sustain it as to

12   relevance, Counsel.

13             MR. GRAY:  Okay.  I have got one more.

14   BY MR. GRAY:

15   Q.  I'm going to show you Exhibit L2.  And by the way, or

16   strike that.

17             Can you identify L2?

18             THE COURT:  Okay.  I'm sorry.  Go ahead.

19             THE WITNESS:  This was during the academy, the

20   Minneapolis Police Academy.  That was one of the reasons I

21   got that community service award was for organizing

22   volunteer opportunities for everyone in our class.  This was

23   at Mary's Place.  It's a homeless shelter for families.

24   BY MR. GRAY:

25   Q.  And while you're at the academy, did you organize a

```
1     volunteer group to --
2     A.  Yep.  I was the contact person, and I'd set up sign-in
3     sheets, and you had to have at least four people, so I think
4     we went maybe eight times.  We'd go for five, six,
5     seven hours at a time.
6     Q.  And what is St. Mary's homeless place?
7     A.  It's in Minneapolis.  It's a homeless shelter for
8     families, and the volunteering, we were kind of the people
9     that would give the kids a place to go for the parents to go
10    to job interviews and do laundry and just kind of get a
11    break.
12    Q.  Is this an accurate copy of the photo of the group of
13    kids and --
14    A.  And then, yeah, all my classmates.  Yes.
15              MR. GRAY:  All right.  We'd offer L2, Your Honor.
16              MS. TREPEL:  Objection.  Relevance.
17              THE COURT:  Sustained.
18    BY MR. GRAY:
19    Q.  So in 2020 or actually in 2019 -- let's see.  I got my
20    years mixed up?
21              When did you graduate from the academy?
22    A.  It was in December of 2019.
23    Q.  Okay.  And after you graduated, what's the next program
24    you go into?
25    A.  From there you go into the FTO program, which is broken
```

1    up into five months.  There's an orientation month, and then

2    you go into your four phases of field training.

3    Q.  And we've heard a lot about the FTO program, but what is

4    the orientation?  Tell the jury about that.

5    A.  Orientation is just based for you to get kind of a feel

6    for wearing your radio, going in and out of the car, turning

7    your radio on and off.  You kind of shadow police officers.

8    And then there's, you do a couple shifts on the desk just to

9    get use to that.

10           You do a couple shifts with investigations.  Then

11   you go down to dispatch and just kind of get a generalized

12   understanding of how all -- yeah, investigations, so just

13   kind of how everything inter works together.

14   Q.  And so when did you start this field training program?

15   Was it after that?

16   A.  It was after that.  That I think went three weeks.

17   Q.  And that would be then in January of 2020?

18   A.  Yes.  Yes.

19   Q.  And who was your first field training officer?

20   A.  Officer Brown in downtown, First Precinct.

21   Q.  And the First Precinct, downtown Minneapolis?

22   A.  Yes, sir.

23   Q.  And what watch were you on?

24   A.  I was on the power shift they called it.  It was the bar

25   close one, so you went from I think 6:00 p.m. to 4:00 a.m.

1    You were the, and you were just cover the bar district in

2    downtown that was your main area to respond to.

3    Q.  And you do that with your field training officer?

4    A.  Yes, sir.

5    Q.  And if you had a question, is that, would you ask them?

6    A.  The first phase, yeah, you're kind of following their

7    lead and, you know, just getting used to everything and

8    getting comfortable, trying to call stuff out on the radio,

9    computer system.

10    Q.  While he was your field training officer in January of

11    2020, January 23rd, did you have an incident where you ran

12    into a --

13              MS. TREPEL:  Objection, Your Honor.

14              MR. GRAY:  -- person.

15              THE COURT:  Let him ask his question.

16              MS. TREPEL:  I'd request a sidebar at this time

17    before the question.

18              THE COURT:  Let him ask the question.

19    BY MR. GRAY:

20    Q.  Did you on January 23rd at about 3:00 in the morning,

21    did you have an occasion to meet a black individual, an

22    elderly man in a wheelchair, at 3:00 a.m. in the morning in

23    January?

24    A.  Yes, sir.

25              MS. TREPEL:  Your Honor, could we have a sidebar

1    on this point?

2              THE COURT:  No, we don't need a sidebar.  State

3    your objection.

4              MS. TREPEL:  Your Honor, I would object because

5    this is getting into an area involving a specific incident

6    to prove character and actions in conformity with character

7    that is not permitted under the rules given the --

8              THE COURT:  I sustain, counsel.

9              MR. GRAY:  I --

10             THE COURT:  I sustain.

11             MR. GRAY:  Can I be heard?

12             THE COURT:  You can be heard.

13             MR. GRAY:  Okay.

14             THE COURT:  Just a minute.  If you're going to be

15   heard, then I've heard the objection.  I've heard the

16   question.  I heard the objection.

17             MR. GRAY:  Two minutes.

18             THE COURT:  Yeah.

19        **(At sidebar)**

20             MR. GRAY:  Okay.  Judge, the only thing that's

21   happened new --

22             Can you hear me?

23             THE COURT:  Yeah.

24             MR. GRAY:  The only thing that's happened new

25   since I filed my motion on this was the government brought

 1    up an incident, I believe it was Kueng's, that there was an

 2    incident while he was in the FTO prior to the incident with

 3    George Floyd.

 4            They brought it up, and that's all I'm doing is

 5    bringing up the same kind of incident that they brought up

 6    when Kueng was working with an FTO.  I mean, if they can do

 7    it, why shouldn't I be able to bring up one of his

 8    incidents?

 9            THE COURT:  Ms. Trepel.

10            MS. TREPEL:  Yes, Your Honor.  Those incidents

11    were brought up to demonstrate that Mr. Kueng had knowledge

12    about how to provide certain types of medical aid that are

13    directly contested in this case.

14            Mr. Gray is bringing this up in order to

15    demonstrate that Mr. Lane acted in conformity with

16    character, and only opinion evidence or reputation evidence

17    is permitted on that point.  This has nothing to do with

18    whether he acted willfully in this particular incident or

19    acted with deliberate indifference in this particular

20    incident.

21            MR. GRAY:  It's got everything to do with it,

22    Judge.  He's charged with being deliberately indifferent of

23    willfulness.  He meets a guy in a wheelchair, elderly man,

24    and pushes him over two blocks in the wintertime with no

25    help from his FTO to a place of warmth at 3:00 in the

1    morning.

2          I have it on body camera.  He was nice to the guy.

3    He did everything for the guy and got him to the police

4    department and put in his wheelchair, which was about

5    400 pounds, put in his wheelchair to amp it up because it

6    was out of electric stuff.

7          MS. TREPEL:  And Mr. Lane can have acted

8    compassionately in the course of his life, just as the

9    character witnesses have testified, and that is

10   circumstantial character evidence.  It does not go to

11   whether he acted willfully in this particular situation,

12   meaning did he know what he was doing or failing to do was

13   wrong and then failed to act anyway on that particular date.

14         There's not -- it's not an essential element here.

15   Character is not an essential element of the charge or the

16   defense.  There's case law on that, and therefore a specific

17   incidence of conduct is not admissible under the rules.

18         MR. GRAY:  Judge, it's all about being

19   deliberately indifferent.  He's not.  He wasn't that day,

20   and there is a specific instance of conduct that I cited in

21   the rule if it's part of the defense, and this is clearly

22   part of the defense.

23         MS. TREPEL:  Your Honor, Mr. Gray is saying it's

24   part of the defense doesn't make an essential element he has

25   to prove to prove a defense.  Deliberate indifference is not

1    a judgment of Mr. Lane's character.  It's whether he

2    deliberately had knowledge of Mr. Floyd's medical condition

3    on a specific day and with that knowledge failed to act on

4    that specific day.

5              MR. GRAY:  The government doesn't want to get into

6    what this man is like.  They just want to get into this one

7    day, which is totally unfair.

8              MS. TREPEL:  Because this is a case about evidence

9    and how the evidence applies to the law.

10             THE COURT:  Counsel, how many times are we going

11   to sit and argue back and forth?

12             MR. GRAY:  Okay.

13             THE COURT:  We're done.

14             MR. GRAY:  Okay.

15             THE COURT:  There is no question in my mind that

16   Mr. Lane was a good Samaritan.  Nevertheless, we have Rules

17   of Evidence that apply, and the rule in this case does not

18   permit this particular evidence.  There is a section B that

19   potentially could, but that's not applicable to this as

20   well.

21             And for that reason, I sustain the objection.

22             MR. GRAY:  Okay.  Thank you, Judge.

23        **(In open court)**

24   BY MR. GRAY:

25   Q.  After -- in January of 2020 you're working as a field

1    training officer, correct?

2    A.  I was working on FTO, yeah.

3    Q.  You were working with a field training officer, correct?

4    A.  Yes, sir.

5    Q.  And how long did you remain with that field training

6    officer?

7    A.  I was with him, each of the four phases was a month

8    long.  So I was with him from beginning of January to the

9    end of, end of January, maybe early February.

10   Q.  All right.  And you were stationed all the time downtown

11   Minneapolis?

12   A.  Yep.  Yes, I worked out of the First Precinct.

13   Q.  And did you change precincts at any time?

14   A.  I worked, from there I went to the Third Precinct.

15   Q.  And the Third Precinct is where you worked on May 25th,

16   2020?

17   A.  Yes, sir.

18   Q.  Now before May 25th, 2020, while you were working at the

19   Third Precinct, did you meet a field training officer Derek

20   Chauvin?

21   A.  I had interactions with him prior to then, yes.

22   Q.  What does "interactions" mean?

23   A.  Just briefly passing in the halls or if I was writing a

24   report and my FTO wasn't around, you could ask, I would ask

25   him for advice on you know wording or --

1    Q.  Were you aware of his reputation as an FTO in the Third

2    Precinct?

3    A.  I knew that he was an FTO, and I knew of his reputation

4    that he'd been on for 20 years and was, you know, a guy that

5    had been in a lot of serious situations and could handle

6    himself.

7    Q.  Okay.  What were you taught about field training

8    officers at the academy?

9    A.  FTOs are the ones that are there to, you know, answer

10    questions, help you on calls.  You kind of are expected to

11    adopt their style of policing.  So the idea is that you go

12    over four phases, and you adopt each FTO's type, style of

13    policing, and then your style at the end, you're then able

14    to figure out how you want to police and what, how you want

15    to handle stuff and --

16    Q.  So it's part of the program they have four separate

17    field training officers?

18    A.  That's what we were told it was going to be, that you

19    would have four.  I only had three so --

20    Q.  Okay.  And when was it decided that you didn't need a

21    field training officer anymore?

22    A.  Once you completed, successfully completed your ten-day,

23    which is the ten-day evaluation period at the end of FTO,

24    once you pass that, you graduated from the FTO program and

25    then you are scheduled and on your own.

1    Q.  Okay.  And did you pass everything and get scheduled to

2    be on your own?

3    A.  I did.

4    Q.  Did you get a ten-day extension?

5    A.  I did get extended on my ten-day.  I --

6    Q.  What is that?  Tell the jury what that is.

7    A.  An extension is that you are not meeting the

8    expectations of where you should be at with your training,

9    that you are doing something dangerous or wrong and they

10   say, you know what, we're going to stop your ten-day.  You

11   need 5, 6, 7, up to 12 more days to continue training.

12           And then once we feel you're ready, then you will

13   start your ten-day again and --

14   Q.  Why were you extended, do you know?  Were you told?

15   A.  There was I think a few different things.  The big one

16   that I knew I was going to get extended on is I didn't, we

17   had had someone in the back of our squad car.  I had taken

18   them out, and I hadn't cleared the backseat, and then I put

19   someone else back in the backseat of the squad car.

20           And every time you take someone out of the squad

21   car, you have to visually check and make sure there's

22   nothing in there.  It's kind of a safety thing where, the

23   example they would give is, if someone was handcuffed and

24   ditched a gun in there, then it could be in there.  And the

25   next person you put in there, for whatever reason, would

1    have access to a gun or something.

2    Q.  So the extension for ten days, did you finally get off

3    the field training?

4    A.  Well, it was, yeah, that reason and then the reason that

5    I forgot my gun on a call, too, so --

6    Q.  Okay.  Why don't you tell the jury about that incident.

7    A.  That one is when I knew for sure I was getting extended.

8    That was not a question.  I went, brought someone down to

9    jail, and when you are in the sally port, which is the

10   secure area before you go into the Hennepin County Jail, you

11   have to take your gun out of your holster and disarm.

12            And there's usually lock boxes on the wall that

13   officers will put their guns in, but it's actually common,

14   my FTO had done it, where he left his gun in the thing and

15   then would drive out so we had to go back.  So I would

16   always put mine in the, locked in the trunk.  I would put it

17   in my duty bag.

18            And we had left jail, and there was a call that

19   came out as soon as we left, and it was just someone was

20   having a loud barbecue in their backyard, and I went to that

21   call and was talking with the homeowners.  It wasn't a big

22   deal.  They were just having a good time.  I said, you have

23   to calm down, keep the music down, we don't want to have to

24   come back, and they were fine.

25            But my FTO saw I didn't have my gun and grabbed my

1    hip and said you are forgetting something, and I realized my

2    gun was in the back.

3    Q.  And after the ten-day extension, did you become a

4    full-time police officer?

5    A.  After I started my ten-day again, then I completed it

6    without issue and --

7    Q.  That would be May 20th of 2020?

8    A.  I think that's correct.  May 20th, yes.

9    Q.  And we're going to get into May 25th, but before we get

10   there, from May 20th to May 25th, tell the jury what, how

11   many calls you had as far as how many, excuse me, how many

12   days you were on duty and what your duty was?

13   A.  So my first day --

14   Q.  Would be what, the 20th?

15   A.  I think the 20th was my last day, so it was -- I'm not

16   sure of the exact, but I had three shifts.  The first day

17   they let you go out able, typically is what they want to do,

18   where you ride in a squad by yourself and just, you know,

19   you're kind of on your own.  You don't have an FTO riding

20   with you.

21          It's kind of a big deal to be able to drive

22   around, but you mostly have to take report calls.  You can't

23   go to any in-progress calls because you are by yourself,

24   unless you have another squad back you.

25   Q.  Okay.  And how many days were you on able?

1     A.  I think I was scheduled able all three days, but the

2     second day off, FTO one of the other guys in the precinct

3     said, hey, I'm able to, you can just jump in with me, and we

4     can, you know, get more calls, go to more serious calls and

5     stuff like that so --

6     Q.  Okay.  And the third, was there a third day before the

7     25th?

8     A.  Third day was the same thing where I think I worked

9     maybe half the shift on my own, and then another officer was

10    able and said, hey, you know, let's jump in together.

11    There's no point having two able cars chasing each other

12    around.

13    Q.  So now we go to May 25th, which was Memorial Day,

14    correct?

15    A.  Yes, sir.

16    Q.  And what time, what were the times that you were to work

17    that day?

18    A.  We were on mid watch, so that was 4:00 to 2:00, 4:30 to

19    2:30.

20    Q.  4:30 in the afternoon to 2:30 in the morning?

21    A.  Yes, sir.

22    Q.  And you were teamed that night with whom, Kueng?

23    A.  That was my first time being scheduled with a partner

24    squad with Officer Kueng.

25    Q.  And did you know Officer Kueng?

1    A.  I did.  We were scheduled in the Third Precinct for the

2    last three phases of FTO.  So I think the last two I was on

3    mid watch with him.  So, you know, we kind of got to know

4    each other more working in the precinct.

5    Q.  And mid watch again is what?

6    A.  4:00 to 2:30, 4:30 to 2:30.

7    Q.  In the morning?

8    A.  4:30 in the afternoon to 2:30, yep.

9    Q.  Now that evening of the 25th of May, you got a call from

10   Cup Foods, right?

11   A.  I believe it came out over the radio.  Me and Officer

12   Kueng had been on.  We were just finishing up a call, and we

13   heard the call come out, and it went to I believe Squad 330,

14   but on the computer --

15   Q.  Who was Squad 330?

16   A.  That was Officer Chauvin and Officer Thao.

17   Q.  Okay.  Go ahead.

18   A.  And on the computer you can see what sector the call

19   belongs to, and we could see that that was a 320 call, which

20   was our sector to work in.

21   Q.  What's a sector?

22   A.  The precinct is broken up into four sectors, so there's

23   310, 320, 330 and then 340 on the side.  So our call, our

24   car was 320.  So that was our call.  It was a call in our

25   sector.

1    Q.  Okay.  So did you go to the call?

2    A.  We cancelled 330 and said that's our call, you know.

3    We're a few blocks away.  We will just put our current call

4    in pending, go take care of that, and it was right around

5    lunchtime, too, so --

6    Q.  Lunchtime at 8:00 o'clock at night?

7    A.  Yeah, I mean 8:00 or 9:00.

8    Q.  Okay.  Well, that's when you are working your shift, you

9    call that lunchtime?

10   A.  Yeah.  Yes.

11   Q.  Now what was the call?  What do you remember the call

12   being about?

13   A.  The call came out as forgery in progress.  The

14   in-progress aspect was, there is a suspect still on scene.

15   They said that the person might be drunk or under the

16   influence, and I think they gave a description, a brief

17   description.

18   Q.  All right.

19   A.  And that he might have been standing on top of or

20   sitting on top of a blue vehicle, a blue van.

21   Q.  In any event you arrive at the scene?

22   A.  Yes, sir.

23   Q.  And what happened once you -- and you are with Officer

24   Kueng, correct?  Once you arrived at the scene, what did you

25   do?

```
1     A.  We --

2     Q.  Strike that question.  Did you have your body cameras

3     on?

4     A.  We turned it on right as we got to the scene.

5     Q.  Okay.  And you didn't have it on before that?

6     A.  We were only a few blocks away so, and there didn't seem

7     to be any hostility or violence or anything, so it wasn't --

8     it was a priority one call, but we weren't going to rush to

9     it just because it came out as, you know, as kind of

10    mentally from the call notes it looked like there might just

11    be an argument or something.

12    Q.  All right.  Did you arrive at the scene?

13    A.  Yes, sir.

14    Q.  And what happened once you arrived at the scene?  What

15    did you do?

16    A.  Pulled up right in front, which probably definitely

17    should not have done, and then went in to meet with store

18    staff, and as soon as we walked in the door, he directed us

19    to the vehicle across the street.  He said, They're over

20    there.  The guy the driver in the car, they're still here.

21    You should go get them before they drive off.

22    Q.  And that area of the Third Precinct, had you learned

23    anything about that area before May 25th?

24    A.  I had, those two, the two sectors, 310 and 320, were the

25    most dangerous.  Those were the high crime areas.  I had
```

 1   heard of Cup Foods.  I know that people, you know, it's kind
 2   of an area to be cautious of but nothing other than that.
 3   Q.  All right.  So you went, you talked to the clerk?
 4   A.  Yes, sir.
 5   Q.  And then what did you do?
 6   A.  Well, he directed us to the vehicle.  So we were going
 7   to go make contact with them and try and figure out, you
 8   know, what the situation was.  And Officer Kueng and I
 9   walked out and we're kind of standing looking at the vehicle
10   across the street, and as we're waiting to cross there was
11   traffic.
12          I could see the front seat passenger look back at
13   us and either hit or kind of motion to the driver, and then
14   the driver looked back and looked right at us, and I said to
15   Kueng -- and then they kind of started moving around.  I
16   said to Kueng they're moving around a lot, which, you
17   know --
18   Q.  That was on your body camera?
19   A.  I believe so, yes, sir.
20   Q.  Okay.  Then what happened?  What happened next, if
21   anything?
22   A.  Then we crossed the street, and since I was kind of
23   coming that way, I went to the driver's side, and I believe
24   Officer Kueng went around to the passenger side.  And the
25   windows were tinted in the backseat, so I took my flashlight

1     out and kind of as we do, I have been trained, you know, use

2     your flashlight to try and look through the tint.

3               And I used that to tap on the driver's side window

4     just to get the driver's attention, because he was facing

5     away from me.

6     Q.  And did you do that?  Did you get the driver's

7     attention?

8     A.  I tapped, and there was a little bit of delay, and then

9     he turned around and kind of looked surprised or like he

10    hadn't seen us or something, and I could see he, he kind of

11    went like this (indicating) and threw one hand up, and I

12    could see his other hand was down.

13    Q.  His right hand?

14    A.  His right hand was below the seat kind of next to his

15    thigh, and I just said, you know, let me see your hands.

16    Kind of that just seemed strange that he was surprised.  He

17    had looked at us and then had his hand below the seat, and I

18    could see it was moving.

19    Q.  And what went through your mind when you saw that, if

20    anything?

21    A.  At first, nothing.  I just said, you know, let me see

22    your other hand, and then he kind of started asking like

23    why, what did we do.  And then his hand kept moving, and

24    that's, I think we've had almost scenarios exactly like that

25    in the academy where if you don't see someone else's hand,

1     they can pull a gun.

2              And I just have known that that, you know, down in

3     that area is not safe, and you know, I think he opened the

4     door, and I said a couple more times, let me see your other

5     hand.  And he kept refusing to do that, so based on what I

6     was seeing, it either looked like he was trying to pull

7     something out or he was trying to put something away, and it

8     just was kind of, you know, alarm bells of --

9     Q.  So what did you do?

10    A.  I pulled my gun out and kind of had it at a ready, and I

11    yelled at him.  I escalated and --

12    Q.  What do you mean by "escalated"?

13    A.  He wasn't responding to let me see your other hand, me

14    just asking.  So I escalated the situation to let him know

15    how serious I thought it was, which was --

16    Q.  Were you taught that in the academy?

17    A.  Yes, sir.

18    Q.  Go ahead.

19    A.  So pulled my gun up, kind of kept it at a ready, raised

20    my voice and then kept giving him commands and I swore, and

21    can I swear here?  I guess --

22    Q.  You don't need to.

23    A.  Okay.

24    Q.  We've seen the video.

25    A.  Okay.

1    Q.  What happened next?

2    A.  He just kept, was like why?  Why do I need to do that?

3    And then I kind of tunnel visioned onto his right hand and

4    took a couple steps back, because he just kept looking like

5    he was looking at me and then just kind of looking around

6    with his hand still hidden.

7            And I took a step back and was just trying to get

8    a better position.  You never want to stand right in front

9    of the window because if they're going to do something, you

10   want to be at the advantage of a step back and use that

11   pillar as kind of a buffer.  And I could see that he had

12   brought his hand up, and he still was refusing to show it to

13   me.

14           And then he just kind of stepped like this

15   (indicating) and threw both his hands out, and it looked

16   like he was trying to step out of the vehicle, and I think I

17   flinched because I didn't know what was in his hand.  And

18   then he was like, well, what did I do or what's going on?

19   Q.  Did he put his hands on the wheel finally?

20   A.  I think I was asking him at that point.  I was kind of

21   giving multiple commands, let me see your other hand, put

22   your hands on the wheel.  And then once I had seen his other

23   hand, I knew that, okay, he wasn't going for something or he

24   didn't want to go for something.

25           He put his hands on the wheel.  I told him to step

1    you know, I was just trying to get control of the situation,

2    told him to step back in.  I don't know why he would be

3    trying to step out into me while I'm, you know, trying to

4    have him at gunpoint.  That seems very unusual.

5    Q.  What did you do with your gun?

6    A.  Once I started to get more verbal compliance and he was

7    putting his hands on the wheel, I kind of tried to lower my

8    voice after a minute and, you know, was trying to

9    de-escalate again.

10           I put my gun in my holster.  He kept saying,

11   please don't shoot me.  I said, I'm not going to shot you.

12   You know, was just trying to de-escalate the situation, so I

13   put my gun away and let him see that I had nothing in my

14   hands.

15   Q.  And by the way, jumping ahead a little bit, did you

16   learn later that where his right hand was, counterfeit bills

17   were found?

18   A.  Much later.

19   Q.  Much later.  Okay.  Let's get back to this.

20           What happened once you put your gun away, and what

21   did he do then?

22   A.  I was giving him directions as we've been trained in the

23   academy.  If you're going to take someone out of the

24   vehicle, you have them put their hands on their head,

25   interlace their fingers so you can grab both their hands and

1   control them and then have them step out and face away from

2   you.

3           I, he, I remember him kind of looking at the keys

4   or he was holding his hand there.  I wasn't sure if he was

5   going to try and drive off.  Just based on his behavior

6   leading up to that with, you know, me having to draw my gun,

7   I felt we needed to get him out of the car as soon as

8   possible.

9           And I called out, I believe, after I put my gun

10  away.  I'm not sure a hundred percent, but I said, you know,

11  we're taking one out, which is --

12  Q.  What does that mean, "we're taking one out"?

13  A.  Calling that out over the radio is just kind of a signal

14  to other officers, you know, there's someone here that we

15  need out of the vehicle, which is not common, and it's just

16  kind of a signal like, hey, if you're in the area, start

17  this way.

18  Q.  Did you learn that at the academy?

19  A.  That I learned more on FTO.

20  Q.  All right.  So what happened once he got out of the

21  video -- out of the vehicle?

22  A.  He was not wanting to step, to get out of the vehicle.

23  I think I gave him multiple commands to step out and face

24  away from me.  So then I just decided that I got to pull him

25  out.  So I grabbed his arm and pulled him out of the

1    vehicle, and as I was doing that, he kind of was turning to

2    try and face me.

3            So we'd been trained in the academy, push him into

4    the door frame, and just based on that I, you know, level of

5    unpredictability, I don't know why you would try and face me

6    like that.  So I pushed him into the door frame and then

7    went in to try and handcuff him.

8    Q.  Where was Officer Kueng at this time?

9    A.  I think he was on the other side of the vehicle, and he

10   did come around to help assist with that.

11   Q.  And assist with what, the handcuffing?

12   A.  Handcuffing.

13   Q.  Was Mr. Floyd resisting your handcuffing?

14   A.  He was.

15   Q.  And did you get him handcuffed?

16   A.  We did eventually get him handcuffed, yes.

17   Q.  And what did you do then?

18   A.  At that point, I think I either looked over or through

19   the car and could see that the other two occupants had

20   exited the vehicle and then were starting to walk away and

21   look like they were trying to walk around the corner.

22           So it just kind of felt like we were, the

23   situation was getting out of hand.  So we had him

24   handcuffed.  I walked over there and said, hey, you know,

25   come back here.  You're not just going to walk away from

```
 1    this situation and --

 2            And they came back and I had them just stand

 3    against the wall.  I asked him to drop the bag.  He did.

 4    They seemed very compliant.

 5    Q.  Is that the fellow that had red clothes on?

 6    A.  Yes.

 7    Q.  Okay.  And after he dropped the bag, did you have a

 8    conversation with the female?

 9    A.  I did.

10    Q.  And what was that?

11    A.  I was just kind of trying to assess what was going on

12    with Mr. Floyd.  I, I asked her, you know, what's, is he on

13    something?  Like his behavior is, that's very unusual.  And

14    I was just kind of trying to assess what was going on with

15    him.  He seemed --

16    Q.  And what did she say, if anything?

17    A.  She said something along the lines of, he always has

18    problems when police come or something like that.

19    Q.  There was an allegation that he said that he was shot by

20    the police once before.

21    A.  He said that --

22            MS. TREPEL:  Objection.  Leading.

23            MR. GRAY:  What was that?

24            MS. TREPEL:  Objection.  Leading.

25            THE COURT:  It's overruled.  It's introductory of
```

1    a subject.

2    BY MR. GRAY:

3    Q.  Okay.  Did you hear that from either him or --

4    A.  He had said, yeah, he had said that, and then I believe

5    Ms. Hill had said that he'd been shot before and -- when the

6    man pulled a gun or something like that.

7    Q.  And do you remember what she said before you walked away

8    about Mr. Floyd and police officers?

9    A.  Something along the lines that he, yeah, either doesn't

10   like or has problems with them or when they come or

11   something like that.

12   Q.  All right.  And why did you do that?  Why did you go

13   over and talk to the lady about Mr. Floyd?

14   A.  They seemed in a better state of mind.  I was just like

15   maybe I could get some answers from them of what was going

16   on and what his condition was, whether it's just trying to

17   assess what was --

18   Q.  And did you learn about that in the police academy?

19   A.  Yes.  Yes, sir.

20   Q.  And was that the part where you wanted to determine if

21   it was intentional, the arrestee's conduct or if he was

22   understand the influence?

23   A.  Yes, sir.  That's just assessing, assessing the call.  A

24   lot of times calls you go to are never what you expect, and

25   it's just kind of trying to figure out what was going on, if

1    it was a mental thing, a drug thing.

2    Q.  And that's what you're taught, right?

3    A.  Yes, sir.

4    Q.  Now when you and Kueng, when you went back and you met

5    with Officer Kueng and Mr. Floyd was sitting on the

6    sidewalk, do you remember that?

7    A.  Yes.  Officer Kueng had walked Mr. Floyd over and sat

8    him down against the wall.  I believe that's when the park

9    officer showed up in response to my taking one out call over

10   the radio, and so I was going to ID those two, and then I

11   would assume at that time that Officer Kueng was IDing

12   Mr. Floyd.

13   Q.  Okay.  And when you say, those two was Ms. Hill and the

14   other fellow?

15   A.  Mr. Hall.

16   Q.  Mr. Hall.  All right.  So now you're back with Officer

17   Kueng and Mr. Floyd sitting on the ground.  What did you do

18   next?  What happened next?

19   A.  At that point I was concerned about what was in the car.

20   I wanted to figure out what was going on and why his hand

21   was down there and kind of what he was doing that would, you

22   know, have it get to the level where I would have to take

23   him at gunpoint.

24            So and kind of just based on his behavior, I was

25   like that was the guy that was pointed out, his behavior

 1    seems something is going on, let's get him in the squad over

 2    there.  We have our squad computer, so we can get a hard ID

 3    with driver's license pictures.  And so we were going to get

 4    him secured, and then we had the two people here that we

 5    hadn't IDed yet.

 6            So we didn't know anything about them, and we

 7    just, it's just kind of a numbers thing for function of --

 8    Q.  So you decided to take him to the squad, you and Officer

 9    Kueng?

10    A.  I think I suggested to Kueng, let's just put him in the

11    squad.

12    Q.  And did you attempt to do that?

13    A.  Yeah.  We started walking across the street.

14    Q.  And we saw, what happened while you're walking across

15    the street from where Mr. Floyd was at to your squad car, if

16    anything?

17    A.  Mr. Floyd was a big guy.  So Kueng was helping get him

18    up, so I just thought I would help with that, too, and then

19    we walked across the street.  And Mr. Floyd was kind of

20    either dragging his feet or dropping his weight a little

21    bit.

22            And I think he had said, you know I, before that I

23    had walked up and asked if he was on anything or are you

24    taking stuff and he said he wasn't.  He said, no, I'm not on

25    anything.

```
1    Q.  Is that also what you learned at the academy, to ask
2    that question?
3    A.  Yeah, it's a common question that you would ask people,
4    have you taken anything, are you on drugs, especially based
5    on their behavior.
6    Q.  And what did he say?
7    A.  He said he wasn't on anything, nothing, he didn't take
8    nothing.
9    Q.  All right.  And then what happened next?
10   A.  We started walking across the street, and then I think
11   Mr. Floyd had said he was calming down.  He said I'm calming
12   down.  We brought him towards the squad, and as we were
13   getting closer to the squad, he kept asking for someone to
14   stay with him.  He didn't want to be left alone.
15   Q.  Did he say why?  Do you remember?
16   A.  He didn't say why.  He just said, please don't leave me
17   alone, you know, someone stay with me.  I think he said that
18   multiple times and seemed concerned about being left alone
19   in the squad for some reason.
20   Q.  Did you respond to that?
21   A.  I'm not sure at that time.  I probably had said that
22   I'll stay with you.  That was the plan anyways, was just to
23   get him secured in the squad, and I was going to jump in the
24   front seat, get the hard ID, you know.
25   Q.  What do you mean by "hard ID"?
```

1    A.  Hard ID with date of birth and name so you can pull up a

2    driver's license picture.  You can do it over the radio, but

3    there's really no way of verifying.  It's easier with the

4    computer because you will have a picture of the person.

5    Q.  Okay.  And what happened at the squad with respect to

6    Mr. Floyd?

7    A.  We were going to, again, I was just going to help.  You

8    know, it seemed he was a bigger guy, and Kueng looked like

9    he needed some help kind of getting the search on him, so I

10   was just going to open the door and go back, but I stopped

11   and stayed and was going to help search Mr. Floyd before we

12   put him in the back of the squad, which is standard.

13   Q.  Is that the procedural rule to search somebody?

14   A.  Absolutely, yeah.

15   Q.  And did you do that?

16   A.  Yes, sir.

17   Q.  And how did he react when you were searching him?

18   A.  Just got kind of more fidgety and just -- I think that's

19   when he had said he was claustrophobic, but he was kind of

20   pushing back on us.  So I ended up getting his arm in -- you

21   put your arm underneath the handcuffs, just so you can lean

22   forward, so we could hold him up and then make sure that we

23   could get a search all the way.

24   Q.  And after -- did you finally get a search?

25   A.  We completed, yeah, like a basic, basic search on him.

1    Q.  And did one of you two officers find a pipe?

2    A.  Officer Kueng found one and handed it to me, just a

3    little, little glass pipe, and handed it to me, and I set it

4    up on the squad car.

5    Q.  Okay.  And did it remain there for a long period of

6    time?

7    A.  It did.

8    Q.  So with the pipe up on top of the squad car, what

9    happened next with respect to Mr. Floyd going into the squad

10   car?

11   A.  He had been saying, once we started searching him, then

12   I think it was when I opened the door and he started saying

13   he was claustrophobic.  So I was just trying to -- he kind

14   of started bringing it up.  His voice was elevating.  I was

15   trying to de-escalate that by lowering my voice.

16           That's -- instead of you raising your voice, if

17   one person is raising their voice and you lower yours,

18   sometimes you can get them to kind of bring it down, and I

19   just tried to assure him that, you know, I'll stay here.  I

20   think he had asked to sit in the front seat.

21           And we were just like, we can't do that, man.  You

22   got to get into the squad.  I had --

23   Q.  How about rolling the windows down?

24   A.  Yeah.  I offered to roll the windows down, put the air

25   on for him, just again let him know that I'd stay with him.

 1    We got him to sit down, but he kind of kept pushing back

 2    against us, almost trying to stand up.

 3    Q.  In the squad?

 4    A.  That would be, yeah, in the back.

 5    Q.  And what happened next?

 6    A.  From there he -- we tried for a few minutes to get him,

 7    just to get him into the squad on his own with de-escalation

 8    and that kind of thing, and he just was adamant about not

 9    doing it.  He kept pushing back on us.

10    Q.  Did he mention whether or not he could breathe when he

11    was --

12    A.  At that point I don't believe he had said anything, but

13    we'd been trained in the academy that the standard process

14    for a non-compliant person is ask, tell, make.  So you ask

15    him to do it, you tell him to do it and then you make him do

16    it.

17         So we'd been asking and kind of telling him, you

18    got to get into the squad, and that just didn't seem to be

19    working, so I was going to go around.  I went around the

20    other side.

21    Q.  What side, the passenger side?

22    A.  Passenger side.  And was just going to try and pull him

23    in that way, because he didn't, we kind of needed him to

24    slide over and then pull his legs in because he was --

25    Q.  Driver's side?

1    A.  From the driver's side, yes.

2    Q.  Okay.  Go ahead.

3    A.  So I opened the door and unbuckled the things, and I

4    think I had given him one more chance.  I said, hey, slide

5    your butt over here, I'm going to pull you in, and he didn't

6    comply with that.

7          So I kind of grabbed his arm and was trying to

8    pull him across, and he at that point kind of seemed to

9    snap, and he started yelling.  And then he had his face and

10   was smashing it on the back of the, the divider or partition

11   between the front and backseat and just started yelling, and

12   then he got in a little bit.

13         I continued trying to pull him.  He got his feet

14   in and used his feet to push, and he kind of launched

15   himself into me on the passenger side, and I had to brace to

16   try and keep him in there, because that was the whole goal

17   was to get him contained in the squad.

18   Q.  Do you remember whether or not he said he wanted to go

19   out on the ground?

20   A.  He said that later.

21   Q.  All right.  Well, what happened after he pushed his

22   feet?  Did some other officer show up?

23   A.  I believe that's when Officer Thao and Officer Chauvin

24   arrived.  I think I had seen them either right when I was

25   going around or when I was on the other side.

1    Q.  And what, if anything, did Officer Chauvin do with

2    respect to where you were at with Mr. Floyd?

3    A.  We just kind of seemed to be struggling with the

4    situation, and I was trying to push him in.  He was trying

5    to push himself out, and I was just kind of like I am not

6    sure of what we should be doing at that point of what's the

7    best thing.

8            I think Officer Chauvin either asked or he kind of

9    just cut in front of me and grabbed ahold of Mr. Floyd and

10   then asked, you know, is he under arrest.  At that point I

11   was only planning on just kind of detaining him until we

12   could get, you know, hard evidence of the probable cause or

13   for the forgery.

14           And he asked if he was under arrest and then

15   informed George Floyd that he was under arrest for forgery.

16   Q.  At that point in time where were you at?

17   A.  I had kind of backed off.

18   Q.  Where was Mr. Floyd at?

19   A.  He was I think with his knees on the ground and his

20   torso kind of like leaning towards the squad.  We were going

21   to maybe try and lift him to put him back in, but like I

22   said, he was a big guy, and that would have been difficult

23   to do in a door frame.

24   Q.  So at some point in time was he put on the ground?

25   A.  He was.  At that point he --

1   Q.  Where were you when he was put on the ground?

2   A.  I think I was standing right by the, by the passenger

3   side door.  What we'd been trained in the academy is if you

4   have a person that's handcuffed and they're either

5   self-harming, they're not compliant, you just can't control

6   them physically, that you would use the MRT, maximal

7   restraint technique.

8   Q.  Is that also the hobble?

9   A.  It is the hobble.  I think I said MRE.  I couldn't

10  remember the acronym, but I remember it was something like

11  that.

12  Q.  So what were you going to testify to about the MRE or T?

13  A.  That, that that's what we probably should use since he's

14  handcuffed and three of us can't control him or, you know,

15  and then the self-harm where he's hitting his head on the

16  glass.

17  Q.  So with respect to the hobble or the MRT, what happened

18  with respect to that?

19  A.  I believe Officer Thao had suggested we use that, and

20  that seemed to make sense.  I was like, okay, yeah, he's

21  meeting the criteria.  He's handcuffed and out of control,

22  so you can't do that to a standing person.

23          And then someone had said, you know, let's take

24  him down.  I was like, yeah, let's take him down to the

25  ground, and we'll do the hobble or the MRT.

1    Q.  So at some point in time was an ambulance called?

2    A.  Yes.  I, when Mr. Floyd came out the other side of the

3    squad, I can see his lip was bleeding and possibly his nose.

4    It looked more like his mouth was bleeding, though.  So once

5    we come out and gone to the ground, I called an ambulance

6    Code 2 for mouth bleed.

7    Q.  All right.  Is that part of what you learned at the

8    academy?

9    A.  Yes.  You call out and give a reason for what you're

10   calling.

11   Q.  All right.  After that happened, what happened next?

12   A.  At that point Mr. Floyd had gone to the ground, and then

13   he was kind of looked like he was bracing himself, so I was

14   going to go get his legs and either control them or get them

15   ready for the hobble.

16          And he was kicking and fighting with us and kind

17   of resisting that.  So once I had gotten his legs under

18   control, I think Officer Thao was going to look for the

19   hobble at that point, or I had called the ambulance.

20   Officer Thao was going to look for the hobble.  He couldn't

21   find it in Kueng's bag, and I had mine all labeled out for

22   situations like that where someone else is looking for it,

23   so he, I said, you know, check my bag.  I have it listed in

24   there.

25          He got it, handed it to me and then I think had

1    said, you know, well, if we use the hobble, you know, a

2    sergeant's going to have to come to the scene, and, you

3    know, it seemed kind of excessive since if we have an

4    ambulance coming, there's no point going through the whole

5    process putting a hobble on because we're going to have to

6    take it off as soon as the ambulance gets here.

7    Q.  So you didn't put the hobble on?

8    A.  It just kind of seemed to be suggested that that was

9    maybe excessive at that point.

10   Q.  Who suggested that?

11   A.  I believe Officer Thao had said that, you know, it, you

12   know, we're going to have to call a sergeant and then the

13   ambulance is already coming.  So putting a hobble on, and

14   the MRTs, you put one around the waist and one around the

15   feet and tie it together.  It's a whole thing, so there

16   would be no point in doing that if we, you know, the

17   ambulance is going to be there and --

18   Q.  So after the hobble incident, what happened next, if

19   anything?  Did you ask the -- Mr. Chauvin or Mr. Thao or

20   anybody about putting his legs up?

21   A.  Yeah, that since we just had him kind of, we all had an

22   area, I asked about --

23   Q.  What area did you have?

24   A.  I had his ankles.

25   Q.  And why did you have those?

1    A.  Just from the kicking and to make sure that he, you

2    know, couldn't do anything else to brace himself or kick

3    or --

4    Q.  Was he kicking?

5    A.  He was kicking, yes.

6    Q.  And did his shoe come off during the kicking?

7    A.  It either came off from the kicking or when he kicked

8    himself out of the ambulance, one of the two.

9    Q.  Okay.  So you asked, should we get his legs up.  Do you

10   remember asking that?

11   A.  I do, yep.

12   Q.  And why did you ask that?

13   A.  It's just another means of like restraint where you take

14   the person's legs and you cross them and put their ankles up

15   on their butt.  It's just kind of a means of controlling

16   that, so they can't kick anymore.  And I said, should we get

17   his legs up, and I think Officer Chauvin said, no, we're

18   good, you know, just like this is fine.

19   Q.  If you got his legs up, would he be put in the recovery

20   position?

21   A.  Not necessarily, but --

22   Q.  All right.  So after you asked about getting his legs

23   up, what happened next?

24   A.  Mr. Floyd, his resistance after a few minutes had kind

25   of stopped with the actively trying to --

1    Q.  Prior to the resistance stopping, was the ambulance

2    stepped up?

3    A.  Oh, yeah, I think that was around the time of the

4    hobble.  When we decided not to use that, Officer Thao had

5    asked me if the ambulance was coming Code 2 or Code 3, and I

6    said it was coming Code 2, but if we're just going to hold

7    we can step it up so the ambulance can get here as soon as

8    possible because Code 2 could take, you know, 15 minutes.

9    It's --

10   Q.  And what does Code 3 mean?

11   A.  Code 3 is get here as far as you can safely, lights and

12   sirens.

13   Q.  Lights and sirens?

14   A.  Yeah, going through that.  Code 2 is just going with

15   traffic, which on a busy day on Lake Street can take a

16   while.

17   Q.  So what happened after the ambulance was stepped up, to

18   the best of your memory?

19   A.  The ambulance was stepped up and --

20   Q.  Did you have a discussion with Chauvin about whether or

21   not the guy was on drugs, Mr. Floyd?

22   A.  Yeah, we were, I think Chauvin was kind of trying to

23   piece together what had happened before, and we were just

24   kind of talking through what had happened up to that point

25   and kind of our assessment of what was going on and

1    Mr. Floyd's behavior and the, you know, thinking that he was

2    on some sort of drug but we're not sure.

3              And just the fact that he, you know, had kept his

4    hand down there, I said he's acting like there was something

5    in there.

6    Q.  Approximately four minutes after he was on the ground,

7    did he start to cease resisting?

8    A.  Yeah, he had kind of stopped with the active resistance.

9    We were just kind of holding in place.

10   Q.  Do you remember what you said to Derek Chauvin once that

11   happened?

12   A.  From what I remember from training, too, I said, should

13   we roll him on his side, and Officer Chauvin said, you know,

14   kind of the same again with asking to get his legs up, he

15   said, no, we're good like this.

16   Q.  And what did you say to him when he said, no, just leave

17   him?

18   A.  I think I, you know, trying to assess the situation, I

19   had said, you know, I was concerned about excited delirium

20   and --

21   Q.  And what is excited delirium?  What did you learn at the

22   academy about excited delirium?

23   A.  Excited delirium is, is just an agitated state mostly

24   done from, mostly induced from drugs.  It's, it can look

25   like a lot of different things, and it's, it's basically my

1    understanding of it is an adrenaline overdose, where your

2    body pumps out so much adrenaline due to drugs or whatever

3    in your system that you --

4    Q.  Do you remember what Derek Chauvin said after you told

5    him you were worried about excited delirium or whatever?

6    A.  Yeah.  I was concerned about that that might be the

7    situation, and he said, well, that's why we got him on his

8    stomach, and that's why the ambulance is coming and --

9    Q.  What did you say to that?

10   A.  I said okay, I suppose, and that, you know, seemed

11   reasonable.

12   Q.  What do you mean by, "Okay, I suppose"?

13   A.  It just seemed reasonable at the time that, you know,

14   this guy has been out of control.  We have an ambulance

15   coming Code 3.  We're just going to hold here.  They should

16   be there any minute.

17          THE COURT:  Let me interrupt and take a morning

18   break, if you would.

19          MR. GRAY:  All right.

20          THE COURT:  Members of the jury, we're going to

21   stand in recess for our morning break at this time.  I would

22   caution you not to discuss the case amongst yourselves or

23   with other persons, and we will be in recess for our morning

24   break.

25   (Recess taken at 11:00 a.m.)

```
1                          *  *  *  *  *

2     (11:20 a.m.)

3                         IN OPEN COURT

4                        (JURY PRESENT)

5              THE COURT:  Proceed, Mr. Gray.

6              MR. GRAY:  Thank you, Your Honor.

7     BY MR. GRAY:

8     Q.  I believe we left off, if my memory serves me right, you

9     were talking about excited delirium.

10    A.  Yes, sir.

11    Q.  And you were in court last week, week before, when there

12    was a video of an excited delirium situation.  Do you

13    remember that?

14    A.  Yes, sir.

15    Q.  Do you remember having that played for you at the

16    academy?

17    A.  Yeah.  Yeah, we were shown that at the academy as part

18    of the excited delirium training.

19    Q.  And were you also, when you were working for the

20    juvenile center, were you also shown or instructed about

21    excited delirium?

22    A.  I believe they had some online quizzes that covered

23    that, at least the idea or topic.

24    Q.  Now, based on the video and audio of the incident, the

25    nine-minute incident, were you able to make up a timeline as
```

1    to when certain things happened?

2    A.  Yes, sir.

3    Q.  And that timeline is Exhibit L4.  Do you have a copy of

4    it?

5    A.  I do.

6    Q.  And have you reviewed that?

7    A.  Yes, sir.

8    Q.  And is that a true and accurate copy of the timeline

9    from when you asked, when you say he is breathing until you

10   start CPR in the ambulance?

11   A.  To the best of my knowledge, sir, yes.

12   Q.  You've looked at all this.

13   A.  Yes.

14   Q.  Okay.  Well, let's go back to, Do you remember saying

15   that he's breathing?

16   A.  Yes, sir, after --

17   Q.  How could you tell that?

18   A.  I could see kind of through Officer Kueng his like right

19   lat.  I could see that his chest rise and fall.  It was kind

20   of hard to see but --

21   Q.  Could you see where Derek Chauvin's knee was at from

22   where you were located down by his feet?

23   A.  I believe I could at the beginning and then towards the

24   end of the restraint.

25   Q.  Well, in the beginning of the restraint, you were down

1    by the feet when Mr. Floyd was struggling, correct?

2    A.  Yes, sir.  I could see where -- his location.

3    Q.  Where was his knee at that point in time?

4    A.  It appeared just to be kind of holding at the base of

5    the, base of the neck or shoulder.

6    Q.  Were you able to see his face at all?  By "his face" I

7    mean Floyd's.

8    A.  No, sir.

9    Q.  So after you -- why did you say that?  Lane says he is

10   breathing.  Why did you say that?

11   A.  I just, I know we're supposed to be keeping an eye on

12   them, on the person in our custody, and I think there were

13   people in the crowd that had yelled.  I could kind of

14   sporadically hear what they were saying, but someone said

15   he's not breathing, and I was like he's breathing.

16   Q.  Okay.  Approximately 26 seconds after you said he's

17   breathing, which you actually saw, correct?

18   A.  Yes, sir.

19   Q.  What did you say to Mr. Chauvin?

20   A.  I believe I suggested again or said we should, you know,

21   should we roll him on his side, just put him in the recovery

22   position.  It's a lot easier to assess a person in that

23   position.

24   Q.  Okay.  So I was just going to ask you that question.

25   Why did you for the second time say roll him on his side?

1    A.  Just to be able to have a better assessment of

2    Mr. Floyd.

3    Q.  Did you know that to be from your training, the recovery

4    position?

5    A.  Yes, sir.

6    Q.  And you, we've seen in the exhibits pictures of the

7    person lying on his side in the recovery position?

8    A.  From EMR, yes, sir.

9    Q.  Okay.  And what's EMR?

10   A.  That's the emergency medical responder course.  It's a

11   five-day course that we took.  It's the big green book that

12   people have had at various times here.

13   Q.  Okay.  And when you said shall we roll him on his side,

14   that was the second time, did you get any response from

15   anybody?

16   A.  I think Officer Chauvin kind of just avoided that and

17   had asked us if we were okay, kind of --

18   Q.  He deflected it by asking you if you were okay?

19   A.  Yeah.  That's typically, you know, a senior officer will

20   always check, especially, you know, make sure, are you guys

21   all right kind of thing.  Sergeants ask that a lot, too.

22   Q.  By the way, back up to when you are riding with your

23   field training officer or for that matter with Chauvin at

24   this incident, can a field training officer terminate your

25   employment?

1   A.  I don't believe they can themselves.  I know they can

2   have a pretty strong hand in a recommendation for that.

3   They, you know, if they think you're unfit, they can make

4   sure that the right people know that you are not qualified

5   or fit for the job.

6   Q.  And then what happens?  You get terminated?

7   A.  Then you are terminated, fired.

8   Q.  And do you have any recourse being -- you're a

9   probation --

10  A.  No.

11  Q.  -- or a cop; is that right?

12  A.  You're an at-will hire at that point, meaning you can be

13  let go for any reason or no reason.  They can just fire you.

14  Q.  And how long does that last as an at-will cop?

15  A.  I believe it was a year from our, the swearing in

16  ceremony, December 10th, so it would have been December 10th

17  of 2020 that I would have been off probation.

18  Q.  All right.  Now after the second time you asked Chauvin

19  to roll Mr. Floyd on the side, approximately 30 seconds

20  later, and between that time, did you have, ask Kueng to

21  check Mr. Floyd's pulse?

22  A.  Yes, sir.  I just, you know, said --

23  Q.  And I believe we saw a video of that or a picture of it

24  where Kueng was checking the pulse.  And where was that at?

25  A.  It was on -- I'm not sure which arm.  I don't remember

1    which arm, but he was kind of checking almost halfway up the

2    forearm, and you want to check a lot closer towards --

3    Q.  Were there handcuffs on Mr. Floyd --

4    A.  There were.

5    Q.  -- while he was checking?

6    A.  Yes, sir.

7    Q.  And did you learn that that might interfere with --

8    A.  It can, yeah, absolutely.

9    Q.  And have you also learned that the classes you've gone

10   to --

11            MS. TREPEL:  Objection.  Leading.

12            MR. GRAY:  Okay.

13   BY MR. GRAY:

14   Q.  What did you learn at the classes, if anything, about

15   checking a pulse?

16   A.  The most reliable one is the carotid pulse.

17   Q.  Did they tell you why it was?

18   A.  I think it's just because there's the most blood flow

19   there, and it's closer to the heart.  It's going to be

20   stronger.  Radial pulses, even carotid pulses, are hard to

21   find sometimes on, if a person's pulse is low.

22   Q.  How about the radial pulse?

23   A.  Radial pulse is easier and more for, it's just not as

24   reliable as the carotid pulse.

25   Q.  So after the pulse was second, was checked by Kueng, did

```
1    he check it again?

2    A.  I believe he did, yeah.

3    Q.  And --

4    A.  Yes.

5    Q.  Was he able to find one?

6    A.  He said he couldn't find one.

7    Q.  So what did you do after that?

8    A.  I again, I was kind of trying to assess Mr. Floyd, and I

9    think I had checked for, I forget what it's called, the

10   ankle, ankle pulse to try and see if there was one there.

11   And I remember I could see his, you know, the veins in his

12   right arm were.

13   Q.  In whose right arm?

14   A.  In Mr. Floyd's right arm.

15   Q.  And what did those veins tell you?

16   A.  I just kind of, he's obviously still has a pulse if his,

17   you know, or has blood pressure because the veins are

18   sticking out in his arm.

19   Q.  And so after you checked the ankle pulse, and I take it

20   you couldn't find one; is that right?

21   A.  I couldn't find one, no.

22   Q.  All right.  And within seconds after that, did you see

23   the lights and siren of the ambulance?

24           MS. TREPEL:  Objection.  Leading.

25           THE COURT:  Oh, I'll overrule.  You may answer.
```

1    BY MR. GRAY:

2    Q.  At some point in time within seconds after that, did you

3    see the ambulance coming?

4    A.  Yes, sir.  They had I think just before that had called

5    out that they were two blocks away on the radio, and I think

6    I hd then checked the ankle pulse.  And then right after I

7    did that, they were actually a lot closer than I think the

8    radio said they were, because I saw them turn and come south

9    on Chicago.  They were a block and a half away at that

10   point.

11   Q.  And at about approximately how many seconds after you

12   saw the lights and siren did they arrive?

13   A.  Ah --

14   Q.  You can look at the --

15   A.  Yeah, if I -- after I said there we go?

16   Q.  Yes.

17   A.  They -- 25 seconds.

18   Q.  And is that when the EMT arrived?

19   A.  Yes, sir.  They arrived on scene then.

20   Q.  And now, what did you learn at the academy once the EMT

21   arrives?

22   A.  EMTs are the medical professionals when they're on

23   scene.  It's their scene.  They're going to assess and do

24   what they need to do, and you are there to assist and help

25   them in any way.  Make sure mostly they're safe is the big

1    thing because if they're not safe they can't do their job.

2    Q.  Okay.  And did you learn that once the EMTs are on the

3    ground, as Zimmerman said, they take over and you assist?

4    A.  Yeah, that's kind of how it had been on most calls when

5    you -- or all calls whether EMS arrived.

6    Q.  Did you say anything to the paramedic or paramedics?

7    There were two of them, correct?

8    A.  Yes, sir.

9    Q.  Did you say anything to the paramedic or medics when

10   they were on the ground?

11   A.  He just had kind of walked out, and I think he had gone

12   to the back of the ambulance.  And, you know, I said you

13   should check on him.  I, you know, he's not responsive right

14   now, and I think he just kind of started walking up there.

15   I was just trying to, you know, let him know that.

16   Q.  So what did you do after you said that?

17   A.  After that I think I had stood up, and Derek Smith or

18   EMT Smith, or whatever his title is, went up and checked the

19   carotid pulse on Mr. Floyd, and he just kind of walked back

20   to the ambulance.

21   Q.  So did he look -- well, strike that.

22           Did he run up to the ambulance?

23   A.  No, he --

24   Q.  Did he flip George Floyd over on the ground?

25           MS. TREPEL:  Objection.

```
1              MR. GRAY:  -- and do CPR?

2              THE COURT:  Overruled.  You may answer.

3              THE WITNESS:  No, sir.  It was just, if anything,

4        kind of reassuring that obviously Mr. Floyd's all right.

5        BY MR. GRAY:

6        Q.  What went through your mind when you saw that he didn't

7        do that?

8        A.  That Mr. Floyd had a pulse and that he's just going to

9        go get the stretcher and load him up.

10       Q.  So were you relieved a little bit that he was all right?

11       A.  Very much so.

12             MS. TREPEL:  Objection.  Leading.

13             THE COURT:  It's overruled.

14       BY MR. GRAY:

15       Q.  And did he go?  What did Smith do after he checked the

16       carotid artery?

17       A.  I believe he went and got the, kind of was going to what

18       he originally was doing, getting the stretcher out and

19       dropped that down and slid it right over to where we were,

20       and then we loaded Mr. Floyd onto that.

21       Q.  Did you see Mr. Floyd's face?

22       A.  I did.

23       Q.  And when was the last time you had seen his face before

24       this?

25       A.  On the outside of the squad.
```

```
1     Q.  When you got out of the squad?

2     A.  On the other side, yeah.

3     Q.  And you, what went through your mind when you saw his

4     face there once he was tipped over?

5     A.  He didn't look good.

6     Q.  Did you help with the stretcher?

7     A.  I did.

8     Q.  And did you help with loading him into the ambulance?

9     A.  I did.

10    Q.  Before you did that, did you say anything or ask anybody

11    about if you could do that?

12    A.  I believe I'd asked Officer Chauvin at that point if we

13    should get another car for the crowd.  There was --

14    Q.  And why did you ask Chauvin if you should get another

15    car for the crowd?

16    A.  It just, there seemed like there was a reason or there

17    was some hostileness that was going on there, and I just

18    wanted to have another car, maybe call someone else to scene

19    to help with that or whatever threat that he had perceived

20    there.

21    Q.  Did Chauvin respond?

22    A.  I think he had said, no, let's just get him loaded up.

23    Q.  Okay.  Prior to the helping with the stretcher, do you

24    remember what Mr. Smith said about being in his way?

25    A.  I think, yeah, we were, when we were trying to load him,
```

```
1    we kind of -- it was either Officer Kueng or I were kind of
2    getting in his way, and he just said, you know, just get out
3    of the way.
4    Q.  And did you get out of the way?
5    A.  I did and let them put him on, and then I wanted to go
6    with to help where I could.
7    Q.  Why did you want to go along and help?
8    A.  Just based on when Mr. Floyd was turned over, he didn't
9    look good, and I just felt like, you know, the situation,
10   they might need a hand.
11   Q.  And did you ride along?
12   A.  I did.
13   Q.  And after you got into the ambulance, we heard from your
14   testimony, is that the first time you met Derek Smith,
15   talked to him?
16   A.  Yeah, very well could have been.  I, it's, this was --
17   Q.  Did you know whether or not he was the one on the
18   outside getting the stretcher at that time?
19   A.  It's hard to say.  With COVID then, everyone was wearing
20   masks, so it was really like hard to know who you were
21   meeting.
22   Q.  Everyone was wearing a mask?
23   A.  Yeah, the EMTs were, and I was initially as well.
24   Q.  And once you got into the ambulance, what did you do?
25   A.  I think I'd asked if they wanted or if I could ride with
```

1    them, and we had pulled the cart or stretcher in, and I had

2    tried taking carotid pulse on Mr. Floyd, and the doors

3    closed, and I think Kueng had asked if it was like my body

4    camera just trying to get situated.

5          And once the door is closed, Derek Smith asked if,

6    you know, kind of was asking what happened, and I think I

7    was trying to give him like a rundown of the whole, the

8    whole call and just to explain what had been going on.

9    Q.   And what did you do after that?

10   A.   At that time Mr. Smith was taking the handcuffs off

11   Mr. Floyd, and I think he had started cutting his clothes

12   off then, too, and he situated and then took a carotid again

13   on Mr. Floyd and said, you know, I need you to start CPR.

14   Q.   And did you start CPR?

15   A.   (Moves head up and down.)

16   Q.   After you started CPR, what happened with respect to the

17   locus?

18   A.   We were, we were going to go to a different location,

19   and I was doing CPR while he was getting the stuff ready,

20   and we stopped and the other paramedic came out, and he had

21   got the LUCAS ready or was starting to get that ready.  So I

22   had seen one of those before on I think it was a suicide.

23         I'd seen how they work and so kind of had a basic

24   understanding of how it goes, and I think we were shown at

25   least some part of how they fit on a person during EMR.  So

1    I kept doing chest compressions until he had the back board

2    ready and flipped him up and helped him get that on.

3    Q.  And did the LUCAS then take over your job of doing the

4    CPR?

5    A.  Yeah.

6    Q.  So what happened next?

7    A.  I think there was a confusion on where they were, their

8    location, EMS, and fire was looking for them.  So they were

9    calling out, asking where we were.  I had no idea where we

10   were because we were in the ambulance, and I couldn't see.

11          So when a squad splits up, it's able and baker, so

12   I was going to be able, Kueng was going to be baker or vice

13   versa.  So I was trying to call out to him on the radio to

14   tell him if he was still on scene with fire to give them our

15   location so that fire could come there and help.

16          And then I think the other EMS guy or I was

17   holding, I think I was trying to just hold Mr. Floyd's

18   airway.

19   Q.  What do you mean "holding his airway"?

20   A.  So during CPR I know now what it was, but I wasn't sure

21   if he was breathing or not because I could hear air passing

22   through, and now I know that it's from when you are doing

23   the chest compressions, it pushes air out of your lungs.

24          So I was just continuing to hold his airway just

25   in case there was breathing or just to help facilitate with

1   that, and the other EMS guy got the, got the oxygen mask or

2   O2 mask, and the other one started with an IV.

3   Q.  Okay.  At some point in time did the ambulance get

4   visited by fire?

5   A.  Yeah.  I kind of felt like a fifth wheel and didn't

6   really, you know, I'm not IV.  I don't know what to do with

7   that kind of stuff, and I know fire has more training, and

8   they kind of came in.

9          And I think the other paramedic had had me start

10  doing the bag, the oxygen bagger, and once the fire showed

11  up, once they showed up, I just said, you know, we can trade

12  out, there's no point.  I guess I didn't feel like I was

13  going to be the most helpful in that situation.  So they had

14  more training, so I was like let's just trade.

15  Q.  So you left the ambulance?

16  A.  I did.

17  Q.  Prior to leaving the ambulance, there were only two

18  paramedics, correct?

19  A.  Yes.

20  Q.  Is that right?

21  A.  Yes.

22  Q.  And one of the paramedics was driving away from the

23  scene, correct?

24  A.  When we left the scene, yeah, I was in the back with

25  Derek Smith, and the other guy was driving to --

```
 1    Q.  So Derek Smith would have been on his own in the

 2    ambulance if you hadn't come along, correct?

 3    A.  Yeah, he would have likely just been doing the CPR

 4    instead of getting to all the other stuff he was doing,

 5    getting ready.

 6    Q.  So you were dropped off.  And what happened then?  How

 7    did you get back to where the incident was at Cup Foods?

 8    A.  There was a, the fire truck had pulled in right behind

 9    the ambulance, and there was a firefighter there, and she

10    just said, you know, motioned for me to come into the car or

11    into the fire engine.

12             And I jumped in there, and she said she could give

13    me a ride, or I wasn't sure if Officer Kueng was going to be

14    coming to my location, and I think I had walked up to the

15    street and was looking for the intersection to figure out

16    where I was.

17    Q.  What was going on in your mind with respect to George

18    Floyd at that time, if anything?

19             MS. TREPEL:  Objection.  Relevance.

20             THE COURT:  That's overruled.  You may answer.

21             THE WITNESS:  Could you ask that again?

22    BY MR. GRAY:

23    Q.  Maybe.  What was going through your mind when you got

24    out the fire truck -- excuse me -- when you got in the fire

25    truck and you're going back to the scene?
```

```
1    A.  In regards to?

2    Q.  What were you thinking?

3              MS. TREPEL:  Your Honor, could we have a sidebar?

4              THE COURT:  Sure.

5         (At sidebar)

6              MS. TREPEL:  Your Honor, I object to this

7    testimony.  This is designed to elicit an emotional response

8    at this point, and this similar testimony has been

9    disallowed for all of the government's witnesses, and this

10   witness has already become emotional on the stand.

11             MR. GRAY:  Well, Your Honor, I just trying to deal

12   with the allegation of being deliberately indifferent about

13   Mr. Floyd's condition.

14             MS. TREPEL:  Again, Your Honor, it does not go to

15   his deliberate indifferent, how he was feeling in his head.

16   This is about what he knew and did or did not fail to do.

17             THE COURT:  Counsel, excuse me.  That's the exact

18   point that's being raised.  I think he can answer the

19   question what is he thinking.  I don't think you can go any

20   farther than that.

21        (In open court)

22   BY MR. GRAY:

23   Q.  Before we go on any further, my worthy assistant told me

24   I hadn't offered L4.

25             Do you have a copy of that up there?
```

```
1    A.  I think that's what this is.

2    Q.  Yes.  And have you reviewed this?

3    A.  Yes, sir.

4    Q.  And have you gone through the video and audio that's

5    been played here and taken out this time and the seconds

6    between it?  Have you?

7    A.  Yeah, this seems accurate.

8    Q.  And is this fair and accurate?

9    A.  Yes.

10   Q.  The specification of the timeline from the time that you

11   said he's breathing until the time that you started CPR?

12   A.  Yes, sir.

13            MR. GRAY:  All right.  We'd offer L4, Your Honor.

14            MS. TREPEL:  No objection.

15            THE COURT:  L4 is received.

16            MR. GRAY:  We don't need to show it, Judge.  I'll

17   just have the jury take it when they go.  I don't need to

18   put it on here.  We've already gone through this.

19            THE COURT:  Okay.

20   BY MR. GRAY:

21   Q.  Okay.  So again let's get back to my question.  What

22   were you thinking after you got out of the ambulance and got

23   picked up by the fire truck with respect to George Floyd's

24   condition?

25   A.  That he had gone into cardiac arrest and just that,
```

1    that -- yeah.

2    Q.  Were you concerned about him?

3    A.  Yeah.

4    Q.  At that point in time, did you know the cause of him

5    being in cardiac arrest?

6    A.  No, sir.

7    Q.  So we go back to the Cup Foods, and you were there with

8    Mr. Kueng, correct?

9    A.  Yes, sir.

10   Q.  And at some point in time you talk to Zimmerman,

11   Lieutenant Zimmerman?

12   A.  Much later on.

13   Q.  All right.  Well, who did you talk to first about --

14   A.  I believe when I got back, Sergeant Pleoger are arrived

15   on the scene, either -- well, I think it was likely to the

16   callout on the radio that Mr. Floyd was in cardiac arrest.

17   The paramedic called that out, and then dispatch called it

18   out to Officer Kueng or anyone that was listening I believe

19   at that point.  So --

20   Q.  Does cardiac -- go ahead.

21   A.  I'm assuming Sergeant Pleoger heard that and started

22   towards us.

23   Q.  Does cardiac arrest mean he's dead or he's in cardiac

24   arrest?

25   A.  Cardiac arrest, so no.

1    Q.  And you at that time didn't know why he was in cardiac

2    arrest?

3    A.  No, sir.

4    Q.  And with respect to being questioned by him, did you

5    tell him the truth as to what you're telling Sergeant

6    Pleoger?

7               MS. TREPEL:  Objection.

8               THE COURT:  That's overruled.

9               THE WITNESS:  I thought Sergeant Pleoger just kind

10   of wanted a rundown, you know, of what had happened.  Kind

11   of when they come it's, you give them just the basis of what

12   has happened that they wouldn't know about from the call

13   notes and just kind of what led to what and how we had

14   gotten there.

15   BY MR. GRAY:

16   Q.  How about, did you talk later with Zimmerman?

17   A.  I did, when Lieutenant Zimmerman came after.

18   Q.  At the time Lieutenant Zimmerman came, did you know

19   whether or not Mr. Floyd survived?

20   A.  I think I kind of assumed at that point that either he

21   had passed away or that he wasn't going to survive, but

22   we're just, we were taught that you never assume that, and

23   you should never make assumptions until you know for sure.

24               EMTs aren't, you know, can't declare people dead,

25   and it's something that happens at the hospital.

1    Q.  Later, were you told by I believe it was Chauvin, I'm

2    not sure, did an officer of rank or an FTO tell you to get

3    the names and addresses of some witnesses?

4    A.  Yeah, I believe that was after, I believe it was after

5    Sergeant Pleoger had left the scene.  That was the last time

6    I talked to Officer Chauvin, and he had said, you know,

7    those people seem angry over there.  You might, they might

8    be more receptive to you if you go and try and talk to them,

9    try and just get information, names and address, that kind

10   of thing to identify them.

11   Q.  And did you go over there and attempt to do that?

12   A.  I did.

13   Q.  And --

14   A.  I talked to Genevieve Hansen and Donald Williams.

15   Q.  And with respect to Genevieve Hansen, what did you say

16   to her?

17   A.  I think I just walked over and said, you know, hi,

18   ma'am, how are you doing, and I just said if I could get,

19   you know, a name and phone number.  And she had said, you

20   know, I'm good.  I don't want to do that, and I just, you

21   know, kind of tried to get that from her.

22           And she said I know you guys have a job, it's an

23   unfortunate situation or something like that.  And I had

24   said, you know, all right, I respect that.  I was trying to

25   get --

```
1    Q.  Were you condescending to her?

2    A.  I don't believe so, no.

3    Q.  The next day, the 26th of May, were you a police officer

4    that day?

5              MS. TREPEL:  Objection.

6              MR. GRAY:  I'll withdraw it.

7              Were you terminated the next day?

8              MS. TREPEL:  Objection.  Relevance.  403.

9              THE COURT:  It's overruled.  I think it's pretty

10   well known.  You may answer.

11   BY MR. GRAY:

12   Q.  Were you terminated the next day?

13   A.  Yeah.  I found out I was terminated, sitting in the

14   Subway parking lot.  I read a news article.

15   Q.  You what?

16   A.  I read a news article.

17   Q.  That's how you got terminated?

18   A.  That's how I found out I was fired.

19             MR. GRAY:  Thank you, Mr. Lane.  That's all I

20   have, Your Honor.

21             THE COURT:  Okay.  Thank you.

22             Ms. Trepel.

23             MS. TREPEL:  Thank you, Your Honor.  Your Honor,

24   before I begin, may I pass out copies of the transcript of

25   Mr. Lane's body worn video?  It's in evidence as Exhibit 5A.
```

```
 1                    THE COURT:  Sure.

 2                    MS. TREPEL:  I can do that in the middle but --

 3                    THE COURT:  No.  Go ahead.  If you want to do it

 4       now, that's fine.

 5                    MS. TREPEL:  Okay.  Thank you.

 6                    THE COURT:  I could look back, but we passed out

 7       copies of a transcript before.  Is this the same, or is this

 8       a different transcript?  I can't remember.

 9                    MS. TREPEL:  This is not one we've already passed

10       out.  It's the remaining one.  It's different.

11                    THE COURT:  Okay.  That's fine.  And the number

12       is?

13                    MS. TREPEL:  5A.

14                    THE COURT:  Okay.  Members of the jury, once again

15       you are getting a transcript of No. 5A, which is a

16       transcript of Exhibit 5.  If there's any discrepancy between

17       the video as you watch it and the transcript that you see,

18       you will be bound by the video and the same rules apply.

19                                CROSS-EXAMINATION

20       BY MS. TREPEL:

21       Q.  Good morning, Mr. Lane.

22       A.  Hi, Ms. Trepel.

23       Q.  All right.  So I just want to talk some basics first.

24       So on May 25th, 2020, you were a sworn officer; is that

25       right?
```

```
1     A.  Yes, ma'am.

2     Q.  You had all the powers of a sworn officer?

3     A.  Yes, ma'am.

4     Q.  You had all the responsibilities of a sworn officer?

5     A.  Yes, ma'am.

6     Q.  All right.  And you testified you had successfully

7     completed the field training program at the Minneapolis

8     Police Department?

9     A.  Yes, ma'am, on the 20th, I believe.

10    Q.  Okay.  And that qualified you to go out on solo patrols

11    alone in an able car?

12    A.  Yes, ma'am.

13    Q.  So you didn't need a more senior officer to go with you

14    at that time, correct?

15    A.  No.  You were qualified for able.

16    Q.  Okay.  And that meant you also didn't need a partner,

17    right, in an able car?

18    A.  Yeah.  As an able car, you mostly just take report

19    calls, don't go to progress, in-progress calls.

20    Q.  All right.  And the field training program was about

21    five months long, right?

22    A.  Yes, ma'am.

23    Q.  And you were dispatched to many calls during that time,

24    right?

25    A.  Yes, ma'am.
```

```
1    Q.  All right.  Say more than about a hundred seem right?

2    A.  I think I wrote more than a hundred reports, but, yeah.

3    Q.  Yeah.

4    A.  Yes.

5    Q.  So maybe 130 reports sound about right?

6    A.  Sure.

7    Q.  Okay.  All right.  And during that time you arrested

8    people, right?

9    A.  Yes, ma'am.

10   Q.  You arrested people who resisted arrest?

11   A.  Yeah.  There were, I mean, I don't think we necessarily

12   charged anyone with that, but there were people that, you

13   know, pulled away and stuff like that.

14   Q.  Sure.  I mean, normal stuff?

15   A.  I wouldn't -- every call is different.  There's no

16   normal to it.

17   Q.  All right.  You responded to forgery or counterfeit

18   calls, right?

19   A.  I believe I responded to one or two of those.

20   Q.  All right.  And some scenes where people were overdosing

21   on drugs right?

22   A.  Yes, ma'am.

23   Q.  And also some scenes where people had gone unconscious,

24   correct?

25   A.  Yeah, the -- a lot of the overdose calls, yes, ma'am.
```

1   Q.  Okay.  All right.  And you had graduated from the MPD

2   police academy, right?

3   A.  Yes, ma'am.

4   Q.  And that was about you said four and a half month

5   program, four to five months?

6   A.  Yeah.  It started in August, and then December 10th was

7   when I graduated so --

8   Q.  Okay.

9   A.  -- however that shakes out.

10  Q.  And that was a full-time program?

11  A.  Yes, ma'am.

12  Q.  Okay.  And at that or at least a week into that, you

13  were a licensed peace officer with the State of Minnesota,

14  right?

15  A.  Yeah.  Within the first week or two, we took the POST

16  test.

17  Q.  Okay.  And you passed the test?

18  A.  I did.

19  Q.  And you were CPR certified?

20  A.  I was.

21  Q.  And you had finished the policing skills program you

22  testified about?

23  A.  Yep.  The Hennepin Technical College, the accelerated

24  one, yeah.

25  Q.  And you had your four-year degree that you got at the

1    University of Minnesota, right?

2    A.  Yes, ma'am.  I graduated from there.

3    Q.  Okay.  And you knew from all of that that officers have

4    a duty to intervene, right?

5    A.  That was gone over in the academy.

6    Q.  All right.  And you knew that officers have a duty to

7    render medical aid, right?

8    A.  Yes, ma'am.

9    Q.  And Mr. Kueng was in your same academy class, right?

10   A.  Yes.  He was, yeah, he was in just the academy.  I think

11   HTC he was in a different program so --

12   Q.  So not the skills program, but the --

13   A.  He was in a separate program, but, yeah, I don't think

14   we met until the Minneapolis academy.

15   Q.  Got it.  All right.  And there at the academy you

16   received those handbooks from the academy that we've seen in

17   this trial?

18   A.  What do you mean by "handbooks"?

19   Q.  Can we bring up the first page of what's been admitted

20   into evidence as Government Exhibit 130?

21          This thing.

22   A.  Oh, yes, ma'am.

23   Q.  Okay.  So you got one of those?

24   A.  Yes, ma'am.

25   Q.  All right.  And that said in there that you would be

1    held responsible for your actions and your inactions, right?

2    A.  Yes, I believe we've seen that.

3    Q.  All right.  And it said you'd be responsible for the

4    actions of your partner and also other officers, right?

5    A.  I can -- I'll take your word for it.  If we've seen it,

6    we've seen it.

7    Q.  Okay.  All right.  You can take that down.

8              And just to clarify, you testified about your

9    field training.  Officer Chauvin was not your personal field

10   training officer; is that right?

11   A.  No, ma'am.

12   Q.  All right.  And he was not a sergeant, correct?

13   A.  No.

14   Q.  All right.  He was a police officer?

15   A.  Yes.

16   Q.  All right.  So same rank as you?

17   A.  Yes.

18   Q.  All right.  Same rank as Mr. Kueng and Mr. Thao?

19   A.  Yes.

20   Q.  And wore the same badge as the three of you, correct?

21   A.  Yes, ma'am.

22   Q.  All right.  And all the same policies and procedures

23   that applied to Mr. Chauvin then applied to you, correct?

24   A.  Yes, ma'am.

25   Q.  And applied to the others?

1    A.  Yes, ma'am.

2    Q.  All right.  No special policies that apply to you.  If

3    you've, only if you've been a police officer for say five

4    years, it doesn't work like that, right?

5    A.  Not in regards to what you are getting at, but I think

6    you have to have certain time on before you can apply for

7    special duty or something like that.

8    Q.  Okay.

9    A.  I think you can't apply for sergeant until you've had

10   five years on.

11   Q.  Fair enough.  All right.  But for the general policies,

12   not talking about time and experience to apply for special

13   roles, the same policies apply to everyone, right?

14   A.  Yes, ma'am.

15   Q.  Okay.  And so when a community member calls 911 for the

16   police, they are just asking for the police, right, not

17   someone who served a particular number of years, right?

18   A.  Yeah, if you're calling 911, you're asking typically for

19   police, ma'am.

20   Q.  They all have a duty, the same duty to protect and

21   serve, right?

22   A.  Yes, ma'am.

23   Q.  All right.  And once you are an officer, you are

24   expected to know the policies, correct?

25   A.  We sign the -- in January or February of 2020 right

1    after I got hired, we got the policy and procedure manual,

2    and then we sign the things saying we acknowledged,

3    acknowledge that, yes, ma'am.

4    Q.  Okay.  Acknowledge that you do know them?

5    A.  At that point we didn't, but we would get trained on

6    them at some point later.

7    Q.  Okay.  And you know then you are expected to follow

8    those policies, right?

9    A.  Yes, ma'am.

10   Q.  And you did eventually get trained on those policies?

11   A.  Yes, ma'am.

12   Q.  All right.  And that includes the policies on use of

13   force, right?

14   A.  Yes, ma'am, that was covered.

15   Q.  All right.  The duty to intervene?

16   A.  That was covered as well.

17   Q.  All right.  And that also included the duty to render

18   medical aid, right?

19   A.  Yeah.  If it was in there, yeah.

20   Q.  Okay.  So that policy applied to you, right?

21   A.  Yes, ma'am.

22   Q.  All right.  And it said you shall render medical aid

23   consistent with your training, correct?

24   A.  I don't know the specific policy, but again if that's

25   what it says, then yes.

THOMAS - CROSS

```
1    Q.  All right.  We can take a look at it if you'd like.  We

2    can bring up what's been admitted as Exhibit 46, page 6.

3              All right.  And specifically I'm talking about

4    there 5-306 of the duty to render medical aid after a use of

5    force.

6    A.  Oh, after the use of force, yes, ma'am.

7    Q.  Okay.  So that's a shall, right?

8    A.  Or shall, yes, ma'am.

9    Q.  Okay.  So it doesn't matter if it might feel awkward or

10   uncomfortable, it's a duty, correct?

11   A.  Yes, ma'am.

12   Q.  All right.  We can take that down.

13             All right.  And now you understood from that

14   training, and I think you've testified, that it can be

15   dangerous to leave a handcuffed person in the prone

16   position, right?

17   A.  Can be.

18   Q.  Okay.  You understood that having officers pin someone

19   down in the prone position can be even more dangerous,

20   right?

21   A.  Can be.

22   Q.  Okay.  And you understood that when a person might be on

23   drugs, that might make the situation potentially even more

24   dangerous, right?

25   A.  Most situations with people on drugs are, yeah, kind of
```

1    volatile and unpredictable.

2    Q.  Okay.  And here you were actually concerned that

3    Mr. Floyd was on drugs, right?

4    A.  I just, yeah, I felt like he was, there was maybe

5    something going on.  It's hard to always tell if a person is

6    on drugs or if they are getting off drugs, or a lot of times

7    people that use drug drugs, you know, will have effects to

8    them for years after.  So it's kind of hard to tell.

9    Q.  Right.  But it was something you were concerned about at

10   the time, right?

11   A.  Yes, ma'am.

12   Q.  That's what you said to the BCA when you spoke to them?

13   A.  Yes, ma'am.

14   Q.  And you actually explained at that time, and I should

15   say you spoke to the BCA just about six days after this

16   incident, right?

17   A.  I don't remember the day, but I'll -- if that's what it

18   was, that's what it was, yeah.

19   Q.  Okay.  And you at that time told them that you felt like

20   the situation with Mr. Floyd could have been handled

21   differently; is that right?

22   A.  I think I said I was coming to that, that, you know,

23   towards the end or, you know, when EMS was there, it was

24   like I had said, I had wanted to roll him on his side so we

25   could get a better assessment of him.  I believe I said I

THOMAS LANE - CROSS

```
 1    was coming to that.
 2              And that's kind of in the probably more of a
 3    hindsight in this situation, too.
 4    Q.  Well, you were talking about actually in the moment
 5    reassessing; wasn't that correct?
 6    A.  I think I said we should have been kind of reassessing
 7    as we were -- yeah.
 8    Q.  In the moment.
 9    A.  Yeah, it's -- that was two years ago.
10    Q.  All right.  Well, why don't we show you what I'm looking
11    at.
12    A.  Sure.
13              MS. TREPEL:  Your Honor?
14              THE COURT:  I don't care.
15    BY MS. TREPEL:
16    Q.  Okay.  And, Mr. Lane, if you could just take a look at
17    that.  First of all, you recognize that document I handed
18    you.
19    A.  Yes, ma'am.
20    Q.  Okay.  And just for the record then, what is the date of
21    that document on the front page?
22    A.  May 31st, 2020.
23    Q.  Okay.  And so why don't we first, if you could just look
24    at page 48.  Now is this the transcript of your BCA
25    interview?
```

```
1    A.  Yes, ma'am.

2    Q.  Okay.  And during that time, a BCA agent asked you:  "It

3    seems like your gut reaction was something is not right

4    here, and we need to rethink how we are restraining

5    Mr. Floyd.  Is that accurate?  That's what it seems like you

6    are saying."

7              Is that right?

8              MR. GRAY:  What page, Counsel?

9              MS. TREPEL:  48.

10             MR. GRAY:  40 or 48?

11             MS. TREPEL:  48 Mr. Gray.

12             MR. GRAY:  What line?

13             MS. TREPEL:  It is the fourth box down from the

14   top.

15   BY MS. TREPEL:

16   Q.  Did I read that right?

17   A.  Which line did you read, ma'am?

18   Q.  I'm doing it by boxes because there's not line numbers,

19   but the fourth box.

20   A.  From the bottom?

21   Q.  From the top.

22   A.  From the top.  I think --

23   Q.  All right.  I have a different printout, then.

24   A.  I think what you're talking about is at the bottom of

25   mine.
```

```
 1   Q.  You are so right.  You have a differently printed
 2   version.  Let me get the same one so we can all be on the
 3   same page.
 4   A.  All right.
 5   Q.  Thank you.
 6           I'm not sure why that printed differently.
 7           All right.  So you found it, then?  Second from
 8   the bottom, then?
 9   A.  Oh, yes, ma'am.  That was the question posed.
10   Q.  Okay.  And your answer was:  "Yeah.  I would say I, I
11   felt like maybe it could have been handled differently or we
12   should be reassessing what we're doing is I think is I, is
13   what I was kind of coming to."
14           Correct?
15   A.  Yeah, it could have been, could have been handled
16   differently.  I think I was, yeah.
17   Q.  Okay.  We can --
18   A.  Okay.
19   Q.  All right.  Now --
20           THE COURT:  Counsel, maybe I should have a copy of
21   that.  If that was for me, I -- thank you.
22   BY MS. TREPEL:
23   Q.  All right.  Now you were also trained that handcuffing a
24   person in the prone position or after handcuffing a person
25   in the prone position you sit them up or get them up or turn
```

1    them over.  You don't keep them prone, right?

2    A.  When feasible and reasonable.

3    Q.  Right.  You get to the next thing?

4    A.  Yep.

5    Q.  You don't hold them in the place.

6    A.  I mean, it depends on the situation, ma'am.  If --

7    there's no hard and fast rules for every time you do this,

8    you do that.  It kind of depends on the situation.

9    Q.  Well, sure, there's no hard and fast rules, but you've

10   been trained that keeping someone down in the prone position

11   all other things being equal isn't safe, correct?

12          MR. GRAY:  Object to that as repetitious, Your

13   Honor.

14          THE COURT:  Sustained.

15   BY MS. TREPEL:

16   Q.  So all things being equal, you were trained to get

17   someone up out of the prone position, correct?

18          MR. GRAY:  Same objection.

19          THE COURT:  I'm going to let -- I'm going to let

20   it be asked.

21          Go ahead.

22          THE WITNESS:  Could you ask it again?

23   BY MS. TREPEL:

24   Q.  Yeah.  All things being equal, you were trained to get

25   someone up out of the prone position, correct?

THOMAS LANE - CROSS

```
1    A.  Yeah, depending on the situation.
2    Q.  All right.  And you did prone handcuffing drills at the
3    academy, right?
4    A.  We had those, yes, ma'am.
5    Q.  All right.  And you actually practiced getting people up
6    out in the prone position during those drills, correct?
7              MR. GRAY:  Objection.  Repetitious.
8              THE COURT:  Repeat please.
9              MS. TREPEL:  Sure.
10   BY MS. TREPEL:
11   Q.  You actually practiced getting people up out of the
12   prone position while at the academy during those drills?
13   A.  Yeah, the -- we would do the handcuffing, and then you
14   are usually getting them up and moving them to go to the
15   squad car, something like that, or there's a situation where
16   it's hard to get someone up that's handcuffed depending on
17   body type as well, so there's a procedure for doing that.
18   Q.  Right.  And you learned how to do it, and you practiced
19   it, right?
20   A.  Yes, ma'am.
21   Q.  All right.  All right.  And then you also learned about
22   the risks of positional asphyxia when you were a juvenile
23   detention officer, correct?
24   A.  I believe they had, yeah, quizzes on that as well, and
25   that was a topic that was covered.
```

1    Q.  Okay.  That was the online training --

2    A.  Yes, ma'am.

3    Q.  -- that you took?  And you actually took that twice,

4    right?

5    A.  I wouldn't know.  We took lots of online training there.

6    Q.  Okay.  All right.  And you were taught in that training

7    then that positional asphyxia is something that can happen

8    if a person is kneeling on someone's back, right?

9    A.  Where was this?

10   Q.  At the juvenile detention center training, the online

11   training.

12   A.  I think that's the general concept of, you know, body

13   weight on someone's back.

14   Q.  Yeah.  And that training also warned about the dangers

15   of putting pressure on people's neck as well, correct?

16   A.  I don't remember specifically.

17   Q.  Okay.

18   A.  But --

19            MR. GRAY:  Talking about training at the juvenile

20   center or the police department?

21            MS. TREPEL:  At the juvenile center.

22            THE WITNESS:  I don't recall specifically.

23   BY MS. TREPEL:

24   Q.  Okay.  We can take a look at Government Exhibit 96.

25            THE COURT:  Counsel, he has declined knowledge.

THOMAS LANE - CROSS

 1              MS. TREPEL:  I was going to refresh his
 2     recollection with his training, Your Honor.  He said he
 3     didn't recall.
 4              THE COURT:  Well, that's the whole point that is,
 5     he does not recall.
 6              MS. TREPEL:  Right.
 7              THE COURT:  I have no idea what in the world you
 8     are doing now.
 9              MS. TREPEL:  I was going to show him the exhibit
10     to refresh his recollection about whether that point was
11     trained.
12              THE COURT:  Oh, you're talking about this thing
13     back in the juvenile detention?
14              MS. TREPEL:  Right, that specifically he got
15     training about the dangers of pressure on a person's neck.
16              THE COURT:  Okay.  Show it.
17     BY MS. TREPEL:
18     Q.  We'll take a look at Government Exhibit 96, which is in
19     evidence.
20              Okay.  Do you see that?
21              MR. GRAY:  Judge, I object to this.  He said he
22     doesn't remember it, and she's refreshing his memory on
23     something at a juvenile hall that may not even have been
24     taught at this time.  We don't know.  It was on online
25     education, by the way.

1          THE COURT:  Well we don't, but --

2          MS. TREPEL:  Your Honor --

3          THE COURT:  -- it's been shown now.  Now we can

4    move on to the next subject.

5    BY MS. TREPEL:

6    Q.  Do you recall that this training specifically warned

7    about pressure on a person's neck?

8    A.  I don't, I mean, have any specific recollection of the

9    exact words of this but --

10   Q.  Okay.  But you see that there?

11          THE COURT:  Counsel, you are being argumentative.

12   Let's stop it.  I said we'll move on to the next thing.

13          MS. TREPEL:  Okay.  We can take this down.

14   BY MS. TREPEL:

15   Q.  All right.  And so you were taught that the best

16   position is to move someone into a side recovery position,

17   correct?

18          MR. GRAY:  Object to that as repetitious.

19          THE COURT:  No, not with this witness.

20          You may answer.

21          THE WITNESS:  Yeah.  Based on some circumstances,

22   that's ideal.

23   BY MS. TREPEL:

24   Q.  Okay.  And you were concerned about positional asphyxia

25   when Mr. Floyd was restrained on the ground, right?

1    A.  I was not.

2    Q.  That's not why you asked to roll him on his side twice?

3    A.  I wanted to just be able to get a better assessment of

4    him.  That wasn't in my mind at the time.

5    Q.  All right.  You have also received CPR certification

6    multiple times, right?

7    A.  I believe at JDC and then probably with Minneapolis.

8    Q.  Okay.  And you took your EMR course back in July of

9    2019; is that right?

10   A.  That sounds right.

11   Q.  Okay.  And you learned basic first aid in that class,

12   correct?

13   A.  It was just kind of a crash course responder, covered a

14   bunch of different stuff.

15   Q.  Right.  A 40-hour course on kind of the basics, right?

16   A.  Yeah, five days.

17   Q.  Okay.  So training on how to take someone's pulse, for

18   example?

19   A.  Yes, ma'am.

20   Q.  The ABCs, the airway, breathing and circulation?

21   A.  Yes, ma'am.

22   Q.  All right.  And you were evaluated on being able to

23   assess a patient, correct?

24   A.  They had the skill stations where it would just, you

25   kind of talk over stuff.  I think that was the assessment

1    you are talking about.

2    Q.  All right.  And you were also evaluated on your ability

3    to do CPR, right?

4    A.  Yeah, we had the dummies.

5    Q.  All right.  And that as part of that evaluation you were

6    required to immediately begin chest compressions after being

7    informed you had an unresponsive and pulseless patient,

8    correct?

9    A.  If the situation allows, yes, ma'am.

10   Q.  Well, I'm just talking about evaluation.  I assume the

11   evaluation the situation allowed, right?

12   A.  I think the evaluation you would just, you walk through

13   the how you doing and then the thing, and then, yeah, you

14   would go right into the chest compressions.

15   Q.  Right.  All right.  And you passed that, right?

16   A.  Yes, ma'am.

17   Q.  Okay.  And you were actually tested on -- can we take a

18   look at Government Exhibit 84, page 15?  And question 5, I

19   believe.

20           And this was one of your test questions from the

21   EMR, correct?

22   A.  Yeah, that looks like it.

23   Q.  And you got this one right, correct?

24   A.  Yes, ma'am.

25   Q.  All right.  And this is a scenario where the question

1    asked about not initiating CPR, and then the paramedics

2    coming six minutes later?

3    A.  Yes, ma'am, if -- yep.

4    Q.  Okay.  And the correct answer is D?

5    A.  Yes, ma'am.

6    Q.  You may be held liable for failure to follow the

7    standard of care?

8    A.  Yes, ma'am.

9    Q.  All right.  You can take that down.

10            And as part of the training, you were trained to

11   take a pulse from an area of the body that was accessible to

12   you, correct?

13            THE COURT:  Excuse me, Counsel.

14            MS. TREPEL:  Your Honor?

15            THE COURT:  Excuse me for interrupting, but I'm

16   going to have to ask you to go to sidebar, please.

17        **(At sidebar)**

18            THE COURT:  Counsel, on Exhibit No. 84, I'm not

19   sure if my records are correct or not, but my record on

20   Exhibit 84 and frankly 85, as long as we're at it, did not

21   show that they have ever been received in evidence.

22            MS. TREPEL:  They were according to our records,

23   Your Honor.  It was part of the stipulated Exhibits 84 and

24   85.

25            THE COURT:  That could be.  I -- I just don't have

THOMAS CHAUVIN - CROSS

1    it marked correctly then.
2            MS. TREPEL:  Okay.
3            THE COURT:  Okay.  Thank you.
4            MS. TREPEL:  Thanks.
5        **(In open court)**
6            THE COURT:  My apologies, Counsel.  I didn't have
7    something marked correctly.
8            MS. TREPEL:  No problem at all, Your Honor.
9    BY MS. TREPEL:
10   Q.  All right.  I think I was asking about your training
11   regarding pulse taking.
12   A.  What was the question again, ma'am?
13   Q.  I'm not even sure at this point.  I think I asked you if
14   you were trained to check a pulse in the area of a body that
15   is accessible to you?
16   A.  I don't know if it was an accessible area to you.  I
17   know it was just trying to take a pulse.  I know that was
18   the deal.
19   Q.  Okay.  Trying to take a pulse where you can?
20   A.  Just assessing with taking a pulse.
21   Q.  Okay.  Well, you were also trained on taking a pulse on
22   multiple parts of the body; is that right?
23   A.  Yes, ma'am.
24   Q.  Okay.  And so you weren't trained that if you can't get
25   to the carotid pulse for whatever reason, you have to sit

```
1     and take no action, right?  You take the pulse somewhere.

2     A.  Assess the situation, ma'am, yes.

3     Q.  All right.  And that includes pulse checking?

4     A.  Yes.

5     Q.  That's assessment, right?

6     A.  Yes, ma'am.

7     Q.  Okay.  And you weren't trained that if you can't take a

8     carotid pulse you should look at the veins?

9     A.  What's that, ma'am?

10    Q.  Well, you testified something about looking at

11    Mr. Floyd's veins.

12    A.  Oh, yes, ma'am.

13              THE COURT:  Counsel --

14              MS. TREPEL:  I'm just asking about your training

15    that if you aren't able to take a carotid pulse but you've

16    taken another pulse, that that's not a valid assessment.

17              THE WITNESS:  Can you say that again, ma'am?

18    BY MS. TREPEL:

19    Q.  Sure.  That you weren't trained that it's a valid

20    assessment to look at someone's veins to determine if they

21    have a pulse when you've not been able to get a pulse

22    somewhere?

23    A.  I think that's just part of the, you know, assessing

24    that there's obviously blood pressure.  There's going to be

25    a heart rate, would, you know, I would assume.
```

3854

1    Q.  Well, I'm not asking you to assume.  I'm asking you

2    about your training.

3    A.  Oh.  It might have been touched on in EMR.  I just kind

4    of deduced that from the situation.

5    Q.  Touched on that you should look at a vein when you can't

6    get a pulse?

7              MR. GRAY:  Objection.  Argumentative.

8              THE COURT:  You are being argumentative, Counsel.

9    And I frankly will tell you that I don't recall that

10   testimony.  Now that doesn't mean it didn't exist.  I just

11   don't recall it with this witness.

12             MS. TREPEL:  Okay.

13   BY MS. TREPEL:

14   Q.  All right.  Now turning aside, do you agree that it's

15   common sense to know someone needs help when they go

16   unconscious?

17   A.  Define "help," ma'am.

18   Q.  Well, some sort of medical aid.

19   A.  Not always.  Overdose calls, people would go in and out

20   of consciousness pretty regularly, and there's not a lot you

21   can do about that in some situations other than, you know,

22   get EMS on scene, or if you think it's a Narcan situation,

23   you could use Narcan.

24   Q.  And you've actually been on some of those calls, right?

25   A.  A few, yes, ma'am.

THOMAS - CROSS

1    Q.  Including overdoses or possible overdoses where people

2    went unconscious?

3    A.  Yes, ma'am.

4    Q.  And in those situations you did take steps to aid those

5    people, didn't you?

6    A.  There was one where, yeah, I held someone's airway, and

7    mostly just our job kind of at that point was typically to

8    search the person before EMS got there or before EMS started

9    working on the person, because if they were administered

10   Narcan and came back and had a weapon, our job was to kind

11   of make it secure and safe for EMS to work.

12   Q.  Sure.  But there are things that you are able to do when

13   a person goes unconscious, right, to help them medically?

14             MR. GRAY:  Object to that as argumentative.

15             THE COURT:  It is argumentative, Counsel.  I

16   sustain.

17   BY MS. TREPEL:

18   Q.  Let me ask you this:  You were talking about this woman,

19   the situation where the person went unconscious that you

20   just referred to?

21   A.  I believe she was unconscious, yeah.

22   Q.  All right.  And you evaluated her breathing and saw that

23   it was shallow, right?

24             MR. GRAY:  Object to that, Your Honor, as

25   irrelevant.

THOMAS-CROSS

```
1              THE COURT:  Yeah.  I don't see the relevance of
2    this, Counsel.
3              MS. TREPEL:  Well, Your Honor, may I ask an
4    additional question to --
5              THE COURT:  You may.
6              MS. TREPEL:  -- make the relevance clear, then?
7    BY MS. TREPEL:
8    Q.  And you stabilized this woman's head and neck to
9    maintain an open airway while she was unconscious, correct?
10   A.  She was on her back and had slumped forward, so yeah.
11   Q.  So you did something to aid her?
12   A.  In that situation, yeah, before EMS arrived.
13   Q.  Yeah.  Okay.  And there was another scene of a suspected
14   overdose where a man was unconscious and you performed a
15   sternum rub, correct?
16   A.  I can't say for sure, but I assume that's kind of
17   something you do to assess.
18   Q.  Okay.  Can you tell the jury what a sternum rub is?
19   A.  Sternum rub is just, you take your knuckles and rub them
20   along the person's sternum, and if they're passed out, they
21   will typically sometimes come, you know, wake up or at least
22   make some sort of motion.
23   Q.  Okay.  And that's taking some action to aid a person who
24   is unconscious, right?
25   A.  It's not aiding.  You're just kind of assessing.  A
```

THOMAS LANE - CROSS

1    sternum rub is, you are not really aiding them in any way.

2    Q.  Well, if it brings them back, it's helpful, right?

3                MR. GRAY:  Object to that.  It's argumentative.

4                THE COURT:  Counsel, you are being argumentative.

5    BY MS. TREPEL:

6    Q.  Do you recall doing a sternum rub on an unconscious

7    person during your field training?

8    A.  I likely did.  I don't -- not a specific instance.

9    Q.  All right.  Now, in the instance with Mr. Floyd, you

10   actually did perform CPR when Mr. Smith told you to,

11   correct?

12   A.  Yes, ma'am, in the ambulance.

13   Q.  All right.  And you knew how to do that CPR, right?

14   A.  Looking back, I don't know if I was doing it correctly.

15   I think you are supposed to do 30 compressions, but I knew

16   the basic position and kind of where you were supposed to do

17   it.

18   Q.  All right.  And you did it?

19   A.  Yes, ma'am.

20   Q.  All right.  And that was five minutes after Mr. Kueng

21   first told you he couldn't find a pulse, correct?

22   A.  It could have been.

23   Q.  All right.

24   A.  The first time that Officer Kueng was assessing for a

25   pulse?

THOMAS-LANE - CROSS

```
 1    Q.  The first time that Mr. Kueng said he couldn't find one,
 2    yeah.
 3    A.  I believe so.
 4    Q.  Okay.  And CPR is what you're trained to do when you
 5    can't find a pulse, correct?
 6              MR. GRAY:  Object to that as repetitious.
 7              THE COURT:  That's overruled.
 8              THE WITNESS:  If the situation allows, yeah, you
 9    should try and start that as soon as possible.  Law
10    enforcement is a little different where in some situations
11    you are not able to do it right away, in dangerous
12    situations or unknown situations.
13    BY MS. TREPEL:
14    Q.  Sure.  Some situations, but other situations that's what
15    you do?
16    A.  In ideal situations, yeah, you immediately start it as
17    soon as possible.
18    Q.  Right.  Because if someone doesn't have a pulse, their
19    heart isn't pumping blood, right?
20    A.  That would -- that would be the -- yeah.
21    Q.  So their heart stopped.
22    A.  Yes, ma'am.
23    Q.  So it's -- that's cardiac arrest that you were talking
24    about earlier?
25    A.  Yes, ma'am.
```

```
1    Q.  Okay.  And so you're trained in those situations to

2    begin CPR immediately within 5 to 10 seconds, correct?

3    A.  Yes, ma'am.

4    Q.  All right.  And that's because just checking the pulse

5    doesn't actually circulate the blood in the person's body,

6    right?

7    A.  No.

8    Q.  Right?  That's what the chest compressions do?

9    A.  Yes, ma'am.

10   Q.  Okay.  And similarly checking the pulse doesn't

11   circulate the oxygen in someone's body, right?

12   A.  No, ma'am.

13   Q.  Okay.  That's what getting the officers off Mr. Floyd

14   would have done?

15   A.  Is what, ma'am?

16   Q.  Allowed him to breathe.

17   A.  I was watching him breathe, ma'am.  He was breathing as

18   we were holding him there.  I could see his chest fall.

19   Q.  The last time -- I didn't mean to cut you off.

20   A.  No.  I was done.

21   Q.  Okay.  And the time you observed that out loud was at

22   8:25, correct?

23   A.  I could check.  I think I have a thing here.  8:25:13.

24   Q.  Okay.  And you did not make another observation out loud

25   that we could hear that he was breathing after 8:25:13,
```

1    correct?

2    A.  I didn't say anything about it after that, no.

3    Q.  All right.  Now, based on MPD training, if a person in

4    custody is bleeding following a use of force, you'd agree

5    that an officer has a duty to try and stop that bleeding,

6    assuming the scene is safe, correct?

7    A.  In what respect, ma'am?

8    Q.  In stopping the bleeding?

9    A.  What kind of bleeding?  I guess that could be, you know,

10   like a cut or a scratch on their finger.

11   Q.  Someone is bleeding out.

12   A.  Someone is bleeding out?

13   Q.  Yeah.

14   A.  In what situation again?

15   Q.  You're there as an officer following a use of force and

16   someone is bleeding out.

17   A.  Oh, yeah.  Yes, ma'am.

18   Q.  Right?  So -- and you've actually gotten training on how

19   to help staunch bleeding in that kind of situation, right?

20   A.  The EMR course covered trauma.

21   Q.  All right.  So it would be within your training to give

22   that kind of aid, correct?

23   A.  Yes.

24   Q.  Okay.  And it wouldn't be enough to fulfill your duty to

25   render aid to say, should we apply a tourniquet?

```
1              MR. GRAY:  Judge, I object to this.  There is

2      nothing in this case about bleeding out or --

3              THE COURT:  Sustained.  It's not relevant,

4      Counsel.

5      BY MS. TREPEL:

6      Q.  Okay.  All right.  Now, an officer can use a knee to pin

7      someone down, right, in order to apply handcuffs in the

8      prone position, correct?

9      A.  Yes, ma'am.

10     Q.  All right.  And an officer can continue to keep a hand

11     on a person after they've stopped resisting to maintain that

12     touch, right?

13     A.  Yes, ma'am.

14     Q.  MPD policy and training does not allow an officer to

15     continue to kneel on the body of a prone person after

16     they're no longer resisting, correct?

17     A.  I'm not sure if there's a specific policy about that.

18             MR. GRAY:  Your Honor, I object to this line of

19     questioning.  He's not charged with use of force.  He's

20     charged with medical services.

21             THE COURT:  Sustained.

22             MS. TREPEL:  It goes --

23     BY MS. TREPEL:

24     Q.  All right.  You knew during this incident with Mr. Floyd

25     that MPD policy and training does not allow an officer to
```

```
1    remain kneeling on a prone person who is not resisting and

2    saying he can't breathe, correct?

3              MR. GRAY:  Same -- same objection.  She asked the

4    same question.

5              MS. TREPEL:  Your Honor, it goes to the actions he

6    took or did not take.

7              THE COURT:  Counsel, I think we better go to

8    sidebar on this.

9         (At sidebar)

10             THE COURT:  Counsel, I don't think I understand

11   what you're getting at here.  It sounded to me like this is

12   a use of force discussion, not a medical services

13   discussion.

14             MS. TREPEL:  Well, they're inextricably

15   intertwined because if he's seeing force that is dangerous

16   and also unnecessary at the time, then he needs to be taking

17   action.  So what he knew is relevant regarding the force.

18             MR. GRAY:  There's no charge here of intervention,

19   Your Honor.  It's medical services.  He's not charged with

20   not taking action on a use of force.  It's simply not

21   charged.

22             MS. TREPEL:  Your Honor --

23             MR. ROBERT PAULE:  And, Your Honor, Robert Paule.

24   I hate to interject myself, but it appears to me that

25   counsel is doing an end-around and using this witness to
```

1    attack my client's case on the duty to intervene, which is

2    entirely inappropriate.

3              MS. TREPEL:  Your Honor, by removing Chauvin's

4    knee at the time that Mr. Floyd is still breathing, that is

5    all the medical aid that would have been required and --

6              THE COURT:  Counsel, I'm sorry.  I'm not hearing

7    you.

8              MS. TREPEL:  Oh, I apologize.

9              THE COURT:  There.  That's better.

10             MS. TREPEL:  Okay.  Sorry about that.  I'm trying

11   to speak low for the jury.  I'll just cover my mouth.

12             Your Honor, at the time that Mr. Floyd was still

13   able to breathe, removing Chauvin's knee from his neck and

14   getting Mr. Floyd into a position that he could have

15   breathed was the all the medical intervention that would

16   have been required at that time, and this defendant didn't

17   do that.  That is part of the failure to provide medical aid

18   here.

19             THE COURT:  Okay.  Counsel, I don't think the

20   question you were asking now goes to the last point that you

21   were raising.  I'm going to sustain the objection to the

22   last question.

23             In the meantime, I think it's time for our noon

24   break, and we're going to take a noon recess at this time.

25   Thank you.

1      **(In open court)**

2              THE COURT:  Members of the jury, we're going to

3      take a noon recess at this time.  I would caution you that

4      you should not discuss the case amongst yourselves or with

5      others during the course of the recess.  I caution you to

6      continue to keep an open mind.

7              And with that, enjoy a good noon break, and we'll

8      see you at 2:00 o'clock this afternoon.

9      (12:29 p.m.)

10                          **IN OPEN COURT**

11                        **(JURY NOT PRESENT)**

12              THE COURT:  You can step down.

13              THE WITNESS:  Step down?

14              THE COURT:  Yeah.  Go ahead.

15              Counsel, I stayed on for just a minute.  It's

16      purely logistics.  Do you have a ball park idea of how much

17      longer you are going to have on this witness?  And I ask the

18      question only because I have a lot of logistical things I

19      have to deal with.

20              MS. TREPEL:  I'm notoriously bad at estimating.

21      I'd say maybe an hour.

22              THE COURT:  Okay.  Okay.  That's fine.  I just

23      needed to get some general area of where we're going to be.

24      Thank you.

25      (Recess taken at 12:31 p.m.)

LANE - CROSS

```
1                              *  *  *  *  *

2       (2:14 p.m.)

3                           IN OPEN COURT

4                          (JURY PRESENT)

5             THE COURT:  Continue, Ms. Trepel.

6             MS. TREPEL:  Thank you, Your Honor.

7    BY MS. TREPEL:

8    Q.  Hi, Mr. Lane.  Continuing where we left off, you knew

9    that to provide medical aid, you need to get an officer who

10   is kneeling on a person off of a person after they've passed

11   out, correct?

12   A.  It would depend on the situation, ma'am.  Again, it's --

13   there's not a lot of hard and fast rules.  If an officer is

14   holding someone in place, that could be a hundred percent

15   reasonable.  It depends on the situation.

16   Q.  Okay.  Well, say a person is kneeling on someone's neck

17   and the person is passed out.  You know that you have to get

18   the person off their neck, right, to provide medical aid to

19   that person?

20   A.  In that situation, I mean, you would, but also again

21   that you don't know how much pressure the person is putting

22   on there.  You don't know if they're just holding them in

23   place, and yeah.

24   Q.  Okay.  And you also knew that to provide medical aid,

25   you would have to get an officer kneeling on a person with
```

1   pressure off that person when the person doesn't have a

2   pulse, right?

3   A.  Could you ask that question again?

4   Q.  Sure.  You knew that to -- in order to provide medical

5   aid, you would need to get an officer who is kneeling on a

6   person's neck, we can stipulate with pressure, when you

7   can't find that person's pulse, right?

8   A.  And medical aid, you mean any kind or CPR or --

9   Q.  Yeah, any kind of medical aid for --

10  A.  Yes, ma'am.

11  Q.  Okay.  Now we've heard testimony during this trial about

12  the fact that you and Mr. Kueng were probationary employees

13  at the time of this incident, right?

14  A.  Yes, ma'am.

15  Q.  All right.  And about the role of field training

16  officers generally, right?

17  A.  Yes, ma'am.

18  Q.  As well as concerns about the idea that a field training

19  officer might, you know, provide a report about your

20  performance, and that would affect your career in some

21  fashion, right?

22  A.  They do reviews, the ROPE forms every day, and yeah,

23  they have a lot of sway in your employment and how you

24  progress through the field training process.

25  Q.  Okay.  And that's during the field training process,

1    right?

2    A.  Yes, ma'am.

3    Q.  Okay.  Now, you'd agree, though, that fear of negative

4    repercussions at work is not an exception to the duty to

5    render medical aid, right?

6    A.  Yes, ma'am.

7    Q.  Okay.  And you also agree that fear of angering or

8    annoying a more senior officer is also not an exception to

9    rendering medical aid, right?

10   A.  Yes, ma'am.

11   Q.  Okay.  Now you and, you and Mr. Kueng were assigned by

12   dispatch eventually to respond to this call at Cup Foods; is

13   that right?

14   A.  We had initially, we picked up the call from another

15   car.  It was assigned to a different squad, and since it was

16   in our sector we, you're ideally supposed to take the calls

17   in your sector, and it's kind of, you don't want to have

18   other cars pick up other sectors, and then it just kind of

19   screws up the whole sector, the point of having sectors.

20   Q.  Okay.  So after it was initially assigned to someone,

21   else, though, you got it assigned to you and Mr. Kueng,

22   correct?

23   A.  Yes, ma'am.

24   Q.  So it was your call at that point.  You weren't going

25   out to back up another set of officers already on screen?

THOMAS - CROSS

1    A.  No.

2    Q.  Correct?

3    A.  No, ma'am.

4    Q.  And you and Mr. Kueng then were the first squad to

5    arrive on the scene?

6    A.  Yes, ma'am.

7    Q.  All right.  And you were in charge of the scene,

8    correct?

9    A.  We were the first car to arrive.

10   Q.  All right.  And you were the senior officer in the first

11   car to arrive, technically by your one shift?

12   A.  By that policy I would have -- actually it's I guess by

13   that policy, but there's the seniority list throughout our

14   class had an individual seniority list.  So I'm not sure

15   where I actually fell on that, but according to that one,

16   yes, I would have been in charge.

17   Q.  Okay.  And you were going through, in your testimony,

18   you at some point you decided to point your gun at

19   Mr. Floyd, right?

20   A.  Yes, ma'am, when I couldn't see his hand and he was

21   refusing to show it to me.

22   Q.  Right.  And that was a decision you made to escalate the

23   situation, as you explained, to take control, right?

24   A.  More of a safety situation, that his behavior was

25   dictating my response, and the fact that he knew I was

THOMAS - CROSS

1    asking to see his hand and I could see it below the seat

2    moving is dangerous, and I responded as I was trained.

3    Q.  Right.  You made a decision about how to respond

4    appropriately in that situation, right?

5    A.  Yes, ma'am.

6    Q.  And you gave Mr. Floyd commands, correct?

7    A.  Yes, ma'am.

8    Q.  All right.  And you made decision about what to do next,

9    correct?

10   A.  Yes, ma'am.

11   Q.  All right.  And then Mr. Chauvin and Mr. Thao then later

12   arrived on the scene, correct?

13   A.  Yeah, probably 10 minutes later, 15 or something.

14   Q.  Okay.  And you and Mr. Kueng, while you were there

15   before Mr. Chauvin and Mr. Thao arrived, you learned some

16   information from an employee at Cup Foods about what had

17   happened, right?

18   A.  Just, yeah, initially what the, that the gentleman in

19   the vehicle over there was the one that had passed the fake

20   bill.  He was the driver and we should go talk to him before

21   he drives off.

22   Q.  And you and Mr. Kueng then had some interactions with

23   Mr. Floyd at his vehicle, right?

24   A.  Yes, ma'am.

25   Q.  And you and Mr. Kueng were the ones who had the

1  opportunity to observe how Mr. Floyd was acting when he was

2  in the vehicle, right?

3  A.  Yes.

4  Q.  Okay.  And you also had the opportunity to observe what

5  Mr. Floyd was saying at that time, correct?

6  A.  I heard what he was saying.

7  Q.  Okay.  And Mr. Thao and Mr. Chauvin weren't there for

8  any of that stuff that happened before you tried to put

9  Mr. Floyd in the squad car, right?

10  A.  No, ma'am.

11  Q.  All right.  So they arrived later when you were trying

12  to get Mr. Floyd into the backseat of the squad, right?

13  A.  Yes, ma'am.

14  Q.  Okay.  And when they got there, they didn't know if

15  Mr. Floyd was under arrest or for what, correct?

16  A.  I think that was on the other side of the squad when

17  Officer Chauvin asked what, if he was under arrest.  And as

18  I had said I was just, the plan at that point was just to

19  detain him and likely search the vehicle and get to talk

20  with the store clerk again.

21  Q.  All right.  And so that's when Chauvin asked, is he

22  going to jail, and Mr. Kueng responded that Mr. Floyd was

23  under arrest, correct?

24  A.  Yes, ma'am.

25  Q.  Okay.

THOMAS - CROSS

1    A.  And then I believe Officer Chauvin told him he was under

2    arrest as well.

3    Q.  After Mr. Kueng had informed Mr. Chauvin of that?

4    A.  Yeah.  I'm not sure of the exact timeline but --

5    Q.  Okay.  You can actually take a look.

6    A.  Sure.  Which one is it?  This one?

7    Q.  Yeah, it's Exhibit 5A, the one with the sticker there.

8            And I'm going to, I'm going to say it's on

9    page 17, but give me a second and I will check that.

10   A.  Start there.

11   Q.  All right.  Do you see that in the middle of page 17?

12   A.  Yes, ma'am.

13   Q.  Derek Chauvin says, "Is he going to jail?"

14   A.  Yes, ma'am.

15   Q.  And then Mr. Kueng responds, "He's under arrest right

16   now for forgery."

17   A.  Yes, ma'am.

18   Q.  Okay.

19   A.  And I believe he said, yeah.  I believe Officer Chauvin

20   said, "You're under arrest, guy."  It might be one of the

21   unintelligibles or something in here as well.

22   Q.  Okay.  All right.  Now at that point, Mr. Chauvin and

23   Mr. Thao also didn't know that you'd already searched

24   Mr. Floyd; is that right?

25   A.  I don't believe we had.  We covered that.

1   Q.  Okay.  So that was knowledge that you and Mr. Kueng had

2   in context that you guys had, correct?

3   A.  Yeah.  They likely would have assumed that if we were

4   trying to put him in the squad, that's kind of standard you

5   search before you put him in.

6   Q.  Right.  But you didn't actually communicate that at that

7   point yet?

8   A.  I did not.

9   Q.  And then, then at some point Mr. Floyd is put on the

10  ground, correct?

11  A.  Yes.

12  Q.  And it was Mr. Thao who asked first whether you wanted

13  to use the hobble; is that right?

14  A.  I think there was, yeah, there was mention of hobble or

15  we're going to have to hobble him.  I believe Officer Thao

16  had said something about that, and I said yeah, MR -- I said

17  MRE again, but I meant MRT, just acronyms.

18  Q.  Right.  Okay.  And Mr. Thao handed you the hobble,

19  right?

20  A.  Once we'd gone to the ground and got Mr. Floyd under

21  control.

22  Q.  And Mr. Thao told you if we hobble him, a sergeant will

23  have to come, right?

24  A.  Yes, ma'am.

25  Q.  And Mr. Thao didn't say if we hobble him, it will take a

THOMAS-LANE - CROSS

1    few extra minutes for EMS to come and remove the hobble,

2    right?

3    A.   No.  But that was kind of the implication that if we're

4    going to hobble him and do all that stuff and EMS is already

5    coming, you know, there's no point in putting it on and then

6    just taking it off to have EMS take him anyways.

7    Q.   But the discussion was about the sergeant coming, right?

8    A.   Yeah, I believe.  And then I think he had said something

9    about EMS coming, too.

10   Q.   And that was later, right?

11   A.   It's hard to say.

12   Q.   Well, take a look.

13   A.   What --

14   Q.   Pages 19 and 20.  The first mention of the hobble is

15   even earlier on 18, but the portion I'm talking about is,

16   begins on 19.

17            MR. GRAY:  What page was that?

18            MS. TREPEL:  18 through 20.

19            MR. ROBERT PAULE:  Counsel, for my edification is

20   the transcript using the one from, excuse me.  Pardon me,

21   Your Honor.  I apologize.

22            Just for edification, is the transcript you are

23   referring to his body-worn camera transcript?

24            MS. TREPEL:  This is Exhibit 5A, his body-worn

25   camera.

```
1              MR. ROBERT PAULE:  Thank you.

2    BY MS. TREPEL:

3    Q.  Do you see that there?

4    A.  I do.  Officer Thao says, "You called for EMS," and then

5    Kueng says, "Yes.  It's on the way," and then he says, "Well

6    do you want to use it at this point then," which is kind of

7    indicative that EMS is coming.  There's no point to hobble

8    at this point.

9              MR. GRAY:  What page was that, again?

10             THE WITNESS:  19.

11   BY MS. TREPEL:

12   Q.  All right.  All right.  And then earlier on 19, so the

13   part you just read was on 20, correct?

14   A.  No.

15   Q.  Page 20?

16   A.  It's 19.

17   Q.  Okay.  All right.  And so at that point when you're

18   referring to EMS, EMS is coming Code 2 at that point,

19   correct?

20   A.  Yes.  I called Code 2 for the bleeding from his mouth.

21   Q.  Okay.  And so no one has yet said anything about upping

22   the urgency of the response by the ambulance, right?

23   A.  Not at that point.  We were just kind of talking

24   through.

25   Q.  Okay.  So the decision about the hobble was made when
```

1    the ambulance was Code 2.

2    A.  I believe so, yes.

3    Q.  Okay.  All right.  Now when you and Mr. Kueng responded,

4    it was a forgery call, right?

5    A.  Yes, ma'am.

6    Q.  Not a violent crime.

7    A.  Not by book definition, but you never know situations.

8    Q.  Okay.  Well, you had no report that the suspect was

9    violent, correct, at that point?

10   A.  Not at that point.  We had information that he was

11   possibly under the influence.

12   Q.  All right.  Which is different than violent, right?

13   A.  Can be unpredictable, though, so --

14   Q.  You had no report that the suspect had a weapon of any

15   kind at that point, right?

16   A.  No, ma'am.

17   Q.  And before you when Mr. Chauvin and Mr. Kueng restrained

18   Mr. Floyd on the ground, you and Mr. Kueng had handcuffed

19   Mr. Floyd, right?

20   A.  Yes, ma'am.

21          MR. GRAY:  Objection to this cross-examination

22   dealing with the use of force and not medical services.

23          THE COURT:  Excuse me.  That's what you're talking

24   to.

25          MS. TREPEL:  Well, I'm trying to develop some

THOMAS-LANE - CROSS

1    context here about his testimony earlier, Your Honor.  I
2    don't think all of my questions need to be keyed in directly
3    to the elements of the charge.
4              THE COURT:  I'll overrule.
5              I'll let you answer.  You can answer the question
6    if you remember it.
7              THE WITNESS:  What was the question again?  Sorry.
8    BY MS. TREPEL:
9    Q.  Just that you and Mr. Kueng had already handcuffed
10   Mr. Floyd after you searched or before you had searched him?
11   A.  Yes, ma'am.
12   Q.  All right.  And you didn't recover any weapons on him,
13   correct?
14   A.  No.
15   Q.  And then after you handcuffed him, he sat down on the
16   sidewalk, right?
17   A.  Officer Kueng walked him over to the sidewalk.
18   Q.  Okay.  And you were able to observe that?
19   A.  I was more talking to them, but yeah, I seen that he was
20   seated.
21   Q.  Okay.  And you could see that he was, Mr. Floyd was
22   having an interaction with Mr. Kueng there verbally while
23   Mr. Floyd was seated on the sidewalk, correct?
24   A.  Yes, ma'am.
25   Q.  You did not see Mr. Floyd try to stand up when he was

1    seated on the ground, correct?

2    A.  I know, I remember seeing him just kind of slowly

3    sitting down.  I'm not sure about getting up, though.

4    Q.  Okay.  You didn't -- all right.  You didn't see him try

5    to escape when he was seated on the sidewalk, correct?

6    A.  No, ma'am.

7    Q.  Okay.  And you didn't see Mr. Kueng touching him or

8    holding him in place at that time, correct?

9    A.  I don't believe so.

10   Q.  Okay.  And Mr. Floyd later at the car then told you he

11   was claustrophobic and didn't want to get in the car, right?

12   A.  At some point.

13   Q.  All right.  And you previously observed that Mr. Floyd

14   seemed to you like he was freaking out when you ordered him

15   in the car, right?

16   A.  He just really didn't seem to want to get in there.

17   Like I said, at first he was wanting someone to stay with

18   him, and then he just kind of became, you know, was saying

19   that he was claustrophobic and just kind of not really

20   making a lot of sense with asking to sit in the front seat

21   and stuff like that, so --

22   Q.  Well, "freaking out" were your words to the BCA, right?

23   A.  I may have used those.

24   Q.  And then when you were trying to get Mr. Floyd into the

25   car, you could hear Mr. Floyd saying, I'm not trying to win.

1    I will get on the ground, anything, right?

2    A.  That was said.

3    Q.  All right.  Now, your plan once Mr. Floyd was restrained

4    on the ground was basically to restrain him there so he

5    couldn't move, right?

6    A.  Keep him from continuing to self harm or kind of get up

7    and fight or try and get away.

8    Q.  Right.  Keep him there so he didn't move?

9    A.  Yes, ma'am.

10   Q.  Fair enough?  Okay.  And then you first asked about

11   rolling Mr. Floyd on his side after you all had, had him

12   pinned there on the ground for about four minutes, correct?

13   A.  That sounds about right.

14   Q.  Okay.  And by the time you asked about rolling Mr. Floyd

15   on his side, Mr. Floyd was not kicking, right?

16   A.  Not at that point.

17   Q.  And by the time you asked about rolling Mr. Floyd on his

18   side, Mr. Floyd was not fighting, correct?

19   A.  Not from my position.

20   Q.  And you had heard Mr. McMillian telling him to get up

21   and get in the car, man, right?

22   A.  I think I might have heard that.

23   Q.  All right.  And you heard Mr. Floyd respond, "I will,"

24   right?

25   A.  Likely.

THOMAS - CROSS

 1    Q.  All right.  And then later Mr. Floyd said, "I can't.

 2    I'm pinned," correct?

 3    A.  I don't necessarily recall that.

 4    Q.  You heard Mr. Floyd saying he couldn't breathe, correct?

 5    A.  I did.

 6    Q.  All right.  You heard him say that multiple times,

 7    correct?

 8    A.  Yes, ma'am.

 9    Q.  More than 20 times when he was on the ground?

10    A.  I'll take your word for it.  He had said it numerous

11    times coming through the squad and when he got on the

12    ground.

13    Q.  Okay.  And specifically you heard him say, "The knee on

14    my neck, I can't breathe," correct?

15    A.  I don't know if I specifically recall that, but he was

16    yelling a lot.

17    Q.  And specifically saying different things hurt, correct,

18    his face?

19    A.  I remember saying his back hurt, everything hurts.  I

20    remember that.

21    Q.  "My neck hurts"?

22    A.  Yeah, I believe so.

23    Q.  Okay.  "My face skinned up so bad"?

24    A.  Again, I don't specifically remember that.

25    Q.  All right.  And you told the BCA investigators that you

1   saw Mr. Chauvin pinning Mr. Floyd down with his knee,

2   correct?

3   A.  I could see that he was holding him in place with his

4   knee.

5   Q.  And that was a knee to the neck area, correct?

6   A.  Yeah, neck, base of the neck.

7   Q.  All right.  And you told the BCA you had never seen or

8   been trained on that particular tactic, correct?

9   A.  With handcuffing, it is a maneuver, but just as a means

10  of keeping someone in place, no.

11  Q.  You observed that Mr. Chauvin continued pinning

12  Mr. Floyd down even after Mr. Floyd had stopped fighting or

13  kicking, correct?

14  A.  Again, it was hard to see at times, but we had just kind

15  of again held him in place, so I guess I could assume that

16  Officer Chauvin was in a similar position.

17  Q.  Well, you could see that Officer Chauvin was kneeling

18  there, right, like --

19  A.  Not throughout the entire interaction, but there was

20  moments that I could.

21  Q.  Well, and I don't mean that you had the perfect view at

22  any time, but you, Mr. Kueng and Mr. Chauvin were kneeling

23  there at Mr. Floyd's body the whole time, right?

24          MR. GRAY:  Object to that as repetitious and

25  argumentative.

1           THE COURT:  I sustain, Counsel.  It is

2     repetitious.

3     BY MS. TREPEL:

4     Q.  At the point in time that Mr. Floyd was not fighting or

5     kicking, but Mr. Floyd was still able to speak, you asked

6     about rolling Mr. Floyd on his side, correct?

7     A.  Yes, ma'am.

8     Q.  And then you said you were worried about excited

9     delirium, right?

10    A.  Yes, ma'am.

11    Q.  Okay.  And you identified what you believed would be a

12    safer position based on your training at the academy,

13    correct?

14    A.  That was something that we had been told is rolling

15    people in the side recovery position, and I was suggesting

16    that that's something we could do.

17    Q.  Okay.  So Mr. Kueng told you to just leave him, though,

18    correct?

19    A.  I remember Officer Chauvin saying, yeah, he's good like

20    this or we'll hold like this, something to that effect, and

21    that just, again, seemed to make sense at the time that we

22    have got the ambulance coming, so we'll just hold here.

23    Q.  Okay.  And Mr. Kueng also, though, said, "Just leave

24    him"?

25    A.  Again, I don't specifically remember that.  He, I mean,

THOMAS LANE - CROSS

1    it's on video.

2    Q.  Okay.  Do you want to take a look at page 23 of GA?

3    A.  Sure.

4              MR. PLUNKETT:  Your Honor, object to this.  He's

5    given his answer, and this is not an appropriate

6    recollection refreshing.

7              THE COURT:  Well, I assume that this is

8    impeachment.  I don't know.

9              MR. GRAY:  What page?

10             MS. TREPEL:  Page 23.

11             MR. GRAY:  What line?

12             MS. TREPEL:  If you go to time stamp 20:23:49,

13   Mr. Lane asking, "Should we roll him on his side?"

14             Do you see the next line there?

15             THE WITNESS:  Yes, ma'am.

16   BY MS. TREPEL:

17   Q.  Mr. Kueng saying, "No."  And then two lines down

18   Mr. Chauvin saying, "Nope," and then another line down

19   Mr. Kueng saying, "Just leave him"?

20             MR. PLUNKETT:  Your Honor, I would like an

21   instruction that the transcript is not the primary source of

22   that information.

23             THE COURT:  Yeah.  I think the jury has been

24   instructed that a number of times.  The jury will be bound

25   by what they see on the video and not what's contained

TRIAL - CROSS

1    within the transcript that has been prepared by the

2    government.

3              MR. ROBERT PAULE:  Your Honor, I would also object

4    because it appears to me that counsel is misstating the

5    evidence because she's attributing things to the order in

6    which they're written on the transcript, which are all

7    occurring at the same time or nearly.

8              THE COURT:  Well, that's the thing that we went

9    through the other day, that the order of these comments are,

10   is an order that will be heard by the jury, and they will

11   determine it according to the, what's on the actual document

12   of Exhibit 5 and not the order that's necessarily written on

13   this transcript, nor on the accuracy of the order of the

14   transcript.

15             MS. BELL:  Your Honor, I would -- this is

16   Ms. Bell.  I would like to put on the record because

17   counsel, the court may not fully understand this.  This

18   transcript was agreed upon by all of the parties.

19             THE COURT:  Counsel, that could be agreed upon.

20             MS. BELL:  Understood.

21             THE COURT:  But they may be wrong.

22             MS. BELL:  Correct.

23             THE COURT:  And that's my difficulty.

24             MS. BELL:  I understand, Your Honor.  I just want

25   to make sure that it was clear that we had agreed upon it.

1           THE COURT:  I recognized that that happened prior

2    to the commencement of this case, but I also know that the

3    jury is to be bound by the --

4           MS. BELL:  Correct.

5           THE COURT:  -- actual document and not by the

6    transcript that your office has prepared.

7           Continue.

8    BY MS. TREPEL:

9    Q.  Okay.  So, Mr. Lane, I just want to clear something up

10   from your earlier testimony.  This is in reference to

11   page 23 and this conversation about rolling him on his side

12   and excited delirium.

13          Mr. Chauvin didn't say that's why he's on his

14   stomach, correct?

15   A.  In what part?

16   Q.  In this conversation.  Anywhere in this transcript, for

17   that matter?

18   A.  That was, I believe that was later at, when I asked if I

19   said I was concerned about excited delirium, and he said,

20   "That's why we got him on his stomach."

21   Q.  Okay.  Can you show me where that is in this?

22   A.  I, it's in my memory.  I --

23   Q.  Okay.  So it didn't --

24          THE COURT:  Counsel, don't ask a witness to

25   memorize these transcripts.  He can't recall where it is.

1    He can't recall where it is.

2    BY MS. TREPEL:

3    Q.  Well, I would like to ask you, though, looking at

4    page 23, do you see a reference to that line anywhere on

5    page 23 when you're having this discussion?

6              MR. GRAY:  Object to that.  It's argumentative,

7    Your Honor, and he's answered the question.

8              THE COURT:  He has answered the question.

9              MS. TREPEL:  He answered he remembered it.  I just

10   would just like to know if he sees it here.

11             THE COURT:  Okay.  Do you see it there?

12             THE WITNESS:  I don't see it there.

13             THE COURT:  Let's move on.

14             MS. TREPEL:  Yes, Your Honor.

15   BY MS. TREPEL:

16   Q.  All right.  So you said, "I suppose," and then you left

17   Mr. Floyd in the position that he was in on his stomach,

18   correct?

19             MR. GRAY:  Object to this.  The Court asked her to

20   move on, and she's on the same subject.

21             THE COURT:  Sustained.

22   BY MS. TREPEL:

23   Q.  All right.  So at the time you chose to defer to your

24   colleagues, correct?

25   A.  In regards to?

1    Q.  Leaving Mr. Floyd where he was.

2    A.  Yes, it seemed reasonable at the time that we have an

3    ambulance coming.  Mr. Floyd's been pretty unpredictable.

4    He fought his way out of the squad.  He was self harming.

5    It seemed reasonable that we can hold here until the

6    ambulance gets here and not use the hobble because of having

7    to take it off again when the ambulance arrives.

8    Q.  And specifically hold here in the prone position,

9    correct?

10   A.  Yes, ma'am.

11   Q.  Okay.  Now, at the time you were getting the sense that

12   Mr. Floyd was starting to have a medical emergency, right?

13   A.  In regards to when?

14   Q.  After you had first said, "Should we roll him on his

15   side?"

16   A.  I was trying to assess the situation and, you know,

17   throwing ideas out that this might be an excited delirium.

18   I'm concerned about that.  I was reassured that this is,

19   he's okay, this is fine, we're just going to wait until the

20   ambulance comes, which again seemed reasonable and made

21   sense.  We had called the ambulance minutes before that

22   so --

23   Q.  And excited delirium situation is a medical situation,

24   right?

25   A.  If you know for sure that's what, yeah, if a person is

THOMAS-LANE - CROSS

```
 1    experiencing that, it can be.
 2    Q.  And that's why you were interested in assessing him,
 3    right?
 4              MR. GRAY:  Object to this as repetitious.
 5              THE COURT:  No.  I'm going to overrule that.
 6              THE WITNESS:  Could you ask again?
 7    BY MS. TREPEL:
 8    Q.  Yeah.  That's why you wanted to assess him, right?
 9    A.  Trying to assess the situation, yes, ma'am.
10    Q.  Or the medical issue, potentially?
11    A.  One of the potential issues, yes.
12    Q.  All right.  Now there came a point in time then that
13    Mr. Floyd stopped speaking, correct?
14    A.  Yes, ma'am.
15    Q.  And he was barely moving at that point, right?
16    A.  At what point?
17    Q.  At the point after he stopped speaking.
18    A.  Yes, there was still some movements, and I believe his
19    leg kicked up.  I wasn't sure if he was coming in and out of
20    consciousness at that point.
21    Q.  Okay.  And you had already taken your own hands off of
22    Mr. Floyd at that point, correct?
23    A.  Intermittently my hands were on at some times, and I
24    need a specific time if you are looking for that.
25    Q.  Point being, you didn't feel the need to keep him pinned
```

THAO - CROSS

```
 1    down with your hands at that point, correct?
 2    A.  At what point?
 3    Q.  At the point in time that Mr. Floyd stopped speaking.
 4    A.  At that point, I was just --
 5              MR. GRAY:  Object, Your Honor, as lack of
 6    foundation and how would he know if he stopped breathing?
 7              MS. TREPEL:  Speaking.
 8              MR. GRAY:  She said at the time he stopped
 9    breathing.
10              MS. TREPEL:  Mr. Gray, I said speaking.
11              MR. GRAY:  Did you say speaking?
12              MS. TREPEL:  Yeah.
13              MR. GRAY:  Oh, I thought you said breathing.
14              THE COURT:  Better restate the question.
15    BY MS. TREPEL:
16    Q.  If I remember the question, I believe I was asking you
17    at the point in time that Mr. Floyd had stopped speaking,
18    you had, you had, didn't feel the need to keep your hands
19    pinning him down at that point, correct?
20    A.  I think I had a hand just holding in place, kind of
21    making sure in case he was coming in consciousness again,
22    just kind of a holding position to make sure that he
23    couldn't continue kicking or anything like that.
24    Q.  But not pressing him down?
25    A.  I don't think I was ever really pressing him down.  It
```

1    was more just kind of holding him in place to keep him from

2    kicking.

3    Q.  Was he kicking a lot at that point?

4    A.  At what point?

5    Q.  The point in time where he's now stopped speaking and

6    you said --

7    A.  No, ma'am.

8    Q.  -- he's passing in and out of consciousness I believe is

9    your testimony.

10   A.  His leg came up once, but no, I wouldn't say kicking.

11   Q.  Okay.  We had --

12            All right.  Mr. Kueng and Mr. Chauvin remained in

13   those same spots that they were in at that time, correct?

14   A.  They were in the similar position.

15   Q.  And they had their knees on Mr. Floyd, correct?

16   A.  Officer Kueng had his knee on Mr. Floyd's hamstrings,

17   and then I believe his other one was on the ground, and then

18   I couldn't get a really good view of where Mr. Chauvin was

19   at.

20   Q.  Okay.  Could you tell that Mr. Chauvin was still holding

21   Mr. Floyd down?

22   A.  I believe he was holding him in place.

23   Q.  Using his knees, correct?

24   A.  He had been using --

25            MR. GRAY:  She just asked the question, and he

1    said he didn't know.

2           MS. TREPEL:  I was clarifying what he did and

3    didn't know, Your Honor.

4           THE COURT:  Well, when he denies knowledge, he

5    denies knowledge.  I sustain.

6    BY MS. TREPEL:

7    Q.  All right.  Now, you heard a person on the sidewalk say

8    he's about to pass out, correct?

9    A.  I believe I heard that.

10   Q.  And then right after that you said, "I think he's

11   passing out"?

12   A.  Yes, ma'am.

13   Q.  And Mr. Floyd wasn't resisting at that point, correct?

14   A.  No, ma'am.

15   Q.  All right.  And after you said you believe Mr. Floyd had

16   passed out, you didn't choose to stand up, correct?

17   A.  Not at that point.

18   Q.  All right.  You didn't say, hey, the plan was to pin him

19   here so he couldn't move and now he's passed outside out so

20   he's not moving?

21          MR. GRAY:  Object to that as argumentative.

22          THE COURT:  It is argumentative, Counsel.

23   BY MS. TREPEL:

24   Q.  All right.  Now at 8:25 p.m. after you said you thought

25   Mr. Floyd was passing out, you again asked, "Should we roll

1    him on his side," correct?

2    A.  At what time?

3    Q.  8:25?  I'm sure there are some seconds there, too.

4    A.  Okay.  39.

5    Q.  Yep.

6    A.  Yes, ma'am.

7    Q.  Okay.  And so that was two minutes after the first time

8    you asked about rolling him on his side, correct?

9    A.  Yes, ma'am.

10   Q.  All right.  And at the same time the people on the

11   sidewalk were saying things like, "He's not responsive right

12   now," and, "Check for a pulse," correct?

13            MR. GRAY:  If you recall.

14            THE WITNESS:  Yeah, I would, it's hard to put a

15   time frame with that, the statements of the bystanders at

16   that point.

17   BY MS. TREPEL:

18   Q.  Okay.  I'd like to show the witness what has been

19   admitted as Government Exhibit 5, starting at 20:25:38.

20            MR. GRAY:  Excuse me, Your Honor.  I object to

21   this.  They've already played this oral video of the

22   yelling.  I think it's prejudicial.

23            MS. TREPEL:  Your Honor, I'm --

24            THE COURT:  Yeah, I am going to sustain this.

25   This is repetitious, Counsel.  We have seen this before.

TROELL-CROSS-CROSS

```
 1                MS. TREPEL:  It was directly in response to the
 2       fact that the witness just testified he didn't recall.
 3                THE COURT:  Counsel, we don't need to argue about
 4       it.  I sustained the objection.
 5       BY MS. TREPEL:
 6       Q.  Okay.  All right.  You could hear the people on the
 7       sidewalk with raised voices, correct?
 8                MR. GRAY:  Object to that as repetitious.
 9                THE COURT:  It is.  We just went over that.
10       BY MS. TREPEL:
11       Q.  When you asked about rolling Mr. Floyd on his side,
12       Mr. Chauvin didn't tell you no, correct, the second time?
13       A.  I don't believe he did at that time.
14       Q.  Okay.  And neither did Mr. Kueng, correct?
15       A.  I don't believe so.
16       Q.  No one actually responded to you, correct?
17                MR. ROBERT PAULE:  I would object.  That assumes
18       facts not in evidence that my client perhaps heard of it.
19                THE COURT:  I'll let it -- he may answer if he
20       knows.
21                THE WITNESS:  What was it again, ma'am?
22       BY MS. TREPEL:
23       Q.  You didn't hear anyone repeat, respond to your question
24       about should we roll him on his side the second time?
25       A.  No, ma'am.
```

```
1    Q.  And you chose not to repeat that question, correct?

2    A.  I did not.

3    Q.  All right.  You also chose not to follow up and explain

4    why you thought Mr. Floyd should be rolled on his side at

5    that point?

6              MR. GRAY:  Object to that as argumentative.

7              THE COURT:  Counsel, that is argumentative.  These

8    are the things that you are making up, not the statements of

9    this client or this witness.

10   BY MS. TREPEL:

11   Q.  So after that, after the second time, you asked about

12   rolling Mr. Floyd on his side, you asked Mr. Kueng to check

13   his pulse, right?

14   A.  I did.

15   Q.  Okay.  And that was about a second after Ms. Hansen

16   said, "Does he have a pulse?  Okay.  Check for a pulse.

17   Please check for a pulse," correct?

18   A.  It may have been in response to that.

19   Q.  And then Mr. Kueng twice said, "I can't find one,"

20   correct?

21   A.  Yes.  I saw Officer Kueng, he checked almost mid forearm

22   where when he was attempting to check Mr. Floyd's pulse, and

23   he just said he couldn't find one.  So yes.

24   Q.  And then you also tried to take a pulse, too, correct,

25   on Mr. Floyd's ankle?
```

1    A.  That was I believe a little later.  I was kind of trying

2    to assess the situation of, you know, what was going on

3    here, check for breathing.  And then I checked for an ankle

4    pulse, and, yeah, I had checked on his left ankle, I

5    believe.

6    Q.  And you heard Mr. Kueng twice say he couldn't find one,

7    correct?

8              MR. GRAY:  Object to that.  She's asked that, and

9    that was before he said that anyway, Your Honor, before he

10   checked the ankle pulse.  She's gone over it twice.

11             THE COURT:  I sustain that.

12   BY MS. TREPEL:

13   Q.  When Mr. Kueng told you he couldn't find the pulse, you

14   couldn't hear the sirens yet, correct?

15   A.  I couldn't see the ambulance.

16   Q.  You -- one second.  I've lost my timeline.  Sorry about

17   that.

18             Okay.  All right.  Now after you checked the ankle

19   pulse, after Mr. Kueng checked, you didn't stand up and try

20   to take Mr. Floyd's carotid pulse, correct?

21             MR. GRAY:  Object to that as argumentative, Your

22   Honor.

23             THE COURT:  Well, I'm going to overrule.  He can

24   say yes or no to it.

25             THE WITNESS:  After what was it?

1   BY MS. TREPEL:

2   Q.  After you and Mr. Kueng checked Mr. Floyd's pulse.

3   A.  I think almost immediately after I checked his ankle

4   pulse, I could see the ambulance turn, and I could hear it

5   before that.  I think they had called out in between.  When

6   Kueng the second time said he was unable to find a pulse,

7   the radio called out and said that the ambulance is four

8   blocks away or three blocks away.

9            So right after I checked the ankle pulse I could,

10  I could see the ambulance turn, and it was about a block,

11  block and a half away.

12  Q.  And there was about a minute and a half between when

13  Mr. Kueng first couldn't find a pulse and the ambulance

14  arrived, correct?

15  A.  I'm not sure.  If that's what the timeline says.  It

16  didn't feel like that.

17  Q.  And during that time, no one took a carotid pulse,

18  correct?

19  A.  I don't believe so.

20          MR. GRAY:  Object to that as repetitious.

21          THE COURT:  Sustained.

22  BY MS. TREPEL:

23  Q.  All right.  Now, Mr. Smith leaned over and took a

24  carotid pulse when Chauvin was still kneeling on Mr. Floyd,

25  correct?

```
1    A.  Yes.  After I directed him to check on Mr. Floyd, he

2    walked over and was able to just lean in and feel a carotid

3    pulse.

4    Q.  And now before Mr. Smith got there, you could see that

5    Mr. Chauvin's knee was still on Mr. Floyd, correct?

6              MR. GRAY:  Object to that as repetitious.

7              THE COURT:  No.  That's overruled.

8              Answer.

9              THE WITNESS:  At that point, yeah, I could see

10   that he had just been, again was just, appeared to be

11   holding Mr. Floyd in place, and his knee was (indicating) on

12   the, one of the shoulders, on the base of the neck area, in

13   between there.

14   BY MS. TREPEL:

15   Q.  And that was when -- and you couldn't find a pulse on

16   Mr. Floyd, correct?

17             MR. GRAY:  Object to that, Your Honor.  She's

18   asked that now four times.

19             THE COURT:  I sustain.  You were talking about a

20   different thing than that on his, on his checking a pulse

21   before.  So I sustain the objection.

22   BY MS. TREPEL:

23   Q.  Now, at any time that, after the point where Mr. Kueng

24   first said he couldn't find a pulse, you did not say

25   anything at all to Mr. Chauvin at that, after that point,
```

1    correct?

2              MR. GRAY:  Object to that as a misstatement of the

3    testimony.  He did.

4              THE COURT:  I don't know.  The witness can answer.

5              THE WITNESS:  What was the question again?

6    BY MS. TREPEL:

7    Q.  At any time after Mr. Kueng could not find a pulse, you

8    did not say anything to Mr. Chauvin, correct?

9    A.  I talked with him about when the ambulance called out.

10   I wasn't sure what they had said.  They said the ambulance

11   is at 36th and Park or something and advised something that

12   I didn't hear what they said, and I ask they advised what.

13             And I think Officer Chauvin or someone had said

14   they advised Code 3, and then Officer Chauvin told one of us

15   to acknowledge that on the radio.

16   Q.  So a discussion about the ambulance?

17   A.  That was, that was what we talked, yeah.

18   Q.  Not about getting Mr. Chauvin off of Mr. Floyd, correct?

19   A.  At that point, no.

20   Q.  And you did not at any time that Mr. Floyd was on the

21   ground begin CPR, correct?

22             MR. GRAY:  Object to that as repetitious.

23             THE COURT:  It is repetitious.  You covered that.

24   BY MS. TREPEL:

25   Q.  At the point when the paramedics arrived, you had not

```
 1    done anything to take off Mr. Floyd's handcuffs to make it
 2    easier for anyone to begin CPR; is that correct?
 3                MR. GRAY:  Object to that as argumentative.
 4                THE COURT:  It is argumentative.
 5    BY MS. TREPEL:
 6    Q.  At the point that the paramedics arrived, you had not
 7    turned Mr. Floyd on his side, correct?
 8                MR. GRAY:  Argumentative again and repetitious.
 9                THE COURT:  That's repetitious.
10    BY MS. TREPEL:
11    Q.  All right.  I think you testified earlier that about
12    asking Mr. Chauvin about whether you should get another
13    squad to the scene, correct?
14    A.  Yes, ma'am.
15    Q.  Okay.  And at that point the ambulance was already on
16    the scene, right?
17    A.  Yes, I believe so, ma'am.
18    Q.  Okay.  So and that was when the people on the
19    sidewalk -- sorry.  Scratch that.
20                That was, the paramedics were there, and they had
21    taken Mr. Floyd onto the stretcher, correct?
22    A.  I believe it was before that.
23    Q.  Okay.  But when the paramedics arrived, they did, you
24    all helped move Mr. Floyd to the stretcher, right?
25    A.  Yes, ma'am, but I had asked about the car I believe.
```

THOMAS-LANE-CROSS

```
1    Q.  Yeah.  No.  Just clarifying.  Understood.
2              At that time that you moved Mr. Floyd onto the
3    stretcher, his body had, he was limp, correct?
4    A.  Yes, ma'am.
5    Q.  Okay.  And you knew that Mr. Floyd had been speaking
6    minutes earlier, correct?
7    A.  Correct.
8    Q.  Okay.  And the people on the sidewalk were also standing
9    there when the paramedics and you all moved Mr. Floyd onto
10   the stretcher, correct?
11   A.  Yes, ma'am.
12   Q.  They could see that too from their position, correct?
13   A.  Yes, ma'am.  Probably not all of them.  Some could.
14   Q.  But some of them.  But you'd agree it might make a
15   person angry when they see someone die in front of them,
16   correct?
17              MR. ROBERT PAULE:  Objection.  That's
18   argumentative and prejudicial, Your Honor.
19              THE COURT:  I sustain on both grounds.
20   BY MS. TREPEL:
21   Q.  All right.  Now initially as we discussed, there was a
22   Code 2 call to EMS, correct, because of the mouth injury?
23   A.  Yes, ma'am.  I had called that.
24   Q.  And then about a minute and a half later, Mr. Thao
25   increased the urgency of the call to a Code 3, correct?
```

THAO - CROSS

```
 1    A.  He'd asked what, what level the ambulance was coming,

 2    Code 2 or 3, and I said 2, but we could probably step it up.

 3    Q.  All right.  And then that was done, right?

 4    A.  I believe so.  He walked away.  I didn't hear him call

 5    it in.

 6    Q.  And could you hear any of the dispatch communications

 7    over your radio?

 8    A.  I don't remember hearing it.

 9    Q.  Did you provide any additional information to dispatch

10    about Mr. Floyd's condition?

11    A.  No, ma'am.

12    Q.  Did you hear anyone else provide additional information

13    to dispatch about Mr. Floyd's condition over the radio?

14              MR. GRAY:  Object to that as irrelevant and also

15    vague.  At what time are we talking about here, the

16    beginning, end, middle or what?

17              THE COURT:  No.  I'm going to overrule.  He can

18    answer whether or not he heard anybody else talk to

19    dispatch.

20              THE WITNESS:  I didn't hear Officer Thao make the

21    call for Code 3.  It's -- being a newer officer, that's one

22    of the hard things to do is be able to listen to your radio

23    and do things around you.  It's something I kind of struggle

24    with still.

25
```

```
 1      BY MS. TREPEL:
 2      Q.  All right.  And you yourself did not let dispatch know
 3      that you were expecting -- you were suspecting excited
 4      delirium might be at play, correct?
 5      A.  I just know that Officer Thao increased the ambulance to
 6      Code 3 and said he was going to do that.
 7      Q.  And by the time the paramedics had arrived at the scene,
 8      you had observed that Mr. Floyd had stopped talking, right?
 9      A.  Correct.
10      Q.  Stopped moving?
11              MR. GRAY:  Object to this as repetitious.
12              THE COURT:  It is, Counsel.  I sustain.
13      BY MS. TREPEL:
14      Q.  The ambulance got there about seven and a half minutes
15      after the original Code 2 call, correct?
16      A.  I'm not sure of the timeline.
17      Q.  Well --
18      A.  If that's what that says, I mean, I'll take your word
19      for it.
20      Q.  All right.  And when the paramedics arrived, then you
21      could see that Mr. Floyd was still facedown and handcuffed
22      and being restrained by Mr. Chauvin, correct?
23              MR. GRAY:  Object to this as repetitious.
24              THE COURT:  Counsel, it is repetitious.  We've
25      been over and over it.
```

THOMAS - CROSS

1    BY MS. TREPEL:

2    Q.  Well, the paramedics weren't there to see that Mr. Floyd

3    had stopped talking in your custody, right?

4              MR. GRAY:  Object to this, Your Honor.  It's

5    repetitious.

6              THE COURT:  It is repetitious, Counsel.  We're

7    just going over the same territory over and over again.

8    We've been there.

9    BY MS. TREPEL:

10   Q.  All right.  You told the paramedics that he's not

11   responsive right now, correct?

12   A.  Yes, ma'am.

13   Q.  All right.  And you didn't tell the paramedics you

14   couldn't find a pulse, correct?

15             MR. GRAY:  Object to that as argumentative, Your

16   Honor.

17             THE COURT:  That is argumentative.

18   BY MS. TREPEL:

19   Q.  Mr. Smith said to get out of the way, as you were all

20   lifting Mr. Floyd onto the stretcher; is that right?

21   A.  Yes, I believe so.

22   Q.  He didn't tell anyone to get out of the way the moment

23   that he arrived on the scene, correct?

24             MR. GRAY:  What was that?  Object to that as

25   argumentative, too.

1          THE COURT:  Well, the jury will recall when the

2     statement was made.

3     BY MS. TREPEL:

4     Q.  All right.  So at the point in time that Mr. Smith

5     arrived, he was walking into a police scene at that point,

6     correct?

7     A.  He was responding to the call.

8     Q.  All right.  And where an officer was still actively

9     using force on a person in custody, right?

10    A.  Define "force."

11    Q.  Well, kneeling on a person with body weight.

12    A.  Holding someone that -- yes, ma'am.

13    Q.  All right.  Now you are trained that excited delirium

14    can be a dangerous situation for someone in custody, right?

15    A.  Can be.

16    Q.  And you were trained specifically to place a person in

17    the side recovery position in those circumstances, right?

18    A.  I, from what I remember from the excited delirium

19    training, the best case thing to do is keep the person from

20    thrashing, hold them in place.  From hearing testimony now,

21    I know it's ketamine, but I remember them saying there's

22    something that EMS can do to counteract the situation or

23    prevent them from having issues with it.

24    Q.  And until then you as a police officer want to hold

25    someone in place safely, right?

THOMAS LANE - CROSS

```
 1                 MR. GRAY:  Object to this as repetitious.
 2       Argumentative, too.
 3                 THE COURT:  Yeah, it is argumentative, Counsel.  I
 4       sustain.
 5       BY MS. TREPEL:
 6       Q.  Well, you said out loud, "Should we roll him on his
 7       side," when you were worried about the excited delirium,
 8       right?
 9                 MR. GRAY:  Object to this as repetitious.  We have
10       gone over it.
11                 THE COURT:  We have, Counsel.  I sustain.
12       BY MS. TREPEL:
13       Q.  And you are trained that when someone experiences
14       cardiac arrest, no matter what the cause, you start CPR,
15       correct?
16                 MR. GRAY:  Object to that, Your Honor, as
17       repetitious.  We've gone over that.
18                 THE COURT:  I'm going to overrule.  That may
19       stand.
20                 THE WITNESS:  When the situation allows that you
21       should start CPR as soon as possible.
22       BY MS. TREPEL:
23       Q.  All right.  Now you didn't take any steps to provide
24       medical aid from the position that you were in from behind
25       the squad car, correct?
```

```
 1                MR. GRAY:  Object to that as argumentative.

 2     Repetitious.

 3                THE COURT:  It is, Counsel.

 4     BY MS. TREPEL:

 5     Q.  Well, you were talking about when the scene allows.  Let

 6     me ask you:  Turning Mr. Floyd on his side wouldn't have

 7     required you to move out from behind the squad car, correct,

 8     to another position on the scene?

 9     A.  Not necessarily, but it just creates a situation where

10     he could start kicking again a lot easier, if that was --

11     Q.  Well, I'm talking about your position on the scene, but

12     let me follow up on that.  You could put someone in the side

13     recovery position and hold them in place on their side,

14     correct?

15     A.  It's more difficult on their side.  People have a lot

16     more leverage and can move their legs more.

17                MR. GRAY:  Speak into the mic.

18                THE WITNESS:  Oh, sorry.

19     BY MS. TREPEL:

20     Q.  All right.  But it's possible?

21     A.  Possible.

22     Q.  And my earlier question was about turning Mr. Floyd on

23     his side wouldn't have required you to move out from behind

24     the cover of the squad car, right?

25     A.  I wouldn't say I was really in cover.  I wasn't thinking
```

1   about it like that.

2   Q.  So it wouldn't have changed your position in terms of

3   the safety of the scene, correct?

4               MR. GRAY:  Object to this as repetitious.  Just

5   asked it.

6               THE COURT:  I think you just asked that question,

7   Counsel.

8               MS. TREPEL:  I wanted to make sure we were talking

9   the same language.

10              THE COURT:  I think you are.

11              MS. TREPEL:  All right.  All right.  All right.

12  BY MS. TREPEL:

13  Q.  So same thing was providing CPR, right?  It wouldn't

14  have required you to move to a different position on the

15  scene from behind the squad car, right?

16  A.  No.  It would involve taking the handcuffs off, and, you

17  know, you could provide CPR right there.

18  Q.  Okay.  And that would have increased Mr. Floyd's safety,

19  correct?

20  A.  In that -- his safety?

21  Q.  Yes, his health, his safety.

22  A.  The CPR?

23  Q.  Yeah.

24  A.  Yes, ma'am, if that had been a good situation where we

25  could have done it, that we would have started CPR

```
 1    immediately in an ideal situation.

 2              MS. TREPEL:  One moment, please.

 3              (Counsel confer)

 4              MS. TREPEL:  No further questions.

 5              THE COURT:  Thank you.

 6              Mr. Gray.

 7              MR. GRAY:  Thank you, Your Honor.

 8                    REDIRECT EXAMINATION

 9    BY MR. GRAY:

10    Q.  Mr. Lane, with respect to this book, the green book

11    about the EMRs and that, any time, is it true that in that

12    book any time that they say you should do something as long

13    as it is safe and reasonable?

14              MS. TREPEL:  Objection.

15              MR. GRAY:  Is that what it says?

16              MS. TREPEL:  Objection.  Leading.

17              THE COURT:  It's introductory.  You may answer.

18    BY MR. GRAY:

19    Q.  What does it say in that book, without going through the

20    whole thing, about when you do perform CPR or anything like

21    that, what does it say?

22    A.  Scene safety is always the priority.  You are not going

23    to do anything until you know that kind of what we were

24    taught, that's -- they have a lot of triage and military

25    stuff in there, so there's no point or you're not supposed
```

```
 1     to like take care of someone if you could be injured

 2     yourself and stuff.

 3               So it's always about scene safety.  That carried

 4     through almost all of our training and scenarios.

 5     Everything is about scene safety first.

 6     Q.  Because when you're a police officer, you want to be

 7     able to go home at night after work; is that right?

 8               MS. TREPEL:  Objection.

 9               THE WITNESS:  Yes, sir.

10               THE COURT:  Sustained.

11     BY MR. GRAY:

12     Q.  Okay.  Now the timeline we have Exhibit L4.  Do you have

13     it there, sir?

14     A.  Yes.

15     Q.  That's this -- I offered into evidence and it was

16     accepted.  Let's go through that.

17               We don't have one for each juror, but at 8:25:13

18     according to this timeline was when you said Lane says he's

19     breathing, correct?

20               MS. TREPEL:  I'm going to object as repetitious.

21     Mr. Gray --

22               MR. GRAY:  Well, Your Honor, I didn't show this

23     yet.  I suppose I could put it on here go through them.

24               MS. TREPEL:  He went through the entire timeline

25     as you stated earlier.
```

1          THE COURT:  I'm sorry.  I don't think he did.

2     I've never seen the document, so I don't know.

3          MS. TREPEL:  He verbally went through it all.

4          MR. GRAY:  Not all of it, Counsel.

5          MS. TREPEL:  It's your words.

6          THE COURT:  I have no idea what it is, so I can't

7     help you.

8          MR. GRAY:  I'll give you -- I'm sorry, Judge.

9     You're going to get one.  It's one of my exhibits that was

10    admitted.

11         THE COURT:  Yeah.  I know it was received.  I just

12    haven't seen it.

13    BY MR. GRAY:

14    Q.  This was received into evidence, Mr. Lane, and there was

15    a substantial amount of repetitious questions about the

16    timeline from when you said, "He is breathing."

17              And are these timelines accurate as far as the

18    video and audio is concerned, and I think that would be

19    five, the video, so this is five, would come off the

20    transcript, the 5A.

21    A.  Yes, sir.

22    Q.  And you say, "He's breathing."  And that was when you

23    checked up, you saw his back; is that right?

24         MS. TREPEL:  Objection.  Leading.

25         MR. GRAY:  Why did you say, "He is breathing," on

1    this, sir?

2              THE WITNESS:  I think I had heard someone in the

3    crowd say he's not breathing, and that was something I could

4    visually check and see that it was.  A lot of times people

5    on force scenes or like some of the overdose calls I've been

6    to, they --

7    BY MR. GRAY:

8    Q.  Why did you say he's breathing, sir?

9    A.  Because I could see that he's breathing.

10   Q.  Where did you see that from?

11   A.  I could see it on his back lat, lat muscle, as you could

12   see the rise and fall.

13   Q.  And according to the exhibit, 26 seconds later, a half a

14   minute, you suggested again to roll Mr. Floyd on his back,

15   correct?

16   A.  Onto his side, yes, sir.

17   Q.  Excuse me.  On his side?

18             THE COURT:  Counsel, I'm going to interrupt.  I

19   think that this jury has seen and heard all of these factors

20   that are involved here.  This is an exhibit that's in

21   evidence, and the jury can review the timeline --

22             MR. GRAY:  All right.

23             THE COURT:  -- in their deliberations, and I think

24   it's just repetitious and taking up too much time.

25             MR. GRAY:  Okay.  I agree.  Thank you.

1    BY MR. GRAY:

2    Q.  So -- one last question:  In the use of force policy

3    that you learned, and I believe this was an exhibit, do you

4    remember learning officers shall use reasonableness, sound

5    tactics and available options during encounters to maximize

6    the likelihood that they can safely resolve the situation?

7              Do you remember reading that?

8    A.  Yes, sir.

9    Q.  Were you taught that at the academy?

10   A.  Yeah.  Just kind of the general concept of use of force

11   and then different tactics and reasonableness and going --

12   Q.  Thank you, sir.

13             MR. GRAY:  That's all I have, Judge.

14             THE COURT:  Thank you.

15             MS. TREPEL:  No further questions.

16             THE COURT:  Okay.  Thank you very much.  You may

17   step down.

18             THE WITNESS:  Thank you, sir.

19             THE COURT:  Thank you.

20             MR. GRAY:  Oh.  Defendant Tom Lane rests, Your

21   Honor.  Thank you.

22             THE COURT:  Okay.  You may step down.

23             Lane has rested.

24             Is there rebuttal?

25             MS. BELL:  There is not, Your Honor.

1              THE COURT:  Okay.  Thank you.

2         Well, members of the jury, there are a number of

3    things for me to talk to you about right now.

4         The first thing I'm going to talk about is to

5    Juror Number 65.

6         Sir, because of the family commitment that you

7    have, the Court is going to excuse you from further service

8    with respect to the case.  I think that will run itself

9    fully into a potential family conflict.  So you can be

10   excused.

11        I'm going to suggest that you might want to step

12   out at this point, go to the jury room and get your box and

13   any other personal items that you have there, bring them to

14   my office so that you and I can have a little chat in a few

15   minutes, but in the meantime you will ride home or ride with

16   the marshal service on your way.

17        And I do give you caution now not to have any

18   discussion with your fellow jurors with respect to the case

19   in any way, shape or form.  And with that, you can be

20   excused.

21        Now, to the other jurors, we're going to stand in

22   recess at this time until 9:30 tomorrow morning.  At that

23   time when you return, you will hear the summations by

24   counsel.  At the conclusion of the summations, you will then

25   receive the instructions of the Court as the law applicable

1    to the case, and after that you will retire to commence your

2    deliberations with respect to the case.

3           Now, instructions for you:  Number one, keep an

4    open mind with respect to the case because you have not

5    heard the summations.  You have not heard the Court's

6    instructions of the law that's applicable to the case, and

7    so while you've heard the evidence, there is still major

8    factors that you have not heard, so keep an open mind with

9    respect to the case.

10           The second thing is, as we go into recess tonight,

11    again, don't read or listen to any media accounts with

12    respect to the case.  Don't carry out any personal

13    investigations.  Don't read or follow up on anything on the

14    internet and that type of thing, and don't have any

15    discussions with any third persons with respect to the case.

16           And with those cautionary instructions, we wish

17    you a good evening, and we will look forward to seeing you

18    tomorrow at 9:30.

19           The jury may be excused.

20    (3:14 p.m.)

21                        **IN OPEN COURT**

22                      **(JURY NOT PRESENT)**

23           THE COURT:  Okay.  Counsel, let's take a few

24    minutes recess at this time.  I'm going to ask --

25           I'll just let you pass those out.

1    I'm going to ask that Ms. Terry pass out the

2    proposed instructions with respect to the matter.  I'll give

3    you a few minutes to read over those instructions, and in a

4    few minutes we will call you back into chambers for any

5    further discussions with respect to the same.

6    At this point, we are in recess for the day, and

7    I'll formally see you tomorrow morning at 9:30.

8    We are in recess.

9                              * * * * *

10   (Court adjourned at 3:15 p.m., 02-21-2022.)

11                            *   *   *

12   I, Renee A. Rogge, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above-entitled matter.

15                    Certified by:  /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR
16

17

18

19

20

21

22

23

24

25